# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KIMBERLEY A. BAILEY

        Plaintiff,

vs.

COMMERCE INSURANCE
SERVICES, INC.,
a New Jersey corporation

        Defendant.

Civil No. 05-CV-183 (SLR)

Civil Action

---

## DEFENDANT COMMERCE INSURANCE SERVICES, INC.'S APPENDIX TO ITS OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### VOLUME I

---

POTTER ANDERSON & CORROON LLP
Wendy K. Voss (I.D.# 3142)
Sarah E. DiLuzio (I.D. # 4085)
1313 N. Market Street
Wilmington, DE 19801
Telephone (302) 984-6000
wvoss@potteranderson.com
sdiluzio@potteranderson.com

BROWN & CONNERY, LLP
William M. Tambussi, Esq.
Susan M. Leming, Esq.
William F. Cook, Esq.
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108
(856) 854-8900

Attorneys for Defendant
Commerce Insurance Services

Dated: May 1, 2006

## TABLE OF CONTENTS - APPENDIX

| Ex. | Description | Page |
|-----|-------------|------|
| CIS-1 | Plaintiff's Deposition Transcript | A1 |
| CIS-2 | Plaintiff's Answers to Interrogatories | A91 |
| CIS-3 | Plaintiff's Letter of April 3, 2003 | A108 |
| CIS-4 | Email Correspondence of April 3, 2003 from Plaintiff to Thomas Marconi | A113 |
| CIS-5 | April 17, 2003 Email Correspondence Between Plaintiff and Bruce McKelvy | A116 |
| CIS-6 | Code of Ethics Form | A118 |
| CIS-7 | Memorandum of June 3, 2003 from CIS to Plaintiff | A120 |
| CIS-8 | Email Correspondence of August 7, 2003 Between Plaintiff and Deb Watson | A122 |
| CIS-9 | CIS Answers to First Set of Interrogatories | A124 |
| CIS-10 | Email Correspondence of July 18, 2003 Between Plaintiff and Mary Corcoran | A141 |
| CIS-11 | Email Correspondence of August 26, 2003 From Valerie Oakes to Mary Corcoran | A143 |
| CIS-12 | Plaintiff's Termination Letter | A145 |

EX. CIS-1

DEPOSITION TESTIMONY OF PLAINTIFF

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KIMBERLEY A. BAILEY,                )
                                    )
            Plaintiff,              )
                                    )
v.                                  )     Civil Action No.
                                    )       05-CV-183 SLR
COMMERCE NATIONAL INSURANCE         )
SERVICES, INC., a New Jersey        )
Corporation,                        )
                                    )
            Defendant.              )

            Deposition of KIMBERLEY A. BAILEY taken
pursuant to notice at the law offices of Potter Anderson
& Corroon, LLP, 1313 N. Market Street, 6th Floor,
Wilmington, Delaware, beginning at 9:20 a.m. on January
27, 2006, before Vincent J. Bailey, Registered
Professional Reporter and Notary Public.

APPEARANCES:

            THOMAS C. MARCONI, ESQ.
            LOSCO & MARCONI, P.A.
                1813 N. Franklin Street
                Wilmington, Delaware  19899
                for the Plaintiff,

            WILLIAM M. TAMBUSSI, ESQ.
            BROWN & CONNERY, LLP
                360 Haddon Avenue
                Westmont, New Jersey  08108
                for the Defendant.

ALSO PRESENT:
      Deborah Watson
--------------------------------------------------------
                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                 C.A. # 05-CV-183 SLR                 Bailey, Kimberly A. - Vol. 1

Page 2

1          KIMBERLEY A. BAILEY,
2      the deponent herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5               EXAMINATION
6   BY MR. TAMBUSSI:
7      Q.  Good morning, Ms. Bailey.  As you know, my name
8   is William Tambussi.  I'm with the Brown & Connery law
9   firm.  I represent Commerce Insurance in an action that
10  you brought against them.  We are here today to take your
11  deposition, which is your testimony under oath to ask you
12  some questions about the claim that you have brought and
13  the facts supporting that claim.
14          Have you ever been in this situation
15  before?
16     A.  No, I have not.
17     Q.  Okay.  I do this a lot, so I become comfortable
18  with it, recognizing that you have not --
19     A.  I am not comfortable.
20     Q.  Okay.  I want to give you a couple instructions
21  first, to let you know what we are doing.  I'm sure that
22  your attorney has given you the same instructions, but we
23  are going to do it now on the record.  That's important
24  to note, because everything that we say in this question

Page 3

1   and answer session will be recorded by the court reporter
2   to my right and your left.
3          For that reason, it's important that all of
4   your responses be verbal.  The court reporter cannot
5   record a shake of the head or sounds that people make
6   that typically indicate a yes or a no.
7      A.  Okay.
8      Q.  If I remind you about that, it's not because I'm
9   trying to be rude, but it is simply that we are trying to
10  make sure that the record is clear and complete.
11     A.  All right.
12     Q.  Now, you have just been sworn under oath, so
13  that all the testimony that you give today must be
14  truthful.  You understand that?
15     A.  Yes, I do.
16     Q.  Okay.  The other thing is my voice tends to be
17  low and that doesn't make the court reporter too happy --
18     A.  I'm very hard of hearing, too.
19     Q.  If you can't hear my question or understand my
20  question, just tell me.
21     A.  Okay.
22     Q.  If you need me to rephrase or repeat my
23  question, please tell me that also.
24     A.  Okay.

Page 4

1      Q.  I'm going to ask you to try to keep your voice
2   up, also.
3          During the course of the deposition I may
4   ask a question and your attorney may object.  Stop.
5   Don't answer my question.  Wait for your attorney to put
6   his objection on the record and then we will go from
7   there --
8      A.  All right.
9      Q.  -- get instructions from your attorney.
10         If at any time during the course of this
11  deposition you need to take a break, for whatever reason,
12  you want to stretch your legs, just need to get a breath
13  of fresh air, just tell me.  The only proviso to that is
14  if I have a question pending, you have to answer it first
15  before we take a break.
16     A.  Good enough.
17     Q.  Now, if you answer one of my questions, I'm
18  going to assume that you have understood it.  So if
19  there's any doubt that you have with my question, please
20  tell me and let me know that.  If you don't recall an
21  answer to a question, simply say I don't recall.  I don't
22  want you to guess or speculate.  We are looking for facts
23  here, not, you know, rumors or conjecture.
24         If you need to estimate by way of a time

Page 5

1   frame or otherwise, please tell me ahead of time that you
2   are estimating, if you don't know for a fact.
3      A.  Okay.
4      Q.  Okay.  Are you presently under any medications
5   or anything that would impair your ability to hear and
6   understand my questions today?
7      A.  No, I am not.
8      Q.  Are you taking any medications today?
9      A.  Birth control.
10     Q.  Okay.  All right.  Anything else?
11     A.  No.
12     Q.  Now, prior to today's deposition did you review
13  anything in preparation?
14     A.  No.  Not exactly, no.
15     Q.  Well, you said "not exactly," so you qualified
16  your answer.  Does that mean you reviewed some things?
17     A.  Besides what we looked at yesterday, no.  We
18  haven't really -- we haven't reviewed any of the prior
19  documents or anything like that.  I haven't gone over the
20  file to review.  No, I have not.
21     Q.  All right.  One of the other instructions I want
22  to give you is that -- and I'm sure your attorney will
23  interject if I get to that point.  I'm not interested in
24  the discussions that you may have that are privileged

2 (Pages 2 to 5)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 1

Page 6

1    because they are with your attorney.
2        A. Okay.
3        Q. I just want to get the parameters and facts. So
4    I'm not going to ask you what your attorney said to you
5    in that context or what you said to him.
6            Now, you said you reviewed some things
7    yesterday. What did you review?
8        A. The review that was yesterday was from the
9    mediation and that was just the form that Tom had
10   presented to the judge, I guess that was our form.
11   That's private or confidential between Tom and I. That
12   has nothing to do with what you said earlier, but it was
13   just with reference to the mediation.
14       Q. You reviewed the mediation statement that was
15   submitted confidentially on your behalf?
16       A. Yes.
17       Q. Have you reviewed any other documents?
18       A. No, I have not.
19       Q. All right. Have you spoken to anyone other than
20   your attorney or anyone on his staff regarding this
21   deposition?
22       A. My husband.
23       Q. Okay. Your husband's name?
24       A. Russell Small.

Page 7

1        Q. When did you speak with your husband about the
2    deposition?
3        A. I believe basically we have been, basically been
4    talking about it as the weeks have progressed. Probably
5    the last week we have been talking about it mostly.
6        Q. Did you discuss with your husband any documents?
7        A. No.
8        Q. Did you show him any documents?
9        A. No.
10       Q. Did you have any discussions with your husband
11   where you related any conversations that you had with
12   anybody that was employed by Commerce?
13       A. I can't — please repeat the question.
14       Q. Sure. You had some discussions with your
15   husband leading up to these proceedings, correct?
16       A. Yes.
17       Q. Okay. In those discussions did you tell him
18   that someone from Commerce told you whatever?
19       A. I don't think I really — I did not relay any
20   hearsay to him, no.
21       Q. What do you mean by "hearsay"?
22       A. Someone told me something, so I told him.
23       Q. Okay.
24       A. No, I didn't.

Page 8

1        Q. All right. Now, did you become aware of any
2    hearsay statements — did somebody talk to you about
3    certain things that you specifically did not relate to
4    your husband?
5        A. From Commerce?
6        Q. From Commerce.
7        A. No.
8        Q. Okay. So when you say you didn't relate any
9    hearsay, what is the hearsay you are referring to?
10       A. If my husband and I had any conversations, it
11   was with reference to the actual case and the situation
12   that happened, that involved myself.
13       Q. Tell me what you said to him and what he told
14   you.
15           MR. MARCONI: I think there's a spousal
16   privilege here that we are going to assert.
17           MR. TAMBUSSI: You are instructing not to
18   answer?
19           MR. MARCONI: Yes.
20           MR. TAMBUSSI: Fair enough.
21   BY MR. TAMBUSSI:
22       Q. Can you tell me your full name, please?
23       A. Kimberley, K-i-m-b-e-r-l-e-y, Anne, A-n-n-e,
24   Bailey, B-a-i-l-e-y.

Page 9

1        Q. Social Security number?
2        A. 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.
3        Q. Date of birth?
4        A. February 9, '64.
5        Q. Okay. Have you ever gone by any other names
6    other than Kimberley Bailey?
7        A. Married name is Small. So I've — actually
8    Kimberley Bailey Small. I've gone by Kimberley Bailey
9    Small.
10       Q. Do you presently reside with Mr. Small?
11       A. Yes, I do.
12       Q. Where do you reside?
13       A. 7 Gilbertie Lane, in Newark, Delaware, 19711.
14       Q. Does anyone else live there with you?
15       A. Our two children.
16       Q. Their names and ages please?
17       A. Amber Bailey, she's twenty-three; and Sam
18   Russell, who is seventeen.
19       Q. Amber Bailey and Sam Russell Small?
20       A. No. We changed his name to Sam Russell. It's a
21   long story.
22       Q. Okay. All right. I'm sorry, Sam Russell, his
23   age is?
24       A. Seventeen.

3 (Pages 6 to 9)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006    C.A. # 05-CV-183 SLR    Bailey, Kimberly A. - Vol. 1

Page 10

1    Q.  He's the one in high school now?
2    A.  Yes.
3    Q.  Amber your daughter, she lives at home.  Does
4    she go to school?
5    A.  Attends the University of Delaware, yes.
6    Q.  Okay.  Anyone else live with you?
7    A.  No.
8    Q.  How long have you lived there?
9    A.  Two -- going on two years I believe June.
10   Q.  Where did you reside prior to that?
11   A.  3214 Champions Drive and that's in Wilmington,
12   Delaware, 19808.
13   Q.  For how long did you live there?
14   A.  I think that was almost two years also.
15   Q.  With whom did you reside at that residence?
16   A.  I resided there with -- my daughter was at
17   George Mason when I first moved into the house.  My
18   son -- my husband and I, when I purchased the house we
19   were separated.  When we reconciled, he did move into the
20   townhouse -- to that location before we sold it.
21   Q.  For how long were you separated from Mr. Small?
22   A.  That was probably just under two years.
23   Q.  What years?
24   A.  From 2001 to 2003.

Page 11

1    Q.  Prior to your separation where -- did you live
2    with Mr. Small?
3    A.  Yes.
4    Q.  Where?
5    A.  We had a home in, back in Newark at 226 Catalina
6    Drive.  That's Newark, Delaware, 19711.
7    Q.  Okay.  Have you ever been a party to any other
8    lawsuit, either suing somebody or being sued?
9    A.  I had a PIP claim -- I think we did disclose
10   that -- personal injury claim.
11   Q.  When was that?
12   A.  That was -- I'm trying -- I was picking my
13   daughter up from swim class or practice.  I'm trying to
14   remember how old she was.
15        I honestly -- I'm guessing it was in '99 or
16   2000.
17   Q.  I don't want you to guess.  Is that your best
18   estimate as we sit here today?
19   A.  Let me think again.
20        She graduated -- no.  It had to be earlier
21   than that, because she wasn't driving.  My guess or best
22   estimate had to be in the -- about '95.  About 1995.  I
23   honestly don't remember.
24   Q.  Okay.  Did that go to court?

Page 12

1    A.  No, it did not.
2    Q.  Did you have to give any testimony under oath?
3    A.  No, I did not.
4    Q.  Did the matter settle?
5    A.  Yes, it did.
6    Q.  Did you receive a sum of money as a result?
7    A.  Yes, I did.
8    Q.  Okay.  Have you ever been involved in any other
9    lawsuits?
10   A.  No, I have not.
11   Q.  Have you been involved in any other legal
12   proceedings?  For example, you mentioned you were
13   separated.  Did you file for divorce?
14   A.  Strangely enough, my husband and I were divorced
15   in 1994.  We remarried in '99.
16   Q.  Okay.  Let me back up.  When did you marry,
17   first marry Russell Small?
18   A.  1986.
19   Q.  Had you been married before that?
20   A.  No, I have not.
21   Q.  So you got married in 1986.  Then you divorced
22   Mr. Small in 1994?
23   A.  Yes, I believe -- if -- yeah, 1994.
24   Q.  Okay.  Then you got remarried?

Page 13

1    A.  Remarried in 1999.
2    Q.  Okay.  Separated in 2001?
3    A.  2001.
4    Q.  Okay.  Reconciled?
5    A.  2003.
6    Q.  Okay.  Now, that divorce, did you actually file
7    the divorce complaint?
8    A.  Yes.
9    Q.  Did you file it or did he file it?
10   A.  I went through a course at Del Tech where you
11   paid 60 bucks and filed all the paperwork to get the
12   divorce complete or whatever.  So I -- I don't actually
13   know what all the documents is that I had completed, but
14   it was a legal divorce.  We were legally divorced.
15   Q.  You did that yourself?
16   A.  Yes, I did.
17   Q.  But you filed as opposed to him?
18   A.  I filed for the divorce, yes.
19   Q.  Did Mr. Small oppose it?
20        MR. MARCONI:  Off the record.
21        (Discussion off the record.)
22   BY MR. TAMBUSSI:
23   Q.  Did Mr. Small oppose the filing that you made?
24   A.  He did not.

4 (Pages 10 to 13)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006           C.A. # 05-CV-183 SLR           Bailey, Kimberly A. - Vol. 1

Page 14

```
 1   Q.  Okay.  Did you have any children with Mr. Small
 2   at that time?
 3   A.  Our son, Sam is, yes.
 4   Q.  Amber is not a product of your union?
 5   A.  No, she's not.
 6   Q.  Okay.  Now, when you separated in 2001 — I
 7   think I asked you this, but I want to be sure — did you
 8   file any legal proceedings whatsoever?
 9   A.  No.
10   Q.  Did Mr. Small file any?
11   A.  No, he did not.
12   Q.  Okay.  Have you been involved in any other legal
13   proceedings whatsoever?
14   A.  No.
15   Q.  No collection actions?  No traffic tickets —
16   A.  Well, yeah.  I have speeding tickets.
17   Q.  Okay.  All right.
18   A.  I'm sorry.  I didn't know you were referring to
19   those.  I have some speeding tickets.
20   Q.  Okay.  Still current, pending?
21   A.  Unfortunately, yes.  They are not pending.  They
22   are paid for and they will be coming off soon.
23   Q.  You have points on your —
24   A.  Yes, I do.
```

Page 15

```
 1   Q.  — driver's record?
 2        Have you ever been sued in any collection
 3   matter?
 4   A.  I don't think that it's gone to the point where
 5   suit papers had been filed.  But I know that there's been
 6   collections out there.  Unfortunately, you know, there
 7   were probably a few black marks on collection, on my
 8   credit history.  When Russell and I were divorced in '94,
 9   I don't know if this is along the lines that you are
10   looking for, but he didn't pay the mortgage and we
11   actually had the bank coming after us for foreclosure.
12   Q.  All right.  Did the bank actually file a
13   foreclosure action against you and Mr. —
14   A.  The sheriff came to the door with the papers to
15   tag things on the house.  I actually happened to be there
16   at that time, picking up the kids or doing something, and
17   Russell was not there.  When I became aware of what was
18   happening, I confronted Russell, told him, you know, we
19   need to do something together to avoid this.  And at that
20   time I moved back into the house and we truly didn't
21   reconcile our relationship, but we were working on a
22   common goal to save our house.
23   Q.  About when did this occur?
24   A.  I think that was like '96, '97.  Again, that is
```

Page 16

```
 1   a complete guess.  I'm not sure of the exact date.
 2   Q.  Okay.  All right.  Have you ever appeared in any
 3   municipal court or traffic court on any of your traffic
 4   tickets?
 5   A.  I've never had to appear for a moving violation.
 6   I had a DUI in '94.  I pleaded first offender's.
 7   Q.  Okay.  Have you ever had your license suspended
 8   in any other matter?
 9   A.  Recently I took my son to pick up his license
10   and they want the parent to have their license.  And I
11   gave the guy my license and he took it from me because he
12   said it was suspended.  Supposedly my speeding ticket
13   that I paid, I neglected to pay a fee, late fee of some
14   $20.  So I had to go over to the cashier, pay that, get a
15   receipt and they reinstated.
16        So it was suspended for I guess not paying
17   the full ticket amount.  I paid the ticket, but I missed
18   the late fee or something.
19   Q.  Do you know when that suspension started?
20   A.  Actually, I do not, because I was unaware of it.
21   I was driving, they had indicated that I had a suspended
22   license and my ticket at that time was going on two years
23   old.
24   Q.  Okay.  When did you become aware that you had a
```

Page 17

```
 1   suspended license?
 2   A.  When I went to DMV with my son to get his
 3   license and I gave them my license to, as identification
 4   for my son.
 5   Q.  Right.  You told me the circumstances, but do
 6   you have an idea when?
 7   A.  I'm sorry.  That was — he's seventeen now.
 8   He's been driving — so it had to be August or September
 9   of 2004 or 2005.
10   Q.  We are in 2006 now.
11   A.  So 2005.
12   Q.  Have you ever been convicted of any crimes?
13   A.  No.
14   Q.  Have you ever been charged with any crimes?
15   A.  No.
16   Q.  Did you ever charge anyone with a crime?
17   A.  No.
18   Q.  Make any allegations against anyone?
19   A.  No.
20   Q.  When did you graduate high school?
21   A.  1982.
22   Q.  What high school was that?
23   A.  Christiana High School.  It's in Newark,
24   Delaware.
```

5 (Pages 14 to 17)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006          C.A. # 05-CV-183 SLR          Bailey, Kimberly A. - Vol. 1

Page 18

1    Q.  What did you do after high school?  Did you go
2    further your education or go to work or both?
3       A.  I did both.  I was pregnant out of high school,
4    so I had my daughter.  I worked in a family business.  I
5    went back to college two years after high school and
6    attended Wilmington College and played volleyball.
7       Q.  So you graduate in '82 and you go to work in the
8    family business?
9       A.  Yes.
10      Q.  What's the name of the family business?
11      A.  It was Commercial Flooring.
12      Q.  What did you do for Commercial Flooring?
13      A.  I was a secretary, office person.
14      Q.  Okay.  For how long did you work at the
15   commercial flooring?
16      A.  I had grown up in the business.  I had worked
17   there part time or summer work from high school up until
18   I attended Wilmington, which was in 1984.
19      Q.  So you worked there until you went to Wilmington
20   in 1984?
21      A.  Yes, until I attended Wilmington College in
22   1984.
23      Q.  Okay.  For how long did you attend Wilmington
24   College?

Page 19

1       A.  Two years.
2       Q.  Did you receive a degree?
3       A.  Unfortunately, no.
4       Q.  What was your major course of study?
5       A.  Behavioral science.
6       Q.  What did you do when you left Wilmington
7    College?
8       A.  When I left Wilmington College, Russ and I got
9    married in '86.  He was finishing up his school work.  I
10   went back to work for a short time with my parents and
11   then obtained a position at the Medical Center of
12   Delaware where I worked.
13      Q.  When did you start working at the Medical Center
14   of Delaware?
15      A.  Goodness -- '87, 1987.  It was September or
16   October.
17      Q.  What did you do for the Medical Center of
18   Delaware?
19      A.  Clerical work.
20      Q.  Let me go back.  At Commercial Flooring, did you
21   supervise anyone?
22      A.  As a family business, I believe I had a title as
23   a vice president, but in no way did -- I wasn't
24   supervising anyone.

Page 20

1    Q.  Okay.
2         MR. TAMBUSSI:  Off the record.
3         (Discussion off the record.)
4    BY MR. TAMBUSSI:
5    Q.  All right.  At the Medical Center of Delaware
6    did you supervise anyone?
7       A.  No, I did not.
8       Q.  How long did you work at the Medical Center of
9    Delaware?
10      A.  I held three positions while in my tenure at the
11   Medical Center of Delaware.  I was there for 11 years I
12   believe it was.  I went from an, I guess it was the
13   administration or bed board clerk, to the emergency room
14   clerk.  And then I went into the pharmacy department and
15   I spent six years in the pharmacy as a pharmacist
16   technician.
17      Q.  As a bed board clerk did you supervise anyone?
18      A.  No, I did not.
19      Q.  As an ER clerk did you supervise anyone?
20      A.  No.
21      Q.  As a pharmacy tech did you supervise anyone?
22      A.  No, I did not.
23      Q.  Why did you leave the Medical Center of
24   Delaware?

Page 21

1       A.  For an opportunity with MBNA in insurance.
2       Q.  That would be '98, '99?
3       A.  It was '98 I believe.
4       Q.  What was the opportunity at MBNA?
5       A.  It was personal lines auto.  MBNA was getting
6    into, I guess they were soliciting their clientele to
7    offer them auto insurance.
8       Q.  Okay.  How did you learn of this opportunity?
9       A.  One of the pharmacists at the Medical Center
10   knew I was taking some courses at Goldey-Beacom.  They
11   said, oh, you are going into business or something along
12   those lines and thought MBNA is business and I'm doing
13   some business.  And he had a son-in-law that worked there
14   and asked -- they were looking for anyone to come along
15   for this new venture.  I interviewed and was offered the
16   position and took it.
17      Q.  Okay.  You mentioned you were taking courses at
18   the time.  When did you start taking courses?
19      A.  On occasion I would take, pick up a class at
20   Goldey-Beacom, at Del Tech.  At that time when I was at
21   Goldey-Beacom I was taking an accounting class.
22      Q.  Okay.  What courses did you take at
23   Goldey-Beacom and over what period of time?
24      A.  It had to be over a two-year period and I think

6 (Pages 18 to 21)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                C.A. # 05-CV-183 SLR            Bailey, Kimberly A. - Vol. 1

Page 22

1  I took accounting I and II.
2    Q.  Anything else?
3    A.  No.
4    Q.  You also mentioned you took courses at Del Tech?
5    A.  I had looked into and I think that I registered
6  for the course and I never actually went to it. And I
7  don't actually remember what it was. So I looked into
8  some courses at Del Tech.
9    Q.  So you never actually --
10    A.  I never actually attended Del Tech. It was my
11  intention and I signed up, but I unfortunately did not
12  go.
13    Q.  Did you take any courses after Wilmington at any
14  other place besides Goldey?
15    A.  No, I did not.
16    Q.  The only courses you took there were the two
17  accounting courses?
18    A.  Yes.
19    Q.  All right. So you started with MBNA in 1998.
20  What are your job duties?
21    A.  The job -- it was sales of personal auto.
22    Q.  When you say "sales of personal auto," you mean
23  personal auto insurance?
24    A.  Personal auto insurance.

Page 23

1    Q.  Okay. Did that involve you making cold
2  telephone calls?
3    A.  There were some cold calls. There were some
4  automated calls where the screen would pop up and one of
5  their -- I guess one of the MBNA credit card holder's
6  name would be there and you would have to go through and
7  give them your spiel: Hello, this is Kim. I'm calling
8  from, we are doing car insurance now. That type of
9  thing.
10    Q.  For how long did you work there?
11    A.  Until that -- until they closed the insurance
12  department, that portion of MBNA I guess. They closed
13  down.
14    Q.  From 1998 until?
15    A.  I believe it was -- it wasn't two years. It was
16  like 18 months.
17    Q.  Okay. In that job did you receive any training?
18    A.  Yes. I was -- I obtained my property and
19  casualty license.
20    Q.  Okay. Anything else?
21    A.  Particular training for job training?
22    Q.  Any training whatsoever. Did they offer you any
23  training whatsoever?
24    A.  On their computer system? On --

Page 24

1    Q.  You are asking me a question. I'm saying
2  whatever. Just tell me what it is from start to finish.
3    A.  They are going to train you on their computer
4  system so you are able to function that way. I also
5  received training on reviewing what they call the clue
6  reports and motor vehicle reports.
7    Q.  Okay. Anything else?
8    A.  Not that I can remember, no.
9    Q.  During this period of time, which takes you into
10  I guess 1999, 2000, did you supervise any employees?
11    A.  No, I did not.
12    Q.  Then you say they went out of business after, of
13  that business after the 18 months?
14    A.  The way that I understand it, MBNA sold off
15  their book of business to AIG, because AIG pulled their
16  contract -- TIG pulled their contract from MBNA.
17    Q.  So what -- did someone else tell you your job
18  was being eliminated or what happened?
19    A.  There was an announcement that the insurance
20  department would be folding. They were keeping a few
21  people on to manage the policies until they actually made
22  the transfer over. They were immediately training us on
23  the credit card side and would place us within the bank
24  doing credit card I guess customer service.

Page 25

1    Q.  Did you get trained in credit card transactions,
2  et cetera?
3    A.  Yes, I did.
4    Q.  Did you go to the bank side?
5    A.  I went to the bank side for the training. I
6  never made it through. I decided to take and pursue a
7  career in insurance.
8    Q.  Okay. Tell me about training. Your property
9  and casualty license, did you have to take any courses to
10  get that?
11    A.  MBNA provided a -- goodness, it was four or six
12  weeks training, where you went in and did -- they have
13  instructors come in and go over the different parts of
14  the property and casualty insurance, preparing us to take
15  the course or the class to obtain our license.
16    Q.  Okay. So MBNA first has people come in,
17  preparing you to take the class?
18    A.  Yes.
19    Q.  Then you took the class?
20    A.  You took the test.
21    Q.  Okay.
22    A.  I'm sorry. It was a test to obtain your
23  property and casualty license.
24    Q.  Okay. So they offered a class?

7 (Pages 22 to 25)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006          C.A. # 05-CV-183 SLR          Bailey, Kimberly A. - Vol. 1

Page 26

1    A. They offered a class to prepare you for the
2  test, to obtain your license.
3    Q. Okay. What sort of topics were covered in this
4  class?
5    A. The general liability, the property -- it was
6  just all the property -- I can't remember. I mean, I
7  deal with it every day and I couldn't tell you what was
8  on the property casualty test.
9    Q. Ultimately you took a test?
10   A. Yes.
11   Q. When did you obtain your license? What year?
12   A. 19 -- my first year at MBNA, '89.
13   Q. '98?
14   A. '98, yes.
15   Q. All right. Do you maintain that license today?
16   A. I do.
17   Q. Are there certain requirements from the Delaware
18  Department of Insurance that you have to comply with in
19  order to maintain that license?
20   A. Yes. You have continuing ed. Every two years
21  you have to complete so many credit courses to maintain.
22   Q. Have you taken those required courses since
23  1998?
24   A. Yes, I have.

Page 27

1    Q. What courses have you taken?
2    A. I don't remember offhand.
3    Q. Do you have some sort of certification or
4  certificate or letter saying that you completed certain
5  courses?
6    A. Yes. And I submit them directly to the State of
7  Delaware Insurance Department where they keep the file.
8    Q. Okay. Do you keep copies for yourself?
9    A. I do have copies at home.
10   Q. Do you have all of them?
11   A. Probably not.
12   Q. Do you have to take a course in ethics?
13   A. Yes, you do.
14   Q. Have you taken that?
15   A. Yes, I have.
16   Q. Has anyone ever filed a complaint with you with
17  the Delaware Department of Insurance?
18   A. Actually, yes, they have.
19   Q. Who has filed a complaint?
20   A. It was with a, one of -- at my current position
21  with Werner Insurance I had a carpet installer guy that
22  came to me looking for general liability insurance. And
23  he insinuated to me that he had some financial problems,
24  was credit score an issue?

Page 28

1        I said, yes, it is, let me run a quote for
2  you to see if it comes up, because some carriers, if they
3  do Dunn & Bradstreet it comes up automatically, or if
4  their underwriters properly underwrite, then they can
5  surcharge you whatever, but it is not going to deny your
6  insurance. It could surcharge you.
7        So I actually obtained a good quote for
8  him. He decided to buy coverage. We bound coverage,
9  made the first payment and let the insurance lapse for
10 nonpayment. I had sent him a letter indicating, you
11 know, you were concerned about getting the insurance and
12 your credit and all these things and basically encouraged
13 him, you know, that you have a premium payment due, we
14 don't want the coverage to lapse. This is our goal, this
15 is what we were working for obtaining and maintaining
16 coverage.
17       And he sent a letter off to the department
18 of Insurance saying that I had overstepped my boundaries,
19 I guess putting my intentions on his or -- intending or
20 insinuating that his credit was bad, when he's the one
21 who basically disclosed that to me and said that he was
22 concerned and wanted to be able to maintain or better his
23 credit score.
24   Q. What's the status of that complaint?

Page 29

1    A. It was a complaint by that insured. The letter
2  came to my current boss, who was asked to reply and
3  discuss it with me, which I discussed it with him. He
4  replied to the State of Delaware and as far as I'm
5  concerned or as far as I know the letter back from my
6  boss indicating that it was discussed with me and he had
7  indicated, you know, don't -- just send saying you need
8  to make your payment and don't discuss credit with them.
9        So I guess my boss reprimanded me or
10 discussed the situation with me and the State of Delaware
11 was happy with that.
12   Q. Did you get any letter or confirmation from the
13 State of Delaware indicating that the case was closed?
14   A. No, I did not.
15   Q. When did this complaint get filed?
16   A. That had to be probably a year ago, maybe over a
17 year ago.
18   Q. Sometime in 2004, 2005?
19   A. 2004. Maybe the end of 2004.
20   Q. Has anyone else filed any other complaints
21 against you with the Delaware Department of Insurance?
22   A. Not that I'm aware of. But I would assume that
23 if a complaint had been filed, they would do the same as
24 they did with this one where you receive notice.

8 (Pages 26 to 29)

Page 30

1  Q.  When you say that your boss reprimanded you, he
2  instructed you not to write a letter including certain
3  things to customers?
4  A.  Yes.
5  Q.  The boss that did this, what's his name?
6  A.  Art Werner.
7  Q.  When is the most recent course that you took as
8  part of your continuing education for your licensure?
9  A.  I took a flood course in December I believe it
10  was.
11  Q.  All the certifications or all the evidence of
12  completion of these courses you have submitted to the
13  Delaware Department of Insurance?
14  A.  Yes.
15  Q.  All right.  So at some point in time, I guess in
16  about '99, 2000, you left MBNA?
17  A.  Yes, I did.
18  Q.  Where did you go?
19  A.  I went to AIG.
20  Q.  In Delaware?
21  A.  Yes.
22  Q.  Okay.  What did you do for AIG?
23  A.  I did a, I worked in a department that was
24  starting up a new venture for small business, doing small

Page 31

1  business insureds, doing what they call BOPs, business
2  owner policies.
3  Q.  For how long did you work there?
4  A.  I was with AIG for about 8 months.
5  Q.  Did that involve calling customers and
6  soliciting their business?
7  A.  No.  They did massive marketing where they would
8  send out an 800 number and people would call into us.
9  Q.  But it involved you dealing with people on the
10  telephone trying to solicit their business?
11  A.  Yes.
12  Q.  Did you actually meet with any customers or
13  clients or was it all telephone?
14  A.  No.  It was all telephone.
15  Q.  Did you supervise anybody in that position?
16  A.  No, I did not.
17  Q.  Why did you leave AIG?
18  A.  We were writing business and they didn't have
19  paper to write it on.  They didn't have a carrier that
20  was supporting that business that we were selling.  We
21  were collecting premium and collecting, you know, from
22  people and they wanted us to send a policy and AIG didn't
23  have a carrier that they were writing that policy with.
24  So I was a little concerned with their ethics and I

Page 32

1  decided to leave AIG.
2  Q.  Correct me if I'm wrong, but my understanding is
3  that that would be against the law, correct?
4  A.  Yes.  It would be wrong, against the law.
5  Q.  Did you report this belief of illegal activity
6  to anyone?
7  A.  That was my understanding.  I don't know it to
8  be true.  I was told -- because I was getting calls from
9  people that we were selling policies to, saying, you
10  know, I submitted a binder to them, we didn't really --
11  we put AIG as the carrier, but AIG as an umbrella has
12  many different carriers underneath.  So we were
13  submitting binder and people are looking for their
14  policies, want the certificates.  When we started asking
15  our supervisor what paper are we writing this on, what's
16  the policy number, we weren't getting answers.  And
17  someone that was connected with them said, you know, they
18  don't have any paper to write it on.
19         So it was -- it wasn't something that I
20  knew for sure.  It was a concern that I had and because
21  of the concern and I didn't like what was going on, I
22  decided to leave.
23  Q.  My question to you was:  Did you report it to
24  anyone?

Page 33

1  A.  No, I did not.  Sorry.
2  Q.  Where did you go next?  We are now in like 2000.
3  A.  I went to Rockwood Programs.
4  Q.  Rockwood Programs?
5  A.  Yes.
6  Q.  What did you do there?
7  A.  I was the assistant to the president.  And I
8  also did do some underwriting for a few different -- they
9  did program insurance, so I did underwriting for some
10  programs.
11  Q.  By the way, when you left AIG did you quit or
12  were you terminated?  How did that work?
13  A.  I gave two weeks notice.  I obtained my position
14  with Rockwood, gave my two weeks notice and went to
15  Rockwood.
16  Q.  Okay.  What were your specific job duties as
17  assistant to the president at Rockwood?
18  A.  I did all of his secretarial duties, kept his
19  calendar, did his typing.  He did a lot of marketing
20  where you would type up certain things and as a rough
21  draft submit it and have final drafts come through.  They
22  actually would go to the marketing companies or vendors
23  that he was using.
24         I did his license.  I got him licensed in

9 (Pages 30 to 33)

Page 34

1  all fifty states. I completed all the processing for his
2  personal license and then also Rockwood Programs, their
3  license.
4      Q.   What did you do by way of underwriting?
5      A.   They would write certain program — it was
6  self-writing insurance. I actually ran a program for
7  nurse practitioners. They would answer like four
8  questions. If they answered all yes or no, something
9  like that, the premium was $750. They would send in the
10 self-written thing signed with their check for $750 and
11 you would process the policy and send it out to them,
12 binding coverage with the carrier and just process the
13 paperwork.
14         So it was just looking at the application,
15 making sure that all the ducks are in a row, it is
16 signed, your premium is there, and you forward on to
17 their policy.
18         I also worked with life agents in obtaining
19 errors and omissions professional liability insurance.
20     Q.   How many employees were at Rockford?
21     A.   I'd say 30, about 30.
22     Q.   Did you have any supervisory function there?
23     A.   No, I did not.
24     Q.   For how long were you at Rockwood?

Page 35

1      A.   Just under two years.
2      Q.   So now we are at 2002? 2003?
3      A.   No. We are — I went to Commerce in 2001.
4      Q.   Okay.
5      A.   From Rockwood I went to Zutz Insurance.
6      Q.   Okay. Now, why did you leave Rockwood?
7      A.   I left Rockwood because doing program insurance,
8  you don't have to be licensed and I wanted to use my
9  property and casualty license. The majority of the
10 people that were of the 30 people, I'd say maybe four
11 were licensed. It wasn't a benefit to me to have my
12 license and my boss wasn't looking at it, you know, as —
13 it wasn't a stepping stone. Basically I wasn't learning
14 anything about insurance. I was doing self-writing
15 applications that wasn't really teaching me anything
16 about insurance.
17     Q.   Did you quit?
18     A.   No. I obtained my position with Zutz, gave my
19 notice at Rockwood and went to Zutz.
20     Q.   Okay. What is Zutz?
21     A.   Harry David Zutz is an insurance agency in
22 downtown Wilmington.
23     Q.   For how long did you work for Zutz?
24     A.   I don't remember if it was a year or if it was

Page 36

1  under a year.
2      Q.   Approximately a year?
3      A.   Approximately a year.
4      Q.   How many employees?
5      A.   They are a fairly large agency. They probably
6  have about 40. That's a guess. I'm not sure.
7      Q.   What was your job at Zutz?
8      A.   I was a commercial lines customer service
9  representative.
10     Q.   Did you supervise any employees?
11     A.   No, I did not.
12     Q.   Did you deal solely with customers in that job?
13     A.   Well, customers and the markets. We had to
14 market our own business.
15     Q.   Why did you leave Zutz?
16     A.   Zutz was a sink or swim agency and being my
17 first true dive into the commercial lines insurance and
18 the time that I was there, it was a difficult agency.
19 The day that I arrived at my desk, there were files this
20 high (indicating) and expiration dates, a list of
21 insureds that were expiring within that week and they had
22 been accumulating since the desk had been vacant. I know
23 the manager Harriet had been working the desk, but the
24 day I showed up there were policies for insureds that

Page 37

1  were expired and I was told to sink or swim, make —
2  correct it.
3         It was just something that I wasn't ready
4  for or used to and I had a lot of questions. I worked
5  it, you know, got everything figured out, but it wasn't
6  the type — it wasn't the atmosphere that I was looking
7  for in an agency to work in.
8      Q.   Okay. Did you voluntarily leave that position?
9      A.   Yes. I quit.
10     Q.   Where did you go after that?
11     A.   To Commerce.
12     Q.   How did you learn of the position at Commerce?
13     A.   There was an ad in the News Journal.
14     Q.   You responded to the ad?
15     A.   Yes, I did.
16     Q.   Did you know anyone that worked at Commerce?
17     A.   That worked there? No, I did not.
18     Q.   So you send in a response to the ad and what
19 happens next to get hired at Commerce?
20     A.   I believe it was Glenn Burcham that had called
21 me in for an interview. I went for the interview. They
22 offered me the position.
23         The position that I believe that I actually
24 responded to or the ad was for a position in Dover where

10 (Pages 34 to 37)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                C.A. # 05-CV-183 SLR                Bailey, Kimberly A. - Vol. 1

Page 38

1  the Dover office was looking for someone.
2      MR. MARCONI: Can we take 5?
3      MR. TAMBUSSI: Sure.
4      (Recess taken.)
5  BY MR. TAMBUSSI:
6      Q. Any time you need to take a break, just let me
7  know.
8      A. Will do.
9      Q. You met with Mr. Burcham and you interviewed?
10     A. Yes.
11     Q. What was the position that you interviewed for?
12     A. A core customer service representative.
13     Q. What did you understand that to be?
14     A. Middle market commercial lines insurance.
15  Customer service.
16     Q. "Core" being core business?
17     A. I believe that they established core to be a
18  certain premium size to be middle market, up to I believe
19  it was like $20,000 to $50,000 or $100,000.
20     Q. Okay.
21     A. There was a premium size to put it within that
22  distinction.
23     Q. Okay. And you had had the interview with
24  Mr. Burcham. Did he offer you the job at the interview?

Page 39

1      A. I don't believe directly. I believe there was a
2  second interview.
3      Q. Who was the second interview with?
4      A. With Mr. Burcham, who offered me the position at
5  that time.
6      Q. I believe you indicated that you initially
7  interviewed for what you thought was a position in Dover?
8      A. No. I responded to an ad that was for Dover and
9  when they called me they said that there was a position
10  in Wilmington that they would like to interview me for.
11     Q. You went to that?
12     A. Yes.
13     Q. After Mr. Burcham offered you the job, you
14  accepted it?
15     A. Yes, I did.
16     Q. Were you still working at Zutz at the time?
17     A. I don't -- I believe that I was, yes --
18  honestly, I don't remember. I know that I left Zutz. I
19  quit. I didn't give them notice.
20     Q. Okay. How long of a period of time elapsed
21  between your last day at Zutz and first day at Commerce?
22     A. I don't remember directly offhand.
23     Q. Best estimation?
24     A. If anything, I may have taken five days off,

Page 40

1  just to take a week.
2      Q. Okay. When you were first hired by Commerce,
3  what were the job duties as explained to you?
4      A. You would work directly with the producer for a
5  core book of business and you would do everything from
6  the auto identification cards to help in preparing for
7  marketing. You would just do the daily processing of the
8  customer service, answering the phones and whatnot.
9      Q. Okay. When you started with Commerce did you
10  have any new employee orientation?
11     A. Yes. They had the Commerce, it's, I guess
12  that's exactly what -- new employee orientation.
13     Q. Tell me about that. What do you remember about
14  that?
15     A. Man standing on top of the table jumping up and
16  down. It was exciting.
17     Q. Okay. That's all you remember?
18     A. No. That's not all I remember, but that's -- it
19  was a very uplifting and moving, exciting class. There
20  was somebody who talked about Commerce and what they
21  wanted to convey about Commerce and they truly believed
22  in it. It was almost like church, you know, when...
23         It was exciting. It was a lot of
24  information. It was overwhelming, the information that

Page 41

1  they gave you, but it was also very exciting. I came out
2  of there excited.
3      Q. Where did this orientation occur?
4      A. I believe it was in the Cherry Hill, up -- it
5  was in New Jersey.
6      Q. At Commerce University?
7      A. Yes.
8      Q. How long were you at Commerce University?
9      A. I believe that was like a half day class
10  orientation. I don't remember directly if it was a full
11  or half day. I believe it was only a half day.
12     Q. Were various topics covered at this class?
13     A. They discussed benefits, other classes and
14  whatnot that you can take within Commerce. They talked
15  about the WOW concept. They touched a little bit on the
16  banking side and what benefits we would get from the
17  banking if we chose to bank with Commerce.
18     Q. What about the other classes you could take? Do
19  you recall which ones they talked about?
20     A. I don't remember offhand exactly what they
21  touched on or classes that they may have spoke about at
22  the orientation. They had indicated there was Commerce
23  University. Obviously, you are at the university, they
24  must teach you something there. So they had indicated

11 (Pages 38 to 41)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006          C.A. # 05-CV-183 SLR          Bailey, Kimberly A. - Vol. 1

Page 42

1  that people come to Commerce University to take courses
2  or classes, yes.
3      Q.  Did you make any further inquiry at that time
4  about the other courses or classes?
5      A.  I believe I was given a pamphlet, but, no, I did
6  not make any further inquiry.
7      Q.  In this orientation process were you made aware
8  of what Commerce expected of employees?
9      A.  I'm sure that there was some handbook or
10  guidelines that were either touched upon or discussed. I
11  don't remember directly what they were.
12      Q.  Were you ultimately given a packet of
13  information?
14      A.  We were given a packet of information, yes.
15      Q.  Did you ultimately sign some forms?
16      A.  Yeah. We signed a few forms that day.
17      Q.  Did you read the information?
18      A.  I probably glanced over it as he was talking
19  about it, yes.
20      Q.  Did you ever read it afterwards?
21      A.  I believe after we signed it, we handed in the
22  original.
23      Q.  Okay. How about any like handbook or policies,
24  did you ever read those?

Page 43

1      A.  Not at that time on the orientation day, but I
2  had a handbook that was given or I asked for and reviewed
3  some of it. But that wasn't while I was a core CSR. I
4  didn't have a handbook at that time.
5      Q.  Do you recall hearing anything about the
6  different policies that Commerce had with regard to use
7  of the phone, the Internet, your computers, things of
8  that nature?
9      A.  Slightly I do, yes.
10      Q.  Do you recall that you were told that it was to
11  be used for business purposes?
12      A.  The phone or the Internet?
13      Q.  Yes.
14      A.  Yes.
15      Q.  You knew that from the outset, right?
16      A.  That's a standard policy I believe in any...
17      Q.  Were you told also that Commerce wanted
18  employees to work in a harmonious way with each other?
19      A.  Yes.
20      Q.  And were you told also that Commerce expected
21  that people show respect to each other in the workplace?
22      A.  Yes.
23      Q.  You recognized that from the outset, right?
24      A.  I recognized that that was Commerce's

Page 44

1  expectations?
2      Q.  Yes.
3      A.  Yes.
4      Q.  Would you characterize telling someone that you
5  don't have, "fucking time to deal with this," as dealing
6  with somebody with respect?
7      A.  If you understood the entire relationship there,
8  yes.
9      Q.  Do you think that using the word "fucking" in
10  that phrase is appropriate for the workplace?
11      A.  It was appropriate for me at that time, yes.
12      Q.  Do you think it was appropriate within the
13  framework of what Commerce expected of its employees and
14  how they deal with each other?
15      A.  I don't know how it was different from any other
16  situation or any other employee that may.
17      Q.  That's not my question.
18      A.  But —
19          MR. MARCONI:  I'm going to object.  You
20  asked her a question.  She's going to give you an answer.
21  She's entitled to finish it.
22          MR. TAMBUSSI:  I thought she was.
23  BY MR. TAMBUSSI:
24      Q.  My question to you is:  Is it your understanding

Page 45

1  that it's appropriate within the Commerce framework of
2  dealing between employees to use the word "fucking" in
3  responding to a subordinate employee?
4      A.  It was not written otherwise and I felt
5  appropriate at that time to use that, yes.
6      Q.  Is it your standard that use of the word
7  "fucking" in giving direction or response to a
8  subordinate employee is appropriate for the workplace?
9      A.  For that situation, yes.
10      Q.  What do you base that upon, that belief upon?
11      A.  That I wasn't the only person to use that type
12  of language.
13      Q.  Whether you were the only person or not, do you
14  believe that it's appropriate to use the word "fucking"
15  in dealing with subordinate employees?
16      A.  Yes, I do. I'm not offended by that.
17      Q.  Now, when you first started with Commerce where
18  was your job located?
19      A.  1011 Centre Road.
20      Q.  What did you do?
21      A.  I did customer service for core for Glenn
22  Burcham for his book of business.
23      Q.  For how long did you work with Glenn Burcham?
24      A.  I worked with Glenn for a little over 6 months,

12 (Pages 42 to 45)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006      C.A. # 05-CV-183 SLR      Bailey, Kimberly A. - Vol. 1

Page 46

1   maybe 8 months.

2     Q.  What happened after that 6- to 8-month period?

3     A.  A position became known to me that would be in

4   the Wilmington office that would be a promotion.  I was

5   extremely interested in being able to -- buying into the

6   WOW and the Commerce.  I loved my job there.  I loved the

7   company.

8          To better myself, I became aware of a

9   position because of my tenure I didn't know if I was

10  able to apply for that position.  I believe that I spoke

11  with Deb Watson first and by the suggestion of Steve

12  Duncan to the fact that would I be allowed to apply for

13  the position, because my -- I think you had to be there a

14  year before you can post out or get promoted to a

15  different position or something along those lines.

16     Q.  Okay.  Did someone tell you that there was a

17  position open?

18     A.  Steve Duncan did, yes.

19     Q.  This is during the period of time that you were

20  working with Mr. Burcham, correct?

21     A.  Yes, it was.

22     Q.  Was Mr. Duncan a co-worker of yours at that

23  time?

24     A.  Mr. Duncan had recently I guess came to

Page 47

1   Commerce.  We were at a company outing for the Wilmington

2   office.  They had reached their goals and they were

3   taking us to Smyrna to some restaurant.  We had crabs and

4   beer and had an afternoon of I guess rewards for a good

5   year.  At that time Mr. Duncan was first became aware of

6   in the Wilmington office and was sitting with Marge

7   Phipps.  And somebody had asked who he was and then I

8   guess that's where it all started.  And, actually, I

9   became aware through Steve, in talking with him and

10  introducing through whomever, that he was coming down to

11  start up a small business department.

12     Q.  So did you first meet Mr. Duncan at this lunch

13  in Smyrna?

14     A.  I don't believe I was actually introduced to him

15  at that time or maybe I was introduced, but it was just

16  an introduction.  I didn't actually have time to go over

17  and say, hey, what's, you know, what's your deal, or to

18  find out anything more than what his name was and he was

19  heading up the small business.

20     Q.  How long had you been working for Commerce when

21  you first met Mr. Duncan?

22     A.  A little over 6 months.

23     Q.  Okay.

24     A.  It was under a year.

Page 48

1     Q.  Was Mr. Duncan already there or did he come

2   after you to Commerce?

3     A.  I believe he was employed after me.

4     Q.  Okay.  So you started at Commerce in 2001?

5     A.  Yes.

6     Q.  Approximately six months later you meet

7   Mr. Duncan?

8     A.  I would assume -- yeah.  That is correct.

9     Q.  You first met Mr. Duncan at this lunch?

10     A.  That's the first time that I had ever seen him,

11  yes.

12     Q.  All right.  Then how long is it after this lunch

13  that Mr. Duncan told you about this other position?

14     A.  I will guess and say probably two, three weeks.

15     Q.  All right.  Is that a guess or best estimate?

16     A.  That's my best estimate.

17     Q.  Okay.  All right.  You have known Duncan for two

18  to three weeks and he tells you that there's a position

19  available in Wilmington.

20     A.  He was talking about Commerce bringing the small

21  business department to the Wilmington office, that they

22  were looking to grow it.  They needed someone to

23  supervise or to run that department -- supervise the

24  department for them.

Page 49

1     Q.  Let me see if I can break this down a little bit

2   more.  You become aware that Mr. Duncan is working for

3   Commerce when you go to this luncheon where they are

4   eating crabs and beer, celebrating meeting their goal,

5   correct?

6     A.  Correct.

7     Q.  Approximately two to three weeks pass after that

8   and then he tells you that there's a potential job

9   opening on an aspect of the work in Wilmington, correct?

10     A.  Yes.

11     Q.  Okay.  During this two- to three-week period

12  from the time you first met Mr. Duncan, what was his

13  position with Commerce with regard to you?

14     A.  He had -- his position to me was nothing.  He

15  was a completely different department.

16     Q.  Okay.  He didn't work with you at all?

17     A.  No.

18     Q.  Okay.  Did he work in the same location as you?

19     A.  I believe, I guess when he first started he came

20  to the same location.  I think the big thing was when he

21  went to the crab lunch everybody was like who in the heck

22  is that?  Why is he here, coming on to our rewards?  They

23  thought he was some bigwig at Commerce coming down and

24  checking up on everybody.

13 (Pages 46 to 49)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006    C.A. # 05-CV-183 SLR    Bailey, Kimberly A. - Vol. 1

Page 50

1    But when we worked at the same location, I
2   believe when he first -- I didn't know who he was when I
3   guess he was first hired. He was positioned in the
4   Wilmington office.
5    Q. Okay. The same place you were working?
6    A. Yes.
7    Q. All right. Now, when did you first start to
8   interact with Mr. Duncan?
9    A. I can't totally recall exactly what the reaction
10   or where the interaction came from.
11    Q. Okay. At some point in time, though, you get to
12   know Mr. Duncan well enough that he tells you about this
13   job opening?
14    A. Yes.
15    Q. Okay. What happened during that two to three
16   weeks that you got to know each other so well?
17    A. I believe what happened is that there was --
18   Patty Kalmbacher, who was another of the CSRs, customer
19   service representatives in the core department, was
20   trying to get something put together for -- it was around
21   the holidays I believe, where we would all go out and
22   everyone would have a drink or we would go out as a
23   department as a group.
24    Patty I believe had spoke with him and knew

Page 51

1   more about Mr. Duncan -- or knew Marge Phipps, actually,
2   because they were friends. Marge and Patty were friends.
3   Marge Phipps and Patty were friends. Marge Phipps was
4   working directly with Steve Duncan, where Patty came into
5   that circle.
6    Patty was trying to get a group of people
7   to go out after work to have a drink to celebrate the
8   holidays.
9    Q. When about -- is this 2001? Late 2001?
10    A. I believe it was late 2001, yes.
11    Q. So Patty is friends with Marge?
12    A. Yes, because they were from the old J.A.
13   Montgomery days.
14    Q. Marge worked for Steve Duncan?
15    A. Exactly.
16    Q. Patty is trying to organize a get-together?
17    A. Yes.
18    Q. Out of work? After work?
19    A. After work.
20    Q. Outside of the workplace?
21    A. Outside of the workplace.
22    Q. Get-together is a fair characterization of what
23   she was trying to organize?
24    A. Yes.

Page 52

1    Q. Okay. Patty mentions it to you?
2    A. Yes.
3    Q. You agree that you would be interested?
4    A. Yes.
5    Q. And then you go to this get-together?
6    A. Yes.
7    Q. Mr. Duncan is there also?
8    A. Yes.
9    Q. Where did the get-together occur?
10    A. That was at, what's -- it was a bar down on the
11   waterfront. It's closed now. I believe Backstage Cafe.
12    Q. Okay. Who all went to the Backstage Cafe?
13    A. I believe there was only a few of us. There was
14   maybe five.
15    Q. Who?
16    A. It would be myself, Patty Kalmbacher, Marge
17   Phipps, Steve Duncan, and I know there was somebody else
18   there and I can't remember who.
19    Q. Did you go right after work?
20    A. Yes.
21    Q. This other person that was there, was that a
22   male or female?
23    A. Probably female.
24    Q. Co-worker?

Page 53

1    A. Yes.
2    Q. When you got to the Backstage Cafe after work,
3   for how long did you stay?
4    A. They had a buffet. We stayed probably -- it was
5   dark, although it was winter, so it probably got dark
6   early. Probably stayed two, maybe three hours.
7    Q. Sometime from let's say --
8    A. 5:00 to 8:00, 8:30. That's an approximate.
9   That's a guess.
10    Q. Okay. This is where you first meet Steve Duncan
11   to talk to?
12    A. I believe that's the first time that I was able
13   to talk to him. And he conveyed or he talked about the
14   happenings in Main Street or what the goals were.
15    Q. Did you drink any alcoholic beverages that
16   night?
17    A. Yes, I did.
18    Q. What did you drink?
19    A. Possibly a beer.
20    Q. Just one?
21    A. No. I had more than one.
22    Q. So you drank some beer. You just don't recall
23   what quantity?
24    A. I don't recall the quantity, yes.

14 (Pages 50 to 53)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                 C.A. # 05-CV-183 SLR              Bailey, Kimberly A. - Vol. 1

Page 54

1    Q.  Was everyone else drinking?
2    A.  Yes.
3    Q.  Anything else eventful occur on that night,
4  other than Mr. Duncan talking to you and speaking about
5  what was happening at Main Street?
6    A.  I believe that was the night that when we were
7  leaving, I was uncomfortable with his presence. He
8  was -- I didn't know if it was because he was the
9  Southern gentleman or that's just the way that he was,
10  but he was walking me to my car, because it's Wilmington,
11  it's dark, and he was close. And it was just
12  uncomfortable. But nothing inappropriate or anything
13  like that happened, but he was close.
14    Q.  I don't know what that means. Was he touching
15  you?
16    A.  No. He wasn't touching me, but he was standing,
17  you know, a little too close or just walking a little
18  closer than what I thought was normal or average for
19  people to just walk out. I didn't know if he had had too
20  much to drink or what that issue might be.
21    Q.  Did you move away from him?
22    A.  We were walking and I tried to -- I walked my
23  normal pace.
24    Q.  Was it just Mr. Duncan and you walking to the

Page 55

1  car?
2    A.  Yes. I believe at that time it was just
3  Mr. Duncan and myself.
4    Q.  Where were Patty and Marge?
5    A.  Patty had left probably about two hours into it.
6  Marge had left I believe at the same time, but was parked
7  closer. We got her.
8    Q.  So Patty left earlier?
9    A.  Patty left earlier than the three of us.
10    Q.  What about this other unidentified female?
11    A.  I believe she didn't stay long. She had left.
12    Q.  Okay. So then there's Marge, you and
13  Mr. Duncan?
14    A.  Yes.
15    Q.  The three of you walk out of the bar together?
16    A.  Yes.
17    Q.  And Marge's car is parked in a different
18  direction than yours?
19    A.  What I can remember is -- I don't exactly
20  remember Marge leaving or what -- I remember us all
21  getting together and going. I believe Marge said, "I'm
22  right over here." We were further down and Steve had
23  mentioned, "I'll walk you to your car."
24    Q.  Okay. You didn't have any objection to that?

Page 56

1    A.  No. I didn't think it was unusual. It's
2  downtown Wilmington.
3    Q.  Okay. And he walked you to your car?
4    A.  Yes.
5    Q.  Then what happened?
6    A.  I got in my car and left.
7    Q.  Okay. That was it for your interaction with
8  Mr. Duncan that day?
9    A.  Yeah, other than the fact that I thought that he
10  was -- I didn't know if he was flirting or what he was
11  doing, but he was close and it was a little
12  uncomfortable.
13    Q.  Did you tell him that?
14    A.  No. I just continued to walk and I got to my
15  car. It was a matter of a short period of time.
16    Q.  Okay. Were you finished?
17    A.  Yes, I am.
18    Q.  Okay. All right. When he talked to you in the
19  bar about what was happening at Main Street, what was
20  your response to that?
21    A.  I thought it was exciting. I thought that
22  having an opportunity to bring in people and start up a
23  call center like that would be a wonderful opportunity.
24    Q.  When did you next speak with anyone about this

Page 57

1  opportunity?
2    A.  Steve had mentioned while we were in the bar at
3  Backstage to come talk to him in his office the next
4  day --
5    Q.  Okay.
6    A.  -- and to see what we would do. And that's when
7  he suggested I should talk to Debbie because of my tenure
8  and the position and all that.
9       We had also discussed that I had many
10  friends in the insurance industry that I'm sure would
11  love an opportunity to work for a very fine company like
12  Commerce.
13    Q.  All right. So he says to you to come talk to
14  him in the office the next day. You walk to the car.
15  You feel that he's walking a little too close to you.
16  Did you raise that issue that you thought that maybe he
17  was walking a little bit too close to you with anyone?
18    A.  At that time, no. I did not.
19    Q.  Okay. The next day you feel comfortable enough
20  to go speak to him in his office.
21    A.  Yes.
22    Q.  Was it an office? A cubicle?
23    A.  It's a cubicle.
24    Q.  No doors?

15 (Pages 54 to 57)

Page 58

1   A. No.
2   Q. All right. You went in to speak to
3   Mr. Duncan —
4   A. Yes.
5   Q. — next day?
6       And he told you some more information about
7   this potential position?
8   A. I believe his conversation went along the lines,
9   he had thought about it and this is probably what we
10  should do is contact Debbie, because of the tenure issue
11  we definitely have to — wouldn't want Glenn to hear it
12  from anyone else. I, you know, I should possibly go to
13  Glenn and say this is an opportunity, I'd love, you know,
14  to be able to advance and have this opportunity. But he
15  first suggested that I call Debbie.
16  Q. Okay. Did you have an understanding from
17  talking with Mr. Duncan as to who you would be reporting
18  to at that time?
19  A. He had indicated that he was the director and
20  Marge was the assistant director. Yes, I would be
21  reporting to the both of them.
22  Q. Okay. Did you at that point in time have any
23  issues with that?
24  A. No, I did not.

Page 59

1   Q. Okay. So the next step you take is to contact
2   Deb Watson, correct?
3   A. Yes.
4   Q. Did you get an understanding from talking with
5   Mr. Duncan at that point in time that you may have some
6   supervisory role in this new position?
7   A. Yes. I fully understood that.
8   Q. That's what you wanted?
9   A. Yes.
10  Q. You understood you would have to deal with other
11  employees, correct?
12  A. Yes.
13  Q. You understood that at times those dealings
14  could become frustrating to you, correct?
15  A. Yes.
16  Q. You understood that, nonetheless, you were
17  expected to act with appropriate decorum and respect for
18  those employees, correct?
19  A. Yes.
20  Q. Okay. So did you call Ms. Watson then?
21  A. I don't know if I called her or if I e-mailed
22  her, but I'm pretty sure I called her.
23  Q. You communicated with her in some way?
24  A. Yes.

Page 60

1   Q. Did you get a response?
2   A. Yes.
3   Q. What was the response?
4   A. I believe she had indicated she wanted to talk
5   to Steve. I'd have to go through an actual interview
6   process. I conveyed to her that, at that time, that I
7   wanted to be able to tell Mr. Burcham, because I didn't
8   want him to hear from other people. I had a lot of
9   respect for Mr. Burcham and his book of business. And
10  she agreed that would be okay for me to talk to him, I
11  believe after she discussed with Steve that that's what,
12  you know, that's where this would all head.
13  Q. Okay. What happened next in this process?
14  A. I talked to Mr. Burcham. I set up -- Steve
15  Duncan set up an interview for me to sit down and talk,
16  to I guess interview with him and Marge Phipps, and I
17  interviewed with them.
18  Q. Okay. About how much time had passed now
19  between the drinks that you had at the Backstage Cafe and
20  the interview with Mr. Duncan?
21  A. Maybe two, three weeks. I honestly don't know
22  how much time. It wasn't an immediate.
23  Q. Okay. Two to three weeks pass. Then you
24  interviewed with Duncan and Ms. Phipps?

Page 61

1   A. Yes.
2       (Recess taken.)
3   BY MR. TAMBUSSI:
4   Q. Ms. Bailey, we are back on the record. We were
5   talking about this two- to three-week period that passed
6   between the time you spoke to Mr. Duncan and then you
7   were ultimately interviewed for the job. During this
8   two- to three-week period did you socialize with
9   Mr. Duncan at all on any occasion?
10  A. No.
11  Q. No lunch? No after work drinks or anything of
12  that nature?
13  A. No.
14  Q. Okay. During this two- to three-week period
15  before you were interviewed, did you have any further
16  communications with Mr. Duncan in the workplace about the
17  job?
18  A. Not that I recall. If we did, it was just in
19  passing or something like that or he would e-mail — no.
20  He did not e-mail me.
21      He would just either say, you know,
22  something, but it wasn't anything that was more than a
23  sentence or two.
24  Q. Okay. Did he work in close proximity to where

16 (Pages 58 to 61)

Page 62

1    your workstation was?

2    A.  I believe, yes, he did.

3    Q.  Did you see him on a daily basis?

4    A.  Not -- he did not come to the office I don't

5    believe, not daily.  So I don't remember seeing him

6    daily.

7    Q.  On the average during this two- to three-week

8    period, how often or frequently did you see him?

9    A.  Maybe once, twice a week.

10    Q.  Okay.  All right.  By the way, going back to

11    this Commerce orientation, do you have any recollection

12    of any discussion regarding workplace attire at that

13    orientation?

14    A.  Yes.

15    Q.  What do you recall?

16    A.  They said to make it business appropriate.

17    Q.  Show you a video?

18    A.  I don't remember, no -- I don't remember.

19    Q.  Don't remember seeing a video?

20    A.  No.

21    Q.  Okay.  When they talked about business

22    appropriate, did they tell you what they meant by that?

23    A.  I believe that they did, but I don't remember

24    exactly what was said.

Page 63

1    Q.  Okay.  When you interviewed with Mr. Duncan and

2    Ms. Phipps -- is it Phipps or Phelps?

3    A.  Phipps.

4    Q.  How long did the interview take?

5    A.  I don't remember.  Maybe an hour.

6    Q.  Did they tell you what would be expected of you

7    in the interview if you got the position?

8    A.  They outlined the job, yeah.  They outlined what

9    the job would entail.

10    Q.  What did they tell you about the job?

11    A.  That it was going to be sales and service and

12    supervising for small business.

13    Q.  What did they tell you about the supervising

14    aspect?

15    A.  That it would be the day-to-day operations of

16    the customer service and the sales representatives.

17    Q.  Did they tell you about how many people you

18    would supervise?

19    A.  I don't remember offhand at that point in time

20    in the interview.

21    Q.  Did you tell them that nowhere in your prior

22    employment had you ever had supervisory authority?

23    A.  Yes.  That was discussed.

24    Q.  Did you have any -- well, tell me what was

Page 64

1    discussed about that.

2    A.  I had indicated that I did not have any

3    supervisory experience.

4    Q.  What was the response?

5    A.  That they were sure that I was able to handle

6    the position.

7    Q.  During that period of time up until this

8    interview you knew that Commerce offered courses or

9    classes or some sort of training at its university with

10    regard to various aspects of the Commerce business,

11    correct?

12    A.  I was aware that they offered classes.  To what

13    aspect they were, I was not aware.  I thought that they

14    were continuing ed., where you would go and discuss

15    general liability.

16    Q.  Did you make any effort to determine what type

17    of classes Commerce offered?

18    A.  On occasion I would look, but I wasn't really

19    looking for any jobs — any classes along those lines,

20    no.  No, I didn't.

21    Q.  Even though you had no experience in the

22    supervisory function?

23    A.  Correct.

24    Q.  Okay.  After this interview, what happened next

Page 65

1    with regard to this job?

2    A.  They offered me the position -- the information

3    was conveyed to Mr. Burcham.  I was told that I couldn't

4    leave my current position until there was a replacement.

5    Q.  Were you offered the position at the interview?

6    A.  I don't believe so.

7    Q.  How much time went by between the interview and

8    when you were offered the position?

9    A.  I don't remember.

10    Q.  Do you have any idea by way of estimation?  Was

11    it a month?  Two months?

12    A.  It wasn't a month.  I don't remember correctly.

13    Q.  Okay.  Between the time you had the interview

14    and time you were offered the position, did you have

15    social interactions with Mr. Duncan?

16    A.  No.

17    Q.  How long did it take to find a replacement for

18    Mr. Burcham — the position you had for Mr. Burcham?

19    A.  I actually found a girl that I worked with at

20    Zutz to come over and interview and she accepted the

21    position.  I believe it was like three months.

22    Q.  So from the time you were offered the position,

23    three months elapsed before you actually took it?

24    A.  I don't know if it was three months.  I'm

17 (Pages 62 to 65)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                 C.A. # 05-CV-183 SLR                 Bailey, Kimberly A. - Vol. 1

Page 66

1   guessing at that. I'm sorry.
2       Q.  Is that an approximation?
3       A.  I honestly don't remember how long it was.
4       Q   Okay. All right. During this period of time,
5   whenever it might be, did you have any social interaction
6   with Mr. Duncan?
7       A.  Social?
8       Q.  Any after work get-togethers? Any lunches? Any
9   breaks where you take a walk around the building or go
10  outside for a breath of fresh air?
11      A.  No.
12      Q.  Anything whatsoever outside of the workplace?
13      A.  No.
14      Q.  Okay. During this period of time between the
15  time that you were offered the position and the time you
16  actually started, did you go out with your co-workers for
17  after work drinks and things like that?
18      A.  I believe there was one occasion where
19  Mr. Duncan, Marge Phipps and myself went out to discuss
20  the Main Street and what their goals were.
21      Q.  This was during the period of time after you
22  were offered the position?
23      A.  After I was offered position.
24      Q.  But before you started?

Page 67

1       A.  Yes.
2       Q.  Where did you go?
3       A.  We went to the same place, Backstage Cafe.
4       Q.  It was just the three of you?
5       A.  Yes.
6       Q.  Okay. Did you have some drinks?
7       A.  Yes.
8       Q.  For how long did you stay?
9       A.  I don't -- I only stayed for about an hour and a
10  half, maybe two at the very longest.
11      Q.  Did Ms. Phipps stay the whole time?
12      A.  I believe -- I don't remember exactly. I don't
13  remember.
14      Q.  Did Mr. Duncan walk you to your car that night?
15      A.  No. He did not.
16      Q.  Did you leave at the same time as Mr. Duncan?
17      A.  I believe I left before everyone.
18      Q.  Not sure, though, right?
19      A.  No. I'm not sure.
20      Q.  Okay. All right. Ultimately you start the job
21  with Main Street, correct?
22      A.  Yes.
23      Q.  Okay. Did you change your physical work
24  location?

Page 68

1       A.  Yes, I did.
2       Q.  Okay. Was it within the same building?
3       A.  It was in the same building.
4       Q.  Different section of the building?
5       A.  Yes.
6       Q.  Where was your new work location with regard to
7   Mr. Duncan's work location?
8       A.  We were in the same section. He had an office
9   with a door. I was in a cubicle.
10      Q.  Okay. Was your cubicle right next to his
11  office? Down the hall from his office?
12      A.  It was outside of his office, but the way the
13  cubicle worked, you had to walk down this long hallway to
14  get into the section to come back. So it wasn't a direct
15  path, no.
16      Q.  Okay. About what time or what year, month and
17  year was it that you actually started this position?
18      A.  I don't remember directly offhand what the exact
19  time was.
20      Q.  Sometime in 2001?
21      A.  No. I don't believe it was 2001. I know for a
22  long time I was -- for a while I was doing the core job
23  and I was doing some aspects of the Main Street job.
24      Q.  Okay. So you think it was sometime in 2002?

Page 69

1       A.  Possibly, yes.
2       Q.  Okay. All right. Prior to this start of the
3   new job, had you ever been reviewed or evaluated by
4   Mr. Burcham?
5       A.  I started in August. They gave reviews in
6   December -- was it November or December? Mr. Burcham I
7   believe did give me -- I know I got a bonus, but I can't
8   remember offhand what the review was.
9       Q.  Okay. But you remember being reviewed by
10  Mr. Burcham?
11      A.  I remember speaking with Mr. Burcham around the
12  review time and I got a bonus. You always remember
13  money, getting a little extra money. I don't remember
14  exactly if there was a complete review form done.
15      Q.  Okay. So if you started at Commerce in August
16  of 2001, sometime in 2002 you move over to this Main
17  Street job, correct?
18      A.  Yes.
19      Q.  Is it more than a year or less than a year that
20  you have been working for Commerce?
21      A.  That I moved over to the Main Street? I believe
22  it was less than a year.
23      Q.  Okay. Sometime prior to August of 2002?
24      A.  Yes.

18 (Pages 66 to 69)

Page 70

1   Q.  Okay. Now, when you start this new position,
2   does Mr. Duncan give you any more specificity as to what
3   your job duties are?
4   A.  I don't remember exact -- no. I believe that --
5   no, he did not.
6   Q.  Okay. And just so I understand how this part of
7   the business was structured, you have Mr. Duncan as a
8   manager of sorts?
9   A.  He was a director.
10  Q.  And then Ms. Phipps, what was her title?
11  A.  She was the assistant director.
12  Q.  Then there was you?
13  A.  Yes.
14  Q.  And you were manager?
15  A.  I was supervisor.
16  Q.  Supervisor. Okay. Who was beneath you?
17  A.  I had 10 -- well, immediately or at what time?
18  Q.  When you started.
19  A.  I believe when I finally made the move over to
20  the Main Street, releasing my responsibilities of the
21  core position, we had hired at that time two customer
22  service reps.
23  Q.  So initially there were two customer service
24  reps?

Page 71

1   A.  One was sales; one was customer service.
2   Q.  Two people ---
3   A.  I'm sorry. They both were sales. Areceli and
4   Sharon both came over as sales.
5   Q.  What was the first name?
6   A.  A-r-e-c-e-l-i.
7   Q.  Those two people reported to you?
8   A.  Yes.
9   Q.  So initially there were two people reporting to
10  you?
11  A.  Yes.
12  Q.  Ultimately that grew to a greater number of
13  people?
14  A.  Fifteen.
15  Q.  Ultimately when you left you were supervising 15
16  people?
17  A.  I was supervising 10.
18  Q.  Okay. 15 reported to you?
19  A.  No. I wasn't overseeing the sales department
20  anymore. I was just overseeing customer service.
21  Q.  Initially when you become supervisor, you are
22  overseeing sales, there's two people. Then more customer
23  service reps come in, correct?
24  A.  Yes.

Page 72

1   Q.  Then the sales group grows also, but you are no
2   longer supervising them?
3   A.  It wasn't until Mr. Duncan was terminated that
4   the sales was taken from me, the salespeople, the
5   supervisory position of the salespeople.
6   Q.  Now, when you became a supervisor, you
7   understood, did you not, that your responsibilities would
8   change somewhat from your previous position in Commerce?
9   A.  My -- yes. I understood my responsibilities
10  would change.
11  Q.  You understood that you would be expected to
12  lead by example, correct?
13  A.  And that's exactly what I told Mr. Duncan in the
14  interview, is that -- he asked me what type of supervisor
15  I was. I said I was the one that basically led by
16  example.
17  Q.  Okay. You understood that Commerce itself, at
18  least from your orientation, had certain expectations on
19  how its employees should act in the workplace, correct?
20  A.  Yes.
21  Q.  And how its employee should dress in the
22  workplace?
23  A.  Yes.
24  Q.  You understood that?

Page 73

1   A.  Yes.
2   Q.  Okay. When you start this job with Main Street,
3   did there come a time thereafter where you socialized in
4   any way, shape or form with Mr. Duncan?
5   A.  Socialize, what do you mean?
6   Q.  Anything where you met with Mr. Duncan, either
7   by yourself or others outside of the workplace.
8   A.  Any outside -- anything outside of the office
9   was something that was work related or work gathering.
10  It wasn't -- there wasn't a meeting outside of work,
11  outside of the office that was social between Mr. Duncan
12  and myself.
13  Q.  Did you ever attend any activities outside of
14  the office with Mr. Duncan where work was not discussed?
15  A.  No.
16  Q.  All right. Tell me about the events that
17  occurred after you started in Main Street outside of the
18  office where Mr. Duncan was in your company, even if
19  others were present?
20  A.  I don't follow your question.
21  Q.  Fair enough.
22  A.  Do we have a specific?
23  Q.  All right. Sometime in 2002 you are working
24  directly for Mr. Duncan, correct?

19 (Pages 70 to 73)

Page 74

1    A. Yes.
2    Q. At some time thereafter you were at events,
3    activities, get-togethers, where Mr. Duncan was also
4    present outside of the workplace, correct?
5    A. Yes.
6    Q. Tell me what they were, when they occurred and
7    who else was there.
8    A. The majority of the events were carrier related
9    where marketing reps would want to take the department as
10   a whole out on a social event.
11   Q. Tell me what they were, where they occurred,
12   when, who was there.
13   A. I don't remember exactly all of them.
14   Q. How many?
15   A. I couldn't give you a number.
16   Q. More than 20?
17   A. I don't believe so, but I couldn't give you a
18   number.
19   Q. How about more than 10?
20   A. I don't remember.
21        MR. MARCONI: Can I lodge an objection?
22   Sort of ask for a clarification. Do you mean other than
23   what's already been identified in the sexual harassment
24   complaint or in our complaint in the District Court?

Page 75

1        MR. TAMBUSSI: I mean what she recalls.
2        MR. MARCONI: Sitting here this minute?
3        MR. TAMBUSSI: Sitting here today what she
4    recalls.
5    BY MR. TAMBUSSI:
6    Q. Were there more than 5 events outside the
7    office?
8    A. I couldn't give you an exact number.
9    Q. Do you have an estimation?
10   A. No.
11   Q. Okay. For how many months did you work under
12   Mr. Duncan's supervision?
13   A. From the beginning up until his termination.
14   Q. How many months was that?
15   A. I don't know.
16   Q. More than 15, 18 months?
17   A. I don't remember the exact date of his
18   termination.
19   Q. Do you remember the exact date of your
20   termination?
21   A. August 27, 2003.
22   Q. Was Mr. Duncan terminated before you?
23   A. Yes.
24   Q. How far before was Mr. Duncan terminated?

Page 76

1    A. Approximately 8 weeks or — you know, I don't
2    know. I don't recall.
3    Q. For how long of a period of time did you work
4    for Ms. Corcoran?
5    A. I don't recall when Mr. Duncan was terminated.
6    Q. My question is — I'm sorry. Did you finish?
7    A. Up until when Mary took the gap between
8    Mr. Duncan leaving and Mary coming and my termination, I
9    don't recall the exact number.
10   Q. I'm not asking for exact. Can you give me your
11   best approximation of the period of time that you worked
12   under the supervision of Ms. Corcoran?
13   A. Under Ms. Corcoran? I honestly — it wasn't
14   long.
15   Q. Eight weeks?
16   A. I don't remember.
17        MR. MARCONI: I'm going to object and
18   instruct her not to answer. This is all information that
19   is within Commerce's records.
20        MR. TAMBUSSI: Don't give a speaking
21   objection. You objected.
22        MR. MARCONI: Well, I'm going to object and
23   instruct her not to answer the question.
24        MR. TAMBUSSI: Are you asserting some sort

Page 77

1    of privilege?
2        MR. MARCONI: No. They are asked and
3    answered and I think you are trying to harass her. You
4    are asking her the same question. It's all just in a
5    different way.
6        MR. TAMBUSSI: I'm asking her questions in
7    a way to try to refresh her recollection.
8        MR. MARCONI: She's —
9        MR. TAMBUSSI: I am entitled to test her
10   recollection and that's part of the deposition process.
11   She makes very serious allegations. These are what she
12   claims to be very serious events and she has no idea of
13   the time frames involved. I think that's very relevant
14   and it also goes to her credibility.
15        Now, you have instructed her not to answer.
16   You can assert that. There's no privilege being
17   asserted. You made an additional statement. I'll move
18   on, but the fact of the matter is I'm entitled to probe
19   her recollection.
20        MR. MARCONI: I agree. But if she says to
21   you sitting here today she can't tell you the period of
22   time that she worked for a particular individual three
23   years ago, I think you should just take the answer as I
24   don't know, I don't remember.

Page 78

1      MR. TAMBUSSI: Counsel, you can take your
2  depositions the way you like, but I think I'm entitled to
3  probe her testimony and her recollection by using
4  whatever means possible to try to refresh her. That's
5  what I've done. If you don't like that, that's fine.
6  You stated your objection for the record.
7      MR. MARCONI: All right. For the record, I
8  think that your tactics are abusive and I don't think
9  it's necessary.
10     MR. TAMBUSSI: That can be your opinion,
11 Counsel.
12 BY MR. TAMBUSSI:
13 Q. Ms. Bailey, do you recall any of the carriers
14 that you say organized an event outside of the workplace
15 that involved your --
16 A. CNA.
17 Q. When did that occur?
18 A. I don't have an exact date.
19 Q. Okay. Did it occur shortly after you came to
20 work for Mr. Duncan or towards the period of time when
21 you were working for Ms. Corcoran?
22 A. It was during the time that I worked for
23 Mr. Duncan.
24 Q. Okay. Where was this event at?

Page 79

1  A. The marketing rep from CNA would try to do
2  something with us monthly.
3  Q. Do you recall having monthly events with the
4  folks from CNA?
5  A. I said she would try to do something with us
6  monthly. I don't believe we were able to do something
7  with every visit.
8  Q. Do you recall the number of times that CNA
9  organized an event?
10 A. No. Do not.
11 Q. Do you recall going to more than one event
12 organized by CNA?
13 A. Yes, I do.
14 Q. To your best recollection, approximation, how
15 many events organized by CNA did you go to?
16 A. I don't remember exactly.
17 Q. Where did these events occur?
18 A. The events would occur at local taverns or bars.
19 Q. Tell me which locations.
20 A. In particular, I can remember one at Backstage
21 Cafe and another one at BBC, which was the Brandywine
22 Brew Club.
23 Q. Just have recollection of two, correct?
24 A. That's my -- I can recall two.

Page 80

1  Q. Can you tell me when the Backstage event
2  occurred in relationship to the time that you first
3  started working with Mr. Duncan?
4  A. It was warm outside, so it had to be summertime.
5  I don't know an exact date.
6  Q. If you started with Mr. Duncan sometime July,
7  August 2002, would it be during that time frame?
8  A. I can't -- I don't have an exact date. I don't
9  have --
10 Q. You have no approximation as we sit here today?
11 A. I know it was summer. And we had already
12 established a work force of 15. Starting from two, we
13 had several months of interviewing and hiring and
14 training all these people. So...
15 Q. The answer is no, you have no approximation of
16 when it occurred?
17 A. It was in the summer of 2002.
18 Q. Who was there?
19 A. I don't remember exactly who was all there.
20 Q. Do you remember Mr. Duncan being there?
21 A. Mr. Duncan was there.
22 Q. Do you recall yourself being there?
23 A. I was there.
24 Q. Was Ms. Phipps there?

Page 81

1  A. I believe, but I can't imagine what why she
2  wouldn't be there. So, yeah, I'm sure she was there.
3  Q. Is that a guess on your part?
4  A. It's a guess.
5  Q. Who was there from CNA?
6  A. Jennifer Palmieri.
7  Q. What is it about this event that enables you to
8  recall that an event occurred at Backstage?
9  A. CNA was the only carrier that would actually,
10 that would try and produce events that were after work.
11 The majority of the other carriers would produce lunch or
12 do something and bring something in for the team. This
13 was just one summer after work that I remember going with
14 the group of girls down to Backstage Cafe.
15 Q. Group of girls and Mr. Duncan?
16 A. And Mr. Duncan.
17 Q. Was he the only male there?
18 A. I believe Julius Bland was also a customer
19 service representative, that he went down with us.
20 Q. Did he report to you?
21 A. Yes, he did.
22 Q. Okay. For how long were you there?
23 A. I don't remember exactly.
24 Q. Approximately?

21 (Pages 78 to 81)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                C.A. # 05-CV-183 SLR                Bailey, Kimberly A. - Vol. 1

Page 82

1    A.  I don't remember.
2    Q.  Can we say that it occurred after 5:00?
3    A.  It occurred after 5:00.
4    Q.  Do you recall about what time you got home that
5    night?
6    A.  No, I don't.
7    Q.  Do you recall whether or not you were one of the
8    first people to leave or one of the last people to leave?
9    A.  I was probably in the middle.
10   Q.  Okay.  And did you leave at the same time that
11   anyone else left?
12   A.  Not that I -- I don't recall.
13   Q.  You don't recall leaving alone or leaving with
14   anyone?
15   A.  No, I don't.  I don't recall if anyone left at
16   the same time as I did.
17   Q.  Do you recall walking out of the establishment
18   with anyone?
19   A.  Do I recall walking out of the establishment?
20   Q.  That's the question.
21   A.  I don't think that I visually see myself.  I
22   know I left.  So, no, I guess I don't actually recall it.
23   Q.  Okay.  Did you have anything to drink that night
24   of an alcoholic beverage nature?

Page 83

1    A.  I'm sure I had a beer.
2    Q.  One beer or more than one?
3    A.  I'm sure I had more than one beer.
4    Q.  Okay.  And did you have any interaction with
5    Mr. Duncan whatsoever that night?
6    A.  What type of -- speaking with him after work
7    or --
8    Q.  Anything.  Do you understand what the word
9    "interaction" means?
10   A.  I think it could be defined different ways.
11   Q.  Did you have any interaction whatsoever of any
12   nature, regardless of the definition, with Mr. Duncan
13   that night?
14   A.  I'm sure I told him good night or something
15   along those lines or I'm leaving.  I don't think that I
16   had any other conversation with him.
17   Q.  Well, what conversation did you have with him?
18   A.  We could have talked about what our -- what the
19   CNA market, what their appetite was, what they're writing
20   more than they are not writing and trying to incent the
21   sales people and getting them ideas on which way to look
22   at a risk.
23   Q.  Is that a guess on your part?
24   A.  It's a guess probably on what the conversation

Page 84

1    would have been, but normally that's what they would be
2    like, having the CNA --
3    Q.  I want to focus on this event and what words you
4    recall speaking with Mr. Duncan.
5    A.  I don't recall exact words.
6    Q.  Do you recall having any conversations non-
7    business related that night with Mr. Duncan?
8    A.  No.  I do not.
9    Q.  Did you have any conversation with Ms. Palmieri
10   that night?
11   A.  Yes, I did.
12   Q.  What was the nature of that conversation?
13   A.  More than likely work.  It was business related.
14   We would have been talking about either work related or
15   just other -- how are the kids doing.  She was a very
16   friendly marketing rep.
17   Q.  You said we would have been talking.  Do you
18   have any recollection?
19   A.  I have no recollection, no.
20   Q.  Anything else you recall about this specific
21   event at Backstage?
22   A.  No.
23   Q.  All right.  Tell me about the Brandywine Brew
24   Club event?  Did that occur before or after the CNA

Page 85

1    Backstage event?
2    A.  I believe it was after.
3    Q.  Okay.  Was Mr. Duncan present there?
4    A.  Yes, he was.
5    Q.  Were your other co-workers present?
6    A.  Other co-workers were present.
7    Q.  People that you supervised were there?
8    A.  Yes.
9    Q.  Was Mr. Duncan the only male there?
10   A.  I don't remember exactly.
11   Q.  Was Ms. Palmieri there?
12   A.  Yes, she was.
13   Q.  Do you have any recollection whatsoever of
14   anything that transpired that night?
15   A.  No.  An exact recollection, no, I do not.
16   Q.  Did you drink any alcoholic beverages that
17   night?
18   A.  Yes.
19   Q.  What did you drink?
20   A.  Beer.
21   Q.  A beer or more than one?
22   A.  Probably more than one beer.
23   Q.  How long did that event last?
24   A.  I don't remember.

22 (Pages 82 to 85)

Page 86

1    Q.   More than one hour?
2    A.   I don't remember.
3    Q.   More than two hours?
4    A.   I don't remember.
5    Q.   Did you have any interaction, by whatever
6    definition you want to put to that word, with Mr. Duncan
7    that night?
8    A.   Other than conversation. That was the
9    interaction was conversation.
10   Q.   What was the subject of the conversation?
11   A.   Work related.
12   Q.   Solely work related?
13   A.   I don't remember exactly.
14   Q.   Could it have been something other than work
15   related?
16   A.   I don't remember.
17   Q.   Could have been?
18   A.   I don't remember.
19   Q.   You don't contend, do you, that Mr. Duncan did
20   anything inappropriate as to you on the night of the
21   Backstage event that you referred to here, that CNA
22   hosted?
23   A.   Did he do anything inappropriate to me?
24   Q.   Yes.

Page 87

1    A.   No.
2    Q.   You don't make any contention that on the
3    occasion that you were in Mr. Duncan's company at the
4    Brandywine Brew Club that anything inappropriate occurred
5    to you from Mr. Duncan?
6    A.   No.
7    Q.   All right. Tell me some more events that
8    occurred outside of the workplace where Mr. Duncan was
9    present and you were present during the period of time
10   that you worked for Mr. Duncan other than these two.
11   A.   There was an occasion where we had a marketing
12   rep come down from -- Hanover I believe was the carrier
13   and Mr. Duncan wanted me to go out with him and this
14   marketing rep --
15   Q.   Okay.
16   A.   -- after work.
17   Q.   When did that occur?
18   A.   I don't remember the exact date.
19   Q.   Do you have an approximation?
20   A.   I have no approximation.
21   Q.   Was this a significant event work-wise?
22   A.   No. Significant by what standards?
23   Q.   I mean, you have a Hanover rep coming down and
24   you are going to meet and talk about business presumably,

Page 88

1    correct?
2    A.   Exactly.
3    Q.   Did the Hanover people come down and take you
4    out or take people from Commerce out frequently?
5    A.   It was my understanding they did, but I had no
6    immediate or -- I had no knowledge of what their
7    activities were.
8    Q.   This is the first time that you were meeting
9    with a Hanover rep after work to talk about business,
10   correct?
11   A.   We initially met at the office and Mr. Duncan
12   had made arrangements with Mr. Durham to go out
13   afterwards and asked me to join.
14   Q.   Was this the first time that you were asked to
15   join Mr. Duncan in meeting with a rep of an insurance
16   company?
17   A.   No.
18   Q.   Okay. Is this the first time that you went out
19   with Mr. Duncan and a rep of an insurance company after
20   work?
21   A.   No.
22   Q.   How many times had you gone out with reps of
23   insurance companies prior to this with Mr. Duncan after
24   work?

Page 89

1    A.   I don't have an exact number, but an example
2    would be the CNA outing.
3    Q.   With what frequency did you meet with members,
4    representatives from insurance companies and go out with
5    them after work in Mr. Duncan's company?
6    A.   I don't have an exact number. To my
7    recollection, it wasn't that frequent.
8    Q.   Was it more than once a week?
9    A.   No -- I don't know how often. It wasn't that
10   often.
11   Q.   Was it more than twice a month?
12   A.   I don't remember.
13       (Ms. Watson has left the deposition.)
14   BY MR. TAMBUSSI:
15   Q.   As we sit here today, your testimony under oath,
16   you can't recall the number of times that you went out
17   with Mr. Duncan and insurance reps during the
18   period of time that you worked with Mr. Duncan?
19   A.   An exact number, no. I could not recall.
20   Q.   Can you give us an approximation?
21   A.   No. I could not.
22   Q.   You can't identify any frequency with
23   relationship to weeks or months?
24   A.   No. It wasn't scheduled or it wasn't — there

23 (Pages 86 to 89)

Page 90

1  wasn't a certain frequency it would go by.
2      Q.  When you went out with this Hanover rep, where
3  did you go?
4      A.  We initially went to Backstage Cafe.
5      Q.  And it was just the three of you, Mr. Duncan,
6  Mr. Durham, and yourself, correct?
7      A.  No.  My girlfriend Cindy met us.
8      Q.  What is her last name?
9      A.  Smith.
10     Q.  Where does Ms. Smith reside?
11     A.  She resides in Apollo, Pennsylvania.
12     Q.  Okay.  Where did she reside at the time of this?
13     A.  Claymont.
14     Q.  Do you have Ms. Smith's phone number?
15     A.  Yes, I do.
16     Q.  What is it?
17     A.  I don't know it offhand.
18     Q.  Okay.  If I made a request, you could find it?
19     A.  Yes, I could.
20     Q.  How did Ms. Smith come to meet you there?  Did
21  you call her?
22     A.  Yeah.  I asked her to meet us there.  It was
23  Mr. Duncan's request, actually.
24     Q.  Mr. Duncan asked you to have Ms. Smith come?

Page 91

1      A.  Yeah.
2      Q.  How did Mr. Duncan know Ms. Smith?
3      A.  I guess in me talking about her.  I don't know
4  if -- I believe that they had met one other time.
5      Q.  What other time did they meet?
6      A.  I guess on another outing when we were at the
7  Backstage Cafe.
8      Q.  Ms. Smith didn't work for Commerce, did she?
9      A.  No.  She did not.
10     Q.  How was it that Ms. Smith would be invited to
11  these carrier-sponsored events at Backstage?
12     A.  I would tell her to either meet me there and we
13  would go somewhere else, because she was a girlfriend and
14  we palled around.  So whenever I was done with my work
15  function, I would go out with my girlfriends.
16     Q.  You told me that these functions that the
17  carriers had for after work were work related, correct?
18     A.  Yes.
19     Q.  Was Ms. Smith invited into these work-related
20  functions, even though she wasn't an employee of
21  Commerce?
22     A.  No.  She wasn't invited in.  She would either
23  meet us there and I would talk to her.  It wasn't -- it
24  wasn't, you know -- it was a social outing.

Page 92

1      Q.  How many times had Ms. Smith met Mr. Duncan
2  prior to this Hanover event?
3      A.  I don't recall.  I believe it was once.
4      Q.  You as we sit here today have specific
5  recollection of Mr. Duncan telling you to call Cindy
6  Smith and telling her to meet you at the Backstage?
7      A.  Yes.
8      Q.  Did you tell Ms. Smith why they wanted,
9  Mr. Duncan wanted her to meet you there?
10     A.  I think Mr. Duncan's thought was that there were
11  two gentlemen, there should be two women.
12     Q.  Did he say that to you?
13     A.  No.  He did not.  It was --
14     Q.  So that's an assumption?
15     A.  It was the assumption that I took, that I might
16  be uncomfortable going out with two gentlemen.  To have a
17  friend there for me.
18     Q.  It was your assumption that Mr. Duncan was
19  looking out for your well-being?
20     A.  I guess you could say that.
21     Q.  No, you said that.
22     A.  Yeah.
23     Q.  So did Ms. Smith meet you there?
24     A.  Yes.

Page 93

1      Q.  How long did you stay?
2      A.  We stayed at Backstage maybe an hour and then we
3  went to a different bar.
4      Q.  Did you have anything to drink at Backstage?
5      A.  Yes.
6      Q.  What did you have to drink?
7      A.  I would assume it was a beer.
8      Q.  A beer or more than one?
9      A.  Probably one.
10     Q.  Just one.  Where did you go after that?
11     A.  Kid Shelleen's.
12     Q.  I'm sorry?
13     A.  Kid Shelleen's.
14     Q.  What's that?
15     A.  It's a local restaurant, tavern, bar.
16     Q.  Did you sit down and have a meal?
17     A.  I don't recall.  I don't know if we ordered
18  appetizers or not.  I don't recall.
19     Q.  Did you sit at the table or at a bar?
20     A.  At the bar.
21     Q.  Okay.  Did you have anything to drink there?
22     A.  Yes.
23     Q.  What did you have?
24     A.  Probably a beer.

24 (Pages 90 to 93)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006              C.A. # 05-CV-183 SLR              Bailey, Kimberly A. - Vol. 1

Page 94

1    Q.  A beer or more than one?
2    A.  Probably more than one.
3    Q.  Okay.  Did Ms. Smith have anything to drink?
4    A.  I believe so, yes.
5    Q.  How about Mr. Duncan?
6    A.  Yes.
7    Q.  Mr. Durham?
8    A.  Yes.
9    Q.  Did you ever tell Mr. Duncan at any time when he
10   suggested that you go to the Backstage and call Cindy
11   Smith to go, that you didn't think it was appropriate?
12   A.  I don't recall, but I don't recall talking to
13   him or discussing with him that.
14   Q.  Well, Mr. Duncan didn't tell you that you had to
15   go, did he?
16   A.  He had indicated that he wanted me to go out and
17   meet with him and this Hanover representative.
18   Q.  He didn't tell you that you would be fired if
19   you didn't go, did he?
20   A.  No.  He didn't say that.
21   Q.  He didn't tell you anything would happen to you
22   if you didn't go, did he?
23   A.  Not that I recall, no.
24   Q.  So you voluntarily went?

Page 95

1    A.  It was a work — he had indicated it was work
2    related.
3    Q.  All right.  When you left the Backstage to go to
4    this other establishment, did you express reservations
5    about going there to Mr. Duncan?
6    A.  To Kid Shelleen's?
7    Q.  Yes.
8    A.  No.
9    Q.  You had no problem going there?
10   A.  To the second bar, no.
11   Q.  Okay.  Why did you leave the first bar?
12   A.  I believe, if I remember correctly, there was a
13   band that was very loud.  It was difficult to hear.
14   Q.  How long did you stay out with Mr. Duncan and
15   Mr. Durham on that — and Ms. Smith on that night?
16   A.  Actually, it wasn't, I don't believe it was that
17   late. Mr. Durham had to -- he had left.
18   Q.  Mr. Durham left first?
19   A.  Mr. Durham and Mr. Duncan left and Cindy and I
20   stayed at Kid Shelleen's.
21   Q.  You are not making any claim that Mr. Duncan did
22   anything inappropriate or untoward towards you on that
23   night, are you?
24   A.  Yes, Mr. Duncan did.

Page 96

1    Q.  What did he do?
2    A.  On the — when we left Backstage, Mr. Duncan
3    asked Cindy to drive Mr. Durham to Kid Shelleen's and
4    wanted me to drive in his car with him.  And at that time
5    Mr. Duncan placed his hands on me.
6    Q.  Okay.  How did you get to Backstage?
7    A.  I drove my vehicle.
8    Q.  Okay.  Why is it that you didn't drive your car
9    to Kid Shelleen's?
10   A.  Because my girlfriend Cindy was taking her car
11   and I would get the ride.  I was going out with her
12   later.
13   Q.  You were going to leave your car at Backstage?
14   A.  Yes.
15   Q.  Is it your contention that Mr. Duncan asked
16   Ms. Smith to drive Mr. Durham?
17   A.  He did.  He asked Cindy that, if she would drive
18   Mr. Durham and he wanted to talk to me.
19   Q.  Okay.  Did you express any reservations about
20   getting in the car with Mr. Duncan at that time?
21   A.  He was my boss.  No, I did not.
22   Q.  Now, you said that Mr. Duncan put his hands on
23   you on that occasion?
24   A.  Yes.

Page 97

1    Q.  As we sit here today, you have no recollection
2    of when that occurred time-wise?
3    A.  The date or time?
4    Q.  Approximation.  You told me you had no idea when
5    it occurred.
6    A.  I don't have — I know I have it written down
7    somewhere and in my complaint.  If I could refer to that,
8    I could tell you what the date was.
9    Q.  As we sit here today, you have no independent
10   recollection of when that event occurred?
11   A.  Of the date, no.
12   Q.  Or even an approximation of the month?
13   A.  No, I don't.
14   Q.  Or even the year?
15   A.  No.  I'm not -- I'm not — I'm not going to
16   guess.
17   Q.  I'm asking for an approximation.  You don't have
18   one?
19   A.  An approximation of the year had to be 2002.
20   Q.  How about the month?
21   A.  I don't know.
22   Q.  Okay.  How long is it a ride from Backstage
23   to Kid Shelleen's?
24   A.  I'd say approximately about 15 minutes.

25 (Pages 94 to 97)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006          C.A. # 05-CV-183 SLR          Bailey, Kimberly A. - Vol. 1

Page 98

1    Q.  How long did you stay at Kid Shelleen's after
2    you took this 15 minute ride from Backstage?
3    A.  How long did Cindy and I stay? Or how long did
4    I stay?
5    Q.  How long did you stay?
6    A.  I stayed probably until about 10:00 or 11:00.
7    Q.  About what time did you get to Kid Shelleen's?
8    A.  I don't remember offhand.
9    Q.  How long were you at Kid Shelleen's, all total?
10   A.  I don't -- I don't know. I don't know.
11   Q.  More than one hour?
12   A.  Yes, more than one hour.
13   Q.  More than two hours?
14   A.  An approximate, yes. More than two hours.
15   Q.  Okay. Of that more, approximately more than two
16   hours, for how long was Mr. Duncan there?
17   A.  I believe Mr. Duncan and Mr. Durham were there
18   for approximately one hour.
19   Q.  Okay. So after this 15 minute car ride where
20   you say Mr. Duncan put his hands on you, you were in his
21   company for approximately another hour?
22   A.  Yes.
23   Q.  Okay. Did you tell Ms. Smith on that night that
24   Mr. Duncan had put his hands on you?

Page 99

1    A.  Yes, I did. I told her after he had left, yes.
2    Q.  Did you tell Mr. Durham on that night that he
3    had put his hands on you?
4    A.  No.
5    Q.  Did you make any phone calls to, when you got to
6    Kid Shelleen's and out of Mr. Duncan's car, to anyone
7    from law enforcement to claim that somebody put their
8    hands on you?
9    A.  No.
10   Q.  Did you call anyone?
11   A.  Not that I recall.
12   Q.  Other than Ms. Smith, who you say you spoke to
13   sometime well after an hour of being in Mr. Duncan's car,
14   did you tell anyone else within the 24-hour period of the
15   event occurring that Mr. Duncan had put his hands on you?
16   A.  Not that I recall, no.
17   Q.  Did you go to work the next day?
18   A.  I don't know if it was -- I don't know if it was
19   a weekend or if it was a work night. I don't recall.
20   Q.  Well, did you go out with Mr. Duncan on like a
21   Saturday night?
22   A.  No. I don't recall if it was a Friday night and
23   if I would have went in to work on the next day.
24   Q.  All right.

Page 100

1    A.  It's a possibility that it could have been a
2    Friday night. It could have been a Tuesday night. I
3    didn't miss too much work.
4    Q.  The next day that you went to work after the day
5    you say Mr. Duncan put his hands on you, did you contact
6    anybody in Commerce and tell them?
7    A.  No.
8    Q.  How about Ms. Phipps, did you tell her about it?
9    A.  No, I did not.
10   Q.  Did you look at the Commerce handbook and see if
11   there was anyone that you could call?
12   A.  No. I didn't look at the handbook.
13   Q.  You went through the same orientation with
14   Ms. Watson. Did you think about calling her?
15   A.  No. I didn't think about calling her.
16   Q.  Glenn Burcham was your previous boss. Did you
17   go and tell him about it?
18   A.  No.
19   Q.  How about any of the people that you supervised,
20   did you tell a single one of them that it had occurred?
21   A.  No.
22   Q.  The next day you went in to work did you
23   confront Mr. Duncan?
24   A.  No, I didn't.

Page 101

1    Q.  Did you say anything to Mr. Duncan about the
2    incident that you say where he put his hands on you?
3    A.  Did I say anything to Mr. Duncan? No, I did
4    not.
5    Q.  Did you tell Mr. Duncan at any time afterwards
6    that what he did was unwelcome?
7    A.  When Mr. Duncan touched me, I took his hands up
8    out of my crotch area and held onto his hand to keep it
9    out of my crotch area. I thought the gesture there would
10   be enough for him to know that I didn't want his hand
11   between my legs.
12   Q.  The next time that you saw Mr. Duncan did you
13   say anything to him that it was unwelcome, don't even try
14   it again?
15   A.  There was another time when I had indicated to
16   him that — this was before this had happened -- that I
17   told Mr. Duncan that he was my boss and I didn't want
18   that type of advancement.
19   Q.  So this is the second event?
20   A.  I believe this was the second event, yes.
21   Q.  We will get to the first event in a minute, but
22   after the second event occurred, when you went back into
23   the workplace did you tell Mr. Duncan that this is
24   unwelcome, I have no interest in this?

26 (Pages 98 to 101)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006    C.A. # 05-CV-183 SLR    Bailey, Kimberly A. - Vol. 1

Page 102

1    A.  No, I did not.
2    Q.  You reported it to no one at Commerce?
3    A.  No, I did not.
4    Q.  Tell me about the first instance.
5    A.  The first event was I was meeting up with my
6    girlfriends -- and this is I believe the, where
7    Mr. Duncan met Cindy for the first time. I was meeting
8    up with my friends on something that was unrelated to
9    work. Mr. Duncan happened to show up at the same bar.
10   Q.  What bar?
11   A.  Backstage Cafe.
12   Q.  Did you mention anything in the workplace that
13   you were going to be at the Backstage that night?
14   A.  I happened to mention when I was talking to a
15   group or something like that, that I was going out
16   tonight with my girlfriends and we were headed to
17   Backstage.
18   Q.  Did you mention that in Mr. Duncan's presence?
19   A.  I had to have mentioned it in his presence, yes.
20   Q.  You say you had to have?
21   A.  He showed up there and he obviously knew we were
22   going there, so...
23   Q.  Are you saying you did not tell him?
24   A.  I was talking about it and he overheard. So I

Page 103

1    guess in my conversation he knew that we were going
2    there, so --
3    Q.  How do you know he overheard? Was he in the
4    same area where you were having this discussion?
5    A.  I believe he said something to me about it, like
6    "you are going to Backstage tonight?"
7    Q.  Is that a guess on your part?
8    A.  Yes. It's a guess. I don't recall the
9    conversation exactly, but I know that I had plans to meet
10   three good friends of mine at Backstage.
11   Q.  Who?
12   A.  Cindy Smith, Lynn Einstein, and Tim Pinion.
13   Q.  And who?
14   A.  Tim Pinion, P-i-n-i-o-n.
15   Q.  We know Ms. Smith doesn't work for Commerce.
16   How about Ms. Einstein?
17   A.  No.
18   Q.  Mr. Pinion?
19   A.  No.
20   Q.  Without having to give them to me today, do you
21   have contact information for Ms. Einstein?
22   A.  Yes.
23   Q.  How about for Mr. Pinion?
24   A.  Yes.

Page 104

1    Q.  Addresses and phone numbers?
2    A.  I can produce them.
3    Q.  Okay. Did you go to Backstage right after work?
4    A.  Yes.
5    Q.  About how often during this period of time that
6    you worked for Mr. Duncan did you go to Backstage after
7    work?
8    A.  I couldn't give you an exact frequency.
9    Q.  More than once a week?
10   A.  I don't have an exact frequency.
11   Q.  Well, I'm looking for an approximation. Did you
12   go every Friday night?
13   A.  To Backstage?
14   Q.  Yes.
15   A.  No.
16   Q.  Did you go to Backstage in the order of once a
17   week?
18   A.  No.
19   Q.  Okay. How long were you at Backstage before you
20   saw Mr. Duncan had showed up?
21   A.  It was shortly after we arrived that he arrived.
22   Q.  And were you at the bar? Were you seated at a
23   table?
24   A.  We were in the bar area, standing up at a tall

Page 105

1    table. They had a buffet. We were having some of the
2    buffet.
3    Q.  Okay. Did Mr. Duncan come in alone?
4    A.  Yes.
5    Q.  And did you tell him to join you?
6    A.  He showed up. He's my boss. I'm going to say
7    hello. I introduced him to my friends.
8    Q.  Did you ask him to join you?
9    A.  No. I did not ask him to join us.
10   Q.  Did he join you?
11   A.  Yes, he did.
12   Q.  Okay. Did you mention to him that this was a
13   private gathering?
14   A.  No, I did not.
15   Q.  Did you have anything to drink that night?
16   A.  Yes, I did.
17   Q.  What did you drink?
18   A.  More than likely beer.
19   Q.  More than one?
20   A.  Yes.
21   Q.  This event where you were with Ms. Smith,
22   Ms. Einstein and Mr. Pinion, did Mr. Duncan buy any of
23   the beer?
24   A.  I don't recall. I honestly don't recall.

27 (Pages 102 to 105)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006

C.A. # 05-CV-183 SLR

Bailey, Kimberly A. - Vol. 1

Page 106

1   Q.  How long did you stay at Backstage?
2   A.  A little over an hour probably and then we
3   headed down into Newark.
4   Q.  You say "we." Who is we?
5   A.  My girlfriends and I normally go to a tavern
6   which is near where I had recently purchased a house.
7   And we — that's where we liked to hang out. That's
8   where we hung out.
9   Q.  You said "normally." I'm talking about this
10  night. Where did you go?
11  A.  We went to Backstage Cafe and from there we went
12  to Bank Shots in Pike Creek.
13  Q.  What's it called?
14  A.  Bank Shots. It's a pool tavern.
15  Q.  So you are at Backstage for a little over an
16  hour. Mr. Duncan is there the entire time?
17  A.  Yes.
18  Q.  And then did you, Ms. Smith, Ms. Einstein, and
19  Mr. Pinion all go to Bank Shots?
20  A.  We had decided — because Mr. Duncan was putting
21  his hand on my backside, that I was becoming
22  uncomfortable and I kept positioning myself so I would
23  talk to him and he would have to take his hand off of me.
24  And my friends were having, you know, they were having a

Page 107

1   cow about it. I said we should probably go and I was
2   thinking that if we headed that way, he lives in a
3   completely different direction, that he would say, oh, I
4   need to go home, so...
5   Q.  You said we decided, because he was putting his
6   hands on my backside. Did you have a discussion about
7   this decision?
8   A.  We didn't have a discussion. I think it was
9   obvious, the way that my posture was and I'm looking at
10  my girlfriends, giving them a face, you know, what? This
11  is my boss. Why does he have his hands on me?
12      And I turned to him and said — started
13  talking to him. He said, "Let's go dance." I said, "I
14  don't want to dance." And I just continued to try to
15  position myself where he wasn't able to put his hands on
16  me.
17  Q.  Did you say anything to Ms. Smith that night,
18  that he had put his hand on your backside?
19  A.  I didn't say anything verbally. I think they
20  could see the expression on my face.
21  Q.  All right. Did you say anything to Ms. Einstein
22  that you didn't like where his hand was?
23  A.  Ms. Einstein, Tim Pinion and Cindy Smith all saw
24  the expression on my face and knew that I was

Page 108

1   uncomfortable.
2   Q.  But my question is more about what they saw with
3   regard to where you say Mr. Duncan's hand was. If you
4   were positioned between them and Mr. Duncan's hand, how
5   could they see that his hand was on your backside?
6   A.  He was up against me.
7   Q.  My question to you is: How could they see his
8   hand was on your backside? Were you facing them?
9   A.  I was facing them, yes.
10  Q.  All right. He was standing, Mr. Duncan was
11  standing close, next to you, correct?
12  A.  Yes.
13  Q.  And he had an arm behind you?
14  A.  Yes.
15  Q.  So just by your positioning, it was not clearly
16  visible to them where Mr. Duncan's hand was, correct?
17  A.  I can't say that it was — I don't know, but
18  they had to know something was going on.
19  Q.  All right. Did you say in the presence of any
20  of these people, Smith, Einstein, Pinion, to Mr. Duncan,
21  look, we have got to go?
22  A.  I'm sorry? Did I say to whom?
23  Q.  Smith, Einstein, Pinion.
24  A.  I don't know if it was myself or it was Cindy,

Page 109

1   but it was indicated let's go.
2   Q.  Okay. Did you tell Mr. Duncan where you were
3   going?
4   A.  I told him, yeah, we were going to head down to
5   Newark.
6   Q.  If you were wanting to get out of his company,
7   why did you tell him where you were going?
8   A.  As I indicated, he lived in Middletown and I was
9   hoping that he would say, oh, it's out of my way, I'm
10  going to head home.
11  Q.  Did you tell him the name of the establishment
12  that you were going to?
13  A.  I told him we were headed to Newark.
14  Q.  That's it?
15  A.  Yes.
16  Q.  Did anyone mention the establishment in
17  Mr. Duncan's presence?
18  A.  No.
19  Q.  All right. Do you recall when this event
20  occurred?
21  A.  The date?
22  Q.  How about the month?
23  A.  I don't recall.
24  Q.  How about the year?

28 (Pages 106 to 109)

Page 110

1  A. I don't recall.

2  Q. So you say he had his hand on your backside and

3  he asked you to dance. You said no. Are you saying this

4  occurred throughout the entire hour plus that you were

5  there?

6  A. No, it did not. It didn't happen the entire

7  time.

8  Q. Okay. How many times did it occur?

9  A. It happened a few, three or four.

10 Q. Three or four times he got close to you and put

11 his hand on your backside?

12 A. It was more of a continuous, but it seemed like

13 it was just where he would take it off and I would

14 position myself and he would reposition himself, until I

15 turned around and looked at him and said, "What are you

16 doing?"

17 Q. Do you recall specifically saying that?

18 A. He completely ignored.

19 Q. What do you specifically recall saying to him?

20 A. "What are you doing?"

21 Q. What did he say?

22 A. He just ignored it.

23 Q. Did you take any steps to push his hand away?

24 A. I put my hand here, yes. I don't know if I

Page 111

1  pushed his hand, but I put my hand here (indicating).

2  Q. Did you say anything to him to the effect that,

3  look, you have to keep your hands off me?

4  A. No. I did not.

5  Q. Okay. All right. So at some point in time you

6  and Ms. Smith and Ms. Einstein and Mr. Pinion decide to

7  leave?

8  A. Yes.

9  Q. Did you all walk out together?

10 A. Yes.

11 Q. What happened with Mr. Duncan?

12 A. He asked us where we were going.

13 Q. You said what?

14 A. We said we were going to Newark.

15 Q. Then what happened?

16 A. He said where in Newark.

17 Q. What did you say?

18 A. I said to the place that was where we like to go

19 and hang out, which was Bank Shots.

20 Q. So you told him where you were going?

21 A. Yeah. He had asked.

22 Q. Okay. What happened next?

23 A. He had said could he follow us.

24 Q. All right. Your response was?

Page 112

1  A. Sure.

2  Q. Okay. Who did you drive with?

3  A. I drove. I drove myself I believe.

4  Q. By yourself?

5  A. Yes.

6  Q. How many beers had you had up until this point?

7  A. Probably two.

8  Q. That's your best recollection?

9  A. Yes.

10 Q. Did you pay for this in cash or credit card?

11 A. I don't recall.

12 Q. Did you ever pay for your tab at Backstage with

13 credit card?

14 A. I don't recall.

15 Q. How long is it a drive to Newark?

16 A. 20 minutes.

17 Q. Did Mr. Duncan follow you?

18 A. Yes.

19 Q. Did Ms. Smith go?

20 A. Yes.

21 Q. Ms. Einstein?

22 A. Yes.

23 Q. Mr. Pinion?

24 A. Yes.

Page 113

1  Q. Anybody else in the group? Did the group get

2  any bigger?

3  A. No.

4  Q. What happened when you got to Bank Shots?

5  A. We ordered a drink.

6  Q. What did you have?

7  A. A beer.

8  Q. How long did you stay at Bank Shots?

9  A. I don't recall offhand.

10 Q. More than an hour?

11 A. I don't recall.

12 Q. Do you recall what time you got home that night?

13 A. Not offhand, no.

14 Q. Before midnight or after?

15 A. I couldn't tell you.

16 Q. Who all walked into Bank Shots with you?

17 A. It was Cindy, myself, Tim and Lynn and

18 Mr. Duncan.

19 Q. What happened when you got to Bank Shots?

20 A. We ordered our drinks.

21 Q. He ordered the drinks for you?

22 A. We ordered our drinks.

23 Q. I'm sorry. I didn't hear you.

24    Did anything happen at Bank Shots for this

29 (Pages 110 to 113)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 1

Page 114

1  indeterminate period of time that you were there?
2      A. Anything --
3      Q. Anything of significance other than you were
4  drinking and talking with your friends?
5      A. We were drinking and talking with our friends.
6      Q. Did Mr. Duncan do anything that you feel was
7  inappropriate at Bank Shots?
8      A. Not inside the establishment.
9      Q. You all walked into Bank Shots at about the same
10  time, your cars --
11      A. About the same time.
12      Q. Your cars pull up, they park, people lock their
13  cars, walk in, correct?
14      A. Yes.
15      Q. Did you sit at the bar?
16      A. No.
17      Q. Get a table?
18      A. No. We stood.
19      Q. Just you got your drinks and stood back off the
20  bar sort of thing?
21      A. Yes.
22      Q. And the entire time that you were there where
23  was Mr. Duncan?
24      A. I had left him standing up with my friends and I

Page 115

1  went and talked to some other people.
2      Q. Did he follow you over to your other friends?
3      A. Not that I recall.
4      Q. These other people that you saw, were they
5  people that you were friendly with?
6      A. Yes, some of my friends.
7      Q. Did you tell any of these other people that the
8  guy that came with you had put his hand on your backside?
9      A. No.
10      Q. After you talked to your friends what happened
11  next?
12      A. I went back and approached my group of friends
13  that I came with and Mr. Duncan said that he was going to
14  leave, would I walk him out to his car.
15      Q. Okay. He asked you to walk him to his car?
16      A. Yes.
17      Q. Your response was?
18      A. He's my boss. I complied.
19      Q. You know at this point in time you have been out
20  drinking for some period of time?
21      A. I know.
22      Q. And you are clearly not in a work situation,
23  right?
24      A. No. We were not at work.

Page 116

1      Q. There's clearly not even a carrier rep there
2  hosting or encouraging the event, correct?
3      A. Correct.
4      Q. You were in the company of your friends,
5  correct?
6      A. Exactly.
7      Q. And this gentleman asks you to walk out to his
8  car. You say yes?
9      A. He insinuated that there was things that he
10  needed to talk to me about.
11      Q. How does he do that?
12      A. Well, "can you walk me to my car? I want to
13  talk to you."
14      Q. Okay. Did he tell you, give you any clue as to
15  what he wanted to talk to you about?
16      A. He's my boss. I would assume that it was work
17  related.
18      Q. Well, I mean, you have been out drinking with
19  him for somewhere well over an hour. Did you at any time
20  during that period of time have any conversations about
21  coverage issues or personal policies or anything like
22  that?
23      A. I'm sure we did. I don't recall exactly, but I
24  was very -- I liked my job and I talked about my job a

Page 117

1  lot. So I can't say that we did or didn't. I'm sure
2  that I did.
3      Q. Well, did Mr. Duncan tell you at any time during
4  this period of time when you were out drinking with him
5  and your friends, that, you know, we need to talk about
6  the so and so account or you've got to follow up on Jane
7  Doe's paperwork or anything of that --
8      A. Not that I recall.
9      Q. All right.
10      A. I don't recall.
11      Q. Okay. So you agreed to walk with him out to his
12  car?
13      A. Yes.
14      Q. This is an establishment, this Bank Shots, that
15  you were familiar with?
16      A. Yes.
17      Q. Not only did you have Ms. Smith, Ms. Einstein,
18  and Mr. Pinion there, but there are other people there
19  that you knew, correct?
20      A. I'm sorry?
21      Q. That you knew?
22      A. Yes.
23      Q. Who are those other people?
24      A. I couldn't give you everyone's name.

30 (Pages 114 to 117)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006          C.A. # 05-CV-183 SLR          Bailey, Kimberly A. - Vol. 1

Page 118

1   Q. Give me who you remember.
2   A. I don't even remember who the bartender was, but
3   it was a group of people that I knew.
4   Q. Nobody else that worked at Commerce?
5   A. No.
6   Q. All right. So when you go out of Bank Shots'
7   doors, is it into a well lit parking lot?
8   A. There's lights out there, yes.
9   Q. Is this an establishment that has any door
10  persons or bouncers or anything like that?
11  A. On occasion they will have a door person.
12  Q. How about this night?
13  A. I don't recall.
14  Q. Okay. Could have been?
15  A. I don't recall.
16  Q. So you walk out to his car. What type of car
17  did he have?
18  A. I believe he had a Buick.
19  Q. Two door? Four door?
20  A. I don't recall.
21  Q. Where was it parked in relationship to your car?
22  A. I don't remember. I don't recall that.
23  Q. Okay. So you walk out with Mr. Duncan and what
24  happens?

Page 119

1   A. I'm following him and we are talking and he had
2   asked me to get in to the car. He was going to start his
3   car up.
4   Q. Was it cold out?
5   A. I don't recall that it was freezing.
6   Q. Okay. Did you find it a little odd that he
7   asked --
8   A. Yes, I did.
9   Q. Did you tell him that I'm going to go back in
10  and catch up with my friend?
11  A. It's my boss. He asked me to get in the car.
12  Q. My question to you is: Did you tell him I'm
13  going to go back in and catch up with my friend?
14  A. No, I did not. I had already agreed to walk him
15  out to his car.
16  Q. Now he's asking you to get in his car?
17  A. Yes.
18  Q. So you get in?
19  A. Yes.
20  Q. What happens once you get in the car?
21  A. I had started to say something and he lunged
22  over and started kissing me.
23  Q. Okay. All right. What did you do in response?
24  A. I was shocked. I didn't know what to do,

Page 120

1   unfortunately for myself. And soon thereafter my
2   girlfriend was knocking on his window, Cindy was.
3   Q. I'm sorry --
4   A. It was such a shock to me and, you know, it
5   lives in my memory, but I couldn't tell you how long it
6   was. I couldn't tell you how long the kiss was or
7   anything along those lines. It was a shock.
8   Q. Okay. You are in the car. He leans over and
9   kisses you and the next thing you hear is a knock at the
10  window?
11  A. He didn't just lean over. He lunged over and
12  grabbed onto me.
13  Q. Bucket seat? Bench seat in the front?
14  A. There's a thing in the middle, bucket.
15  Q. When he kisses you, what did you do?
16  A. I didn't know what to do. I didn't know what to
17  do.
18  Q. Did you kiss him back?
19  A. I assume that I did, but it wasn't my intention
20  to kiss back.
21  Q. Okay. Did you push him away?
22  A. I had my hand up. I didn't know what to do.
23  Q. Okay. All right. And the next thing you recall
24  is that --

Page 121

1   A. My girlfriend Cindy was knocking on the door, on
2   his car window door.
3   Q. You don't know how long you were out in the car?
4   A. It wasn't that long.
5   Q. But you do not know how long?
6   A. I don't recall how long it was.
7   Q. Okay. What happened after Cindy knocked on the
8   car window?
9   A. She said, "Get out of there." I got out.
10  Q. You went back into the bar?
11  A. Yes.
12  Q. Okay. And did you have some more drinks?
13  A. Yes.
14  Q. Okay. Did you have any discussion with
15  Ms. Smith at that point in time --
16  A. Yes. I was flabbergasted and told her I had,
17  you know, I didn't appreciate that. I didn't know what
18  his understanding was, but, you know, that wasn't -- she
19  said, "His hands were all over you all night," all this
20  stuff.
21      I said, "That's my boss." I don't -- she
22  knows I don't do that.
23  Q. You have a specific recollection of her saying
24  those words to you?

31 (Pages 118 to 121)

Page 122

1    A.  I don't have a specific recollection of what our
2  discussion was, but I knew that it was in disgust or
3  disbelief of what had happened.
4    Q.  All right.  Did you say anything to Mr. Duncan
5  in that car?
6    A.  No.  I started to — I began to speak and that's
7  when he lunged over.
8    Q.  Okay.  How about after that, after Ms. Smith
9  knocked on the window?
10    A.  She knocked on the window.  I was in such shock,
11  I just opened — I believe that her words were, "what are
12  you doing, get out of there," you know, or something
13  along those lines.  And I just opened the door and got
14  out.
15    Q.  Mr. Duncan drove away?
16    A.  Yes.
17    Q.  Do you recall what day of the week this
18  occurred?
19    A.  I do not.
20    Q.  The next day you went to work, did you contact
21  anybody, anyone in Commerce to tell them that this event
22  occurred?
23    A.  I tried to speak with Mr. Duncan.  He was not
24  there that day.  I did not contact anyone else.

Page 123

1    Q.  Did you contact anybody in law enforcement?
2    A.  No.
3    Q.  Did you tell anyone, other than Ms. Smith who
4  observed what you say happened, that this event occurred?
5    A.  Besides Lynn and Tim, no.
6    Q.  Did you tell anybody in the workplace?
7    A.  No.
8    Q.  Okay.
9    A.  I was embarrassed.
10    Q.  Did you tell Ms. Phipps?
11    A.  No.  I did not.  I was embarrassed.
12    Q.  How about any of the people that worked for you?
13    A.  No.  I did not.
14    Q.  But you were aware that Commerce has a phone
15  number that you can call if you feel that there's — you
16  have some problems in the workplace?
17    A.  I don't know that there's an exact phone number.
18  I'm sure there's someone you can contact.
19    Q.  But you didn't do that?
20    A.  No.  I did not.
21    Q.  Okay.  How much time went by between this event
22  occurring and the time you were out with Mr. Durham and
23  Ms. Smith?
24    A.  I don't have — I know it is written down there

Page 124

1  somewhere.  I don't know what the exact time is.
2    Q.  Was it weeks or months?
3    A.  I don't know.
4    Q.  This is the same Ms. Smith who you called to go
5  out with Mr. Duncan and Mr. Durham who witnessed this
6  event at Bank Shots?
7    A.  Yes.
8            MR. TAMBUSSI:  Okay.  I need to take a
9  short break.
10            (Discussion off the record.)
11            (Luncheon recess from 12:07 to 12:50 p.m.)
12  BY MR. TAMBUSSI:
13    Q.  Ms. Bailey, we are back on the record after a
14  brief lunch break.  Thus far you told me that you have
15  been out with Mr. Duncan on four different occasions
16  after work hours that you can recall, this Backstage
17  event with your friends, the Hanover Durham meeting —
18    A.  Yes.
19    Q.  — and then two events that you recall, one at
20  Backstage, one at Brandywine Brew Club that CNA was
21  somehow involved with?
22    A.  Yes.
23    Q.  Can you recall any other times that you were
24  with or in the company of Mr. Duncan outside of the

Page 125

1  workplace?
2    A.  There was the Travelers event where we went to
3  the Seniors golf outing.
4    Q.  When did that occur?
5    A.  I don't recall the date.
6    Q.  Do you recall the month?
7    A.  No.
8    Q.  Do you recall the year?
9    A.  No, I don't.
10    Q.  Do you recall where it occurred?
11    A.  In Maryland.
12    Q.  All right.  Was Travelers sponsoring or hosting
13  that event?
14    A.  I don't believe that they were sponsoring it.
15  They were a vendor or a venue at the outing.  They had a
16  tent.
17    Q.  Okay.  Did this occur after work hours?  During
18  work hours?
19    A.  This was on a Saturday.
20    Q.  Okay.  Were there any other folks from Commerce
21  there?
22    A.  Yes, there were.  I don't recall their names.
23    Q.  Were you the only person from your group with
24  Mr. Duncan?

32 (Pages 122 to 125)

Page 126

1   A.  Yes.
2   Q.  How did you come to go to that event?
3   A.  Chris Link, who was the Travelers marketing
4   representative, had offered to Steve tickets to attend
5   the Seniors Open Tour I believe is what it is called.
6   Q.  "Steve" meaning Mr. Duncan?
7   A.  Yes.
8   Q.  Okay.  How many tickets did he offer?
9   A.  I don't know that for exact.
10  Q.  Okay.  How did you come to learn of the event?
11  A.  Mr. Duncan asked me if I would like to attend.
12  Q.  Now, this Travelers event, was it before or
13  after the time that you were first at Backstage and then
14  at Bank Shots?
15  A.  It was after.
16  Q.  Was it before or after the Hanover occurrence?
17  A.  It was after.
18  Q.  Okay.  Was it months after the Hanover?
19  A.  I don't know exactly.
20  Q.  Okay.  How did you come to be invited to this?
21  A.  Mr. Duncan invited me.
22  Q.  How did that occur?  Did he call you into his
23  office?  What happened?
24  A.  If I remember correctly, Chris Link was visiting

Page 127

1   on a marketing visit to the department and had indicated
2   that the Seniors Tour was coming up and asked if we liked
3   golf or something like that, said that he could get us
4   tickets or something along those lines.
5   Q.  Were you present when he said this?
6   A.  When Mr. Link was talking about it the first
7   time, I remember hearing conversations about it, just in
8   being in the office with Mr. Link, Mr. Duncan and myself.
9   They were finishing up talking about upcoming events or
10  something and Chris had told Steve if he needed some
11  tickets for his department, if anyone would like to
12  attend, he could get some tickets.
13  Q.  Did you express any interest in going to this?
14  A.  I can't stand golf, no.
15  Q.  Me, neither.  I don't golf, nor do I like it.
16      All right.  So how was the subject broached
17  that you would attend?
18  A.  It was later on that Mr. Duncan had insinuated
19  that it would probably be a good thing for me to go, that
20  there was — Travelers was recently taken over by some
21  CEO or something, somebody changed from one carrier to
22  the other and he was going to be there and he thought it
23  would be a good idea if we attended and made an
24  appearance as Commerce Main Street.

Page 128

1   Q.  Did he make this — you said "insinuation."
2   What do you mean by that?
3   A.  I guess insinuation is not the right — he
4   indicated to me that with the change of the CEOs and the
5   important people that were going to be there for
6   Travelers, that it would be a good idea that as Commerce
7   — and we are supposed to be an upcoming thing — that we
8   should make an appearance and let ourselves be known to
9   these people.
10  Q.  You used the word insinuation before and I'm —
11  A.  I think I may have used it wrong.
12  Q.  Did you mean statement?  Did he say actual
13  words?
14  A.  Yes.  He said actual words.
15  Q.  So it wasn't that he implied something.  He
16  actually said something?
17  A.  He said that, yes.
18  Q.  Okay.  Who else, if anyone, was present when he
19  said these words to you?
20  A.  I don't recall.  I believe it would have just
21  been the two of us.
22  Q.  Okay.  Did you agree to go?
23  A.  Yes, I did.
24  Q.  He explained a business purpose for it and you

Page 129

1   agreed to go?
2   A.  Yes, and I agreed to go.
3   Q.  All right.  Now, how far away was this event in
4   terms of driving distance?
5   A.  I don't actually recall.  I know it was south.
6   Q.  Well, Maryland, part of Maryland is south of
7   Delaware —
8   A.  Yes.
9   Q.  Some of it might be west, but —
10  A.  It's definitely south.
11  Q.  Now, did you drive with Mr. Duncan to this
12  event?
13  A.  We made arrangements to meet at Pier 1 at the
14  Christiana Mall.  I parked my car there and Mr. Duncan
15  drove.
16  Q.  How long of a drive was it?
17  A.  I don't actually remember.  I know it was over a
18  couple hours.
19  Q.  Couple hour drive?
20  A.  I believe so, but I don't actually remember.
21  Q.  Prior to making this drive, did you say anything
22  to Mr. Duncan with regard to these other events that had
23  occurred in the past and that you were not interested?
24  A.  We finally, I finally did get ahold of him after

33 (Pages 126 to 129)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 1

Page 130

1  that one incident where he kissed me and had asked him
2  that he's my boss and I didn't want any advances that
3  way.
4      Q.  Okay.  When you say I finally did get in touch
5  with him --
6      A.  The day he had kissed me and I tried to approach
7  him asking him, you know, if we could talk, he wasn't at
8  work or he wasn't in the office, our office that day.
9  There was plenty of times he spent time up in New Jersey.
10 When I was able to get ahold of him and have a moment and
11 said, can we go to lunch or can we get out of the office
12 so that I can talk to you, he evaded me for a little bit,
13 because I'm sure he knew I wanted to talk about that.
14 But then finally within the next week we did make it to
15 lunch.
16     Q.  So you initiated a lunch with Mr. Duncan?
17     A.  Yes, I did.
18     Q.  Okay.  How long was it between this Bank Shots
19 occurrence and that lunch?  Weeks?
20     A.  I believe it was within, it was within the next
21 week.  So that week ended up where he was either out of
22 the office one day and then the next day he didn't have
23 time to -- I didn't have the correct time in private to
24 say, you know, I'd like to have a lunch with you to

Page 131

1  discuss some things.  So that week had ended and it was
2  with the next week that we had lunch.
3      Q.  Where did you go for lunch?
4      A.  Bull's Eye.
5      Q.  What's that?
6      A.  It's a little roast beef joint on Kirkwood
7  Highway.
8      Q.  Do they serve alcohol there?
9      A.  Yes.
10     Q.  Did you have any at lunch?
11     A.  No.
12     Q.  Did Mr. Duncan?
13     A.  I don't believe that he did, no.
14     Q.  Tell me what you said and he said at that lunch.
15     A.  It was, the drive over was fairly quiet.  We got
16 into the restaurant.  Mr. Duncan drove.  And I had
17 insinuated to -- I said to him -- I didn't insinuate.  I
18 said to him, "You are my boss.  I don't care where I
19 shit."  And I don't, you know, I don't want any
20 advancement -- I asked him that, did he offer me this
21 opportunity, this career opportunity because he was
22 attracted to me or was there anything along those lines?
23 He had indicated, no, that there was not.  He apologized.
24 He understood what my parameters were.  And he indicated

Page 132

1  that it wouldn't happen again.
2      Q.  Okay.  You left the lunch --
3      A.  We finished lunch up.  From what I understood,
4  it was understood.
5      Q.  So then when you went out with Ms. Smith and
6  Mr. Duncan and Mr. Durham after that --
7      A.  After that.
8      Q.  -- did you attempt to have a similar
9  conversation?
10     A.  That's why I took his hand out of and I held on
11 to it, so he would not touch me.
12     Q.  Did you have any further discussion with him
13 after that event?
14     A.  After?
15     Q.  Like the lunch you had at Bull's Eye?
16     A.  No.  The Bull's Eye was the only actual time
17 that I said, you are my boss, I'm your subordinate.  Do
18 not do that.  That's not where I want -- that's not what
19 I wanted out of this opportunity.
20     Q.  So then you go to this Travelers event.  You
21 drive for a couple hours down.  Anything significant
22 happen on the hour -- the drive?
23     A.  Mr. Duncan asked me to masturbate in front of
24 him or something like that.  He stuck his hand between my

Page 133

1  legs and asked if I were to masturbate, how would I
2  masturbate.  I told him I would not masturbate in front
3  of him.
4      Q.  How far in the ride were you when he made this
5  comment?
6      A.  I don't know exactly how far into the ride it
7  was.
8      Q.  You ultimately got to the event?
9      A.  We ultimately got to the event.
10     Q.  Anything happen there?
11     A.  As far as him touching me at the event?
12     Q.  Anything.
13     A.  Nothing that I can recall happened at the event.
14     Q.  Okay.  There were other Commerce people there,
15 though?
16     A.  There were other Commerce people there.
17     Q.  Did you at any time indicate to any of the other
18 Commerce people there that you believed Mr. Duncan was
19 acting inappropriately?
20     A.  No, I did not.
21     Q.  Okay.  This was on a Saturday?
22     A.  This was on a Saturday.
23     Q.  Okay.  At some point in time the event ended and
24 you needed to come back to Christiana Mall, correct?

34 (Pages 130 to 133)

Page 134

1    A. Yes.
2    Q. Did you ask any of the other Commerce people
3    there to give you a ride back?
4    A. No, I didn't. Mr. Duncan was trying to drop me
5    off at the hotel of Mr. Durham.
6    Q. He was trying to drop you off at the hotel of
7    Mr. Durham. Was Mr. Durham at this event?
8    A. Yes, he was.
9    Q. Tell me what you mean by that.
10   A. Mr. Duncan was trying to set up or have
11   Mr. Durham and I date and I guess he was trying to play
12   matchmaker.
13   Q. Okay. What makes you believe that?
14   A. He had asked me if I wanted to go to
15   Mr. Durham's hotel room. And he had already also at
16   other times with this other outing with Mr. Durham, he
17   had tried to set us up or get us to be able to get
18   interested in each other or date.
19   Q. I thought he had Ms. Smith go with Mr. Durham?
20   A. He had Mr. Durham drive with Ms. Smith to the
21   second bar, but on our drive over there when Mr. Duncan
22   was putting his hand between his legs and was expressing
23   Mr. Durham's -- he liked me or he wanted to touch me
24   here, he wanted to do this and that --

Page 135

1    Q. Well, what are the exact words that he said?
2    A. I don't remember exactly, but they were sexual
3    in content.
4    Q. So you get to this Travelers event. Did you
5    know Mr. Durham was going to be there?
6    A. I knew Mr. Durham was going to be there.
7    Q. Had you had any occasion to interact in any way
8    with Mr. Durham between the time that he was at the
9    Backstage with you and Mr. Duncan and Cindy?
10   A. Mr. Durham and I e-mailed on occasion. I
11   believe that he may have called me. I can't recall if we
12   actually -- I had his cell phone number only because that
13   was his business number. I don't know if I actually gave
14   him my cell phone number, but I know that we had called
15   each other.
16   Q. What did you talk about?
17   A. He wanted to meet. He wanted to be able to have
18   dinner, something along those lines.
19   Q. Did you return his calls?
20   A. I talked to him on occasion, yes.
21   Q. Did you ever tell Mr. Durham that you weren't
22   interested in having dinner with him or anything of --
23   A. That I was not interested?
24   Q. That you were not interested.

Page 136

1    A. No.
2    Q. These e-mails that you sent and received from
3    Mr. Durham, about how many are there?
4    A. I can't recall exactly.
5    Q. Did you send them from your Commerce computer?
6    A. I possibly did, yes.
7    Q. How about your home computer?
8    A. I can't recall that if I -- I'm sure I may have,
9    but I cannot recall.
10   Q. These e-mails, e-mail traffic that you had with
11   Dr. Durham, did any of that occur after hours, so to
12   speak, in the evening, for example, or weekends?
13   A. Well, there was several times in my job that I
14   worked very late and/or worked over the weekend that I
15   may have received an e-mail that he sent, when they could
16   have been after those particular hours.
17   Q. How about the e-mail traffic that had nothing to
18   do with work, but, rather, having dinner and things like
19   that?
20   A. I don't believe there was too much
21   correspondence via e-mail that way. He would either call
22   and we would try to set up something that way.
23   Q. Did you ever go out to dinner with him?
24   A. We had appetizers and a drink one time.

Page 137

1    Q. That's it?
2    A. Yes.
3    Q. Where was that?
4    A. That was at the -- we decided to meet in the
5    middle, which was Philadelphia at the Airport Marriott in
6    the bar there.
7    Q. So you drove up to Philadelphia?
8    A. Yes, I did.
9    Q. Was that after hours?
10   A. Yes, it was. I'm trying to remember if it was
11   over the weekend. I don't recall.
12   Q. Okay. Was this before or after the golf outing
13   in Maryland?
14   A. I don't truly recall. I believe it was after.
15   Q. How long did this appetizers and drinks meeting
16   last?
17   A. Our date? My date with Mr. Durham?
18   Q. Yeah.
19   A. It was a date. Probably two hours. It wasn't
20   that long.
21   Q. Did you ever tell Mr. Durham that you thought
22   Mr. Duncan had acted inappropriately toward you?
23   A. I don't believe that I used those exact words.
24   Q. What words did you use?

35 (Pages 134 to 137)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                C.A. # 05-CV-183 SLR                Bailey, Kimberly A. - Vol. 1

Page 138

1    A.  I may have indicated to Mr. Durham that I
2    believe that Mr. Duncan was a little flirtatious with me.
3    Q.  Is that as far as you went?
4    A.  Yeah.  I was interested in this man.  I didn't
5    want to insinuate that my boss was hitting on me.
6    Q.  The e-mails that were received or sent from your
7    personal computer, do you still have that computer?
8    A.  No.  I do not.
9    Q.  What happened to it?
10   A.  I believe I sold it in a garage sale.
11   Q.  When?
12   A.  When I moved into my new house on 7 Gilbertie
13   Lane.
14   Q.  Do you presently have a computer in your new
15   house?
16   A.  Yes, I do.
17   Q.  Does that computer -- was that computer ever
18   used to send or receive e-mail from Mr. Durham?
19   A.  No, it was not.
20   Q.  Did you ever keep copies of any of the e-mails
21   that were sent or received from Mr. Durham?
22   A.  No. I did not.
23   Q.  When you spoke to Mr. Durham did you use your
24   cell phone or your land line?

Page 139

1    A.  I can't truly recall that.
2    Q.  Do you still have the same cell phone number
3    that you had when you spoke with Mr. Durham?
4    A.  I believe I do.
5    Q.  What's your cell phone number?
6    A.  (302) 562-7688.
7    Q.  After you had this date with Mr. Durham, did you
8    have any further contact with him prior to the Travelers
9    golf outing?
10   A.  Prior, no.  I believe the date was after.
11   Q.  Okay.
12   A.  So no -- well, my contact with the setting up
13   that Mr. Duncan had done when we went to Backstage and
14   then to Kid Shelleen's, that was actually the first time
15   I ever met him.
16   Q.  Okay.  You met Durham when you went to Backstage
17   and Kid Shelleen's?
18   A.  Yes.
19   Q.  Then Durham came up again with regard to the
20   Travelers golf outing?
21   A.  As Hanover had a venue or tent there also and
22   was represented.
23   Q.  Then you had a date with Mr. Durham?
24   A.  Yes.

Page 140

1    Q.  Have you had any contact with him since?
2    A.  With Mr. Durham?
3    Q.  Yes.
4    A.  Yes.  He had a roommate that had a birthday -- I
5    don't know if it was a roommate.  A friend that turned
6    forty and he had a party at his house that I attended.
7    Q.  Mr. Durham's house?
8    A.  Yes.
9    Q.  Where is his house?
10   A.  It is up in New Jersey.  I believe it's near
11   Commerce University.  I'm not sure of the exact...
12   Q.  Okay.  Were you still working for Commerce when
13   you went to Mr. Durham's house?
14   A.  Yes, I was.
15   Q.  Did you tell Mr. Duncan you were going to
16   Mr. Durham's house?
17   A.  I'm sure he knew, but I don't believe that I
18   did.  I can't recall that I did.
19   Q.  Was Mr. Duncan at the party?
20   A.  No.  He was not.
21   Q.  How long did you stay at Mr. Durham's house?
22   A.  I spent the night actually there.
23   Q.  Was the party on like a Friday or Saturday or --
24   A.  It was a Friday evening, if I recall correctly.

Page 141

1    Q.  Have you had any further contact with
2    Mr. Durham?
3    A.  I had left a jacket there and I had to call him
4    so I could pick up my jacket.  But after that, no.
5    Q.  So you went back again?
6    A.  I went back when I had to drive up for some
7    miscellaneous something or another for Commerce,
8    Mr. Durham left his house unlocked and I believe a
9    roommate was there or something.  I ran in, grabbed my
10   jacket and ran out.  But that was the last contact.
11   Q.  What is Mr. Durham's first name?
12   A.  Scott.
13   Q.  Did you ever send Mr. Duncan any e-mails
14   regarding Scott Durham?
15   A.  I can't recall.  I don't remember.  I'm sure I
16   may have, but I do not recall.
17   Q.  Did you ever forward Mr. Duncan any e-mails
18   regarding Scott Durham?
19   A.  Not that I can recall.
20   Q.  Did you ever communicate with Mr. Duncan
21   regarding your feelings towards Mr. Durham?
22   A.  I think any communication that would have been
23   between Mr. Duncan and I about Mr. Durham would not have
24   been conveyed through e-mail, and anything by or from

36 (Pages 138 to 141)

A36

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 1

Page 142

1    Mr. Durham that was forwarded to Mr. Duncan had to do
2    with work-related, because we wanted them to write
3    particular properties for us and any issues I had may
4    have been forwarded that way.
5         As regards to my feelings for Mr. Durham to
6    Mr. Duncan, I may have indicated, you know, that he's an
7    interesting man, he's very handsome, something along
8    those lines.
9         MR. TAMBUSSI: Mark that, please.
10        (Bailey Deposition Exhibit No. 1 marked for
11   Identification.)
12   BY MR. TAMBUSSI:
13        Q.   I'm going to show you what's been marked
14   Bailey 1 for identification. Could you take a read
15   through that and I'll ask a couple of questions about
16   that?
17        A.   (Witness complies.)
18        Q.   Ms. Bailey, before you is an e-mail that was on
19   your computer at Commerce. Do you recognize that
20   document?
21        A.   Yes, I do.
22        Q.   Do you recall receiving the initial part of that
23   document?
24        A.   Yes, I do.

Page 143

1    Q.   Who is Mr. James E. Scull, Sr.?
2    A.   He is a gentleman that I knew from a softball
3    league that I played on in Salem, New Jersey.
4    Q.   Mr. Scull in his e-mail sends you an invitation
5    of sorts, does he not?
6    A.   Yes, he does.
7    Q.   And he explains some things that he says could
8    happen to you if you went on this trip with him, correct?
9    A.   Exactly, yes.
10   Q.   Including cuddled and coddled and things of that
11   nature?
12   A.   Yes.
13   Q.   You forwarded this e-mail to Steve Duncan, did
14   you not?
15   A.   Yes, I did.
16   Q.   All right. Forwarding that e-mail to
17   Mr. Duncan, you never said that you found this to be
18   offensive, did you?
19   A.   No. I found this actually flattering.
20   Q.   Okay. In your forwarding to Mr. Duncan you say,
21   "I need to get this guy to give Scott some lessons." Do
22   you see that?
23   A.   Yes, I do.
24   Q.   Are you referring to Mr. Durham there?

Page 144

1    A.   Yes, I am.
2    Q.   Why did you send this to Mr. Duncan?
3    A.   In my first statement there it says, "Can a girl
4    get some time off." I had considered going on this
5    weekend with Mr. Scull.
6    Q.   Even though you were not interested in him at
7    all?
8    A.   He was a friend of mine. We had dated.
9    Q.   You also said, "It's a damn shame I'm not
10   interested at all in him," correct?
11   A.   Yeah. It was a damn shame that he wasn't
12   something. He was a very nice gentleman, but it wasn't
13   really anything that I was attracted to.
14   Q.   Well, why didn't you just send an e-mail to
15   Mr. Duncan saying I'd like some time off in October?
16   A.   Because Mr. Duncan was into my business along
17   those lines. He talked to me about dating, Mr. Durham or
18   other men that I may have dated. And I thought this was
19   cute, it was flattering, and I was forwarding it on to
20   Mr. Duncan and basically explaining that this is a nice
21   guy, if I was as interested in him as I was with
22   Mr. Durham, that would be nice.
23   Q.   So at least as of October of '02, you were
24   telling Mr. Duncan that you were interested in

Page 145

1    Mr. Durham?
2    A.   Yes.
3    Q.   Okay. You made that clear to him?
4    A.   Made it clear to Mr. Duncan?
5    Q.   Mr. Duncan, that you were interested in
6    Mr. Durham?
7    A.   He could give him some lessons. I can't
8    remember if, at that time if I was upset with Scott
9    because he was too much of a playboy or if he was not
10   giving me the attention that I wanted. So I can't
11   remember if my feelings toward Mr. Durham were at a
12   negative or a positive at that time.
13   Q.   But at this time you were sharing something that
14   you considered to be somewhat flattering to you with
15   Mr. Duncan in a very candid way, weren't you?
16   A.   I guess you could perceive that way, yes.
17   Q.   How do you perceive it?
18   A.   I was sharing a flattering e-mail with my boss,
19   who was in my personal business a lot more than was
20   necessary.
21   Q.   Didn't you put him or perpetuate him being in
22   your business by sending him this e-mail?
23   A.   I guess I included him, yes.
24   Q.   So when you say that Mr. Duncan was trying to

37 (Pages 142 to 145)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006          C.A. # 05-CV-183 SLR          Bailey, Kimberly A. - Vol. 1

Page 146

1  play matchmaker, you were already — you had already told
2  him that you were interested in Mr. Durham, correct?
3     A.  I had already expressed to him —
4     Q.  That you were interested in Mr. Durham.
5     A.  After I met him, yes, I explained that I was
6  interested, yes.
7     Q.  Well, obviously you had known Mr. Durham before
8  you sent this e-mail on to Mr. Duncan, correct?
9     A.  Yes.
10    Q.  So by the time you get to this Travelers golf
11 tournament, you had already let Mr. Duncan know that you
12 were interested in Mr. Durham?
13    A.  Yeah.  I never denied that I was interested in
14 Mr. Durham.
15    Q.  So why do you say that Mr. Duncan was trying to
16 play matchmaker?  When you go to the golf tournament, you
17 were already a match?
18    A.  No.  There was interest between the two of us
19 where we both expressed, you know, an interest in taking
20 it further, but we never took the time to I guess
21 actually date or take it further.
22    Q.  This isn't a work-related e-mail, is it?
23    A.  No, it is not.
24    Q.  You sent it on your Commerce computer to

Page 147

1  Mr. Duncan, correct?
2     A.  Yes, I did.
3     Q.  You are aware, are you not, that's a violation
4  of the Commerce policies regarding use of inneroffice
5  e-mail?
6     A.  I believe that is.
7     Q.  Have you used your Commerce e-mail, did you use
8  your Commerce e-mail to send other personal messages, not
9  of a business nature?
10    A.  I possibly could have.  I don't remember
11 exactly.
12    Q.  In fact, you have used your work-related e-mail
13 in your present employment to send personal matters to
14 Commerce people?
15    A.  Yes, I do.  I talk to girlfriends over there all
16 the time.
17    Q.  You know that it is a violation of the Commerce
18 policy to use e-mail there for personal reasons, correct?
19    A.  That's within there, yeah.  They have indicated
20 that to be so.
21    Q.  Is it your belief that sending, via business
22 e-mail, notice of a sex toy party is an appropriate thing
23 to do in a business setting?
24    A.  Do I think that's inappropriate?

Page 148

1     Q.  Do you think it's appropriate?
2     A.  Do I think it's appropriate?  If I have
3  girlfriends that are giving me an e-mail address and said
4  I can e-mail them at that address, it's appropriate, yes.
5     Q.  Even if the subject matter is regarding the
6  scheduling of a sex toy party at your house?
7     A.  Yes.
8     Q.  Even though you know that the use of the
9  Commerce e-mail for such messages is deemed inappropriate
10 by Commerce?
11    A.  Yes.
12    Q.  Did you not send an e-mail regarding a sex toy
13 party at your house to folks at Commerce?
14    A.  I believe I included a few girls at Commerce,
15 yes.
16    Q.  Did you communicate with Mr. Duncan any other
17 information regarding your personal relationships via
18 e-mail?
19    A.  Not that I'm aware of.
20    Q.  All right.  So now we are in Maryland and
21 Mr. Duncan, according to you, is trying to play
22 matchmaker between you and Mr. Durham and drives you
23 to — wants to drive you to Mr. Durham's hotel?
24    A.  He wants to drop me off at Mr. Durham's hotel.

Page 149

1  Have Mr. Durham on his way home the next day drop me off
2  at my car at the Christiana Mall.
3     Q.  Okay.  You know that because he says that to
4  you?
5     A.  Yes.  He's on the phone with his Commerce phone
6  calling Mr. Durham on his Hanover phone trying to make
7  arrangements of where he can drop me off.
8     Q.  Okay.  Did you go to Mr. Durham's hotel?
9     A.  I did not.  I told Mr. Duncan not to worry about
10 my sex life.
11    Q.  Did he say anything about sex?
12    A.  He's dropping me off at a hotel room to spend
13 the night.
14    Q.  Did he say anything about sex is my question?
15    A.  No.  He didn't say anything about sex.
16    Q.  And he then took you back to the Christiana
17 Mall?
18    A.  We had stopped on our drive at a restaurant to
19 have something to eat and had a couple margaritas I
20 believe.
21    Q.  Who suggested stopping to have dinner?
22    A.  It was getting late.  We both were hungry.
23 Mr. Duncan did.
24    Q.  You had no concern about stopping to have some

38 (Pages 146 to 149)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                C.A. # 05-CV-183 SLR              Bailey, Kimberly A. - Vol. 1

Page 150

1  drinks and some food with Mr. Duncan at that time?
2  A. No. At that time I did not.
3  Q. Okay. How long was dinner?
4  A. I don't recall exactly.
5  Q. Where did you stop?
6  A. I don't recall the name of the restaurant. Some
7  chain like Ruby Tuesday's or something, TGI Friday or
8  something. We ate at the bar.
9  Q. He dropped you off at your car?
10  A. Yes.
11  Q. That was it for that event?
12  A. That was it for that event.
13  Q. The next day you went to work, either following
14  Monday, Tuesday, whatever. Did you ever contact anybody
15  in the Commerce organization and tell them what had
16  transpired on that trip to Maryland?
17  A. No. I wouldn't call someone and tell them that
18  he asked me to masturbate.
19  Q. How about telling them that he tried to drop you
20  off at the hotel of Mr. Durham?
21  A. No. I didn't do that, either.
22  Q. Not a single person, didn't tell anybody?
23  A. I may have told one of my girlfriends.
24  Q. Who?

Page 151

1  A. Probably either Cindy or Lynn.
2  Q. Okay. When else were you in the company of
3  Mr. Duncan outside of the office?
4  A. On our trip to Randolph.
5  Q. Did that occur after the Maryland —
6  A. Yes, it did. If I remember correctly, yes, it
7  did.
8  Q. During this — do you have any idea when that
9  occurred?
10  A. It was cold out. I believe it was somewhere
11  between November and December.
12  Q. 2002?
13  A. I was terminated in 2003, so it had to be 2002.
14  Q. So we are in November, December 2002. And you
15  are going to make a trip to Randolph?
16  A. Yes, Randolph, New Jersey.
17  Q. During this period of time did you continue to
18  include some non-business related matters in your e-mails
19  to Mr. Duncan?
20  A. Not that I'm aware of.
21  Q. Do you recall in November of 2002 working on
22  your bio with Mr. Duncan?
23  A. Yes.
24       MR. MARCONI: Is this going to be Number 2?

Page 152

1       MR. TAMBUSSI: Yes. Can you mark that
2  Bailey 2.
3       (Bailey Deposition Exhibit No. 2 marked for
4  Identification.)
5  BY MR. TAMBUSSI:
6  Q. This bio, was it part of a package for Commerce
7  to send out?
8  A. It was something Mr. Duncan was putting together
9  to introduce Main Street.
10  Q. Okay. For Commerce?
11  A. Yes, for Commerce.
12  Q. Okay. And by November of 2002 you had already
13  been out with Mr. Duncan on a couple of occasions where
14  you say events occurred, correct?
15  A. Yes.
16  Q. During the same period of time you still enjoyed
17  a fairly casual working relationship with him, did you
18  not?
19  A. Yes. I assume so, yes.
20  Q. How did you refer to him in the workplace? Was
21  it Steve, Mr. Duncan?
22  A. It would actually — I would assume most of the
23  time, majority of the time Steve.
24  Q. Okay. Did you ever refer to him as Stevie?

Page 153

1  A. I could have. I don't recall.
2  Q. You wouldn't expect that Commerce would write a
3  bio of you that would include subjects personal to you,
4  would you?
5  A. I would hope that they would not.
6  Q. Let me show you what's been marked Bailey 2 for
7  identification.
8  A. (Witness reviewing document.)
9       Okay.
10  Q. Do you recognize that two page trail of e-mails?
11  A. Yes, I do.
12  Q. And do you recall sending to Mr. Duncan on
13  November 25, 2002, at 11:06 an e-mail regarding your bio?
14  A. Yes, I do.
15  Q. Do you recall referring to him as Stevie in
16  that?
17  A. It appears that I did say, "good job Stevie."
18  Q. Would it be fair to say that you were being
19  rather casual and maybe even flirtatious in that e-mail
20  to Mr. Duncan?
21  A. I think casual.
22  Q. Well, he's writing your bio and sends you it
23  with a request as to what your thoughts are, correct?
24  A. I'm sorry?

39 (Pages 150 to 153)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006          C.A. # 05-CV-183 SLR          Bailey, Kimberly A. - Vol. 1

Page 154

1    Q. He attached a draft of your bio and asks you
2    what your thoughts are, correct?
3    A. Exactly.
4    Q. And you say, "You didn't mention anything about
5    long walks on the beach or bubble baths or that I am soon
6    to be single and looking for Daddy Warbucks. Or that I
7    am the WOW of Main Street." You see that?
8    A. Yes, I do.
9    Q. Don't you consider that to be somewhat
10   flirtatious?
11   A. This was Mr. Duncan, who would bring up this
12   e-mail about walks on the beach and bubble baths being in
13   my personal life and it was just banter that occurred
14   from Mr. Duncan to myself and I was bantering him back
15   about it.
16   Q. Well, nowhere in this e-mail trail does he
17   initiate this banter, does he?
18   A. No. He does it verbally.
19   Q. Well, in this e-mail trail he's asking you what
20   you think of the bio, correct?
21   A. Yes.
22   Q. You are the one who raises long walks on the
23   beach and bubble baths and soon to be single and looking
24   for Daddy Warbucks?

Page 155

1    A. Because he always goes in my personal life about
2    my children and things like that.
3    Q. Your children don't have anything to do with you
4    looking for Daddy Warbucks, do they?
5    A. No.
6    Q. In fact, Mr. Duncan inquires: "Where is Amber
7    going to school? I want it in your bio"?
8    A. Yes.
9    Q. It has nothing to do with bubble baths and long
10   walks on the beach, does it?
11   A. No.
12   Q. So this was a comment, can we agree, that you
13   initiated?
14   A. Yes, it is.
15   Q. Do you think that's appropriate commentary in
16   the workplace?
17   A. If you understood the relationship between
18   Mr. Duncan and I, then, yes, that would be appropriate.
19   Q. Well, tell me what that relationship was that it
20   would be appropriate for you in an e-mail where you are
21   asked to comment on your bio for business purpose, to
22   talk about long walks on the beach, bubble baths, soon to
23   be single and looking for Daddy Warbucks.
24   A. Mr. Duncan had no problem talking to me about

Page 156

1    his sexual deviances, the fact that he had never been
2    faithful to his wife, the fact that he was screwing this
3    one as he's screwing that one. And for me to talk about
4    a bio and him making it sound like he's trying to, you
5    know -- he was always in my personal life, trying to set
6    me up or trying to do something in my personal life, that
7    an e-mail to him like that would not be out of line.
8    Q. It would be contrary to Commerce policy, would
9    it not?
10   A. Yes.
11   Q. As a supervisor you knew that also, correct?
12   A. As a director he knew that also.
13   Q. As a supervisor you knew that, correct?
14   A. I knew that, yes.
15   Q. Okay. You sent this to him at or around the
16   time this Randolph meeting was?
17   A. We were working on the bios prior to our visit
18   to Randolph.
19   Q. Okay. So after this e-mail exchange, you were
20   on your way to Randolph and what happens?
21   A. Before our visit to Randolph, I made it clear to
22   Mr. Duncan that, you know, in no way is this going to
23   be -- we do have separate rooms? That's bluntly what I
24   asked him. He said yes.

Page 157

1        And I indicated that in no way was any
2    advancements from him acceptable. I didn't want him
3    touching me.
4        We made our trip to Randolph. On our ride
5    up there, he tried to explain to me the different
6    producers and who was more important than the other one
7    and which one should I may pay more attention to.
8    Q. Okay.
9    A. Did I answer your question? I'm sorry.
10   Q. I asked you what happened on the way up.
11   A. Okay.
12   Q. What happened next. So you ride up and he's
13   talking to you about the different producers and who is
14   important and who is not?
15   A. Exactly.
16   Q. Okay. This conversation occurs without any
17   physical incident?
18   A. Yes, it does.
19   Q. Okay. It takes what? About from here, three
20   hours?
21   A. I don't know exactly. It seemed longer than
22   that, but I don't know exactly how long it was.
23   Q. It's not a straight line to Randolph?
24   A. No. It is not. You go up and then --

40 (Pages 154 to 157)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                C.A. # 05-CV-183 SLR              Bailey, Kimberly A. - Vol. 1

Page 158

1   Q.  Right.  It takes some time, clearly more than
2   two hours?
3   A.  Yes.
4   Q.  So you have this ride up without incident and
5   what happens when you get to Randolph?
6   A.  We get to Randolph and we attend a meeting with
7   the producers and I get to meet all these people that
8   Steve, Mr. Duncan has indicated as important.  Also, Paul
9   Scaffidi, who was the one that he pointed out to me that
10  it is most important that I make him love us, I make him
11  love me.  Those were his words.  He had to love Main
12  Street, he had to love me.
13  Q.  Okay.  You knew at that time that he wasn't
14  saying love as in romantic commitment, correct?  Because
15  one can't have a romantic commitment with Main Street,
16  can they?
17  A.  Well, no.  It was not with Main Street, no.
18  Q.  So when someone says we need to have this person
19  love us --
20  A.  Need their support.
21  Q.  Okay.  All right.  So he identifies Mr. Scaffidi
22  and the importance of having him support Main Street?
23  A.  Yes.
24  Q.  What happened next?

Page 159

1   A.  We attend a meeting at the Randolph office with
2   the producers and we go to dinner after the meeting.
3   Q.  Okay.  Who's at dinner?
4   A.  I don't remember exactly.  It was the majority
5   of the producers, the director of the Randolph office, I
6   believe his name is Mike Smith --
7   Q.  Okay.
8   A.  -- and Mr. Duncan and myself.
9   Q.  All right.  What happens at dinner?
10  A.  We eat.
11  Q.  Drink?
12  A.  We had drinks, yes.
13  Q.  More than one?
14  A.  Oh, yes.
15  Q.  Then what happens?
16  A.  After dinner, I guess the parties were leaving
17  and was telling everybody it was nice to meet them all,
18  that kind of stuff, gave out cards and did the business
19  affairs or whatever.  Mr. Duncan, myself and
20  Mr. Scaffidi, I don't remember exactly if it was just the
21  three of us or if there was someone else, we adjourned to
22  the bar.
23  Q.  Okay.  What, if anything, happened at the bar?
24  A.  We sat there and yukked it up for a while.

Page 160

1   Mr. Duncan decided it was time for him to go and I
2   started to put my jacket on.  He said, "No, no.  Go ahead
3   and stay with Mr. Scaffidi."
4        I'm like, I don't want to stay, I don't
5   want to stay.  I have some e-mail I need to catch up on.
6   I had my laptop with me.  There was work I could get done
7   back at the room.  I didn't want to be left in a bar
8   alone with a man that I just met.
9        But Mr. Duncan insisted that I stay.
10  Mr. Scaffidi assured me I would make it back to the room
11  safely or to the hotel safely.  And I stayed.
12  Q.  You had a couple more drinks with Mr. Scaffidi?
13  A.  Yes.
14  Q.  How long did you stay?
15  A.  Probably another hour.  Maybe a little bit
16  longer.  I'm not really sure.
17  Q.  How many more drinks did you have?
18  A.  I don't recall exactly.
19  Q.  Then you went to your room?
20  A.  Yes.  Mr. Scaffidi drove me back to the hotel.
21  Q.  Without incident?
22  A.  He went down the wrong side of the road, almost
23  had a head-on collision.  It was snowing outside.  He did
24  put his hands on me.

Page 161

1   Q.  You say Mr. Scaffidi put his hands on you.
2   Where?
3   A.  I don't remember exactly.  He was touching me.
4   Q.  In the bar?
5   A.  I believe he touched me in the bar and tried to
6   kiss me.
7   Q.  You believe or you have a recollection?
8   A.  I'm having not too clear -- I know there was
9   something there where he definitely expressed his
10  interest in me.
11  Q.  I wasn't there.  You were.  So I'm trying to get
12  an idea of exactly what happened here and you are telling
13  me that you can't tell me exactly what happened?
14  A.  He either rubbed my shoulder or touched my hair
15  or did something, gleaming into your eyes, you know.
16  Q.  I don't know.  You have to tell me.
17  A.  He expressed interest by touching my shoulder or
18  my hair and looking into my face and touching my face.
19  Q.  Is that a specific recollection or are you a
20  little hazy?
21  A.  It's a little -- it's specific enough.
22  Q.  I don't know what "specific enough" means.  You
23  don't have a clear recollection, do you?
24  A.  I know Mr. Scaffidi touched me and expressed

41 (Pages 158 to 161)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 1

Page 162

1  interest. Exactly where he touched me, no, I don't
2  remember exactly. It wasn't in an inappropriate area.
3      Q.  It was not?
4      A.  At that time at the bar, no. In a public place,
5  no. I don't want a man touching me inappropriately in a
6  private area. He touched me on -- in an appropriate
7  area.
8      Q.  Like brushing against your arm or --
9      A.  Yeah, just talking to you and rubbing your hair
10 or into the hair or just --
11     Q.  But you are not sure?
12     A.  No. I'm sure that he touched me.
13     Q.  You have no idea where?
14     A.  No. I can't.
15     Q.  All right. Okay. At any time did you get up
16 and say, look, I'm going to call a cab?
17     A.  No, I did not. If I called a cab, I don't even
18 know what hotel I'm going to. I had no clue where to go.
19     Q.  You had your room key, didn't you?
20     A.  Yes, I did.
21     Q.  All right. So you then get in the car with
22 Mr. Scaffidi?
23     A.  Yes.
24     Q.  And what did you say happened?

Page 163

1      A.  We got back to the hotel and he sat there. I'm
2  like, "I'm going to go in." He's like, "Oh, no. Let's
3  talk a little bit more." He started kissing on me.
4      Q.  In the hotel?
5      A.  No. In the car. We did not go into the hotel.
6      Q.  When you say he started kissing on you, what
7  does that mean?
8      A.  He was kissing my neck and kissing me on my face
9  and started kissing.
10     Q.  What were you doing?
11     A.  I kissed him back.
12     Q.  Okay. Then what happened?
13     A.  We stayed in the car for probably 20 minutes I
14 would say. I don't recall exactly the time. And then I
15 said, "I've got to get some sleep, I have to go."
16     Q.  Did you ever make any complaint to Commerce that
17 Mr. Scaffidi acted inappropriately?
18     A.  No, I did not. I was told Mr. Scaffidi needed
19 to love us.
20     Q.  Even after you left Commerce, did you make any
21 complaint before today that Mr. Scaffidi acted
22 inappropriately?
23     A.  No. I didn't make a complaint about
24 Mr. Scaffidi. I did not make a complaint about him.

Page 164

1      Q.  Do you feel that Mr. Scaffidi's actions were
2  totally inappropriate or was there some consensual
3  aspect?
4      A.  There could have been, yeah. There was a
5  consensual aspect to the fact that the relationship that
6  I maintained with Mr. Scaffidi after the Randolph
7  incident where I was told that he had to love us, I did
8  because of the department and I became friends with
9  Mr. Scaffidi.
10     Q.  Have you dated Mr. Scaffidi?
11     A.  Have I dated him?
12     Q.  Yes.
13     A.  I've met up with Mr. Scaffidi. I don't -- he's
14 a married man.
15     Q.  Where did you meet up with him?
16     A.  In -- we met twice and I believe it's in
17 Canterbury --
18     Q.  Cranberry?
19     A.  New Jersey.
20     Q.  Where?
21     A.  At a hotel. I don't recall the exact --
22     Q.  Did you meet up for drinks and dinner or --
23     A.  We had lunch.
24     Q.  Did you have relations with Mr. Scaffidi?

Page 165

1      A.  I had relations with Mr. Scaffidi, yes.
2      Q.  More than one occasion?
3      A.  Twice.
4      Q.  Do you still maintain contact with Mr. Scaffidi?
5      A.  On occasion I receive an e-mail from him.
6      Q.  Okay. This all occurred after the Randolph
7  incident?
8      A.  Yes.
9      Q.  When you made your complaints about Mr. Duncan,
10 why didn't you include anything about Mr. Scaffidi?
11     A.  My direct boss was my boss and who touched me
12 inappropriately was Mr. Duncan. My complaint about
13 Mr. Scaffidi was that Mr. Duncan basically pushed me into
14 a relationship that was not appropriate because he was a
15 married man, but my complaint was not with Mr. Scaffidi.
16     Q.  But you consensually continued that relationship
17 with Mr. Scaffidi on at least two occasions?
18     A.  I saw him once and then after I knew he was
19 married I saw him a second time and then that was it. I
20 told him we could not see each other like that.
21     Q.  And you drove to Cranberry on both occasions?
22     A.  Yes, I did.
23     Q.  When is the last time you spoke to Mr. Scaffidi?
24     A.  Communicated or spoke with him over the phone?

42 (Pages 162 to 165)

Page 166

1  Q.  Spoke with him on the phone, e-mailed —
2  A.  I received an e-mail from him I think last week.
3  Q.  What was the nature of that e-mail?
4  A.  It was a forward, some joke.  It wasn't, I don't
5  think it had anything to do with anything, really.  It
6  was just a forward saying, hey, how are you doing, what's
7  going on, one of those keeping in touch.
8  Q.  When you finally decided to complain about
9  Mr. Duncan to Commerce, you were encouraged to be
10  truthful, were you not?
11  A.  When I —
12  Q.  Communicated your complaints about Mr. Duncan —
13  A.  I was encouraged to be truthful, yes.
14  Q.  You were encouraged to be free and open and
15  forthcoming, correct?
16  A.  Yes.
17  Q.  But you were not completely forthcoming, were
18  you?
19  A.  On what grounds?
20  Q.  Well, you didn't tell them about the Scaffidi
21  issue completely, did you?
22  A.  I didn't think that it was my place to get him
23  in an issue or to get him in trouble.  I didn't — we
24  handled our situation as adults and said a mistake or a

Page 167

1  problem happened and it won't happen again.
2  Q.  Was your relationship over, your physical
3  relationship?
4  A.  Our physical relationship was over after our
5  second meeting.  We continued with a friendship, e-mail
6  relationship.
7  Q.  But that physical relationship, did it end
8  before or after you submitted your complaint as to
9  Mr. Duncan?
10  A.  I don't remember the exact time frame.
11  Q.  Do you know the name of the hotel you went to?
12  A.  No, I do not.
13  Q.  But you never told Ms. Watson or Mr. McKelvie
14  anything about your relationship with Mr. Scaffidi?
15  A.  No, I did not.
16  Q.  You never told Ms. Watson or Mr. McKelvie
17  anything about your relationship with Mr. Durham?
18  A.  I didn't have relations with Mr. Durham.  We
19  dated one time.
20  Q.  You never even told them about the date?
21  A.  No.  I don't believe — I don't remember that I
22  did.
23  Q.  Did you ever date Mr. Duncan?
24  A.  No.

Page 168

1  Q.  Did you ever have relations with Mr. Duncan?
2  A.  No, I did not.
3  Q.  Okay.  After this Randolph event, were there any
4  other times outside of the workplace that you were in the
5  company of Mr. Duncan?
6  A.  I'm trying to remember the instances.
7    I can't recall.  That we were just outside
8  of the workplace?
9  Q.  Yeah.
10  A.  No.  I believe that was it.  I can't recall any
11  other.
12  Q.  Were there ever any other times when you were in
13  Backstage or any of the other establishments and
14  Mr. Duncan was present?
15  A.  Not that I can recall, no.
16  Q.  There came a time — this Randolph incident,
17  that was months before you ultimately complained about
18  Mr. Duncan, correct?
19  A.  It was I believe several months, yes.
20  Q.  During that several month period, you had no
21  other interaction outside of the office with Mr. Duncan?
22  A.  Outside of the office, no.
23  Q.  Okay.  Tell me about your working relationship
24  with Mr. Duncan in the office during that period of time?

Page 169

1  A.  Mr. Duncan had started seeing steadily Jennifer
2  Palmieri from CNA and — which was to some relief to me,
3  so he would back off of me.  And he was busy running
4  around seeing her and boasting that he was fucking a girl
5  who was 16 years younger than him.
6  Q.  So that's the only relationship you had with him
7  in the office?
8  A.  No.  No.  We had our normal work-related issues.
9  Had the carrier representatives come in.  There were —
10  the WOW award.  There were other things that we did as a
11  team or as a department.
12  Q.  Did that involve going out to establishments
13  that had alcoholic beverages?  Hold off on the WOW awards
14  for us.
15  A.  What did we do?  I can't recall, but I know that
16  we did, we had a dinner at the Crab Shack down on the
17  waterfront, where we took the entire team out to dinner.
18  Q.  Any incidents where Mr. Duncan did anything by
19  way of physical or verbal interaction with you that you
20  deemed inappropriate?
21  A.  No.
22  Q.  So for this three-month period after Randolph —
23  by the way, at Randolph Mr. Duncan didn't touch you,
24  correct?

**Page 170**

1    A.  No, he did not.

2    Q.  So you didn't complain until maybe 4, 5, 6

3    months after the last incident where Mr. Duncan did

4    anything physically inappropriate to you, correct?

5    A.  No.  There was an incident where Mr. Duncan had

6    suggested an inappropriate situation that was the, I

7    guess the proverbial straw that broke the camel's back.

8    Q.  When?

9    A.  I don't know the exact date and time, but he had

10   invited me to join him and his girlfriend for a hotel

11   visit for a menage a trois.

12   Q.  When did he do this?

13   A.  I don't remember the exact date or time, as I

14   indicated.

15   Q.  Where were you when he indicated this to you?

16   A.  We were at work.  We were -- I believe I was in

17   his office.

18   Q.  Tell me the exact words, as best you can recall.

19   A.  I don't recall the exact words.  Mr. Duncan had,

20   we had talked about sexual deviances and things like

21   that.  My girlfriend, I don't know if you consider her a

22   swinger, but she enjoys that type of lifestyle.

23   Mr. Duncan always wanted to talk about my girlfriend

24   Cindy and the things that she had done or she was doing

**Page 171**

1    or what dates she had had.  Mr. Duncan had always asked

2    me was I ever interested, would I ever do anything along

3    those lines.

4    Q.  How did Mr. Duncan come to learn that Cindy was

5    a swinger?

6    A.  We would talk -- I would talk with Mr. Duncan in

7    casual conversation that, you know, Cindy went home with

8    this guy and don't even know him.  God, I hope she used

9    protection, along those lines.  He would ask more

10   questions for me to elaborate on the situation.

11   Q.  Are you saying that you brought up conversation

12   of a sexual nature in the workplace?

13   A.  Mr. Duncan would be talking about his sexual

14   escapades with his parties.  I wasn't having sex with

15   anybody, so I had to talk about my girlfriend's sexual

16   escapades.  That's the exciting life that I had.

17   Q.  Mr. Scaffidi, is he a Commerce employee?

18   A.  Yes, he is.

19   Q.  And you used the phrase in a statement that you

20   said to Mr. Duncan that you didn't want to shit where you

21   eat?

22   A.  Yeah.

23   Q.  Does that mean you didn't want to get involved

24   with someone who worked for Commerce?

**Page 172**

1    A.  Yes.

2    Q.  But you got involved with Mr. Scaffidi

3    consensually?

4    A.  Yes, I did, under the direction of Mr. Duncan.

5    Q.  Did Mr. Duncan know that you were meeting with

6    him at Cranberry on the two other occasions?

7    A.  I don't believe that he did, no.

8    Q.  Did Mr. Duncan specifically tell you to go sleep

9    with Mr. Scaffidi?

10   A.  He told me to make sure that he loved us.

11   Q.  Okay.  Are you saying the only reason you slept

12   with Mr. Scaffidi was because of Mr. Duncan?

13   A.  I'm saying that I allowed Mr. Scaffidi's

14   advances for the department, yes.  That I allowed his

15   advances and I was nice to him and I saw him because

16   Mr. Duncan told me to make sure that he loved us, that he

17   worked with us and he wanted to do business with us.

18   It's not anything I'm proud of, but it's something that I

19   did.

20           MR. TAMBUSSI:  Why don't we break here.

21       (Discussion off the record.)

22       (The deposition recessed at 1:55 p.m.)

23           - - - - -

24

**Page 173**

1              INDEX TO TESTIMONY

2

3    KIMBERLEY A. BAILEY                    PAGE

4

5    Examination by Mr. Tambussi            2

6

7

8              - - - - -

9

10             INDEX TO EXHIBITS

11

12   BAILEY DEPOSITION EXHIBIT NO.          PAGE

13   1................................. 142:10

14   2................................. 152:3

15

16

17

18

19

20

21

22

23

24