# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **KIMBERLEY A. BAILEY**<br><br>**Plaintiff,**<br>vs.<br><br>**COMMERCE INSURANCE**<br>**SERVICES, INC.,**<br>**a New Jersey corporation**<br><br>**Defendant.** | **Civil No. 05-CV-183 (SLR)**<br><br>**Civil Action** |

---

## DEFENDANT COMMERCE INSURANCE SERVICES, INC.'S APPENDIX TO ITS OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### VOLUME I

---

POTTER ANDERSON & CORROON LLP
Wendy K. Voss (I.D.# 3142)
Sarah E. DiLuzio (I.D. # 4085)
1313 N. Market Street
Wilmington, DE 19801
Telephone (302) 984-6000
wvoss@potteranderson.com
sdiluzio@potteranderson.com

BROWN & CONNERY, LLP
William M. Tambussi, Esq.
Susan M. Leming, Esq.
William F. Cook, Esq.
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108
(856) 854-8900

Attorneys for Defendant
Commerce Insurance Services

Dated: May 1, 2006

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                C.A. # 05-CV-183 SLR                Bailey, Kimberly A. - Vol. 1

Page 174

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

Page 175

State of Delaware )
                 )
New Castle County )

CERTIFICATE OF REPORTER

I, Vincent J. Bailey, Notary Public, do hereby
certify that there came before me on the 27th day of
January, 2006, the deponent herein, KIMBERLEY A. BAILEY,
who was duly sworn by me and thereafter examined by
counsel for the respective parties; that the questions
asked of said deponent and the answers given were taken
down by me in Stenotype notes and thereafter transcribed
by use of computer-aided transcription and computer
printer under my direction.

I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.

I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

Vincent J. Bailey
Certification No. 171-RPR
(Expires January 31, 2008)

DATED:  2-15-06

_____

Page 176

VOLUME

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KIMBERLEY A. BAILEY,                    )
                                        )
            Plaintiff,                  )
                                        )   Civil Action
v.                                      )   No. 05-CV-183-SLR
                                        )
COMMERCE NATIONAL                       )
INSURANCE SERVICES, INC., a             )
New Jersey corporation,                 )
                                        )
            Defendant.                  )

        Continued deposition of KIMBERLEY A. BAILEY
taken pursuant to notice at the law offices of Potter,
Anderson & Corroon, 1313 North Market Street, Hercules
Plaza, Wilmington, Delaware, beginning at 10:17 a.m., on
Tuesday, February 7, 2006, before Eleanor J. Schwandt,
Registered Merit Reporter and Notary Public.

APPEARANCES:

            THOMAS C. MARCONI, ESQ.
              LOSCO & MARCONI
              1813 North Franklin Street
              P.O. Box 1677
              Wilmington, Delaware  19899
              for the Plaintiff
            WILLIAM M. TAMBUSSI, ESQ.
            BROWN & CONNERY, LLP
              360 Haddon Avenue
              P.O. Box 539
              Westmont, New Jersey  08108
              for the Defendant
                    WILCOX & FETZER
        1330 King Street – Wilmington, Delaware 19801
                    (302) 655-0477

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006                C.A. # 05-CV-183 SLR                Bailey, Kimberly A. - Vol. 2

Page 177

```
1         KIMBERLEY A. BAILEY,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5               EXAMINATION
6    BY MR. TAMBUSSI:
7       Q.  Miss Bailey, we are back on record in your
8    deposition in the matter of Bailey versus Commerce
9    Insurance, and we are going to continue as we did last
10   week, I believe it was, a week and a half ago.
11      A.  Okay.
12      Q.  Would you like me to repeat the instructions?
13      A.  No. I don't do head gestures. I speak.
14      Q.  Thank you. Between the time of your last
15   deposition and the continuation today have you spoken to
16   anyone about your deposition?
17      A.  No.
18      Q.  Did you have any discussions with your attorney
19   about the deposition?
20      A.  No.
21      Q.  Did you in the course of making a complaint
22   against Commerce ever tell Commerce that you had a
23   consensual sexual relationship with Paul Scaffidi?
24      A.  No, I did not.
```

Page 178

```
1       Q.  Did you ever tell Mr. Duncan that you had a
2    consensual sexual relationship with Mr. Scaffidi?
3       A.  Not that I remember, no.
4       Q.  In the course of your discussions with the folks
5    at Commerce about your issues, did you ever tell
6    Commerce, anyone from Commerce, that you had spent the
7    night in Cherry Hill in Mr. Durham's house?
8       A.  No, I did not.
9       Q.  Did you ever tell Mr. Duncan that you had spent
10   the night in Mr. Durham's house?
11      A.  I am sure Mr. Duncan was aware. But that was
12   over the weekend. That had nothing to do with
13   work-related. That was a birthday party for one of Mr.
14   Durham's friends.
15      Q.  Okay. So the answer is that no, you didn't tell
16   Mr. Duncan you had spent the night at Mr. Durham's house?
17      A.  I don't believe I did. I believe Mr. Durham may
18   have told him.
19      Q.  When did you first meet Mary Corcoran?
20      A.  Soon after I was hired from Commerce I met Mary
21   Corcoran. She was involved in the Marketing Department.
22      Q.  Where was the Marketing Department located?
23      A.  They had several different locations. They had
24   locations in Wilmington, Cherry Hill.
```

Page 179

```
1       Q.  Where did Miss Corcoran work?
2       A.  I don't know. I thought it was in the Cherry
3    Hill office.
4       Q.  What were the circumstances under which you first
5    met Ms. Corcoran?
6       A.  I believe we were having an issue marketing one
7    of the core accounts, which was a larger account, prior
8    to my position at MainStreet, and I had helped her out,
9    and that's how I met Mary.
10      Q.  Can you tell us about a time frame when you met
11   with her?
12      A.  Oh, I don't remember. No.
13      Q.  Did you meet physically with her or did you talk
14   to her on the telephone?
15      A.  I don't recall exactly if I -- I know that I
16   spoke with her either through e-mail or through the
17   phone, via the phone. I don't actually remember if --
18   meeting her if this incident was over or if I met her
19   during. I don't recall actually when I met her.
20      Q.  After that initial meeting with Miss Corcoran
21   when did you next have any contact with Miss Corcoran?
22      A.  I don't really recall any actual contact with her
23   other than, if she was in the building, I happened to see
24   her, you know, I don't even know if we actually spoke
```

Page 180

```
1    with each other.
2          The next actual business contact I had with
3    her I believe was when she took over as the MainStreet
4    director.
5       Q.  When was that?
6       A.  That was after Mr. Duncan was fired.
7       Q.  And about what time frame?
8       A.  I don't remember.
9       Q.  How long was it before your employment with
10   Commerce ended?
11      A.  It was -- I was terminated in August of 2003. Is
12   that correct? Was it 2003?
13          So I believe it was probably just a few
14   weeks before that.
15      Q.  Okay. So prior to meeting Miss Corcoran when she
16   came over or down to MainStreet you had only one contact
17   with her?
18      A.  With reference to business-related items, yes.
19      Q.  About how many times would you say you saw her?
20      A.  Honestly, I couldn't put a number on it. It was,
21   I would say I could count it on one, you know, on both
22   hands. Had to be ten or less.
23      Q.  Are you aware that Miss Corcoran's primary work
24   location prior to coming to MainStreet was in New Jersey?
```

2 (Pages 177 to 180)

Page 181

1      A.   I'm sorry, I didn't hear the first part.
2      Q.   Sure.  Are you aware that Miss Corcoran's primary
3   work location for Commerce, prior to coming to
4   MainStreet, was in New Jersey?
5      A.   Yes.
6      Q.   Now, do you have any facts as we sit here today
7   that Miss Corcoran knew that you had any relationship
8   with Paul Scaffidi?
9      A.   Do I have any facts?
10     Q.   Yes.
11     A.   No.
12     Q.   Do you have any facts as we sit here today that
13  Miss Corcoran knew that you had some sort of relationship
14  with Mr. Durham?
15     A.   I didn't have a relationship with Mr. Durham.
16  But I don't believe that -- no, there would be no facts
17  for that.
18     Q.   You dated Mr. Durham?
19     A.   Yes, we had a -- we had a friendship.
20     Q.   Do you have any facts as we sit here today that
21  Miss Corcoran had knowledge of anything that you said Mr.
22  Duncan did to you?
23     A.   Do I have any facts?
24     Q.   Facts.

Page 182

1      A.   No.
2      Q.   It is true, is it not, that you didn't bring any
3   of what you claim to be acts of misconduct by Mr. Duncan
4   to the attention of Commerce Human Resources when they
5   occurred, correct?
6      A.   When they occurred, no.
7      Q.   Now, how were you advised that Miss Corcoran was
8   coming to become your boss?
9      A.   I was advised by, I believe it was Mr. Morrissey
10  that they were placing Mary Corcoran as the new director,
11  the day before she arrived.
12     Q.   Okay.  Do you have any facts as we sit here today
13  to support any contention that Miss Corcoran knew
14  anything about your written complaint to Commerce Human
15  Resources?
16     A.   Facts?
17     Q.   Facts.
18     A.   No.
19     Q.   Now, when Miss Corcoran came on board, tell me
20  about your relationship with Miss Corcoran at MainStreet,
21  your work relationship.
22     A.   Our work relationship was she was the director, I
23  was the supervisor.  There wasn't very mis -- too much
24  understanding there.

Page 183

1          Mary was basically known as a bull.  She
2   would come in and take over.  She -- I was hoping to, you
3   know, deter any type of relationship like that.  I was
4   hoping that we would have a very cordial working
5   relationship where she was the boss, I would respect her,
6   I was her supervisor.
7      Q.   Okay.  You say that she was known as a bull.
8   From whom did you get that knowledge?
9      A.   When she was in the Marketing Department, she had
10  fired people for no -- I guess what they thought were no,
11  you know, for no reason.  She ran a tight ship, I guess.
12  She was just very forceful.
13     Q.   When you say "for no reason" and you referred to
14  "they" you meant that the people --
15     A.   The individual who was terminated.
16     Q.   Thought that there was no reason?
17     A.   Yes.
18     Q.   Okay.  You don't know whether there was reason --
19     A.   No, I don't know both sides of the story.
20     Q.   I'm going to remind you of one instruction.  We
21  can only speak one at a time or the court reporter has a
22  difficulty with that.
23     A.   Okay.
24     Q.   We want to make a clear record, okay?

Page 184

1          So if I interrupt it is not because I'm
2   trying to be rude or obnoxious.  It is just I'm trying to
3   keep the record clean.
4      A.   Got you.
5      Q.   Now, did anyone in particular tell you that Mary
6   Corcoran was a bull who ran a tight ship?
7      A.   Yes.  Venus Barr, and what was her -- Becky
8   Corcoran, worked in the Marketing Department, and they
9   were fearful or they were worrisome when, oh, Mary is
10  coming, everybody has got to get everything cleaned up.
11  So she was just -- they would talk about her.
12     Q.   What do you mean by "run a tight ship"?
13     A.   I guess if they were lax, or they were not up
14  on their diaries with their work progress, she would come
15  down on them pretty hard.
16     Q.   Is it fair to say that Miss Corcoran insisted
17  that the business operation be run in accordance with the
18  way Commerce wanted it to run?
19     A.   I don't know if it was the way that Commerce
20  wanted it to be run.  But it is fair to say that Mary was
21  running a tight ship and she expected work to be
22  processed and completed in a timely manner.
23     Q.   Is it fair to say that Miss Corcoran also
24  insisted that the Commerce policies be adhered to?

3 (Pages 181 to 184)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 2

Page 185

1    A.  I guess it is fair to say.  But actually I don't
2  know what the -- if there was policies with reference to
3  the work process.
4    Q.  Is it fair to say that Miss Corcoran insisted
5  that the Commerce dress code policy be adhered to?
6    A.  Yes, that's fair to say that Miss Corcoran would
7  like the dress code to be adhered to.
8    Q.  Is it fair to say that Miss Corcoran wanted to
9  see Commerce's e-mail and Internet policies adhered to?
10    A.  Sure, yes.
11    Q.  And Miss Corcoran made that clear?
12    A.  Directly to me, no.
13    Q.  I meant to the department.
14    A.  To the MainStreet or Marketing Department?
15    Q.  MainStreet.
16    A.  I don't remember actually her coming in and
17  making a statement like that, no.
18    Q.  Well, she did, in fact, tell you on one occasion
19  that she did not believe that your dress was appropriate
20  and in accordance with the Commerce policy, correct?
21    A.  7:45 in the morning she approached me or she
22  called me to her office, prior to my work time, and asked
23  -- and indicated that she did not like my attire, yes.
24    Q.  And she told you she did not think it was

Page 186

1  appropriate and in accordance with the Commerce policy,
2  correct?
3    A.  Yes, she did.  But I wore that outfit on several
4  different occasions.
5    Q.  Prior to Miss Corcoran coming on board?
6    A.  Prior to Miss Corcoran coming on board.
7    Q.  And Miss Corcoran asked you to change, correct?
8    A.  She sent me home to change, yes.
9    Q.  And you did so?
10    A.  Yes, I did.
11    Q.  You recognized that she was doing so in
12  accordance with the Commerce dress code policy, correct?
13    A.  She had indicated in accordance, yes, that she
14  would like me to dress differently, and from that point
15  out I wore suits from, up until my termination.
16    Q.  And you don't claim that that was an incident of
17  retaliation, do you?
18    A.  Yes, I do, because there were other individuals,
19  such as Venus Barr and Becky Corcoran, who wore much
20  shorter skirts or much more revealing outfits than
21  myself, under her supervision, and nothing was ever done
22  about that.
23    Q.  How do you know that for a fact, that nothing was
24  ever done?

Page 187

1    A.  I witnessed what they wore every day.
2    Q.  What facts do you have to support the contention
3  that it was in retaliation for you making a complaint
4  against Steve Duncan that Miss Corcoran sent you home to
5  change?
6    A.  What facts do I have?
7    Q.  Facts.
8    A.  To support that?
9    Q.  Facts.
10    A.  I don't have any facts.
11    Q.  Okay.  Do you have any facts as we sit here today
12  to support any claim that Miss Corcoran knew anything
13  about your written complaint to Human Resources on April
14  3rd, 2003?
15    A.  I have no facts.
16    Q.  Now, Miss Corcoran sent you home and asked you to
17  change.  Did Miss Corcoran ever counsel you or advise
18  you, either formally or informally, with regard to any
19  other aspect of your work?
20    A.  She called me in on an e-mail and asked me to
21  read the e-mail.  She had printed it out and asked me to
22  read it back to her.  I did.  She graded it as if I was
23  in kindergarten, with a red pen, indicating that I was
24  using run-on sentences or something like that, and asked

Page 188

1  me not to send any further correspondence to my team via
2  e-mail without her approval.
3    Q.  Were there grammatical errors in the e-mail?
4    A.  Grammatical as in spelling or sentence structure?
5    Q.  Well, tell me what the errors were that were
6  pointed out to you.
7    A.  She had indicated a run-on sentence, where it was
8  wordy.  It was -- I believe it was an e-mail with
9  reference to some event or something that the team was
10  doing together.  I wasn't -- there were no spelling
11  errors, but I may have used a run-on sentence in her
12  eyes, and to my eyes it wasn't.
13    Q.  You don't think as we sit here today that it was
14  in error for Miss Corcoran to attempt to have your
15  e-mails take on a more professional, businesslike
16  fashion, do you?
17    A.  I'm sorry, I didn't --
18    Q.  Sure.  You don't contend that Miss Corcoran was
19  outside of her boundaries as your supervisor in asking
20  you to clean up or dress up your e-mails in a more
21  professional fashion, do you?
22    A.  I think there is an appropriate time to use a
23  professional fashion, but when it is a very casual
24  e-mail, I don't think that you have to say sir and ma'am.

4 (Pages 185 to 188)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006

C.A. # 05-CV-183 SLR

Bailey, Kimberly A. - Vol. 2

Page 189

1  I think that you can be a lot more lax.
2     Q.  Well, the e-mail had to do with business,
3  correct?
4     A.  It was with reference to a social event or
5  something along those lines.
6     Q.  WOW event?  W-O-W, WOW?
7     A.  I don't believe that that was the e-mail that I'm
8  referring to.
9     Q.  Okay.  You understand that Commerce expects that
10  people in a supervisory position act and write in a
11  professional way, correct?
12     A.  And also behave, yes.
13     Q.  And you understand that it was within Miss
14  Corcoran's purview as your supervisor to address anything
15  that she thought was a deficiency with regard to your
16  e-mails, correct?
17     A.  Yes.
18     Q.  Okay.  What facts do you have as we sit here
19  today that would support any claim that Miss Corcoran's
20  comments to you regarding your e-mail were in any way,
21  shape or form related to the complaint you made about
22  Steve Duncan?
23     A.  I have no facts to support that.
24     Q.  Did Miss Corcoran counsel you or advise you on

Page 190

1  any other aspects of your work other than the dress on
2  the occasion and the e-mail that you described?
3     A.  Counseled me for behavior or --
4     Q.  Whatever you are doing in the work place?
5     A.  Not that I can -- not that I can remember
6  offhand.  I'm trying to remember.
7     Q.  Take your time.
8     A.  I don't remember any other incidences where I was
9  called into her office to be...
10     Q.  How about any other incidences that occurred in
11  the work place where you weren't called into her office,
12  where she came by your desk, you saw each other in the
13  hallway, anything of that nature, where she addressed any
14  issues with you?
15     A.  Not that I can remember.
16     Q.  Isn't taking Commerce to a higher level one of
17  MainStreet's mottos?
18     A.  MainStreet alone?  It may be one of their -- I
19  don't remember that being a motto when I was there.  But
20  I don't think that that would be something out of their
21  nature to say.
22     Q.  Didn't Miss Corcoran address with you the belief
23  that Commerce wanted to be represented in the most
24  professional manner possible?

Page 191

1     A.  I don't remember that.
2     Q.  Now, did there come a time when Miss Corcoran
3  discussed with you the use of the word, by you the word
4  "fuck" in the work place?
5     A.  No.
6     Q.  She never addressed that with you at all?
7     A.  Miss Corcoran used the word "fuck" in the work
8  place.
9     Q.  I'm asking, did she ever use it with you, address
10  it with you, address use of that word with you?
11     A.  No.
12     Q.  When did Miss Corcoran use it in the work place?
13     A.  One occasion I remember offhand, we were in the
14  boardroom at the Wilmington office, and had one of the
15  brokers visiting, and we were playing the Power Ball as a
16  group, the MainStreet.  And it was 300 million or
17  something along those lines.  And she had indicated to
18  the two people visiting that "If we won, fuck Commerce,
19  we are out of here."
20     Q.  Who was there?
21     A.  I believe it was Jim Cor.  Which, I don't
22  remember the marketing rep's names.  Jim Cor was a broker
23  that we used for non-standard carriers.
24     Q.  How do you spell that?

Page 192

1     A.  I believe it is J-I-M, C-O-R.
2     Q.  And on what occasions did you hear Miss
3  Corcoran use the word "fuck" in the work place?
4     A.  I don't recall actually a certain time.  The word
5  "fuck" and other profanities were used on a daily basis.
6     Q.  Did Miss Corcoran ever use the word "fuck" in
7  giving direction to you?
8     A.  Not that I remember.
9     Q.  Did Miss Corcoran ever tell you that she was "too
10  fucking busy to deal with your issues or problems"?
11     A.  No, she didn't.
12     Q.  You also said at the outset that you were hoping
13  for a cordial relationship with Miss Corcoran.  Do you
14  recall saying that?
15     A.  Yes, I do.
16     Q.  What do you mean by that?
17     A.  I knew the fear that she instilled in her
18  marketing people from the Wilmington office, and I was
19  hoping not to have that type of relationship, having to
20  fear going into your office or your boss' office.  I
21  wanted us to be able to have a very professional and have
22  the same goals in being able to build MainStreet.
23     Q.  Did you, in fact, have a cordial working
24  relationship with Miss Corcoran?

5 (Pages 189 to 192)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006

C.A. # 05-CV-183 SLR

Bailey, Kimberly A. - Vol. 2

Page 193

1  A.  I thought that we did.
2  Q.  Miss Corcoran never gave you any sense of
3  believing that she was out to get you in any way,
4  correct?
5  A.  It concerned me on occasion with the way that she
6  would, she would approach an incident to the point where
7  I had made a -- well, actually Marge Phipps had called me
8  shortly before I was terminated and I had expressed to
9  Marge Phipps that I was considering stepping down as the
10  supervisor because I thought that she was after me.
11  Q.  Tell me what it is that Miss Corcoran did
12  specifically, since you thought you had a cordial working
13  relationship with her, that you believed made her out to
14  get you.
15  A.  There were the incidences with the dress code,
16  the incidence with the e-mail where she was trying to
17  control me, and it just made my working at Commerce a lot
18  more difficult.  I didn't have the freedom to be able to
19  run and do for my department as I had in the past.
20  Q.  Well, you told me one time when you were sent
21  home to change your attire, correct, and one time when
22  she went over an e-mail with you, correct?
23  A.  But there were other daily items that I don't
24  recall exactly, but she was the bull where she demanded

Page 194

1  respect, she wanted, you know, the daily aspects where
2  she was at times difficult to get along with.
3          But I was trying to put that behind or
4  trying to work through that, where we would have a
5  cordial relationship and we could work successfully
6  together.
7  Q.  I thought you said that you thought you did have
8  a cordial relationship.
9  A.  I was trying to, and I wanted to believe that we
10  did.
11  Q.  Demanding respect, you don't think that that is
12  in any way retaliatory, do you?
13  A.  It can be, yes.
14  Q.  Well, I mean, isn't it fair to say that Miss
15  Corcoran demanded respect of all of her employees?
16  A.  Yes, that's fair to say.
17  Q.  Male, female?
18  A.  Yes.
19  Q.  And isn't it fair to say that Miss Corcoran
20  treated all her employees alike in demanding respect?
21  A.  I don't know if she treated everyone equally,
22  but, I think that she had a few favorites, but she still
23  wanted respect from everyone.
24  Q.  And you don't believe that demanding respect in

Page 195

1  and of itself is a retaliatory trait?
2  A.  I said it could be, yes.
3  Q.  How, specifically?
4  A.  You could demand something more of one individual
5  than the other, and there could be some underlying reason
6  that that individual is wanting more from one than the
7  other.
8  Q.  Other than the fact that you were one of her
9  supervisors, how and in what way did Miss Corcoran demand
10  more respect from you?
11  A.  I believe that her demanding more respect of me
12  was just her way of trying to mold me into something.
13  But I'm not sure that I have an answer for that.
14  Q.  Okay.  You said that there were things that
15  happened in the work place which indicated that she was
16  difficult to get along with.  What specific things are
17  you referring to?
18  A.  I was the butt of Mary's jokes in team meetings
19  and things.  She would use an example and some underlying
20  tone would make me the butt of the humor of the
21  department.
22  Q.  Tell me what specifically Mary said that you
23  considered to make you the butt of her jokes.
24  A.  In the team meetings, I don't really recall

Page 196

1  exactly what was said.  There was an actual incident that
2  she said something that was to be the butt of her joke.
3  But in meetings I can't recall.  I would just either try
4  to forget them or just let them roll on my back because
5  it was meant to be humorous, or at least I thought.
6          We were at a bowling incident --
7  Q.  Bowling event?
8  A.  Yes, a bowling event, incident, bowling event
9  where MainStreet had succeeded or had maintained a
10  certain goal.  We were rewarding them with time off from
11  work where we would go bowling.  The bowling had beer and
12  appetizers, and everybody was very casual and it was very
13  comfortable.
14          Somebody had -- we had prizes there for high
15  games or strikes or something along those lines.  And
16  Mary had indicated about "Whose idea was it to come
17  bowling?"  And I said that, "Well, the team wanted to
18  come, or we wanted, this is what we had decided on."  And
19  she said that she would do something more sophisticated
20  like golf, not like, low-life like bowling, where she was
21  indicating that -- my perception of it was she was
22  indicating I was low-life because we had come bowling.
23  And it was a big, funny joke and everybody had to laugh
24  about it.

6 (Pages 193 to 196)

A51

Page 197

1    Q.  Did she specifically use the word "low-life"?
2    A.  I don't exactly remember, but she --
3    Q.  What word did she use?
4    A.  I don't remember exactly what she said.  But her
5  indication was, is that bowling was for someone unlike
6  herself, where golf was much more her speed or her level.
7    Q.  Did you just make up the word "low-life"?
8    A.  I said she indicated like it was low-life.  She
9  was making an indication.
10    Q.  How does one do that?  I'm not sure.  I wasn't
11  there.
12    A.  You are snide or you are very condescending of a
13  particular activity, that it would be below you.
14    Q.  Well, did it ever cross your mind, just as you
15  testified last deposition that you don't like golf, that
16  maybe she doesn't like bowling?
17    A.  She was actually pretty good at bowling so I
18  couldn't imagine that she wouldn't -- she didn't like it.
19    Q.  Well, did it ever occur to you that maybe she
20  didn't like bowling, just like you don't like golf?
21    A.  No.  Well, I guess -- it didn't occur to me at
22  that time, no.
23    Q.  You said that you told Miss Corcoran that it was
24  the team's idea to come bowling, not yours?

Page 198

1    A.  Yes.  But I had actually made the plans to do the
2  bowling and that's what we decided upon.
3    Q.  So Miss Corcoran never said that your idea was
4  low-life, in your word?
5    A.  She was indicating that I put it together.  If
6  she would have put it together we would have been
7  golfing.
8    Q.  When you say she was indicating, what was she
9  doing?  I don't understand.
10    A.  It was her body language, it was her gestures, it
11  was her way of making me the butt of the situation.
12    Q.  Well, I wasn't there, so tell me what her body
13  gestures were.
14    A.  Her body gestures were light and they were -- it
15  was just making light of the situation, or making fun of
16  the situation in a --
17    Q.  Joking and humorous way?
18    A.  I don't think it was -- if it -- I think she was
19  trying to be joking and humorous.
20    Q.  Who was present when she made this statement
21  besides you?
22    A.  There were other members of the team standing
23  there.  I don't remember.  I don't recall exactly who was
24  standing there.

Page 199

1    Q.  Can you remember even one name?
2    A.  No, I cannot.
3    Q.  Did you have any discussions with anyone else
4  about Miss Corcoran's comment at the bowling event?
5    A.  I believe I spoke, when Marge Phipps called me
6  that Friday night, when she knew I was completely
7  stressed out, I had commented to her that Mary had done
8  this and it was just another example of how I thought
9  Mary was completely after me.
10    Q.  What facts, as we sit here today, do you have to
11  support any claim that Miss Corcoran made this bowling
12  comment as a result of you filing a complaint with regard
13  to Steve Duncan?
14    A.  I don't follow you.  What facts do I have?
15    Q.  Yes.
16    A.  About the bowling complaint?
17    Q.  How it was in any way, shape or form related to
18  the complaint you filed to Mr. Duncan, against Mr.
19  Duncan?
20    A.  I have no facts.
21    Q.  You said the butt of Mary's jokes, plural.  Other
22  than this bowling event, what other jokes did Mary
23  Corcoran make about you?
24    A.  Besides the team meetings, there were on

Page 200

1  occasions when I would be in the central area, amongst
2  the cubicles in MainStreet, and I don't exactly remember
3  if it was in front of one particular CSR, which is a
4  customer service rep, she would, you know, make some
5  comment that was to be funny, but it was at my expense.
6    Q.  Well, what were the comments that she made?
7  First, were there more than one?
8    A.  Yes.
9    Q.  How many?
10    A.  I don't recall how many.
11    Q.  More than five?
12    A.  I don't recall.
13    Q.  What were the comments?
14    A.  They were just daily, everyday jabs.
15    Q.  Like what?  I wasn't there.  You have to tell me.
16    A.  I don't actually recall what was actually said.
17  But I know that it was happening, and it was stressing me
18  out.
19    Q.  You understand that this is your case and you
20  have to tell me all the facts in support of your claim.
21  So I'm trying to get you to at least try to search your
22  memory and try to refresh your recollection as to what
23  you claim that she said.  Are you saying that you don't
24  have any recollection of any specific comment that she

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006　　　　　　C.A. # 05-CV-183 SLR　　　　Bailey, Kimberly A. - Vol. 2

Page 201

1　made other than something with regard to the bowling
2　event?
3　　　A.　Specific comments, on exact words, no, I can't
4　actually recall that.
5　　　Q.　How about in the meetings, do you recall any
6　comments she made in the team meetings?
7　　　A.　Other -- exact words?
8　　　Q.　Well, why don't you start with telling me whether
9　you know the exact words.
10　　　A.　No, I don't know the exact words.
11　　　Q.　Tell me what you recall about comments that she
12　made in the team meetings.
13　　　A.　I don't recall.
14　　　Q.　Do you have any facts as we sit here today that
15　would support any notion that any comments that Miss
16　Corcoran made in the team meetings or outside your
17　cubicle or in the work area were in any way, shape or
18　form related to the complaint you made about Steve
19　Duncan?
20　　　A.　For facts, no.
21　　　Q.　Okay.　Thank you.
22　　　　　When you filed your complaint against Mr.
23　Duncan did you have any expectations as to what would
24　occur?

Page 202

1　　　A.　I had no idea what would occur.
2　　　Q.　Now, you filed a written complaint against Mr.
3　Duncan, correct?
4　　　A.　Yes, I did.
5　　　Q.　He was still employed there at the time?
6　　　A.　Yes, he was.
7　　　Q.　Did you expect that Commerce would investigate
8　that complaint?
9　　　A.　Yes, I would hope they would investigate.
10　　　Q.　All right.　Did, in fact, Commerce investigate
11　the complaint?
12　　　A.　Commerce investigated.
13　　　Q.　Were you spoken to as part of the investigation?
14　　　A.　I believe that they, they took my written
15　complaint.　I met with Deb Watson and Bruce McKelvy, who
16　went over my deposition and asked me several questions.
17　　　Q.　Went over your statement?
18　　　A.　Yes.
19　　　Q.　You said deposition, but you meant statement?
20　　　A.　Yes, I'm sorry.　Statement.
21　　　Q.　That's okay.　How long did this meeting occur or
22　last?
23　　　A.　It was, it was a couple hours.　I don't remember
24　exactly.　And I don't recall the date.

Page 203

1　　　Q.　Where was the meeting?
2　　　A.　I traveled up to the Commerce University site.
3　　　Q.　In Mount Laurel?
4　　　A.　Yes.
5　　　Q.　And were you given the opportunity to say
6　everything you wanted to say about that investigation?
7　　　A.　Well, at that time the investigation wasn't going
8　on.　I was still working with Mr. Duncan.　And they had
9　my written statement.　They were asking me further
10　questions.
11　　　Q.　Okay.　Were you given the opportunity to say
12　everything you wanted to say about that statement?
13　　　A.　I don't remember not being able to make a
14　statement.　But they asked me questions.　I wasn't asking
15　them questions.
16　　　Q.　Okay.　But did they cut you off and say, We don't
17　want to hear about that or we don't want to hear about
18　this?
19　　　A.　I don't recall.　I don't believe they would have
20　done that.
21　　　Q.　Okay.　Were you totally candid and forthright in
22　that discussion with Mr. McKelvy and Miss Watson?
23　　　A.　With reference to my statement?
24　　　Q.　Sure.

Page 204

1　　　A.　Yes.
2　　　Q.　Did you tell Mr. McKelvy and Miss Watson all
3　there was to know about your complaint regarding Mr.
4　Duncan?
5　　　A.　No.
6　　　Q.　You withheld information by your own choice?
7　　　A.　Yes.
8　　　Q.　Did Mr. McKelvy and Miss Watson ask you if there
9　was anything you wanted to add to your written statement?
10　　　A.　I don't recall them -- I don't recall that.
11　　　Q.　They could have?
12　　　A.　I'm sure they could have, but I don't recall.
13　　　Q.　Why is it that you withheld information from Mr.
14　McKelvy and Miss Watson?
15　　　A.　It was already a very embarrassing situation.
16　And I thought that there was enough information there
17　that if they were to investigate all of that, they would
18　be able to make a determination on what to do.　I just
19　wanted the harassment to stop.
20　　　Q.　Did you tell Mr. McKelvy and Miss Watson that you
21　had a dating relationship with Mr. Durham?
22　　　A.　I don't believe -- I believe that I did say that
23　I met Mr. Durham, if the timing is correct, I believe
24　that I told them that I met and had a drink and appetizer

8 (Pages 201 to 204)

Page 205

1   with him in Philadelphia.
2       Q.  Did you also tell Mr. McKelvy and Miss Watson
3   that you had spent the night at Mr. Durham's house in
4   Cherry Hill?
5       A.  I can't remember if that was before or after.
6       Q.  Did you tell Mr. McKelvy and Miss Watson that you
7   had a consensual sexual relationship with Mr. Scaffidi?
8       A.  No, I did not.
9       Q.  Did you tell Mr. McKelvy and Miss Watson that you
10  had traveled or on at least two occasions to Cranberry,
11  New Jersey, to have this consensual sexual relationship
12  with Mr. Scaffidi?
13      A.  No, I didn't tell Mr. McKelvy or Miss Watson with
14  reference to that because the incident with Mr. Scaffidi,
15  Mr. Scaffidi and I spoke about and we handled it
16  ourselves. I didn't have a complaint with Mr. Scaffidi.
17      Q.  But you do reference Mr. Scaffidi, although not
18  by name, in your complaint regarding Mr. Duncan, correct?
19      A.  No, I believe that I do mention that Mr. Duncan
20  left me at the bar with Paul Scaffidi, who drove me back
21  to my hotel.
22          (Bailey Deposition Exhibit 3 was marked for
23  identification.)
24      Q.  Miss Bailey, before you is a document which we

Page 206

1   have marked Exhibit 3 for identification.
2       A.  Mm-hmm.
3       Q.  Do you recognize that document?
4       A.  Yes, I do.
5       Q.  Is that the statement that you provided Commerce
6   with regard to Mr. Duncan?
7       A.  I would have to read over it directly, but it
8   looks like the statement, yes.
9       Q.  Why don't you take a moment and look at it.
10          (Discussion off the record.)
11      Q.  Miss Bailey, did you have the opportunity to read
12  over what has been marked Bailey 3 for identification?
13      A.  Yes, I have.
14      Q.  Is that the written complaint that you submitted
15  to Commerce regarding Mr. Duncan?
16      A.  Yes, it is.
17      Q.  Is Mr. Scaffidi's name mentioned even once in
18  that document?
19      A.  His name is not. It was in the statement that --
20  with Mr. Bruce McKelvy and Deb Watson, when she had asked
21  me what the producer was, that I revealed Mr. Scaffidi's
22  name.
23      Q.  But you didn't reveal your relationship with Mr.
24  Scaffidi to them?

Page 207

1       A.  No.
2       Q.  On the very last page of this document, in very
3   small print down the bottom or in the middle of the page,
4   I should say, it says "Patti/Bailey"?
5       A.  Yes.
6       Q.  Do you know what that is?
7       A.  No.
8       Q.  You actually had this document reviewed by your
9   attorney before you submitted it to Commerce; did you
10  not?
11      A.  Yes, I did.
12      Q.  And when did you start drafting this document?
13      A.  I don't recall.
14      Q.  Did you draft it at work?
15      A.  I don't recall. I don't...
16      Q.  Did you use your e-mail at Commerce to
17  communicate with your attorney regarding this document?
18      A.  I don't, I don't recall if I did or not.
19          (Bailey Deposition Exhibit 4 was marked for
20  identification.)
21      Q.  Miss Bailey, I'm going to show you what has been
22  marked as Bailey 4 for identification. Do you recognize
23  those e-mails?
24      A.  Yes.

Page 208

1       Q.  Does this refresh your recollection as to whether
2   or not you communicated with your attorney regarding this
3   document at least as early as March 31st?
4       A.  Yes.
5       Q.  Of 2003?
6       A.  Yes.
7       Q.  And in that e-mail Mr. Marconi gives you some
8   information, correct?
9       A.  Yes, he does.
10      Q.  Did you change your statement as a result?
11      A.  Did I change the actual document or statement?
12      Q.  Yes.
13      A.  I believe that we -- yes, it was a rough draft
14  and we revised it, yes.
15      Q.  How many drafts did you have?
16      A.  I believe there was only the one.
17      Q.  What did you do with the first draft?
18      A.  I don't -- it was revised. It was a rough draft.
19  We just went over it and corrected it.
20      Q.  So you never kept a copy of your first draft?
21      A.  Not that I -- no, I did not.
22      Q.  This wasn't the only time you spoke to Mr.
23  Marconi about this statement, was it?
24      A.  No. About this statement or --

9 (Pages 205 to 208)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006    C.A. # 05-CV-183 SLR    Bailey, Kimberly A. - Vol. 2

Page 209

1   Q.  Via e-mail, Commerce e-mail about your statement
2   to Commerce?
3       A.  I don't, I don't recall.  There could have been
4   other times.
5           (Bailey Deposition Exhibit 5 was marked for
6   identification.)
7   Q.  Miss Bailey, before you now is a document marked
8   Bailey 5 for identification which is an e-mail trail of
9   communication between you and Mr. Marconi, correct?
10      A.  Yes.
11  Q.  Did you make the corrections that Mr. Marconi
12  suggested in his e-mail?
13      A.  I don't know if actually they were corrections or
14  if there was just, just correcting the actual way that I
15  said it.
16  Q.  Okay.  How did you say it before?
17      A.  I may have used profanity or something along
18  those lines, where he told me that he didn't think it was
19  appropriate to use.
20  Q.  Can you go back to Bailey 3 for identification.
21  The second page, the first full paragraph, last sentence,
22  do you see that, starts with the words "by the conclusion
23  of our meeting"?
24      A.  Mm-hmm.

Page 210

1   Q.  Is that a yes?
2       A.  Yes.  I'm sorry.
3   Q.  Now, go back to Bailey 5 for identification, the
4   e-mail, Bailey 5.
5       A.  Okay.
6   Q.  Do you see the e-mail from Mr. Marconi which
7   says, "I noticed an editing error," and then he also
8   says, "The second page, first full paragraph, last
9   sentence should read:  By the conclusion of our meeting"?
10      A.  Yes.
11  Q.  It is referring to the same sentence that I
12  referred you to?
13      A.  It appears, yes.
14  Q.  Now, you sent an e-mail back to Mr. Marconi on
15  the 3rd saying, "Tom, thanks got it and made the
16  corrections"?
17      A.  Yes.
18  Q.  Where is the document that includes the phrase
19  that Mr. Marconi suggested?  Because that's not what is
20  on Bailey 3.
21      A.  I guess I may have indicated -- I may have made a
22  choice not to use the sexual innuendoes.
23  Q.  Okay.  So it is pretty clear at least from the
24  e-mails that you had been discussing your contemplated

Page 211

1   action with regard to Mr. Duncan with an attorney before
2   you made this complaint to Commerce, correct?
3       A.  Yes.  I thought that I needed to speak to
4   someone.
5   Q.  Let's go back to Bailey 3.  The fourth full
6   paragraph, first page starts with the words "over the
7   next several weeks," do you see that?
8       A.  Yes.
9   Q.  The second sentence you state, "At these meetings
10  the conversation sometimes turned to personal matters"?
11      A.  Yes.
12  Q.  Then you continue, "I spoke of my current
13  separation from my husband, my kids and also my very
14  close girlfriends"?
15      A.  Yes.
16  Q.  Do you see that?  Is that when you spoke to Mr.
17  Duncan and Margie about your friends sexual proclivities?
18      A.  Margie was not -- I wouldn't talk to Margie about
19  my friend's sexual proclivities.
20  Q.  But you did speak to Mr. Duncan about your
21  friend's, I think you said she was a swinger or something
22  of that nature?
23      A.  Yes.
24  Q.  Was Margie present at those times when you spoke

Page 212

1   of personal matters?
2       A.  Yes, Margie was involved in some of the personal
3   matter conversations.
4   Q.  But not the conversations that regarded sex,
5   correct?
6       A.  I don't think that it was something that I would
7   talk to her about or I would -- but --
8   Q.  The answer is no?
9       A.  No, no.  Margie could have been there on times
10  when I was talking about one of my girlfriends and the
11  guy that she was dating.
12  Q.  But Margie wasn't there when you spoke about your
13  friend who was the swinger or whatever else you
14  described?
15      A.  No, no.
16  Q.  Next paragraph, last two sentences, the sentence
17  starts with "He insinuated that we could travel
18  together," and continues, "and that he was interested in
19  having sex with me on these trips."  That sentence, do
20  you see it?
21      A.  Yes.
22  Q.  Did Mr. Duncan tell you he was interested in
23  having sex with you on the trips?
24      A.  Yes, he did.

10 (Pages 209 to 212)

Bailey v. Commerce National Insurance Services, Inc.
February 7, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 2

Page 213

1    Q.   When you say he insinuated, what do you mean by
2    the word "insinuated"?
3    A.   He had made comments with reference to that we
4    could travel, where we would be alone together, and we
5    could have sex.
6    Q.   So rather than insinuating, he stated?
7    A.   I don't believe that -- yes, he stated it.
8    Q.   Then you continue, He insinuated that having sex
9    with him could be beneficial to my career"?
10   A.   Yes.
11   Q.   What do you mean by the word "insinuated" there?
12   A.   He had indicated that if, in not so many words,
13   that if we were to be in a sexual manner that he wouldn't
14   forget it and he wouldn't allow things to happen to me
15   and he would allow me to advance.
16   Q.   What do you mean "in not so many words"? I don't
17   know what you are trying to tell me there.
18   A.   I don't remember the exact words or the exact
19   manner that Mr. Duncan -- but what I came away from the
20   conversation was an indication that if I allowed Mr.
21   Duncan to have sex with me on these travels that it would
22   be fun and he would allow me to basically make my own
23   path and career within Commerce.
24   Q.   Let's go to page 3. The third full paragraph

Page 214

1    down begins with "We scheduled a meeting for Mr. Duncan,"
2    do you see that?
3    A.   Yes.
4    Q.   This refers to the meeting up in Randolph with
5    core producers, correct?
6    A.   Yes.
7    Q.   And this is the meeting where you met with Mr.
8    Scaffidi, correct?
9    A.   I met with the four other producers and Mr.
10   Scaffidi, yes, he was one of them, yes.
11   Q.   The last sentence of the paragraph states, "The
12   implication, however, was that I should consider sleeping
13   with these producers as a way for us to garner their
14   favor and keep their business." What do you mean by the
15   word "implication"?
16   A.   That Mr. Duncan, in implying that they should
17   love me, is that it should be in a sexual way.
18   Q.   I thought you told me the other day that they
19   should love MainStreet, he said that they should love
20   MainStreet?
21   A.   They should love MainStreet and they should love
22   me.
23   Q.   Okay. And the implication, was that something
24   that you implied from what he said?

Page 215

1    A.   It is what I took from his comment.
2    Q.   So it was an assumption made on your part?
3    A.   It was pretty clear what he was saying.
4    Q.   But it was an assumption made on your part?
5    A.   It was very clear what he was saying, that he
6    wanted them to love me in a sexual way, yes.
7    Q.   Did he say to you that he wanted them to love you
8    in a sexual way?
9    A.   He said that if I didn't get laid that it was my
10   own fault.
11   Q.   Did he say that he wanted them to love you in a
12   sexual way?
13   A.   He wanted them to love MainStreet.
14   Q.   Okay. The next full paragraph, middle of the
15   paragraph, you have a sentence, "Soon all that was left
16   was Mr. Duncan, myself and one other of the Randolph core
17   producers." Do you see that?
18   A.   Yes.
19   Q.   You are referring to Mr. Scaffidi there; are you
20   not?
21   A.   Yes, I am.
22   Q.   Now, after you went up to Commerce and met with
23   Mr. McKelvy and Miss Watson regarding this complaint that
24   you made, did you have any other interaction with Mr.

Page 216

1    McKelvy or Miss Watson regarding this complaint?
2    A.   I believe that I called Miss Watson on occasion,
3    just telling her that, you know, it was nerve-racking,
4    just wanting to talk to somebody.
5    Q.   What was nerve-racking?
6    A.   The situation, having -- working with Mr. Duncan
7    -- with Mr. Duncan and wanting to know where we were,
8    when they were going to interview him.
9    Q.   Did Miss Watson ever refuse to take your phone
10   call?
11   A.   I don't think she was always there. You always
12   had to go through voice mail or try to find her down.
13   But she would return it either that day or the next.
14   Q.   Okay. So she was responsive to your calls?
15   A.   Yes.
16   Q.   And she spoke with you?
17   A.   Yes.
18   Q.   Provided you with whatever information that you
19   wanted that she could give you?
20   A.   That she could give me, yes.
21   Q.   She let you know that Commerce was in the process
22   of investigating the matter, correct?
23   A.   Well, Mr. McKelvy was on vacation the first week,
24   then she was taking vacation the next week, and so it

11 (Pages 213 to 216)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006                                                    Bailey, Kimberly A. - Vol. 2
C.A. # 05-CV-183 SLR

Page 217

1  was...
2      Q.  They assured you -- go ahead.
3      A.  I'm sorry.
4      Q.  You go ahead.
5      A.  She was -- they were doing what they could at
6  that time.
7      Q.  In fact, you are aware that Commerce spoke to
8  other people regarding your complaints, correct?
9      A.  Yes, they did interview other people.
10     Q.  At some point in time you let Commerce know that
11 you had certain expectations regarding your complaint,
12 correct?
13     A.  Commerce asked me to write up a statement of what
14 I expected as an outcome.
15     Q.  And did you do that?
16     A.  Yes, I did.
17     Q.  What did you tell them?
18     A.  I told them that I didn't expect -- I wasn't --
19 I'm not going to tell them that I wanted Mr. Duncan to
20 jump off a bridge and be killed, but I told them that I
21 wanted us to be able to work separately.  If I remember
22 to have to work with him anymore.  If I remember
23 correctly -- I don't remember exactly what I said, but I
24 was trying to be nice in my, what my expectations were,

Page 218

1  because I had no idea which way they would read it.
2      Q.  Did you tell Commerce you didn't want to see Mr.
3  Duncan fired?
4      A.  I believe that I did, yes.
5      Q.  Did you tell Commerce that what you expected was
6  simply an apology?
7      A.  Yes.  Again, I was trying to be nice.  I wasn't
8  going to stomp my foot and say this is what I want.  I
9  wanted the situation to stop.
10     Q.  But the situation had stopped for a period of
11 months before you sent this complaint, correct?
12     A.  There was another incident that had happened.
13     Q.  Did you forget to tell me about that when we were
14 in our first deposition?
15     A.  No.  I had indicated that Mr. Duncan invited me
16 with him and his girlfriend up for a "menage a trois" up
17 in Philadelphia.
18     Q.  The expectation that you had was that Mr. Duncan
19 give you an apology, correct?
20     A.  I wanted it to stop.
21     Q.  The expectation that you had was that Mr. Duncan
22 give you an apology, correct?
23     A.  The statement indicates that, yes, I wanted an
24 apology.

Page 219

1      Q.  Well, did you lie in that statement?
2      A.  Again, I was trying to be nice.  I didn't, I
3  didn't want to stomp my feet and say I expect him to be
4  put on a firing line and to be killed.
5      Q.  Were you lying when you made that statement?
6      A.  I was trying to be politically correct and nice.
7      Q.  Was it accurate?
8      A.  Yes, I would have liked an apology.
9      Q.  And that would have satisfied you?
10     A.  If they had -- if an apology was all I got and we
11 were to still work together, no, I wouldn't, I wouldn't
12 have accepted that.
13     Q.  In fact, Commerce fired Mr. Duncan as a result,
14 despite your statement, correct?
15     A.  Yes.  I didn't think it was my ground to indicate
16 that anyone was to be fired.
17         (Bailey Deposition Exhibit 6 was marked for
18 identification.)
19     Q.  Miss Bailey, before you is a document that has
20 been marked Bailey 6 for identification.
21     A.  Yes.
22     Q.  Could you please take a moment and read that.
23     A.  Okay.
24     Q.  Miss Bailey, you've had the opportunity to read

Page 220

1  what has been marked Bailey 6 for identification,
2  correct?
3      A.  Yes, I have.
4      Q.  Is that a statement you prepared and sent to Miss
5  Watson of Commerce?
6      A.  It was requested of me by Deb Watson that I
7  prepare this statement, and this is the statement that I
8  sent.
9      Q.  Did you have any objections to preparing a
10 statement as to what your expectations might be?
11     A.  I thought it was a little unusual that they would
12 ask me what my expectations were.  They are the --
13     Q.  I'm sorry, go ahead.
14     A.  They are the human resource people.  They should
15 know what the expectations or the outcome of a situation
16 like this should be.  I wondered why they wanted my --
17 wanted to know what my expectations of the outcome would
18 be.
19     Q.  You understand that there is a difference between
20 what an expectation is and what an outcome is, correct?
21     A.  Yes.
22     Q.  Commerce simply asked you what you wanted or
23 expected in response to the complaint that you made,
24 correct?

12 (Pages 217 to 220)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006

Bailey, Kimberly A. - Vol. 2

Page 221

1  A. Yes, they did.
2  Q. You don't contend that that is somehow unfair, do
3  you?
4  A. I don't believe it is unfair, but I found it odd.
5  Q. You don't contend that somehow that's unlawful
6  for the employer to ask an employee who makes a complaint
7  as to what his or her expectations might be, do you?
8  A. I don't know the law, but I don't believe it is
9  unlawful.
10  Q. When you sent this writing to Commerce had you
11  had it reviewed by counsel prior to sending it?
12  A. I don't remember that I did or not. I probably
13  did.
14  Q. When you sent it to Commerce did you intend it to
15  be complete and truthful in all respects?
16  A. Was it my intention to be complete and truthful?
17  Q. Yes.
18  A. No. They asked me what my expectations were. I
19  was not trying to make any waves in my pond and I was
20  trying to be politically correct in a professional
21  manner.
22  Q. So tell me where in this statement you were not
23  truthful.
24  A. "It was not my intention to report these issues

Page 222

1  and have Mr. Duncan terminated."
2  Q. Is that a lie?
3  A. It is not a lie, but I didn't want us to work
4  together anymore, and I knew that they would have to
5  terminate one of us, or I thought they would have to
6  terminate one of us.
7  Q. Let's break it down. First you say, "It was not
8  my intention to report these issues," is that truthful or
9  false?
10  A. It was my intention to report these issues.
11  Q. Okay. Then you say, "and have Mr. Duncan
12  terminated," is that truthful or false?
13  A. Well, it is neither. It is just, it is a
14  statement, but it is -- I didn't really care if he was
15  terminated or not. I wanted the behavior to stop.
16  Q. But you say, "It was not my intention to have Mr.
17  Duncan terminated," is that a true statement or a false
18  statement?
19  A. It is a false statement.
20  Q. Where else did you make false statements in this
21  document?
22  A. I believe that that is the only one, because I
23  really didn't care what happened to Mr. Duncan, but I was
24  sickened, I was stressed, an apology would have been

Page 223

1  nice. I wanted to handle it in a very professional and
2  respectful manner. I did love my job.
3  Q. And it is your contention as we sit here today
4  that you lied to Human Resources because you wanted to be
5  politically correct?
6  A. I didn't think it was my grounds to stomp my feet
7  and say, Mr. Duncan touched me, he needs to be fired.
8  Q. Well, why did you make any statement at all as to
9  whether or not you had an intention to have Mr. Duncan
10  terminated as opposed --
11  A. Because I -- I'm sorry.
12  Q. Excuse me. -- as opposed to putting a false
13  statement in that memo?
14  A. I thought that that is what they wanted to hear.
15  I thought they wanted to know what I expected them to do
16  with Mr. Duncan.
17  Q. And you thought that the Commerce Human Resources
18  people wanted you to be truthful, correct?
19  A. Well, I think they want anyone to be truthful,
20  yes.
21  Q. But in particular, they wanted you to be truthful
22  in this case, correct?
23  A. Yes, I would think that they would want, yes,
24  they would want me to be truthful.

Page 224

1  Q. Nonetheless, you lied to them, correct?
2  A. I indicated that it wasn't my intention to have
3  him terminated, but I think I knew that someone would be
4  terminated from this.
5  Q. And that was a lie, correct?
6  A. It was a lie to say it was not my intention?
7  Q. Correct.
8  A. Yes.
9  Q. Who did you want the professional apology from?
10  A. Either the -- from Commerce.
11  Q. From Commerce, the organization?
12  A. From Commerce, the organization, yes.
13  Q. Let's go to the last paragraph. Who told you
14  that your career was on a fast track?
15  A. Mr. Duncan.
16  Q. Who told you that stock options would be in your
17  future?
18  A. Mr. Duncan.
19  Q. Who told you that AVP — Assistant Vice
20  President, is that?
21  A. Yes.
22  Q. -- would be in your future?
23  A. Mr. Duncan.
24  Q. And who told you that your own personal parking

13 (Pages 221 to 224)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006

C.A. # 05-CV-183 SLR

Bailey, Kimberly A. - Vol. 2

Page 225

1  space would be in your very near future?

2  A. That was Mr. Duncan and Marge Phipps. Marge

3  Phipps was trying to get me a parking spot.

4  Q. Where did you have to park?

5  A. I parked out with the other -- my subordinates or

6  the other common people. The important people parked

7  underneath at an assigned parking spot.

8  Q. And you wanted to be considered an important

9  person?

10  A. It didn't matter to me. It wasn't anything that

11  -- I was a part of the team.

12  Q. But it was important enough for you to put it in

13  this e-mail, correct?

14  A. It was promised to me. It was indicated that it

15  was something that they would give me.

16  Q. Did you get a response from Miss Watson to this

17  memo?

18  A. I don't recall getting a response, no.

19  Q. When you sent this memo had Mr. Duncan already

20  been terminated?

21  A. April 14th, I don't believe.

22  Q. Now, do you contend, is it your contention that

23  Commerce did not do a thorough investigation of your

24  claims?

Page 226

1  A. I think eight weeks is a bit long.

2  Q. That's not my question. My question is: Do you

3  contend that Commerce did not do a thorough investigation

4  of your claims?

5  A. I don't know what their investigation brought

6  because they did not share that with me. So I contend

7  that they did not.

8  Q. Okay. And what facts do you have that would

9  support the contention that Commerce did not do a

10  thorough investigation?

11  A. Again, I don't have the facts because I don't

12  know anything about their investigation. They did not

13  share that information with me.

14  Q. Well, you know that Commerce's investigation

15  resulted in a termination of Mr. Duncan, correct?

16  A. Yes, Mr. Duncan was terminated.

17  Q. By the way, you know Mr. Scaffidi has been

18  terminated from Commerce also, correct?

19  A. Yes, I do. I know that.

20  Q. Now, you stated Commerce's investigation took too

21  long?

22  A. It took, it took awhile, yes. It took a long

23  time. When you are in that situation and you are living

24  with that daily, working with the person who has touched

Page 227

1  you, and you have reported them, and you have to face

2  them every day, it is a long, it is a long time.

3  Q. During this eight-week period of the

4  investigation --

5  A. Yes.

6  Q. -- did you ever make any complaints about

7  harassment or retaliation that occurred during that

8  period?

9  A. I believe that I called Deb Watson about a

10  situation with Mr. Duncan.

11  Q. What situation was that?

12  A. He made a comment about an e-mail that I sent out

13  about the WOW awards.

14  Q. Tell me what the comment was.

15  A. He told me "Good e-mail," or something along that

16  lines. It had --

17  Q. You sent out an e-mail regarding the WOW awards

18  in New York City, correct? Yes?

19  A. Yes, I did.

20  Q. I'm not trying to be rude, but you are shaking

21  your head.

22  A. I'm sorry. I forgot.

23  Q. In that e-mail you expressed some excitement

24  about going to New York City, correct?

Page 228

1  A. Yes, yes, I did.

2  Q. And Mr. Duncan sent a reply to that e-mail

3  saying, "Good e-mail"?

4  A. No, Mr. Duncan would not reply by e-mail. Mr.

5  Duncan came down, and this is after the -- I had reported

6  him, and they had notified him, he came down to my

7  cubicle and stuck his head in and said, "Good e-mail."

8  It was just in a sarcastic way.

9  Q. And you found it to be sexually harassing?

10  A. I didn't find it to be sexually harassing. I

11  found it to be unusual that in this time when Mr. Duncan

12  and I are not supposed to be communicating to each other

13  other than business, and I had to work for him, he is

14  going to come down and make a comment to me about an

15  e-mail that had no bearing on work.

16  Q. Well, the WOW awards were something associated

17  with work; were they not?

18  A. It had no bearing on our daily work.

19  Q. Can you answer my question?

20  A. The WOW awards?

21  Q. Yes.

22  A. It is an awards ceremony.

23  Q. That has to do with work, correct?

24  A. Yes, it has to do with your performance.

14 (Pages 225 to 228)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006

C.A. # 05-CV-183 SLR

Bailey, Kimberly A. - Vol. 2

Page 229

1    Q.   At Commerce?
2    A.   At Commerce.
3    Q.   Commerce was your employer, correct?
4    A.   Yes.
5    Q.   At this time did you send any e-mails to Mr.
6    Duncan, during this eight-week period, during the
7    investigation?
8    A.   I may have.  They hopefully were all just with
9    reference to work.  I don't -- I can't imagine I would
10   have sent him anything.
11   Q.   Is there a doubt in your mind?
12   A.   No, there isn't.
13       (Bailey Deposition Exhibit 7 was marked for
14   identification.)
15   Q.   Miss Bailey, before you is an e-mail which has
16   been marked Bailey 7 for identification.
17   A.   Okay.
18   Q.   Can you take a moment and read it, please.
19   A.   Sure.  Okay.
20   Q.   Is this the e-mail that you say that Mr. Duncan
21   told you was a good e-mail?
22   A.   Yes.
23       (Bailey Deposition Exhibit 8 was marked for
24   identification.)

Page 230

1    Q.   Miss Bailey, have you had an opportunity to read
2    Bailey 8 for identification?
3    A.   Yes, I have.
4    Q.   This is an e-mail where you thank your
5    co-employees for sending you roses?
6    A.   Yes.
7    Q.   In fact, you sent a copy of that e-mail to Mr.
8    Duncan, correct?
9    A.   It was work-related, yes.
10   Q.   And in there you say in all caps, "You all are
11   the best," correct?
12   A.   "You all are the best," yes.
13   Q.   Also there you say, "I could not imagine being
14   anywhere but at MainStreet," correct?
15   A.   Yes.
16   Q.   This is during that period of time after you had
17   reported Mr. Duncan, correct?
18   A.   Yes.
19   Q.   Did there come a time when you actually told the
20   folks at Commerce and Human Resources that you had second
21   thoughts about even reporting Mr. Duncan?
22   A.   I don't recall doing that.  I think that -- no, I
23   don't recall.
24       They sent me roses because I was completely

Page 231

1    stressed out.
2    Q.   And Mr. Duncan was part of the people who
3    received the thank you, correct?
4    A.   He was my director at the time.  I thought that
5    it should be in my file that my employees sent me roses.
6    Q.   It is a yes or no question.
7    A.   I'm sorry?
8    Q.   Mr. Duncan was part of the distribution of the
9    e-mail?
10   A.   Yes, he was.  He was cc'd.
11   Q.   Thank you.
12       (Bailey Deposition Exhibit 9 was marked for
13   identification.)
14   Q.   Miss Bailey, I show you what has been marked
15   Bailey 9 for identification.
16   A.   Mm-hmm.
17   Q.   Take a moment and read that, please.
18   A.   Okay.
19   Q.   Before you in Exhibit 9 are two e-mails, one that
20   you sent to Miss Watson and Mr. McKelvy, correct?
21   A.   Yes.
22   Q.   And a response from Mr. McKelvy to you, correct?
23   A.   Yes.
24   Q.   Now, in the e-mail that you sent to Miss Watson

Page 232

1    and Mr. McKelvy you thanked them for taking the time to
2    meet you, correct?
3    A.   Yes, I did.
4    Q.   And in the second full paragraph you start it by
5    saying, "I guess I am second-guessing my decision to
6    report him," do you not?
7    A.   That is correct.
8    Q.   Is that a true statement?
9    A.   No.
10   Q.   That's a lie?
11   A.   Again, here I am trying to thank them for their
12   time.  It is a very stressful situation.  I'm up there
13   crying.  I have snot going.  You are wondering what you
14   are doing.  And the questions that they asked me
15   sometimes were trying to make me look like it was my
16   fault.
17   Q.   My question was a yes or no question.  Is the
18   statement "I guess I am second-guessing my decision to
19   report him" a lie?
20   A.   Yes.
21   Q.   The third sentence in that paragraph you say,
22   "The only peace I have is my honesty," do you see that?
23   A.   Yes, I do.
24   Q.   You wrote that right after you wrote the words

15 (Pages 229 to 232)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006                    C.A. # 05-CV-183 SLR              Bailey, Kimberly A. - Vol. 2

Page 233

1  that constituted a lie?

2      **A.  Yes.**

3      Q.  Mr. McKelvy wrote back to you, correct?

4      **A.  Yes, he did.**

5      Q.  And he told you that Commerce was taking your

6  complaint seriously?

7      **A.  He, yes, he does indicate that they would take it**

8  **seriously.**

9      Q.  He told you that they were doing their best to

10 get to the very bottom of it?

11     **A.  Yes.**

12     Q.  He told you that they would be back in touch with

13 you?

14     **A.  Yes.**

15     Q.  And they were, correct?

16     **A.  Yes, they were.**

17     Q.  They asked you for what your expectations were,

18 correct?

19     **A.  Later, yes, they did.  Well, yes, they had asked**

20 **for what my expectations were.**

21     Q.  And you submitted that to them, correct?

22     **A.  Yes, I did.**

23     Q.  It had false statements in it?

24     **A.  It had a false statement, yes.**

Page 234

1      Q.  They also told you to be sure to let either of

2  them know if there were any further inappropriate

3  contacts, correct?

4      **A.  Yes, they did.**

5      Q.  And you, in fact, contacted Miss Watson

6  periodically to speak with her, correct?

7      **A.  Yes.**

8      Q.  Did you ever tell them that you put lies in your

9  correspondence to them?

10     **A.  I don't think that they are -- they are not lies.**

11 **I mean, I really don't wish any ill-will on anyone.  But,**

12 **no, I never told her that I put lies in my**

13 **correspondence.**

14     Q.  Okay.

15         (Bailey Deposition Exhibit 10 was marked for

16 identification.)

17     Q.  Miss Bailey, I'm going to ask you to review what

18 has been marked Bailey 10 for identification.  I'm just

19 going to step out of the room for a moment and I'll be

20 back to continue.

21         (Brief recess taken.)

22     **A.  Okay.**

23     Q.  Miss Bailey, you've had an opportunity to review

24 what has been marked Bailey 10 for identification?

Page 235

1      **A.  Yes, I have.**

2      Q.  You know that's the complaint you filed against

3  Commerce Insurance in this case?

4      **A.  Yes.**

5      Q.  Did you review this complaint before it was

6  filed?

7      **A.  I believe that I would have, yes.**

8      Q.  Well, did you or didn't you?

9      **A.  Yes.**

10     Q.  Did you review all of the facts and find them to

11 be true and accurate?

12     **A.  That's what I have Mr. Marconi for.  But yes.**

13     Q.  No.  Let's break that down.  You understand that

14 there are certain legal arguments or legal statements in

15 the complaint, correct?

16     **A.  Yes.**

17     Q.  Because it is a legal document, correct?

18     **A.  Yes.**

19     Q.  You also understand that there are factual

20 allegations?

21     **A.  Yes.**

22     Q.  Things that you said occurred, correct?

23     **A.  Yes.**

24     Q.  Focusing on the factual allegations, did you

Page 236

1  review them to see that they were all true, accurate and

2  correct?

3      **A.  Yes.**

4      Q.  And are they?

5      **A.  Yes.**

6      Q.  Looking at this complaint here today, can you

7  think of anything that you would change or otherwise

8  amend?

9      **A.  Off the top of my head, no.**

10     Q.  Can you turn to paragraph 9 on page 3, please.

11 The first sentence of paragraph 9 states, "Beginning in

12 December 2001, Ms. Bailey's supervisor, Steven Duncan,

13 began to sexually harass her in and outside the

14 workplace."

15     **A.  Okay.**

16     Q.  It continues, "The harassment included: fondling

17 her back, breasts, and buttocks; forcibly kissing her,"

18 and continues on.  Do you see that?

19     **A.  Yes.**

20     Q.  When did Mr. Bailey fondle your back, breasts and

21 buttocks in the workplace?

22     **A.  Mr. Duncan.**

23     Q.  Mr. Duncan, I'm sorry.

24     **A.  In the workplace -- I don't believe -- he never**

16 (Pages 233 to 236)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006

Bailey, Kimberly A. - Vol. 2

Page 237

1 touched me in the office, but he would use his manner.
2    Q.  Okay.  So he never touched you in the workplace?
3    A.  No, not in the office.
4    Q.  He never forcibly kissed you in the workplace?
5    A.  No.
6    Q.  He never rubbed your legs and inner thighs in the
7 workplace?
8    A.  No.  He would make suggestions, but he would
9 never touch me.
10    Q.  Why don't you just answer my question.  He never
11 rubbed your legs and inner thighs in the workplace?
12    A.  No.
13    Q.  He never pushed his hand between your legs in the
14 workplace?
15    A.  In the office, no.
16    Q.  In paragraph 11 on page 4, the second sentence
17 you state, "In addition, Ms. Bailey was completely
18 excluded from the investigation, and was not given any
19 information about the status of the investigation until
20 June 2003, when she learned that Mr. Duncan was no longer
21 employed by Defendant."  Is that your statement?
22    A.  I don't see where you begin with -- oh, I'm
23 sorry.  Yes.
24    Q.  You weren't excluded from the investigation at

Page 238

1 all, were you?
2    A.  They asked me my side of the story, and my
3 statement, and in my interview with Mr. McKelvy and Miss
4 Watson.
5    Q.  And they followed up by asking you for your
6 expectations, correct?
7    A.  That was on April 14th.
8    Q.  Which was 11 days after you had made your
9 complaint, correct?
10    A.  And I believe one or the other was still on
11 vacation, and so it was still very new in the
12 investigation.
13    Q.  Well, you say that you were completely excluded
14 from the investigation.  That's not correct, is it?
15    A.  From the information that they obtained from the
16 investigation, yes.
17    Q.  You weren't completely excluded from the
18 investigation because they asked you for some additional
19 information, correct?
20    A.  They asked me for information.  But any of the
21 outcome of the information I was not privy to.
22    Q.  They responded to all your telephone calls,
23 correct?
24    A.  They called me back.

Page 239

1    Q.  They responded to your e-mails, correct?
2    A.  That I remember, yes.
3    Q.  Okay.  They told you that they were taking it
4 seriously and that they were going to investigate it
5 fully, correct?
6    A.  It is their job to take it seriously and they
7 should fully investigate it.
8    Q.  No question about it.  But you make the statement
9 that you were completely excluded from the investigation.
10    A.  I was excluded.  I gave my side of the story.
11 When they investigated it and any information that they
12 obtained from the investigation was not shared with me.
13    Q.  Okay.  Is it your contention that they are
14 somehow obligated by law to share that information with
15 you?
16    A.  If someone --
17        MR. MARCONI:  I'm going to object.  Hold on
18 a second.  To the extent she is asked to give a legal
19 conclusion, I'm going to tell her she shouldn't answer
20 it.
21 BY MR. TAMBUSSI:
22    Q.  I'll rephrase it.  Is it your contention that
23 Commerce is obligated to tell you each and every step
24 that they take in the investigation of your complaint?

Page 240

1    A.  Each and every step?
2    Q.  Yes.
3    A.  No, they don't have to give me each and every
4 step.
5    Q.  Did you want Mr. Duncan to be fired by Commerce?
6    A.  I didn't want to work for Mr. Duncan anymore.
7    Q.  That's not my question.
8    A.  No.
9    Q.  Did you want Mr. Duncan to be fired by Commerce?
10    A.  I didn't really care what they did with him.
11    Q.  Did you ever tell anyone from Commerce that you
12 didn't care what they did with him?
13    A.  No.  I was embarrassed over the entire situation.
14 I didn't speak to anybody about this situation.
15    Q.  Except for Deb Watson?
16    A.  Deb Watson.
17    Q.  Who was Commerce's Human Resources person?
18    A.  And Bruce McKelvy, who was Commerce Bank's HR
19 person.
20    Q.  Paragraph 12 you make the contention that you
21 were excluded from meetings, projects and other matters
22 concerning the operation of the department.  Do you see
23 that?
24    A.  Yes.

17 (Pages 237 to 240)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006
C.A. # 05-CV-183 SLR
Bailey, Kimberly A. - Vol. 2

Page 241

1   Q.   What meetings?

2   A.   At the time when Mr. Duncan was fired, we were in

3   the midst of putting together or working with a vendor to

4   put together a software program called SEMCI. It is a

5   single entry management something or other that our

6   salespeople would be able to work with that would be

7   easier for them to quote new business.

8          I was very much involved with this prior to

9   Deb Watson coming along.

10   Q.   Deb Watson or Mary Corcoran?

11   A.   I'm sorry, Mary Corcoran. And soon after Mary's

12   arrival I was excluded from these meetings.

13   Q.   Okay. What facts do you have as we sit here

14   today that would support any contention that Mary

15   Corcoran's decision to exclude you from these meetings

16   were related to the filing of the Duncan complaint?

17   A.   The facts that I have is the meetings, I attended

18   all of them. Mary came and then I didn't attend any.

19   Now, what their -- how they relate as a fact to what you

20   are indicating, I don't have that fact.

21   Q.   Okay. It is an assumption on your part?

22   A.   Yes.

23   Q.   All right. What projects were you excluded from?

24   A.   The project was the SEMCI project and putting

Page 242

1   together the software, working with the vendor. That was

2   a project that was the SEMCI project.

3   Q.   Is that it? Because you used the word

4   "projects," plural.

5   A.   I can't remember offhand, other than any other

6   sales-related projects, because they were taken from me

7   also.

8   Q.   Which ones?

9   A.   Working with the marketing people, learning the

10   new markets, the risks.

11   Q.   What facts as we sit here today do you have to

12   support any contention that those projects were taken

13   away from you by Mary Corcoran because you filed a

14   complaint against Steve Duncan?

15   A.   I don't have facts or those facts.

16   Q.   All right. You refer to other matters concerning

17   the operation of the department from which you were

18   excluded. What other matters are you referring to?

19   A.   I would handle the marketing reps that would come

20   in, and scheduling them. I wasn't doing that anymore.

21   Q.   That's a decision that Miss Corcoran made?

22   A.   Yes.

23   Q.   Okay.

24   A.   Just, you know, my daily operations in working

Page 243

1   with my team were interfered by her, so, and a lot of I

2   guess my direct dealings were not -- they weren't just as

3   easy, so --

4   Q.   What facts do you have as we sit here today that

5   would support any contention that Mary Corcoran's

6   decision in that regard was a result of your filing of

7   the complaint against Mr. Duncan?

8   A.   I don't have any facts to support that.

9   Q.   Thank you. Paragraph 13, you refer to a

10   conclusion of the Commerce investigation and quote, "both

11   parties had engaged in inappropriate behavior in

12   violation of Commerce guidelines on professionalism and

13   its policies and procedures," do you see that?

14   A.   Yes.

15   Q.   Then it continues that "Defendant made this

16   determination based at least in part on lies told by Mr.

17   Duncan," do you see that?

18   A.   Yes.

19   Q.   What specific lies did Mr. Duncan tell?

20   A.   I don't know them to be exact. What we know is

21   things that have been brought up in other I guess

22   mediations or things along those lines where they have

23   accused me of doing certain things which are untrue.

24   Q.   Well, what lies are they? Tell me if it is not

Page 244

1   true.

2   A.   Something to do with a phone vendor, a copy

3   vendor, and I believe there was something else. I don't

4   remember off the top of my head.

5   Q.   Can you be more specific?

6   A.   Mr. Duncan had indicated that I was sexually

7   forward with both these vendors.

8   Q.   And is it your contention that you were not?

9   A.   It is my contention I was not.

10   Q.   What else did Mr. Duncan say that you say are

11   lies?

12   A.   I don't, I don't remember.

13   Q.   Well, it is your complaint so you have to tell me

14   what the lies are.

15   A.   I can't -- I know that there was one about the

16   copy vendor and the phone guy. But they are just things

17   that we had heard, I guess, from Commerce. But I can't

18   remember what the other ones are.

19   Q.   How do you know that Commerce made its

20   determination based at least in part on lies told by Mr.

21   Duncan?

22   A.   Because they had accused my of inappropriate

23   behavior.

24   Q.   Well, we know that you had a dating relationship

18 (Pages 241 to 244)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006                 C.A. # 05-CV-183 SLR                 Bailey, Kimberly A. - Vol. 2

Page 245

1  with an insurance person?
2      A. That was outside of work.
3      Q. Okay. We know that you also had a sexual
4  relationship with a core producer, correct?
5      A. That was not in my statement.
6      Q. We know that you told lies to Commerce in the
7  internal investigation, correct?
8      A. They were mis-truths. I don't believe that they
9  were lies.
10     Q. Mis-truths?
11     A. Mis-truths.
12     Q. You prefer that word to lie?
13     A. Yes.
14     Q. Is there a difference in the definition in your
15 mind between lie and mis-truth?
16     A. I believe in my statements that you are
17 construing to be lies were mis-truths that I told because
18 I was trying to be politically correct, professional.
19     Q. Didn't you tell me in your deposition under oath
20 that they were lies?
21     A. Well, I'm saying that what you are trying to
22 indicate is lies are mis-truths in my eyes.
23     Q. Didn't you answer the questions in this
24 deposition, this morning, just a few minutes ago --

Page 246

1      A. Yes, yes, I did.
2      Q. -- that they were lies?
3      A. Yes, I did.
4      Q. Okay. Now, in paragraph 15 you refer to the
5  assistance that Commerce wanted to provide you in
6  understanding your role as a supervisor. Do you see
7  that?
8      A. Yes.
9      Q. And Commerce wanted you to attend certain
10 classes, correct?
11     A. Yes.
12     Q. Okay. What facts as we sit here today do you
13 have that would support any contention that having you
14 attend classes to further your education in the business
15 was retaliation for filing a complaint against Mr.
16 Duncan?
17     A. I don't have facts to indicate that. I just know
18 that no one else was asked to attend these classes and
19 these classes had nothing to do with insurance.
20     Q. Well, they did have to do with acting as a
21 supervisor; did they not?
22     A. They had to do with taking a bank teller to an
23 assistant manager position.
24     Q. Well, they had to do with understanding your role

Page 247

1  as a supervisor, correct?
2      A. Not -- I don't believe necessarily. It was all
3  -- I'm sure that their interpretation is to make an
4  indication to teach these entry-level people to go up to
5  an assistant manager position type, and what to do with
6  your daily, common problems.
7          (Discussion off the record.)
8          (Lunch recess taken.)
9  BY MR. TAMBUSSI:
10     Q. I guess we left off, Miss Bailey, before the
11 lunch break we were talking about, I think we left off at
12 paragraph 15, did we?
13     A. I don't remember. I'm sorry.
14     Q. Let me try to refresh my own memory here.
15     A. Okay.
16     Q. Can you refer to paragraph 15 on page 5 of your
17 complaint?
18     A. Okay.
19     Q. You refer to certain classes that Commerce wanted
20 you to go to, correct?
21     A. Yes.
22     Q. Did you attend all those classes?
23     A. No, I did not.
24     Q. Did you notify Commerce that you had, in fact,

Page 248

1  missed at least one of those classes?
2      A. I actually e-mailed Deb Watson that I had missed
3  one, yes.
4      Q. Was that in response to her e-mail to you?
5      A. I don't remember exactly. It may have been.
6      Q. Why did you miss the class?
7      A. I believe the one class that I missed, I had
8  written it down for the afternoon and it was actually a
9  morning class, so...
10     Q. Any others?
11     A. I attended a class that was up in northern New
12 Jersey. I missed two classes at my termination week that
13 Mary Corcoran advised me not to attend.
14     Q. Did Miss Corcoran do that in writing?
15     A. I don't remember.
16     Q. You say in your complaint that the class that you
17 did attend was largely a waste of time?
18     A. Yes.
19     Q. That was your opinion?
20     A. Yes.
21     Q. Paragraph number 17 begins on page 5 and
22 continues over to page 6. Could you just read that
23 paragraph, please, to yourself.
24     A. Okay.

19 (Pages 245 to 248)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006
C.A. # 05-CV-183 SLR
Bailey, Kimberly A. - Vol. 2

Page 249

1     Okay.
2     Q.   Have you read it?
3     A.   Yes, I have.
4     Q.   When Miss Corcoran came on board as your new
5  supervisor, you understood that she had the right to make
6  job assignments as she deemed appropriate?
7     A.   She was the director, yes.
8     Q.   And you know that Miss Corcoran had the right,
9  the management right, to re-assign people to different
10  job duties, correct?
11     A.   I don't -- I assume it is a right.  She is the
12  director.  It is her department.
13     Q.   Okay.  You also understood that Miss Corcoran had
14  the right to decide who was to supervise the five sales
15  personnel, correct?
16     A.   Sure, she had the right to supervise it -- to
17  oversee who was supervising it, yes.
18     Q.   You say in that complaint on the top of page 6
19  that you were embarrassed in front of others.  Do you see
20  that?
21     A.   Yes.
22     Q.   Who were the others?
23     A.   We were in a team meeting in the board room in
24  Wilmington.

Page 250

1     Q.   Who were they?
2     A.   It was the MainStreet Department.
3     Q.   Who?
4     A.   Offhand, who was attending at that time -- these
5  were the members of the department.  I don't remember
6  exactly if they were attending, but more than likely they
7  were.  It was Sharon Scotton, Diane Schauber, Julius
8  Bland, Dorothy Whalen, Dorothy Deegan, Cheryl Luckanish,
9  Valerie Oakes, Marge Phipps, Aricelli Campose.  I know
10  there are some more that I'm forgetting.
11     Q.   Do you have any recollection as we sit here today
12  who specifically was in attendance at that meeting where
13  you say you were embarrassed?
14     A.   It was the MainStreet Department.
15     Q.   No.  Do you remember who specifically of the
16  MainStreet Department was there at the meeting where you
17  say that you were embarrassed?
18     A.   It would have been those people that I had
19  indicated, yes.
20     Q.   Is that a guess on your part?
21     A.   No.  Those people would have attended that
22  meeting.
23     Q.   You say would have.  Were they there or were they
24  not there?

Page 251

1     A.   They were there.
2     Q.   Each and every one of them?
3     A.   As far as -- yes, they were.
4     Q.   Now, in paragraph 21 on page 6 you make reference
5  to the employee to whom the profanity was directed.  Do
6  you see that on page 6, paragraph 21?
7     A.   Yes.
8     Q.   You are referring to the profanity that you used,
9  correct?
10     A.   The profanity that they indicated that terminated
11  me, yes.
12     Q.   Well, you used the word, correct?
13     A.   Yes.
14     Q.   So you are referring to the profanity there that
15  you used?
16     A.   Yes.
17     Q.   Okay.  Who was the employee?
18     A.   Valerie Oakes.
19     Q.   You indicate later in that paragraph that the
20  incident was apparently reported to Miss Corcoran by Miss
21  Frenz?
22     A.   Yes.
23     Q.   F-R-E-N-Z?
24     A.   Yes.

Page 252

1     Q.   Okay.  What is the source of facts for that
2  statement?
3     A.   The day that I was terminated I called Valerie
4  Oakes at her desk from my home and told Valerie I didn't
5  blame her.  And she goes, "Kim, it wasn't me.  Joan Frenz
6  overheard it and reported it."
7     Q.   Did you become aware of any memo that was written
8  by any employee regarding your use of that profanity to
9  them?
10     A.   At what time?
11     Q.   At any time.
12     A.   I have seen copies of e-mails that I guess has
13  been provided to my attorney.
14     Q.   Do you believe that the statements made in those
15  e-mails are lies?
16     A.   I believe that they are incorrect.
17     Q.   Well, do you believe that they are lies?
18     A.   Yes.
19     Q.   So you believe that Miss Oakes lied?
20     A.   I believe that she was asked to say something and
21  she wrote it down.
22     Q.   On what facts do you form that belief?
23     A.   Because the way that she says it is completely
24  untrue.

20 (Pages 249 to 252)

Page 253

1  Q. So you are saying that Miss Oakes is a liar?
2  A. No, I'm just saying that she was asked to write
3  something and she complied.
4  Q. Who told her to write something?
5  A. Commerce, I believe, asked her to give a written
6  response, because she says "at your request" or "upon
7  your request."
8  Q. Is it a guess on your part that Commerce asked
9  her to write those words?
10  A. Well, she starts her response off to Commerce
11  saying "upon" or "at your request."
12  Q. Right. And the words that she wrote, do you
13  contend that they are false?
14  A. I contend that that are untrue.
15  Q. So false and untrue, does that mean the same to
16  you?
17  A. I believe that Valerie wouldn't have made any
18  type of statement like that otherwise. She was asked to
19  make that statement.
20  Q. Are you saying that Commerce told her to write
21  certain specific words?
22  A. I'm saying Commerce asked her to say something,
23  yes.
24  Q. Okay. Is that an assumption on your part?

Page 254

1  A. It is an assumption because what Valerie wrote is
2  not like what Valerie would have written.
3  Q. All right. Are you saying that Miss Oakes wrote
4  lies in that statement?
5  A. I'm saying Valerie wrote what Commerce asked her
6  to write.
7  Q. Did Valerie tell you that Commerce asked her to
8  write something?
9  A. I have never asked. I have never talked to
10  Valerie about that.
11  Q. Did Miss Oakes tell you that Commerce asked her
12  to write specific words?
13  A. I never -- I haven't talked to Valerie about
14  that.
15  Q. Did anyone tell you that Commerce asked Miss
16  Oakes to write specific words?
17  A. When someone writes "upon your request" they are
18  looking for something particular.
19  Q. Well, see, it will go quicker if you answer my
20  questions. Did anyone tell you that Commerce asked
21  Valerie Oakes to write specific words?
22  A. Has anyone told me that, no.
23  Q. Okay. So it is purely an assumption on your
24  part, correct?

Page 255

1  A. Again, when a paragraph starts off that way, it
2  appears that somebody is asking.
3  Q. So it is purely an assumption on your part?
4  A. It is an assumption.
5  Q. Okay. You have no independent facts to support
6  that belief, correct?
7  A. I guess if I could ask Valerie I could find out.
8  Q. As we sit here today, you have no independent
9  facts to support that belief, correct?
10  A. Other than the fact that it says "upon your
11  request."
12  Q. I'll ask you again. As we sit here today, you
13  have no independent facts to support that belief,
14  correct?
15  A. I have no independent fact.
16  Q. How do you know that Miss Frenz is a close friend
17  of Miss Corcoran?
18  A. They had lunch together, they shopped together.
19  Whenever I had the opportunity to travel with Miss
20  Corcoran, Joan Frenz called her on occasion.
21  Q. Okay. That's the factual belief or factual
22  underpinning for your statement there that Miss Frenz is
23  a close friend of Miss Corcoran?
24  A. They are friends. I don't go shopping on a

Page 256

1  Saturday or to lunch, call someone up on a Thursday or
2  Friday saying, What time do you want me to pick you up
3  tomorrow?
4  I believe that that indicates that they are
5  good friends, that they would go shopping together.
6  Q. But it is an assumption on your part?
7  A. They shopped together. They picked out clothes
8  together. They said, That looks nice on you. They would
9  be friends.
10  Q. Let's go to page 7, please. You indicated that
11  after you filed the complaint against Mr. Duncan he told
12  you on one occasion that you wrote a good e-mail,
13  correct?
14  A. Yes.
15  Q. How much interaction did you actually have with
16  Mr. Duncan during the eight weeks that followed your
17  filing of the complaint against him?
18  A. I had interaction with him. We had to speak with
19  reference to certain accounts or things that were going
20  on. How much, I don't know exactly. I'm sorry.
21  Q. Well, did you speak every day during the eight
22  weeks following the filing of your complaint?
23  A. I don't believe that we spoke every day, no.
24  Q. There were some days he wasn't even in the

21 (Pages 253 to 256)

Page 257

1  office, correct?
2  **A. Yes.**
3  Q. During that eight-week period could you estimate
4  how much time he was out of the office?
5  **A. No, I could not.**
6  Q. During that eight-week period, do you have any
7  specific recollection of any words that he said to you
8  other than "Good e-mail"?
9  **A. No, I don't have any recollection of him saying**
10 **anything other than that, other than business related.**
11 Q. Okay. And in those words that he spoke to you
12 that were business related, were they conveyed to you in
13 a professional manner?
14 **A. It was just a normal conversation.**
15 Q. Where are we on the Jones file sort of comments?
16 **A. That, yes.**
17 Q. And during that eight-week period were you ever
18 put in a situation where you and Mr. Duncan were to
19 travel together?
20 **A. No.**
21 Q. During that eight-week period were you ever in a
22 situation where you and Mr. Duncan were at a social
23 occasion together?
24 **A. No. I would never agree to travel or to**

Page 258

1  **socialize or anything. It was an uncomfortable time.**
2  Q. That's not my question.
3  **A. But, no, we were not to travel or to social**
4  **events, no.**
5  Q. Okay. So you were at no travel events with Mr.
6  Duncan during the eight-week period, correct?
7  **A. No. Correct.**
8  Q. You did not go to any social events with Mr.
9  Duncan, correct?
10 **A. No.**
11 Q. Did you ever have lunch with Mr. Duncan during
12 that eight-week period?
13 **A. No.**
14 Q. Were you ever during that eight-week period in
15 the workplace with Mr. Duncan alone, behind closed doors?
16 **A. No. I was advised not to do that, which I**
17 **wouldn't have done it anyway.**
18 Q. Well, the answer is no then, you were not behind
19 closed doors with Mr. Duncan at any time during that
20 eight-week period, correct?
21 **A. I was behind closed doors. There was someone**
22 **with me. Marge Phipps was with us in his office. The**
23 **door was closed.**
24 Q. All right. During that eight-week period Mr.

Page 259

1  Duncan did not make any disparaging remarks to you,
2  correct?
3  **A. I avoided Mr. Duncan, so I don't recall any**
4  **comments.**
5  Q. During that eight-week period Mr. Duncan did not
6  make any disparaging remarks to you, correct?
7  **A. Not that I recall.**
8  Q. On page 7, paragraph 24, subparagraph (b), you
9  state that Commerce "failed to keep the charge against
10 Mr. Duncan confidential which resulted in others in the
11 department learning of the charges," do you see that?
12 **A. Yes.**
13 Q. Who are the others, specifically by name?
14 **A. Mr. Duncan would speak in his office loudly to**
15 **others about the situation. Outside of his office is a**
16 **lady, Chickadel is her last name, Nancy, Nancy Chickadel.**
17 **In walking up and down the hallway you could hear Mr.**
18 **Duncan talking on the phone. Nancy sits right there.**
19 **Nancy had to have heard everything that he had said on**
20 **the phone.**
21 Q. Was that a mere assumption on your part?
22 **A. No. It has to be fact because she sits there.**
23 **She is not deaf. And you can walk down the hallway, feet**
24 **from his office, and hear him speaking, and she is**

Page 260

1  sitting right there.
2  Q. Did you ever ask her if she heard anything about
3  your charge?
4  **A. I never spoke about my charge to anyone.**
5  Q. So you assume that she heard it, correct?
6  **A. She had to have heard it.**
7  Q. Okay. Who are the others?
8  **A. I believe Mr. Duncan was talking on the phone**
9  **with those people, whomever he was speaking with.**
10 Q. So you have no idea who the others are that you
11 put in this complaint other than the woman who sat
12 outside of his office?
13 **A. There was -- I know that he spoke to Paul**
14 **Scaffidi because Paul Scaffidi told me. I know that he**
15 **talked to the director up in Randolph.**
16 Q. Who is that?
17 **A. I don't recall his name.**
18 Q. What did Mr. Scaffidi tell you?
19 **A. He just asked, or he said, "Steve called and**
20 **wanted to talk about the charges," and just basically**
21 **wanted to know what Paul's side of the story was going to**
22 **be.**
23 Q. And Mr. Scaffidi told you this before or after
24 you had slept with him?

22 (Pages 257 to 260)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 2

Page 261

1    A.  I believe it was after.
2    Q.  Okay.  Was it before or after the second time
3   that you slept with him?
4    A.  It had to be after.
5    Q.  Were you still having the relationship with Mr.
6   Scaffidi at that time?
7    A.  A sexual relationship?
8    Q.  Yes.
9    A.  No.
10   Q.  You still had a friendship relationship with him?
11   A.  We are still friends, yes.
12   Q.  And Mr. Scaffidi told you that Mr. Duncan called
13  him?
14   A.  Tried to contact, spoke with him.  I don't
15  actually recall.  But I know that Steve Duncan tried to
16  call Paul Scaffidi.
17   Q.  Your complaint, could you go back to the first,
18  very first page.  You see where it says "Kimberley A.
19  Bailey, Plaintiff"?
20   A.  Yes.
21   Q.  Then it says "Commerce National Insurance
22  Services, Inc., a New Jersey corporation, Defendant," do
23  you see that?
24   A.  Yes.

Page 262

1    Q.  The defendant, when you use that word in the
2   complaint, refers to Commerce, correct?
3    A.  Yes.
4    Q.  Now, do you contend that anyone other than Mr.
5   Duncan publicized your charge against him?
6    A.  I don't know that anyone other -- I don't know
7   that.  I know Mr. Duncan spoke freely of it when we both
8   were asked not to.
9    Q.  Okay.  When you say that defendant Commerce
10  "failed to keep the charges against Mr. Duncan
11  confidential," who at Commerce besides Mr. Duncan said
12  anything about these charges to anyone?
13   A.  I had told Deb Watson that he was speaking loudly
14  on the phone, and he is talking about the situation, and
15  they did nothing to control him.
16   Q.  So when you say that Commerce failed to keep the
17  charge against Mr. Duncan confidential, you are saying
18  that Mr. Duncan's words were able to be heard by other
19  people?
20   A.  And Commerce did nothing to stop him from talking
21  about it or talking to other people about it.
22   Q.  How do you know that Commerce did nothing?
23   A.  Because I told Deb Watson that he was on the
24  phone speaking loudly, and she is like, well, she had

Page 263

1   really no answer for me.
2    Q.  When did you have this conversation?
3    A.  I don't remember.  It was, I would assume, weeks
4   before, just a few weeks, few days before Steve was
5   terminated.
6    Q.  Okay.  Some time during this eight-week period?
7    A.  Yes.
8    Q.  How many times did you speak with Miss Watson
9   about this?
10   A.  I don't recall offhand.  Once or twice.
11   Q.  And did you ever send Miss Watson, or Mr.
12  McKelvy, for that matter, an e-mail indicating that Mr.
13  Duncan was speaking about it?
14   A.  I don't believe that I did.
15   Q.  Did you ever tell Miss Watson or Mr. McKelvy that
16  Mr. Scaffidi had called you and told you that Mr. Duncan
17  had called him about the charge?
18   A.  I don't recall talking to Deb about that.  I may
19  have, but I don't recall.
20   Q.  Did Mr. Scaffidi ever ask you if you had named
21  him in your charge?
22   A.  I don't recall.  I don't recall.  I think that if
23  we talked about it, it was after I was terminated.
24   Q.  So you didn't even learn that Mr. Duncan called

Page 264

1   Mr. Scaffidi until after you were terminated?
2    A.  I don't recall.  I don't recall exactly, no.
3    Q.  Who else told you that Mr. Duncan was not keeping
4   this charge confidential?
5    A.  Other than those three individuals, I --
6    Q.  You said three, you mean Mr. Scaffidi told you,
7   you said you heard Mr. Duncan's voice, that's two?
8    A.  And Nancy Chickadel had to know.
9    Q.  Well, she didn't tell you anything, did she?
10   A.  No, she didn't tell me anything.
11   Q.  So only two people you've heard words from
12  regarding Mr. Duncan's charge, Mr. Duncan speaking in his
13  own office in a voice loud enough for you to hear, and
14  Mr. Scaffidi who called you at some undetermined time,
15  possibly even after you had been terminated?
16   A.  Yes.
17   Q.  That's it?
18   A.  Yes.
19   Q.  You say that this failure to keep the charge
20  confidential caused you further fear.  What were you
21  afraid of?
22   A.  I was afraid of losing the respect of my team.
23   Q.  Because you had made a charge?
24   A.  Yes.

23 (Pages 261 to 264)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 2

Page 265

1    Q.   Did you seek any medical treatment for this fear?
2    **A.   I spoke to some counselors.**
3    Q.   Who?
4    **A.   Linda Whiting was one and Sandy Knauer was**
5    **another.**
6    Q.   Did you specifically tell them that you were
7    placed in fear because Mr. Duncan was speaking loudly in
8    his office?
9    **A.   I spoke with these counselors after my**
10   **termination.**
11   Q.   During this eight-week period did you seek any
12   medical treatment whatsoever for this fear that you say
13   you suffered?
14   **A.   No.   I should have, but I didn't.**
15   Q.   During this eight-week period did you seek any
16   counseling for this fear you claim that you had suffered?
17   **A.   It was fear and stress, yes.   But, no, I didn't**
18   **seek any counseling.**
19   Q.   By the way, Miss Phipps was between you and Mr.
20   Duncan in the hierarchy chart, correct?
21   **A.   Yes, she was.**
22   Q.   And you reported to Miss Phipps also, correct?
23   **A.   I don't believe that I reported directly to her.**
24   **There wasn't a chart that I directly went to Miss Phipps.**

Page 266

1    **No, I didn't report directly to her.**
2    Q.   During this eight-week period between the time
3    that you filed the charge and Mr. Duncan's termination
4    you worked directly with Miss Phipps, correct?
5    **A.   Yes, I did.**
6    Q.   Let's go to page 8, please.   Paragraph 24 (j)
7    starts with the words "overly scrutinized."   Do you see
8    that?
9    **A.   Yes.**
10   Q.   Are you referring to Miss Corcoran here?
11   **A.   Yes.**
12   Q.   And this is the same person who you characterize
13   as being tough and a stickler for the rules?
14   **A.   And a bully, yes.**
15   Q.   And Miss Corcoran scrutinized everyone's work,
16   correct?
17   **A.   No, she scrutinized mine.   I don't believe that**
18   **she scrutinized any of my team members at that time.**
19   Q.   Do you have any facts to support that belief that
20   she didn't scrutinize anyone else's work?
21   **A.   I know that she did not approach any of my team**
22   **members or my subordinates with reference.   I would have**
23   **known about that.**
24   Q.   Well, you were a supervisor, correct?

Page 267

1    **A.   Yes.**
2    Q.   Do you know whether she scrutinized Miss Phipps'
3    work?
4    **A.   I, I don't -- I don't recall.**
5    Q.   You don't know one way or the other?
6    **A.   I believe Marge would have shared that with me**
7    **when I was sharing with her.**
8    Q.   But you don't know one way or the other as we sit
9    here today, do you?
10   **A.   I don't know that.**
11   Q.   Thank you.   Let's go to 24 (k) on page 8.   You
12   say that Commerce falsely accused you of engaging in
13   social activities involving the consumption of alcohol
14   which were not sponsored by Commerce.   Do you see that?
15   **A.   Yes, I do.**
16   Q.   Now, you did testify, did you not, under oath in
17   this deposition that you went to social activities, not
18   sponsored by Commerce, with Mr. Duncan, where alcohol was
19   consumed, correct?
20   **A.   We had went to Back Stage Cage.   I was going with**
21   **my friends.**
22   Q.   Is it not true that you engaged in social
23   activities involving the consumption of alcohol, which
24   were not sponsored by Commerce, where Mr. Duncan was

Page 268

1    present?
2    **A.   I believe at the beginning of my statement that's**
3    **even in here.   But, it indicates that, but I can't truly**
4    **remember if that was a Commerce, that started to be a**
5    **Commerce function and then my friends showed up later**
6    **where I removed myself from Commerce.**
7    Q.   Just listen to my question, okay?   Is it not a
8    fact that you engaged in social activities involving the
9    consumption of alcohol which were not sponsored by
10   Commerce where Mr. Duncan was present?
11   **A.   The beginning of that event or that thing, that**
12   **outing started as, if I remember correctly, a Commerce**
13   **event, where I removed myself and Mr. Duncan followed.**
14   **        Now, if he followed and consumption of**
15   **alcohol was still happening, then yes.**
16   Q.   So it is not a false accusation to say that you
17   engaged in social activities involving the consumption of
18   alcohol which were not sponsored by Commerce?   That's not
19   false, is it?
20   **A.   But they were -- basically indicated, this is**
21   **another thing with the copy guy, the copy vendor and the**
22   **phone vendor, they had accused me of taking my**
23   **subordinates out on social activities, engaging in**
24   **alcohol, which I did not.**

24 (Pages 265 to 268)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006

C.A. # 05-CV-183 SLR

Bailey, Kimberly A. - Vol. 2

Page 269

1    Q.   You say that Commerce falsely accused you of
2    engaging in social activities involving the consumption
3    of alcohol which were not sponsored by Commerce.  Do you
4    see that allegation that you make?
5    **A.  Yes.**
6    Q.   It is a fact, is it not, that you did engage in
7    such activities in Mr. Duncan's presence?  Yes or no?
8    **A.  The beginning of the outing was a**
9    **Commerce-sponsored outing.  And I believe that this,**
10   **where they accused, where they falsely accused me, they**
11   **are indicating that I went with my subordinates.**
12   Q.   All right.  Let's go to paragraph (I).  You say
13   that you were embarrassed in the presence of other
14   employees and sent home to change your clothing?
15   **A.  Yes.**
16   Q.   Who were the other employees specifically by
17   name?
18   **A.  Diane Schauber was coming in right before 8:00**
19   **o'clock for her shift that started at 8:30, and she saw**
20   **that I had the -- my red jacket on, it was a red Friday,**
21   **I had a red blazer, jacket on, and a pair of white capri**
22   **slacks.  She saw me leave and she said, "Where are you**
23   **going?"  I said, "I'll be right back."  And she saw me**
24   **return in different attire.**

Page 270

1    **She asked me later, and I said I didn't want**
2    **to talk about it.  I was embarrassed.  But I think she**
3    **basically knew that I was sent home to change my attire.**
4    Q.   Is that an assumption on your part?
5    **A.  No, she knew I was sent home.  It was obvious.**
6    Q.   What do you mean by "it was obvious"?
7    **A.  I had a different outfit on.**
8    Q.   Well, did you tell her that you were sent home to
9    change?
10   **A.  I think later on I may have told her, yes.**
11   Q.   So she didn't know while you were leaving the
12   precise reason until you told her at some time later?
13   **A.  No.  She understood later, when I returned.**
14   Q.   Did she tell you that she understood that or did
15   you assume that?
16   **A.  That day she did not say anything to me because I**
17   **wasn't, I wasn't talking about it.  But I believe later**
18   **on, when Miss Schauber and I had the chance to talk, it**
19   **was discussed.**
20   Q.   How much later on?
21   **A.  It was more than likely after, well after my**
22   **termination.**
23   Q.   The last paragraph of your complaint that starts
24   with the word "wherefore," do you see that?

Page 271

1    **A.  On page 9?**
2    Q.   Yes, ma'am.
3    **A.  Yes.**
4    Q.   In that paragraph you seek certain damages,
5    correct?
6    **A.  Yes.**
7    Q.   One of the damages that you seek is attorney's
8    fees.  Do you see that?
9    **A.  Yes.**
10   Q.   Do you have an attorney's fee agreement with Mr.
11   Marconi?
12   **A.  Yes, we do.**
13   Q.   Is that a signed agreement?
14   **A.  Yes.**
15   Q.   You say you are looking for front pay, back pay
16   and compensatory damages.  Could you tell me the damages
17   you claim to have suffered with regard to front pay as a
18   result of the termination of your employment by Commerce?
19   **A.  I believe that would be -- is that where, where I**
20   **was terminated and collecting unemployment?**
21   Q.   Well, if you don't understand a question I'll
22   rephrase it.  Because --
23   **A.  Okay.  I don't understand the question.**
24   Q.   All right.  When you were terminated from

Page 272

1    Commerce did you apply for unemployment?
2    **A.  Yes, I did.**
3    Q.   Did you obtain unemployment benefits?
4    **A.  Yes, I did.**
5    Q.   How much in unemployment benefits did you obtain?
6    **A.  The weekly amount or an --**
7    Q.   However you want to calculate it.
8    **A.  I believe it is $330 a week, and I was on**
9    **unemployment for, I think it was eight to 12 weeks, if**
10   **that long.**
11   Q.   Okay.  During that period of time following your
12   termination from Commerce, what efforts did you make to
13   find other employment?
14   **A.  I applied to many different -- for many different**
15   **jobs.**
16   Q.   Did you receive any interviews?
17   **A.  Yes, I did.**
18   Q.   Did you keep a record of the jobs you applied to?
19   **A.  Well, I received my unemployment.  I went to work**
20   **for a private agency, All State, immediately, because**
21   **they were paying more than unemployment.**
22   **Then I sought out my current position, which**
23   **was paying more than that.  But since I have obtained my**
24   **current position I have kept records of the many job**

25 (Pages 269 to 272)

Bailey v. Commerce National Insurance Services, Inc.
February 7, 2006                        C.A. # 05-CV-183 SLR                        Bailey, Kimberly A. - Vol. 2

Page 273

1   interviews or applications that I have made.
2       Q.  How about prior to obtaining your present
3   position, from the time you were terminated from
4   Commerce, did you keep a record of all the people that
5   you contacted looking for work?
6       A.  Yes, I think I did keep a few e-mails.
7       Q.  A few or all of them?
8       A.  A few.  Not all of them.
9       Q.  Do you still have those e-mails?
10      A.  I could check to see.  I think that I have them,
11  yes.
12      Q.  If you have them could you please provide them to
13  your attorney --
14      A.  Sure.
15      Q.  -- so he could turn them over to us.
16          How many jobs did you actually apply for
17  during this period of time?
18      A.  When I was on unemployment?
19      Q.  From the time you were terminated from Commerce
20  to the time you got your present position, how many jobs
21  did you apply for?
22      A.  I don't know offhand.
23      Q.  How many interviews did you get?
24      A.  I don't recall.  I know that I applied for a lot,

Page 274

1   and I guess the only interview that I got was with
2   Werner, where I am now.
3       Q.  Is that a guess?
4       A.  It is the only, it is the only interview that I
5   can recall going on and being offered employment.
6       Q.  How many rejection letters or e-mails did you
7   get?
8       A.  Before my current position with Werner?  The
9   majority of e-mails, if I would have sent out, were with
10  contacts of marketing people that were with current
11  carriers.
12          MR. MARCONI:  Can we go off the record for a
13  second.
14          (Discussion off the record.)
15          THE WITNESS:  Would you repeat your
16  question?
17  BY MR. TAMBUSSI:
18      Q.  We are back on the record.  From the time that
19  you were terminated from Commerce to the time you were
20  hired in your present position, how many rejection
21  letters or e-mails did you receive?
22      A.  I don't recall.
23      Q.  Did you keep any of those rejection letters or
24  e-mails?

Page 275

1       A.  I would have to check, but I don't recall.
2       Q.  If you have any of those could you please turn
3   those over to your attorney?
4       A.  I will.
5       Q.  Okay.  Now, you say that after you were
6   terminated from Commerce you went to work for All State,
7   correct?
8       A.  Yes.
9       Q.  For how long did you work for All State?
10      A.  It was a short while.  I don't -- just a few
11  months.  I don't recall how long.
12      Q.  And you worked at All State until you got your
13  present position, correct?
14      A.  Yes.
15      Q.  Now, you indicated that while in your present
16  position you have sought other employment, correct?
17      A.  Yes, I have.
18      Q.  How many employers did you solicit for other
19  employment?
20      A.  The number, I don't know.
21      Q.  Do you have any record of those?
22      A.  I believe that I do.
23      Q.  Okay.  Have you turned those over to your
24  attorney yet?

Page 276

1       A.  I think I have turned some, but I'll check and
2   what I --
3       Q.  Could you turn all that you have over to your
4   attorney, please?
5       A.  Yes.
6       Q.  The jobs that you sought since the time you have
7   been employed by Werner, have you received any
8   interviews?
9       A.  Yes.
10      Q.  How many?
11      A.  The number, I don't know.
12      Q.  Is it more than five or less than five?
13      A.  I don't recall.
14      Q.  Do you have those interview dates marked
15  somewhere in a date book, diary, calendar or otherwise?
16      A.  I actually worked with some headhunters and I can
17  check with them.  I'm sure they have dates.
18      Q.  To the extent there are any records regarding
19  those, could you please turn those over to your attorney?
20      A.  Yes.
21      Q.  As a result of any of those interviews have you
22  been offered any other jobs?
23      A.  No.
24      Q.  By the way, do you keep a personal diary?

26 (Pages 273 to 276)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 2

Page 277

1    A.  No, I do not.

2    Q.  When is the last time you went on a job

3    interview?

4    A.  Probably two months ago.

5    Q.  What was the position that you were seeking?

6    A.  A commercial lines, customer service.

7    Q.  And how long did the interview last?

8    A.  I believe just an hour.

9    Q.  Do you recall who it was you interviewed with?

10   A.  Not their names offhand, no.

11   Q.  Well --

12   A.  Oh.

13   Q.  -- the company?

14   A.  The company, I'm sorry. No, I don't. I don't

15   remember exactly. It was two names, an agency up in

16   Pennsylvania.

17   Q.  This job search that you are going through now,

18   are you limited in some geographic area?

19   A.  I don't think I understand.

20   Q.  Well, then don't answer. The jobs that you are

21   seeking now, do you limit your search to only those

22   employers in the State of Delaware?

23   A.  No, I do not.

24   Q.  What geographic area do you use to search for

Page 278

1    jobs?

2    A.  I have considered up to an hour commute.

3    Q.  So an hour north, south, east, west?

4    A.  Yes.

5    Q.  I guess you really couldn't go an hour east from

6    here, could you?

7    A.  You could.

8    Q.  If you wanted to swim, I guess.

9         So you've had no job offers since you have

10   been working at Werner?

11   A.  No.

12   Q.  When you seek these jobs do you tell the

13   prospective employers that you have a salary requirement?

14   A.  If it is asked, I will.

15   Q.  And what do you tell them?

16   A.  I'm actually looking for 50 at the moment.

17   Q.  In any of these interviews have you been asked

18   about your employment at Commerce?

19   A.  Yes.

20   Q.  And what do you tell them?

21   A.  Well, it depends on what -- if they are asking

22   about my job duties or what.

23   Q.  Okay. Fair enough. In any of these interviews

24   has anyone asked you about why your employment with

Page 279

1    Commerce ended?

2    A.  Yes.

3    Q.  What is your response?

4    A.  I indicate that they let me go or they laid me

5    off.

6    Q.  Has anybody asked whether or not you have any

7    litigation pending?

8    A.  No. Not that I am aware of. No, I don't

9    remember that question.

10   Q.  You make a claim for loss of wages, both front

11   and back wages. What do you claim you lost by way of

12   wages?

13   A.  Well, my salary compared now to what it was when

14   I was terminated is much less. And also, the, I guess

15   the increases that I would have been making would be a

16   percentage much larger than what they are now.

17   Q.  You know that you are not guaranteed an increase,

18   you were not guaranteed an increase while you were

19   working at Commerce, correct?

20   A.  No. It is very unlikely that you don't get an

21   increase, but I don't, I don't believe -- I believe I

22   remember reading somewhere where it is indicated that you

23   are not guaranteed an increase.

24   Q.  So you are talking about the salary differential

Page 280

1    and the increase. Anything else you claim you have lost

2    as a result, by way of wages or benefits?

3    A.  My benefits with my 401.

4    Q.  Anything else?

5    A.  I also believe that the benefits working with

6    Commerce, and being able to purchase their stocks and

7    things like that, where I don't have opportunity for that

8    at my current employer.

9    Q.  Okay. So what is it about the 401(k) plan that

10   is different?

11   A.  Well, when I was making a higher salary I was

12   able to participate more into my 401 than I am now. I am

13   not participating. My employer does for me, but I don't

14   participate.

15   Q.  What is your current salary?

16   A.  42.

17   Q.  What was your salary when you left Commerce?

18   A.  I thought it was a lot higher, but from what I

19   read it was 53.

20   Q.  All right. So the loss you claim with regard to

21   the 401(k) is that you are not able to contribute

22   yourself?

23   A.  Myself, and also I don't have the, I guess -- I'm

24   not able to participate in the other options with the

27 (Pages 277 to 280)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006

C.A. # 05-CV-183 SLR

Bailey, Kimberly A. - Vol. 2

Page 281

1 stock and everything.
2 Q. I'm going to get to the stock.
3 A. Okay.
4 Q. But with the 401(k), you claim to have suffered a
5 loss because you yourself are not able to contribute?
6 A. Yes.
7 Q. Okay. And with regard to the stock and the stock
8 options at Commerce, at the time you left your options
9 weren't even vested, were they?
10 A. I don't, I don't recall. I'm not -- I don't
11 recall.
12 Q. And how many stock options do you believe you
13 would have been entitled to?
14 A. Well, I believe we were able to purchase some at
15 a discounted rate, and I was actually considering that at
16 that time.
17 Q. Did you have the financial wherewithal to
18 purchase stock at a discounted rate at that time?
19 A. I believe I did, yes.
20 Q. How much were you going to purchase?
21 A. Speaking with one of the other girls in the
22 office, she had invested like 500 bucks or something like
23 that. I don't remember exactly. It wasn't very much.
24 Q. Well, how much did you intend to invest?

Page 282

1 A. I knew that I had five hundred to a thousand
2 dollars that I could play with.
3 Q. Has anything stopped you from purchasing Commerce
4 stock now?
5 A. I don't have the money. I believe that we were
6 offered some type of, I don't know if it was a fee that
7 they would do away with or some other, but it was -- you
8 weren't paying full price, you would be able to purchase,
9 because you were a Commerce employee, the options for the
10 stock cheaper than I would not being a Commerce employee.
11 Q. At any time during which you were employed by
12 Commerce did you purchase any stock of Commerce?
13 A. No, I did not. I actually didn't start
14 participating in the 401 until later also.
15 Q. You also seek compensatory damages. Did you seek
16 any medical treatment whatsoever associated with your
17 termination from Commerce?
18 A. I, I saw two separate counselors.
19 Q. Who were they?
20 A. It was the Linda Whiting and Sandra Knauer.
21 Q. Who else?
22 A. Well, before I was able to see them I had to see
23 my own family doctor to get --
24 Q. So Whiting and Knauer, are they together?

Page 283

1 A. No. I didn't actually -- I met with Whiting, and
2 I would go over and tell her my story, and I would go
3 back and visit her and she would go, you know, she didn't
4 -- my rapport with her I guess wasn't good, so I changed
5 over to Sandra.
6 Q. Sandra being Knauer?
7 A. Knauer, yes.
8 Q. Now, Miss Whiting, how often did you see her?
9 A. I believe I only saw her a couple times.
10 Q. In relationship to the termination of your
11 employment at Commerce in August of 2003, when did you
12 first see Miss Whiting?
13 A. I don't remember.
14 Q. Weeks? Months?
15 A. I don't recall.
16 Q. Do you recall seeing Miss Whiting in August of
17 2003?
18 A. I don't recall.
19 Q. Do you recall seeing her any time in 2003?
20 A. I don't, I don't remember the exact date.
21 Q. Well, why don't you give me, do it this way:
22 Your employment with Commerce ended in August of 2003.
23 When is the first time after that date that you first
24 sought medical treatment or counseling related to your

Page 284

1 termination?
2 A. I don't, honestly, I don't remember. I would
3 have to -- I'm sure I have records and I would have to
4 look to see when it was.
5 Q. Well, was it still within calendar year 2003 that
6 you first sought some treatment?
7 A. I don't, I don't remember.
8 Q. Okay. You say that you saw Miss Whiting a couple
9 of times, and then you switched to Miss Knauer, correct?
10 A. Yes.
11 Q. How many times did you see Miss Knauer?
12 A. I don't remember exactly how many times I saw
13 her.
14 Q. How many scheduled sessions did you have with
15 Miss Knauer?
16 A. That would be a guess.
17 Q. I don't want you to guess.
18 A. I don't know.
19 Q. How about this: Would it refresh your
20 recollection if I tell you that there were eight
21 scheduled sessions?
22 A. Through my insurance?
23 Q. With Miss Knauer.
24 A. I don't recall that. That could be right. I

28 (Pages 281 to 284)

Page 285

1  don't know.
2      Q.  If there were eight scheduled sessions, which you
3  say could be right, did you complete the eight scheduled
4  sessions with Miss Knauer?
5      A.  I may have.  And I could -- I believe that with
6  the insurance that you can get an extension also.
7      Q.  If the records show that you did not complete the
8  eight scheduled sessions, would that refresh your
9  recollection?
10     A.  No, it would not.  It doesn't refresh my
11 recollection.
12     Q.  What complaints did you present to Miss Knauer
13 when you saw her?
14     A.  When I went to see Miss Knauer we first spoke
15 about my other, the other counselor that I worked with,
16 and she had basically indicated situational depression.
17     Q.  Okay.  Did you tell her all about your situation?
18     A.  I don't understand.
19     Q.  Well, your situation just wasn't limited to being
20 terminated from Commerce, was it?
21     A.  I still don't, I still don't understand.
22     Q.  Did you tell Miss Knauer you were also having
23 marital difficulties?
24     A.  Well, I was separated, and my husband and I were

Page 286

1  considering recon --
2      Q.  Reconciliation?
3      A.  Yes.  Thank you.
4      Q.  Did you tell Miss Knauer about your marital
5  difficulties?
6      A.  She asked more about that.  I think that she was
7  more concerned in working with that than with the
8  situational depression, that, you know, that that issue
9  was over with, and what was I going to do.
10     Q.  Of the sessions that you went to with Miss
11 Knauer, how much time was spent on discussing what had
12 happened during your employment with Commerce?
13     A.  I don't recall.
14     Q.  How much time with Miss Knauer was used to
15 discuss your marital problems?
16     A.  I don't recall that either.
17     Q.  Would it refresh your recollection at all if I
18 told you that the records show that virtually all of the
19 sessions dealt with your marital problems?
20     A.  Again, I believe Sandy was looking or Knauer was
21 looking to work with issues that she thought were going
22 to deal with my future.
23     Q.  Did you provide Miss Knauer with a comprehensive
24 history of what you believe had happened at Commerce?

Page 287

1      A.  I don't recall.
2      Q.  How did you get to Miss Knauer?
3      A.  Her name came through the, I guess, approved
4  counselors that you can see.
5      Q.  How did you get to Miss Whiting?
6      A.  Through the same pool.
7      Q.  You also went to your primary care physician, I
8  believe you said?
9      A.  Yes, Dr. Livesay.
10     Q.  L-I-V-E-S-A-Y?
11     A.  Yes.
12     Q.  When did you first see Dr. Livesay for any
13 problems that you claim were associated with the Commerce
14 situation?
15     A.  I don't recall an exact date.
16     Q.  Can you give me a frame of reference as to that
17 time with regard to your termination date?
18     A.  I don't remember.
19     Q.  Do you even recall if it was in 2003?
20     A.  I don't recall.
21     Q.  Did you tell Dr. Livesay that you believe you had
22 health problems that were related somehow to the Commerce
23 situation?
24     A.  I believe -- I spoke with Dr. Livesay, and I

Page 288

1  didn't indicate any health problems, no.
2      Q.  Are you claiming that you suffered any health
3  problems as a result of your employment with Commerce?
4      A.  No, it is not health issues.
5      Q.  Well, when I talk about health I'm talking about
6  physical or mental.
7      A.  Mental health.  Depression, yes, I think that
8  there was a lot that I dealt with in the stress, in the
9  depression, in the questioning in your own mind the
10 should have, could have, would haves.
11     Q.  But for this litigation and the stress that might
12 be associated with this, is it fair to say that that
13 stress is gone from your life?
14     A.  No, it is not.  Because I deal with it, any
15 interview I go to, having to jump around the question of
16 why I left, you know, and then someone bringing up, Oh,
17 do you know Steve Duncan?  He used to work there.  It is
18 something that --
19     Q.  Who brought that up?
20     A.  There were actually three interviews that I have
21 been on that I remember directly that someone asked if I
22 knew Steve Duncan.
23     Q.  Who were they?
24     A.  I don't remember their -- I don't remember their

29 (Pages 285 to 288)

Bailey v. Commerce National Insurance Services, Inc.
February 7, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 2

Page 289

1  names. I know that they were in Pennsylvania, agencies
2  that I've interviewed for.
3       Q.  Three people mentioned Steve Duncan and you don't
4  have any idea what the names of the agencies are?
5       A.  One was initials. Another I don't recall.
6       Q.  Do you even recall the towns that they were in?
7       A.  Conshohocken, I believe was a close town. But,
8  no, I don't.
9       Q.  If there is no record in Dr. Livesay's notes of
10  you ever mentioning anything associated with Commerce,
11  would that refresh your recollection as to what you told
12  her?
13       A.  I don't -- I don't believe that I would have went
14  into my family doctor and said, Oh, my job. I don't
15  believe I would have conveyed to her that.
16       Q.  Are you being treated in any way, shape or form
17  for the stress that you say you are undergoing even
18  today?
19       A.  I like to think that there is a lot of
20  self-motivating, there is a lot of inter or self-things
21  that you can do to help yourself out with your
22  self-esteem or with yourself in stress or being able to
23  overcome these issues.
24       Q.  So the answer is no?

Page 290

1       A.  No, I'm not seeking any treatment at this current
2  time.
3       Q.  Are you making a claim that you are suffering
4  from emotional damages to this day regarding the incident
5  at Commerce?
6       A.  This hasn't been easy. This has been difficult.
7  And it has been emotional for me, yes. It has been
8  stressful.
9       Q.  How does it manifest itself?
10       A.  Well, when I go on interviews, when I come to
11  depositions, when I go to mediations, it is a very
12  stressful situation for me.
13       Q.  Put the litigation aside, because stress of
14  litigation is not recoverable under the law.
15       A.  Okay.
16       Q.  I want to put everything outside of the
17  litigation. Tell me what it is that you are seeking
18  damages for as a result of what you claim to be
19  retaliation by Commerce.
20       A.  I work in an insurance industry where it is
21  small, and everyone knows everyone, and I just believe
22  that with me trying to seek other employment, and having
23  to deal with the stress of answering the questions, if
24  someone happens to have known Mr. Duncan and do they know

Page 291

1  about the situation with me, is that what you are
2  referring to? Or is there a different --
3       Q.  What I'm referring to is what you are seeking by
4  way of damages. I need to know that. You have to tell
5  me what that is.
6       A.  It has been -- it has been very stressful. It
7  has just been -- I have lost a lot of sleep and I just --
8  it has been very difficult on me.
9       Q.  Anything else?
10       A.  Not that I can remember offhand.
11       Q.  Do you seek any other damages as a result of what
12  you claim to be retaliation by Commerce?
13       A.  It indicates front pay, back pay, compensatory
14  damages, punitive damages, attorney's fees, costs, pre-
15  and post judgment.
16       Q.  I know what your complaint says, but do you seek
17  any other damages?
18       A.  Not that I can think of right at this time.
19       Q.  Have you told me up until now everything about
20  your claim for damages?
21       A.  I would say that other than what is indicated in
22  the statement or in the paragraph 25 there, I would think
23  that that is enough, yes.
24       Q.  Okay.

Page 292

1       (Discussion off the record.)
2       Q.  Miss Bailey, how were you advised that you were
3  being terminated?
4       A.  How was I told?
5       Q.  Yes.
6       A.  I believe Mary Corcoran called me or came back
7  and grabbed me and asked me to come into an office with
8  her.
9       Q.  What did she say?
10       A.  She -- after I got into the office --
11       Q.  Yes.
12       A.  -- behind closed doors? It was Deb Watson that I
13  believe did the majority of the speaking.
14       Q.  What did Miss Watson say to you?
15       A.  She asked me if I remembered an incident on
16  August 12th of 2000, whatever it was. And I -- kind of
17  struck me and I'm trying to remember what had happened,
18  and I didn't remember exactly until she made the
19  statement.
20       Q.  Okay. Then what happened?
21       A.  They asked me if I had said that, and I had to
22  think exactly, if that's exactly what I had said, and I
23  agreed that I had said it.
24       Q.  Okay. And then what did they say?

30 (Pages 289 to 292)

Page 293

1    A.  She had indicated that they would have to
2  terminate me because of that.
3    Q.  All right.  What did you say?
4    A.  I had told her that I thought that that was
5  bullshit, and that we use profanity almost all the time,
6  and that I would probably have to talk to my attorney,
7  something along those lines.
8    Q.  All right.  What happened next?
9    A.  They asked me to go clean out my desk.  I cleaned
10  out my desk and I left.
11    Q.  Did you have any other contact whatsoever with
12  Commerce after that point?
13    A.  I believe I sent Deb Watson an e-mail asking her
14  about certain items or things that were to happen.
15    Q.  Okay.  Did you get a response?
16    A.  Yes.
17    Q.  What did she say?
18    A.  I don't remember.  I, I mean, I believe I asked
19  her about pay and an employee referral.  But she
20  responded.
21    Q.  Did you have any other further contact with
22  Commerce whatsoever after that?
23    A.  With --
24    Q.  Anybody from Commerce?

Page 294

1    A.  I am good friends with a few of the girls there.
2    Q.  Are these people that you continue to send
3  e-mails to?
4    A.  Yes.  I talk to on the phone and we meet on
5  occasion to have dinner and drinks.
6    Q.  Are these people that you send e-mails to telling
7  them you are going to go forward with the breast
8  augmentation?
9    A.  Yes.
10    Q.  Are these people that you sent e-mails to
11  inviting them to your house to meet the dildo diva?
12    A.  Yes.  That kind of talk or that kind of play was
13  not uncommon even when I worked there.
14    Q.  I don't have a question pending.
15    MR. MARCONI:  Did that get on the record?  I
16  mean her statement got on the record?
17    THE COURT REPORTER:  Yes.
18    (Discussion off the record.)
19    MR. TAMBUSSI:  Let's just go through a
20  couple last things here.
21    (Bailey Deposition Exhibit 11 was marked for
22  identification.)
23    Q.  Miss Bailey, what I put before you, marked as
24  Bailey Exhibit 11, is an e-mail from Valerie Oakes to

Page 295

1  Miss Corcoran.  Did you have an opportunity to read that
2  e-mail?
3    A.  Yes.
4    Q.  In this e-mail Miss Oakes indicates to Miss
5  Corcoran that she did not want to report you speaking
6  with her or to her using profanity because of, number
7  one, "Fear of retaliation from Kim."  Do you see that?
8    A.  I see that.
9    Q.  Miss Oakes says she had been on your bad side
10  before and that your reactions make the working
11  conditions around the office very tense.  Do you see
12  that?
13    A.  Yes.
14    Q.  Do you believe that Miss Oakes is stating a lie
15  there?
16    A.  I can't imagine what she is talking about.
17    Q.  Had Miss Oakes ever been on your bad side?
18    A.  No.  Valerie and I are actually very friendly.
19    Q.  Number two, Miss Oakes expresses concern about
20  you writing her performance review.  Did you, in fact,
21  write Miss Oakes' performance review?
22    A.  I, I can't recall directly with Valerie's last
23  performance review.  I know I assisted in writing the
24  performance reviews.

Page 296

1    Q.  Number three, she says, "I felt it was futile, as
2  last December there was a problem with Kim that I
3  reported to my manager, asking for a meeting with the
4  three of us to resolve it.  The meeting never took place,
5  the problem was never addressed, and my personnel file
6  and performance review reflected it."  Do you see that?
7    A.  Yes.
8    Q.  Do you know what she was referring to?
9    A.  Yes.  Mr. Duncan wanted her to sign a complaint
10  that he had about her on her performance review, and she
11  wanted to respond, and she responded directly to him, not
12  to me.
13    Q.  What was the problem with you that she is
14  referring to?
15    A.  I guess she is encompassing me in the -- I
16  attended the review that was given to her with Mr.
17  Duncan.
18    Q.  That's just a guess on your part?
19    A.  No.  I attended the review.
20    Q.  No, no.  You are guessing that that is what the
21  problem is that she is referring to?
22    A.  Yes.  She is incorporating Mr. Duncan at that
23  time, who -- "was a problem with Kim that I reported to
24  my manager, (Mr. Duncan at the time)" -- yes, she is

31 (Pages 293 to 296)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 2

Page 297

1  indicating that it is that meeting.
2     Q.  Well, did Miss Oakes report a problem that she
3  had with you to Mr. Duncan in December that you recall?
4     A.  Oh, no, no.  No.  The problem was with her
5  performance review, a comment that Mr. Duncan made on her
6  review, that she was -- wanted to rebuttal.
7           (Bailey Deposition Exhibit 12 was marked for
8  identification.)
9     Q.  Miss Bailey, before you is Bailey 12 for
10  identification.
11    A.  Yes.
12    Q.  Do you recognize that document?
13    A.  The Code of Ethics, yes.
14    Q.  And is that your name printed at the bottom of
15  that page?
16    A.  That is my name printed.
17    Q.  And is that also your signature?
18    A.  Yes, that's my signature.
19    Q.  Did you read this before today?
20    A.  I think I have glanced over it, yes.
21    Q.  Do you see paragraph number 5, "I agree to fully
22  review the Code of Conduct/Conflict of Interest Policy"?
23    A.  Yes.
24    Q.  Did you read, the review the Code of Conduct?

Page 298

1     A.  I don't remember.  I don't recall.
2     Q.  Up at the top, second full paragraph, do you see
3  where it says, "As a condition of my employment by the
4  Bank, I accept the principle that the welfare of the Bank
5  depends upon the conduct and honesty of the employee," do
6  you see that?
7     A.  Yes.
8     Q.  And you have admitted here in this deposition
9  that you were not entirely honest with Commerce, correct?
10    A.  I believe what I had done was in the best
11  interests of Commerce and my employment and my
12  well-being.
13    Q.  You indicated here in this deposition that you
14  were not entirely honest with Commerce, correct?
15    A.  It is a mis-true.  Again, I believe it was in my
16  best interests.
17    Q.  Thank you.
18           (Bailey Deposition Exhibit 13 was marked for
19  identification.)
20    Q.  Miss Bailey, before you is Bailey 13 for
21  identification.
22    A.  Yes.
23    Q.  The Commerce e-mail policy.  Is that your printed
24  name and signature at the bottom of that page?

Page 299

1     A.  Yes, it is.
2     Q.  Did you read that policy before you signed it?
3     A.  I reviewed it, yes.
4     Q.  Did you understand it?
5     A.  Yes.
6     Q.  Based on some of the e-mails that we have
7  discussed and talked about and you were shown in this
8  deposition, isn't it a fact that you violated certain
9  portions of that e-mail policy at times?
10    A.  I may have.  But along with everyone else, I
11  think that I was following suit.
12    Q.  Thank you.
13           (Bailey Deposition Exhibit 14 was marked for
14  identification.)
15    Q.  Miss Bailey, before you is Bailey 14 for
16  identification.
17    A.  Yes.
18    Q.  Which is the Commerce Internet policy.  Is that
19  your signature and printed name at the bottom of the
20  page?
21    A.  Yes, it is.
22    Q.  Did you review this policy before you signed it?
23    A.  I reviewed it.
24    Q.  Did you understand it?

Page 300

1     A.  I believe, yes, I did.
2     Q.  You understand that violation of this policy,
3  like the other policies, is subject to disciplinary
4  action up to termination?
5     A.  Yes, I understand that.
6           (Bailey Deposition Exhibit 15 was marked for
7  identification.)
8     Q.  Miss Bailey, before you is Bailey 15, which is an
9  employee acknowledgment form indicating that you had
10  acknowledged that you have reviewed the Commerce
11  handbook, understood that it is your responsibility to
12  read and comply with the policies contained in the
13  handbook.  Does that document bear your signature and
14  printed name?
15    A.  Yes, it does.
16    Q.  Did you read the handbook?
17    A.  I reviewed it.
18    Q.  Isn't it a fact that based on some of the
19  testimony in this deposition, you have conceded that you
20  violated certain portions of that handbook?
21    A.  I don't believe that I have.
22    Q.  You don't believe that you violated the dress
23  code?
24    A.  No, I don't believe what I wore was

32 (Pages 297 to 300)

Page 301

1  inappropriate.

2  Q.  What were you wearing that day?

3  A.  I was wearing a pair of capri slacks, a red

4  undershirt which was sleeveless, with a jacket over top.

5  Q.  Did you take your jacket off while you were at

6  work?

7  A.  At 7:30 when I got there, yes, it was very hot.

8  I had taken my blazer off.  My intent was to wear it the

9  entire day.  Normally people don't arrive until closer to

10  8:00, 8:15.  I had turned the air down.  I was running

11  around doing a few reports that I do first thing in the

12  morning.  I had just walked in and it was still a little

13  bit warm.  I had taken my jacket off.

14  Q.  Isn't it a fact that Commerce policy does not

15  encourage or permit the use of profanities in the

16  workplace?  Yes or no?

17  A.  That may be their policy.

18  MR. TAMBUSSI:  Thank you.  Okay.  That's all

19  I have.

20  EXAMINATION

21  BY MR. MARCONI:

22  Q.  Ms. Bailey, you just testified that not using

23  profanity in the workplace may be their policy.  But was

24  it, in fact, their practice?

Page 302

1  A.  Every day.  Yes.

2  Q.  What do you mean by "every day, yes"?

3  A.  Every day someone used profanity in that

4  workplace.  If it was one of my subordinates, myself, a

5  producer who could be of a VP standing, everyone used

6  profanity.

7  Q.  I think you testified earlier that you heard Ms.

8  Corcoran use profanity in the workplace, correct?

9  A.  Yes.

10  Q.  And did she use the word "fuck"?

11  A.  Yes.

12  Q.  And to your knowledge, was anything whatsoever

13  done to her in the form of disciplinary action as a

14  result of the use of that word?

15  A.  No.

16  Q.  And was there an assistant director of the

17  MainStreet Division?

18  A.  Yes, Marge Phipps.

19  Q.  And did you ever hear Ms. Phipps use profanity in

20  the workplace?

21  A.  Every day.

22  Q.  Could you describe the kind of words and actions

23  that Ms. Phipps would engage in?

24  A.  Marge Phipps would have blow-ups or arguments

Page 303

1  with one of the individuals, particularly in the Randolph

2  office, Nick, I can't remember his last name.  She would

3  slam the phone down, scream, "Mother fucker," she said,

4  "I'm fucking sick and tired of this shit," and have to

5  get up and go get a smoke or something like that.

6  And that was on an almost a daily occasion

7  when the MainStreet and core business were interacting.

8  Q.  And would she ever speak disrespectfully or treat

9  other Commerce employees disrespectfully, either in

10  person or over the telephone?

11  A.  Yes.  Actually, she sat right next to Val Oakes

12  who would, on occasion, start bitching about something,

13  and Marge would lean over and yell at her and tell her to

14  shut up and get back to work, something along those

15  lines.  Profanity could have been used.  There was no

16  issues there.

17  But she would on occasion yell at Darlene

18  also, which Darlene and Marge had many years of tenure

19  together, so I think they were comfortable doing that

20  also.

21  Q.  Was that something that you personally overheard?

22  A.  Yes.

23  Q.  And did other people personally overhear that,

24  those kinds of exchanges you are referring to?

Page 304

1  MR. TAMBUSSI:  Objection to the form of the

2  question.

3  Q.  You can answer.

4  A.  Within the MainStreet Department, yes.

5  Q.  And do you know whether or not anyone was ever

6  asked to make a report to Ms. Corcoran or anybody else

7  concerning those events?

8  A.  Never, never.

9  Q.  Was any disciplinary action ever taken against

10  that individual?

11  A.  Marge Phipps, no.

12  Q.  Marge Phipps.

13  A.  Not that I'm aware of.

14  Q.  You still have your exhibits in front of you, I

15  notice.  Take a look at numbers 4 and 5, please.

16  A.  Okay.

17  Q.  Now, those are e-mails between the two of us

18  concerning your complaint about Mr. Duncan to Commerce,

19  correct?

20  A.  Yes.

21  Q.  Was it your understanding that making a complaint

22  to Commerce about sexual harassment by your supervisor,

23  who was also employed by Commerce, was something that

24  related to Commerce Insurance Services?  In other words,

33 (Pages 301 to 304)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006      C.A. # 05-CV-183 SLR      Bailey, Kimberly A. - Vol. 2

Page 305

1  was it a business issue that you were discussing?

2      **A. This was an issue that I had at work. Yes, I was**

3  **discussing a business issue.**

4      Q. And is it something that in your mind Commerce

5  would have been interested in, in its context as your

6  employer?

7      **A. Yes, I would say, yes.**

8      Q. So did you view these e-mails as personal matters

9  or as business-related matters?

10     **A. This was a, this was a business-related matter**

11  **that I needed assistance on.**

12     Q. Move on to number 6, please. The second full

13  paragraph, "It was not my intention to report these," and

14  so on.

15     **A. Okay.**

16     Q. Read that paragraph to yourself again, please,

17  that full paragraph, and tell me when you are finished.

18     **A. Okay.**

19     Q. Now, in writing this paragraph were you

20  attempting to deceive Ms. Watson in any way?

21     **A. No.**

22     Q. What were you attempting to do?

23     **A. I was trying to tell them what they wanted to**

24  **hear. I didn't think it was actually my position to say**

Page 306

1  **what they should do. But I was trying to, in a**

2  **professional manner, indicate that I just wanted it to be**

3  **over. I wanted it to be done. An apology was fine.**

4     Q. I think Mr. Tambussi somehow got you to testify

5  that you were lying or being untruthful in connection

6  with this memorandum, and in particular in this language.

7  Were you attempting to be untruthful or lie?

8      MR. TAMBUSSI: Objection to the form of the

9  question.

10     **A. No, I wasn't attempting to be untruthful or lie.**

11  **I -- no, I wasn't.**

12     Q. Is it fair to say that you were sort of taken

13  aback by this request that you propose some sort of a

14  solution to this?

15     **A. Yes, I was. This is not my forte. I do**

16  **insurance. I don't do HR.**

17     Q. Would you just quickly look at Exhibits 7 and 8.

18  Did you consider these to be internal memoranda or

19  business-related memoranda?

20     **A. Yes, I did.**

21     Q. Take a look at number 9. I'm looking at your

22  e-mail to Debbie.

23     **A. And Bruce.**

24     Q. And Bruce. And the first sentence of the second

Page 307

1  paragraph, just read that to yourself. I'll read it. "I

2  guess I am second-guessing my decision to report him."

3      Here again, Mr. Tambussi got you to say that

4  you were lying or being untruthful in your words here.

5  Was it your intention to deceive Ms. Watson or Mr.

6  McKelvy in any way in this e-mail?

7     **A. No.**

8      MR. TAMBUSSI: Objection to the form of the

9  question.

10     Q. What was your intention?

11     **A. I wanted it to stop.**

12     Q. Mr. Tambussi asked you sort of towards the end

13  there, I guess, about, I think he used the term health

14  effect of your termination. Just the termination,

15  putting aside the litigation, does the fact that you were

16  terminated by Commerce and the manner and the reasons for

17  the termination by Commerce, does that still bother you

18  today?

19     **A. Yes, it does.**

20     Q. How so?

21     **A. I am embarrassed. I could not even imagine**

22  **seeing Steve Duncan. I think that I would vomit. Being**

23  **able to even discuss these items with my old co-workers,**

24  **I don't -- I have discussed with them with reference to**

Page 308

1  **we are bringing suit against Commerce. I still have not**

2  **discussed anything about the sexual harassment or**

3  **anything that has to do with Steve Duncan.**

4     Q. All right. I'm talking about specifically the

5  termination. I know the sexual harassment bothers you.

6  But I'm talking about the fact that you were wrongfully

7  terminated by Commerce. Does that still bother you?

8     **A. Yes.**

9     Q. Does it cause you to lose sleep?

10     **A. Yes.**

11     Q. Still today, these days?

12     **A. There is on occasion that I'll -- yes.**

13     Q. Does it cause you to cry?

14     **A. Yes.**

15     Q. Do you get depressed about it?

16     **A. I do.**

17     Q. Now, have you sought treatment recently for any

18  of those things you just said, depression, the crying,

19  not being able to sleep, from a professional?

20     **A. I have talked to my husband about it, because of**

21  **the recent ongoings. But I have not -- I try to do a lot**

22  **of meditating or self-help stuff.**

23     Q. It seems like you are beginning to cry now a

24  little bit?

34 (Pages 305 to 308)

Page 309

1    A.  Yes, I am.

2    Q.  And is it because of these same things or is it

3    because I'm asking you about it?

4    A.  It is just a combination of all.  It is, it is

5    just a little bit overwhelming.

6    Q.  All right.  We will move off of that.  During the

7    eight-week period that Commerce was supposedly

8    investigating this, your sexual harassment charge, were

9    you ever given the opportunity to move to another

10   position?

11         MR. TAMBUSSI:  Objection to the form of the

12   question.

13   A.  No, I was not.

14   Q.  Did you make it known to Commerce that you felt

15   uncomfortable continuing to work with Mr. Duncan during

16   this eight-week period?

17   A.  I specifically told Deb Watson that it was very

18   stressful to work with Mr. Duncan.

19   Q.  What was her response when you made that known to

20   her?

21   A.  They were doing the best that they could.

22   Q.  Do you know, in fact, whether or not there was

23   another place you could have worked while this was going

24   on?

Page 310

1    A.  I don't know.  I mean, I could have worked from

2    home.  I'm sure that there is something they could have

3    worked out where Mr. Duncan could have worked -- they

4    have many different locations.  There could have been

5    something they worked out.

6    Q.  As far as you know, it was possible, perhaps Mr.

7    Duncan could have been moved some place else?

8         MR. TAMBUSSI:  Objection to the form.

9    A.  His office could have been moved to a different

10   Commerce location, yes.

11   Q.  Had you been given the opportunity to move your

12   office or work at home or do something other than

13   continue to work directly with and for Mr. Duncan during

14   the eight weeks, would you have taken advantage of that?

15   A.  Yes, I would.

16   Q.  Take a look, please, Kim, at Exhibit 10, which is

17   the complaint that was filed in the case.

18   A.  Do you want me to read it again?

19   Q.  No, not the whole thing.  Take a look at

20   numbered paragraph 9.  Just read it to yourself.

21   A.  Okay.

22   Q.  The first thing we talk about in the second line

23   of paragraph 9 is the harassment included, and it says,

24   "fondling her back, breasts, and buttocks."  What

Page 311

1    incident are you referring to in that?

2    A.  When he was -- when he fondled by back, my

3    breasts and my buttocks was at the Back Stage Cage.

4    Q.  Was that outside the workplace that that

5    occurred?

6    A.  It was in the Back Stage Cage.  It was outside.

7    Q.  Okay.  Now, was Mr. Duncan there sort of in his

8    capacity as your supervisor or did he just happen to show

9    up?

10   A.  He was there as -- I believe that we went

11   together, and, again, then separated or whatever.  But he

12   was there initially as my supervisor or as my -- as a

13   director, yes.

14   Q.  So, in other words, you left directly from work

15   and he left directly from work, and the plan was, in both

16   of your minds at the time, was to leave work and go

17   there, correct?

18   A.  Yes.

19   Q.  To discuss business?

20   A.  Yes.

21   Q.  How about when the suggestion was made that you

22   and he have sex on business trips, was that something

23   that was spoken while you were at your office or some

24   place else?

Page 312

1    A.  That was out of the office.

2    Q.  Where?

3    A.  At Back Stage Cage or any of the other taverns

4    that we may have visited.

5    Q.  Now, do you know whether or not that was a

6    similar situation, where you were there with Mr. Duncan

7    to discuss business?

8    A.  Yes.

9    Q.  How about the making comments to male business

10   associates and so on about your anatomy?

11   A.  That was, one particular time, with Mr. Durham.

12   Q.  Was that when he came to Commerce's office?

13   A.  Yes.  It was in the board room.

14   Q.  So this was in the Commerce office?

15   A.  It was in the Commerce office.

16   Q.  Okay.  Now, how about the rubbing her legs and

17   inner thighs and so on?

18   A.  He did that on two separate occasions, one was

19   leaving Back Stage, where Mr. Duncan asked me to ride

20   with him, and Mr. Durham rode with my girlfriend Cindy,

21   and he also put his hand on my leg or inner thigh.

22   Q.  Well, let's take it one at a time.

23   A.  Okay.

24   Q.  When you were leaving the Back Stage, if I recall

35 (Pages 309 to 312)

Page 313

1  your testimony when Mr. Tambussi was questioning you,
2  that was sort of at a point where he had gone to the Back
3  Stage with you, but then were you trying to get rid of
4  him sort of?
5      A.  No.  That was on a separate occasion.  This was
6  with Mr. Durham.
7      Q.  Tell me about that then.
8      A.  We had left Back Stage Cage, were headed over to
9  Kid Shelleen's, and that's when Mr. Duncan was trying to
10  express to me how I guess excited Mr. Durham was or how
11  interested Mr. Durham was by rubbing my leg and my inner
12  thigh.  And I took his hand and put it between both of my
13  hands and talked to him so he would keep his hands out of
14  between my legs.
15      Q.  Would you consider that something related to your
16  work with Commerce or did that sort of cross over the
17  line into a non-work-related event?
18          MR. TAMBUSSI:  Objection to the form of the
19  question.
20      A.  We were still with the marketing rep, Mr. Durham.
21  I don't think I understand your question.
22      Q.  Well, no, I think you answered it.
23      A.  We were still with Mr. Durham, so it was still
24  work-related.

Page 314

1      Q.  Okay.
2      A.  But I don't know if you meant his putting his
3  hand, if that's work-related.  That's not work-related.
4      Q.  I'm talking about the situation in which you
5  found yourself when that occurred.
6      A.  We were still with the marketing rep, Mr. Durham.
7      Q.  And, therefore, you felt it was still
8  work-related; is that what you are saying?
9      A.  Yes, it was.
10      Q.  How about the second time?
11      A.  When Mr. Duncan put his hands on me?
12      Q.  Correct.
13      A.  That was when we were headed to the golf outing,
14  when he asked me to masturbate, but he put his hands
15  between my legs with my hands.
16      Q.  You were in his car?
17      A.  Yes.
18      Q.  And he was driving, you were in the passenger
19  seat?
20      A.  Yes.
21      Q.  And you were going down to the senior golf
22  tournament?
23      A.  Yes.
24      Q.  In Maryland?

Page 315

1      A.  Yes.
2      Q.  Was that a business function?
3      A.  That was a business function.
4      Q.  Did you consider yourself to be at work when you
5  were in the car with Mr. Duncan?
6      A.  I was representing Commerce, yes.
7      Q.  When you were in the car with him on the way
8  down, you considered that to be work?
9      A.  Yes.
10      Q.  Go to paragraph 12 of this same Exhibit 10.  Read
11  it to yourself.
12      A.  Okay.
13      Q.  Now, you discussed with Mr. Tambussi when he was
14  questioning you things that you had previously been
15  involved in and that you had been excluded from after you
16  made your charge of sexual harassment.  One of those was
17  that SEMCI project?
18      A.  Yes.
19      Q.  S-E-M --
20      A.  -- C-I, I believe.
21      Q.  S-E-M-C-I.  And Mr. Tambussi asked you whether or
22  not you believed that it was in Ms. Corcoran's purview to
23  remove you from certain projects, certain meetings,
24  things like that, and you testified I believe of course

Page 316

1  it was in her purview to do that, correct?
2      A.  It was her privilege.  She is the director.
3      Q.  Now, when you were removed from the various
4  meetings and projects and other matters, were you ever
5  given any explanation as to why you were removed?
6      A.  No.  In fact, I would question, "Do you need me
7  to go to the next meeting?"  She is like, "Oh, no, no,
8  no, no."  She completely took me out of the loop, no
9  explanation provided.
10      Q.  So were you ever informed, for example, with
11  respect to SEMCI that you were not doing a good job?
12      A.  No.
13      Q.  Was the work that you did on that project, for
14  example, something that, as far as you know, contributed
15  to the betterment; if you will, of the --
16      A.  I was an integral part at the beginning, yes.
17          MR. TAMBUSSI:  Objection to the form of the
18  question.
19      Q.  How about when the sales personnel were removed
20  from your supervision, do you remember that happening?
21      A.  Yes, I do.
22      Q.  That happened after the report of the sexual
23  harassment?
24      A.  Yes, it did.

36 (Pages 313 to 316)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006

C.A. # 05-CV-183 SLR

Bailey, Kimberly A. - Vol. 2

Page 317

1    Q.  Were you ever informed at any time that those
2   sales personnel were not performing properly or that
3   there was anything wrong with the way you were handling
4   them?
5    A.  I was not informed that there was any issues with
6   the sales department. I was actually informed that the
7   salespeople would be going under the guidance of Miss
8   Phipps at the same time everyone else was in a team
9   meeting. So she didn't give me any heads-up on that at
10  all.
11   Q.  So were you ever given any explanation whatsoever
12  as to why those people were removed?
13   A.  No, no, I wasn't given an explanation. It was
14  just part of the MainStreet.
15   Q.  Sorry, didn't mean to interrupt. Had you ever
16  been counseled in any way by Ms. Corcoran or anybody with
17  regard to problems that they perceived in your
18  performance, other than I know there was an issue with an
19  e-mail?
20   A.  An e-mail. No. Other than the attire where she
21  sent me home, and from that point forward, I understood
22  she likes to see people in business attire or suits,
23  particularly. But, no, she -- never was I ever counseled
24  or taken within her office to discuss any performance

Page 318

1   issues.
2    Q.  Speaking of the dress issue, Ms. Phipps was the
3   assistant director of the MainStreet area, correct?
4    A.  Yes, she was.
5    Q.  Did Ms. Phipps comply with the dress code that
6   was in place at Commerce?
7        MR. TAMBUSSI:  Objection to the form of the
8   question. You can answer.
9    A.  It depends on whose dress code you are going by.
10  I'm sure Mary Corcoran would have much rather seen her
11  wear matching business -- or suits. It was Marge's --
12   Q.  Let me stop you and pose the question this way:
13  Did Marge wear clothing that was less nice, if you will,
14  than the capri pants you were sent home for wearing?
15   A.  Yes, she did.
16       MR. TAMBUSSI:  Objection to the form of the
17  question.
18   Q.  Could you explain your answer then? What do you
19  mean?
20   A.  Marge wore corduroys or colored denim with a
21  blazer, and a lot of the times her shoes were tattered or
22  worn. So Marge, in a physical appearance or attire, was
23  not always nice.
24   Q.  And was she ever disciplined or counseled or

Page 319

1   spoken to in any way?
2    A.  No.
3        MR. TAMBUSSI:  Objection to the form of the
4   question.
5    Q.  Was she ever sent home?
6    A.  No, she was never sent home to change. Neither
7   were any of the girls who wore short skirts.
8    Q.  Were you aware that wearing short skirts was not
9   permitted at Commerce?
10   A.  In comparing my skirts to the other skirts, I
11  mean, it is only -- I think it is understood that you
12  don't wear something that is going to reveal or show
13  anything. None of my skirts were that way. But -- I'm
14  sorry, I forgot what your question was. Was I aware
15  that--
16   Q.  Just slow down.
17   A.  Okay.
18   Q.  Take a breath. All I'm trying to figure out is,
19  was it common knowledge at Commerce that short skirts
20  were not permitted?
21       MR. TAMBUSSI:  Objection to the form of the
22  question.
23   A.  No, it was not.
24   Q.  Do you believe that Ms. Corcoran observed Ms.

Page 320

1   Phipps wearing clothing, the clothing that you just
2   described, denim and jackets?
3        MR. TAMBUSSI:  Objection to the form of the
4   question.
5    Q.  You have to give --
6    A.  Did she observe it?
7    Q.  That's the question, correct.
8    A.  Yes.
9    Q.  To your knowledge, was Ms. Phipps ever talked to,
10  sent home, counseled or anything?
11   A.  No.
12       MR. TAMBUSSI:  Objection to the form of the
13  question.
14       (Discussion off the record.)
15   Q.  When the announcement was made that the
16  salespeople would be taken away from you, was that made
17  in a public meeting?
18   A.  Yes.
19   Q.  And had you any knowledge or inkling at all that
20  either the announcement would be made at that public
21  meeting or that the decision had been made to take those
22  people away from you?
23   A.  No, no. I had no forewarning.
24   Q.  And was that something that was embarrassing to

37 (Pages 317 to 320)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 2

Page 321

1  you?

2      A.  Yes, it was.  I had several people from the
3  sales, two in particular, that asked me what was going
4  on, why wasn't I overseeing them anymore.

5      Q.  And did you ultimately get any kind of a reason
6  from anybody as to why those people were taken away?

7      A.  No, I did not.

8      Q.  In your experience, have you ever been involved
9  in a situation where a person was similarly embarrassed?

10         MR. TAMBUSSI:  Objection to the form of the
11  question.

12      A.  No.

13      Q.  Or something like that was done to somebody else
14  besides you?

15      A.  No.

16         MR. TAMBUSSI:  Objection to the form of the
17  question.

18      Q.  Do you have any idea why they would have done
19  that to you?

20         MR. TAMBUSSI:  Objection to the form of the
21  question.

22      A.  It appeared to me because of my complaint.

23      Q.  You testified earlier, again in response to
24  questions from Mr. Tambussi, that you didn't have any

Page 322

1  facts to support any claim that Ms. Corcoran knew about
2  the charge of sexual harassment that you made against Mr.
3  Duncan.  Do you have any belief as to whether or not she
4  knew about it?

5         MR. TAMBUSSI:  Objection to the form of the
6  question.

7      A.  Oh, I have belief that she knew, yes.

8      Q.  What was your belief?

9      A.  I believe that she knew through her good friend
10  Joan Frenz, or through Commerce, through HR.  There were
11  several situations where Joan Frenz spoke of other people
12  being terminated or private information that I became
13  privy to, just being in a meeting with Joan Frenz and Mr.
14  Duncan, where Joan Frenz would gossip about things that
15  were going on.

16         I'm well aware that Joan Frenz knew about
17  the situation with Mr. Duncan, and I believe that she
18  conveyed that to Mary Corcoran.

19      Q.  How do you know that she knew about the situation
20  with Mr. Duncan?

21      A.  Joan Frenz was brought in as Steve's support when
22  they terminated him and to clear out his office.

23      Q.  When Ms. Corcoran was, we will say counseling you
24  concerning the e-mail that she didn't like —

Page 323

1      A.  Yes.

2      Q.  -- how did that entire situation come up?  Did
3  you send an e-mail that she saw and she called you in?

4      A.  Yes.  More than likely, I had shared something
5  with the department, and I would always cc my director
6  and assistant director on those e-mails, and that had to
7  be where it came from.

8      Q.  Now, when you did your e-mails, do you have like
9  a list where you can just identify a list and an entire
10  list of people would be sent the e-mail, plus cc, or did
11  you have to type individual names every time?

12      A.  I think that I had to type individual name every
13  time.  I never put an address book or something like that
14  together.

15      Q.  That's what I meant.  Was it your impression that
16  Ms. Corcoran, in criticizing you over this e-mail, was
17  trying to improve your performance or was some other
18  motive sort of apparent to you?

19         MR. TAMBUSSI:  Objection to the form of the
20  question.

21      A.  It wasn't apparent that she was trying to improve
22  my English or my e-mail format.  It kind of caught me off
23  guard.  I had no idea what she was actually trying to do
24  or get out of that meeting.

Page 324

1      Q.  Did you get any constructive criticism from her
2  in that review?

3      A.  Other than my e-mail?

4      Q.  No.  I mean, did you consider the criticism that
5  you got from her concerning your e-mail constructive or
6  something else?

7      A.  It wasn't constructive.  I thought it to be
8  evasive.  It didn't help me improve.  So what I took from
9  the meeting was more confusion than anything, because
10  there was no plan for improvement.  She just said my
11  e-mails were bad.  It was just criticism.

12      Q.  Criticism for the sake of criticism?

13         MR. TAMBUSSI:  Objection to the form of the
14  question.

15      A.  Yes.

16      Q.  I think you testified when Mr. Tambussi was
17  questioning you that you got the feeling that Ms.
18  Corcoran was after you.

19      A.  Yes.

20      Q.  I think you gave him a couple of examples of why
21  you got that feeling.  Did you testify also that you
22  asked someone for assistance in that regard?

23      A.  I spoke to Deb Watson on the phone once, and
24  after a meeting one time I asked to speak to her in

38 (Pages 321 to 324)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006      C.A. # 05-CV-183 SLR      Bailey, Kimberly A. - Vol. 2

Page 325

1　person. I told her that I thought I pissed in my pond
2　because I honestly thought Mary was after me. She
3　indicated for me to discuss this with Mary.
4　　　Q. When you say you pissed in your pond, what did
5　you mean by that?
6　　　A. By filing the complaint, that it was public
7　knowledge and people were after me, they were out to make
8　my life miserable.
9　　　Q. And you thought that Mary Corcoran was one of
10　those people?
11　　　A. Yes, I did.
12　　　Q. And did you ask Ms. Watson to intervene?
13　　　A. Yes, I did.
14　　　Q. And did she intervene?
15　　　A. No, she did not.
16　　　Q. Did she tell you why not?
17　　　A. She told me to talk to Mary, which I didn't trust
18　Mary.
19　　　Q. Did you talk to Mary?
20　　　A. No, I did not.
21　　　Q. Why not?
22　　　A. I didn't trust Mary. I didn't -- I didn't -- I
23　didn't talk to anybody about the complaint, and I didn't
24　want to go there with her. I was told at my termination

Page 326

1　they were giving me a new beginning, and I didn't want to
2　have to go back.
3　　　Q. You mean at Mr. Duncan's termination?
4　　　A. No, my -- oh, yes, at Mr. Duncan's termination.
5　I was beginning a fresh start.
6　　　Q. Did you feel like you needed a fresh start?
7　　　A. No, I didn't feel I needed a fresh start. I just
8　wanted the harassment to go away. I thought the team,
9　overall, we were doing great.
10　　　Q. When Ms. Corcoran was, I think you used the
11　phrase criticizing you about planning and holding a
12　bowling outing, she directed the criticism to you; am I
13　correct?
14　　　A. Yes, she did.
15　　　Q. Saying something along the lines that, I'll
16　paraphrase poorly, that bowling is not a sophisticated
17　activity in her eyes, and essentially you should not have
18　scheduled a bowling outing? Is that basically what she
19　said?
20　　　A. Yes.
21　　　Q. Did she say that to you in a way that sounded as
22　though she was trying to be helpful to you?
23　　　A. No, she was --
24　　　　　MR. TAMBUSSI: Objection to the form.

Page 327

1　　　A. She was criticizing me. She was making fun of me
2　at that time in front of my subordinates.
3　　　Q. And was that something that was embarrassing to
4　you?
5　　　A. Yes, it was.
6　　　Q. In your experience, is that something that people
7　at Commerce did routinely?
8　　　A. No, that does not uphold to their WOW standards.
9　　　Q. Do you have any idea why Ms. Corcoran might be
10　here again publicly embarrassing you in front of --
11　　　A. I thought it was because of my complaint.
12　　　Q. Did you get approval from anyone for holding a
13　bowling outing that Ms. Corcoran apparently didn't think
14　was sophisticated enough?
15　　　A. Mary Corcoran approved the outing.
16　　　Q. Before you held it?
17　　　A. Yes.
18　　　Q. You testified earlier that you did not discuss
19　the relationship that you had with Mr. Scaffidi, you
20　didn't discuss that relationship with Mr. McKelvy or Ms.
21　Watson in the context of their investigation into the
22　sexual harassment charge. Do you remember that
23　testimony?
24　　　A. Yes, I do.

Page 328

1　　　Q. Were you asked about a relationship with Mr.
2　Scaffidi?
3　　　A. No, I was not.
4　　　Q. By either Mr. McKelvy or Ms. Watson?
5　　　A. No, I was not.
6　　　Q. Did your relationship with Mr. Scaffidi, in your
7　view, have anything whatsoever to do with the sexual
8　harassment charges that you were making against Mr.
9　Duncan?
10　　　A. No.
11　　　Q. Is that why you didn't mention it to them at that
12　meeting?
13　　　A. Yes, that's why.
14　　　Q. To your knowledge, was it common practice at
15　Commerce for employees occasionally to use their company
16　e-mail for personal matters?
17　　　A. Yes.
18　　　Q. As far as you know, has anybody ever been
19　disciplined for that?
20　　　　　MR. TAMBUSSI: Objection to the form of the
21　question.
22　　　A. No.
23　　　Q. When you went to Bank Shots and you found
24　yourself in Mr. Duncan's car, and I think you testified

39 (Pages 325 to 328)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006                                                    C.A. # 05-CV-183 SLR                                    Bailey, Kimberly A. - Vol. 2

Page 329

1    that he lunged at you and kissed you --
2    A. Yes.
3    Q. -- did you intend that either one of you would
4    kiss when you got into his car?
5    A. No.
6    Q. Did you want him to kiss you when he kissed you?
7    A. No, I did not.
8    Q. How soon after he kissed you did you leave the
9    car?
10   A. It wasn't very long. It had -- I don't exactly
11   -- it wasn't, it wasn't that long. It was thirty seconds
12   to a minute. It wasn't very long at all.
13   Q. Is it fair to say you were shocked when he did
14   it?
15   A. I was floored, yes. I was totally shocked.
16   Q. Is it fair to say that you didn't want him to do
17   it again?
18   A. Yes, that's very fair to say. I didn't, I didn't
19   want his advancements.
20   Q. In your response to certain written discovery
21   that was sent to you by Commerce, the various questions
22   you were asked to answer, the documents you were prepared
23   to supply, do you remember those?
24   A. Vaguely, yes.

Page 330

1    Q. The questions we call the interrogatories.
2    A. Okay.
3    Q. And the papers, of course, or the documents were
4    called document production requests. Do you remember
5    those?
6    A. Yes.
7    Q. Sort of towards the end of your questioning by
8    Mr. Tambussi you were talking about basically your work
9    history from the time that you left Commerce.
10   A. Yes.
11   Q. And you sounded a little bit unsure and confused
12   and didn't recall certain things, as I recall.
13   A. Okay.
14   Q. Are you relying, though, on the information that
15   was set forth in that other discovery as being accurate,
16   rather than what you can sit here today and remember?
17   A. Yes. The other discovery is much more accurate,
18   yes.
19   Q. When you made the infamous reaction on August the
20   12th of 2003 to Ms. Oakes inquiry -- well, actually,
21   let's back up. Describe, if you will, the events of that
22   morning leading up to what happened, that reaction.
23   A. My day started at Commerce about 7:30. My
24   subordinates started at 8:30. I would come in, run my

Page 331

1    reports.
2        I actually had two people out, if I remember
3    correctly, that day, and one called out sick, so I had
4    three customer service reps out.
5    Q. Of how many?
6    A. There is ten customer service reps. I jumped
7    into Julius, because he was actually on his honeymoon, I
8    was in his desk working some of his backlog, just so when
9    he comes back he is not that far behind and if there is
10   any expiring issues that we don't put ours in an E&O
11   issue.
12       Valerie came walking in probably about 20
13   minutes, 15, 20 minutes late. And I'm like, "Good
14   morning, Val." You know, we gave that little rapport
15   back and forth, where she knows I'm aggravated with her.
16   She is like, "I'm here," you know, and she goes to her
17   desk. And I'm actually on the phone with somebody, and
18   answering some questions, and somebody that's looking for
19   something that was due two days ago. And it was always
20   very stressful, working Julius' work.
21       And Val yells across the two cubicles, "Kim,
22   Kim, come here." I'm like, you know, "In a second."
23       So I get done what I was doing. I go back
24   there. And I look at her monitor and she is on the

Page 332

1    Internet. She hasn't even signed into her e-mail, hasn't
2    signed on to her phone, which you have to sign on to so
3    you can get the calls to come through, because if you are
4    not signed on, they go -- they are either dumped into
5    somebody else or they go into your voice mail. And she
6    hasn't signed into Sagitta, which is our 800 number.
7        But she has a CIC website up on the
8    Internet. And I look at her. She goes, "I want to go to
9    this." I said, "I ain't got fucking time for this shit.
10   You know what the procedures are, for requesting,"
11   whatever, and I walked away from her. And in my walking
12   away, Dee Whalen was between the two of us, I hear Dee
13   laughing, and I turn around and Val is like this
14   (indicating). It was Val's normal rapport to do this
15   (indicating).
16   Q. For the record, you are --
17   A. For the record, I'm giving the finger with both
18   hands and jerking them back and forth.
19   Q. So, in other words, you believe that she was
20   giving you the finger when your back was turned?
21   A. Yes. Because they both were giggling and Val
22   took the smirk, you know, and gave me the straight face,
23   and --
24   Q. I'm sorry.

40 (Pages 329 to 332)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006

C.A. # 05-CV-183 SLR

Bailey, Kimberly A. - Vol. 2

Page 333

1  A. And just kind of, you know, gave me the
2  I'm-not-doing-anything look.
3  Q. Was Val giggling?
4  A. Yes.
5  Q. And who else was giggling?
6  A. Dee Whalen.
7  Q. Anybody else?
8  A. Not that I -- I'm sure other people saw it, but I
9  was only paying attention to the two of them. I'm sure
10  everybody saw what happened or overheard what happened
11  because other people reported it.
12      But I went back to Julius' desk and I
13  continued to work. I spent another hour or so there.
14  Then I went over and did some other stuff, and the day
15  went on as a normal day.
16  Q. Was that sort of event anything really different
17  than other things you had observed at Commerce that
18  involved other people?
19      MR. TAMBUSSI: Objection to the form.
20  A. That was a normal day within MainStreet.
21  Q. And had you used profanity before?
22  A. Yes.
23  Q. And had you ever been disciplined for that
24  before?

Page 334

1  A. I have not.
2  Q. And I think you testified earlier that you had
3  heard other people use profanity in that same manner
4  before?
5  A. Almost everyone in that building used profanity
6  almost every day.
7  Q. And no one was disciplined for it?
8  A. No one was disciplined.
9  Q. Had you received any kind of warning of any kind
10  that that kind of language and that kind of conduct was
11  not permitted any longer or that they were trying to
12  change things around the office?
13  A. I received no warning, no.
14  Q. No discussions in that regard at all?
15  A. No discussion of any changes in our conduct or
16  the way that we were doing things. As far as I knew,
17  everything was going along great in MainStreet.
18  Q. And when you got your interview, I believe that
19  it was November of 2002, but it was your first and only
20  -- I'm sorry -- performance appraisal that you got.
21  A. Okay.
22  Q. In November of 2002, which was your first one as
23  a supervisor?
24  A. It was my first one as a supervisor.

Page 335

1  Q. Had you ever gotten another one?
2  A. I believe that there was one other, because when
3  I first worked at Commerce, Glen Burchum was my
4  supervisor, and I started there in August, they gave the
5  reviews in November, and they gave me a bonus, and I am
6  sure I had a review or something like that. I don't
7  actually recall.
8  Q. How about as a supervisor, had you only received
9  one review as a supervisor?
10  A. Yes.
11  Q. Do you know why you only got one as a supervisor?
12      MR. TAMBUSSI: Objection. Objection to the
13  form.
14  A. They schedule them in November. I was terminated
15  before my next scheduled review.
16  Q. Okay. Had anybody ever told you that there was
17  anything wrong with the review that you received, that it
18  was inaccurate?
19  A. No.
20  Q. When you received that review, were you
21  conducting yourself in the same way that you were
22  conducting yourself on August the 12th of 2003?
23  A. Yes.
24  Q. Do you believe Mr. Duncan was aware curse words

Page 336

1  were being used in the department?
2  A. Yes.
3      MR. TAMBUSSI: Objection to the form.
4  Q. And there was nothing in your review that said
5  that that wasn't appropriate?
6  A. There was nothing in my review that indicated
7  profanity was inappropriate.
8  Q. Again, Ms. Corcoran never said anything to you
9  about the use of profanity at all?
10  A. No.
11  Q. Was it you and Valerie Oakes that had a nickname
12  for each other?
13  A. No. That was somebody else.
14  Q. Who was the other person?
15  A. Diane Schauber and Heather Pokoiski. It is
16  Chickadel now.
17  Q. And did Ms. Whalen ever cuss or be involved in
18  using profanity?
19  A. I'm sure she did. She wasn't one of our normal
20  sailors, but she will -- she would get angry with some of
21  the situations or producers we were dealing with.
22  Q. How about Ms. Wilkins?
23  A. Darlene, I don't think she used that much
24  profanity. She would on occasion, shit or something

41 (Pages 333 to 336)

Page 337

1  along those lines.  She, she is pretty funny.
2  Q.  In what way?
3  A.  Darlene was -- she was like the mom of the
4  department.  And she would always talk to us about her
5  and her husband Skip and swinging from the chandeliers,
6  or she is sorry she is running late, her and Skip were
7  having -- going at it, having mad sex and stuff like
8  that.
9  Q.  So she would say that publicly in the department?
10  A.  Yes, and we would all laugh about it, giggle.
11  Q.  Was anybody ever disciplined for anything like
12  that?
13  A.  No.
14  Q.  How about Ms. Whalen, did she have any things
15  that you found funny or interesting about her?
16  A.  No.  Dee is a good girl.  She would on occasion
17  cuss.  She wasn't a big yeller or screamer, but she is a
18  good girl.  She would egg Darlene on.  We all would egg
19  Darlene on, which would just make her story -- the fish
20  story would get bigger and larger and louder.  But we
21  just all enjoyed each other.
22  Q.  Other than the meeting you had with Ms. Watson
23  and Mr. Morrissey after the termination --
24  A.  Of Mr. Duncan.

Page 338

1  Q.  -- that was in June of 2003, correct?
2  A.  I don't remember.
3  Q.  But it was the meeting at which you were told
4  that he was terminated?
5  A.  Yes.
6  Q.  Were you given any sort of memoranda or anything
7  in writing, e-mails, letters, anything in writing that
8  laid out their plan for you to help you get this fresh
9  start that they were talking about?
10  A.  No.
11  Q.  Did they ever specifically tell you what it was
12  that you had done wrong or what it was that displeased
13  them about your performance that led them to the
14  conclusion that you needed a fresh start or help in being
15  a better supervisor?
16  A.  They conveyed nothing to that matter.
17  Q.  Other than take some courses, were you
18  specifically instructed to do or not to do anything at
19  all in connection with your job in order to please
20  Commerce or make it understand that you were getting your
21  fresh start?
22  MR. TAMBUSSI:  Objection to the form.
23  A.  They didn't, they didn't tell me -- give me any
24  specific instructions, no, other than the classes.

Page 339

1  Q.  On the classes, you did go to the one, right?
2  A.  Yes.
3  Q.  Second one sounds like you mixed up the
4  scheduling?
5  A.  Yes.
6  Q.  Was that just an honest mistake?
7  A.  That was an honest mistake.  That was my fault.
8  Q.  And then, well, the one that you did go to, that
9  sounded like, based on your testimony, that it was more
10  for the banking side?
11  A.  It was conducting a team meeting.  That's the
12  name of the class, if I remember correctly.  And there
13  were banking people there where they would talk about
14  banking situations, and how you would discuss certain
15  things in a team meeting scenario.
16  So when it came for my turn to talk about
17  conducting a team meeting, and I would want to talk about
18  insurance situations, the guy basically, the instructor
19  of the class apologized later, and at that time, in
20  stating that they don't know anything about insurance or
21  what we would talk about, so he didn't feel that the
22  class or the staying there or role playing would benefit
23  me, because there is no way that they could understand
24  what facing an X date would be.

Page 340

1  You know, for a bank teller to tell me,
2  well, you know that X date is really staring at me, you
3  know, so they had no idea in how to role play with me.
4  Q.  Did he offer to let you leave?
5  A.  No.  I told him I drove over two hours to get
6  there.  I wasn't just going to turn around and leave, or
7  leave.  I was going to stay.  I was told to go to the
8  class.
9  Q.  Now, were you given any choice in terms of what
10  classes you were to attend or were you just told that you
11  were going to attend certain classes?
12  A.  First Deb Watson had indicated there were some
13  classes she wanted me to take.  Then she came back and
14  said, "Oh, those weren't available, but they were looking
15  for some other ones and they were trying to get, you
16  know, something put together."
17  Q.  My question is, though, regardless of what
18  classes they were, did you have any say in what classes
19  were selected for you or was that sort of imposed on you?
20  A.  They told me what classes to attend.
21  MR. MARCONI:  That's all I have for now.
22  RE-EXAMINATION
23  BY MR. TAMBUSSI:
24  Q.  Just a couple, Miss Bailey.  Did you ever request

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006          C.A. # 05-CV-183 SLR          Bailey, Kimberly A. - Vol. 2

Page 341

1  a transfer after you made a complaint as to Mr. Duncan?
2  Yes or no?
3      A.  No, I didn't request a transfer.
4      Q.  Okay.  These people that you were asked about by
5  your counsel, Valerie, Diane, I think it was Deb,
6  Darlene, Heather, and whether or not any of them used
7  four-letter words in the workplace, those are all people
8  subordinate to you, correct?
9      A.  Yes.
10     Q.  When is the last time you ever spoke to anyone at
11 Commerce about your claim against Commerce, either by
12 e-mail or verbally, telephone, face-to-face?
13     A.  It has been awhile.  I don't know exactly how
14 long it has been, but it has been a couple of months.
15     Q.  Who did you last speak to?
16     A.  I believe that I talked to Diane and Valerie.
17     Q.  What did you talk to them about?
18     A.  Just, just I told them that my attorney could be
19 contacting them with reference to a deposition.
20     Q.  Okay.  Who else did you tell that, give that
21 message to?
22     A.  It was Diane and Val.
23     Q.  Anybody else?
24     A.  Not that I recall.

Page 342

1      Q.  Why did you decide to say that to Diane and Val
2  as opposed to anybody else?
3      A.  Well, because I knew they would have to depose
4  Val, and Diane was just there.
5      Q.  Did you tell her what your claim was about?
6      A.  I don't believe that we discussed that.  I just
7  told them I was bringing suit against Commerce.
8      Q.  So you just called them up out of the blue and
9  said --
10     A.  No, we were meeting one time and I -- actually,
11 Tom had indicated, you know, I need to start contacting
12 these people so we can get scheduling some stuff or
13 whatever.
14     Q.  Who were the list of people that you have
15 contacted besides Val and Diane?
16     A.  It was only those two.
17     Q.  Did you contact Paul Scaffidi?
18     A.  I did not.  I have not talked to Paul Scaffidi
19 about this, not recently about the case.
20     Q.  You did at one time have some e-mail
21 correspondence with him; did you not?
22     A.  With reference to this case?
23     Q.  Yes.
24     A.  I'm sure that I have, yes.

Page 343

1      Q.  In fact, he joked with you about sleeping your
2  way to the top?
3      A.  I'm sure that he -- that would probably be
4  something Paul would say.
5      Q.  And you responded "ha-ha"?
6      A.  How do you respond to that?
7      Q.  I don't know.  Did you tell Paul Scaffidi what
8  you intended to say about him in the litigation?
9      A.  I think Paul asked me if I mentioned him, and I
10 think I remember correctly, I forwarded a copy of my
11 statement or something like that.
12     Q.  Did you tell Paul Scaffidi after your employment
13 ended that that really lifted a boulder off your
14 shoulder?
15     A.  I remember that statement, but I don't remember
16 the context that I was using it.
17     Q.  How about, "My employment as of August 27th, 2003
18 has ceased with Commerce.  Boy, did that lift a boulder
19 off my shoulder"?
20     A.  The stress was overwhelming.
21     Q.  Did you also tell him, "Yes, hello, I used
22 profanity in the workplace every day"?
23     A.  Yes.
24     Q.  Did you also tell him that you can't wait to hit

Page 344

1  Commerce with your complaint from the Department of
2  Labor?
3      A.  I believe that we discussed that.
4      Q.  Did you tell him that you were going to make Mary
5  Corcoran and Joan Frenz look like complete idiots?
6      A.  Was that Paul that I said?  It could have been.
7      Q.  You said it to somebody though, right?
8          Was that your goal, to make Mary Corcoran
9  and Joan Frenz look like complete idiots?
10     A.  No, it is not my goal.
11     Q.  Did you tell Paul Scaffidi in an e-mail that you
12 appreciate him agreeing to help you with what you asked
13 about, that you wouldn't put in writing?
14     A.  I don't remember that.
15     Q.  Did you ask him to help you out with something
16 that you were reluctant to put in writing?
17     A.  I don't recall that.
18     Q.  Is there anybody else, either present employee of
19 Commerce or who had been an employee of Commerce, that
20 you knew while you were there who you have spoken about
21 regarding this litigation?
22     A.  No.
23     Q.  Just Valerie and Diane and Paul Scaffidi?
24     A.  Yes.

43 (Pages 341 to 344)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006

C.A. # 05-CV-183 SLR

Bailey, Kimberly A. - Vol. 2

Page 345

1   Q.   Since you have been employed by someone other

2   than Commerce have you attempted to solicit employees to

3   leave Commerce?

4      **A.   I think I sent an e-mail with reference to one of**

5   **the employees at Commerce about a position that might be**

6   **available.**

7   Q.   Which employee did you send it to?

8      **A.   I think it was Val.**

9         MR. TAMBUSSI:  That's all I have.

10        MR. MARCONI:  Stay on the record here.

11        Bill, it sounds like you have medical

12   records and it sounds like you have correspondence that

13   would be responsive either to a subpoena that I have

14   never seen or to something that was included in my

15   document production request, that I have never gotten.  I

16   mean, do you have medical records?

17        MR. TAMBUSSI:  I believe we have medical

18   records.

19        MR. MARCONI:  I never saw a subpoena for

20   medical records.  I never saw any medical records.

21        MR. TAMBUSSI:  I will get you the medical

22   records.  I have two other documents that were on a

23   computer dump that I just got that were given.

24        MR. MARCONI:  What are they?

Page 346

1         MR. TAMBUSSI:  Here.

2         MR. MARCONI:  Can I have these copies?

3         MR. TAMBUSSI:  They are the only copies I

4   have.  I just got them this morning.

5         MR. MARCONI:  Oh, all right.

6         MR. TAMBUSSI:  There is others we will give

7   you, but those are two that I have.

8         MR. MARCONI:  So the only things that you

9   have are medical records and these, these two e-mails

10   which are October 30th of '03 --

11        MR. TAMBUSSI:  No, I have more e-mails.  I

12   just got this.  I pulled two out.

13        MR. MARCONI:  Oh.  So you will get me that

14   package, looks like there is a hundred documents there in

15   that package.

16        MR. TAMBUSSI:  I'm not going to speculate as

17   to how many documents are there, but there are pages of

18   documents.

19        MR. MARCONI:  And then the medical records.

20   How about my other written discovery?  It is about 45

21   days old now.

22        MR. TAMBUSSI:  I don't know about it, Tom,

23   to be honest with you.  I'll have to go back to the

24   office and talk to Susan about it.

Page 347

1         MR. MARCONI:  Okay.

2         MR. TAMBUSSI:  As we discussed last week, I

3   was supposed to be on trial this week and that canceled,

4   so my focus was on the trial as opposed to this, other

5   than the fact that I had already prepared for the

6   deposition.

7         In fact, I will give you what we have by way

8   of some medical records.  In fact, let's just mark them.

9   Okay.  Bailey 16 appears to be records from Livesay.

10        (Bailey Deposition Exhibit 16 was marked for

11   identification.)

12        MR. TAMBUSSI:  And Bailey 17 are records

13   from Knauer.

14        (Bailey Deposition Exhibit 17 was marked for

15   identification.)

16        MR. TAMBUSSI:  Are we done?

17        MR. MARCONI:  Yes.  Just so I am clear,

18   these are all of the records, the medical records that

19   you have, 16 and 17?

20        MR. TAMBUSSI:  Correct.  Both of which --

21        MR. MARCONI:  I haven't got 17 yet.

22        THE WITNESS:  You want the original?

23        MR. TAMBUSSI:  Sorry, the court reporter has

24   got the original.

Page 348

1         THE WITNESS:  I have all these.

2         MR. TAMBUSSI:  Well, you have it now.

3         MR. TAMBUSSI:  Both of which were

4   impeachment up until today.  Now they are no longer

5   impeachment since they were used for that.

6         Thanks.

7         MR. MARCONI:  That's all I have.

8         (Proceedings conclude at 3:00 o'clock, p.m.)

44 (Pages 345 to 348)

Bailey v. Commerce National Insurance Services, Inc.
February 7, 2006
C.A. # 05-CV-183 SLR
Bailey, Kimberly A. - Vol. 2

Page 349

1        I N D E X
2
DEPONENT:   KIMBERLEY A. BAILEY         PAGE
3
     Examination by Mr. Tambussi        177
4    Examination by Mr. Marconi         301
     Re-Examination by Mr. Tambussi     340
5
6        E X H I B I T S
7    BAILEY DEPOSITION EXHIBITS          MARKED
8    3 - 4/3/03 Bailey event report letter     205
     4 - 3/31/03 Marconi to Bailey e-mail      207
9    5 - 4/3/03 Marconi/Bailey e-mail chain    209
     6 - 4/14/03 Bailey to Watson memo         219
10   7 - 5/13/03 Bailey WOW Awards e-mail       229
     8 - 5/15/03 Bailey flowers e-mail         229
11   9 - 4/18/03 McKelvy/Bailey e-mail chain   231
     10 - Complaint                234
12   11 - 8/26/03 Oakes to Corcoran e-mail     294
     12 - Code of Ethics             297
13   13 - E-Mail Policy              298
     14 - Internet Policy            299
14   15 - Employee Acknowledgment Form     300
     16 - Christiana Care Progress Notes, 1/17/01   347
15   17 - Knauer Summary of Services     347
16
17   ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 350
18   CERTIFICATE OF REPORTER          PAGE 351
19
20
21
22
23
24

Page 351

1  State of Delaware )
                     )
2  New Castle County )
3
4        CERTIFICATE OF REPORTER
5
6        I, Eleanor J. Schwandt, Registered
   Professional Reporter and Notary Public, do hereby
7  certify that there came before me on the 7th day of
   February, 2006, the deponent herein, KIMBERLEY A. BAILEY,
   who was duly sworn by me and thereafter examined by
8  counsel for the respective parties; that the questions
   asked of said deponent and the answers given were taken
9  down by me in Stenotype notes and thereafter transcribed
   by use of computer-aided transcription and computer
10 printer under my direction.
11       I further certify that the foregoing is a
   true and correct transcript of the testimony given at
12 said examination of said witness.
13       I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.
15
16
17       Eleanor J. Schwandt
18       Certification No. 125-RPR
19       (Expires January 31, 2008)
20
   DATED:
21
22
23
24

Page 350

1
2
3
4        REPLACE THIS PAGE
5        WITH THE ERRATA SHEET
6        AFTER IT HAS BEEN
7        COMPLETED AND SIGNED
8        BY THE DEPONENT.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Wilcox & Fetzer, Ltd.        Registered Professional Reporters        (302)655-0477
                                                                      A90

EX. CIS-2

PLAINTIFF'S ANSWERS TO INTERROGATORIES