# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

**KIMBERLEY A. BAILEY**

        **Plaintiff,**

vs.

**COMMERCE INSURANCE
SERVICES, INC.,**
**a New Jersey corporation**

        **Defendant.**

**Civil No. 05-CV-183 (SLR)**

**Civil Action**

---

## DEFENDANT COMMERCE INSURANCE SERVICES, INC.'S APPENDIX TO ITS OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### VOLUME II

---

POTTER ANDERSON & CORROON LLP
Wendy K. Voss (I.D.# 3142)
Sarah E. DiLuzio (I.D. # 4085)
1313 N. Market Street
Wilmington, DE  19801
Telephone (302) 984-6000
wvoss@potteranderson.com
sdiluzio@potteranderson.com

BROWN & CONNERY, LLP
William M. Tambussi, Esq.
Susan M. Leming, Esq.
William F. Cook, Esq.
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108
(856) 854-8900

Attorneys for Defendant
Commerce Insurance Services

Dated:  May 1, 2006

## TABLE OF CONTENTS - APPENDIX

| Ex. | Description | Page |
|---|---|---|
| CIS-1 | Plaintiff's Deposition Transcript | A1 |
| CIS-2 | Plaintiff's Answers to Interrogatories | A91 |
| CIS-3 | Plaintiff's Letter of April 3, 2003 | A108 |
| CIS-4 | Email Correspondence of April 3, 2003 from Plaintiff to Thomas Marconi | A113 |
| CIS-5 | April 17, 2003 Email Correspondence Between Plaintiff and Bruce McKelvy | A116 |
| CIS-6 | Code of Ethics Form | A118 |
| CIS-7 | Memorandum of June 3, 2003 from CIS to Plaintiff | A120 |
| CIS-8 | Email Correspondence of August 7, 2003 Between Plaintiff and Deb Watson | A122 |
| CIS-9 | CIS Answers to First Set of Interrogatories | A124 |
| CIS-10 | Email Correspondence of July 18, 2003 Between Plaintiff and Mary Corcoran | A141 |
| CIS-11 | Email Correspondence of August 26, 2003 From Valerie Oakes to Mary Corcoran | A143 |
| CIS-12 | Plaintiff's Termination Letter | A145 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KIMBERLEY A. BAILEY )
)
    Plaintiff, ) C.A. No.: 05-183 SLR
)
v. ) Trial by Jury Demanded
)
COMMERCE NATIONAL INSURANCE )
SERVICES, INC., a New Jersey corporation. )
)
    Defendant. )

## PLAINTIFF KIMBERLEY A. BAILEY'S ANSWERS TO DEFENDANT
## COMMERCE INSURANCE SERVICES, INC.'S FIRST SET OF INTERROGATORIES

Plaintiff, Kimberley Bailey hereby responds, pursuant to Federal Rule of Civil Procedure 33, to Defendant's First Set of Interrogatories directed to Plaintiff, as follows:

### GENERAL OBJECTIONS

Plaintiff generally objects to the definitions section of Defendant's Interrogatories on the grounds that the definitions are overly broad and unduly burdensome.

Plaintiff generally objects to each Interrogatory which calls on Plaintiff to identify "all individuals who possess the knowledge necessary to establish" certain facts on the grounds that Plaintiff is unable to know whether another person possesses certain knowledge.

Plaintiff generally objects to each Interrogatory which calls on Plaintiff to identify the "extent" of another person's knowledge of a fact or set of facts on the grounds that Plaintiff is unable to know the extent of knowledge possessed by another.

Plaintiff generally objects to each Interrogatories which call on Plaintiff to identify the actual compensatory or other damages sought in relation to a particular retaliatory act, on the grounds that Plaintiff has not and cannot itemize her compensatory or other damage claims by individual acts of retaliation.

### ANSWERS

1.    Please provide your full name, current home and work addresses, date of birth, social security number, marital stares, and if married, name of spouse.



EXHIBIT

A92

**ANSWER:**   Kimberley A. Bailey
7 Giliberti Lane
Newark, DE 19711

A. Horace Werner Insurance, Inc.
1313 N. Market Street, Suite 113
Wilmington, DE 19801

Date of birth: February 9, 1964
Social Security Number: 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

Married to Russell C. Small

2.    Please state your educational background, including the name of the institutions attended, years at each, degrees attained, and areas of concentration; as to your past employment history, please state every employment position you have held since 1980, including the name and address of the employer(s), the dates of employment, the job title and salary and/or hourly earnings at the time of cessation of your employment, and the reason for cessation of your employment; and for your current employment, please set forth your current job title, dates of employment, salary, whether your job title has ever changed, and a description of your job duties.

**ANSWER:**   Christiana High School - 1982 graduate
Wilmington College - attended 1984-1986
Goldey Beacom College - 1995 - 1996

Areas of concentration:    Wilmington College - Behavioral Science
Goldey Beacom College - Accounting

Employment history from 1980 to Present:

1978 - 1982  Colonial Meat Market  - Clerk
Professional Installers  - Secretary

1982-1986 Professional Installers - Secretary

Plaintiff cannot now recall her salary at Colonial Meat Market or Professional Installers. She left both positions for better opportunities.

1986 - 1997 Medical Center of Delaware -  various positions including admitting, emergency room, and pharmacy. Plaintiff left this position to work in the insurance industry.

March 1997 - August 1998 MBNA - Personal Lines Auto Insurance underwriter; annual salary $42,000.00 Plaintiff left this position because MBNA closed its insurance business. She was offered a position on the banking side of MBNA's business but Plaintiff desired to continue working in the insurance industry.

-2-

September 1998 - September 1999 AIG Insurance - Commercial Insurance Consultant; annual salary $32,000.00. Plaintiff left this position to pursue a better position with Rockwood Programs.

September 1999 - November 2000 Rockwood Programs - Underwriter and Assistant to the President; annual salary $35,000.00. Plaintiff left this position to pursue a better position with Zutz Insurance.

November 2000 - August 2001 Zutz Insurance - Commercial Account Manger, annual salary $38,000.00. Plaintiff left this position to pursue a better position with Commerce Insurance Services.

August 2001 - August 2003 Commerce Insurance Services - Senior Customer Service Representative and Small Business Department Supervisor, annual salary $57,000.00 at the time of termination. Plaintiff was wrongfully terminated from this position.

October 2003 - January 2004 Allstate Insurance Company - Personal Lines agent, annual salary $32,000.00. This was a temporary position. Plaintiff left this position to pursue a better position with A. Horace Werner Insurance.

January 2004 - Present A. Horace Werner Insurance - Commercial Lines Agent/Customer Service Representative, annual salary $42,000.00.

3.    Prior to the present lawsuit, state if you have ever been either a plaintiff or defendant in any other legal proceeding(s), state where such suit was filed (including the Docket Number), the party or parties involved and the attorneys who represented each party, and the name and current status of each lawsuit.

**ANSWER:** The only other litigation in which Plaintiff has been involved was a claim against Liberty Mutual Insurance Company under the Personal Injury Protection coverage of her personal automobile insurance policy. Plaintiff cannot recall precisely when that claim was filed, or the case number. She believes it was filed in the Superior Court of the State of Delaware in and for New Castle County. She was represented by Phillip Finestrauss, Esquire. She cannot recall the name of the attorney for Liberty Mutual in that matter. The matter has been resolved.

4.    If you or any person on your behalf has obtained any written or oral statements, reports, or other documents relating to this litigation from any parties, witnesses, or any other person or organizations not a party to this action, set forth the names and addresses of any persons from whom such statement(s) were obtained; the date said statement(s) were made; the verbatim contents of the statement(s); identify the custodian of the statement(s); and attach a copy of all documents relating to such statement(s).

**ANSWER:** Except for statements made by Plaintiff to her counsel which are protected by the attorney-client privilege, and written statements made by Plaintiff and Defendant's counsel to the State of Delaware, Department of Labor, Division of Industrial Affairs ("DOL") in connection with the administrative proceedings associated with the matter, Plaintiff is unaware of any "written

A94

or oral statements, or other documents relating to this litigation".

5.    Set forth the name, address, telephone number and position of employment of all persons having relevant knowledge of any facts related to this litigation and include in your response a summary of each person's knowledge.

**ANSWER:** See response to Interrogatory number 1. By way of further answer, Plaintiff believes that the following persons have such knowledge:

Julius Bland, Arceli Campos, Dottie Degan, Coralea Layton, Cheryl Luckanish, Valerie Oakes, Heather Pokoiski, Marjorie Phipps, Heather Smith, Dee Whalen, Darlene Wilkins, Andrew Bumstead, Diane Shauber, Jennifer Joo, Cindy Smith, Lynn Einstein, Tim Pinion, Patty Kalmbacher, Cindy Pfeiffer, Gary Bullock, Vince Panarella, Tom Einstein, Venus Barr, Adonna Manlove, Becky Condron, Tom Cetolia.

The employment and contact information for these individuals is either known to Defendant or will be supplied by Plaintiff.. Stated generally, these individuals have knowledge that Plaintiff was a competent and dedicated employee of Defendant, that profanity had always been used by Plaintiff and many other persons within the Main Street Department on a daily basis in precisely the same manner that Plaintiff did in the incident that resulted in her termination. Some or all of these persons have knowledge of the other retaliatory acts alleged in the Complaint, and that no other employee of Defendant was disciplined for using profanity in the workplace.

6.    Have any declarations against interest or admissions been made by defendants relevant to this case? If so, please set forth the names and addresses of any persons who made the declaration(s) or admission(s); the date and location the declaration(s) or admission(s) was made; the verbatim contents of the declaration(s) or admission(s); the mane(s) and addresses of any witness tn any admission, including which such declaration(s) or admission(s) they witnessed; and attach a copy of any writing pertaining to your answer to this interrogatory.

**ANSWER:** Except for the admission in Defendant's counsel's Position Statement made to the DOL dated July 21, 2004 that Plaintiff's use of profanity in the workplace "finally formed the basis for her termination". Plaintiff cannot currently recall any declarations against interest or admissions by Defendant, or any representative of Defendant. Plaintiff will supplement this response if any come to mind as this matter progresses.

7.    Set forth whether you made any complaint(s) to defendant regarding the alleged harassing and/or discriminatory treatment alleged in the Complaint, and/or regarding your employment with defendant. If so, please set forth name of the individual(s) that you made your complaint to and their job title(s); the date(s) you made your complaint; whether the complaint was oral or in writing, if in writing, please produce; and the names of all persons who were present when you made such Complaint and/or who have knowledge of such Complaint made by you.

**ANSWER:** On April 3, 2003, Plaintiff met with Deborah Watson, Vice-President of Human Resources for Defendant and provided Ms. Watson with a written statement of her complaint against Steven Duncan. This written statement is already in the Defendant's possession.

-4-

With respect to Plaintiff's retaliation claim, from the time that she made her complaint of sexual harassment by Mr. Duncan, the attitude of some of her managers toward her had begun to change adversely. After Mr. Duncan's termination, his replacement, Mary Corcoran, almost immediately began to subject Plaintiff to the retaliatory treatment identified in the Complaint. After initially trying to determine the reason for this treatment on her own, and attempting to do whatever she could to please Ms. Corcoran. On August 20, 2003, Plaintiff met with Deborah Watson to complain about the manner in which she was being treated by Ms. Corcoran. The complaint was made orally. At the conclusion of this meeting Ms. Watson advised Plaintiff to sit down and discuss her concerns directly with Ms. Corcoran. Plaintiff is unaware of any effort by Ms. Watson to discuss Plaintiff's complaints with Ms. Corcoran. Plaintiff has no written record or report of these complaints or her meeting with Ms. Watson.

As far as Plaintiff can now recall Ms. Watson was the only person present at the August 20, 2003 meeting.

8.    In response to Paragraph 24(a) of the Complaint, identify all individuals who possess the knowledge necessary to establish that Commerce administration forced you to continue to work with Mr. Duncan; the extent of each individual's knowledge; the date, time and place of any representations of the defendant to the effect that defendant forced Ms. Bailey to continue to work with Mr. Duncan, if any (provide same if in documentary form); and the date, time, and place of any demands made by you to the administration for removal from your position within eight weeks after the charge (provide same if in documentary form); the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct.

**ANSWER:**    Plaintiff is unable to identify all individuals who possess the knowledge necessary to establish that Commerce Administration forced her to continue to work with Mr. Dawson. On April 15, 2003, Plaintiff was interviewed by Ms. Watson and Mr. Bruce McKelvey about her sexual harassment allegation against Mr. Duncan. At the conclusion of that meeting she was instructed to continue with her job and "act in a professional manner." She was advised that if she had to meet with Mr. Duncan that she should not do so "alone". She was further instructed to go on with her job as though nothing was wrong. This included continuing to work directly under Mr. Duncan. Plaintiff did not request or demand a reassignment or transfer in light of these instructions. Plaintiff was embarrassed, and afraid of adverse consequences as a result of her charge. She did not feel as though she was in a position to demand anything of Defendant. Plaintiff enjoyed her job and didn't want to jeopardize it. Plaintiff intended to persevere in the hope that Mr. Duncan would be removed and she could return to just doing her job to the best of her ability.

Anyone who was present in the office during work hours during the eight week period between Plaintiff's complaint and Mr. Duncan's termination could have observed that Plaintiff and Mr. Duncan were working together as they had before the harassment charge.

Plaintiff contends that Defendant chose not to suspend or reassign Mr. Duncan, or reassign Plaintiff, or otherwise take any action to insulate Plaintiff from her harassor, pending the investigation, in part, to harass and embarrass Plaintiff, and to retaliate against Plaintiff for making the sexual harassment charge.

A96

9.    In response to Paragraph 24(b) of the Complaint, identify all individuals who possess the knowledge necessary to establish that Commerce administration failed to keep the charge against Mr. Duncan confidential; the extent of each individual's knowledge; the date, time and place of any representations of the defendant to the effect that it had disclosed the existence of the charge (provide same if in documentary form); the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct.

**ANSWER:** Plaintiff is unable to identify all individuals who possess the knowledge necessary to establish that the Commerce administration failed to keep the charge against Mr. Duncan confidential. Such information would be in the possession of Defendant. Plaintiff was instructed by Ms. Watson and/or Mr. McKelvey not to discuss the charge. To Plaintiff's knowledge, no similar instruction was given to anyone else, including, Mr. Duncan. If such instruction was given to Mr. Duncan, it clearly was not enforced by Defendant. It was common knowledge in the office shortly after the sexual harassment charge was made, that a charge of sexual harassment had been made, and that Plaintiff was the charging party. Plaintiff does not know how the information spread through the office. She is aware, however, that Mr. Duncan both before, and after his termination, disclosed the charge, and that Plaintiff was the charging party, both in and outside of Defendant's office. The one specific example Plaintiff can recall is overhearing Mr. Duncan speaking loudly to a colleague in Randolph, New Jersey about Plaintiff and the charge of sexual harassment on the telephone in his office. There were other employees of Defendant in proximity to Mr. Duncan's office who probably overheard at least some of this conversation. Defendant failed to keep the charge confidential in order to harass and embarrass Plaintiff to retaliate against her for making the sexual harassment charge.

10.    In response to Paragraph 24(c) of the Complaint, identify all individuals who possess the knowledge necessary to establish that Commerce administration failed to keep you apprised of the status of the investigation; the extent of each individual's knowledge; whether Deborah Watson or anyone else in the administration instructed you not to contact them on the status of the investigation; what obstacles existed that prevented you from contacting Deborah Watson or anyone else in administration about the status of the investigation; the date, time and place of any requests you made for an update on the investigation; the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct.

**ANSWER:** Plaintiff is unable to identify all individuals who possess the knowledge necessary to establish that Commerce Administration failed to keep her apprised of the status of the investigation. Neither Deborah Watson nor Mr. McKelvey provided any useful information to Plaintiff during the investigation. Plaintiff made frequent calls to Ms. Watson to obtain information concerning the status of the investigation, and to advise Ms. Watson that she was having difficulty continuing to work directly for and with Mr. Duncan. Plaintiff also informed Ms. Watson by telephone that she had overheard Mr. Duncan on the telephone speaking with a colleague in Randolph, New Jersey about Plaintiff and her charge of sexual harassment. Plaintiff also informed Ms. Watson at that time, that the volume of his voice during this conversation was sufficiently high such that nearly everyone in the room could hear the conversation. While Ms. Watson did respond

-6-

to Plaintiff's calls, Plaintiff could never get an adequate answer as to when the investigation would conclude, nor was Plaintiff told how long she would be required to continue to work for and with Mr. Duncan. Plaintiff believes that this was done to harass and embarrass her in retaliation for the making the sexual harassment charge against Mr. Duncan.

11.     In response to Paragraph 24(d) of the Complaint, identify all individuals who possess the knowledge necessary to establish that Commerce administration took an inordinate amount of time to investigate the charge; the extent of each individual's knowledge; the basis for your opinion that an inordinate amount of time was taken; the existence of any agreements between you and administration as to the length of the investigation (provide same if documented); the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct.

**ANSWER:** Plaintiff is unable to identify all individuals who possess the knowledge necessary to establish that Commerce Administration took an inordinate amount of time to investigate the charge. Plaintiff contends that eight weeks is an inordinate amount of time, under the circumstances, to conclude the investigation into Plaintiff's sexual harassment charge against Mr. Duncan, particularly, given that during the entire eight week period, Plaintiff was required to continue to work directly for and with Mr. Duncan. Plaintiff was not kept properly informed of the status of the investigation, and Mr. Duncan was openly discussing the matter with others and publicly slandering Plaintiff in order to deflect the charge. Plaintiff believes that the investigation was either intentionally delayed, or not diligently pursued, knowing that Plaintiff was instructed to continue to work for and with her harassor. Plaintiff believes the slow pace of Defendant's investigation was in retaliation for Plaintiff making the sexual harassment charge against Mr. Duncan.

12.     In response to Paragraph 24(e) of the Complaint, identify all individuals who possess the knowledge necessary to establish that Commerce administration failed to permit you to respond in any way to Mr. Duncan's accusations of misconduct; the extent of each individual's knowledge; the date, time, and place of any representations of defendant that you were not allowed to respond to allegations; who made such representations; the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct.

**ANSWER:** Plaintiff is unable to identify all individuals who possess the knowledge necessary to establish that Commerce Administration failed to permit her to respond to Mr. Duncan's allegations of misconduct. Upon information and belief, Mr. Duncan attempted to defend himself against the sexual harassment charge by accusing Plaintiff of improper conduct. Plaintiff has no details concerning what those accusations were. The basis for her belief is that shortly after the allegation was made, and, particularly after Mr. Duncan was terminated, various aspects of Plaintiff's job performance, her appearance, and other matters that had not been problems before, suddenly became problems. Defendant apparently believed the accusations of misconduct made by Mr. Duncan. Defendant used those accusations as a means to find fault with Plaintiff in retaliation for making the sexual harassment charge.

-7-

13.    In response to Paragraph 24(f) of the Complaint, identify all individuals who possess the knowledge necessary to establish that Commerce administration accused you of being unable to perform your duties as supervisor; the extent of each individual's knowledge; the date, time, and place that Commerce administration accused you of being unable to perform your duties as supervisor; the reasons Commerce administration said you were unable to perform your duties as supervisor; the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct.

**ANSWER:** Plaintiff is unable to identify all individuals who possess the knowledge necessary to establish that Commerce Administration accused her of being unable to perform her duties as a supervisor. Shortly after Mr. Duncan's employment with Defendant was terminated, Plaintiff was informed by Ms. Watson and Joseph Morrissey that Defendant desired to "assist" Plaintiff with her career with Defendant. This assistance was offered despite the fact that Plaintiff had never been informed before that there was any problem with her job performance or her career with Defendant. In fact, in her most recent performance review, Plaintiff received either superior or outstanding evaluations in the following categories: job knowledge, customer service, work quality, initiative, compliance/business ethics, organization and planning, strategic focus, communications, leadership and motivation. Moreover, before the sexual harassment charge, Plaintiff had been called upon to represent Defendant and her department at various business functions both internal and external. The effort to "assist" Plaintiff involved sending her to training seminars, most of which were held hours away, and some of which had nothing to do with her position with Defendant. Moreover, from almost the outset of taking over the department, Ms. Corcoran overly scrutinized and unnecessarily criticized many aspects of Plaintiff's work, including the grammar and sentence structure of informal and/or internal e-mails, and other correspondence composed by Plaintiff. Plaintiff was also openly criticized by Ms. Corcoran for organizing a company social event at a bowling alley, on the grounds that bowling is not a "sophisticated" activity. Defendant also relieved Plaintiff of certain job responsibilities, and openly criticized and embarrassed her about her appearance after she made the sexual harassment charge when others similarly situated were not criticized. Plaintiff believes that Defendant's reversal on Plaintiff's ability to perform her duties as a supervisor was in retaliation for her sexual harassment charge against Mr. Duncan.

14.    In response to Paragraph 24(g) of the Complaint, identify all individuals who possess the knowledge necessary to establish that Commerce administration excluded you from meetings and other briefings on matters related to the department; the extent of each individual's knowledge; the date, time, and place of each meeting or briefing in which you were excluded; whether those that excluded you from meetings and other briefings were involved in the investigation, and if so, the extent of such involvement; the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct.

**ANSWER:**    Plaintiff is unable to identify all individuals who possess the knowledge necessary to establish that Commerce Administration excluded her from meetings and other briefings or matters related to her department.   Almost immediately after she was appointed as Director of the department, Ms. Corcoran excluded Plaintiff from meetings in which Plaintiff had

-8-

A99

previously participated. Plaintiff cannot recall the precise date and or time of each such meeting. She can recall, however, that she was excluded from a meeting involving goal setting and discussions between Ms. Corcoran and the staff members under Plaintiff's direct supervision. Plaintiff believes that Defendant excluded her in retaliation for her sexual harassment charge against Mr. Duncan.

15.    In response to Paragraph 24(h) of the Complaint, identify all individuals who possess the 'knowledge necessary to establish that you were relieved of or excluded from duties you previously performed; the date, time, and place you were informed you would be relieved of or excluded from duties you previously performed; who informed you would be relieved of or excluded from duties you previously performed, and how such communication was made; the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct.

ANSWER: Plaintiff is unable to identify all individuals who possess the knowledge necessary to establish that Commerce Administration relieved her of or excluded her from duties she previously performed. See answer to Interrogatory number 14. By way of further answer, Ms. Corcoran advised Plaintiff and her staff for the first time in a staff meeting that Plaintiff would no longer be supervising the five sales personnel that she hired, and that she had supervised since the department was established. Plaintiff was also excluded from the SEMSI project in which Plaintiff had been heavily involved in, prior to her claim of sexual harassment. Plaintiff was also excluded from goal setting meetings and meetings wherein Ms. Corcoran was introduced to the members of Plaintiff's staff. Plaintiff cannot now recall the precise dates and times of these events other than that they occurred after she made her charge of sexual harassment against Mr. Duncan. Plaintiff believes that these actions were taken in retaliation for her sexual harassment charge against Mr. Duncan.

16.    In response to Paragraph 24(I) of the Complaint, identify all individuals who possess the knowledge necessary to establish that you were required to attend classes that others were not required to attend; the extent of each individual's knowledge; the foundation for your opinion that the classes had nothing to do with your position; the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct

ANSWER:    Plaintiff is unable to identify all individuals who possess the knowledge necessary to establish that Commerce Administration required her to attend classes that others were not required to attend. Shortly after Plaintiff was informed by Ms. Watson and Mr. Morrissey that Mr. Duncan had been terminated, Plaintiff was informed that she was being required to take an aggressive schedule of management training courses. The next day Plaintiff scheduled the first two classes for July 30, 2003 and August 11, 2003. Thereafter, she scheduled management training classes for August 18, 2003, August 19, 2003, August 25, 2003, and August 27, 2003. The excuse given to Plaintiff at the time that she was directed to take these courses was that Defendant was trying to "assist" her in her career and "better understand her role as supervisor". However, prior to making the sexual harassment charge against Mr. Duncan, Plaintiff received superior or outstanding evaluations in the following areas; job knowledge, customer service, work quality, initiation, compliance/business ethics, organization, and planning strategic focus, communication, leadership

-9-

and motivation. Defendant required Plaintiff to take these courses, many of which were held hours away, and at least one of which had little or nothing to do with her position, in order to harass Plaintiff in retaliation for her sexual harassment charge against Mr. Duncan.

17.    In response to Paragraph 24(j) of the Complaint, identify all individuals who possess the knowledge necessary to establish that you were overly scrutinized in virtually all aspects of your work; the extent of each individual's knowledge; your opinion as to the adequate amount of scrutiny over your work; the personal knowledge you possess to make that opinion; the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation tins particular allegation of wrongful conduct.

**ANSWER:** Plaintiff is unable to identify all individuals who possess the knowledge necessary to establish that Plaintiff was overly scrutinized in virtually all aspects of her job. Soon after Mary Corcoran was appointed the Director of the Department, she called Plaintiff into her office to have her read aloud an informal e-mail sent to members of the department staff by Plaintiff. Ms. Corcoran criticized this e-mail and instructed Plaintiff not to send any other department e-mails without Ms. Corcoran's prior approval. Ms. Corcoran also made personal verbal attacks on Plaintiff in both department meetings and casual meetings involving other employees of Defendant. Ms. Corcoran made Plaintiff the butt of her office humor. She also made a public personal attack on Plaintiff by openly criticizing Plaintiff for organizing a bowling outing claiming that Plaintiff should not have organized a bowling outing because bowling is not a "sophisticated" activity. Ms. Corcoran stated that Plaintiff should have organized a golf outing.

Plaintiff cannot specifically identify each and every person who was present during all of the matters referred to in this answer. Some or all of the members of the department staff as well as other employees of Defendant were present for at least some of these incidents. Plaintiff believes that she was subjected to this treatment in retaliation for making her sexual harassment charge against Mr. Duncan.

18.    In response to Paragraph 24(k) of the Complaint, identify all individuals who possess the knowledge necessary to establish that you were falsely accused of engaging in social activities involving consumption of alcohol which were not sponsored by Commerce when others who actually engaged in such conduct were not penalized; the extent of each. individual's knowledge; all individuals who possess the knowledge necessary to establish that no mention was made that such activities were not permitted until after you made the sexual harassment charge; the extent of each individual's knowledge; the date, time, and place such false accusations were made, and by whom; the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct.

**ANSWER:** This information is set forth in Defendant's counsel's Position Statement dated July 21, 2004 made to the DOL. Plaintiff denies the entire contents of the Position Statement to the extent that it accuses her of wrongdoing.

19.    In response to Paragraph 24(1) of the Complaint, identify all individuals who possess

-10-

the knowledge necessary to establish that you were embarrassed in the presence of other employees when sent home to change clothing that defendant thought was inappropriate; the extent of each individual's knowledge; the date, time, and place such embarrassment occurred; the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct.

**ANSWER:**    See Plaintiff's answer to the foregoing interrogatories. By way of further answer, on a "Red Friday" in mid-July or early August, 2003, Plaintiff arrived at work approximately an hour before her scheduled starting time, wearing a pair of white "capri slacks, a red sleeveless blouse, and a red blazer." Because the air conditioning in the office had not yet cooled it to normal levels, Plaintiff was not wearing the blazer when she initially arrived. Shortly after Plaintiff arrived, and still prior to Plaintiff's normal starting time, Ms. Corcoran observed her in the capri slacks and the sleeveless blouse without the blazer. Plaintiff was summoned to Ms. Corcoran's office. She put on her blazer and went to Ms. Corcoran's office.

Ms. Corcoran stated that Plaintiff's outfit, which she had worn several times before on "Red Friday", was "too casual". Ms. Corcoran then sent Plaintiff home to change her clothes. By that time, several department staff members had arrived at the office and observed Plaintiff leaving.

Upon her return, Plaintiff was asked by certain staff members why she had changed. Plaintiff informed them that she had been sent home to change by Ms. Corcoran. This caused significant embarrassment for Plaintiff. Plaintiff contends that she was treated in this way in retaliation for her sexual harassment charge against Mr. Duncan. Other than Plaintiff and Ms. Corcoran, Plaintiff cannot recall precisely who in the office learned of this incident but does know that it was a number of the members of the department staff.

20.    In response to Paragraph 24(m) of the Complaint, identify all individuals who possess the knowledge necessary to establish that you were embarrassed after an announcement in a staff meeting that you would no longer be supervising five salespersons in the department; the extent of each individual's knowledge; the date, time, and place such embarrassment occurred; the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct.

**ANSWER:** As best as Plaintiff can recall, her entire staff of 15 individuals and Marjorie Phipps witnessed this incident. Plaintiff believes that she was treated in this way in retaliation for making her sexual harassment charge against Mr. Duncan.

21.    In response to Paragraph 24(n) of the Complaint, identify all individuals who possess the knowledge necessary to establish that you were terminated for using profanity; the extent of each individual's knowledge; all individuals who possess the knowledge necessary to establish that the Director and Assistant Director used profanity; the extent of such knowledge; the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct.

-11-

A102

ANSWER: See Plaintiff's termination letter which was attached as Exhibit "C" to the Complaint, and Defendant's counsel's Position Statement to the DOL.

22.    In response to Paragraph 24(0) of the Complaint, identify all individuals who possess the knowledge necessary to establish that you were terminated for using profanity without any form of progressive discipline or opportunity to respond to the charge; the extent of each individual's knowledge; the causal relationship between this alleged adverse employment action and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation this particular allegation of wrongful conduct.

ANSWER: See answer to Interrogatory Number 21.

23.    In response to Paragraph 24(p) of the Complaint, identify all individuals who possess the knowledge necessary to establish that you were otherwise retaliated against; the extent of each individuals knowledge; the date, time, and place of such instances of retaliation, and by whom; the causal relationship between these other alleged adverse employment actions and the discrimination charge that was lodged; and the actual compensatory or other damages sought in relation these particular allegations of wrongful conduct.

ANSWER: See Plaintiff's answer to the foregoing interrogatories. By way of further answer, Plaintiff is unable to fully respond to this Interrogatory on the grounds that Defendant has not as yet served its responses to Plaintiff's discovery.

24.    Identify each and every element of damage you allegedly sustained and for which you are making a claim against defendant in your Complaint, including the amount of each element of damages claimed and the dates damages occurred, the method of computation for each element of damages sought, the basis for such claim, the identity o ail persons with knowledge relating to each element of damages, the identity and location o all documents which refer or relate thereto, and all efforts, if any, made by you to minimize or mitigate the damages you claim.

ANSWER: Plaintiff is in the process of having her damages evaluated by an expert and will supplement her response to this Interrogatory as soon as the expert's report is received.

25.    Have you consulted any physician or other healthcare provider, including but not limited to any physician, psychiatrist, psychologist and/or counselor, regarding the alleged humiliation and embarrassment you alleged to have suffered, as noted in paragraph 24(1), (m) the Complaint, or as otherwise alleged? If so, please state the name and address of each and every such healthcare provider or physician consulted, and the date(s) of treatment and diagnosis, if any, and if you claim medical expenses, please set forth and itemize all expenses incurred and provide a copy of all bills incurred relating to your treatment, including but not limited to bills for any prescriptions, and include the name and address of family physician and any other physicians, hospitals, clinics and/or other health care providers with whom you have treated for any medical conditions within the past fifteen (15) years.

-12-

ANSWER:     Linda Whiting, LCSW
            11 Heritage Professional Center
            Wilmington, DE 19808

            Susan Livesay, M.D.
            200 Hygeia Drive
            Newark, DE 19713

            Sandy Knaur, LCSW
            2101 Drummond Plaza
            Newark, DE 19713

Plaintiff is currently compiling the balance of the information needed to fully answer these interrogatories and will supplement these responses as soon as it is received.

                    **LOSCO & MARCONI, P.A.**

                    Thomas C. Marconi, Esquire (#2761)
                    1813 N Franklin Street
                    P.O. Box 1677
                    Wilmington, DE 19899
                    (302) 656-7776
                    F(302)656-7774
                    tmarconi@delaw.org
                    Attorneys for Plaintiff, Kimberley A. Bailey

Date: August 26, 2005


G:\Carla\Bailey, Kim 0309-3714\Pleadings US Dist Ct of DE\P AIN's to Commerce.wpd

-13-

A104

Discovery Documents

1:05-cv-00183-SLR Bailey v. Commerce National Insurance Services Inc.

### U.S. District Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from Marconi, Thomas entered on 8/26/2005 at 3:35 PM EDT and filed on 8/26/2005

**Case Name:**       Bailey v. Commerce National Insurance Services Inc.
**Case Number:**    1:05-cv-183
**Filer:**          Kimberley A. Bailey
**Document Number:** 15

**Docket Text:**
NOTICE OF SERVICE of Notice of Service of Plaintiff Kimberley Bailey's Answers to Defendant Commerce National Insurance Service, Inc.'s First Set of Interrogatories Directed to Plaintiff by Kimberley A. Bailey.(Marconi, Thomas)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=8/26/2005] [FileNumber=91061-0]
[603a2238c7ecc06461448780cec3b0aa19b837b2362b4d1ef641213a3aaf49e86373f
2ffbd9f1ba838bb62e1821dc56c73a6e8e88ba21d7f85e8db99e2ccbecb]]

**1:05-cv-183 Notice will be electronically mailed to:**

Sarah Elizabeth DiLuzio      sdiluzio@potteranderson.com, rbrown@potteranderson.com

Thomas C. Marconi      tmarconi@delav.org

**1:05-cv-183 Notice will be delivered by other means to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KIMBERLEY A. BAILEY              )
                                )
        Plaintiff,              )
                                ) C.A. No.: 05-183 SLR
v.                              )
                                ) Trial by Jury Demanded
                                )
COMMERCE NATIONAL INSURANCE     )
SERVICES, INC., a New Jersey corporation.  )
                                )
        Defendant.             )
                                )

## NOTICE OF SERVICE

I, Thomas C. Marconi, Esquire, hereby certify that on this 26th day of August, 2005, I

caused a true and correct copy of *Plaintiff Kimberly Bailey's Answers to Defendant Commerce*

*National Insurance Services, Inc.'s First Set of Interrogatories Directed to Plaintiff* were delivered

by hand upon the following:

> Wendy K. Voss, Esquire
> Sarah E. DiLuzio, Esquire
> Potter Anderson & Corroon, LLP
> Hercules Plaza, 6th Floor
> 1313 N. Market Street
> Wilmington, DE 19801

and by first class mail, postage prepaid upon the following:

William M. Tambussi, Esquire
Susan M. Leming, Esquire
Brown & Connery, LLP
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108

**LOSCO & MARCONI, P.A.**

/s/Thoms C. Marconi, Esquire
Thomas C. Marconi, Esquire (#2761)
1813 N Franklin Street
P.O. Box 1677
Wilmington, DE 19899
(302) 656-7776
F(302)656-7774
tmarconi@delaw.org
Attorneys for Plaintiff, Kimberley A. Bailey

- 2 -

G:\Carla\Bailey, Kim 0309-3714\Pleadings US Dist Ct of DE\Notice of Service of Plaintiff's Answers to lgs by Commercc.wpd

EX. CIS-3

Plaintiff's Letter of April 3, 2003

I need to report events that have occurred in recent months that have brought me here today. Mr. Steven Duncan has made several offensive inappropriate sexual advances towards me since approximately December, 2001. Until now, I was too embarrassed and afraid to report his advances.

December 2001, Marjorie Phipps, Patty Kalmbacher, Steve Duncan and I went to the Back Stage Café. That evening Mr. Duncan advised me that the MainStreet Sales & Service Supervisor position was available. He asked me directly if I were interested. I was elated and advised him YES!! He asked me to come talk to him the next day at work. As the evening progressed, Patty and Margie left, leaving Mr. Duncan and me. Mr. Duncan suggested he walk me to my car, which because of the location of this bar, seemed appropriate. As we approached my car I began to feel extremely awkward about the situation, however, nothing offensive occurred.

Shortly thereafter I was approved for an interview for the MainStreet position. I interviewed with Mr. Duncan and Ms. Phipps for the supervisory position and soon thereafter the position was offered to me and plans for me to transfer over to MainStreet were underway.

Over the next several weeks Mr. Duncan, Margie, and I met several times after hours to discuss where we were going with MainStreet. At these meetings the conversation sometimes turned to personal matters. I spoke of my current separation from my husband, my kids and also my very close girlfriends. One evening I invited Mr. Duncan to join me and my girlfriends at the Back Stage Café. He agreed to meet us there but didn't want me to tell Margie.

Almost immediately after he arrived he began rubbing my back and touching my backside. I was offended by this and asked him "what are you doing?" He completely ignored my question and asked me if I wanted to dance. I told him no. Mr. Duncan also asked me questions about traveling and if I would have any problems getting away for business. He insinuated that we could travel together and that he was interested in having sex with me on these trips. He insinuated that having sex with him could be beneficial to my career.

As the evening progressed, I decided that it was getting late and my girlfriends and I wanted to go to a tavern near our homes. I was thinking we (my girlfriends & I) would leave but would have to extend the offer to Mr. Duncan, hoping he would decline to follow. Mr. Duncan accepted the offer to follow us. We went to Bank Shots in Pike Creek. After being there for a short while, Mr. Duncan advised he needed to go home. He had a much farther drive to make. He asked me to walk him to his car, and I complied. When we got to his car, he asked me to get in the car so that we could talk just a little more. I complied. As soon as I entered his car he lunged at me forcing his tongue in my mouth. He started kissing me, feeling my breast and telling me how excited I made him and that he would "love to make love to me". He reiterated that he would have to find a way for us to travel together.

I was in shock. My girlfriends came out into the parking lot to check on me. One girlfriend knocked on his window, telling me to get out. I reached for the door and he reached for me. He kissed me one more time and then let me go. I got out of the car and was so embarrassed; I

EXHIBIT

tabbies®

CONFIDENTIAL

didn't know what to tell my friends.

The next day at work was very awkward. Approximately one week later I asked Mr. Duncan to lunch to talk about what happened. As soon as we sat down at the table and I informed Mr. Duncan that I was not interested in a relationship with him and did not want a repeat of what occurred earlier, he thanked me for taking that weight off his shoulders. I asked him if I got the job because of my physical appearance or if he was thinking along the lines of establishing a relationship with me? He reassured me that the reason I was offered the position was not because of my physical attributes and that I was more than qualified for the position. He indicated he was looking forward to watching me advance. I also conveyed to him that I didn't want anyone to think I got this job because I slept with him. He again thanked me for being so open, honest and up front with him. He said he thought our business relationship would prosper if we did not make our relationship sexual. By the conclusion of our meeting I believe that I made it clear that I did not want any more sexual advances.

About two months later, Mr. Duncan advised me that Mr. Durham, a marketing representative, would be coming in from Andover and that I should invite a girlfriend to join us for drinks. Mr. Duncan again asked me not to advise Margie of our plans. I complied and invited one of my girlfriends. Mr. Durham made it to our office late in the afternoon. Mr. Duncan met with him in the boardroom and called me in soon after their meeting started. I went to the boardroom to meet Mr. Durham with paper and pen to take notes. I approached Mr. Durham to shake his hand, both Mr. Duncan and Mr. Durham stood for the introduction. After I shook Mr. Durham's hand, I turned to go around the table to sit. As I turned, Mr. Duncan said... "see, what did I tell ya." I got to my seat, and questioned Mr. Duncan about his comment. Both Mr. Durham & Mr. Duncan just smiled and ignored the question. I sat ready to take notes with reference to Andover's marketing appetite but the conversation never went there. Mr. Duncan asked if I was ready to go and who would be meeting us? I told him yes, I was ready and my friend was joining us. He told me to go close up my computer and to meet him and Mr. Durham at Back Stage Café.

Soon after we arrived we decided to visit another bar. Mr. Duncan suggested I ride with him and have Mr. Durham ride over with my friend because Mr. Duncan wanted to " talk to me". We got into the cars and we started down the road. Mr. Duncan started holding my hand, rubbing my palm and fingers. He told me that Mr. Durham was "really attracted to me" and in saying this; he started rubbing my leg and my inner thigh. He advised me Mr. Durham would love to be rubbing my leg right at this moment. I gave a nervous laugh to Mr. Duncan and put his hand in mine, to keep his hands off me. We arrived at the bar and the evening was uneventful after that.

Soon thereafter, Mr. Duncan received an invitation from Travelers to attend a Senior Golf Tournament in Graves, MD. Mr. Duncan advised me that Mr. Durham would be there and we (Mr. Durham & I) could "hook up". The golf tournament was on a Saturday and Mr. Duncan advised me to clear my calendar so the two of us could attend. He told me Mr. Durham might able to set us up in the hotel for the night. Here again, he asked me not to tell Margie.

I met Mr. Duncan on the Saturday morning we were to go to the tournament. Shortly after I got

into his car Mr. Duncan started talking about sex again. He took my hand and pushed it in between my legs. He asked me to masturbate, to show him "how I would pleasure myself". I did not comply. He continued trying to force me by keeping my hand in between my legs. This was very offensive to me. I immediately changed the subject and eventually he took his hands off of me. During the rest of the ride down he was talking about his extra-marital affairs. He stated that he has never been faithful to his wife and probably would never be.

We finally made it to the golf tournament and toward the end of the day Mr. Duncan tried to make arrangements to drop me off at Mr. Durham's hotel. I asked Mr. Duncan to please stop worrying about my sex life. I would be fine and did not need him to try to "hook me up." Finally Mr. Duncan agreed to go home but we would stop for some dinner first. We stopped somewhere in Maryland where Mr. Duncan began again telling me about his sex life and his extra-marital affairs.

The next event that happened that really made me see how Mr. Duncan thought of me was on our over night trip to Randolph, NJ. I was concerned because he advised me of his recent break up of an extra-marital affair and I didn't want him to think that he could refocus his sexual desire on me. When we were scheduling the trip I indicated we would be staying in two separate rooms. He agreed.

We scheduled a meeting for Mr. Duncan and me to meet with the core producers from Randolph to educate them on some of our procedures and to basically reassure them their clients past and present will be taken care of. On our ride up Mr. Duncan tried to describe each producer and their different mannerisms. Mr. Duncan advised me the best way for us to win them over is for these men to "love me". I need to make them "love me". I thought love was a strong word but I was trying to go with the importance of the situation. A majority of our small business is written from this area and has direct connections with these producers. The implication, however, was that I should consider sleeping with these producers as a way for us to garner their favor and keep their business.

We arrived and had our meeting. We were scheduled for a dinner and drinks afterward at a restaurant. Our meeting went well and the dinner was extremely nice. A few of us stayed afterwards for cocktails. Soon all that was left was Mr. Duncan, myself and one other of the Randolph core producers. Mr. Duncan decided he wanted to go back to the hotel and would leave me with this producer.

I told Mr. Duncan, I would leave with him; I needed to go back to my room and catch up on some e-mails and what not. He insisted I stay and establish the "relationship". I again said I think I should go; I barely know this individual and would feel uncomfortable having him drive me back to the hotel. Mr. Duncan told me everything would be ok. Feeling like a sold piece of meat and dumbfounded at my situation, I sat there and had a few more drinks with this producer and explained how awkward I felt and how cheap this made me feel. Again, the implication was that I should sleep with this person. This person eventually drove me back to my hotel. However, I blame Mr. Duncan for putting me in this embarrassing position.

CONFIDENTIAL    CIS 0655

A111

I am very grateful to our company for the promotion and I work immensely. However, I am concerned for my future at Commerce with Mr. Duncan in control of my career. I am sick to my stomach and find it extremely hard to do my work. I've recently learned of some other issues that I would prefer talking about rather than putting them in writing. I'm a single mom with two children; I'm a hard worker and I need my job.

I did nothing to deserve this treatment of me by Mr. Duncan and I respectfully request that Commerce see to it that it will not happen again and that no adverse action be taken against me as a result of this complaint now and in the future.

Patti/Bailey

CONFIDENTIAL

CIS 0656

A112

EX. CIS-4

Email Correspondence of April 3, 2003 from Plaintiff to Thomas Marconi

**Kimberly A Bailey**

04/03/03 11:33 AM

To: "Tom Marconi" <tmarconi@delaw.org>
cc:
Subject: Re: thank you 

Tom, thanks got it and made the corrections.

"Tom Marconi" <tmarconi@delaw.org>

**"Tom Marconi"**
**<tmarconi@delaw.org**
**>**

04/03/03 11:24 AM
Please respond to
"Tom Marconi"

To: "Kimberly A Bailey" <kbailey@yesinsure.com>
cc:
Subject: Re: thank you

Kim I noticed an editing error that I forgot to correct.: The the second
page, first full paragraph, last sentence should read:

"By the conclusion of our meeting I believed that I made it clear that I did
not want any more sexual advances or sexual innuendo"

Good luck. Please call me and let me know how things turn out.
----- Original Message -----
From: "Kimberly A Bailey" <kbailey@yesinsure.com>
To: "Tom Marconi" <tmarconi@delaw.org>
Sent: Wednesday, April 02, 2003 5:15 PM
Subject: Re: thank you


> Tom, I'm leaving my office by Noon tomorrow.
> so 10ish should be great... thanks again
>
>
>
>
>
> "Tom Marconi" <tmarconi@delaw.org>
> 04/02/03 05:15 PM
> Please respond to "Tom Marconi"
>
>
>          To:      "Kimberly A Bailey" <kbailey@yesinsure.com>
>          cc:
>          Subject:          Re: thank you
>
>
> Kim    I hope to e-mail you the revised document before 10:30 tomorrow.
> Sorry I couldn't get it sooner. I hope that's soon enough. If not let me
> know asap
> ----- Original Message -----
> From: "Kimberly A Bailey" <kbailey@yesinsure.com>
> To: <tmarconi@delaw.org>
> Sent: Tuesday, April 01, 2003 6:56 PM
> Subject: thank you
>



EXHIBIT

bobbles'

CONFIDENTIAL          CIS 0658

```
>
> > Tom,
> >
> > My meeting is with Human Resources this Thursday at 2PM.  Do you have
> time
> > to review & correct my letter before then???  I'm starting to get real
> > nervous.  I've got pits in my stomach.  Is it going to be as bad as I've
> > imagined???
> >
> > thanks for all your help and I would not be mad if you sent me a bill.
> >
> > Again, thanks for all your time.
> >
> > Kim Bailey
> > 3214 Champions Drive
> > Wilmington, DE  19808
> >
> >
> >
>
>
>
>
>
```

CONFIDENTIAL

CIS 0659

A115

EX. CIS-5

April 17, 2003 Email Correspondence Between Plaintiff and Bruce McKelvv

**Bruce McKelvy**

04/18/03 08:52 AM

To: Kimberly A Bailey/Commerce Bank@yesbank
cc: (bcc: Deborah E Watson/Commerce Bank)
Subject: Re: thank you

Thanks Kim for the note. Don't worry at all about the emotion.  Believe me when I say that under the circumstances you handled yourself quite well, with the kinds of questions we needed to ask you.  I needed to be honest with you that when situations like this happen, it can be very trying for the person that reports the issue,  as well as the accused, but you certainly did the right thing by coming forward.    I am sorry you feel that there is a "gentleman's club" in any industry and especially within Commerce.  As a company we strive to have a diverse workforce and provide equal opportunity to all of our employees.  I believe we try very hard to be sure all people are treated equal.  We have taken your complaint seriously and will do our very best to get to the bottom of it. As Deb  and I said, we will be back in touch with you as the investigation progresses.  In the interim, please be sure to let either of us know immediately if there are any further inappropriate contacts.

Bruce
Kimberly A Bailey

**Kimberly A Bailey**

04/17/03 09:53 AM

To: Deborah E Watson/Commerce Bank@yesbank, Bruce
    McKelvy/Commerce Bank@yesbank
cc: Kimberly A Bailey/Commerce Bank@yesbank
Subject: thank you

Debbie & Bruce,

I wanted to thank you both for taking your time to meet with me.  I also wanted to apologize for becoming emotional.  The entire situation has become very overwhelming and completely embarrassing.  I wish I would have handled each situation differently now.  The - should of, could of and would of's are really hitting me upside my head.  Working in this "DE gentlemen's club" along with this "man's business world" isn't easy for women.  Bruce, I would like to think that ALL would be treated equal but we are not.  I would also like to think that in the positions we work and the responsibilities we have, we should know where to draw the line.  I haven't changed my professional work ethic from day one and never before has anyone cross that line where Mr. Duncan did.

I guess I am second guessing my decision to report him.  The road ahead isn't going to be pretty and I don't deal with this type of conflict easily.  The only peace I have is my honesty.  I will just have to keep faith that Right always prevails over Wrong.  Again, thank you for taking your time to meet with me. Please let me know if there is anything you need me to do.

Kim

CONFIDENTIAL

**EXHIBIT**

tabbies®

EX. CIS-6

Code of Ethics Form

# CODE OF ETHICS

As an employee of Commerce, you are required to follow and maintain a high standard of ethics as established in the following Policy:

As a condition of my employment by the Bank, I accept the principle that the welfare of the Bank depends upon the conduct and honesty of the employee and upon the trust and confidence of the public. Our customers rightly expect honesty, security, and confidentiality in their financial affairs with the Bank.

Therefore:

(1)     I agree not to provide information relative to the financial affairs and matters of this Bank or its relations to others, and not to discuss matters of a confidential nature relating to the Bank's affairs, unless such discussion is in the necessary course of Bank business and is in accordance with Bank policy and the Bank's Code of Ethics. I further agree not to reveal internal passwords used for access to Software and LANS.

(2)     I agree to inform the Officers of the Bank, without delay, of any fraud, false entry, substantial error, embezzlement, employee misconduct, which I discover or know to have taken place in any records, property, or funds of the Bank and to report any transaction or matter that seems to be suspicious, irregular or damaging to the Bank.

(3)     I agree that a response to requests by third-parties for information concerning the Bank's record keeping systems or other Bank procedures shall be deferred until notification is provided to and approval received from my supervisor and the Bank's legal counsel.

(4)     I also understand that the Federal law prohibits the accepting of gifts or entertainment from customers and suppliers of the Bank either for myself, my family, or my dependents as further described in the Code of Conduct/Conflict of Interest Policy. In addition, I agree not to personally accept fees or commissions in connection with banking transactions.

(5)     I agree to fully review the Code of Conduct/Conflict of Interest Policy. I agree that I am responsible for adherence to its contents.

I agree that a violation of this pledge of responsibility is a violation of the Bank's trust in me and could result in the termination of my employment.

SIGN NAME:     _Kim Bailey_

PRINT NAME:     _Kim Bailey_

This handbook describes policies but is not an employment agreement in whole or in part between Commerce Bank and any employees for any period of time. Employees and the bank may sever their employment relationship at any time. The policies, procedures and benefits, described in this handbook may be modified or rescinded, at any time with or without notice.

g:\depts\humanres\generalhr\newhireforms\codeofethics.doc

EXHIBIT

tabbies®

EX. CIS-7

Memorandum of June 3, 2003 from CIS to Plaintiff

June 3, 2003

To: Kimberly Bailey
Fr: Joe Morrissey, Debbie Watson
Re: Required training

As per our discussion, we are requiring that you attend the following management training classes by end of year, 2003:

HRM 1- Leadership the Commerce Way
HRM 3- Managing with in the Law
At least 4 parts of the DDI (supervisory training series) including 'Core Skills for Building Commitment' and 'Retaining Talent: the Leader's Role'.

Please access Commerce University through Lotus Notes to enroll in these classes. I will follow up with you in two weeks to verify your enrollment in the classes.

I would be happy to assist you in this process or discuss with you other potential classes to take to further develop your management skills.

Please feel free to contact me at 8-234-3309.

CONFIDENTIAL

**EXHIBIT**
tabbies®

EX. CIS-8

Email Correspondence of August 7, 2003 Between Plaintiff and Deborah Watson

**Kimberly A Bailey**

08/07/03 03:51 PM

To: Deborah E Watson/Commerce Bank@yesbank
cc:
Subject: Re: Revision to training schedule 📄

Debbie,

Per your request, here is a schedule of classes I've registered for:

1) 08/18/03 – Delegating Responsibility  – on a wait list
2) 08/19/03 – Conducting a Team Meeting
3) 08/25/03 – Effective Communication Skills
4) 08/27/03 - Reducing Resistance to Change


Deborah E Watson


**Deborah E Watson**

08/06/03 01:56 PM

To: Kimberly A Bailey/Commerce Bank@yesbank
cc:
Subject: Revision to training schedule

Hi Kim
Thank you for explaining why you missed the below class. Please reschedule to take it when it is available again. It will most likely be in January or February of 2004. Please make sure that you attend Managing within the Law that you are scheduled for in August.

Also, please attend the following three classes by year end 2003:

Effective Communication Skills
Conducting a Team Meeting
Reducing Resistance to Change

If that will not be possible due to scheduling constraints, please let me know as soon as possible.
Thanks,
Debbie
----- Forwarded by Deborah E Watson/Commerce Bank on 08/06/03 01:50 PM -----



**Cathy Ensign**

07/30/03 12:41 PM

To: Deborah E Watson/Commerce Bank@yesbank
cc:
Subject: Kimberly A Bailey did not attend Commerce University HRM Series Part 6:  Leading People From All Walks of Life

Kimberly A Bailey was absent from the scheduled course HRM Series Part 6:  Leading People From All Walks of Life:

Location: Commerce U-Mt. Laurel;  Date: 07/30/2003;  Time: 08:00:00 AM - 12:30:00 PM;  Instructor: Karen A.Watson

```
EXHIBIT

exhibit

_____
```

CONFIDENTIAL

CIS 0541

A123

EX. CIS-9

CIS Answers to First Set of Interrogatories

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **KIMBERLEY A. BAILEY**<br><br>        **Plaintiff,**<br>vs.<br><br>**COMMERCE NATIONAL<br>INSURANCE SERVICES, INC.,**<br>a New Jersey corporation<br><br>        **Defendant.** | **Civil No. 05-CV-183 (SLR)**<br><br>**Civil Action**<br><br>**Defendant's Responses to Plaintiff's First<br>Set of Interrogatories** |

**TO:**    **Thomas C. Marconi, Esquire**
          Losco & Marconi, P.C.
          1813 N. Franklin Street
          P.O. Box 1677
          Wilmington, DE 19899

        Defendant Commerce Insurance Services, improperly pled as Commerce National Insurance

Services, hereby responds and objects to Plaintiff's First Set of Interrogatories to Defendant.

                            **BROWN & CONNERY, LLP**
                            Attorneys for Defendant


                          By:   _____
                                  William M. Tambussi
                                  Susan M. Leming

Dated:

## GENERAL OBJECTIONS

1       Defendant objects to each interrogatory to the extent it purports to impose upon defendant obligations beyond the scope of that set forth in the Federal Rules of Civil Procedure. Defendant will object to each interrogatory to the extent required by the Federal Rules of Civil Procedure.

2       Defendant objects to each interrogatory to the extent it seeks information which is subject to the attorney-client privilege or the work product doctrine or to any other privilege or doctrine which precludes a response to the request.

3       Defendant objects to each interrogatory to the extent that it is overly broad, ambiguous or uses terms or phrases without definition thereof.

## PRESERVATION OF RIGHTS

All responses to the following interrogatories are made without in any way waiving or intending to waive, but on the contrary, intending to preserve and preserving:

1.      The right to object on any grounds to use any of these responses or any subsequently produced documents or the subject matter thereof, in any subsequent proceeding or the trial of this or any other action;

2.      The right to object on any grounds at any time to a demand for further responses to these discovery requests or other discovery requests involving or relating to the subject matter of the discovery requests herein answered; and

3.      The right at any time to revise, correct, supplement, clarify and/or amend the responses and objections set forth herein.

2

1.      Please identify specifically and in detail each and every reason why Defendant terminated Plaintiff's employment, including but not limited to, each and every action, or inaction committed, or foregone by Plaintiff, which caused or contributed to Defendant's decision.

ANSWER:

Plaintiff's employment with Commerce was terminated on August 27, 2003. On that date, Ms. Bailey was informed of her termination at a private meeting between Deborah Watson, Mary Corcoran and Ms. Bailey. The purpose of the meeting was to inform Ms. Bailey of her termination and also inform her of the reasons for her termination.

Ms. Watson explained to Ms. Bailey that an incident had been brought to her attention which involved Ms. Bailey's use of language unbecoming of a supervisor toward a subordinate. Ms. Bailey was told that this language could not be tolerated. Ms. Bailey was also told that such behavior is the type that seriously undermines employee morale in the workplace. Ms. Bailey was reminded of the counseling she had received from Mr. Joseph Morrissey, and Ms. Watson. Ms. Bailey's use of inappropriate language was part of a broader failure of Ms. Bailey to maintain standards of professionalism as a supervisor.

Ms. Watson made clear to Ms. Bailey that Commerce was not "out to get" Ms. Bailey after Ms. Bailey's allegation of sexual harassment by Stephen Duncan. Ms. Watson told Ms. Bailey that this was not where Commerce wanted this to end. Ms. Watson informed Ms. Bailey that supervisors must be held to a higher standard. In June 2003, after Commerce had completed its extensive investigation into Ms. Bailey's allegation of sexual misconduct by Mr. Duncan, Ms. Bailey was asked not initiate or encourage this banter about the physique of the phone or copy vendor representatives. As another example, Commerce cited an incident involving an email between Ms. Bailey and her staff at Main Street at an upcoming Commerce function in New York City which involved an overnight stay. In the email, Ms. Bailey suggested that the employees at Main Street take transportation to New York separate from the transportation that Commerce would have provided for the employees. Ms. Bailey was advised that she should work within the parameters that the company establishes for the events they sponsor. In June 2003, Ms. Bailey was told about engaging in social activities with coworkers that are not company sponsored. Ms. Bailey was also reminded that such outside activities may make it more difficult for her to perform the duties in her role as supervisor. It was recommended that she refrain from making any unprofessional comments, especially those concerning a person's appearance. It was also suggested to Ms. Bailey that she coordinate social events which were company sponsored only. Commerce asked Ms. Bailey to avoid contact with coworkers outside the workplace except for contacts that were limited and professional. Commerce required Ms. Bailey to take various leadership courses that were offered by Commerce for its supervisors. At the time, Commerce also made clear that it appreciated her talents and that it was confident that she could make the changes necessary to improve her supervisory skills. Commerce told Ms. Bailey that they wanted her to have a long and successful career at Commerce. All agreed that the process was a learning experience and it was time to move on. Commerce did not formally reprimand Ms. Bailey at this time. Commerce's clear objective was to give Ms. Bailey a second chance.

3

After the meeting in 2003 in which Commerce informed Ms. Bailey of the results of their investigation, Commerce took extensive measures to help Ms. Bailey improve her professional abilities. Commerce required that Ms. Bailey take as many as seven courses to assist her in her improvement. Commerce gave Ms. Bailey several months to complete these classes. These classes included the following:

1.      Leadership the Commerce Way!;
2.      Management within the Law;
3.      Performance Management;
4.      Effective Communication Skills;
5.      Handling a Performance Problem;
6.      Conducting a Team Meeting; and
7.      Reducing Resistance to Change

When Ms. Bailey was unable to make a class on July 30, 2003, Commerce did not punish Ms. Bailey for missing the class. Rather, Commerce told Ms. Bailey that she simply needed to reschedule the class, so as to not make the attendance of these classes an onerous burden upon Ms. Bailey's time.

A separate incident involving Ms. Bailey occurred July 18, 2003. That day, Ms. Bailey came to work in clothes that her co-employees felt were inappropriate. Her clothing included a sleeveless sweater, pedal pusher pants and open-toed backless slip-on shoes. Ms. Bailey's supervisor, Ms. Corcoran, asked Ms. Bailey to go home and change into more appropriate clothing.

In another example, Ms. Corcoran had worked with Ms. Bailey on an ongoing basis throughout the summer of 2003 to help Ms. Bailey improve her communication skills, especially the tone of her emails. Ms. Corcoran made such efforts because she wanted to preclude disciplinary action with Ms. Bailey.

All of these events preceded the event in August 2003 when Ms. Bailey used inappropriate language toward a subordinate. In making its decision to terminate Ms. Bailey on August 27, 2003, Commerce also had evidence that Ms. Bailey had created an atmosphere in which her employees at Main Street were intimidated from bringing their employment concerns to Ms. Bailey. This was aptly demonstrated by the emails of witnesses to Commerce administration explaining what occurred with the inappropriate comment that Ms. Bailey made toward one of her subordinates. When Commerce explained to Ms. Bailey at the meeting on August 27, 2003 in which Commerce told Ms. Bailey that she would be terminated, these were the types of behaviors behind Commerce's decision.

The goal of Commerce at that time was to give Ms. Bailey a fair opportunity to prove herself as a supervisor. To facilitate that process, Commerce hired a new director to manage Ms. Bailey at the Main Street location. This was Mary Corcoran. Commerce specifically did not discuss its investigation of Mr. Duncan or Ms. Bailey's claims of sexual harassment with

Ms. Corcoran. Commerce did not do this because it wanted to protect Ms. Bailey's privacy and because Commerce felt this would give Ms. Bailey the best opportunity for a fresh start.

Commerce also observes that Ms. Bailey made no complaints about retaliation in the weeks following her report about Duncan in April 2003. She made no complaints about retaliation as the investigation was ongoing.

2.     Identify all persons who took part in any investigation or review in connection with the decision to terminate Plaintiff's employment. With respect to each such person, identify specifically the role such person played in Defendant's decision to terminate Plaintiff's employment. Please also identify the person who made the final decision to terminate Plaintiff's employment and the date that decision was finally made.

**ANSWER:**

The decision by Commerce to terminate Ms. Bailey from employment with Main Street was a decision that was made collectively by various employees within Commerce. These persons included Ms. Watson, Ms. Corcoran, Joseph Morrissey, and Bruce McKelvy. It was based on information received from Ms. Valerie Oakes, Ms. Darlene Wilkins and Ms. Dee Whalen as well as Commerce's investigation.

Ms. Watson and Ms. Corcoran participated in the meeting in which Ms. Bailey was informed of her termination. Mr. Morrissey was kept informed of developments with respect to Ms. Bailey. Mr. McKelvy was also kept informed of developments. Ms. Oakes, Ms. Wilkins and Ms. Whalen were witnesses to the conversation in which Ms. Bailey used the inappropriate language.

It is impossible to identify a single person who made the final decision to terminate Ms. Bailey's employment. This is because the decision was made after much deliberation on the part of Commerce management and against Commerce's hopes for Ms. Bailey as indicated in June 2003 to Ms. Bailey.

3.     Please identify whether or not Steven Duncan had ever been accused of sexual harassment or other misconduct of a sexual nature at any time prior to the charge made by Plaintiff against Mr. Duncan. If so, please identify the facts surrounding the charge, the including the person making the charge, the charge made, the date of all alleged misconduct and the disposition of the charge by Defendant.

**ANSWER:**

Objection. This interrogatory is overbroad, seeks information of a CIS employee and seeks information outside the permissible scope of discovery permitted by Federal Rules of Civil Procedure. The defendant objects to the interrogatory insofar as it is irrelevant to whether or not Commerce retaliated against Ms. Bailey for her exercise of rights under Title VII or the NJLAD. Without waiving this objection, defendant answers as follows:

Commerce is not aware of any other incidents of misconduct by Mr. Duncan at Commerce during his employment. Commerce reserves the right to supplement this answer as discovery proceeds.

4.      Please identify all policies, rules or regulations, hereinafter ("policy or policies") allegedly violated by Plaintiff at any time during her employment with Defendant. With respect to each such violation, please identify the policy, the date the alleged violation occurred, all disciplinary or related action taken against Plaintiff as a result of the violation, and the identity of all persons having knowledge of the facts related to the alleged violation, and the facts known to each such person.

**ANSWER:**

Commerce seeks to maintain the highest standards of conduct and professionalism among its employees. This is especially important for employees in supervisory positions at Commerce. Supervisors set the tone for the atmosphere in the workplace and because supervisors are in a position to do what it takes to take Commerce "to a higher level." "Taking Commerce to a higher level" is one of Main Street's valued mottos. Commerce seeks to reward the efforts of all employees to maintain and elevate Commerce's status and reputation as a respected employer. Insofar as Ms. Bailey failed to abide by these basic notions of respect, Ms. Bailey failed in her special duty as supervisor.

At Commerce, supervisors are hired/promoted based on their special abilities to recognize common sense notions of fairness and decency and for their abilities to distinguish between professional and unprofessional acts in the workplace. Commerce must rely on the innate ability of a supervisor to engage in appropriate conduct in the workplace, because no policy handbook or procedural guide can contemplate every situation that might arise in the real life workplace. As a supervisor, Ms. Bailey was expected to consult these basic notions of leadership. See also Commerce's Handbook.

5.      If you contend that one of the reasons for Plaintiff's termination was inappropriate dress, please identify specifically and in detail the alleged inappropriate dress worn by Plaintiff and all dates when Plaintiff was allegedly inappropriately dressed.

**ANSWER:**

See previous interrogatory discussing reasons for termination.

Ms. Corcoran enforced the Commerce dress code by sending Ms. Bailey home for inappropriate dress. As noted, this occurred in July 2003. Given the highly customer service-driven nature of the business in which Ms. Bailey was involved in her capacity as supervisor, it was absolutely incumbent upon Ms. Bailey to represent Commerce in the most professional light possible. This was particularly so given that Commerce does not maintain a casual dress code or a dress down policy in the normal course of its business. Moreover, as a supervisor of a team of customer service representatives who looked to Ms. Bailey as a role model, it was ever more important for Ms. Corcoran to ensure that proper dress requirements were applied to all.

6.      With respect to all counseling given to Plaintiff by Defendant at any time, please identify the specific reason why she was counseled, the dates and nature of all counseling, all persons involved in the counseling, including the decision to counsel Plaintiff, and the role played by each such person.

ANSWER:

See previous interrogatories and plaintiff's personnel file.

After Mr. Duncan was terminated for inappropriate behavior, Commerce counseled Ms. Bailey on the opportunities available for her to grow as a supervisor under the guidance of Ms. Corcoran. Ms. Corcoran's role was to improve production at Main Street and to help her team of which Ms. Bailey was integral. Ms. Bailey balked at the chance to expand her professional experienced under Ms. Corcoran. Rather, Ms. Bailey considered Ms. Corcoran's attention to detail and Ms. Corcoran's enforcement of Commerce policies as a personal affront.

7.      Please identify all disciplinary action taken by Defendant against Plaintiff at any time while she was employed by Defendant. With respect to each such disciplinary action, please identify the date and nature of the offense giving rise to the disciplinary action, the date and nature of the disciplinary action taken, all persons involved in the decision to take disciplinary action and the role played by each such person in the decision as well as all persons making a complaint or other charge against Plaintiff which resulted in such disciplinary action.

ANSWER:

See previous interrogatory answers discussing reasons for termination and plaintiff's personnel file.

Ms. Corcoran enforced the Commerce dress code by sending Ms. Bailey home for inappropriate dress. As noted, this occurred in July 2003. Given the highly customer service-driven nature of the business in which Ms. Bailey was involved in her capacity as supervisor, it was absolutely incumbent upon Ms. Bailey to represent Commerce in the most professional light possible. This was particularly so given that Commerce does not maintain a casual dress code or a dress down policy in the normal course of its business. Moreover, as a supervisor of

7

a team of customer service representatives who looked to Ms. Bailey as a role model, it was ever more important for Ms. Corcoran to ensure that proper dress requirements were applied to all.

8.    If you contend that Plaintiff committed "inappropriate behavior toward co-workers and subordinates directly under her supervision," please identify all facts which support your contention, including, but not limited to, the date and nature of all such inappropriate behavior, the person or persons to whom such behavior was directed, all other persons having knowledge of such inappropriate behavior and the knowledge possessed by each such person, and all action taken by Defendant in response to Plaintiff's alleged inappropriate behavior.

ANSWER:

See previous interrogatory answers on reasons for termination.    See previous interrogatory answers on Commerce's impressions conveyed to Ms. Bailey at the June 2003 meeting in which Commerce advised Ms. Bailey that she needed to use better judgment in her outside encounters with co-employees. See previous interrogatories on Ms. Bailey's failure to abide by the dress code.    See previous interrogatories on Ms. Bailey's usage of highly inappropriate language toward a subordinate.

Ms. Corcoran enforced the Commerce dress code by sending Ms. Bailey home for inappropriate dress. As noted, this occurred in July 2003. Given the highly customer service-driven nature of the business in which Ms. Bailey was involved in her capacity as supervisor, it was absolutely incumbent upon Ms. Bailey to represent Commerce in the most professional light possible. This was particularly so given that Commerce does not maintain a casual dress code or a dress down policy in the normal course of its business. Moreover, as a supervisor of a team of customer service representatives who looked to Ms. Bailey as a role model, it was ever more important for Ms. Corcoran to ensure that proper dress requirements were applied to all.

9.    If you contend that Plaintiff committed "unprofessional conduct which set a poor example for the customer service representatives," please identify all facts which support your contention, including but not limited to, the date and nature of all such unprofessional conduct, all persons having knowledge of such unprofessional conduct and the knowledge possessed by each such person, and all action taken by Defendant in response to Plaintiff's alleged unprofessional conduct.

ANSWER:

See previous interrogatory answers discussing reasons for termination.  See previous interrogatory answers discussing persons involved in the various instances of unprofessional conduct. See previous interrogatory answers on the actions taken by Commerce to help Ms. Bailey in her role as supervisor.

Ms. Corcoran enforced the Commerce dress code by sending Ms. Bailey home for

A132

inappropriate dress. As noted, this occurred in July 2003. Given the highly customer service-driven nature of the business in which Ms. Bailey was involved in her capacity as supervisor, it was absolutely incumbent upon Ms. Bailey to represent Commerce in the most professional light possible. This was particularly so given that Commerce does not maintain a casual dress code or a dress down policy in the normal course of its business. Moreover, as a supervisor of a team of customer service representatives who looked to Ms. Bailey as a role model, it was ever more important for Ms. Corcoran to ensure that proper dress requirements were applied to all.

10.     If you contend that Plaintiff made inappropriate comments about the physique of a male phone vendor representative and/or a copy machine vendor representative in the presence of her staff, please identify precisely what comments were made, the person(s) to whom they were directed, each and every date on which this conduct allegedly occurred, and all witnesses to this conduct. Also please identify all action taken by Defendant in response thereto.

ANSWER:

Ms. Bailey's inappropriate comments about male phone vendor or copy machine vendor representatives occurred in early 2003. The name of the phone vendor was Greg Alpugh. All employees within Main Street in early 2003 were familiar with Ms. Bailey's behavior toward outside vendors. Those familiar with Ms. Bailey's behavior in this regard would include, but are not limited to, Darlene Wilkins, Heather Pokoisky, Valerie Oakes, Dee Whalen, Julius Bland, Dorothy Deegan, Cheryl Luckanish, Heather Smith, Diane Schauber, Marjorie Phipps and Stephen Duncan. Ms. Bailey was informed at the meeting in June 2003 that she needed to avoid making such comments about others.

11.     If you contend that Plaintiff coordinated and engaged in social activities involving consumption of alcohol which were not sponsored by the Defendant, please identify each and every date which this conduct allegedly occurred, precisely what occurred, all witnesses to this conduct, and all action taken by Defendant in response thereto.

ANSWER:

Objection. This interrogatory is overbroad, ambiguous and seeks information outside the permissible scope of discovery established by the Federal Rules of Civil Procedure. Plaintiff is better able to respond to this interrogatory than defendant as she possesses greater knowledge of her social activities. Without waiving the objections and by way of further response, see previous interrogatory answers on reasons for termination. See previous interrogatory answers discussing June 2003 meeting at which Commerce informed Ms. Bailey of the results of their investigation into her allegation. See previous interrogatory answers on the counseling Ms. Bailey received as to the need to understand the important of the distinction between professional and social activities. See previous interrogatory answers on Ms. Bailey's email in May 2003 regarding a Commerce event in New York City.

In addition, Commerce's investigation into Ms. Bailey's allegations of sexual harassment revealed that Ms. Bailey had used poor judgment in social activities during the period in which she claims she was harassed by Mr. Duncan. These events include an event in May 2002 during which Ms. Bailey invited Steve Duncan to join Ms. Bailey and her girlfriends at the Backstage Café. After the Backstage on the same evening, Bailey, her girlfriends and Duncan went to a place called Bank Shots. After a while at Banks Shots, Mr. Duncan told Ms. Bailey that he was going home and he asked her to escort him to his car. Ms. Bailey voluntarily went with Mr. Duncan to his car. Moreover, when Mr. Duncan asked Ms. Bailey to get into his car with him, she voluntarily entered the car with him. Later, in June 2002, Ms. Bailey voluntarily agreed to go to a golf event in Maryland with Mr. Duncan in the same car.

12.    If you contend that Plaintiff did not understand her role as a supervisor, particularly a supervisor for her own department, please identify all facts which support your response as well as the identify of persons having knowledge of such facts and the facts known to each such person.

ANSWER:

See previous interrogatory answers discussing circumstances leading to Ms. Bailey's termination. See previous interrogatory answers discussing the efforts of Commerce to help plaintiff understand her role as a supervisor. See previous interrogatory answers discussing the necessity for a supervisor to act as a role model for others. See previous interrogatory answers discussing the need for supervisors to take Commerce to a higher level at all times.

Ms. Corcoran enforced the Commerce dress code by sending Ms. Bailey home for inappropriate dress. As noted, this occurred in July 2003. Given the highly customer service-driven nature of the business in which Ms. Bailey was involved in her capacity as supervisor, it was absolutely incumbent upon Ms. Bailey to represent Commerce in the most professional light possible. This was particularly so given that Commerce does not maintain a casual dress code or a dress down policy in the normal course of its business. Moreover, as a supervisor of a team of customer service representatives who looked to Ms. Bailey as a role model, it was ever more important for Ms. Corcoran to ensure that proper dress requirements were applied to all.

13.    If you deny that Steven Duncan sexually harassed Plaintiff, please identify all facts which you believe support your denial as well as the identity of all persons having knowledge of such facts and the facts known to each such person.

ANSWER:

Commerce took Ms. Bailey's internal complaints regarding Mr. Duncan's sexual harassment very seriously.    As already noted, Commerce performed a prompt and comprehensive investigation. At the conclusion of the investigation, Steve Duncan moved on.

14.    If you contend that Plaintiff was in any way responsible for, or contributed in any way to the sexual harassment by Steven Duncan, please identify all facts which you believe support that

A134

contention as well as the identity of all persons having knowledge of such facts, and the facts known to each such person.

**ANSWER:**

See previous interrogatory answers discussing Ms. Bailey's failure to use proper judgment in outside social activities.

Ms. Corcoran enforced the Commerce dress code by sending Ms. Bailey home for inappropriate dress. As noted, this occurred in July 2003. Given the highly customer service-driven nature of the business in which Ms. Bailey was involved in her capacity as supervisor, it was absolutely incumbent upon Ms. Bailey to represent Commerce in the most professional light possible. This was particularly so given that Commerce does not maintain a casual dress code or a dress down policy in the normal course of its business. Moreover, as a supervisor of a team of customer service representatives who looked to Ms. Bailey as a role model, it was ever more important for Ms. Corcoran to ensure that proper dress requirements were applied to all.

15.     Please identify each and every reason why Plaintiff was required to continue to work directly with Steven Duncan while Defendant was investigating Plaintiff's sexual harassment charges against Steven Duncan. Please further identify all persons having knowledge of such reasons and the knowledge possessed by each such person.

**ANSWER:**

Commerce took Ms. Bailey's allegations of sexual harassment very seriously. Commerce engaged in an extensive 8 week investigation of Ms. Bailey's allegations to allow it time to thoroughly interview all witnesses. Accordingly, Commerce did not take action against Mr. Duncan until the investigation had concluded. Furthermore, given the nature and location of Main Street, as well as Ms. Bailey's job assignment, a reassignment to another position or location was not an available alternative.

16.     Please state why Plaintiff was not in any way involved in the investigation of the sexual harassment charges made by Plaintiff against Steven Duncan after she made the initial charge. Please identify each person having knowledge of the facts contained in your response and the facts known to each such person.

**ANSWER:**

Commerce expressly disputes the underlying proposition that Ms. Bailey had no involvement in the investigation after she made the charges against Mr. Duncan. Ms. Bailey was the very first person Commerce interviewed after she submitted her claims to Commerce administration. See also the April 17, 2003 email from Ms. Bailey to Ms. Watson and Bruce McKelvy. Ms. Bailey thanked Ms. Watson and Mr. McKelvy for taking the time to meet with

11

her. See Mr. McKelvy's response to Ms. Bailey's email of April 17, 2003. In this email, Mr. McKelvy specifically told Ms. Bailey that Commerce strives to have a diverse workforce and provide equal opportunity to all employees. Mr. McKelvy further explained to Ms. Bailey in no uncertain terms "we have taken your complaint seriously and will do our very best to get to the bottom of it." Mr. McKelvy advised Ms. Bailey that Commerce would be in touch with Ms. Bailey as the investigation progresses and he further advised Ms. Bailey that she should "be sure to let either of us know immediately if there are any further inappropriate contacts." There can be no question of Commerce's intent to keep Ms. Bailey involved in this investigation.

In addition, at no point during the 8 week investigation did Commerce thwart Ms. Bailey's ability to contact Ms. Watson or Mr. McKelvy either through email or by phone. This is evidenced by at least two instances where Ms. Bailey emailed Ms. Watson during the investigation. See the May 15, 2003 email from Ms. Bailey to Ms. Watson regarding the event in New York City. See also the May 15, 2003 email in which Ms. Bailey blind carbon copies Ms. Watson on an email that Ms. Bailey sent to her Main Street staff in which Ms. Bailey informed the staff "YOU ALL ARE THE BEST."

Further, Commerce observes that in late May 2003, when Commerce intended to meet with Ms. Bailey again about the investigation, Ms. Bailey advised Ms. Watson that she could not meet because she had a vacation scheduled for Thursday and Friday of that week and she had to leave early on Wednesday prior to her vacation. Commerce was flexible in its efforts to accommodate Ms. Bailey's vacation schedule.

17.    Please identify specifically and in detail each and every defense given by Steven Duncan to Defendant to the sexual harassment charge made by Plaintiff.

ANSWER:

See May 6, 2003 interview notes of Ms. Watson with Mr. Duncan. In part, Mr. Duncan believed that Ms. Bailey was motivated in her allegations by the frustrations she had insofar as the relationship between Mr. Duncan and her had not continued.

18.    Please identify all "inappropriate behavior" committed by Plaintiff that defendant learned of during the investigation into the sexual harassment charges made by Plaintiff against Steven Duncan. Please identify each and every inappropriate act as well as the date the act was committed. Please further identify how Defendant first learned of this alleged inappropriate behavior by Plaintiff, and all witnesses to each alleged inappropriate act.

12

A136

**ANSWER:**

See previous interrogatory answers discussing reasons for Ms. Bailey's termination. See previous interrogatory answers discussing Ms. Bailey's failure to understanding the importance of keeping personal and work lives separate.

Ms. Corcoran enforced the Commerce dress code by sending Ms. Bailey home for inappropriate dress. As noted, this occurred in July 2003. Given the highly customer service-driven nature of the business in which Ms. Bailey was involved in her capacity as supervisor, it was absolutely incumbent upon Ms. Bailey to represent Commerce in the most professional light possible. This was particularly so given that Commerce does not maintain a casual dress code or a dress down policy in the normal course of its business. Moreover, as a supervisor of a team of customer service representatives who looked to Ms. Bailey as a role model, it was ever more important for Ms. Corcoran to ensure that proper dress requirements were applied to all.

19.    If you contend that Plaintiff "considered Ms. Corchoran's attention to detail and enforcement of Commerce policies as a personal affront," please identify each and every fact which you believe supports that contention, including specific example of situations in which this occurred. Please further identify all persons having knowledge of the facts and the facts known to each such person.

**ANSWER:**

Ms. Bailey failed to abide by Ms. Corcoran's reasonable efforts to assist Ms. Bailey in her professional development. This included Ms. Bailey's failure to abide by Ms. Corcoran's advice on how to compose office emails. This also included Ms. Corcoran's refusal to permit Ms. Bailey to violate the standards for dress at Commerce.

20.    If you contend that Plaintiff "balked at the opportunity to expand her professional experience under Ms. Corchoran," please identify all facts which you believe support that contention, including specific examples of situations in which this occurred. Further please also identify all persons having knowledge of such facts and the facts known to each such person.

**ANSWER:**

See previous interrogatory answers discussing Ms. Bailey's failure to effectively follow up on the recommendations of Commerce administration at the meeting in June 2003 when Commerce informed Ms. Bailey of the reasons for her termination.

Ms. Corcoran enforced the Commerce dress code by sending Ms. Bailey home for inappropriate dress. As noted, this occurred in July 2003. Given the highly customer service-driven nature of the business in which Ms. Bailey was involved in her capacity as supervisor, it was absolutely incumbent upon Ms. Bailey to represent Commerce in the most professional

light possible. **This was particularly so given that Commerce does not maintain a casual dress code or a dress down policy in the normal course of its business. Moreover, as a supervisor of a team of customer service representatives who looked to Ms. Bailey as a role model, it was ever more important for Ms. Corcoran to ensure that proper dress requirements were applied to all.**

21.    Please identify the facts known to the following persons which Defendant stated in its Rule 26(a) initial disclosures that it may use to support its claims or defenses:

    Valerie Oakes
    Darlene Wilkins
    Dorothy Whalen

    Robert Hackett
    Marjorie Phipps
    Ms. McKee

**ANSWER:**

    **All individuals having knowledge regarding plaintiff's employment at CIS and allegations raised by plaintiff in this litigation. Specifically, Ms. Oakes, Ms. Wilkins and Ms. Whalen were witnesses to the inappropriate language that Ms. Bailey used toward a supervisor in August 2003. These individuals are also familiar with the general environment that Ms. Bailey allowed to exist at Main Street. Mr. Hacket and Ms. McKee are familiar with the inappropriate dress of Ms. Bailey.**

22.    Please identify whether any other supervisory or management level employee of Defendant dressed inappropriately at any time. If so, please identify all such persons and all dates when such person dressed inappropriately. Please further identify what action, if any, was taken against such person and the person or persons taking such action.

**ANSWER:**

    **Objection. This interrogatory is overbroad, unduly burdensome and outside the scope of permissible discovery established by Federal Rules of Civil Procedure. Notwithstanding this objection, defendant submits that the dress code is enforced among supervisors to maintain the professionalism that is necessary in the office. Enforcement of the dress code among supervisors is critical given that supervisors must be ready to meet with other business professionals on short notice during the day.**

23.    Please identify all current or former employees of Defendant whom Defendant believes were fearful or apprehensive of Plaintiff allegedly as a result of her use of profanity in the workplace. Please further identify all facts which form the basis for this belief.

14

**ANSWER:**

**Valerie Oakes (see email of August 26, 2003 to Mary Corcoran – fear of retaliation for reporting profanity incident)**

**Dee Whalen (see email of August 26, 2003 to Mary Corcoran – fear of retaliation for reporting profanity incident)**

**This is not an exclusive list, as not every employee at Main Street documented such concerns in writing. Defendant reserves the right to call as witnesses any of the employees who worked under the supervision of or with Ms. Bailey at Main Street.**

24.     Please state whether at any time prior to Plaintiff's termination any other employees of Defendant ever used profanity in the workplace. Please further identify each and every person whom Defendant knew or believe used profanity in the workplace at any time prior to Plaintiff's termination. With respect to each such person, please identify the profanity used, all persons who witnessed such conduct, as well as the date of such conduct and all disciplinary or other action taken against each such person or each occasion as a result of their use of profanity in the workplace.

**ANSWER:**

**Objection.  This request is overbroad and outside the scope of permissible discovery established by Federal Rules of Civil Procedure.  Commerce is not aware of the use of profanity by a supervisor, in a derogatory and condescending manner, against a subordinate employee.  It is the responsibility of a supervisor to maintain professionalism in the workplace.**

25.     If you contend that there is a difference or distinction between the profanity used by Plaintiff which caused or contributed to Defendant's decision to terminate Plaintiff's employment, and the profanity used by other employees of Defendant, please explain the distinction.

**ANSWER:**

**See answer to previous interrogatory.**

## CORPORATE CERTIFICATION

I, Deborah E. Watson, hereby certify as follows:

1.    I am the Vice President of Human Resources, of defendant Commerce Insurance Services, Inc., an indirect wholly owned subsidiary of Commerce Bancorp, Inc., and am the agent of the corporation for the purpose of answering the interrogatories served upon the attorneys for said corporation in this action by the plaintiff, and for making this verification.

2.    I have read the said interrogatories and the foregoing answers. The information stated therein has been assembled by counsel for Commerce and present employees of Commerce. Although the matters stated therein are not all entirely within my personal knowledge, based on information and belief, and my own personal knowledge, the answers stated therein are true.

3.    I hereby certify that I am authorized by Commerce to answer these interrogatories on its behalf.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated:                          COMMERCE INSURANCE SERVICES, INC.

                                By:  Deborah E. Watson, SPHR
                                Title: Vice-President of Human Resources

A140

CIS-10

Email Correspondence of July 18, 2003 Between Plaintiff and Mary Corcoran



**Mary T Corcoran**
08/22/03 11:01 AM

To: Deborah E Watson/Commerce Bank@yesbank
cc:
Subject: Kim Bailey

Deb,

This is the email I sent to Kim thanking her for going home and changing into more professional attire after she came to work with a sleeveless sweater, pedal pusher (3/4 length) pants and open-toed, backless, slip-on shoes.

Both Bob Hackett and Liz McKee also had noticed and mentioned to me that he apparel was inappropriate.

Mary
----- Forwarded by Mary T Corcoran/Commerce Bank on 08/22/03 10:58 AM -----

**Kimberly A Bailey**
07/18/03 08:52 AM

To: Mary T Corcoran/Commerce Bank@yesbank
cc:
Subject: Re: Thank you

I'm back and I'm sorry...
duly noted.

Mary T Corcoran

**Mary T Corcoran**
07/18/03 08:39 AM

To: Kimberly A Bailey/Commerce Bank@yesbank
cc:
Subject: Thank you

Thank you for your cooperation in taking Main Street to the next level.

Mary

CONFIDENTIAL

**EXHIBIT**

CIS 0593

A142

CIS-11

Email Correspondence of August 26, 2003 From Valerie Oakes to Mary Corcoran



**Valerie J Oakes**

08/26/03 11:11 AM

To: Mary T Corcoran/Commerce Bank@yesbank
cc: Deborah E Watson/Commerce Bank@yesbank
Subject:

As you reguested, the following are the events of Tuesday, August 12, 2003.

Around 8:45 a.m., I asked Kim what information she needed from me in order to approve my enrollment in a CIC class.  While at my desk, Kim said, "I don't fucking have time for this now, I have too much work on my desk."  With that she walked away.

I did not want to report this for the following reasons:
     1.  Fear of retaliation from Kim.  I have been on Kim's bad side before and her reactions make the working conditions around the office very tense.
     2.  Kim writes my performance review and I don't want this used against me.
     3.  I felt it was futile, as last December there was a problem with Kim that I reported to my manager, (Mr. Duncan at the time) asking for a meeting with the three of us to resolve it,  The meeting never took place, the problem was never addressed, and my personnel file and performance review reflected it.

**EXHIBIT**

CONFIDENTIAL

CIS 0614

A144

CIS-12

Plaintiff's Termination Letter

August 27, 2003

Kimberley Bailey
3214 Champions Drive
Wilmington, DE 19808

Dear Kimberley,

It has come to management's attention that an incident occurred in the Delaware office on August 12, 2003. The incident involved inappropriate behavior you exhibited toward a subordinate. Two other employees witnessed this incident and both verified the inappropriate behavior.

We previously discussed with you the issue of behavior in the workplace, and even arranged for you to attend training on that area, as well as other topics related to your employment at Commerce.

The type of wrongful conduct exhibited by you as a supervisor, on August 12, 2003, is unacceptable and violates Commerce's policies. It is, therefore, necessary for Commerce to terminate your employment effective immediately.

If you have further questions, please contact me at (856) 470-3309.

Sincerely,


Deborah Watson
Human Resources Manager


cc: Joe Morrissey
    Ed Kiessling



**EXHIBIT**

tabbies

CONFIDENTIAL

CIS 0615

A146