# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **KIMBERLEY A. BAILEY**<br><br>     **Plaintiff,**<br><br>   vs.<br><br>**COMMERCE INSURANCE SERVICES, INC.,**<br>**a New Jersey corporation**<br><br>     **Defendant.** | **Civil No. 05-CV-183 (SLR)**<br><br>**Civil Action** |

---

## DEFENDANT COMMERCE INSURANCE SERVICES, INC.'S APPENDIX TO ITS RENEWED BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## VOLUME III

---

POTTER ANDERSON & CORROON LLP
Wendy K. Voss (I.D.# 3142)
Sarah E. DiLuzio (I.D. # 4085)
1313 N. Market Street
Wilmington, DE 19801
Telephone (302) 984-6000
wvoss@potteranderson.com
sdiluzio@potteranderson.com

BROWN & CONNERY, LLP
William M. Tambussi, Esq.
Susan M. Leming, Esq.
William F. Cook, Esq.
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108
(856) 854-8900

Attorneys for Defendant
Commerce Insurance Services

Dated: June 16, 2006

## TABLE OF CONTENTS – APPENDIX VOLUME III

| <u>Ex.</u> | <u>Description</u> | <u>Page</u> |
|------|-------------|------|
| CIS-13 | Deposition Transcript of Mary Corcoran | A146 |
| CIS-14 | Deposition Transcript of Deborah Watson | A169 |

Mary Corcoran

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


KIMBERLEY A. BAILEY,            )
                               )
        Plaintiff,             )
                               )
v.                             )    Civil Action No.
                               )      05-183 SLR
COMMERCE NATIONAL INSURANCE    )
SERVICES, INC., a New Jersey   )
corporation,                   )
                               )
        Defendant.             )

        Deposition of MARY CORCORAN taken pursuant to
notice at the law offices of Losco & Marconi, P.A.,
1813 North Franklin Street, Wilmington, Delaware,
beginning at 10:00 a.m. on Wednesday, May 17, 2006,
before Robert Wayne Wilcox, Jr., Registered Professional
Reporter and Notary Public.

APPEARANCES:

        THOMAS C. MARCONI, ESQ.
        LOSCO & MARCONI, P.A.
          1813 North Franklin Street
          Wilmington, Delaware  19801
          for the Plaintiff,

        SUSAN M. LEMING, ESQ.
        BROWN & CONNERY
          360 Haddon Avenue
          Westmont, New Jersey  08108
          for the Defendant.

ALSO PRESENT:  KIMBERLY A. BAILEY



                CORBETT & WILCOX
          Registered Professional Reporters
     230 North Market Street     Wilmington, DE 19801
                (302) 571-0510
              www.corbettreporting.com

A-146A

Mary Corcoran

2 (Pages 2 to 5)

Page 2

1          MARY CORCORAN,
2     the witness herein, having first been
3     duly sworn on oath, was examined and
4     testified as follows:
5 BY MR. MARCONI:
6     Q.  Ma'am, good morning. My name is Tom Marconi.
7 I'm an attorney here in Wilmington, and I represent Kim
8 Bailey in a case that's been filed in the federal court
9 against Commerce.
10     Are you familiar with the case at all?
11    A.  Yes.
12    Q.  How so?
13    A.  Just that I'm involved because the allegations
14 are that I knew of the sexual harassment suit, I guess,
15 prior to terminating Kim and that that was some of the
16 reason why -- or that it's alleged that that's the reason
17 why I fired her.
18    Q.  Okay. So your understanding is that Kim filed
19 a case --
20    A.  A wrongful termination suit.
21    Q.  Wrongful termination.
22     MS. LEMING: You have to let him finish
23 asking his question first before you --
24     THE WITNESS: Okay.

Page 3

1     MS. LEMING: -- start answering, because
2 the court reporter has a hard time taking --
3     THE WITNESS: Okay.
4     MS. LEMING: -- things down.
5 BY MR. MARCONI:
6    Q.  So your understanding is that Kim filed a
7 wrongful termination suit against whom?
8    A.  Commerce.
9    Q.  Okay. You don't believe that you're mentioned
10 as a party to this suit. Are you?
11    A.  I'm not familiar with the inner -- the details
12 of the suit.
13    Q.  Okay. What is your understanding of Kim's
14 specific claim in the suit?
15    A.  That she was terminated wrongfully.
16    Q.  By Commerce?
17    A.  By me.
18    Q.  Okay. By you.
19    A.  Well, and Commerce, I guess.
20    Q.  At your --
21    A.  Direction.
22    Q.  Direction?
23    A.  Correct.
24    Q.  Do you agree with the claim that you are

Page 4

1 responsible for terminating Kim's employment?
2    A.  Yes.
3    Q.  How so?
4    A.  Because it was my decision that her employment
5 be terminated.
6    Q.  Was anybody else involved in that decision
7 besides you?
8    A.  Human resources.
9    Q.  Any people in particular?
10    A.  Deb Watson.
11    Q.  So it's your understanding that the people
12 that were involved in the decision to terminate Kim were
13 yourself and Deb Watson?
14    A.  Correct.
15    Q.  Anybody else?
16    A.  No.
17    Q.  Why was Kim terminated?
18    A.  For unprofessional behavior in the workplace.
19    Q.  Can you give me an instance in which she --
20    A.  Yes.
21    Q.  Okay.
22    A.  I don't know all of the -- or I can't recall
23 the exact specific wording that was used. But an
24 employee approached her on the floor in front of other

Page 5

1 employees and asked to -- asked what she needed to do in
2 order to register for a continuing -- or a CIC class,
3 which is a professional designation in insurance. And
4 Kim basically told her that she didn't have Fing time
5 for this. And the employee was completely embarrassed
6 and demoralized as a result of that. And Kim was in a
7 supervisory position. And I felt that that was -- after
8 having other conversations with her about
9 professionalism, that that was something that I could not
10 train out of a person.
11    Q.  What other conversations did you have with Kim
12 about professionalism?
13    A.  Again, about profanity. That my second or
14 third day taking over the department I held a team
15 meeting. And twice in that meeting she used the s-h-i-t
16 word. And during the meeting the first time I said, "Is
17 that a technical term?" trying to highlight that that was
18 unacceptable for me in running that department, that I
19 wasn't -- that wasn't what I was about and that I wasn't
20 going to accept it. And then the second time it was
21 used, I said, "Oh. Is that that technical term again?"
22 because I didn't want to embarrass her. But I wanted
23 everyone to know that that was not something that was
24 acceptable to me.

Corbett & Wilcox

Mary Corcoran

Page 6

1    We had a conversation afterwards. I
2  said I don't accept profanity in the workplace and could
3  you please, you know, try to curtail your language. And
4  especially if we're in a supervisory position, we need to
5  lead by example. And if we act that way when we're
6  counseling others, we're not going to have credibility
7  with them because we need to conduct and lead by example.
8    Q. So your testimony is that within a couple of
9  days after you took over the department there was a
10  meeting at which Kim and other members of – was it the
11  MainStreet team?
12    A. Yes.
13    Q. Were present?
14    A. Correct.
15    Q. Can you name any of the people that were there
16  besides you and Kim?
17    A. Some of the players have changed. Dorothy
18  Deegan, Cheryl Luckanish.
19    MS. LEMING: Can you spell "Luckanish"
20  for the court reporter?
21    THE WITNESS: Yes. L-u-c-k-a-n-i-s-h.
22  I'm trying to remember the service
23  people that were still there at the time. Darlene
24  Wilkins; Dee Whalen; Valerie Oakes; Margerie Phipps,

Page 7

1  P-h-i-p-p-s; Heather Poikiski, P-o-i-k-i-s-k-i; Araceli,
2  A-r-a-c-e-l-i, Campos, C-a-m-p-o-s; Heather Smith;
3  Corelea Layton, C-o-r-e-l-e-a L-a-y-t-o-n; Julius Bland,
4  I think – yeah, Julius Bland, J-u-l-i-u-s, Bland,
5  B-l-a-n-d. And I think that's everyone that was there at
6  the time.
7    Q. I'm sure, ma'am, that you normally don't use
8  words of this nature, but I'm going to ask you to tell me
9  as best you can – and I want you to say the words that
10  you heard – exactly what Kim said at this meeting that
11  you're referring to.
12    A. She said "shit."
13    Q. But can you tell me the entire sentence
14  that –
15    A. No.
16    Q. So you just heard her say –
17    A. One time I think it was "bullshit," and the
18  other time I think it was "shit." But, no, I can't – I
19  don't remember the context in which it was used.
20    Q. At that meeting your testimony is that you
21  asked her if that's a technical term? Did that generate
22  laughter or giggling or anything like that in the
23  meeting?
24    A. Yeah.

Page 8

1    Q. Okay. How about the second time you asked her
2  if that's a technical term? Did it pretty much do the
3  same thing?
4    A. No. People kind of just sat back. Because
5  after having highlighted the first time that basically I
6  honed in on that word, people just sat back and were
7  silent the second time.
8    Q. So –
9    A. They were surprised.
10    Q. What you said was just: Is that a technical
11  term? Right?
12    A. Is that a – I think I said "Is that a
13  technical small business term?" because MainStreet
14  handled small business and I had come from a different
15  unit.
16    Q. Okay. After the second time you claim the
17  words were spoken – "shit" and "bullshit" – did Kim say
18  anything else that you thought was unacceptable in that
19  meeting?
20    A. No. There weren't any words that were used
21  that were unacceptable, no.
22    Q. Is that the meeting where you announced that
23  she would not be supervising the salespeople?
24    A. No.

Page 9

1    Q. When was that meeting?
2    A. I don't remember. But that was after I was
3  there probably a good month, month and a half, and I had
4  the opportunity to assess the operations and the
5  organizational structure.
6    Q. Okay. So after that meeting, the meeting
7  where the two words were used, you said that you pulled
8  her aside.
9    A. After the meeting we had a conversation, and I
10  said I didn't – you know, I didn't mean to pick on you,
11  but those words are unacceptable. I don't use them. I
12  don't expect people to use them in the workplace. She
13  agreed. It was a brief conversation. That was it.
14    Q. You had been there for –
15    A. A few days.
16    Q. A few days?
17    A. Mm-hmm.
18    Q. Were you aware at that time that the use of
19  those kinds of words was commonplace in the department?
20    A. No.
21    Q. Did you ever come at a later time to
22  understand that at that time that kind of talk was very
23  commonplace?
24    A. I was aware that there had been profanity used

Corbett & Wilcox

Mary Corcoran

4 (Pages 10 to 13)

| Page 10 | Page 12 |
|---|---|
| 1　on the floor, yes.<br>2　　Q.　When did --<br>3　　A.　But not that it was necessarily commonplace.<br>4　　Q.　When did you become aware of that?<br>5　　A.　I can't honestly tell you. I mean, it<br>6　would....<br>7　　Q.　Can you relate it to --<br>8　　A.　Maybe a few weeks --<br>9　　　MS. LEMING:　You need to let him finish<br>10　asking --<br>11　　　THE WITNESS:　Okay.<br>12　　MS. LEMING:　-- his questions before you<br>13　jump in with your answer.<br>14　　　THE WITNESS:　I'm sorry. I thought you<br>15　were finished.<br>16　BY MR. MARCONI:<br>17　　Q.　Maybe a few weeks what?<br>18　　A.　After I was there.<br>19　　　You asked me if I -- you know, when did<br>20　I become aware that people cursed on the floor.<br>21　　Q.　How did you become aware of that?<br>22　　A.　People just, you know, told me. And there<br>23　were times where people would not necessarily curse but<br>24　yell on the floor. They would hang up the phone. They | 1　was being on the phone with customers and underwriters.<br>2　And by using that language, by being loud, by having<br>3　emotional responses to things, not only are you<br>4　distracting your fellow employees, but there could be<br>5　another customer on the phone with someone sitting in<br>6　front of you and they could hear that. And that's<br>7　inappropriate behavior for a professional environment.<br>8　　Q.　You certainly wouldn't want a customer to<br>9　overhear another representative cursing another customer.<br>10　Right?<br>11　　A.　Correct.<br>12　　Q.　Do you think that that happened?<br>13　　A.　I can't confirm that that happened, but,<br>14　certainly, it's a potential if people are yelling and<br>15　screaming. I mean, other people could hear the goings on<br>16　in the office.<br>17　　Q.　Anybody beside Valerie that you know of that<br>18　cursed?<br>19　　A.　Not that I witnessed. Not cursing.<br>20　　Q.　So Kim and Valerie are the only people you<br>21　witnessed curse?<br>22　　A.　That I recall, yes.<br>23　　Q.　What did Valerie say that you consider to be a<br>24　curse word? |

| Page 11 | Page 13 |
|---|---|
| 1　would be upset with a customer. And, yeah, I guess they<br>2　did curse. I mean, I didn't keep track.<br>3　　Q.　Why not?<br>4　　A.　Because I would correct people and I would<br>5　move on just like I did with Kim.<br>6　　Q.　So every time you heard somebody cuss you<br>7　corrected them?<br>8　　A.　Yes.<br>9　　Q.　Can you give me one instance other than Kim?<br>10　　A.　I know that Valerie -- I corrected Valerie,<br>11　not just for cursing but just for loudness and just<br>12　inappropriate behavior in the form of volume and<br>13　emotional responses to things.<br>14　　Q.　To other employees or customers or whom?<br>15　　A.　Both.<br>16　　Q.　Did you find what Valerie had done to be<br>17　offensive?<br>18　　　MS. LEMING:　Objection to the form. You<br>19　can answer. You can answer his question. Go ahead.<br>20　　A.　No. I just thought it was inappropriate.<br>21　　Q.　How so?<br>22　　A.　Because there were other people -- the room<br>23　was set up so there were just a bunch of desks. And<br>24　everyone was on the phone. A large portion of their job | 1　　A.　I don't remember the exact. Probably -- I<br>2　don't remember the exact term. This is -- understand,<br>3　this wasn't a formal setting like the meeting was. This<br>4　was just me walking out on the floor. And there was a<br>5　lot going on. I don't recall the exact words.<br>6　　Q.　Do you recall that it happened more than once?<br>7　　A.　Not language as much as behavior.<br>8　　Q.　What do you mean by that?<br>9　　A.　Just, again, you know, emotional responses to<br>10　things, very loud communication across the floor. There<br>11　was a lot of that that went on among people.<br>12　　Q.　Was Valerie too emotional?<br>13　　　MS. LEMING:　Objection to the form. You<br>14　can answer.<br>15　BY MR. MARCONI:<br>16　　Q.　In your view.<br>17　　A.　I thought she overreacted to things, yes.<br>18　　Q.　You mean emotionally overreacted to things?<br>19　　A.　I think she just -- you know, the jobs were<br>20　very, very stressful. I mean, they still are. But at<br>21　that time the workloads were ridiculously high. There<br>22　was not as much technical support as we needed. And<br>23　that's part of the reason that I was down there.<br>24　　　So she was having a difficult time |

Corbett & Wilcox

Mary Corcoran

Page 14

1  managing her desk and all of the pressures that came
2  along with it. So there was a lot — there were a number
3  of people who were in that same position. So it was my
4  job to structure it so that it was manageable and mentor
5  people as to how to conduct themselves professionally and
6  provide them with education and a workplace in which they
7  felt that they could thrive professionally.
8      Q.  Ma'am, who's Joan Frenz? Do you know that
9  person?
10     A.  Yes.
11     Q.  Tell me how you know her.
12     A.  She was hired in an operations position when I
13 was in a — when I was director of Core Marketing for
14 Commerce prior to coming to MainStreet, she was hired
15 into a corporate position.
16     Q.  What's Core Operations?
17     A.  It's the premium level above MainStreet. So
18 MainStreet had a premium threshold. Our unit would
19 service accounts to the premium threshold in MainStreet,
20 and, then, anything above that would be handled by
21 another unit entirely.
22     Q.  Called Core?
23     A.  Correct.
24     Q.  So in other words, if the policy was going to

Page 15

1  generate a premium of — I'll make up a number — annual
2  premium of $5,000 or less, for example, that would be
3  done by MainStreet. Anything higher than that would be
4  done by Core?
5      A.  Correct.
6      Q.  So that's the concept?
7      A.  Correct.
8      Q.  All right. Now, Ms. Frenz was in operations.
9  What does that mean?
10     A.  She was responsible for — in the Core
11 Division, making sure that the policies and procedures
12 were defined, that the customer service representatives
13 were handling things consistently.
14     Q.  What was her job in relation to yours in
15 MainStreet?
16     A.  We didn't have a relationship in MainStreet.
17 I mean, there were times when there were projects that
18 were -- for instance, if we had — I'm trying to recall.
19 A coding -- we had coding issues in our agency management
20 system. Well, the agency management system is used for
21 all units. So you — when you're looking at correcting
22 the coding, you can't just look at it corporately for one
23 unit. So there were projects like that that she was
24 responsible for, and she would get my input.

Page 16

1      Q.  But you two, you and Ms. Frenz, didn't, I'll
2  say, work together in the same sense that you and Kim
3  Bailey worked together.
4      A.  Correct.
5      Q.  Is that correct?
6      A.  That's correct.
7      Q.  She did a completely different job for a
8  completely different area?
9      A.  Correct.
10     Q.  Now, would you say that you two were on the
11 same level --
12     A.  We were peers.
13     Q.  — corporately?
14     A.  Yes.
15     Q.  That would have been a level above Kim, right,
16 corporately?
17     A.  Correct.
18     Q.  Okay. You were the director --
19     A.  Correct.
20     Q.  -- of MainStreet?
21     A.  Yes.
22     Q.  And she was the operations --
23     A.  I don't know her exact title, but she was in
24 an officer position.

Page 17

1      Q.  And Kim was not?
2      A.  Correct. That's my understanding.
3      Q.  Now, had you ever heard Ms. Frenz cuss at the
4  workplace or slam down the phone and scream?
5      A.  Did I ever?
6      Q.  Yes.
7      A.  No.
8      Q.  Never.
9          Did you, I'll say, socialize with
10 Ms. Frenz?
11         MS. LEMING: Objection to the form. You
12 can answer.
13     A.  Only at work. We would go to lunch sometimes.
14     Q.  But her position generally had nothing to do
15 with your position. Right?
16     A.  No. There were times when we would be in
17 meetings together and there would be projects that
18 overlapped. But, no, she had no direct involvement with
19 MainStreet.
20     Q.  So if there was a problem with MainStreet,
21 the day-to-day operations, say a personnel problem or
22 something, you would have no reason to discuss that with
23 her. Right?
24     A.  Correct.

Mary Corcoran

6 (Pages 18 to 21)

Page 18

1    Q.  Other than maybe at lunch?
2    A.  No.  Unless — I mean, as officers of the
3  company, we all realize what our responsibility is.  So
4  if in the absence of one officer -- and at that time
5  there were — when I took over MainStreet, there were at
6  least three other officers in that office.
7    Q.  I'm not sure I understood your answer.
8    A.  My point is that we were all responsible.  No,
9  we don't have direct involvement with each other's
10  departments.  But corporately speaking, we're all
11  responsible.  So we would step in for one another if
12  there was a need.
13    Q.  But you say at work you would go to lunch with
14  Joan?
15    A.  On occasion.
16    Q.  Would you speak to her after hours on the
17  phone or something?
18    A.  Not really.  Not that wasn't work related.
19    Q.  Well, I mean, would you talk to her after
20  hours about work things?
21    A.  Sure.
22    Q.  For example, would you call her at home?
23    A.  She had a home office.  I would call her at
24  her home office.

Page 19

1    Q.  From, say, your home to her home?
2    A.  Sometimes.
3    Q.  Would she do the same?  She'd call --
4    A.  Yes.  But knowing my --
5        MS. LEMING:  Go ahead.
6        THE WITNESS:  I'm sorry.
7  BY MR. MARCONI:
8    Q.  If you want to finish your answer, go ahead.
9    A.  On my cell phone.  I don't have a home office.
10    Q.  Okay.
11    A.  But she would call me on my work cell phone.
12    Q.  Okay.  Would you e-mail also?
13    A.  Work-wise, yes.
14    Q.  From home to home?
15    A.  No.
16    Q.  No?
17    A.  No.  It was work to work.
18    Q.  Okay.  So the only time you would ever e-mail
19  Ms. Frenz would be from your office to her office?
20    A.  Yes.
21    Q.  Okay.  But you would call her sometimes from
22  home to home.  Is that what you told —
23        MS. LEMING:  I object to the form.  Do
24  you mean like her home number to her home number or from

Page 20

1  when she's physically at home?
2    A.  I — no.  I mean, generally — I can't say
3  that I never did that.  To be honest with you, I don't
4  recall.  But generally, it was work to work.
5    Q.  Only work to work?
6    A.  Yeah.  I mean, there were times where — I
7  mean, there was a lot going on in both worlds.  So we
8  worked a lot.  A lot after hours.  We worked on
9  Saturdays.
10    Q.  What I'm trying to do is get some sense of
11  your relationship with Joan Frenz.
12    A.  Joan was a peer of mine.
13    Q.  And you would occasionally go out to lunch
14  with Joan?
15    A.  Yes.
16    Q.  Would you occasionally go out to dinner with
17  Joan?
18    A.  No.  The only time I ever went out to dinner
19  with Joan was before she left or after a management
20  meeting where there would be a bunch of us that would go
21  to dinner.
22    Q.  So it was never just the two of you?
23    A.  No.
24    Q.  Is that the same thing with lunch, or was

Page 21

1  there times when you would go out with Joan just for
2  lunch the two of you?
3    A.  No.  There were times it would be just the two
4  of us for lunch, yeah.
5    Q.  And it was all business talk mostly?
6    A.  No.
7    Q.  What was it?
8    A.  I mean, I have three children.  She has a
9  daughter.  She had a dog that she doted over.  I mean, we
10  talked about the normal things that people go to lunch
11  talk about.
12    Q.  Do you know where Joan went?
13    A.  She moved to California, I believe.
14    Q.  Do you know where in California?
15    A.  No.
16    Q.  Do you know where she's working?
17    A.  No, I do not.
18    Q.  Have you spoken to her since she left?
19    A.  Yes.
20    Q.  When?
21    A.  Only right after she left.
22    Q.  What was the occasion that you spoke to her
23  about?
24    A.  She was going — well, she called me to let me

Corbett & Wilcox

Mary Corcoran

Page 22

1　know where she was. She had e-mailed me at work to tell
2　me where she was. But then she moved around a couple
3　times. And I lost track of her. She did call me to tell
4　me she was going on vacation. And she was going to the
5　Tour de France. And I was into cycling at the time. And
6　she sent me a T-shirt. And to be honest with you, I
7　haven't spoken to Joan in a very long time. Like maybe
8　two years.
9　　　Q.　So the last time was two years ago?
10　　　A.　Approximately, yeah.
11　　　Q.　When was the first time you found out about
12　the existence of this lawsuit?
13　　　A.　After Kim left.
14　　　　　Which lawsuit? The --
15　　　Q.　The lawsuit that we're here about today -- Kim
16　suing Commerce.
17　　　A.　I honestly don't know. It was a while after
18　Kim left.
19　　　Q.　Can you give me a month and a year?
20　　　A.　No.
21　　　Q.　Can you give me a season of the year --
22　　　A.　No.
23　　　Q.　-- as in spring?
24　　　　　No?

Page 23

1　　　A.　No. You have to understand. I walked into a
2　snake pit. There were so many business issues that I had
3　to take care of that that is what I focused on primarily.
4　　　Q.　What do you mean?
5　　　A.　I can't -- meaning I didn't pay attention to
6　other distractions. I tried not to get distracted. So I
7　can't honestly recall when I became aware of it.
8　　　Q.　Did you ever talk to Ms. Frenz about it?
9　　　A.　No.
10　　　Q.　Did you ever talk to Ms. Frenz about Kim's
11　sexual harassment charge?
12　　　A.　No.
13　　　Q.　Never?
14　　　A.　No.
15　　　Q.　Did you ever speak to --
16　　　A.　Can I ask a question?
17　　　　　MS. LEMING: No.
18　　　　　THE WITNESS: No?
19　　　　　MS. LEMING: You're not allowed. Well,
20　only if it relates to the form or something Mr. Marconi
21　is asking you.
22　　　　　THE WITNESS: Okay.
23　　　　　MS. LEMING: If you need him to clarify
24　something, please ask him to do so, and he will be happy

Page 24

1　to.
2　　　　　THE WITNESS: Okay.
3　　　　　MS. LEMING: Okay.
4　　　　　THE WITNESS: I don't know that this
5　would be...
6　　　　　MS. LEMING: Okay.
7　BY MR. MARCONI:
8　　　Q.　Have you ever spoken to anyone or has anyone
9　ever spoken to you about Kim's sexual harassment charge?
10　　　　　MS. LEMING: I'm going to object to the
11　form. By "charge," would you just define that? Do you
12　mean the Department of Labor charge? Do you mean the
13　litigation?
14　　　　　MR. MARCONI: The fact that Kim made an
15　allegation that she was sexually harassed in the
16　workplace.
17　　　　　MS. LEMING: At Commerce?
18　　　　　MR. MARCONI: Yeah.
19　　　　　MS. LEMING: Okay.
20　　　A.　The only -- honestly, the only thing that I
21　became aware of was after Kim left there were some things
22　that didn't make sense to me. And so I asked Deb Watson.
23　I said, you know, I'm getting the sense that I walked
24　into something here that I wasn't aware of. And at that

Page 25

1　point Deb said, well, you're right. And I said because
2　it's just -- I mean, it was just very strange. The
3　dynamics were very strange. The only thing that I was
4　aware of is that there was a suit filed. And that was
5　it. I know nothing else about it. And to this day I
6　know nothing else about it.
7　　　Q.　When you say a "suit filed," what do you mean?
8　　　A.　That there were allegations that there had
9　been sexual harassment.
10　　　Q.　Made by Kim?
11　　　A.　Correct.
12　　　Q.　The allegations were made by Kim --
13　　　A.　Correct.
14　　　Q.　-- against Commerce?
15　　　A.　Against Steve Duncan --
16　　　Q.　Okay.
17　　　A.　-- my predecessor.
18　　　Q.　So when did you first learn that?
19　　　A.　It was after Kim left.
20　　　Q.　How did you learn it?
21　　　A.　I learned it by talking to Deb Watson. Like I
22　said, things just -- you know, after Kim left, the tone
23　of the department changed. And there were just -- I had
24　asked for Kim to go to certain classes. And I felt that

Corbett & Wilcox

Mary Corcoran

8 (Pages 26 to 29)

Page 26

1  I was being blown off a little bit. And then I came to
2  find out after the fact -- after Kim left that she had
3  already been signed up for certain classes and she never
4  attended.
5        And I said to Deb: Why wasn't I made
6  aware of this? What did I walk into here? You know, why
7  were you having -- why did you and Kim have something
8  going on and I wasn't aware of it? When I walked in to
9  take over a brand new unit -- which somebody would expect
10 that I would be sat down and briefed about what I was
11 taking over. And that was never done. And I was angry.
12     Q.  What is it that you perceived was going on
13 that you hadn't been told about?
14     A.  Well, that Kim had already been instructed to
15 attend these classes. And when I asked by whom -- and
16 I'm thinking, well, was it my predecessor? Was it, you
17 know, part of a development plan? And you would think,
18 as the director of the unit, I would be aware of all of
19 these things as it pertains to employees. And Deb told
20 me, no, that was between me and Kim. And I said --
21     Q.  Wait, wait. I'm not sure I understand what
22 you mean by that.
23     A.  I had asked, you know, what was the source of
24 these classes. Was it my predecessor who had signed Kim

Page 27

1  up, Steve Duncan, for the classes? Was it part of Kim's
2  development that she take certain classes on
3  professionalism and writing and things of that sort? And
4  Deb said to me, no, she was instructed by me to take
5  those classes, which she never attended. And I said,
6  "Why wasn't I made aware of this when I took over
7  MainStreet?" Why -- what -- why were you directing Kim?
8  And I was her boss. Why was HR directing Kim to take
9  classes?
10     Q.  You had this conversation after Kim was
11 terminated?
12     A.  Correct.
13     Q.  What was the response?
14     A.  The response was that there had been
15 allegations of sexual harassment and that in an effort to
16 bring Kim to the next level professionally that it was
17 deemed that she needed some direction and she needed
18 to take these classes.
19     Q.  When did you take over the MainStreet
20 department?
21     A.  In June of 2003.
22     Q.  You came from where?
23     A.  From Core. From the Core division.
24     Q.  In the same place? Were you working out of

Page 28

1  the same office?
2     A.  No. I had a position in the Cherry Hill
3  office, but I had indirect reports throughout the
4  footprint of Commerce Insurance. So I was in Cherry
5  Hill. And then once a month I would go to each of the
6  offices.
7     Q.  Including the MainStreet office?
8     A.  No. Delaware  I was in Delaware, which is
9  where the MainStreet office was -- or the MainStreet
10 division was housed. But I didn't have any interaction
11 with MainStreet.
12     Q.  None at all?
13     A.  No.
14     Q.  Did you know Steve Duncan?
15     A.  Yes
16     Q.  How so?
17     A.  He was a peer of mine. So I would see him at
18 management committee meetings and things of that sort.
19     Q.  Did you ever have any discussions with Steve
20 about MainStreet?
21     A.  No. As a matter of fact, I often joked that I
22 should have paid more attention when he was presenting
23 because I knew nothing about MainStreet when I took it
24 over.

Page 29

1     Q.  So in June of 2003 you took over MainStreet.
2  How did that come to be? Did you have to interview for
3  the job?
4     A.  No. I was on my way back from Randolph,
5  New Jersey, up in North Jersey, driving back from a visit
6  there, one of my monthly visits. And I got a call from
7  Joe Morrissey. And he said Ed Kiessling, who was the
8  former president of Commerce Insurance -- that they
9  wanted to have dinner with me that night.
10     Q.  Okay.
11     A.  So I asked him what it was about. And he
12 said, "It's a good thing." And that's all he said. I
13 said okay. So we met for dinner. And --
14     Q.  Joe and Ed met you?
15     A.  Correct.
16        And they said, "We have an opportunity
17 we'd like to talk to you about." And they proceeded to
18 tell me that because of what I had accomplished in Core
19 that they needed something very similar done in the
20 MainStreet division.
21     Q.  Which is what? What did you accomplish?
22     A.  Which was consistency in -- I was responsible
23 for marketing, so I put a policy and procedure in place
24 so that all of the marketers throughout the footprint of

Corbett & Wilcox

Mary Corcoran

Page 30

1  Commerce Insurance Services -- all their submissions look
2  the same. There was consistency in how they approached
3  the marketplace. Things of that sort.
4      Q.  Did they mention to you --
5      A.  Gelled the team together.
6      Q.  Did they mention to you at this meeting or at
7  any time afterwards that there were problems with
8  MainStreet?
9      A.  I knew that there was problems in MainStreet
10  because the numbers -- the results were -- our numbers
11  were posted at quarterly management committee meetings.
12  And we also received management reports -- weekly reports
13  that showed results for all of the divisions within
14  Commerce.
15      Q.  But my question is: Did either Mr. Morrissey
16  or Mr. Kiessling infer or state to you that there were
17  problems with MainStreet?
18      A.  Yeah. They said, you know, we're not -- we
19  have a low retention. Our sales are -- we haven't --
20  we've never achieved our sales goal. And we need someone
21  to go down there and get the team together, motivate
22  them, you know, establish consistent procedures for
23  servicing clients, for approaching the marketplace for
24  new business.

Page 31

1      Q.  Did they mention to you that Mr. Duncan would
2  be leaving?
3      A.  No. I asked the question.
4      Q.  What was the question that you asked?
5      A.  The question was, well, where's Steve?
6      Q.  What did they say?
7      A.  They said Steve is no longer with us.
8      Q.  Did you ask anything else?
9      A.  Yes.
10      Q.  What did they --
11      A.  I said --
12          MS. LEMING:  Let Mr. Marconi finish
13  asking his question --
14          THE WITNESS:  Oh, I'm sorry.
15          MS. LEMING:  -- before you answer.
16          The court reporter is going to have a
17  hard time getting everything down.
18          Go ahead.
19      Q.  Well, what did you ask?
20      A.  I asked, "Well, where is he?"
21          They said, "He left."
22          And I said, "Well, where did he go?"
23          And they said, "We don't know."
24          And I said, "Was he terminated or was he

Page 32

1  let go?"
2          And they said yes.
3          And I asked, "For what reason?" I said,
4  "Why?"
5          And Joe Morrissey said, "For
6  unprofessional behavior."
7      Q.  And did you ask: What do you mean by
8  unprofessional behavior?
9      A.  No. Because -- I'll be honest with you. I
10  actually thought that I knew exactly what he meant,
11  because Joe Morrissey and Steve Duncan could not stand
12  one another. And it was known. And so I thought that
13  Steve finally just told Joe what he thought.
14      Q.  I'm not sure I understand what you mean.
15      A.  That he told Joe to, you know, kiss off or
16  whatever, because he couldn't stand Joe.
17      Q.  That's what you perceived?
18      A.  Mm-hmm.
19      Q.  So they didn't give you any more information
20  about --
21      A.  No.
22      Q.  -- Mr. Duncan?
23      A.  And I didn't ask.
24      Q.  What else did you talk about in terms of

Page 33

1  things going on at MainStreet?
2      A.  I asked them what they thought the issues
3  were. And they were exactly what I just said -- that,
4  you know, our retention is really poor and we haven't
5  reached a sales goal since MainStreet has been in
6  existence, that they felt that things needed -- that the
7  team wasn't working well together, that there were some
8  additional efficiencies that we could build in. But Joe
9  admitted that he really didn't know a whole lot about
10  MainStreet.
11      Q.  When you said they told you that the team was
12  not working well together --
13      A.  They just felt that there was --
14          MS. LEMING:  There's no question
15  pending. Let him ask you something first.
16          THE WITNESS:  I'm sorry.
17          MS. LEMING:  Okay.
18  BY MR. MARCONI:
19      Q.  Did you ask any questions? What do you mean
20  that the team is not working well together?
21      A.  No. No, I didn't ask questions.
22      Q.  Did Kim Bailey's name come up in this
23  conversation at all?
24      A.  No.

Mary Corcoran

10 (Pages 34 to 37)

Page 34

1    Q.  Not at all?
2    A.  No one's name -- no one's specific name came
3  up.
4    Q.  Did you get any information from them at this
5  meeting -- Mr. Morrissey and Mr. Kiessling -- that they
6  felt that the supervisor of the unit was not doing a good
7  job?
8    A.  No.  We didn't talk about specific employees.
9    Q.  And you didn't talk about specific positions?
10    A.  No.
11    Q.  What else did they say at the meeting was
12  wrong with MainStreet?
13    A.  Nothing.  They didn't -- to be honest, they
14  really didn't know much about MainStreet.
15    Q.  Were you offered the position that night?
16    A.  Yes.
17    Q.  Did you accept it?
18    A.  Not that night.
19    Q.  What did you do between the time of that
20  meeting and the time that you accepted the position to
21  figure out whether you wanted it?  Did you talk to
22  anybody?
23    A.  I talked to my husband.  That was pretty much
24  it.  I looked -- I can't remember if I spoke to HR or not

Page 35

1  about it.  But I don't think that I did.  And I looked --
2  I went back over the -- what we call Monday morning
3  reports that show all the results and, you know, just
4  kind of looked at a little bit of the history of
5  MainStreet.  But, no, I really didn't really talk to many
6  people about it.  I had to make the decision the next
7  morning.
8    Q.  So you made the decision the next morning?
9    A.  Yes.  I did.
10    Q.  That would have been sometime in June of 2003?
11    A.  Correct.
12    Q.  How much time elapsed between the time that
13  you accepted the job and the time that you actually
14  started performing the job?
15    A.  Two days.
16    Q.  Two days?
17    A.  Mm-hmm.
18    Q.  Now --
19    A.  As a matter of fact, it might have even -- I
20  don't recall the timing, but it might have been that next
21  day that Joe introduced me.  I can't recall the exact
22  time frame, but it was very short.  It may have been that
23  next afternoon.  I know it was an afternoon when Joe took
24  me down there to introduce me.  So it may have been that

Page 36

1  afternoon.
2    Q.  What was the timing between Steve Duncan's
3  termination and the time that you started?
4    A.  That I didn't know.  I didn't know that.
5    Q.  You did know that Steve had been terminated by
6  then.  Right?
7    A.  Yes.
8    Q.  What did you do, other than what you said
9  already, to prepare yourself for the job?  By that I
10  mean, you said you reviewed numbers.
11    A.  Mm-hmm.
12    Q.  Did you look at personnel files or --
13    A.  No.
14    Q.  -- interview people?
15    A.  No.  I didn't have access to any of that
16  information.
17    Q.  You never looked at any of that stuff?
18    A.  I didn't have access to that prior to coming
19  down to MainStreet.
20    Q.  No.  But I mean afterwards.
21    A.  Oh, after?
22    Q.  Yeah.  Once you're in the chair.
23    A.  Oh.  I thought the question was in preparation
24  for.

Page 37

1    Q.  No.  I'm sorry.  Maybe I misspoke.
2        What I'm trying to get you to tell me
3  is:  What did you do once you were there to sort of
4  orient yourself to what you were dealing with?
5    A.  I did look at Steve's files, but they -- to be
6  honest with you, they were -- there was a lot missing.  I
7  went -- I contacted all the carriers to let them know,
8  the insurance carriers.
9    Q.  Let me just stop you a second.
10        When you say you looked at Steve's
11  files, what files would you have looked at?
12    A.  Everything that was in his office.
13    Q.  Okay.
14    A.  So carrier information, special projects, if
15  he had information on individual employees, which he
16  didn't have a whole lot of in his office.
17    Q.  Did he have any information on Kim Bailey?
18    A.  No.
19    Q.  What else?
20    A.  I contacted the carriers.  I let them know
21  that I was in this position now.  And then I proceeded --
22  I met with the employees, like I said, a day or two
23  after taking over MainStreet.  Well, Joe came down,
24  introduced me.  I let them -- I encouraged them at the

Corbett & Wilcox

Mary Corcoran

Page 38

1  introductory meeting to contact those employees that have
2  reported to me in my former position to get some
3  background about what I'm about and how I manage, because
4  those folks didn't know me. And it was kind of a
5  whirlwind. And I basically told them what I was about,
6  that -- what my management style was like.
7      Q.  What did you tell them?
8      A.  I told them that I felt that I had high
9  expectations of myself and that I didn't expect anything
10  from other people that I didn't expect of myself, that I
11  believe that MainStreet had the opportunity to do really
12  great things and that I welcome their ideas, that I was
13  big on education, that I was -- I don't participate in
14  nor do I condone certain behaviors in the workplace. And
15  I know specifically -- I can't say that I talked about
16  profanity. I don't think I did.
17          But I talked about gossip. Because
18  everywhere that I've ever worked, that can be the
19  downfall of a unit and the whole team environment. I
20  also talked about that I will treat people with dignity
21  and respect and I expect them to treat each other with
22  dignity and respect and to treat our carriers and our
23  underwriters with dignity and respect.
24          And a few days later when we met -- or a

Page 39

1  day or two later when we met, you know, I asked them if
2  they had -- if anyone had gone -- had called anyone and
3  if anyone was comfortable sharing what, you know, they
4  heard about my management style. And some people did
5  share.
6      Q.  Was this the meeting you talked about earlier
7  where Kim said --
8      A.  Mm-hmm.
9      Q.  So that's a couple days after --
10      A.  Yeah. It was within, I want to say, two days
11  within me taking over.
12      Q.  You said earlier that after that meeting where
13  Kim said those words that you counseled her.
14      A.  Mm-hmm.
15      Q.  Is that something that will be reflected in
16  her personnel file?
17      A.  No.
18          MS. LEMING: Objection to the form. You
19  can answer.
20          THE WITNESS: Okay. No.
21  BY MR. MARCONI:
22      Q.  Why not?
23      A.  Because it was just -- I mean, I can -- number
24  one, I just took over. I was cognizant of the fact that

Page 40

1  this is a whole new management style that these -- I
2  didn't really know Steve's management style, but I know
3  my own. And that, you know, it was hey, listen, here's
4  what I'm about. This isn't something that I believe is
5  going to assist us in getting to the next level. And I
6  do not participate in nor do I condone profanity in the
7  workplace. So -- you're a supervisor. I need you, you
8  know, to really help take us to the next level because,
9  you know, we need to be a team here and we need to lead
10  by example.
11      Q.  Were there any witnesses to that?
12      A.  No.
13      Q.  No.
14          Why didn't you put something in writing
15  or put something in her personnel file?
16      A.  Because it was strictly just a verbal -- not a
17  verbal warning. I guess you could deem it that way. But
18  it was just, you know -- heck, I had only been there two
19  days.
20      Q.  So what? You didn't feel like --
21      A.  I didn't feel that it was -- I didn't know if
22  it was a trend or not. I mean, it could have just been,
23  you know, nervousness or -- I mean, I just didn't know.
24  So it was, hey, here. Here's what I'm about. This is

Page 41

1  unacceptable behavior. Could you please work with me and
2  try to curtail the language?
3      Q.  Can you think of any other instances in which
4  you counseled Kim about her behavior?
5          MS. LEMING: Objection to the form. You
6  can answer.
7      A.  Yes. Just -- I mean, I can't recall every
8  conversation, because when you're in an environment like
9  that that's very intense and needs a lot of work and --
10  but I know that we had several interactions where we
11  would talk about, you know, how to talk to employees. I
12  know that we -- you know, I had spoken to her about, you
13  know, writing skills and that the importance of when
14  communicating an e-mail -- and this is kind of a
15  consistent theme throughout my career with regard to
16  e-mail. You have to be very careful how you word things.
17  That if you're, you know, instructing people in how to do
18  something, not only is it important from a credibility
19  standpoint that your grammar be correct but the tone, and
20  that e-mails are -- you know, can be a difficult thing
21  through which to communicate because people don't know
22  the inflection in your voice and so forth.
23      Q.  Well, let's take it one at a time.
24          My question was: I wanted you to relate

Mary Corcoran

12 (Pages 42 to 45)

Page 42

1  to me situations where you counseled Kim. So far we've
2  talked about the two words she used at that meeting early
3  on.
4      A.  Mm-hmm.
5      Q.  Now it sounds as though at some point you
6  counseled her about her writing skills, particularly in
7  e-mails.
8      A.  Correct.
9      Q.  Can you give me some details about that? For
10  example, what was wrong with her writing skills?
11      A.  Well, there -- I was carboned in on -- I had
12  asked her to carbon me in on e-mails she was sending out,
13  you know, to the team or to individuals if it was a --
14  you know, a more involved situation, you know. And, you
15  know, just so that I could start to get a sense of what
16  was going on and so I was in the loop. So I started to
17  see those e-mails, and I noticed those trends.
18      Q.  Such as?
19      A.  Such as grammatical and -- grammatical
20  mistakes and misspellings.
21      Q.  Well, give me an example of a grammatical
22  mistake.
23      A.  I can't give you an example. But maybe the
24  misuse of a word or sentence structure or something

Page 43

1  that -- I don't honestly recall.
2      Q.  Was it such that in your view the recipient of
3  the e-mail wouldn't know what was being communicated?
4      A.  I thought that through that and also the tone
5  that Kim could have had a credibility issue with her
6  folks. And part of my job was to help her be a stronger
7  leader.
8      Q.  How so? How could she have a credibility
9  issue with her folks?
10      A.  Well, because if I'm sending out an mail that
11  constantly has grammatical mistakes and constant
12  misspelling and has a strong tone to it, it's not going
13  to be an effective communication tool.
14      Q.  Who's "her folks"?
15      A.  The people that reported into her -- the
16  customer service reps.
17      Q.  Can you relate to me an example where a
18  grammatical mistake in an e-mail led to a credibility
19  error or a communication error?
20      A.  No. I can't relate it to a specific. But my
21  job, again, was to mentor her and to help her be a
22  stronger leader. And it had been my experience both --
23  personally with having the same issue at one point in my
24  career as well as managing people that communication is

Page 44

1  critical with a leader. Both verbal, written and body
2  language.
3      Q.  So you say there were grammatical errors, but
4  you can't identify any sitting here now?
5      A.  No. Because there were so many e-mails that
6  went around. I don't recall like on a certain date this
7  was the tone of the e-mail. This was -- but we sat --
8  Kim and I sat down and agreed that -- I said "Listen.
9  You know, I'm going to be honest with you. I always
10  wasn't the best writer." I said, "But it was identified
11  when I started to get into management that I needed to
12  improve my writing skills."
13          And so I had a manager who offered to
14  me, because he happened to be a very good -- I think he
15  may have even been an English major in college. But he
16  offered to me to critique my e-mails. I said -- and it
17  really helped me. And then I took some writing classes.
18  And it really helped me. I found that more and more it's
19  a very useful tool and it's one that I rely on heavily.
20  And I said I would like to offer that to you if you, you
21  know, would be willing. And she agreed that, yes, she
22  would --
23      Q.  I thought you told me -- I'm sorry.
24          MS. LEMING:  Can you just let her

Page 45

1  finish? Go ahead.
2      A.  So that she would -- we agreed that she would
3  start to forward her e-mails. Not every e-mail. Not
4  like, hey, can you stop by my office on such and such a
5  date or please check into this account. But where --
6  there were a lot of policies and procedures that needed
7  to be changed. And so I said, you know, when we're
8  communicating these major changes, if you could just
9  shoot me the e-mail first so that I could critique it,
10  you know, or to -- you know, see if there's any input
11  that I would have. And then, you know, I'll do -- I'll
12  look at it and send it back to you and, you know...
13      Q.  Did she comply with your request?
14      A.  She did.
15      Q.  When you say that the tone of the e-mail was
16  not to your liking, what do you mean by that?
17      A.  I thought that sometimes the tone was very
18  strong.
19      Q.  What's wrong with very strong?
20      A.  Well, it depends. I don't recall the exact
21  e-mail, but there was one e-mail that I saw that said,
22  you know, you didn't do this and I told you to do this.
23  I mean, it was written very casually like that. And I
24  explained that -- that while, yes, you need to send out

Mary Corcoran

Page 46

1  those e-mails that, you know, there's a better way to say
2  it. And that is that -- you know, we spoke. We
3  agreed -- you agreed that you would follow through on
4  this, and you didn't. And as a result, please confirm
5  when it will be completed. Or give a date when it will
6  be completed.
7      Q.  So it sounds like it's sort of a question of
8  style.
9      A.  No. I think it's a question of effectiveness
10 and a tone that we were trying to set for MainStreet.
11     Q.  This was something that was sort of your
12 personal criteria. Correct?
13         MS. LEMING: Objection to the form. You
14 can answer.
15     A.  Yes.
16     Q.  Now, who was the assistant director of the
17 department at that time?
18     A.  There was no real assistant director of the
19 department at that time.
20     Q.  Was there anybody between you and Kim in terms
21 of corporate?
22     A.  Well, Marge Phipps was an officer, but she
23 wasn't in a leadership role at the time.
24     Q.  But did she report to you?

Page 47

1      A.  Marge did, yes.
2      Q.  Was she higher than Kim corporately or the
3  same?
4      A.  Just -- no. They were both -- they were the
5  same within MainStreet, but Marge was an officer, which
6  meant she was -- had to have been given assistant vice
7  principal -- vice president status.
8      Q.  Now, what was her job -- Marge's job?
9      A.  When I got there, Marge was responsible for
10 two account executives who were in the field.
11     Q.  Sales?
12     A.  And I believe that at that time she was also
13 in a sales position. She was actually doing sales
14 herself.
15     Q.  But you were her boss?
16     A.  Correct.
17     Q.  Did you ever counsel her or review her writing
18 or her e-mails?
19     A.  I do that to everyone.
20     Q.  So you did it to her too?
21     A.  Mm-hmm.
22     Q.  And you counseled her?
23     A.  Mm-hmm.
24     Q.  How about any of the customer service reps

Page 48

1  that --
2      A.  I do it to everyone. If I see an e-mail that
3  I feel requires some constructive criticism, I will offer
4  it.
5      Q.  But it doesn't sound like you considered Kim's
6  failings in terms of her e-mail skills -- communication
7  skills a disciplinary matter. Right?
8          MS. LEMING: Objection to the form. You
9  can answer.
10     A.  No.
11     Q.  It was just something that you were trying
12 to --
13     A.  I was trying to make her a better leader.
14     Q.  Right
15         Bring to her attention and help her?
16     A.  Correct.
17     Q.  So you didn't consider that her failure to
18 live up to those standards in the beginning or at any
19 time a disciplinary matter of any kind?
20         MS. LEMING: Objection to the form. You
21 can answer.
22     A.  No.
23     Q.  No, I'm correct or, no --
24     A.  No. I didn't consider it to be a disciplinary

Page 49

1  issue.
2      Q.  Okay. What other sorts of counseling did you
3  give to Kim? So far we've got the e-mails and the
4  writing skills. We've got the two curse worse very early
5  on.
6      A.  I mean, there was just constant interaction.
7  Part of my job is coaching and mentoring. So there --
8  I'm sure that there were other conversations that I
9  can't -- I don't remember every conversation that I had.
10 But I counseled her on her dress and asked her to go home
11 one day on a Friday to get changed.
12     Q.  Anything else?
13     A.  No. Not that I can recall.
14     Q.  Did you ever counsel anybody else on their
15 dress?
16     A.  Yeah. I mean, it was a -- and I had -- yes.
17 And I had formal meetings with people and formally
18 reinforced Commerce's dress code and the importance of
19 conducting ourselves professionally.
20     Q.  Well, other than Kim, did you ever send
21 anybody home for dress?
22     A.  Not that I recall. But I've got to be honest.
23 I don't recall.
24     Q.  Is that because nobody else violated the dress

Corbett & Wilcox

Mary Corcoran

14 (Pages 50 to 53)

Page 50

1  code or because you just didn't send them home?
2      A.  I can't recall.  But every interaction I've
3  had with people about dress -- I mean, there's many times
4  I've said to people, you know, what you're wearing really
5  isn't appropriate for work.  But it also probably --
6      Q.  Just a second.
7      A.  I'm sorry.
8      Q.  There are times that you said that to people?
9      A.  I'm sure that there are.
10     Q.  Can you name one person?
11     A.  No.  I probably have said it to a lot of
12 people.
13     Q.  Other than Kim?
14     A.  I don't recall the specific conversations.
15     Q.  So you believe that you said to other people
16 that what they were wearing did not satisfy Commerce's
17 dress policy?
18     A.  Correct.
19     Q.  Did you send those people home?
20     A.  Not that I recall.
21     Q.  Why didn't you send them home?
22     A.  I don't remember anyone where it was to the
23 degree, number one, that when I sent Kim home.  Sometimes
24 there would be people that -- you know, they had a skirt

Page 51

1  on but their top wasn't appropriate.  Or they had sandals
2  on but they had, you know, a skirt and a blouse on.  So I
3  would identify, you know, specific things.  But, I mean,
4  I ran into so many people that I can't remember.  But in
5  Kim's case all three of those factors applied in this
6  situation.  Her top, her pants and her shoes were
7  inappropriate.
8      Q.  What was wrong with her top?
9      A.  We're not supposed to wear sleeveless tops at
10 work.  So -- I mean, you could certainly have them under
11 a jacket, but we're not supposed to have sleeveless tops.
12 So she had a sleeveless top on, which she acknowledged "I
13 forgot my jacket."  She had three-quarter length capris
14 on.
15     Q.  Pants?
16     A.  Yes.
17     Q.  Mm-hmm.
18     A.  And she had like a slip-on backless sandal
19 with no stockings, obviously.
20     Q.  Wasn't this on Red Friday?
21     A.  Yes, it was on a Friday.
22     Q.  Is the dress code for Red Friday different
23 than it is during the rest of the week?
24     A.  Only that it's politically correct to wear

Page 52

1  red.  But it's business dress.
2      Q.  Where is this dress code written?
3      A.  It's in the Commerce handbook.
4      Q.  It was in the Commerce handbook at the time?
5      A.  Correct.
6      Q.  Did you take out the handbook and look at it
7  and see whether or not what she was wearing was allowed?
8      A.  No.  Because I didn't pull it out at that
9  time.  But I knew based on reading the dress code.
10     Q.  What does the dress code say?
11     A.  I don't recall everything that's in there, but
12 it says sleeveless -- no sleeveless tops, no three-
13 quarter length pants or some equivalent thereof, and no
14 sandals.
15     Q.  It specifically said that?
16     A.  It did at the time.
17     Q.  What else did you counsel her for?
18     A.  Other than that, I don't recall.
19     Q.  Did you ever have any discussions with anyone
20 in HR about Kim prior to the time that Kim was
21 terminated?
22     A.  Sure.
23     Q.  What can you recall about these?
24     A.  Well, I did let HR know that I sent Kim home.

Page 53

1  Just kind of an FYI:  I just want to let you know that I
2  did send someone home today to get changed.  I had -- as
3  I said earlier, I had inquired about some classes both to
4  the training department and to HR -- I think it was in
5  the same e-mail -- that I was looking for specific, you
6  know, classes.  I wasn't sure what we had available.
7      Q.  Were you told then that she had already been
8  scheduled for classes?
9      A.  No.  Like I said, I didn't find out till after
10 the fact.
11     Q.  After the fact meaning --
12     A.  After Kim left.  And then prior to Kim's
13 departure, obviously, I had conversations with human
14 resources.
15     Q.  Well, can you be a little bit more specific?
16     A.  Well, I made them aware of the situation as I
17 knew it and that --
18     Q.  When you say "made them aware of the
19 situation," what do you mean?
20     A.  I had sent them e-mails that I had received
21 from employees about the situation.
22     Q.  When you say "the situation," what do you
23 mean?
24     A.  The situation where Kim said to Valerie Oakes

Corbett & Wilcox

Mary Corcoran

Page 54

1   when Valerie approached her about the CIC class and what
2   Kim's response was.
3       Q.   The cursing?
4       A.   Correct.
5       Q.   Had you ever looked at Kim's earlier
6   employment evaluation?
7       A.   I don't recall doing that but it's possible.
8   But I don't recall.
9       Q.   What else besides forwarding the e-mails about
10  the cussing situation with Valerie Oakes?  What other
11  communications did you have with anybody?
12      A.   With HR.  I just -- I let them know and I let
13  my boss know that I was very concerned because I felt
14  that -- I didn't think that this -- that I could train
15  this behavior out of Kim and that I felt that it was a
16  detriment to the department.
17      Q.   What made you think you couldn't train the
18  behavior out of Kim?
19      A.   Because I hadn't seen any improvement.
20      Q.   So improvement from what point?
21      A.   Improvement from Day 2 when I came to
22  MainStreet and I was very direct about cursing to the
23  time when on the floor she used -- you know, insulted
24  Valerie and said "I don't have F'ing time for this," or

Page 55

1   whatever exactly was said.
2       Q.   So your testimony is that between the time
3   that she said "shit" and "bullshit" at the very initial
4   meeting you had after taking over MainStreet and the time
5   that you learned about this thing with Valerie in August
6   of 2003 that you heard her cuss in that interim period?
7       A.   No.  That's not what I said.  What I said was
8   I didn't see an improvement in overall behavior that
9   would allow me -- that would lead me to believe that we
10  could change the results -- the tone and the team
11  cohesiveness -- and that I couldn't train -- based on
12  everything in between the time that -- the initial team
13  meeting and the time that she had this interaction with
14  Valerie and all the things in between that I just told
15  you -- I felt there was a trend there that I couldn't
16  train that behavior out of Kim -- that that was just part
17  of her.
18      Q.   So --
19      A.   And that it was to the detriment of the
20  department.
21      Q.   So we've got she said "shit" and "bullshit."
22  Right?
23      A.   Mm-hmm.
24      Q.   She was having trouble composing e-mails

Page 56

1   that --
2       A.   And communicating.  It was all overall
3   communication.
4       Q.   Let me finish the question.
5       A.   Mm-hmm.
6       Q.   She had trouble composing e-mails --
7       A.   Mm-hmm.
8       Q.   -- that you didn't think was a disciplinary
9   problem, but you were just trying to help her.
10           Right?
11      A.   Mentor her, right.
12      Q.   Right.
13           The next thing that went wrong was that
14  one day on a Red Friday she wore dress that you didn't
15  feel was appropriate.  Right?
16      A.   Correct.
17      Q.   I can't remember anything else that you said
18  that she did wrong.
19      A.   No.  Like I said, it was just the overall
20  communication piece was -- I mean, I highlighted the
21  credibility issue that -- Kim and I talked about
22  credibility with her team and the importance of
23  communication.
24      Q.   What I want you to do is tell me now what is

Page 57

1   it that she did wrong that didn't improve that you
2   couldn't manage out of her.
3       A.   Well, to me, if -- when your boss walks in and
4   says, okay, you know, here's what we need to do.  We all
5   need to dress appropriately.  We all need to treat each
6   other with dignity and respect.  You know, to Kim
7   specifically and to the entire team that profanity is not
8   acceptable.  Okay.  That it's important that we lead by
9   example, that we communicate and, you know, appropriately
10  that we, you know, again, lead by example.  I didn't see
11  any improvements in any of those areas.
12           And within -- I don't know what the time
13  period was -- two, two and a half months, okay, I hadn't
14  seen any improvement.  And the culmination was what I
15  view as a pretty grave -- a pretty -- and highly
16  unacceptable behavior in the form of cursing at an -- at
17  a direct report on the floor.
18      Q.   Well, when you say "cursing at," was it your
19  understanding that she cursed at or that she spoke a
20  curse word in a sentence directed to an employee?
21      A.   Define the difference.
22      Q.   Well, without the risk of offending you, which
23  I don't want to, if I were to say "F You, Mary" --
24      A.   Mm-hmm.

Corbett & Wilcox

Mary Corcoran

16 (Pages 58 to 61)

Page 58

1    Q. -- in your mind is there a difference between
2  me saying that and me saying, "Move your F'ing glass"?
3    A. No.
4    Q. No?
5    A. No.
6    Q. Okay. So is all cursing -- no matter what the
7  context, is that all something that's just not allowed,
8  period?
9    A. In the workplace, correct.
10   Q. I think you said earlier that you heard other
11 people cuss.
12   A. I don't remember directly other than Valerie.
13 And I don't remember the exact words, because, again, I
14 mean, you know, they were not -- there was so much going
15 on at the time. But I don't recall specific people
16 cursing in front of me.
17   Q. But you do know that it happened?
18   A. I was told that it happened.
19   Q. Who told you?
20   A. I think Kim may have told me that people did
21 it, you know.
22   Q. Did you counsel any of them?
23   A. I didn't know -- like I said, I didn't
24 specifically hear people.

Page 59

1    Q. But --
2    A. But there was other behavior that went on that
3  I never saw that apparently went on. I mean, I was not
4  out on the floor all the time.
5    Q. Well, what other behavior went on that you
6  never saw?
7    A. Well, I can't recall exactly what, to be
8  honest with you.
9    Q. You knew that Valerie cussed?
10   A. Like I said, I had heard her curse.
11   Q. Did you do anything to her?
12   A. Well, like I said, I did, you know, counsel
13 her on that.
14   Q. You never heard her do it again. You just
15 heard it one time?
16   A. I can't honestly say that it was only one
17 time.
18   Q. Did you ever do anything to her discipline-
19 wise for cussing more than once after you counseled her?
20   A. No. I can't honestly recall if I heard her
21 afterwards. I mean, it's possible, but I don't recall.
22   Q. Do you recall ever disciplining her for
23 cussing?
24   A. No. Counseling her, I did.

Page 60

1    Q. Why is it that you would actually want Kim
2  fired but you would do nothing to Valerie other than
3  counsel her?
4    A. Well, first of all, when you're in a
5  supervisory position, you're held to a higher standard.
6  That's the reality of it. Kim and I talked about leading
7  by example and the responsibility that goes along with
8  being in a leadership position and that it does make it
9  difficult sometimes. Because even with the dress code,
10 you know, I said to her, I know it's -- you know, it's
11 Friday and I know everyone is tired and we're all working
12 hard. But I really need you to work with me here because
13 we need to lead by example.
14       Plus, you know, I mean, there were three
15 instances specifically, you know, that were documented.
16 Not documented. The other two weren't. I'm sorry.
17 But --
18   Q. Three instances of what?
19   A. With Kim.
20   Q. Of what?
21   A. Of profanity.
22   Q. That was --
23   A. You know, in front of the team.
24   Q. The two words that were spoken in the initial

Page 61

1  meeting and then one on August the 12th of 2003?
2    A. Correct.
3    Q. Okay. And no others. Right?
4    A. Right. But, you know, it wasn't -- it was --
5  like I said, it was everything that did or did not take
6  place in the form of progress. And I was there to
7  improve the unit. And I did not see improvement, you
8  know, in Kim's behavior and her -- certainly her language
9  as noted by the events of August 12th. And so I made the
10 decision that -- again, I felt that it was in the best
11 interest of the department and that her staying on board
12 would have been to the detriment of the department.
13   Q. Because she cussed?
14   A. Because of everything as I just described it.
15   Q. Do you know whether or not anybody in HR was
16 aware that people were cussing in the department at
17 MainStreet?
18   A. I am not aware of that.
19   Q. Did you ever say anything to anybody in HR or
20 maybe your boss about cussing and that kind of goings on
21 in the department?
22   A. No.
23   Q. Was there not a system of progressive
24 discipline at Commerce?

Mary Corcoran

Page 62

1    A.  Yes.  There is.
2    Q.  Can you tell me, Ms. Corcoran, what the
3  various levels are?
4    A.  I don't know off the top of my head, but I
5  know that it involves written warnings and then
6  termination.
7    Q.  Do you know whether or not there's a certain
8  number or level of written warnings that have to be
9  given --
10    A.  No.  I think that some of that depends on the
11  situation, as I was counseled by HR.
12    Q.  So when were you counseled by HR?
13    A.  When I spoke to them, I made them aware of the
14  situation, and I forwarded the e-mails.  And I explained
15  to them that I did not feel that I could train these
16  issues out of Kim and that her staying would be to the
17  detriment of the department and that we would not be able
18  to achieve our financial goals if she were to stay on
19  board.
20    Q.  Was that in the form of an e-mail?
21    A.  No.  I believe that was a conversation.
22    Q.  So you forwarded the e-mails, and they
23  counseled you and said that there are means of
24  progressive discipline?

Page 63

1    A.  No.
2    Q.  Oh, I'm sorry.
3    A.  No.
4    Q.  I misunderstood your answer.
5    A.  No.  They didn't say that to me.
6    Q.  Well, tell me what they said.
7    A.  What Deb Watson -- Deb Watson was the only
8  person I spoke to in HR about it.  And she said to me,
9  "What do you want to do?"
10        And I said, honestly, I think we need to
11  terminate Kim.  I don't believe that we can train these
12  issues out of her.  I don't believe -- I don't believe
13  that she was committed.  And that I felt that it was to
14  the detriment of the department and we wouldn't be able
15  to achieve our financial goals if she were to stay on
16  board.  And they supported the decision.
17    Q.  So did you ask anybody at HR about "Can I fire
18  her?"  Did you say that or did you inquire about what you
19  would be permitted to do?
20    A.  No.  They asked me what I wanted to do, and I
21  told them.  And then Deb Watson said, okay, well I need
22  to get back to you on that.  I need to think this
23  through, and I need to get back to you on that.
24    Q.  You said Deb Watson was the only person you

Page 64

1  talked about it in HR.  Did you talk to anybody else
2  about it in Commerce?
3    A.  I let Joe Morrissey, my boss, know about the
4  conversation.  I don't believe he -- I sent him copies of
5  the e-mail.  I think that was just between me and HR.
6  But I made him aware of the situation and I made him
7  aware that I felt that if Kim were to stay that it would
8  be to the detriment of the department.
9    Q.  So you made him aware what she said?
10    A.  Yes.  And what my decision was.
11    Q.  Okay.  What did Joe say?
12    A.  Joe supported me.
13    Q.  Did you talk to anybody else besides Joe
14  Morrissey and Deb Watson?
15    A.  No.
16    Q.  Nobody else?
17    A.  My husband.
18    Q.  Okay.  Nobody else at Commerce?
19    A.  No.
20    Q.  So you explained to Joe what she had said to
21  Valerie on August the 12th.
22    A.  Correct.
23    Q.  What else did you tell him?
24    A.  I just told him what -- and I said I contacted

Page 65

1  HR and I've spoken to HR and they asked me what I wanted
2  to do.  And I told them that I believe we need to
3  terminate her.
4    Q.  Have you ever cussed in the workplace?
5    A.  No.
6    Q.  Never?
7    A.  I don't curse in the workplace.
8    Q.  Do you curse outside the workplace?
9    A.  Sometimes.
10    Q.  You ever remember talking to somebody about
11  what you would do if you won the lottery and one of the
12  things that you would do would be to -- and I'll gesture
13  by sticking up my middle finger at Commerce.
14    A.  No.  And that's out of character for me.
15    Q.  So that never happened?
16    A.  I would not do -- I don't use the middle
17  finger.
18    Q.  Okay.  Do you ever say anything like "Fuck
19  Commerce"?
20    A.  Never.
21    Q.  Take a look at what I've marked as Corcoran --
22        MS. LEMING:  Can we go off the record
23  for one second?
24        MR. MARCONI:  Mm-hmm.

Corbett & Wilcox

Mary Corcoran

18  (Pages 66 to 69)

Page 66

```
 1              (A brief recess was taken.)
 2              - - - - -
 3              MARY CORCORAN, resumes
 4              (Corcoran Deposition Exhibit No. 1 was
 5    marked for identification.)
 6    BY MR. MARCONI:
 7       Q.  Ma'am, I've handled you what's been marked
 8    as --
 9       A.  Mm-hmm.
10       Q.  -- Corcoran No. 1.
11       A.  Mm-hmm.
12              MS. LEMING:  Is that a yes?
13              THE WITNESS:  Yes.
14              MS. LEMING:  You have to answer --
15              THE WITNESS:  I'm sorry.  Yes.
16    BY MR. MARCONI:
17       Q.  During the little break, I think it seemed
18    like you had an opportunity to review that.
19       A.  Yes.
20       Q.  I just wanted to ask you a couple of
21    questions.  This is an e-mail from you --
22       A.  Yes.
23       Q.  -- to Deborah Watson --
24       A.  Mm-hmm.
```

Page 67

```
 1       Q.  -- and Joseph Morrissey?
 2       A.  Yes.
 3       Q.  Right?
 4              Regarding Kim --
 5       A.  Mm-hmm.
 6       Q.  -- and the incident that you say on August the
 7    11th.  But wasn't it actually August the 12th?
 8       A.  (The witness indicated.)
 9       Q.  You're shaking your head no.
10       A.  I don't know --
11       Q.  Okay.
12       A.  -- the exact date.
13              I don't know the exact date.
14       Q.  Is this the first time that you talked to
15    Ms. Watson or Mr. Morrissey about this?
16       A.  I -- no.  I believe that I spoke to at least
17    Deb verbally first, I believe.  I don't recall.
18       Q.  Did she ask you to send this e-mail?
19       A.  I don't recall.  But it would be in my nature
20    to document something like this.
21       Q.  Now, you say:  On August 11th while I was on
22    vacation, Kim Bailey was approached out on the floor by
23    one of her subordinates, Valerie Oakes, CSR, who was
24    inquiring about the process for pursuing her CIC.
```

Page 68

```
 1              So you weren't there when this occurred?
 2       A.  Correct.
 3       Q.  Where did you get the information?
 4       A.  From Joan Frenz.
 5       Q.  Joan Frenz?
 6       A.  Yes.  The initial information.
 7       Q.  Why is it that Joan Frenz would communicate
 8    this to you?
 9       A.  She called me on my business cell phone and
10    left me a message saying that Valerie was very upset,
11    that she saw her crying and that she called her in and
12    that she felt that it was something that I needed to
13    know.
14       Q.  Do you know whether or not Joan Frenz was
15    aware that Ms. Bailey had made a claim of sexual
16    harassment?
17       A.  I wouldn't know.  I was not aware of that.
18       Q.  You don't know one way or the other?
19       A.  No.
20       Q.  Then you go on to say Kim responded by
21    saying -- and I won't repeat the words, but they're in
22    this exhibit.
23       A.  Mm-hmm.
24       Q.  Then you say that -- the next line down -- two
```

Page 69

```
 1    lines down -- you've confirmed with all parties the facts
 2    of the conversation.
 3       A.  Mm-hmm.
 4       Q.  Who did you confirm it with?
 5       A.  I believe that when I spoke to Valerie at
 6    first when I came back from vacation I asked her if there
 7    was anyone else out on the floor when it occurred, and
 8    she told me who was out there.  And then I went to those
 9    individuals or I asked them to come into my office.  And
10    I said, you know, "My understanding is that there was a
11    situation between Kim and Valerie while I was on
12    vacation.  Are you aware of that?"
13              And they said yes.
14              And I said, "Could you please send me an
15    e-mail with your words as to what took place or what you
16    observed?"
17              And so each of them sent me an e-mail.
18       Q.  Then you say:  The use of profanity and the
19    disregard for a coworker/subordinate is unacceptable and
20    destructive.
21       A.  Mm-hmm.
22       Q.  We cannot afford to tolerate this behavior.
23       A.  Mm-hmm.
24              MS. LEMING:  Yes?
```

Corbett & Wilcox

Mary Corcoran

Page 70

1      THE WITNESS: Correct.
2      MS. LEMING: Thank you.
3   BY MS. LEMING:
4      Q. This e-mail is to advise you that effective
5   Monday, August 25th, I am placing Kim on final written
6   warning.
7      A. Yes.
8      Q. What does that mean?
9      A. You know, I don't remember writing this
10  e-mail.
11     Q. You mean you don't remember writing this
12  e-mail --
13     A. I don't remember writing that portion about
14  the final written warning.
15     Q. But you wrote it. Right?
16     A. I did write it.
17     Q. What does "final written warning" mean?
18     A. It means that any failure to change whatever
19  the issues are will result in your termination.
20     Q. So it looks like, as of the 21st of August,
21  your intention was not to terminate Ms. Bailey. Correct?
22     A. Yes. But I guess after subsequent
23  conversations -- I mean, Deb and I did agree that she
24  would be terminated.

Page 71

1      Q. Was she placed on final written warning?
2      A. No.
3      Q. Why not?
4      A. I don't recall. I don't recall what happened
5   after this, to be honest with you.
6      Q. This is the --
7      A. I don't -- yeah. I don't specifically
8   remember coming to the conclusion that we were going to
9   put her on a final written warning, but obviously, I did
10  in this e-mail. But after subsequent conversations we
11  must have agreed that she was going to be terminated.
12     Q. Shouldn't there be something in her personnel
13  file that details your and Ms. Watson's discussions about
14  what you were going to do with Kim?
15     A. I would think so, but HR keeps the personnel
16  files.
17     Q. Had Ms. Bailey been given any written warnings
18  about anything prior to September 21st, 2003?
19     A. Not by me, no.
20     Q. Well, then, how is it that she could be given
21  a final written warning?
22     A. That would be something you would have to
23  discuss with HR, but they supported me in the decision.
24  Like I said earlier, it depends on the gravity of the

Page 72

1   situation. And there are times when I guess you can take
2   somebody directly. And I felt that this was one of those
3   situations.
4      Q. I'm not going to mark this, but this is a copy
5   of Commerce's responses to what are called
6   interrogatories. They're written questions that we ask
7   and that they answer under oath. Just take a look at
8   this. This is my copy. I just want to know if you've
9   ever seen that document before.
10     A. No.
11     Q. Were you ever asked to assist in preparation
12  of this document as far as you know?
13     A. No.
14     Q. Did you ever have an interview with counsel
15  where you were told that we have to answer certain
16  questions and so we have to ask you to help us?
17     A. We've had meetings
18         MS. LEMING: Answer the question he's
19  asking you, though. It's a very direct point.
20         THE WITNESS: Yes.
21  BY MR. MARCONI:
22     Q. Do you know whether or not your input was used
23  in answering these?
24     A. I do not, no.

Page 73

1      Q. Did you have a chance to read this document a
2   little bit?
3      A. Right now?
4      Q. Yeah.
5      A. Okay.
6      Q. It doesn't ring any bells with you?
7      A. No.
8      Q. Okay. I'll take it back.
9         So the only reason that you thought --
10  and I'm not trying to trap you here. But the reason that
11  you thought that Kim should have been terminated is,
12  sitting here today, that she cursed at Valerie Oakes
13  after you told her early on that she should not curse --
14         MS. LEMING: Objection to the form. You
15  can answer.
16  BY MR. MARCONI:
17     Q. -- and --
18         MS. LEMING: I'm sorry. I thought you
19  were done, Tom.
20  BY MR. MARCONI:
21     Q. -- and that sort of conduct and attitude is
22  something that you didn't think you could train out of
23  her?
24         MS. LEMING: Objection to the form. You

Mary Corcoran

20 (Pages 74 to 77)

Page 74

1  can answer.
2      A.  Along with other things, yes.
3      Q.  What are the other things?
4      A.  The other things that I described as far as
5  effective communication and commitment to Commerce.
6      Q.  So you don't think she was committed to
7  Commerce?
8      A.  I don't think that -- I didn't see a level of
9  commitment and any improvement which led me to believe
10  that -- yes.  She was not committed.
11      Q.  What is the measure of commitment in your
12  view?
13      A.  The measure of commitment is showing signs of
14  improvement, showing signs that you're -- you know, that
15  you're engaged, that you see the importance of the
16  leadership role.  And leadership is very deliberate.  And
17  it requires, like I said, everything from how you dress
18  to how you communicate to the language that you use.
19      Q.  So the things you described to me earlier led
20  you to conclude that she didn't have commitment to
21  Commerce?
22      A.  Yes.  And that she could be trained to -- that
23  some of this behavior could be trained out of her.
24      Q.  And you concluded inside of 60 days that it

Page 75

1  couldn't be trained out of her?
2      A.  Yes.
3      Q.  Were you ever informed that it was alleged
4  that Ms. Bailey had made unprofessional comments
5  concerning someone's appearance that came into the
6  office?
7      A.  No.  I don't recall that.
8      Q.  When Ms. Bailey was going to the training
9  classes that she had been instructed to go to by
10  Ms. Watson and the HR people, did she tell you before she
11  was going, hey, I have to go to these classes?
12      A.  My understanding is she didn't go to the
13  classes.  She was registered and she didn't go.
14      Q.  Well, did she ever tell you that she was going
15  and then not go?
16      A.  No.  I wasn't aware that she was even
17  registered for those classes.  That was between she and
18  Deb Watson.
19      Q.  Let's say she went to a class.
20          Wouldn't it have been something that she
21  would have done to contact you to say, hey, Mary, on
22  Monday I'm not going to be here because I'm going to be
23  at, you know, such and such Commerce U doing a class?
24  That's something that she would have done.  Correct?

Page 76

1      A.  Correct.
2      Q.  You have no record of her ever doing that?
3      A.  Not -- no.  I don't -- but I can't say I do or
4  do not remember.  I just don't remember.
5      Q.  But that's not something you would have made a
6  record of.  Right?
7      A.  No.  And people registered for classes before
8  I even got there.  They were already registered for
9  classes for designations and things like that.
10      Q.  Where did you get the impression that she
11  never went to any of the classes?
12      A.  It was after she was terminated.
13      Q.  How did you get that impression?
14      A.  Because I said to Deb -- I said, you know,
15  Deb, some of this doesn't make sense.  I said, you know,
16  I had asked for some classes.  And I don't recall exactly
17  what the response was, but my recollection is that I
18  didn't get a response.  And that's when Deb said to me,
19  well, Kim was already set up for some of those classes
20  and she didn't attend.
21      Q.  So Deb Watson told you that she didn't go to
22  any of the classes?
23      A.  No.  I don't -- she just said that she didn't
24  go the classes that I had asked for.  Some of the classes

Page 77

1  she had already been registered for and she didn't
2  attend.  She didn't say she didn't attend any of them.  I
3  don't recall that.
4      Q.  Do you feel as though Kim resented your
5  efforts to help her with her communication skills in the
6  sense that you were trying to help her with the e-mails?
7      A.  No.  Not really.
8      Q.  Did she cooperate with your efforts to help
9  her?
10      A.  Yes.
11      Q.  She just, I guess, wasn't capable of improving
12  herself?
13      A.  I just didn't see an improvement.
14      Q.  But it wasn't because she wasn't trying.
15  Right?
16      A.  I can't say that.  I don't know.
17      Q.  You don't know why there wasn't any
18  improvement?
19      A.  I don't know why there wasn't any improvement.
20      Q.  But she did cooperate with your efforts.
21  Right?
22      A.  She agreed that she would send me her e-mails,
23  yes.
24          (Corcoran Deposition Exhibit No. 2 was

Corbett & Wilcox

Mary Corcoran

Page 78

1  marked for identification.)
2     Q.  Let me show you what I've marked as Corcoran
3  No. 2.  Take a look at that, would you?
4     A.  Mm-hmm.
5     Q.  Why would you call Joan Frenz —
6     A.  Like I said —
7     Q.  — on vacation?
8     A.  — my recollection is that she left me a voice
9  mail message.
10    Q.  But this e-mail message says, "When I was on
11 vacation and called in to check on the status of a few
12 items..."
13    A.  I can't recall.
14    Q.  You can't recall what?
15    A.  I can't recall writing that line.  I know I
16 was on vacation and I — my memory serves — or if memory
17 serves, I remember that I had a message from Joan.  So
18 it's possible I called in to check on the status of a few
19 items, which includes my voice mail, and I had a message.
20 I honestly don't remember.  I thought it was on my cell
21 phone.
22    Q.  You don't mention anything about a message
23 from Joan here, do you?
24    A.  No.

Page 79

1     Q.  I thought you told me before that you didn't
2  call Joan except from work.  Why would you call her from
3  your vacation?
4        MS. LEMING:  Objection to the form.  You
5  can answer.
6     A.  Yeah.  Like I said, my recollection is that I
7  had a message from her and that I called her back.
8     Q.  Although you don't note that in here?
9     A.  I don't.
10    Q.  You didn't talk to Valerie or Dee or Darlene
11 during this telephone call that you're referring to, did
12 you?
13    A.  I don't recall.
14    Q.  Well, you say that upon my return I was
15 informed by Darlene and Dee and Valerie.  Right?
16    A.  Mm-hmm.
17    Q.  "Further investigation and conferences with
18 employees revealed that Kim had often spoken to her
19 subordinates in this matter."
20       Who told you that?
21    A.  They did.
22    Q.  Who's "they"?
23    A.  The — Darlene, Valerie and Dee.
24    Q.  And that's something that you claim you

Page 80

1  weren't aware of?
2        MS. LEMING:  Objection to the form.  You
3  can answer.  Go ahead.
4     A.  Yeah.  They just told me that this was
5  something they were used to.  But I hadn't witnessed
6  anything, nor had there ever been a circumstance where
7  someone came to me except for this time.
8     Q.  What is it they were used to?
9     A.  They were used to Kim cursing and treating
10 them unprofessionally.
11    Q.  That's what they told you?
12    A.  Yes.  Or that they witnessed it out on the
13 floor.
14    Q.  Did they tell you that cursing was pretty much
15 a common occurrence?
16    A.  I don't remember anyone telling me that.
17    Q.  You're not saying that they didn't.  You just
18 don't remember?
19    A.  I don't recall.
20    Q.  When you say "In addition, her subordinates
21 confided in me..."
22    A.  Yes.
23    Q.  — do you mean Kim's subordinates?
24    A.  The folks here.

Page 81

1     Q.  The same three?
2     A.  Correct.
3     Q.  Did they tell you what any of those personal
4  issues were?
5     A.  No.
6     Q.  Did you ask them?
7     A.  No.
8     Q.  So they said they had personal issues and
9  didn't trust her, and you didn't question that at all?
10    A.  No.
11    Q.  Are you aware that Marge Phipps routinely
12 cursed?
13    A.  No.
14    Q.  Never heard that?
15    A.  No.
16    Q.  Were you aware that Joan Frenz did also?
17    A.  No.
18    Q.  I asked you that.
19       How about Darlene Wilkins?
20    A.  No.
21    Q.  How about Valerie Oakes?
22    A.  Well, we spoke about Valerie — that I had
23 heard her at least on the one occasion.
24    Q.  Do you know a guy named Tim Cetola?

Corbett & Wilcox

Mary Corcoran

22 (Pages 82 to 85)

Page 82

1    A.  Tom Cetola.
2    Q.  I'm sorry.  Tom Cetola.
3    A.  Yes.
4    Q.  Have you ever spoken to him at work?
5    A.  Spoken to him at work?
6    Q.  Yes.
7    A.  Yeah, I've to him.  He doesn't work for
8  MainStreet -- didn't work for MainStreet.
9    Q.  Have you ever heard of him refer to an
10  employee whose name I'll withhold as referring to that
11  person as a "nigger"?
12    A.  Never.  No.
13    Q.  Have you ever referred to Heather Smith as a
14  "lazy ass"?
15    A.  No.
16    Q.  You never have?
17    A.  I never heard anyone refer to her that way.
18    Q.  I'm talking about you yourself.
19    A.  Me?
20    Q.  Yes.
21    A.  No.
22    Q.  Why were the salespeople removed from Kim?
23    A.  Because Kim had, in my opinion, too many
24  people reporting to her.  And again, it was my goal to

Page 83

1  help her be a leader, get the financial components of the
2  department back on track -- or on track.  And Marge had a
3  sales background.  So I thought that the skill sets were
4  better matched and the workloads were more manageable and
5  the direct reports were more manageable.
6         MR. MARCONI:  Off the record for about
7  five minutes.
8         (A recess was taken.)
9         - - - - -
10         MARY CORCORAN, resumes
11  BY MR. MARCONI:
12    Q.  Ms. Corcoran, did you ever counsel Kim Bailey
13  on making arrangements for a trip to New York for the
14  WOW! awards.
15         MS. LEMING:  Objection to the form.  You
16  can answer.
17    A.  No.  That was taken care of by corporate.
18    Q.  Okay.
19    A.  I didn't have involvement in that.
20         Excuse me.  Can I clarify something?
21  The WOW! awards didn't take place during the time that
22  Kim was employed in MainStreet under my --
23    Q.  Right.  I think you're right.
24    A.  Okay.

Page 84

1         MR. MARCONI:  I don't have any other
2  questions.
3         MS. LEMING:  I just have a couple.
4  BY MS. LEMING:
5    Q.  Ms. Corcoran, you testified earlier that Joan
6  Frenz would -- I believe this is what you said --
7  corporately speaking, step in for one another.  Do you
8  recall that testimony?
9    A.  Well, all officers will.  If I'm up in
10  Randolph and the officer there that runs that division is
11  not there and an issue comes up, since I'm the next
12  highest-ranking in the office, people will come to me.
13    Q.  That would also happen down in Delaware?  In
14  your absence Ms. Frenz would jump in?
15    A.  Sure.  Or Bob Hackett or any one of the
16  officers.
17    Q.  Was it uncommon for Ms. Frenz to bring the
18  incident with Valerie Oakes to your attention while you
19  were on vacation?
20    A.  No.
21         MS. LEMING:  I have no further
22  questions.
23         (The deposition concluded at 12:20 p.m.
24  this same day.)

Page 85

1  (I HAVE READ THE FOREGOING DEPOSITION,
2  AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.)



_____
WITNESS NAME

- - - - -

INDEX TO TESTIMONY

MARY CORCORAN                    PAGE

Examination by Mr. Marconi         2
Examination by Ms. Leming         84

- - - - -

INDEX TO EXHIBITS

CORCORAN DEPOSITION EXHIBIT NO.          PAGE

1  Document Bates stamped CIS 0572      66

2  Document Bates stamped CIS 0567      77

- - - - -

Corbett & Wilcox

Mary Corcoran

Page 86

```
 1          C E R T I F I C A T E
 2  STATE OF DELAWARE:
                       :
 3  NEW CASTLE COUNTY:
 4        I, Robert Wayne Wilcox, Jr., a Registered
 5  Professional Reporter and Notary Public, within and for
 6  the County and State aforesaid, do hereby certify that
 7  the foregoing deposition of MARY CORCORAN, was taken
 8  before me, pursuant to notice, at the time and place
 9  indicated; that said deponent was by me duly sworn to
10  tell the truth, the whole truth, and nothing but the
11  truth; that the testimony of said deponent was correctly
12  recorded in machine shorthand by me and thereafter
13  transcribed under my supervision with computer-aided
14  transcription; that the deposition is a true record of
15  the testimony given by the witness; and that I am neither
16  of counsel nor kin to any party in said action, nor
17  interested in the outcome thereof.
18        WITNESS my hand and official seal this 23rd day
19  of May A.D. 2006.
20
21        _____
22        ROBERT WAYNE WILCOX, JR.
          REGISTERED PROFESSIONAL REPORTER
          CERTIFICATION NO. 101-RPR
23        (Expires January 31, 2008)
24
```

Corbett & Wilcox

Deborah Watson

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KIMBERLEY A. BAILEY,          )
                              )
        Plaintiff,            )
                              )
v.                            )    Civil Action No.
                              )       05-183 SLR
COMMERCE NATIONAL INSURANCE   )
SERVICES, INC., a New Jersey  )
corporation,                  )
                              )
        Defendant.            )

        Deposition of DEBORAH E. WATSON taken pursuant to
notice at the law offices of Losco & Marconi, P.A.,
1813 North Franklin Street, Wilmington, Delaware,
beginning at 1:30 p.m. on Wednesday, May 17, 2006, before
Robert Wayne Wilcox, Jr., Registered Professional
Reporter and Notary Public.

APPEARANCES:

        THOMAS C. MARCONI, ESQ.
        LOSCO & MARCONI, P.A.
          1813 North Franklin Street
          Wilmington, Delaware  19801
          for the Plaintiff,

        SUSAN M. LEMING, ESQ.
        BROWN & CONNERY
          360 Haddon Avenue
          Westmont, New Jersey  08108
          for the Defendant.

ALSO PRESENT:  KIMBERLY A. BAILEY


                    CORBETT & WILCOX
            Registered Professional Reporters
        230 North Market Street     Wilmington, DE 19801
                    (302) 571-0510
                www.corbettreporting.com

Deborah Watson

2 (Pages 2 to 5)

| Page 2 |
| --- |

1          DEBORAH E. WATSON,
2      the witness herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5              (Watson Deposition Exhibit Nos. 1
6  through 18, respectively, were marked for
7  identification.)
8  BY MR. MARCONI:
9      Q.  Ms. Watson, what is your title at Commerce
10 Insurance?
11     A.  I am the associate director of human
12 resources, vice president of human resources for Commerce
13 Insurance.
14     Q.  Now, is one of those titles with the bank and
15 the other is with the insurance business?
16     A.  Yes.  One is considered a functional title and
17 the other one is considered an officer title.
18     Q.  Who is the director of human resources?
19     A.  My human resources boss, Grace Migliaccio.
20     Q.  Is she in New Jersey?
21     A.  Yes.
22     Q.  Is it fair to say that you are the chief human
23 resources officer in the insurance business?
24     A.  Yes.

| Page 3 |
| --- |

1          MS. LEMING:  Objection to the form.  You
2  can answer.
3          THE WITNESS:  For the insurance
4  division, yes.
5  BY MR. MARCONI:
6      Q.  Is Grace the chief human resources person for
7  the bank?
8      A.  The bank corp.
9      Q.  Oh, the corp.
10     A.  Yes.
11     Q.  Is there someone who has a position similar to
12 yours with respect to the bank only?
13     A.  I have approximately four peers on the bank
14 side because of the size of the bank relative to
15 insurance.
16     Q.  Do the five of you report to Grace?
17     A.  Yes.
18     Q.  Do you have the authority to terminate
19 someone's employment on your own instigation or do you
20 have to go above to terminate someone's employment?
21     A.  It's consultative.
22     Q.  What do you mean?
23     A.  I do not okay a termination without a
24 discussion with my boss on the insurance side or the

| Page 4 |
| --- |

1  department manager or, in some cases, in consultation
2  with Bruce McKelvy on the HR side.
3      Q.  Who is Bruce McKelvy?
4      A.  Bruce McKelvy is -- I don't know his
5  functional title, but he is the head of employee
6  relations for the bank -- the corporate employee
7  relations.
8      Q.  Is he one of the four peers that you referred
9  to?
10     A.  Yes.
11     Q.  Ma'am, were you involved in this matter when
12 it was in front of the Delaware Department of Labor/
13 Division of Industrial Affairs?
14     A.  Yes.  I did come down to Delaware for a
15 mediation.
16     Q.  Were you involved in responding to the
17 discrimination charge -- the written responses that were
18 prepared and submitted to the Department of Labor?
19     A.  Yes.  I would have reviewed them with Susan,
20 if I remember correctly.
21     Q.  Take a look at this.  I'm just going to show
22 you a letter that's Defendant Bates marked CIS 0140
23 through CIS 0143.  It's a letter dated July 21st, 2004 to
24 Julie Cutler.  It looks like it was signed by William M.

| Page 5 |
| --- |

1  Tambussi, T-a-m-b-u-s-s-i, from Brown & Connery.  Take a
2  look at that for a minute or so.
3          MS. LEMING:  Do you have another copy of
4  that, Tom?
5          MR. MARCONI:  You know what?  I don't.
6  I thought I did.
7          MS. LEMING:  Are we marking this as an
8  exhibit?
9          MR. MARCONI:  Not yet.
10 BY MR. MARCONI:
11     Q.  Did you have an opportunity to review that
12 entire document?
13     A.  Right now?
14     Q.  Yes.
15     A.  Yes.
16     Q.  Do you recognize that document, ma'am?
17     A.  It seems familiar, yes.
18     Q.  Do you know whether or not you were involved
19 in providing Mr. Tambussi with information necessary to
20 prepare that document?
21     A.  I would have had to send some of our records
22 over, yes.
23     Q.  Do you recognize that as something that was
24 sent to the Department of Labor in the context of the

Corbett & Wilcox