Deborah Watson

3 (Pages 6 to 9)

**Page 6**

1  administrative proceedings that were held before the
2  Department of Labor in this matter?
3      A.  It's addressed to Julie Cutler at the
4  Department of Labor. So at that point I would have to
5  say yes. I don't remember personally mailing it or
6  anything like that.
7      Q.  Did you review it before it was sent to
8  Ms. Cutler?
9      A.  That I don't recall.
10     Q.  Do you know whether anyone reviewed it before
11  it was sent to Ms. Cutler?
12     A.  I don't know. I could only speak for myself.
13     Q.  You don't know whether you did or not?
14     A.  I don't remember. I'm sorry.
15     Q.  Is there anything in that document that you
16  consider to be inaccurate?
17     A.  I'm comfortable with the document.
18     Q.  I looked at my watch when you began to read it
19  a second time --
20     A.  Mm-hmm.
21     Q.  -- and you took about two minutes.
22         Did you have enough time to review it to
23  make sure that you were comfortable with it?
24     A.  Yes.

**Page 7**

1      Q.  What was your role, ma'am, if any, in the
2  decision to terminate Ms. Bailey's employment with
3  Commerce?
4      A.  I was part of the group that discussed that.
5      Q.  When you say "that," you mean the decision to
6  terminate Ms. Bailey?
7      A.  Yes.
8      Q.  Who else was part of the group?
9      A.  Mary Corcoran, Joe Morrissey. I called Sue
10  Leming. Possibly Ed Kiessling. Possibly Bruce McKelvy.
11     Q.  At the time this group was formed -- actually,
12  when was this group formed, if you will?
13         MS. LEMING: Objection to the form. You
14  can answer.
15  BY MR. MARCONI:
16     Q.  Assembled, maybe.
17         MS. LEMING: Same objection. You can
18  answer.
19     A.  It wasn't really a group that was formed.
20  Mary, as the department manager, as I stated earlier, is
21  someone I would talk to if we were going to talk about a
22  termination or discipline. Joe is Mary's boss and was
23  ultimately responsible for MainStreet. Ed Kiessling was
24  the president of Commerce Insurance at the time. And,

**Page 8**

1  then, Bruce McKelvy had assisted me in the initial
2  investigation.
3      Q.  Of Steve Duncan?
4      A.  Yes.
5      Q.  Why did you feel it was necessary to bring
6  Bruce McKelvy in to a committee or a group that was going
7  to be assembled to discuss firing Kim?
8      A.  That's why I said "possibly." I'll be honest
9  with you. I don't recall a specific conversation I had
10  with him.
11     Q.  Well, let's assume that he was brought in.
12         Why would you have brought him in?
13     A.  I use Bruce as a sounding board for myself.
14  He has over 25 years of human resources experience, and
15  he's a respected colleague.
16     Q.  Do you recall asking Bruce for his advice in
17  connection with this -- firing Kim?
18     A.  I don't recall.
19     Q.  Why did you consult with Ms. Leming?
20     A.  I knew from doing the sexual harassment
21  investigation that she had -- Kim had e-mailed her
22  original letter to you for editing, at which point if I
23  know an employee is in contact with an attorney I will
24  often contact our attorneys as a sounding board.

**Page 9**

1      Q.  Now, did you contact Ms. Leming during the
2  investigation of the charges against Steve Duncan?
3      A.  No. I believe Bruce was talking to Sam first
4  at Brown & -- or at Blank Rome, which is the other
5  employment attorneys that the bank uses.
6      Q.  About what?
7         MS. LEMING: I'm going to --
8      A.  I wasn't part of the conversation. I don't
9  know.
10     Q.  Well, you have no idea what he was talking to
11  Blank Rome about?
12         MS. LEMING: I'm just going to instruct
13  you not to disclose any attorney-client communication, if
14  you know any.
15     A.  I don't.
16     Q.  But were they discussing Duncan or Kim?
17     A.  I don't know.
18     Q.  Okay.
19     A.  I don't know.
20     Q.  All right. So the group was -- and I'll use
21  the word "assembled." I know that wasn't your word. But
22  there was a group of people that you consulted with prior
23  to making the determination to terminate Kim's
24  employment. Right?

Corbett & Wilcox

Deborah Watson

4 (Pages 10 to 13)

Page 10

1    A.  It was a discussion just like we would do with
2  any other termination.
3    Q.  Obviously, the decision was made to terminate.
4    A.  Correct.
5    Q.  Okay.  I want to show you a copy of what are
6  called Defendant's Responses to Plaintiff's First Set of
7  Interrogatories.
8    A.  Mm-hmm.
9    Q.  I'll represent to you that these are written
10 questions that we asked Commerce through Brown & Connery,
11 and they sent written answers back.
12   A.  Mm-hmm.
13   Q.  This is a copy of the questions and the
14 answers that were received from Brown & Connery.  I just
15 want you to take a look at that.  And sort of the same
16 question as I had with respect to the letter:  Were you
17 called upon to provide information?
18       MS. LEMING:  It has your notes in here.
19 Do you want her to see a different set?
20       MR. MARCONI:  No.  That's fine.
21 BY MR. MARCONI:
22   Q.  Do you recognize that document, ma'am?
23   A.  Yes.
24   Q.  How do you recognize that?

Page 11

1    A.  This was one of the interrogatories that we
2  had to respond to that you had sent over to us.
3    Q.  Now, I take it you received that from your
4  attorneys.  Right?
5    A.  Yes.
6    Q.  Did they send that to you and instruct you to
7  help compile the answers?
8    A.  Yes.
9    Q.  Were you one of the people that was involved
10 in the preparation of the answers?
11   A.  I read over them, because I believe I had to
12 sign a certification with it.
13   Q.  But, I mean, where did your counsel get the
14 information they used to prepare the responses?
15       MS. LEMING:  I just want to instruct
16 you:  Don't disclose any attorney-client communication.
17 If you can answer his question other than that, please go
18 ahead and do so.
19   A.  We sent over our files, and then they would go
20 through it.
21   Q.  When you say "our files," what did you send
22 over specifically?
23   A.  Don't know.  I couldn't go page by page for
24 you.

Page 12

1    Q.  Who was the person that sent them over?
2    A.  I think we used Christine Ruggeri, who works
3  on Bruce McKelvy's team, to compile all the files and
4  send them over.
5    Q.  Well, how would Christine Ruggeri know where
6  to go to get the files?
7    A.  I would have had most of the file.  We would
8  have pulled a personnel file, if that's necessary.  We
9  would have talked to Mary to make sure that we had
10 everything, particularly once we got into discovery.
11   Q.  So before you told Christine where to go to
12 find the files to pull to send to your counsel, you
13 talked to Mary Corcoran?
14   A.  I don't know if I personally talked to Mary
15 Corcoran, but we had a meeting.
16   Q.  Who had a meeting?
17   A.  Me, Bruce —
18   Q.  Now, when you say —
19   A.  — Christine.
20   Q.  I'm sorry.
21       When you say you had a meeting, you mean
22 once you received that from Brown & Connery, those
23 interrogatories?
24   A.  I can't say it was when we received the

Page 13

1  interrogatories.  I believe it was when we were notified
2  that we had a complaint.
3    Q.  So then you had a meeting?
4    A.  Yes.
5    Q.  After you first learned that there was a
6  discrimination complaint filed by Kim against Commerce?
7    A.  That would be my guess.
8    Q.  You're guessing?
9    A.  And it's a guess.
10   Q.  But you're not guessing about the fact that
11 there was a meeting.  Right?
12   A.  Correct.
13   Q.  You just don't know when it was?
14   A.  Correct.
15   Q.  It was you and Mr. McKelvy in this meeting?
16   A.  It was me, Mr. McKelvy and his assistant
17 Christine Ruggeri.  There might have been a fourth
18 person.  I don't remember for sure.
19   Q.  What was the purpose of the meeting?
20   A.  To make sure that we were going to gather all
21 the documents that we needed to in order to respond to
22 whatever you requested from us or attorneys requested
23 from us.
24   Q.  But how did you know, ma'am, what documents

Corbett & Wilcox

Deborah Watson

5 (Pages 14 to 17)

Page 14

1  you needed to gather?
2      A. It wasn't that specific, meaning I wasn't
3  going to pick and choose through the file. It was going
4  to be my file, if Bruce had a file, and if there was
5  anything additional that Mary had. In other words,
6  gather everything that we had for Kim Bailey, including
7  her personnel file, and then send it to the attorneys.
8      Q. And you did that?
9      A. Yes.
10     Q. So the only thing you gathered was stuff that
11 related to Kim Bailey?
12     A. Again, I didn't go through it page by page,
13 but it would have been the investigation file, her
14 personnel file, anything Mary had.
15     Q. You said the "investigation file."
16     A. Right.
17     Q. Which investigation?
18     A. The -- anything surrounding the termination.
19     Q. Of whom?
20     A. Of Kim.
21     Q. So you pulled all of the information that you
22 were requested to pull by Brown & Connery?
23     A. Yes.
24     Q. You submitted that information to them.

Page 15

1          They are the ones that prepared the
2  responses to these interrogatories.
3              MS. LEMING: Objection to the form. You
4  can answer.
5              THE WITNESS: I can answer?
6              MS. LEMING: Yes, you can.
7              THE WITNESS: Okay. They prepared them,
8  and then I read them and signed the certification.
9  BY MR. MARCONI:
10     Q. When you signed the certification, what were
11 you certifying?
12     A. That I felt it was accurate.
13     Q. Do you still feel that they're accurate?
14     A. Yes, I do.
15     Q. After your review just now of the entire
16 20 pages?
17     A. Yes.
18     Q. Did you have any discussions with Mary
19 Corcoran about the fact that Kim Bailey had filed a
20 sexual harassment claim against Steve Duncan?
21     A. No.
22     Q. Never?
23     A. No.
24     Q. Do you know whether anyone at Commerce had

Page 16

1  such a discussion with Mary Corcoran?
2      A. To my knowledge no one did.
3      Q. Was any information about Kim's sexual
4  harassment claim put in her personnel file?
5      A. No.
6      Q. Did you or anyone at Commerce ever have any
7  discussions with Mary Corcoran about any concerns that
8  they had about Kim?
9      A. I can only speak for myself. And I did not.
10     Q. You never spoke to Mary Corcoran about Kim
11 Bailey?
12             MS. LEMING: At any time?
13             MR. MARCONI: Well, no. Other than
14 after August the 12th when there was an allegation that
15 she did something inappropriate. I mean before that
16 time.
17             THE WITNESS: Could you read back that
18 question?
19             (The reporter read the requested
20 portion.)
21             MR. MARCONI: Before August the 12th of
22 2003.
23             THE WITNESS: I think I had a
24 conversation with Mary about both Kim and Marge, because

Page 17

1  they were the management people.
2  BY MR. MARCONI:
3      Q. Approximately when would that be?
4      A. Sometime that summer.
5      Q. Now, are you referring to Marge Phipps?
6      A. Yes.
7      Q. What concerns did you express to Mary Corcoran
8  about Kim Bailey at that conversation?
9      A. They weren't concerns. They were actually
10 compliments.
11     Q. How about Marge Phipps?
12     A. I believe I told her that Marge had a smaller
13 management role and that she was very knowledgeable in
14 insurance but could be rough around the edges.
15     Q. How so?
16     A. Marge is a very direct person. And either you
17 like that style or you don't like that style.
18     Q. Did Marge cuss a lot and slam the phone?
19     A. Not that I'm aware of.
20     Q. You never heard anything like that?
21     A. No.
22     Q. Did you ever hear that anybody in MainStreet
23 cussed a lot and slammed the phone?
24     A. Not that I heard, no.

Deborah Watson

6 (Pages 18 to 21)

Page 18

1    Q. How about anywhere else in Commerce Insurance?
2  Did you ever hear anything like that — people said that
3  that happened?
4    A. Cussed a lot and slammed the phone, no.
5    Q. Cussed and slammed the phone.
6    A. No.
7    Q. Did you hear anybody do anything that wasn't
8  consistent with Commerce's policies —
9        MS. LEMING: Objection.
10 BY MR. MARCONI:
11   Q. -- concerning demeanor?
12       MS. LEMING: Objection to the form. You
13 can answer.
14   A. Could you be more specific?
15   Q. You were here the other day when Darlene and
16 Valerie Oakes testified that it was fairly common in
17 MainStreet that people would swear when they'd get
18 frustrated and slam the phone and use expletives that I
19 won't use now.
20       Do you remember that testimony?
21   A. Yes, I do remember that.
22   Q. Is that the first time that you were aware
23 that that was the case? When you heard those women
24 testify at their depositions the other day?

Page 19

1    A. Kim had sent me an e-mail after we terminated
2  her where she said she used profanity each and every day
3  in Delaware. That was the first that I had heard about
4  profanity each and every day in Delaware.
5    Q. Well, did you hear about it? If not each and
6  every day, is that the first time that you heard that it
7  was used in the workplace in Delaware?
8    A. I'm not recalling a specific conversation
9  where I was made aware of it, and I had no formal
10 complaints that ever came up to me about that type of
11 thing.
12   Q. How about a general conversation where you
13 were made aware of it as opposed to a specific
14 conversation?
15   A. Again, nothing is coming to mind.
16   Q. So it's your testimony, ma'am, that you had no
17 idea whatsoever at any time before Kim Bailey was
18 terminated that profanity was used at Commerce Insurance?
19   A. Now, in this last statement, you said Commerce
20 Insurance.
21   Q. Where you worked.
22   A. I'm speaking about Delaware, because you were
23 talking about MainStreet where Delaware was.
24   Q. Okay. Well, let's talk about Commerce

Page 20

1  Insurance in general, and then we can talk about
2  Delaware.
3    A. We actually terminated an employee in Randolph
4  for cursing.
5    Q. Who was that?
6    A. Wow. Her first name was Debbie. She was the
7  mailroom clerk. I don't remember her last name.
8    Q. So you were aware that people cussed.
9        To your knowledge, everybody that did
10 that was terminated?
11       MS. LEMING: Objection to the form. You
12 can answer.
13   A. No, no, no. To my knowledge, I knew this
14 woman Debbie called the CFO a very inappropriate two
15 swear words, at which point I was contacted by the
16 manager who wanted to terminate her, and we agreed that
17 that was an appropriate response.
18   Q. Well, is that the first time that you had any
19 inkling that people actually did that in the workplace at
20 Commerce Insurance?
21       MS. LEMING: Objection to the form. You
22 can answer.
23   A. I don't know if that was the first time that I
24 heard about someone swearing. I can't give you a

Page 21

1  specific example. I know that stands out in my memory as
2  an example of someone swearing where it was very
3  inappropriate and we moved to termination.
4    Q. Okay. How about in Delaware? Was the
5  incident with Kim the first time you had ever heard that
6  that was something that occurred?
7    A. To my recollection today, yes.
8    Q. You're not denying that was a routine thing.
9  You're just saying that you just never heard it. Right?
10       MS. LEMING: Objection. You can answer.
11   A. I had nothing raised to my level. I had not
12 heard it.
13   Q. Do you deny that it occurred routinely?
14   A. I have no idea. I don't sit in Delaware.
15   Q. Oh. You don't sit in Delaware.
16   A. No.
17   Q. Where do you sit?
18   A. Cherry Hill.
19   Q. When Steve Duncan was terminated, were you in
20 Delaware the day he was terminated?
21   A. Yes.
22   Q. Was Joan Frenz in Mr. Duncan's company at any
23 time that day, do you recall?
24   A. Not that I saw.

Deborah Watson

Page 22

1    Q.  Did you hear anything about that?

2    A.  I heard that Joan was the last person to walk

3 Steve out of his office.

4    Q.  Why would Joan be the person to walk Steve out

5 of his office?

6    A.  I don't know the answer to that. I left when

7 Joe Morrissey said he was going to stay.

8    Q.  That Joe Morrissey was going to stay?

9    A.  He was going to stay, yes, so I could go home.

10 I live farther north than Cherry Hill. So I have a

11 longer ride. So I asked Joe, "Are you going to stay?"

12 because Steve needed to clean out his office. And he

13 said yes.

14    Q.  Who actually spoke the words to Steve Duncan

15 "You're fired"?

16    A.  Joe Morrissey.

17    Q.  Joe did.

18        Were you there?

19    A.  Yes.

20    Q.  Was Joan Frenz there?

21    A.  No.

22    Q.  Do you know whether Joan Frenz knew why Steve

23 was terminated?

24    A.  To my knowledge, she did not know.

Page 23

1    Q.  Did you ever ask her if she knew?

2    A.  No.

3    Q.  Do you know whether or not Joan Frenz knew

4 that Steve had been accused of sexually harassing Kim?

5    A.  I didn't tell her.

6    Q.  Do you think Steve told her?

7        MS. LEMING: Objection to the form. You

8 can answer, if you know.

9    A.  I don't have any facts that he did, and I

10 don't know why he would.

11    Q.  Do you have any facts that he may have?

12    A.  No. No, I don't have any facts. I don't

13 think he did and I don't think he would have. But it's a

14 think. It's not a fact. He was very embarrassed..

15    Q.  So as far as you know, Joan Frenz had no idea

16 that he had been accused of sexual harassment by Kim

17 Bailey?

18    A.  Correct.

19    Q.  Let's talk about the sexual harassment charge

20 made by Kim Bailey against Steve Duncan.

21    A.  Okay.

22    Q.  Were you involved in the investigation of that

23 charge?

24    A.  Yes.

Page 24

1    Q.  Was there a group of people formed to

2 investigate that charge?

3    A.  It was myself and Bruce McKelvy.

4    Q.  Anybody else?

5    A.  Not for the investigation, no.

6    Q.  Now, the purpose of the investigation was to

7 what?

8    A.  To try to find facts.

9    Q.  To support the charge, you mean?

10    A.  To support either side.

11    Q.  Who decided that Kim Bailey would continue to

12 work under Mr. Duncan's control, if you will, or

13 supervision while the investigation was ongoing?

14        MS. LEMING: Objection to the form. You

15 can answer.

16    A.  I believe Bruce and I discussed it.

17    Q.  When?

18    A.  I couldn't give you a specific date.

19    Q.  Can you give me a month and a year?

20    A.  It would have been right when Kim brought the

21 charge to our attention.

22    Q.  So you and Bruce McKelvy specifically

23 discussed the issue of keeping her there?

24    A.  We would have discussed what our options were.

Page 25

1    Q.  What were they?

2    A.  To try to transfer one of them during the

3 investigation. And we had nowhere to transfer them to.

4    Q.  So you don't think you had anywhere to

5 transfer Mr. Duncan or Kim?

6    A.  The only other place where we had MainStreet

7 was in Randolph, New Jersey, which from Delaware is

8 easily 150 miles each direction, and they both lived down

9 here.

10    Q.  The basis for the decision not to transfer

11 either one is because there wasn't any place to send

12 either one?

13    A.  If you transfer one of them out of the

14 workplace, number one, it's almost as if you're picking

15 sides. The other issue is we had nowhere to send them

16 that would make sense. And one of the things that Kim

17 was concerned about was confidentiality. So if I don't

18 have anywhere or Bruce doesn't have anywhere to send one

19 of them that would make a sense that we could give a

20 business reason, it's going to make it extremely

21 difficult to try to keep what's going on confidential.

22    Q.  Well, to whom would you have given a business

23 reason?

24    A.  The employees who would be wondering where

Corbett & Wilcox

Deborah Watson

8 (Pages 26 to 29)

Page 26

1  their bosses went.
2      Q.  Did you ever consult Kim specifically and
3  discuss with her why she wasn't being moved or he wasn't
4  being moved?
5      A.  I don't recall. But we, I would hope, had
6  asked her in the initial meeting if she could work
7  professionally with him while we worked through this.
8      Q   Is --
9      A.  And I believe we asked Mr. Duncan the same
10 thing.
11     Q.  So you say you hoped you would have asked her
12 that?
13     A.  I'm going to change that to I believe we asked
14 her.
15     Q.  Are you sure?
16     A.  To the best of my recollection.
17     Q.  You did ask her?
18     A.  Yes.
19     Q.  Did you ask her input into your decision that
20 there was no place to send her other than Randolph?  In
21 other words, did you ask her, look, we're willing to send
22 you to Randolph if you want, you know, but we're not
23 going to require you to go there?
24     A.  No, we did not ask her that.

Page 27

1      Q.  Why not?
2      A.  Because it would seem punishing. She lives in
3  Delaware. Randolph is up north. Again, we would have a
4  better business reason, but we still have to explain why
5  she's up there. And the investigation, it was not
6  something we would do in a day or two, which meant it
7  would have been an extended period of time. It would
8  have felt burdensome.
9      Q.  So you decided that it would be more
10 burdensome for her to go up to Randolph every day than it
11 would to work with a guy that was sexually harassing her?
12         MS. LEMING:  Objection to the form. You
13 can answer.
14     A.  I didn't have facts yet that he was sexually
15 harassing her. I had her charge, which was why we asked
16 if she could work professionally with him. And, again,
17 we had to ask the same thing of Duncan.
18     Q.  Your testimony is that you believe you asked
19 Kim that question, and she said, sure, I'm willing to
20 work with him?
21     A.  No. I said I believe I asked that question,
22 and she did not come back to me. I don't know what
23 specifically she said that I recall, but she did not come
24 back to me and say, no, no way. I can't do it.

Page 28

1      Q.  Did you she specifically tell you that she was
2  willing to work with Steve Duncan while you were
3  investigating?
4          MS. LEMING:  Objection to the form. You
5  can answer.
6      A.  That I don't recall.
7      Q.  So you and Mr. McKelvy were the only people
8  that were involved in the investigation into the charges
9  of sexual harassment. Correct?
10     A.  Yes. He and I interviewed the witnesses,
11 talked to Steve, talked to Kim.
12     Q.  Who were the witnesses that you interviewed?
13     A.  Cindy Smith, Scott Durham, Paul Scaffidi. We
14 spoke to Steve Duncan. And we spoke to Marge Phipps with
15 just some general questions about the office environment.
16     Q.  What did you ask Marge?
17     A.  We asked Marge about professional behavior in
18 the MainStreet office.
19     Q.  Can you be more specific?
20     A.  We asked her if she had any inappropriate
21 dealings with Steve, and she said no; any inappropriate
22 dealings with Kim, which she said no.
23     Q.  What did you mean by "inappropriate dealings"?
24     A.  Meaning like uncomfortable or unprofessional.

Page 29

1      Q.  Towards her?
2      A.  In her personal interactions, yes.
3      Q.  In other words, did you ask her: Did you ever
4  see Steve Duncan and Kim doing anything of a sexual-type
5  nature?
6      A.  No.
7      Q.  No?
8      A.  What I asked her was: Marge, in your
9  interactions with Steve, has he ever been unprofessional?
10 Inappropriate? And her response was, no, he's always a
11 perfect gentleman.
12         Marge, in your interactions with Kim,
13 has there ever been anything unprofessional or
14 inappropriate? And she said there was a lot of office
15 banter -- some of it directed at the copy machine
16 person -- and that she felt it was Kim trying to keep it
17 light, but it was sometimes unprofessional.
18     Q.  Did she specifically accuse Kim of doing
19 anything unprofessional?
20     A.  She felt that Kim was trying to keep it light.
21 She didn't say it was unprofessional. She just said it
22 was not, I guess, as professional as Mr. Duncan was.
23     Q.  What is it that made you ask Marge Phipps
24 anything?

Deborah Watson

Page 30

1    A.  To try to get a feel for the office.
2    Q.  Why did you think that was important?
3    A.  Because we had the complaint -- or the charge
4  from Kim and we had interviewed Steve Duncan and he had
5  some very different versions.  And so we were trying to
6  get a feel for:  Was anything out in the workplace?  Was
7  the office functioning or was this dysfunctional?  Was
8  there anything visible?  So we interviewed the third
9  member of the management team figuring she would have the
10  most interaction with Kim and Steve.
11    Q.  Did you interview Kim other than to take her
12  initial complaint?
13    A.  I talked to Kim twice.
14    Q.  You mean after she filed the complaint?
15    A.  The first time I talked to Kim I met her at
16  the Sage Diner, and we had an initial discussion.
17    Q.  What's the Sage Diner?
18    A.  It's a diner in Cherry Hill.
19    Q.  After hours?
20    A.  I think it was breakfast.  It was early in the
21  morning.
22    Q.  What was she doing in Cherry Hill?
23    A.  She sent me an e-mail and asked to meet with
24  me.

Page 31

1    Q.  This is before she filed the written letter or
2  after the written letter?
3    A.  She handed me the written letter at the
4  meeting.
5    Q.  Okay.  At the meeting with Kim where she
6  handed you the letter?
7    A.  Yes.
8    Q.  All right.  Let me ask you this:  I suppose
9  that the substance of the meeting was what was contained
10  in that letter.  Right?
11    A.  We discussed the summary of it.  She let me
12  read it.  I asked her to think about how she would --
13  what did she want out of this, how did she want to see
14  this resolved and to communicate that to me in writing.
15  And then I asked that I have some time to read through it
16  and then contact her if I needed to speak with her again.
17    Q.  Of course, she said that's fine.  Right?
18    A.  Yes.
19    Q.  How long did that meeting last?
20    A.  I don't recall.  But I'd say 30 minutes to an
21  hour.
22    Q.  You said it was a breakfast meeting?
23    A.  Yes.
24    Q.  Did both of you eat breakfast?

Page 32

1    A.  I don't remember.
2    Q.  You said you had another communication with
3  Kim after she gave you that letter at the Sage Diner?
4    A.  Yes.
5    Q.  What was that?
6    A.  We asked her to come up and meet with Bruce
7  McKelvy and I.  I had shared the letter with Bruce.  And
8  we wanted to ask her questions to make sure we thoroughly
9  understood her charge and her perspective on this.
10    Q.  Was this meeting in Cherry Hill?
11    A.  Yes.
12    Q.  It was you, Bruce McKelvy and Kim?
13    A.  Yes.
14    Q.  How soon after you got the letter at the Sage
15  Diner did this meeting occur?
16    A.  A couple days, maybe.  I don't remember
17  exactly.
18    Q.  Do you have any notes of that meeting?
19    A.  Yes.  You have them.
20    Q.  Do you have any notes of the meeting at the
21  Sage Diner?
22    A.  No.
23    MS. LEMING:  Can we just take a short
24  break real quick?

Page 33

1    MR. MARCONI:  Sure.
2    (A recess was taken.)
3    -----
4    DEBORAH E. WATSON, resumes
5  BY MR. MARCONI:
6    Q.  Can you take a look at what I've marked as
7  Watson 8?  Obviously, we're going out of order.
8    A.  (The witness complied with counsel's request.)
9    Q.  First, let me ask you:  Do you recognize that
10  as your handwriting?
11    A.  Yes.
12    Q.  Are these notes that you took from this second
13  meeting in Cherry Hill?
14    A.  Yes.
15    Q.  Now, who prepared this form?
16    A.  I did.
17    Q.  Okay.  So you were asking Kim these questions,
18  and then you're writing down her answers?
19    A.  Yes.
20    Q.  Had she been given the questions before, or
21  did you just ask her for the first time when she came?
22    A.  These were -- this was my way of working
23  through her charge document to make sure I understood
24  everything.  So she had not seen them ahead of time.  It

Deborah Watson

10 (Pages 34 to 37)

<table>
<tr><td>

Page 34

1  was for me to make sure that I got the things answered
2  that I wanted to make sure I was clear about.
3      Q.  So the letter that she wrote that she gave you
4  at the Sage Diner, you reviewed that and created this
5  sort of template?
6      A.  Yes.
7      Q.  Okay.  Look at No. 3.  Actually, back up.
8  No. 1 is "Date and sign letter."
9      A.  Yes.
10     Q.  She hadn't signed it?
11     A.  She hadn't dated or signed what she originally
12  gave me.
13     Q.  So you asked her to do that?
14     A.  I asked her to do it.
15     Q.  The check mark means you checked it off when
16  she did it?
17     A.  Yes.  That it was taken care of.
18     Q.  Now, what is "More detail on dates of events"?
19  What does that mean?
20     A.  I don't recall exactly, but I was -- that
21  implies -- I'm just trying to think through my own head.
22  I wanted to make sure I understood the dates of when this
23  stuff occurred so I understood the time lines.  For
24  example, I think in the letter she listed some month and

</td><td>

Page 36

1  There was a Christmas get-together, and Patty Kalmbacher
2  usually organized that.
3          MS. LEMING:  Can you spell "Kalmbacher"
4  for the court reporter?
5          THE WITNESS:  Oh.  K-a-l-m-b-a-c-h-e-r.
6          MS. LEMING:  Thank you.
7  BY MR. MARCONI:
8      Q.  Then go down to the next.  It's not a numbered
9  entry there.
10     A.  Mm-hmm.
11     Q.  But it says Backstage Cafe when, question
12  mark.
13     A.  Right.
14     Q.  She said May 2002.  Right?
15     A.  Yes.
16     Q.  What does the next handwriting say?
17     A.  He walked very close to her.  Felt un.
18     Q.  "Un" what?
19     A.  Uncomfortable.
20     Q.  So you're saying that's what Kim said?
21     A.  That's what I believe -- yeah   Based on this.
22  I believe she actually wrote that in her letter, which is
23  probably why I wasn't worried about finishing the word.
24     Q.  How about the next one, No. 4?

</td></tr>
<tr><td>

Page 35

1  year, and I was going to try to see if I could get a
2  specific date.
3      Q.  Now, it looks like the third question is:
4  12/01 -- December '01 --
5      A.  Mm-hmm.
6      Q.  -- did all of you go out regularly after work?
7      A.  Mm-hmm.
8      Q.  Who is "all of you"?
9      A.  I would probably have to look at her letter,
10  but I believe the initial instance she referenced with
11  Mr. Duncan was a group of people.  And so I was
12  questioning was this a regular happy hour group, Friday
13  night group, get together group.
14     Q.  What does that handwriting under that No. 3
15  say?
16     A.  I didn't go to Catholic school.  It says no
17  regular, quote, happy hour group.  Christmas get
18  together -- Patty Kalmbacher organized.
19     Q.  Who is Patty Kalmbacher?
20     A.  She was a CSR in the Core unit in Delaware.
21     Q.  So what does that handwriting mean?
22          Translate it for me.
23     A.  It means that there was no regular happy hour
24  group that went out after work.  No specific group.

</td><td>

Page 37

1      A.  Wednesday night is girl's night.  Steve
2  overheard Kim talking to one of the producers about the
3  evening out.  Kim invited him.
4      Q.  How about No. 5?  Actually, it's not numbered.
5  It's the next one on the next page
6          MS. LEMING:  Do you want her to read the
7  whole thing?
8          MR. MARCONI:  I just want her to
9  translate it for me.  What is she saying --
10     A.  When you asked, quote, what are you doing,
11  ignored the comment, turned and faced him to remove his
12  hands.  Friends saw the whole exchange.  In Kim's letter
13  she said that he had touched her -- was rubbing her back.
14  Or I think rubbing her back side.  And she said she asked
15  him, "What are you doing?"  And I asked her what
16  happened.  And she said that he ignored the comment,
17  turned and faced him -- she turned and faced him so he
18  had to remove his hand and that her friends saw it.
19     Q.  Did you ever give Kim a copy of this question
20  and answer?
21     A.  No.  These are notes that go into the
22  investigative file, and Bruce and I keep those.
23     Q.  So you never asked her to agree or disagree
24  with whether your summary of her answers to your

</td></tr>
</table>

Corbett & Wilcox

Deborah Watson

11 (Pages 38 to 41)

Page 38

1  questions was correct?
2      A.  No.  These were my notes from the
3  conversations we had.
4      Q.  But the conversation you had was her answers
5  to your questions.  Right?
6      A.  Right.  About the document she had already put
7  in writing for us.
8      Q.  Right.
9          But was she ever given an opportunity to
10 review this and say whether she agreed with your summary
11 of her answers?
12     A.  No.
13     Q.  Why not?
14     A.  Because these are confidential documents that
15 stay in the investigation file.  So, again, Bruce and I
16 were the only ones who saw these as a part of when we
17 worked through the investigation.
18     Q.  But they couldn't have been confidential as to
19 Kim.  Right?  She's the one that's the source of all of
20 the answers.
21     A.  It's confidential from everyone.  It's Bruce
22 and I through an information-gathering process.  I
23 wouldn't share that.
24     Q.  How can you share information with the source

Page 39

1  of the information?
2      A.  Excuse me?
3      Q.  What you're saying is that you would not share
4  the information that you have with the source of the
5  information.
6      A.  What I'm saying is, as I gather facts through
7  the investigation, those are things that Bruce and I
8  would gather and keep together  If there was something
9  in here that we needed to go back and clarify, we would.
10 But I'm not going to put a formal document in front of
11 her.  These are my notes.
12     Q.  You didn't think it was important that Kim
13 agree with the way you've characterized her answers or at
14 least have an opportunity to see how you've characterized
15 her answers?
16         MS. LEMING: Objection to the form.  You
17 can answer.
18     A.  I wrote down, to the best of my ability, what
19 she said.
20     Q.  Well, that's not my question.
21         My question is: Didn't you think it was
22 important to at least let Kim Bailey see your
23 characterization of her answers?
24         MS. LEMING: Objection to the form.  You

Page 40

1  can answer.
2      A.  I didn't think it was necessary, because,
3  again, I wrote down to the best of my ability what she
4  said, and I was going off of something she had already
5  put in writing for me.
6      Q.  Why did you have her sign this statement,
7  then?
8      A.  Because when I got the statement there was no
9  name on it and there was no date on it.
10     Q.  Well, why did you have her sign it?
11         You knew who it came from.
12     A.  If I got hit by a bus, I wanted to make sure
13 that everybody knew who it came from.
14     Q.  You told me earlier you had two meetings with
15 Kim.  One was the Sage Diner.
16     A.  Mm-hmm.
17     Q.  The second one was this meeting where you went
18 over this questionnaire.  Any other meetings with Kim
19 concerning the investigation of Steve Duncan's sexual
20 harassment of her?
21     A.  After we terminated Steve, Joe Morrissey --
22     Q.  Before that.
23     A.  Before that?
24     Q.  Yes.

Page 41

1      A.  No.  It was phone conversation or e-mail.
2      Q.  How many phone conversations?
3      A.  I don't remember how many.
4      Q.  Can you tell me whether it was more or less
5  than ten?
6      A.  It was less than ten.
7      Q.  Less than five?
8      A.  I don't know.  I'm comfortable saying less
9  than ten.  I don't want to drill it any further.  I'd be
10 purely guessing.
11     Q.  Can you recall the substance of any of those
12 conversations?
13     A.  One of them concerned Steve Duncan talking to
14 Mike Smith, Sr., and Kim wanted to let me know what she
15 had overheard -- or actually what she heard by listening
16 in on the phone.
17     Q.  What did she tell you?
18     A.  She told me that she heard Steve talk to Mike
19 Smith, Sr., and tell him that HR was going to talk to
20 Paul Scaffidi about the night that Kim and Steve were in
21 Randolph in MainStreet for a meeting.
22     Q.  So Kim overheard this conversation with Steve
23 talking to Mike Smith, Sr.?
24     A.  No.  Kim actually told me she had the ability

# Deborah Watson

12 (Pages 42 to 45)

## Page 42

1  to listen in to conversations for her employees. And
2  because of the way the phone system was set up, she could
3  also listen in on Steve.
4      Q. And she overheard the conversation. Right?
5      A. She used the technology to listen in, yes.
6      Q. Who is Mike Smith, Sr.?
7      A. Mike Smith, Sr., was the regional matter in
8  Randolph during the time where they were -- Steve and Kim
9  were moving the Randolph MainStreet unit to Delaware.
10     Q. Does that mean he was an employee of Commerce
11 Insurance?
12     A. Yes.
13     Q. What else did Kim tell you about this
14 conversation between Steve and Mike Smith, Sr.?
15     A. That she didn't want Steve talking to Mike --
16 why would he do that? -- and that I needed to stop that
17     Q. So was Steve telling Mike that he was under
18 investigation as a result of a sexual harassment claim?
19 Is that your understanding?
20     A. No. I don't think Steve brought up the sexual
21 harassment. I believe he said that HR was involved and
22 that we were going to want to talk to Paul Scaffidi about
23 the night they were up there
24     Q. Kim didn't want that to happen?

## Page 43

1      A. Kim didn't want Steve talking to Mike Smith.
2      Q. At all?
3      A. That was my understanding.
4      Q. What did you do about it?
5      A. I called Steve Duncan and told him that he
6  needed to deal with me if he had any questions
7      Q. What did he say?
8      A. He said fine but that he had talked to Mike
9  Smith, at which point I then went to Mike Smith and said,
10 "I don't know why Steve called you. What did he say?"
11 Mike Smith said Steve told me that HR was looking into
12 something and that you were going to want to talk to Paul
13 Scaffidi about the night that everybody was up here. And
14 I said, "Mike, any questions, you talk to me."
15     Q. Did he talk to you after that?
16     A. No. That was the end of that conversation.
17     Q. Did you ever talk to anybody about what
18 happened in Randolph?
19     A. I talked to Paul Scaffidi.
20     Q. Okay. You think you had ten conversations
21 with Kim after those two meetings. It sounds like she
22 was complaining about the investigation. Right?
23         MS. LEMING: Objection to the form. You
24 can answer

## Page 44

1      A. No. I didn't say ten. I said less than ten,
2  although I wasn't comfortable saying less than five.
3      Q. Okay.
4      A. But I don't remember.
5      Q. But the rest of what I just said is true.
6  Right?
7          MS. LEMING: Objection the form again.
8  You can answer.
9      A. No. She wasn't complaining to my knowledge.
10 She was concerned about Steve Duncan and him talking to
11 Mike Smith. She sent me an e-mail about -- she sent an
12 e-mail about trying to get the MainStreet people to go to
13 New York.
14     Q. All right. I'm trying to focus this a little
15 bit. She contacted you about the fact that she was
16 concerned that Steve Duncan and Mike Smith were talking
17 about something that she perceived to be related to her
18 claim. Right?
19     A. Yes. That Steve had reached out to Mike.
20     Q. Okay. And you handled that?
21     A. Yes.
22     Q. All right. That was one of the ten or under
23 communications that you had with Kim after the two
24 meetings. Correct?

## Page 45

1      A. Yes.
2      Q. All right. What is the next one that you can
3  recall -- communications with Kim concerning anything?
4          MS. LEMING: Do you mean by e-mail or
5  phone? Any way?
6          MR. MARCONI: Any way, yeah.
7          MS. LEMING: Okay.
8      A. We had the e-mail -- she sent an e-mail about
9  going to New York and trying to get the MainStreet group
10 to go to New York and she would coordinate the hotel
11 stay. And I believe she called me to say that after the
12 e-mail was sent that Steve had made a comment to her
13 like, oh, yeah, great e-mail, which she said she felt
14 kind of paranoid about. So she sent me sort of a
15 retraction that she sent to the entire group later in the
16 day.
17     Q. A retraction of what?
18     A. She said he made her nervous. She wasn't sure
19 what that comment was about. So she sent another e-mail
20 stating that she wasn't trying to force anybody to go to
21 New York and she had implied in the original e-mail that
22 the guys and the girls -- you know, there were only two
23 guys. And she was going to arrange hotel rooms and they
24 may have to bunk together. And so she sent that second

Deborah Watson

13 (Pages 46 to 49)

## Page 46

1 e-mail that, you know, she was kidding and no one would
2 have to stay in a room with someone that they didn't want
3 to.
4    Q. Anything else you can remember?
5      Now we've got at least two
6 communications with Kim.
7    A. I contacted her in May, late May, to try to
8 set up a meeting because we needed to meet with her and
9 Steve to resolve this, and she said she was going out on
10 vacation. She was going to be out for three days.
11    Q. You proposed a meeting.
12      Who was going to be at the meeting?
13    A. At least myself.
14    Q. So —
15    A. I don't remember if Bruce was coming down or
16 not.
17    Q. And Kim and Steve Duncan?
18    A. No. We were going to have to go down there to
19 meet with Kim to talk to her about what was going -- you
20 know, what was going to happen and the conclusion of the
21 investigation and to talk to Steve, as the other party,
22 about the conclusion of the investigation.
23    Q. But not in the same meeting. Right?
24    A. No, no.

## Page 47

1    Q. So you proposed to meet with Kim to tell her,
2 okay, Kim, this is what we have decided to do --
3    A. Right.
4    Q. -- with your charge?
5    A. Right.
6    Q. And this is late May?
7    A. Late May.
8    Q. And she couldn't make it?
9    A. She had a vacation.
10    Q. So did you eventually have this meeting with
11 her?
12    A. It ended up it was June 3rd.
13    Q. June 3rd.
14      Did you have the meeting with Steve
15 Duncan in late May when she wasn't around --
16    A. No.
17    Q. -- and terminate him?
18    A. No.
19    Q. When was he terminated?
20    A. June 3rd.
21    Q. Okay. So he was terminated first, and then
22 Kim was sat down and talked to?
23    A. Yes.
24    Q. Anything else? Oh, that's it. You said

## Page 48

1 that's June 3rd. Right?
2    A. Yeah. I thought of something else, though.
3    Q. Go ahead.
4    A. I had to contact Kim at one point because we
5 wanted -- Bruce and I wanted to talk to Cindy Smith. And
6 I had to reach out to Kim to find out how to get in touch
7 with Cindy so we could set up a meeting with Cindy.
8    Q. Did you do that?
9    A. Yes.
10    Q. When was that, do you remember?
11    A. May sometime.
12    Q. May of 2003?
13    A. Yes.
14    Q. What did Cindy Smith have to say?
15    A. We asked her about the initial meeting -- the
16 initial outing where Kim left the bar with Steve to walk
17 him to his car, I believe.
18    Q. What did she say?
19    A. Cindy said they had all been out, and they
20 were having drinks. And Steve said that he had to go.
21 And he asked Kim if she would walk him to his car, which
22 she agreed to do. And then about ten minutes or so later
23 Cindy and the rest of the group came out, because I think
24 a couple of Cindy's friends were there too. And they

## Page 49

1 kind of waited and could see that Kim was in the car with
2 Steve, at which point Cindy had to go home. She wasn't
3 really sure what to do. So she finally decided to go up
4 and knock on the window and said, "Kim, get out of there.
5 I've got to go home."
6    Q. She said to Kim to get out of the car?
7    A. Yeah. She had to go home.
8    Q. What else did she say?
9    A. She told us that she had known Kim for a
10 while. She told us that Kim had asked her to go out the
11 night that Scott Durham, Steve, and Kim were all going to
12 go out -- that Cindy was the fourth person to come along.
13 That was a carrier meeting. And they had been out for
14 drinks that night also. She said that she and Kim had
15 talked about -- that Kim had been uncomfortable at the
16 bar the first meeting. And they had talked about Kim
17 talking to Steve about it and that they had agreed that
18 Kim was going to say something to Steve.
19    Q. Cindy and Kim agreed?
20    A. Yes.
21    Q. So she said that Kim expressed to her
22 discomfort with what was going on with Duncan and that
23 she wanted it to stop?
24    A. The one evening that she felt uncomfortable.

Corbett & Wilcox

A181

Deborah Watson

14  (Pages 50 to 53)

Page 50

1   Q.  Do you remember what evening that was?
2   A.  I think it was the first night.
3   Q.  Did you ask Cindy if she saw Mr. Duncan put
4  his hands on Kim inappropriately?
5   A.  She said she could see them in the car, but I
6  don't recall that she could see what they were doing.
7  She said she just knocked on the window.
8   Q.  My question was:  Did you ask her whether she
9  saw Steve Duncan do anything inappropriate to Kim Bailey?
10   A.  I think yes.  Yes, we did.
11   Q.  What —
12   A.  Yes, we did.  We asked about being in the bar,
13  because Kim had said that Steve was touching her in the
14  bar.
15   Q.  What did Cindy say in response to that
16  question?
17   A.  Cindy said that they were standing separate —
18  they weren't really with the group — and that Kim had
19  said something to her later.
20   Q.  Said something to her about what?
21   A.  As I said earlier, that she had been
22  uncomfortable and that she was going to talk to Steve
23  about it.
24   Q.  But did you ask her, ma'am, whether she saw —

Page 51

1  I'm not asking you whether it happened.
2   A.  Yeah.
3   Q.  I'm asking you:  Did you ask her whether or
4  not she saw Steve Duncan do anything inappropriate to
5  Kim?
6   A.  I believe we asked if she saw her — him touch
7  her in the bar.  And that's when she said they were
8  standing separate.  And then she told us that Kim felt
9  uncomfortable later and had talked it over with her.
10   Q.  Did you do a similar template like you did
11  with Exhibit No. 8 where you typed up general areas of
12  questioning and wrote down Cindy's responses?
13   A.  I did that with Steve, not with Cindy.
14   Q.  You didn't do it with Cindy?
15   A.  No.
16   Q.  Why not?
17   A.  Steve and Kim were the two main parties.  When
18  we met with Cindy, it was at a restaurant in Delaware,
19  and it was more conversational.  So it was over lunch.
20   Q.  You have no notes of any kind concerning your
21  conversation with Cindy?
22   A.  Yeah.  I do have a few.  They're in the stack.
23   Q.  Did you give those to us?
24   A.  Yes.

Page 52

1   Q.  Those were taken down the same way?
2   A.  Yeah.  They — it was handwritten.
3   Q.  At this restaurant meeting —
4   A.  Yes.
5   Q.  — with Cindy?
6   A.  Yes.
7   Q.  So basically what did Cindy tell you happened
8  between Steve Duncan and Kim?
9   A.  That Steve had come out that first night and
10  that they were standing separately and that when Steve
11  went to leave he asked Kim to walk to the car, which she
12  did, and that they were gone about ten minutes, and that
13  when Cindy came out they were both in the car.  And Cindy
14  was kind of standing a couple cars down with whoever
15  these other people were and she needed to leave.  So she
16  walked up to the window, knocked on the window and could
17  see them both in the car and said, "Get out of the car.
18  I need to leave."
19   Q.  Did you draw any conclusions based on your
20  discussions with Cindy whether or not Steve had in fact
21  sexually harassed Kim Bailey?
22   A.  It verified for me that Kim felt uncomfortable
23  after the first meeting because she said something to
24  Cindy.  I did wonder about the ten-minute delay on the

Page 53

1  walk out to the car.
2   Q.  What did you wonder about that?
3   A.  It just seemed like a long amount of time to
4  walk to a car, be in a car.
5   Q.  Well, what did you perceive as happened in
6  that ten minutes?
7   A.  I didn't know.  I assumed they just walked to
8  the car and got in the car, which Kim said she got in the
9  car and Steve lunged at her.  Steve said it was
10  consensual.
11   Q.  But had you already talked to Steve by the
12  time you talked to Cindy?
13   A.  Yes.
14   Q.  Did Cindy's name come from Steve or from Kim?
15   A.  From Kim.
16   Q.  Did Cindy's information in your view
17  corroborate anything that Steve Duncan had said?
18   A.  It was more Kim's side of the story because of
19  the uncomfortable piece and the fact that Cindy said that
20  Kim had talked to her about wanting to talk to Steve to
21  make sure it didn't happen again.  I did have the
22  question about the ten-minute walk to the car.
23   Q.  I'm got trying to — .
24   A.  It was a question in my head, though.

Corbett & Wilcox

Deborah Watson

15 (Pages 54 to 57)

Page 54

1  Q.  What were you questioning?
2  A.  That length of time -- being gone for ten
3  minutes.
4  Q.  Well, what was the significance of that?
5  A.  What I was wondering was -- Kim said that she
6  felt that she had to get in the car, and then Steve
7  lunged at her.  And if in fact they were in the car for
8  the full ten minutes -- Steve said consensual.  Kim said
9  no.  I was wondering in my mind where does ten minutes
10 land in that.
11 Q.  Maybe I misunderstood your testimony.
12     There is ten minutes that's missing
13 between the time that they left the bar together --
14 A.  Mm-hmm.
15 Q.  -- and they were seen in the car together.
16     Is that what you're saying?
17 A.  Yes.
18 Q.  That's what Cindy told you?
19 A.  Yes.
20 Q.  Your question is:  What happened during that
21 ten minutes?
22 A.  Right.  Because I had two separate stories.
23 Q.  What were the stories?
24 A.  Kim's story was that they had walked to the

Page 55

1  car and Steve asked her to get in the car to talk.  And
2  they did.  And then he lunged at her.  And she didn't get
3  out or couldn't get out until her friend knocked on the
4  window.  Steve's story was he asked her to walk to the
5  car, they got in the car, and that he kissed her and that
6  it was consensual.
7  Q.  So your question is:  If he lunged at you --
8  you're assuming that he lunged at her right away.  Your
9  question is:  If he lunged at you right away and you
10 didn't like it, why didn't you just high-tail it out of
11 that car?  Right?
12 A.  That's what I was thinking.  And I didn't have
13 any way to prove it because Cindy didn't see specifically
14 in the car.
15 Q.  Was that something you were trying to prove?
16 A.  No.  It was just a thought that I had.  And I
17 wrote that off as a he said/she said.
18 Q.  Take a look at -- again, I'm out of order
19 here -- what I've marked as No. 10.
20     Can I interrupt you real quickly and ask
21 you one thing?  Did you ever show Steve Duncan a copy of
22 the written complaint that Kim made?
23 A.  No.
24 Q.  No?

Page 56

1  A.  No.
2  Q.  Why not?
3  A.  Again because that's in the confidential
4  investigation file.  I wanted to confront him with the
5  allegations and find out what his side of the story was.
6  Q.  So your interpretation of the allegations?
7     MS. LEMING:  Objection to the form.  You
8  can answer.
9  A.  Well, no.  Based on the writing and based on
10 the interview I had with Kim, she had some very specific
11 instances in there, and I wanted to find out what his
12 side of the story was.
13 Q.  You've had a chance to review Watson No. 10?
14 A.  Yes.
15 Q.  Can you tell me what that is, ma'am?
16 A.  These are the questions and notes from Bruce
17 McKelvy and my interview with Steve Duncan.
18 Q.  Was the typewritten stuff prepared in advance?
19 A.  Yes.
20 Q.  Then you sat down with Steve and you asked him
21 these questions?
22 A.  Yes.
23 Q.  And you wrote down the answers?
24 A.  Yes.

Page 57

1  Q.  Before this was Steve asked to give any kind
2  of a written statement about what his position was on the
3  charge?
4  A.  No.
5  Q.  I take it you interviewed him on May 6th.
6  A.  Yes.
7  Q.  You and Mr. Morrissey together prepared this
8  template?
9  A.  No.
10 Q.  Who did?
11 A.  I prepared the template and I showed it to
12 Bruce.  It was Bruce McKelvy, not Morrissey.
13 Q.  I'm sorry.
14     Did Bruce make any changes?
15 A.  I don't recall.
16 Q.  If he did, they would have been incorporated
17 into the typewritten part, though?
18 A.  Correct.
19 Q.  How soon before May the 6th, 2003 did you show
20 this to Bruce?
21 A.  I don't recall.
22 Q.  So you met with Steve Duncan, and you went
23 through these questions line by line?
24 A.  Correct.

Deborah Watson

16 (Pages 58 to 61)

Page 58

1    Q. The first reference that I want you to look
2  at -- let's just go to the first one. He's describing
3  his relationship with Kim as beginning friendly and
4  social.
5    A. Correct.
6    Q. Then it says: Has it ever been more than
7  professional, in quotes, in nature? And he says yes.
8    A. Yes.
9    Q. What did he mean by that, if you know?
10   A. As we got into the discussion, Steve admitted
11  to instances where he and Kim were either kissing or
12  touching, and his position was that it was consensual.
13  And obviously, that is not professional in nature.
14   Q. Did you believe him that it was consensual?
15   A. I didn't have any facts. I couldn't believe
16  either side. I was looking for facts
17   Q. Okay. Did you ever come to believe that it
18  was consensual?
19   A. I came to believe that it might have been
20  consensual, although I didn't have facts other than -- I
21  had facts -- behavior facts. Like both of them admitted
22  that they talked personally about their lives in a lot of
23  detail. There was an e-mail.
24   Q. Hold on just a second.

Page 59

1        Where did Kim admit that? Do you have
2  any documents or anything?
3    A. I believe it's in the notes from my first
4  conversation with her.
5    Q. You mean No. 8?
6    A. I think so.
7    Q. Would you like to take a look at No. 8 and
8  locate that for me?
9    A. In here under my question "What specifically
10  did he say?" quote, started talking about sex again.
11  This was the ride to Maryland. And Steve started talking
12  about Kim's dating and social life. It says developed a
13  personal relationship and discussed personal topics.
14  This is where -- I remember Kim saying that they did
15  discuss some personal things They knew they had -- each
16  of them had kids. Steve knew Kim was single. They had
17  these types of discussions. Now, Kim did share with me
18  that in the car Steve was talking about extramarital
19  affairs, and that made her uncomfortable.
20   Q. So that information from Kim led you to
21  believe that they had had a personal relationship outside
22  of work?
23        MS. LEMING: Objection to form. You can
24  answer.

Page 60

1    A. No, no. It led me to believe that they
2  had personal discussions beyond just the work
3  environment. Then we also found an e-mail where Steve
4  had -- or a gentleman had contacted Kim about a night in
5  Atlantic City. And Kim sent a response back saying --
6  either forwarding to Steve or response back -- I don't
7  remember exactly -- saying, "It's a shame I'm not
8  interested in this guy. Maybe he should give Scott some
9  pointers." Again, this is a work e-mail. So I know that
10  they have personal conversations that are beyond just
11  business.
12   Q. Anything else?
13   A. Kim said she knew she wanted -- Steve was
14  trying to set her up with Scott. Scott Durham verified
15  that they had met at a Marriott Hotel at one point just
16  to chat and get to know each other.
17   Q. So what you're saying is that the nature of
18  the professional -- the relationship beyond the
19  professional relationship was those things that you just
20  testified to. Right?
21   A. Now I'm getting confused. I thought you were
22  asking me about how I knew that Kim and Steve went beyond
23  just the professional conversation.
24   Q. Yeah. That's basically it.

Page 61

1        It says in here: Has it ever been more
2  than professional in nature? If so, when? He answers
3  yes, apparently. Right?
4    A. Yes. He did.
5    Q. Okay. Did you question him: How so?
6    A. Yes. And he admitted to -- Kim had four
7  instances where she said that Steve had touched her
8  inappropriately. Steve verified two instances where,
9  yes, they were kissing in the car. And that's where it
10  was beyond professional. And I knew that conversations
11  that occurred between the two of them were also not
12  professional -- that it went beyond that. It was
13  friendly.
14   Q. But did you ever tell Kim that Steve had said
15  that the kissing in the car was consensual and ask her to
16  verify that?
17   A. We had asked Kim in the initial interview if
18  any of this was consensual, and she said no.
19   Q. Okay. And Steve said it was consensual?
20   A. Yes.
21   Q. May 2002, Backstage Cafe, Corner Pockets --
22  what does that mean?
23   A. They were at two bars.
24   Q. So that means in May 2002 they went to the

Corbett & Wilcox

Deborah Watson

17 (Pages 62 to 65)

Page 62

1  Backstage Cafe and then Corner Pockets?
2      A.  Yes.  That's what I believe happened.
3      Q.  You said to Steve in this interview:  What
4  happened at those bars?
5      A.  Yes.
6      Q.  And he said what?
7      A.  That they were kissing in the car at Corner
8  Pockets.
9      Q.  Is that what you're referring to as the "first
10  incident"?
11      A.  Yes.
12      Q.  Is that the incident that Cindy Smith was
13  talking about to?
14      A.  Yes.
15      Q.  Now, did you ever ask Kim to specifically
16  address the accusation by Mr. Duncan that the kissing in
17  the car was consensual?
18      A.  No.  Because I knew already that from her
19  perspective it was not consensual, because she told me
20  that she had walked him out, got in the car at -- both at
21  his request and that he then lunged at her.  So I, again,
22  had asked her and knew it was from her perspective not
23  consensual.
24      Q.  Did anybody corroborate either Mr. Duncan's

Page 63

1  version of what happened or Kim's version of that
2  incident, the lunging incident?
3      A.  No.  No one saw it.
4      Q.  But he didn't deny it.  He just said it was
5  consensual.  Right?
6      A.  Correct.
7      Q.  Then the next one is:  Did you touch her?
8  Where?  Is that referring to the same May 2002 time
9  frame?
10      A.  Yes.
11      Q.  Again, he says, I take it, consensual contact
12  in the car, kissing --
13      A.  Yes.
14      Q.  -- no touching in the bar.
15      A.  Correct.
16      Q.  Again, nobody was able to corroborate that one
17  way or the other?
18      A.  Yes.  To my recollection, Cindy Smith said
19  they were separate, but I don't recall that she could
20  tell us if there was touching going on in the bar.
21      Q.  But he denied it?
22      A.  Yes.
23      Q.  Did she ever tell you to stop?  I'm moving
24  down to the third one.

Page 64

1      A.  Mm-hmm.
2      Q.  Did he say, no, she didn't tell me to stop?
3      A.  That's what "no" means, yes.
4      Q.  Kissing?  Or was it touching her?
5      A.  Both of them.
6      Q.  Both.
7      A.  Meaning she said both of these were unwelcome.
8  Did she ever ask you to stop?  And he said no.
9      Q.  Now, did you ever tell Kim that he alleged
10  that she never told him to stop?
11      A.  No.  Because, again, I knew from her
12  perspective that this was all unwelcome.
13      Q.  Was there any witness that corroborated any of
14  that stuff that he did it and she was silent?
15      A.  No.
16          MS. LEMING:  Objection to the form.  You
17  can answer
18      Q.  What does "Don't tell Marge, dash, ever" mean?
19      A.  Kim said that Steve made a comment before they
20  were going out not to tell Marge that they were going
21  out.  And so I asked Steve, "Have you ever brought Marge
22  or made a comment don't bring Marge"?  And he said, no,
23  he never said that.
24      Q.  Did he say Kim said it?

Page 65

1      A.  No.  I don't believe I asked him that, because
2  Kim was specific that he had said it.
3      Q.  Did you discuss business travel or work with
4  her that night?  No answer.
5      A.  Yes.  There's no answer there.
6      Q.  What does that mean?
7      A.  I probably didn't ask the question.
8      Q.  Why not?
9      A.  He might have answered it in another question.
10      Q.  An earlier question?
11      A.  Probably a later question, because we haven't
12  gotten into any of the conversation yet.
13      Q.  But how would you know in an earlier question
14  that he was going to answer it at a later question?
15      A.  I don't.  What you're asking me, though, is
16  why is nothing written there?  My thought is -- or maybe
17  I should say it's a yes.  And maybe that's not my best
18  thing to do.  But my best guess is I didn't write
19  anything down at that point because it might be answered
20  at another point.
21      Q.  I'm not sure I understand that answer.
22          So there's none there?
23      A.  Right.
24      Q.  Five:  Did you ask her to make love with you?

Corbett & Wilcox

Deborah Watson

18 (Pages 66 to 69)

Page 66

1    Did you discuss making love when you traveled for
2    business? What's he saying?
3        A.  He's saying, no, there were no insinuations
4    and no touching.
5            You know what? That's the question.
6    That's my answer to No. 4, because Kim had alleged that
7    in this conversation that they were talking about
8    business travel and that Steve implied they could make
9    love or they could stay together. So instead of asking
10   the business travel, we got into the: Did you make the
11   statements? And he said, no, I did not. There was no
12   insinuation like that.
13       Q.  All right. I'm confused.
14           What is the relationship between
15   Questions 4 and 5 now?
16       A.  Kim had said that when they were having
17   conversations about travel Steve had asked, you know, "Is
18   it okay that you can travel for part of work?"
19       Q.  At this Backstage Cafe meeting?
20       A.  Yes.
21       Q.  Okay.
22       A.  And that part of that conversation was that he
23   had insinuated that they could travel together; they
24   could stay in hotels; if she was so inclined, they could

Page 67

1    make love.
2            So I didn't write anything for
3    Question 4 because, as I get into this discussion
4    between Questions 4 and 5, Steve absolutely denies all of
5    it, saying he did not insinuate it at all.
6        Q.  At this meeting at the Backstage Cafe and the
7    Corner Pockets?
8        A.  Yes.
9        Q.  Again, did you ask or inform Kim about his
10   responses to these questions and ask her for her input on
11   the truthfulness of it?
12           MS. LEMING: Objection to the form. You
13   can answer.
14       A.  I already had Kim's answers because I had her
15   side of the story. And what I'm looking for with the
16   interviews with both of them is to try to collaborate one
17   side or the other with some sort of fact. So I already
18   knew what her perspective was on this.
19       Q.  Were there any independent witnesses that
20   corroborated one way or the other on this issue?
21       A.  No.
22       Q.  Now, it says: Alleged quote — sorry — we
23   could travel together and whatever happens happens.
24   Whose quote is that?

Page 68

1        A.  That is what Kim told me Steve had said. And
2    again, this wraps in with Questions 4 and 5 where he
3    denied the whole thing that there were any insinuations
4    or anything like this. And he had already denied once
5    there was no touching in the bar, and he's now denied
6    again any touching in the bar.
7        Q.  "Whatever happens happens" means, you know --
8    he's talking about sex. Right?
9        A.  Kim interpreted it that way, yes.
10       Q.  How did you interpret it?
11       A.  I was looking to see if I could get a
12   verification on that. Because, for example, I had gone
13   to Steve and I had already asked about the touching and
14   the kissing, trying to verify Kim's story. And he's
15   already admitted to kissing her. So in looking at this
16   statement, I'm looking to see if he's going to verify
17   that he said anything like that. And again, he's now
18   denied all of this.
19       Q.  Again, you didn't inform Kim of his denial and
20   ask for her input?
21       A.  I already have her input.
22           MS. LEMING: Objection to the form of
23   the question.
24           THE WITNESS: I already had her input

Page 69

1    from her initial story, and I know it's not consensual or
2    welcome.
3    BY MR. MARCONI:
4        Q.  6 and 7 look like they're taking about leaving
5    the Backstage, Corner Pockets. Right?
6        A.  Mm-hmm.
7            MS. LEMING: Is that a yes?
8            THE WITNESS: Yes. Sorry.
9    BY MR. MARCONI:
10       Q.  It says they went to Bank Shots.
11       A.  Yes. In Pikes Creek.
12       Q.  Did he tell you who all went?
13       A.  He said it was two guys and two women and that
14   they were all Kim's friends.
15       Q.  How about 8? What's he saying there?
16       A.  They had walked to Steve's car. There's two
17   guys and two women who were the other people they were
18   with. They were all Kim's friends. He had already said
19   there was no touching in the bar. None of the
20   conversation. And Steve thought it was Tom Einstein's
21   ex-wife who knocked on the window.
22       Q.  What's "None of the conversation"? What about
23   "None of the conversation"?
24       A.  It says no conversation, meaning, again, he's

Corbett & Wilcox

Deborah Watson

19 (Pages 70 to 73)

Page 70

1   disturbed about her allegations about the conversation in
2   the bar and the touching in the bar. And he's admitted
3   to the kissing, but he's reiterating that there was no
4   touching in the bar and none of these conversations in
5   the bar. So Steve is keeping it focused to in the car.
6       Q.   So he admitted to kissing her in the car.
7   It's just that she said he lunged at her and did it, and
8   he says that it was consensual.
9       A.   Yes.
10      Q.   Who's Einstein's ex-wife?
11      A.   Tom Einstein was an employee of Commerce
12  Insurance Services, and his ex-wife apparently was part
13  of this group.
14      Q.   He's saying she's the one that knocked on the
15  window when they were kissing?
16      A.   Yes. Steve thought that was her.
17      Q.   Then it says:  When you were in the car, what
18  happened?  Who initiated it?  Was anyone else there?
19      A.   His answer was they were in there for
20  approximately ten minutes and that both of them agreed to
21  get in the car.
22      Q.   Now, is that the ten minutes that you had
23  concerns about that you talked to me about earlier?
24      A.   That was Steve's version of how long it was.

Page 71

1   And then when we talked to Cindy Smith, we asked her
2   approximately how long it was, and she also said about
3   ten minutes.
4       Q.   How long what was?
5       A.   Between — Cindy had said between when they
6   left the bar -- when Kim and Steve left the bar to go to
7   the car and then when Cindy walked out with the rest of
8   the friends.
9       Q.   And saw them in the car?
10      A.   Yes.
11      Q.   There are notes that Cindy said that?
12      A.   Yes. The ten minutes, I believe, is written
13  off to the side.
14      Q.   No. 10 says -- what is that saying?
15      A.   When did the evening end?  This is where Steve
16  said that her friends saw the end of the evening. It
17  ended because he had to go. And Kim left with her
18  friend. And I wrote Tom Einstein's ex-wife made the
19  comment because Steve felt that it was Tom Einstein's
20  ex-wife who knocked on the window and said, "I've got to
21  go."
22      Q.   So what you're saying here is that Mr. Duncan
23  thought that the lady that knocked on the door and said,
24  "Kim, I have to go" was Tom Einstein's wife?

Page 72

1       A.   Ex-wife, yes.
2       Q.   Ex-wife.
3            Did you try to contact her?
4       A.   No.
5       Q.   Why not?
6       A.   Because Kim was sure that it was Cindy Smith
7   who knocked on the door and Steve had verified that these
8   were Kim's friends.
9       Q.   Look at the back.  It's CIS 0506.
10      A.   Mm-hmm.
11      Q.   What's that?  I'm not sure what that says.
12  What does "C1" mean?
13      A.   "C1" — if you look at the list, the major
14  events, I have letters. And then you have the questions
15  numbered. "C1" is a comment that Steve made relative to
16  a question I asked that I didn't fit underneath that. So
17  that's how I cross-reference it --
18      Q.   Okay.
19      A.   -- to keep it organized.
20      Q.   What does that mean -- that C1 on CIS 0506?
21      A.   We were talking about Steve -- who Scott
22  Durham was. And Steve wanted to set them up.
23      Q.   But I'm asking you to tell me what that says.
24      A.   Kim confided in Steve about her personal life.

Page 73

1   Tom Cetola -- in the spring Tom came to SD, Steve Duncan,
2   and said, quote, Kim likes you and was telling people at
3   the WOW! awards. Kim never confronted -- or didn't
4   confront him.
5       Q.   All right. So who told you that Kim confided
6   in Steve about her personal life?
7       A.   Steve.
8       Q.   Steve?
9       A.   Yeah.
10      Q.   Did you do anything to corroborate that?
11           MS. LEMING:  Objection to the form.  You
12  can answer.
13      A.   We had pulled the e-mails to see what the
14  conversation was back and forth between Steve and Kim.
15  And, for example, we had an e-mail discussion between the
16  two of them about some guy who was going to invite Kim to
17  Atlantic City.
18      Q.   Okay. Then Tom Cetola in the spring. What
19  does that mean?
20      A.   In the spring of that year -- so earlier that
21  year -- Tom Cetola, who was a producer in Core, according
22  to Steve Duncan, had come to Steve and said that Kim
23  likes you and that Kim was wandering around the WOW!
24  awards, which was March of that year, I guess, telling

Corbett & Wilcox

Deborah Watson

20 (Pages 74 to 77)

Page 74

1  people that she liked him.
2      Q.  All right. Cetola was telling people at the
3  WOW! awards -- let me finish -- that he was saying that
4  Kim Bailey liked Steve Duncan?
5      A.  Tom Cetola came to Steve and said to Steve,
6  "Kim likes you. Kim was telling people this at the WOW!
7  awards."
8      Q.  And Steve Duncan told you this?
9      A.  Yes.
10     Q.  Did you talk to Tom Cetola about that?
11     A.  No, I did not.
12     Q.  Why not?
13     A.  Because this occurred before Kim's first
14  interaction with Steve in May that she had -- that she
15  was upset about.
16     Q.  Yeah. But you had a suspicious, didn't you,
17  at least based on information that you got from Steve
18  Duncan that all of this was consensual? Right?
19     A.  I had two sides of the story. I didn't have
20  any facts yet.
21     Q.  Well, but you did have an allegation that it
22  was consensual and an allegation that it wasn't.
23     A.  Correct.
24     Q.  Now we have a third party here who apparently

Page 75

1  says that he, of his own personal knowledge, heard Kim
2  say she likes Duncan. Right?
3      A.  Correct.
4      Q.  Now, wouldn't that in your mind lend credence
5  to Duncan's argument that all this was consensual?
6          MS. LEMING: Objection to the form. You
7  can answer.
8      A.  That's not a yes or a no. Can I give you more
9  information?
10     Q.  Well, first give me a yes or no, and then you
11  can give me more information.
12     A.  No. Not necessarily.
13     Q.  Okay. Well, how might it?
14     A.  Just because Kim says to someone that she
15  likes them doesn't mean that she's willing or interested
16  in doing something about it.
17     Q.  But --
18     A.  In doing the investigation, what I was looking
19  for was the events that occurred in trying to corroborate
20  with facts whose side of the story was more accurate.
21     Q.  All right. That sounds good.
22         But you mean the fact that this was
23  allegedly said didn't even warrant an inquiry at all?
24         MS. LEMING: Objection to the form. You

Page 76

1  can answer.
2  BY MR. MARCONI:
3      Q.  Maybe it's not going to prove it one way or
4  the other, but you said you didn't do anything to
5  corroborate that.
6          MS. LEMING: Objection to the form. You
7  can answer.
8      A.  I also did not want to open the investigation
9  up to another party beyond the people that I had already
10  been given by Kim. And Steve had also given me some
11  people. And this was going to give me one statement that
12  Kim might have made to Tom and his allegations that she
13  was saying as opposed to trying to verify, for
14  example, by talking to a Cindy Smith what she physically
15  saw in the bar relative to an event that Steve denied and
16  Kim was very much upset about.
17     Q.  Wait a minute. You're investigating a claim
18  of sexual harassment. What difference does it make how
19  many people are involved as long as you get to the proper
20  conclusion?
21     A.  Because I am trying to get to the proper
22  conclusion but at the same time honor Kim's request and,
23  to an extent, Steve's request to keep this confidential.
24     Q.  Yeah. But did Kim say I want this kept

Page 77

1  confidential at the expense of the integrity of your
2  investigation?
3          MS. LEMING: Objection to the form. You
4  can answer.
5      A.  Kim was very concerned about confidentiality
6  right from the start. And therefore, in trying to
7  determine who we would interview, we were very careful
8  again to try to get to people who had facts as opposed to
9  going to a Tom Cetola that is a name I'm only hearing
10  from one side, which is only Steve, to try to get to the
11  facts.
12         If you look at the three people we spoke
13  to, I have Steve and Kim both saying that Cindy Smith was
14  involved in some of these. So I have both of them saying
15  that. I have Paul Scaffidi -- again, both of them saying
16  that Paul Scaffidi was talked to. And then I have Scott
17  Durham. Again, both of them saying that. In this
18  instance, I just have Tom Cetola coming in from Steve's
19  side.
20     Q.  So you decided it wasn't worth pursuing this
21  with Tom Cetola. Right?
22         MS. LEMING: Objection to the form. You
23  can answer.
24     A.  We made a decision not to talk to Tom in an

Deborah Watson

Page 78

1    effort to try to maintain confidentiality without
2    compromising the investigation.
3         Q. Okay. Move onto the second page, 0507. I
4    guess that would be the third page.
5         A. (The witness complied with counsel's request.)
6         Q. Now we're talking about a lunch meeting at
7    Bull's Eye. Remember that?
8         A. Yes.
9         Q. What does this mean? What do these
10   handwritten notes mean?
11            MS. LEMING: Do you want her to read the
12   whole top section?
13            MR. MARCONI: No. I just want her to go
14   to No. 1 and say -- what does she mean when she makes
15   that handwriting? What is it saying to us?
16            MS. LEMING: Objection to the form. You
17   can answer.
18        A. It says: Where? When? Who initiated it? A
19   day or two later --
20        Q. Initiated what?
21        A. The meeting at Bull's Eye.
22        Q. But what was your understanding about what
23   happened at the meeting at Bull's Eye?
24        A. Kim's version was that she had asked Steve if

Page 79

1    they could go to lunch to talk about what had happened
2    and that he had agreed -- that this was initiated by her.
3         Q. What was his version?
4         A. That he initiated it.
5         Q. What did he want to talk about?
6         A. According to Steve, it was a day or two later.
7    He asked, meaning you asked for the meeting -- that's his
8    first person -- quote, I apologize for last night. Let's
9    go to lunch, meaning that Steve initiated it. And my
10   last comment: Initiated the apology because he was
11   wrong. That was Steve's version.
12        Q. What was he apologizing for?
13        A. He felt he was wrong in engaging in that
14   activity.
15        Q. What activity?
16        A. The kissing in the car that he admitted to.
17        Q. Okay. And he told you that?
18        A. Yes.
19        Q. So are you telling me that his position was
20   that he was going to meet with Kim for purposes of
21   apologizing to her for that?
22        A. According to what I have here, he asked to go
23   to lunch because he wanted to apologize. I have, quote,
24   I apologize for last night. Let's go to lunch. And he

Page 80

1    said he initiated the apology because he was wrong.
2         Q. Did you discuss with him what discussions he
3    and Kim had at the lunch?
4         A. If I did, it should be in here.
5         Q. It says: What was discussed?
6         A. Steve said recognized he made a mistake and
7    that she apologized too.
8         Q. Now, did you ever ask Kim whether or not she
9    apologized at that meeting?
10        A. In her write-up, I had Kim's version of what
11   happened at that meeting. I'm now talking to Duncan to
12   try to find out his side of the story.
13        Q. But does her write-up specifically address
14   the issue of whether she apologized for anything?
15        A. I would have to look at it to be sure. But
16   her write-up addressed that she initiated the meeting and
17   that she wanted to verify that she didn't get the job
18   because of anything concerning her looks or her physical
19   appearance and that she was qualified and that she was
20   upset because she felt that at the meeting he took
21   control of the lunch and make it sound like it was his
22   idea to go to lunch
23        Q. That's what you recall from the write-up?
24        A. That's what I recall from the write-up.

Page 81

1         Q. He says that she said she apologized also.
2    Right?
3         A. She apologized too, yes.
4         Q. Did he say what she apologized for?
5         A. Didn't get that specific that I can recall.
6         Q. Okay. Go down to No. 3.
7            What are you telling us here?
8         A. No. 3: What was agreed upon or resolved when
9    the meeting was over? Socially, it would be on a
10   business level. Steve felt both agreed. Steve said the
11   conversation never occurred about, quote, why she got the
12   job.
13        Q. So what does that mean?
14        A. It means that, according to Steve's version,
15   they agreed it would be -- go forward on a business
16   level. He felt that they both agreed to that. And he
17   denied that they ever talked about whether she got the
18   job for her looks or her qualifications
19        Q. Did you ever tell Kim that he denied that the
20   conversation occurred about her looks or her
21   qualifications?
22        A. No. Because I knew her side of the story.
23        Q. Was there anybody that was able to corroborate
24   any of the stuff that Steve said concerning this meeting

Corbett & Wilcox

Deborah Watson

22 (Pages 82 to 85)

Page 82

1    at Bull's Eye?
2      A.  No.
3      Q.  Go down to the heading C, the June 2002 entry.
4         Did you ask Kim to discuss how Kim and
5    Mr. Durham met?
6      A.  My first question is:  Who is Scott Durham?
7    When did Kim meet him?  Steve said -- Steve wanted to set
8    them up.  Steve had, quote, prepped Scott about Kim.
9      Q.  Did he say what he said about her?
10     A.  No.  Not that I recall.
11     Q.  Did you ask him?
12     A.  I don't remember.
13     Q.  If you had, would you have made a note of it?
14     A.  I did ask him about "See, what did I tell
15   you," which was Kim's allegation that when they walked in
16   the room for the carrier meeting that Steve looked at
17   Scott and made this comment -- "See, what did I tell
18   you" -- that Kim didn't know how to interpret.  And Steve
19   denied making the comment.
20     Q.  Did you ever verify that with Mr. Durham?
21     A.  It would be in my notes somewhere.  There are
22   notes from my conversation with Mr. Durham.
23     Q.  So if you had, you would have noted that in
24   your notes from that conversation?

Page 83

1      A.  Yes.  I believe so.
2      Q.  Then the next question asks:  Did Kim say she
3    was uncomfortable during the meeting?  He didn't answer
4    that?
5      A.  I don't have anything written down.
6      Q.  Any idea why?
7      A.  I don't recall
8      Q.  Do you know whether you asked him that
9    question or not?
10     A.  Don't recall.
11     Q.  Then it says that Mr. Durham told you that you
12   went to Kid Shelleen's after this meeting in the board
13   room with Mr. Durham and Kim.
14     A.  This is Mr. Duncan.
15     Q.  I'm sorry.  Steve Duncan.
16        But wasn't it Mr. Duncan, Mr. Durham and
17   Kim?
18     A.  The three of them in the meeting was -- yes.
19   That was my understanding.
20     Q.  But who went to Kid Shelleen's?
21     A.  It was Kim, Steve, Scott Durham, and then, per
22   the next question, short woman sells life insurance, not
23   Tom Einstein's wife.  And we verified that this was Cindy
24   Smith.

Page 84

1      Q.  Then you said:  Whose idea was it for Kim to
2    bring a friend?  Why did she come?
3      A.  Steve's answer was it was support for Kim.
4    The "no" is that he said it was not his idea.
5      Q.  Did he say why he thought Kim needed support?
6      A.  I believe he said that it was because there
7    were three of them.  It's an awkward number.
8      Q.  Did MainStreet have any business dealings with
9    Scott Durham?
10     A.  My understanding is that he was a carrier rep
11   for Andover Insurance, which was either one of our
12   carriers or a carrier that we were trying to build a
13   relationship with.
14     Q.  Would that have been part of Kim's job -- to
15   help build a relationship with him?
16     A.  It would have been part of Kim's job to meet
17   with the carrier representative and participate in any
18   business discussions to get a business relationship
19   going.
20     Q.  Would that include going to Kid Shelleen's?
21     A.  I don't know if the carrier paid for that
22   evening.
23     Q.  What difference does that make?
24     A.  I don't know that it was a social gathering or

Page 85

1    did the carrier pay for it, meaning that the carrier
2    invited them out.
3      Q.  Well, how about if they invited the carrier?
4      A.  The carriers usually pay is my understanding
5    because they want to hook up with brokers because we're
6    the ones who bring in business.
7      Q.  But by going to Kid Shelleen's, Kim was trying
8    to impress Mr. Durham so that he would perhaps send
9    business Commerce's way.  There would have been nothing
10   wrong with that at all.  Right?
11        MS. LEMING:  Objection to the form.  You
12   can answer.
13     A.  It depends on whether or not this was a
14   business meeting -- a continuation of the meeting in the
15   conference room or if this was a more social, hey, let's
16   just go out and have a drink.
17     Q.  Well, do you have any reason to suspect that
18   it wasn't a continuation of the meeting that was started
19   in the conference room?
20     A.  Well, yes.  Because Cindy Smith was invited.
21   And if it's a business meeting, why would you invite an
22   outside person?
23     Q.  Any other reason to believe that business
24   wasn't discussed at that meeting?

Deborah Watson

Page 86

1    A.  Why would you have the preliminary meeting and
2  not just finish everything up there?
3    Q.  I don't know that that's responsive to my
4  question.
5    A.  Well, maybe I didn't understand your question.
6  I apologize.
7    Q.  The question is:  Do you have any other reason
8  to believe, other than Cindy Smith was there, that
9  business wasn't on the agenda at Kid Shelleen's?
10   A.  Steve Duncan's version was that he was trying
11  to hook up Scott and Kim.
12   Q.  Where's that?
13   A.  CI:  Who is Scott Durham?  When did Kim meet
14  him?  Steve wanted to set them up.  Steve had prepped
15  Scott about Kim.
16   Q.  Well, that's what Steve and Scott intended.
17        Is there any reason to believe that
18  that's what Kim was looking for too?
19   A.  Kim's version of this was that there was a
20  business meeting in the conference room and that she was
21  instructed to go in there to meet the carrier rep and
22  that Steve had asked Kim that they were going to go out
23  later and to bring a friend, which Kim felt was unusual
24  but that she had complied.  So, again, I have two

Page 87

1  different versions.
2    Q.  But you don't have any reason to suspect that
3  Kim did not believe that that was a business meeting --
4  that that's what they were going out for?
5    A.  I believe she said in her write-up that she
6  thought it was a little unusual.  But her boss asked it,
7  so she complied.
8    Q.  Okay.  Did you think that it was proper for
9  Scott Durham and Steve Duncan to try to set Mr. Durham up
10  with Kim?
11        MS. LEMING:  Objection to the form.  You
12  can answer.
13   A.  Personally or professionally?
14   Q.  Both.
15   A.  Personally and professionally, I don't believe
16  that, as a manager, you should be that involved in a
17  subordinate's life.  And as a subordinate, I think you
18  should try to keep the business life separate from the
19  personal life.
20   Q.  Okay.  Let me ask you this.
21        I want you to assume for me that Kim
22  Bailey had no idea that Mr. Duncan and Mr. Durham had
23  discussed trying to fix her up with Mr. Durham.  I want
24  you to assume that.  Okay?

Page 88

1    A.  Mm-hmm.
2    Q.  I also want you to assume that when she left
3  her office with those people and Ms. Smith to go to
4  Kid Shelleen's that the only reason she intended to go
5  there was to discuss business with Mr. Durham and
6  hopefully get some business from his company.  Okay?  I
7  want you to assume that too.
8    A.  Mm-hmm.
9    Q.  Do you believe that it's sexual harassment for
10  Mr. Duncan to make an arrangement to try to fix her up
11  with Mr. Durham without telling her?
12        MS. LEMING:  Objection to the form.  You
13  can answer, if you can.
14   A.  Honestly, I'm not comfortable with trying to
15  answer that because you've asked me to make two
16  assumptions --
17   Q.  Well, you have to answer it.
18   A.  -- that I don't necessarily agree with.
19   Q.  Well, I'm not asking you whether you agree
20  with them.  I'm just asking you to make those assumptions
21  and answer the question.  And you can't not answer it.
22   A.  Could you repeat it for me one more time?
23        MR. MARCONI:  Could you read it back?
24        Actually, wait a second.  Let me --

Page 89

1  BY MR. MARCONI:
2    Q.  If Steve Duncan is making arrangements to set
3  up Kim and Mr. Durham and Kim doesn't know about it --
4    A.  Mm-hmm.
5    Q.  -- and Kim's not interested in it, do you
6  contend or do you believe that that's sexual harassment?
7        MS. LEMING:  Objection.  You can answer.
8    A.  If it makes Kim uncomfortable, then she has a
9  right to tell him to stop or to contact human resources
10  or another management person and let us know that it's
11  making her uncomfortable, at which point it could
12  potentially be a sexual harassment allegation.
13   Q.  What would be required beyond that to make it
14  a sexual harassment allegation?
15   A.  She has to be uncomfortable with the actions
16  in order for it to be sexual harassment.  If she's -- if
17  it's not quid pro quo and she is not expressing it is
18  making her feel uncomfortable or inhibiting her ability
19  to do her job in a reasonable manner or environment, then
20  it may not be sexual harassment.  It depends on how she's
21  feeling about this.  And your question was concerning
22  whether or not she knew it was going on.
23   Q.  Well, let's say she didn't know when it was
24  happening but she found out about it in the middle of the

Deborah Watson

24 (Pages 90 to 93)

Page 90

1  night, you know, when they're at the bar and she got
2  angry and she came in the very next day and said, "Guess
3  what Steve Duncan did to me."
4      A.  Mm-hmm.
5      Q.  Would you consider that to be sexual
6  harassment?
7          MS. LEMING:  Objection.
8      A.  I would consider that to be a charge of sexual
9  harassment.  I then have to go investigate and find out
10 what he did.
11     Q.  All right.  Let's assume you investigated it
12 and everything that she said happened happened.  Is that
13 sexual harassment?
14         MS. LEMING:  Objection to the form.  You
15 can answer.
16     A.  So I'm assuming, to make sure I'm clear, that
17 she finds out in the middle of the night.  She comes to
18 human resources the next day.  We investigate it.  And
19 are you saying that Steve Duncan admits to the whole
20 thing?
21     Q.  Yeah.
22         Steve Duncan says I tried to fix up
23 Mr. Durham with Kim Bailey.  I didn't tell her.  I
24 thought she would like it.  I thought it would be cool

Page 91

1  for him.  And that's what I did.  And she comes in and
2  says I hate it.  There's no way I ever wanted anything
3  like that.  How dare he?
4      A.  Mm-hmm.
5      Q.  You have all those facts in front of you.
6      A.  Mm-hmm.
7      Q.  What's the answer?  Sexual harassment or not?
8      A.  If it has not negatively impacted her and we
9  stop that behavior, it's not going to fall in the sexual
10 harassment realm.  It is absolutely going to fall in the
11 inappropriate realm.  And I would be happy that she
12 brought that to my attention so I can deal with the
13 management person.
14     Q.  Well, where's the line?  When do you decide
15 when it's sexual harassment and when it's not?  Do you
16 decide that?
17     A.  It's part of the investigation, which is
18 what --
19     Q.  But there's no more --
20         MS LEMING:  Can she finish her answer,
21 please?
22         MR. MARCONI:  I don't want to interrupt
23 her, but there's no more investigation.
24

Page 92

1  BY MR. MARCONI:
2      Q.  The investigation has concluded, and the
3  results of the investigation are as I have described them
4  already.  He did it.  He didn't tell her he was doing it.
5  He did it like he felt like it.  She absolutely detested
6  the fact that he did it.  And the moment she found out
7  about it she came to you.
8      A.  Mm-hmm.
9      Q.  You said that that's not sexual harassment.
10 It's inappropriate.  Right?
11     A.  Because --
12         MS. LEMING:  There's no question
13 pending.
14         MR. MARCONI:  Well, the question is:
15 Right?
16 BY MR. MARCONI:
17     Q.  Is that what you said?
18         MS. LEMING:  Is that what you said?
19 BY MR. MARCONI:
20     Q.  You said that is not sexual harassment, but it
21 is certainly inappropriate.
22     A.  I said that may not be sexual harassment, but
23 it is certainly inappropriate, because the piece that we
24 have to find out through the investigation is:  Is there

Page 93

1  any negative impact in her job?
2      Q.  How about the fact that she feels as though
3  she's been betrayed and abused personally?
4          MS. LEMING:  Objection.
5      A.  But now you're modifying the initial question
6  that you asked me to answer.
7      Q.  All right.  Well, what is it that has to
8  affect her job that would bring it over the threshold
9  into sexual harassment from just inappropriate?
10     A.  Did he threaten her in any way?  If she does
11 not go out for dinner that night or to drinks --
12     Q.  No.
13     A.  -- that X will happen to her.
14     Q.  No.
15     A.  Has he taken any negative steps towards her
16 because of either refusing or expressing the anger?  Has
17 there been any retaliation of any sort for her bringing
18 it to human resources?  In other words, has something in
19 her work been impacted beyond her ability to work within
20 that environment?
21     Q.  So all that stuff has to be shown before you
22 think that that's sexual harassment?
23     A.  That it would qualify under a hostile work
24 environment.

Deborah Watson

Page 94

1    Q.  Did you tell Ms. Bailey that Mr. Duncan was
2    trying to fix her up with Mr. Durham or did she tell you?
3    A.  I didn't tell her.
4    Q.  But you talked about that with Mr. Duncan.
5         Did he deny it?
6    A.  I asked him these questions: Who is Scott
7    Durham?  When did Kim meet him?  And Steve volunteered
8    that he wanted to set them up.
9    Q.  That Steve wanted to?
10   A.  Yes.  It's in my notes Steve wanted to set
11   them up.
12   Q.  Did you ask Steve if he ever asked Kim if it
13   was okay to set the two of them up?
14   A.  I don't recall
15   Q.  If you have, that would be in the notes?
16   A.  Possibly.
17   Q.  Did you ever ask Kim whether it was okay for
18   Duncan to try to set her and Durham up?
19   A.  I asked Scott Durham about that, not Kim.
20   Q.  You never asked Kim?
21   A.  I don't recall asking Kim.
22   Q.  Why not?  Why didn't you ask her?
23   A.  Because Kim said she was uncomfortable with
24   the meeting with Steve and Scott.  Steve says I wanted to

Page 95

1    set them up.  I know through the e-mail that there has
2    been conversation between Kim and Steve about who Kim
3    dates.  So I went to Scott Durham to try to find out what
4    happened with these three people -- Scott, Steve and Kim.
5    Q.  Wasn't it important for you to know whether or
6    not Kim objected to trying to be fixed up with Scott
7    Durham?
8         MS. LEMING:  Objection to the form.
9    You can answer.
10   A.  It was important to try to find a fact.  And
11   the fact was Scott Durham said that he and Kim met at a
12   Marriott.  So Kim was not upset enough about this that
13   she refused to meet Mr. Durham to have a drink.
14   Q.  They met at a Marriott?  At a hotel?
15   A.  Just a conversation to meet each other, yes
16   Like a date.
17   Q.  Before this Kid Shelleen's or after?
18   A.  After.
19   Q.  I'm talking about before.  I'm trying to
20   figure out why you wouldn't ask Kim when you're trying to
21   figure out whether Steve Duncan was sexually harassing
22   her.  I'm trying to figure out why you wouldn't ask her
23   did she have an objection to Steve Duncan trying to fix
24   her up with this Durham guy.  I don't understand why you

Page 96

1    wouldn't do that
2    A.  Because --
3         MS. LEMING:  Is there a question there?
4         MR. MARCONI:  Yeah.
5    BY MR. MARCONI:
6    Q.  Explain to me why you didn't do that.
7    A.  Because I'm trying to collaborate either Steve
8    or Kim's version of the events that Steve was -- Steve
9    and Kim were bothered by.  So, again, I go to Scott
10   Durham to say, "Did you meet Kim?  What happened there?"
11   because I already know that Kim's lining up in these
12   meetings that none of this was consensual and made her
13   uncomfortable.  And Steve is lining up saying that this
14   was consensual.  So I went to this third person that they
15   have both talked about and asked him.
16   Q.  Well, what did he say?
17   A.  He said that, yes, they met at a Marriott and
18   they had a conversation.  And then I found an e-mail
19   where Kim actually references Scott in a very casual
20   fashion.  So I know that they did at some point meet and
21   say I should have this -- again, the guy from Atlantic
22   City's name is escaping me.  But have him give Scott
23   lessons.
24         THE WITNESS:  Can I have a break,

Page 97

1    please?
2         MR. MARCONI:  Sure.
3         THE WITNESS:  We've been at this for a
4    while.
5         MR. MARCONI:  Sure.
6         THE WITNESS:  Thank you.
7         (A recess was taken.)
8         - - - - -
9         DEBORAH E. WATSON, resumes
10   BY MR. MARCONI:
11   Q.  Move on please to page 0509 beginning with D.
12   A.  (The witness complied with request.)
13   Q.  Would you go through those and explain what
14   you're saying and what's being said under the Heading D?
15   A.  D -- Caves Valley Golf Tournament in Caves
16   Valley, Maryland.  What was the purpose of the event?
17   Who went?  Anyone else from CIS?  Travelers invited Kim
18   and Steve to tournament.  All-day event.  Bill Taylor was
19   there.  Scott was at Andover tent.
20   Q.  What does that mean?
21   A.  That means it was a -- we were invited to the
22   event, meaning Kim and Steve were invited to the event by
23   Travelers, which is one of our carriers.  It was an all-
24   day event.  Bill Taylor, who's another management person,

Deborah Watson

26 (Pages 98 to 101)

Page 98

1  was there. Scott was at the Andover tent. And that's
2  Scott Durham, which is with Andover, which is the other
3  carrier.
4      Q.  So Scott Durham -- that's right. He worked
5  for Andover. Didn't he?
6      A.  Correct.
7      Q.  Okay. Go ahead.
8      A.  Did anything happen in the car? SD said
9  touching in the car on the way home.
10     Q.  That's Steve Duncan?
11     A.  Steve Duncan.
12         SD: Nothing on the way down. Event
13  didn't happen. And what we're talking about is that Kim
14  said that there was touching and conversation she didn't
15  like on the way down.
16     Q.  But is he saying that there was touching in
17  the car on the way home?
18     A.  Yes.
19     Q.  Did he say whether or not that touching was
20  something that Kim found offensive?
21     A.  It's actually further down, if we keep going.
22     Q.  Okay. Show me.
23     A.  When you get to No. 4 -- did Kim tell you she
24  was uncomfortable or to stop? Did she tell you she was

Page 99

1  uncomfortable with the topic of the conversation -- his
2  sex life and extramarital affairs? Kim had said that
3  Steve was talking about his extramarital affairs on the
4  way down and that, although she hadn't said anything, she
5  didn't want to hear about it.
6         Steve talked about his personal life.
7  Steve touched her leg and said -- and this he said to
8  himself -- quote, I'm not going to do this. And that's
9  what the arrow is to himself. She didn't say no. And
10  according to Steve, when Steve stopped touching her, Kim
11  yelled at Steve, quote, you can't do this. Makes me mad
12  that you won't continue this.
13     Q.  So basically Steve said that she wanted him to
14  touch her in the car?
15     A.  To continue what was going on. That's what
16  Steve said.
17     Q.  What was going on? He was touching her leg?
18     A.  Yes.
19     Q.  Now, did you ever confront Kim and tell Kim
20  that Steve had said that it was consensual and asked for
21  her response to this claim?
22     A.  I already had her response which was that the
23  touching in the car was not consensual and that she had
24  not said anything to him, because I had asked that

Page 100

1  question.
2      Q.  Was there anybody that corroborated either
3  side?
4      A.  No.
5      Q.  Did you do anything to try to corroborate
6  either side on this issue?
7      A.  Yes.
8      Q.  What?
9      A.  Steve claimed that when they got home Kim
10  called him and continued to yell at him. So we got Kim's
11  cell phone number and tried to verify the phone call and
12  were unable to do so.
13     Q.  So he wasn't telling the truth?
14     A.  Unable to verify whether the phone call
15  occurred. I was looking for a fact from either side that
16  I could verify since I had two people sitting alone in a
17  car.
18     Q.  And he gave you a fact. Right? He said that
19  she called him from her cell phone to his cell phone. Right?
20     A.  He gave me an allegation that I then tried to
21  prove or disprove and was unable to prove or disprove
22  with the cell phone bills.
23     Q.  What was the allegation? That she called him
24  from her cell phone to his cell phone?

Page 101

1      A.  Yes. Later at night.
2      Q.  Okay. You reviewed the cell phone records for
3  both Kim and Mr. Durham?
4      A.  No. It was not Mr. Durham. It was between
5  Kim and Mr. Duncan.
6      Q.  I'm sorry. Mr. Duncan.
7      A.  He was not able to prove -- it might not have
8  gone to his cell phone, because the cell phone records I
9  could try to get a hold of was Kim's.
10     Q.  Those records would have shown if she had
11  placed a call from her cell phone to him that day.
12  Right?
13     A.  That's what I was hoping that it would show.
14     Q.  Why were you hoping that's what it would show?
15     A.  Because I'm looking for a fact. I'm looking
16  for something to show that it -- one thing did or didn't
17  occur. And what happened when I got the cell phone bills
18  is that it didn't list the phone numbers. I was unable
19  to prove or disprove either side.
20     Q.  So it didn't list the phone numbers that she
21  was calling to?
22     A.  Correct.
23     Q.  Did you do anything else to try to find his
24  cell phone number?

Deborah Watson

27 (Pages 102 to 105)

Page 102

1    A.  I don't believe it went to his cell phone.  I
2  would have to double-check that.  There was one cell
3  phone we could check, and I don't remember why we
4  couldn't check the other side of it.
5    Q.  How did you get Kim's cell phone?
6    A.  If it's a company cell phone, then Commerce
7  Insurance pays for the majority of the bill and gets the
8  bills.  We have access to those.
9    Q.  None of the phone bills or the phone records
10 that you get from Kim's phone ever show numbers that were
11 called?
12   A.  I didn't peruse all of Kim's phone bills
13 because I didn't want to look into all of those calls.  I
14 was trying to figure out this fact, again, with two
15 people in a car issue.
16   Q.  All right.  But you knew the day that this
17 call was allegedly made.  Right?
18   A.  Mm-hmm.
19   Q.  Did you review the phone records for the day
20 that the call was made?
21   A.  There's an e-mail where I believe we requested
22 it for approximately a four-day period.
23   Q.  Ma'am, my question is:  Did you review the
24 phone records for the day that this alleged phone call

Page 103

1  was made?
2    A.  Yes.
3    Q.  Okay.  Any of those phone records that you
4  reviewed, did they show telephone numbers to which calls
5  were placed by that cell phone?
6    A.  No.  That was the problem.  It wasn't a bill
7  that gave me both sides of a phone call, meaning both
8  phone numbers.  It would show incoming or it would show
9  outgoing to her phone number, but it wouldn't show the
10 other phone number.
11   Q.  So if she was called by Mr. Duncan, for
12 example, it would have shown his number on the bill?
13   A.  No.  It would have shown incoming -- the word
14 "incoming" or "outgoing," if I remember correctly.
15   Q.  But no number --
16   A.  Right.
17   Q.  -- to which the outgoing call went?
18   A.  Correct.
19   Q.  That was with respect to all of the days that
20 you looked at or just this day?
21   A.  All of those days.
22   Q.  Are all the bills like that all the time?
23   A.  I haven't looked at all of the bills.
24   Q.  So you weren't able to corroborate his story

Page 104

1  that basically the events in the car were consensual?
2    A.  I couldn't corroborate either side.  Correct.
3    Q.  Did you tell Kim that he had said that she
4  called him and complained that the relationship was over
5  or whatever he said?
6    A.  No.  Because, again, I was looking to try to
7  find a fact to see who's side of the story I could get a
8  fact to back up.
9    Q.  Well, what if Kim was able to show you that
10 she was with a certain person from the time that an hour
11 before he claimed it happened to an hour after he claimed
12 it happened?  What if she could have had somebody
13 corroborate that she never been made such a phone call?
14 Wouldn't that have been important?
15         MS. LEMING:  Objection to the form.  You
16 can answer.
17   A.  There was a phone call made between 11:00 and
18 12:00 at night.
19   Q.  Right.
20   A.  It was a late night phone call.
21   Q.  Okay.  Let's say you called Kim and --
22   A.  Mm-hmm.
23   Q.  -- talked to her husband and he said, "I can
24 tell you she came home at 10:45, dropped down on the bed

Page 105

1  and was sound asleep the moment she came in the door and
2  slept like a baby all the way through."
3         Would that have been something that
4  would have been interesting to you in terms of your
5  investigation?
6    A.  It would have been an opinion of a witness
7  from her side.  What I was looking for was the cell phone
8  bill was ironclad.  If I can get a phone bill that can
9  prove one phone number to another phone number at that
10 specific time, then I don't have to really worry about is
11 Steve or Kim telling the truth.  I can prove it.  And
12 therefore, that's why I went after the bill.
13   Q.  What's wrong with a witness from her side?
14   A.  Meaning that -- Kim obviously has her people
15 who she wants me to talk to who will collaborate her
16 side.  Steve Duncan has people he wants me to talk to
17 that will collaborate his side.  And those people have
18 emotional attachments to either Steve or Kim.  So what
19 I'm looking for is this -- if I can verify this phone
20 call.  It doesn't verify for me exactly what happened in
21 the car.  It just is a fact that if I can figure it out
22 helps me take an independent fact and apply it to one
23 side or the other.
24   Q.  Right.

Corbett & Wilcox

Deborah Watson

28 (Pages 106 to 109)

Page 106

1  And if Kim's husband says, "I was with
2  her the whole time, and she didn't make any such phone
3  call," wouldn't that have an effect on Mr. Duncan's
4  credibility?
5  MS. LEMING: Objection. You can answer.
6  A. It would have some effect, but I really
7  wanted to get an actual fact coming out of a phone bill.
8  Q. But you couldn't
9  A. But to my earlier statement, the other key
10  with this fact is that it wasn't going to help me with
11  what happened in the car. In the car I have a he said/
12  she said.
13  Q. But you also have a guy who's telling you that
14  certain things happen. And if you can investigate what
15  he says and it turns out that what he says is not true,
16  then perhaps some of the other stuff that he said wasn't
17  true. Right?
18  A. I'm sorry. Could you repeat that?
19  Q. If you investigate a statement that he
20  makes —
21  A. Mm-hmm.
22  Q. — and it turns out that it's not true, then
23  wouldn't that lead you to the conclusion that perhaps the
24  other stuff he said happened that night didn't happen?

Page 107

1  A. It would give me an impression. But, again,
2  I'm looking for a fact.
3  Q. But the point is you didn't even try to
4  contact Kim to at least ask her to deny or admit that
5  that phone call happened. Right?
6  MS. LEMING: Objection. You can answer.
7  A. That is correct. I did not call Kim.
8  Q. Did you communicate with her in that regard in
9  any way?
10  A. In this particular instance, no.
11  Q. Okay. Did you believe Steve's side of the
12  story or her side of the story?
13  MS. LEMING: Objection. You can answer.
14  A. About what?
15  Q. About what happened in the car to and from
16  Andover
17  A. I questioned why Kim would get in the car with
18  him and drive to Maryland.
19  Q. Anything else?
20  A. Beyond that I had no way to decide either
21  side. And, again, I'm trying to look for a fact, not an
22  opinion.
23  Q. So you didn't believe one side or the other is
24  what you're telling me?

Page 108

1  A. I found it unusual that Kim got in the car
2  after having had two instances where her boss made her
3  very uncomfortable and that she was in a position where
4  she was alone with him in a car for two and a half hours
5  each way again.
6  Q. Based on that, it sounds like you were leaning
7  towards believing Steve Duncan and not Kim Bailey.
8  MS. LEMING: Objection to the form. You
9  can answer.
10  A. For this particular instance, that would be
11  correct.
12  Q. Well, how about the other instances?
13  Let me make sure I understand. You
14  basically believe Steve Duncan's version of what happened
15  over Kim Bailey's version of what happened in the ride to
16  and from Andover and whatever else happened in Andover.
17  MS. LEMING: Objection to the form. You
18  can answer.
19  A. I am — I do believe — I do lean a little
20  more toward Steve's side on what happened with Andover
21  than I do — or the Caves Valley, Maryland trip than I do
22  with Kim's. Although, to be clear, I don't have a fact
23  backing up either side.
24  Q. Not a single fact?

Page 109

1  A. Other than they both agreed that they got in
2  the car. They road together.
3  Q. No. We're talking about —
4  A. They spent the day.
5  Q. I'm not talking about that stuff. We're
6  talking about the stuff that she said happened that was
7  offensive that she alleged in her letter to you in her
8  initial complaint.
9  And, then, based on the conversation you
10  had with Mr. Duncan, you believe him and not her. Right?
11  MS. LEMING: Objection. You can answer.
12  A. For this particular instance, I'm leaning more
13  towards Steve's side.
14  Q. Now? Or did you lean more toward Steve's side
15  when this was all going on back in May and June of 2003?
16  A. For this particular instance, it was a
17  question mark in my mind as to who's side I was leaning
18  towards. And for this particular instance in 2003, I was
19  leaning a little more towards Steve's side.
20  Q. How about Mr. McKelvy?
21  A. I believe Bruce agreed with me.
22  Q. How about Mr. Morrissey?
23  A. Mr. Morrissey was not involved in that level
24  of detail. He would not have heard this.

Deborah Watson

Page 110

1    Q. Did Mr. McKelvy do any independent
2  investigation of his own into the facts concerning the
3  Caves Valley golf tournament matter?
4    A. Not that I'm aware of. He may have.
5    Q. So you met with him, told him the results of
6  your investigation and that you had concluded that you
7  were more likely to believe Mr. Duncan than Ms. Bailey?
8    A. No. Mr. McKelvy was with me through these
9  interviews.
10   Q. Oh, he was.
11   A. Yes. The only person I spoke to alone was
12  Paul Scaffidi as far as interviews went.
13   Q. Okay. Did Mr. McKelvy take any notes like you
14  did?
15   A. Not to this extent. I was the one who was
16  writing. If he has any notes, you would have them.
17         MR. MARCONI: Off the record.
18         (A brief discussion was held off the
19  record.)
20  BY MR. MARCONI:
21   Q. You said that Mr. McKelvy was with you
22  whenever you interviewed these people except
23  Mr. Scaffidi.
24   A. Correct.

Page 111

1    Q. All right. You also said that he took notes
2  of the meetings but not as extensive the notes as you
3  took?
4    A. I specifically remember him writing during the
5  Bruce, Kim and I meeting, which I thought you guys had
6  copies of. I'm almost positive I've seen a copy of it.
7  I was primary writer. Absolutely.
8    Q. All right. But my question is: Did you see
9  Mr. McKelvy writing notes of any of the interviews of any
10  of the people involved that you and he conducted?
11   A. I remember specifically that he took some
12  notes when we talked to Kim. I can't specifically speak
13  to Steve, Cindy Smith or Scott Durham. I know I was
14  writing and that I was the one who talked to Scaffidi.
15   Q. All right. Move on to E in this Exhibit
16  No. 10 on page 0509.
17   A. Mm-hmm.
18   Q. That's concerning the Randolph trip?
19   A. Yes.
20   Q. Let's go through that.
21         I want you to tell me what you're saying
22  here and what's being told to you.
23   A. The first sentence: Steve told Kim affair was
24  over. He and Jen had decided not to tell her. Kim was

Page 112

1  dating Jen Plumeri. And according to Steve --
2    Q. Did you just misspeak? I think you said Kim
3  was dating --
4    A. I'm sorry. Yes. Thank you. Steve was dating
5  Jen Plumeri. And according to Steve, he and Jen had
6  decided not to tell Kim that they were continuing to
7  date, that instead they told her that it was over -- they
8  had split up.
9    Q. How did that come up?
10   A. Steve -- we get to it farther in the back.
11  Steve felt that Kim's motivation -- it's on 0511. Steve
12  felt she wants to carry on the relationship with him and
13  is getting back at him. Steve felt that this was
14  retaliatory in some way by Kim to file this complaint.
15   Q. So the concept is that Kim wanted a
16  relationship, Steve did not, and Kim was retaliating
17  against him for cutting her off by filing a sexual
18  harassment claim?
19   A. That was his perspective, yes.
20   Q. Okay. Now, explain to me how this
21  relationship with Ms. Plumeri comes into play.
22   A. Steve denied or had a different -- totally
23  different version of the trip to Randolph. And part of
24  Steve saying that this had not occurred was him telling

Page 113

1  Bruce and I that he was in a relationship with Jen
2  Plumeri and he was not going to go outside this
3  relationship.
4    Q. Well, what was his version about what happened
5  in Randolph?
6    A. Well, that's what this piece is here.
7    Q. Well, tell me what it says.
8    A. Purpose for the trip? How did you get there?
9  What was planned in the car? Kim was in the car. They
10  took Core AEs and MainStreet out to dinner. They drove
11  Steve's car up to Randolph.
12   Q. Let me just stop you a sec.
13         Is he saying that this was a business
14  trip to Randolph that Kim was on as well as he and some
15  other people?
16   A. It was he and Kim going to Randolph to meet
17  with other Commerce business people.
18   Q. He's not saying that it was some kind of a
19  personal get-together. This was a business trip?
20   A. Correct.
21   Q. Okay. Go ahead
22   A. Correct
23         Alleged comment -- if you don't get
24  laid, it's your fault -- walking into the Randolph lobby.

Corbett & Wilcox

Deborah Watson

30 (Pages 114 to 117)

Page 114

1 Kim had said he said that. Love me was not the
2 implication she interpreted it to be. Kim felt that
3 Steve implied that she needed to build a relationship.
4 Make these people, you know, love you, had sexual
5 overturns when Steve said it. Steve's version was that
6 he may have said, you know, make them love you or love
7 me, but it was not a sexual thing. It was more of a —
8 they -- we need these people to like us to help bring in
9 business, because they were meeting with salespeople.
10    Q. So he's saying she misinterpreted what I told
11 her?
12    A. Yes.
13    Q. Let me just ask you this.
14       Did you ever talk to Kim and say, Kim,
15 is it possible that you misinterpreted what Mr. Duncan
16 said to you up there in the Randolph trip about make them
17 love you?
18    A. No. Because I knew her perspective was that
19 it had an overtone. The next sentence is: They went at
20 the end of the evening. Did Kim return to the hotel with
21 you? Why or why not? They went on Route 10 to an
22 Italian restaurant. Steve claimed he didn't want to be
23 around her. Then, who's idea was it for her to stay
24 behind? Steve said you were leaving. Can you get a

Page 115

1 ride? Yeah. Paul said he'd take her home. And nothing
2 unusual on the ride up or the ride back.
3       So Steve denied any improper
4 conversations and he denied he told Kim to stay at
5 the bar and build the relationship.
6    Q. He denied that?
7    A. Mm-hmm.
8    Q. So Kim's idea of staying at the bar with
9 Mr. Scaffidi was Kim's idea?
10    A. That's what Mr. Duncan felt.
11    Q. Okay. Did you talk to Mr. Scaffidi about
12 that?
13    A. Yes, I did.
14    Q. What did he say?
15    A. He said that he didn't hear the conversation
16 between Steve and Kim but that Kim said something to him
17 afterwards that she was kind of uncomfortable. And Paul
18 took her home.
19    Q. Uncomfortable about the fact that she had been
20 left there?
21    A. Yes. That she was still there.
22    Q. Now, did you form a belief as to who was
23 telling the truth concerning what happened at the
24 Randolph trip, whether it was Mr. Duncan or Kim Bailey?

Page 116

1    A. I felt for this event I was leaning more
2 towards Kim's side of the story.
3    Q. In what way?
4    A. Mr. Scaffidi verified that she had a
5 conversation with him afterwards that she was
6 uncomfortable.
7    Q. Did you feel that it was generally improper
8 for Kim to go with Mr. Duncan to this Randolph trip?
9    A. No. She was, my understanding, the
10 supervisor, and they were meeting with the producers and
11 management in Randolph who had a MainStreet unit. And
12 they were moving the MainStreet unit down to Delaware.
13    Q. What accusations did Kim make, if you can
14 recall, about what Mr. Durham had done on the Randolph
15 trip -- what had he done improperly?
16    A. Mr. Duncan?
17    Q. I'm sorry. Mr. Duncan.
18    A. It concerned the comments — the love me
19 comments with the innuendo. It was, in her opinion,
20 making her feel like she had to stay at the bar and build
21 the relationship while he left. And I believe she wrote
22 in her write-up that she felt like a piece of meat that
23 was being sold
24    Q. Did you understand that her position was that

Page 117

1 Mr. Duncan was encouraging her to have sex with
2 Mr. Scaffidi?
3    A. My understanding is that she felt — it wasn't
4 that it was about sex, but it was implied that she build
5 that relationship and be social and friendly so they
6 really liked her.
7    Q. My question is: What was your understanding
8 of Kim's take on all this? In her write-up, didn't she
9 say that she felt as though she was dropped off there
10 with the understanding that she would have sex with this
11 Mr. Scaffidi?
12    A. I don't believe that was in her write-up. I
13 believe she said it was feeling kind of cheap and like a
14 piece of meat. I don't believe it was that specific.
15    Q. Well, what did you understand that to mean,
16 then?
17       MS. LEMING: Objection to the form. You
18 can answer, if you know.
19    A. My understanding is that she was to form a
20 relationship -- a friendlier relationship than just
21 business. I didn't take it as an assumption that that
22 meant sex. I took it from the perspective that Kim was
23 put in a very uncomfortable position, which, from my
24 perspective, as an investigator, I have to try to verify.

Corbett & Wilcox

Deborah Watson

Page 118

1   And I did verify that with Mr. Scaffidi.
2       Q.  So do you think that what Mr. Duncan did was
3   wrong?
4           MS. LEMING:  Objection to the form.  You
5   can answer.
6       A.  I am leaning towards Kim's side of the story.
7   If I try to assume that Kim's side is correct, then
8   Steve's comments were not right.  But, again, I told you
9   earlier I'm assuming on this toward's Kim's side -- or I
10  am leaning towards Kim's side of the story because of
11  what Paul told me about her feeling uncomfortable.  I was
12  not able to collaborate the actual dialogue that
13  occurred.
14      Q.  Did you believe that what Kim said happened
15  happened?  Yes or no?
16          MS. LEMING:  On this instance?
17          MR. MARCONI:  Yes.  On Randolph.
18      A.  I do believe that Mr. Duncan didn't want to
19  take her home from the bar and that she felt
20  uncomfortable sitting there with Paul and wasn't sure why
21  she was stuck there and from her perspective that with
22  these comments that Steve made she felt that she was sort
23  of left there in an uncomfortable position.
24      Q.  Do you believe Mr. Duncan's claim that Kim

Page 119

1   really wanted a relationship with him and that he decided
2   not to tell Kim about his decision concerning
3   Ms. Plumeri?
4           MS. LEMING:  Can you repeat the
5   question?
6           (The reporter read the requested
7   portion.)
8           MS. LEMING:  Thank you.
9       A.  I believe that he didn't want to discuss
10  Ms. Plumeri with Kim.  I don't necessarily believe his
11  theory that she did all this for anger over a
12  relationship.
13      Q.  On June 3rd, 2003, when there was a meeting
14  involving you and Mr. Morrissey and Kim, did you believe
15  then that Kim was essentially thwarted in her desire for
16  a relationship with Steve Duncan and that's in part why
17  she filed her sexual harassment claim against him?
18          MS. LEMING:  Objection to the form.  You
19  can answer, if you know.
20      A.  I believe that Kim felt mistreated by
21  Mr. Duncan.  I don't think she did it solely as a
22  retaliation against this relationship.  I believe she
23  wanted any behavior like this to stop.
24      Q.  Well, do you think that her desire for a

Page 120

1   relationship with Mr. Duncan and the alleged thwarting of
2   that played any part in her decision to file a sexual
3   harassment claim against Mr. Duncan?
4       A.  Kim told me that the reason she filed this
5   complaint was because she overheard Steve in his office
6   talking about her and her family.  That was the
7   motivation she gave me.  Steve denied that conversation.
8       Q.  All right.  Ma'am, I don't think -- I know
9   this is going long, but --
10      A.  That's okay.
11      Q.  -- I don't think you're listening to my
12  questions.
13      A.  Okay.  I apologize.
14      Q.  My question is, Ms. Watson:  Based on your
15  investigation, her desire for a relationship with Steve
16  Duncan that he claims he rebuffed, did that have any
17  impact on her decision to file a sexual harassment claim
18  against Mr. Duncan?  In other words, the fact that she
19  was this alleged jilted lover, did that have any bearing
20  on her decision in your view based on your investigation?
21          MS. LEMING:  Objection to the form.  You
22  can answer.
23      A.  In my view, no.  I believe she overheard a
24  conversation from Steve that made her uncomfortable and

Page 121

1   she decided to come forward.  Part of what you said,
2   though, was about the investigation.  In the
3   investigation I could not collaborate his theory or her
4   theory because Steve denied the conversation that Kim
5   allegedly overheard.
6       Q.  So your testimony is that the reason that she
7   filed this sexual harassment claim -- as a result of your
8   investigation, you concluded that the reason she did it
9   had nothing to do with what was written in the letter
10  that she had initially gave to you making the claim.
11  Rather, it was some telephone conversation that she
12  overheard Steve make?
13      A.  No.
14          MS. LEMING:  Objection to the form.  You
15  can answer.
16          THE WITNESS:  That's right.  No.  I
17  disagree.
18  BY MR. MARCONI:
19      Q.  Then, I don't understand your answer.
20      A.  Kim made the sexual harassment complaint
21  because she was very uncomfortable with what had happened
22  and she wanted it to stop, and she wanted to make sure
23  that it didn't impact her career.
24      Q.  Now, wait a minute.  Hold on a second.