Deborah Watson

32 (Pages 122 to 125)

Page 122

1    That is the result that you reached
2 following your investigation of her allegations?
3    MS. LEMING: Well, I think she needs to
4 finish her answer.
5    A. Now I'm getting confused. I'm sorry. Because
6 I thought you asked me my personal opinion. Are we
7 talking about the investigation or my person opinion?
8 You asked me my opinion on some of this too.
9    Q. Well, I don't know how they could be
10 different. I'm trying to figure out: Following your
11 investigation, okay, you concluded that apparently there
12 was sexual harassment. Did you not?
13    A. I concluded that there was inappropriate
14 behavior as a manager on the part of Steve Duncan.
15    Q. Is it fair, then, to say that you concluded
16 that he had not sexually harassed Kim?
17    A. The belief was that it was consensual.
18    Q. Okay. That belief was based on your
19 investigation?
20    A. Correct.
21    Q. And that of Mr. McKelvy?
22    A. Correct.
23    Q. Okay. But you, nonetheless, found that what
24 Mr. Duncan had done was improper?

Page 123

1    A. Correct.
2    Q. But not sexual harassment?
3    A. Correct.
4    Q. Okay. So the reason that you concluded that
5 there was no sexual harassment was because you believed
6 that the things that she had complained of that she said
7 she did in her letter were done but she was a willing
8 participant in it?
9    A. Correct.
10    Q. Okay. I just want to get back one more time
11 to the decision concerning Ms. Plumeri.
12    A. Mm-hmm.
13    Q. Did you believe Steve Duncan when he said he
14 wasn't going to tell Ms. Bailey about the decision
15 concerning Ms. Plumeri?
16    A. Meaning that he was still dating Ms. Plumeri?
17    Q. In other words, my impression was that he
18 didn't want Kim Bailey to know the truth about
19 Ms. Plumeri because he feared that that knowledge or the
20 existence of that relationship would make her angry
21 because she wanted to have a relationship with Steve
22 Duncan and she didn't like the fact that Plumeri was in
23 the picture.
24    Is that what he told you?

Page 124

1    A. Yes.
2    Q. Okay. Did you believe that?
3    A. I think he believed that I felt that Steve
4 realized as a manager that he had crossed the line of
5 professionalism with Kim and that it was best that he not
6 share his personal life to the level that they had
7 earlier in their relationship.
8    Q. But did you believe what he said? That's my
9 question. Did you believe what he said? I'm not asking
10 you why he said it, you know, why you theorize he may
11 have done something. I want to know: Did Deborah Watson
12 believe that to be the fact?
13    MS. LEMING: At what point?
14    MR. MARCONI: At any point
15    A. Could you -- I'm sorry. Could you read the
16 question back?
17    Q. All right. I'm trying to get you to focus on
18 the concept that she is the jilted lover and Plumeri is
19 her competition.
20    A. Okay.
21    Q. All right. That's a concept that Mr. Duncan
22 told you was the case. Right?
23    A. That was his allegation, yes.
24    Q. All right. Did you believe it? Yes or no?

Page 125

1 Did you believe that Kim considered herself to be the
2 jilted lover and that Plumeri was in the way as
3 Mr. Duncan alleged?
4    A. No, I did not.
5    Q. You didn't?
6    A. No, I did not.
7    Q. What was the basis for the fact that you
8 didn't believe that?
9    A. I believed Kim when she said that she was
10 concerned about her career working for Mr. Duncan and
11 that the reason she filed the complaint was because of
12 what she overheard him saying on the phone and the damage
13 that that could potentially do to her reputation and
14 career. I did not believe the jilted lover theory that
15 Mr. Duncan threw out.
16    Q. All right. Well, tell me what he said, then,
17 that caused her to do this on the phone.
18    A. According to him, she overheard him on the
19 phone. She dropped a pen outside his office, and she
20 overheard him on the phone making comments about her
21 personal life -- that she has two kids, that one has a
22 different father than the other. And he was laughing and
23 joking, "Yeah. Can you believe that?" And she felt it
24 was a very derogatory conversation. And her concern was

Deborah Watson

33 (Pages 126 to 129)

Page 126

1  she did not know who was on the other end of the phone.
2  And she realized that this was her boss and, if he is
3  saying these things about her, what else could he
4  possibly be saying
5        Q.  Now, did she overhear this phone conversation
6  before she filed the sexual harassment allegation or
7  after?
8        A.  Before.
9        Q.  How soon before?
10       A.  It was a couple months before.
11       Q.  So let me just make sure I understand.
12          You're saying that she really wasn't
13  worried about all the things that she said happened.  He
14  grabbed her in the car and kissed her against her will.
15  He was fondling her -- touching her back side and her
16  back that she didn't like.  The stuff that happened in
17  Randolph.  The stuff that happened in the car on the way
18  down to the golf tournament.  You're saying that she
19  wasn't worried about any of that stuff.  But then, all of
20  a sudden, two months before she complained she overheard
21  this conversation.  And that's all she was complaining
22  about?
23          MS. LEMING:  Objection to the form.
24       A.  No.  That's not what I'm saying.

Page 127

1        Q.  Well, then, I have no idea what you're talking
2  about.  You have to explain it to me.
3        A.  What I'm saying is she -- we asked her why
4  now?  Because she comes forward in the spring of '03
5  And the last event she is talking about occurs in
6  November of '02.  So the question that we asked is:
7  Well, why now?  Because she said this has been bothering
8  her -- "I have been worried about this."  And she said
9  the final things that came forward were, number one,
10  overhearing this conversation, and then --
11       Q.  All right.  But let me just stop you.
12          MS. LEMING:  Can she finish her answer?
13  Maybe that will help you clear it up.
14          MR. MARCONI:  I'm just trying to get out
15  of here before ten o'clock.
16          MS. LEMING:  I understand that, but the
17  witness is trying to respond.
18          MR. MARCONI:  Let me focus the question.
19  She can respond afterwards, if she wants.
20  BY MR. MARCONI:
21       Q.  Are you just telling me, then, that you
22  believe that was the straw that broke the camel's back?
23       A.  Yes.
24       Q.  Okay.

Page 128

1        A.  Yes.
2        Q.  But it's not the only reason that she filed
3  the complaint.
4        A.  She wouldn't have filed the complaint if she
5  wasn't concerned about his actions prior to that
6  Correct.
7        Q.  But you're saying that that conversation that
8  she overheard Mr. Duncan was the straw that broke the
9  camel's back?
10       A.  That and something about he confronted her
11  about sending flowers to a hotel room where he was
12  meeting Jen.  And those two things were the straws.
13       Q.  Did you investigate whether or not what was
14  going on in connection with the flower sending incident?
15       A.  It was not anything that was tied to a record
16  I could get a hold of.  Kim had told me -- Kim had -- or
17  Steve -- I'm sorry -- had confronted her about this.  And
18  she absolutely didn't do it and was very upset that he
19  would even allege that.  Steve's perspective was that he
20  could not prove it, but who else could it be?
21       Q.  So Steve told you that it had to have been
22  her?
23       A.  Yes.
24       Q.  Did you do anything to investigate it?

Page 129

1        A.  I couldn't.
2        Q.  Did you talk to Ms. Plumeri?
3        A.  No, I did not talk to her.
4        Q.  Why not?
5        A.  Because I felt that she was going to give us
6  Steve's version of the story.
7        Q.  What made you think that?
8        A.  Because they were dating and they were in a
9  relationship together that they were allegedly hiding
10  from Kim.
11       Q.  Again, we are going out of order.  It has been
12  marked as No. 13.
13          What's this?
14       A.  These are my notes from a conversation with
15  Scott Durham.
16       Q.  On May 15th of '03?
17       A.  Yes.
18       Q.  Can you just go through them and translate
19  them for me?
20       A.  He is a -- works for Andover, which is a
21  wholesaler.  And he is a marketing rep.  He was in
22  Wilmington, Delaware about a year and a half ago.  They
23  were having a board room meeting.  He doesn't remember
24  clearly.  They discussed rates for BOPs differences in

Deborah Watson

34 (Pages 130 to 133)

**Page 130**

1  dealing with Hanover. He said he didn't remember a Kim
2  description.
3     Q.  What does that mean?
4     A.  Meaning that Steve had described Kim ahead of
5  time to him. Doesn't remember a conversation or any
6  event. Again, I'm trying to verify what was said in the
7  room. Thinks he would have remembered that type of
8  event.
9     Q.  What type of event?
10    A.  Meaning a comment. Kim alleged that Steve
11 said, "See, I told you," when she walked in the room.
12    Q.  He said he doesn't remember?
13    A.  Right.
14        6:00 to 9:00 p.m. they had an evening
15 out. Nothing -- meaning nothing unusual happened. He
16 thinks they all left together. Scott asked Steve if Kim
17 was single, and Kim and Scott met at the Airport
18 Marriott. Then at Scott's house he had a Christmas
19 party. It was about 25 percent friends, 75 percent
20 clients. Kim stayed that evening. Stayed in the room
21 with his roommate. He has no idea what happened.
22    Q.  Take a look at 14. Tell me what this is, if
23 you know.
24    A.  These are my notes from my conversation with

**Page 131**

1  Paul Scaffidi. The event was in December of '02, he
2  remembered.
3     Q.  Actually, let me -- I'm sorry.
4        Going back to 13, was there anything in
5  your conversation with Mr. Durham that verified any of
6  the information that you got from Mr. Duncan about what
7  had happened in the car or anything like that?
8        MS. LEMING: Do you need to see it?
9  BY MR. MARCONI:
10    Q.  I should say it like this: That verified the
11 claim that Kim was, in essence, a jilted lover or was
12 interested in a relationship with Mr. Durham?
13       MS. LEMING: Objection to the form. You
14 can answer. With Mr. Durham or Mr. Duncan?
15       MR. MARCONI: I'm sorry. Mr. Duncan.
16       MS. LEMING: Objection to the form. You
17 can answer.
18    A.  I'm sorry. Can you ask it again?
19    Q.  In your investigation that involved
20 Mr. Durham, did he give you any evidence that supported
21 Mr. Duncan's claim that Ms. Bailey was the jilted lover,
22 if you will?
23       MS. LEMING: Objection to the form. You
24 can answer.

**Page 132**

1     A.  I didn't ask about that. That was Steve's
2  theory. What I did find out was that Kim and Scott met
3  at an Airport Marriott for, in essence, a date.
4     Q.  What bearing did that have on your
5  investigation?
6     A.  It showed me that Steve and Kim had had some
7  conversation about Kim's single status and that Kim was
8  open to meeting with Scott Durham. So when Steve alleged
9  he wanted to set them up -- that Kim, once she had some
10 conversation with Scott, was willing to go meet him off-
11 site at another place and have another meeting with him.
12 She also went to his Christmas party.
13    Q.  How do you know that the thing that happened
14 at the hotel was a date?
15    A.  Mr. Durham implied that.
16    Q.  How so?
17    A.  There were no other Commerce business people
18 there. Steve wasn't there.
19    Q.  Did you --
20    A.  It was just the two of them.
21    Q.  Did you talk to Mr. Durham and ask him what
22 the topic of the discussions were at this hotel?
23    A.  No, I didn't ask him the topic. Scott
24 admitted that he asked Steve if Kim was single.

**Page 133**

1     Q.  So before this ever happened? Before this
2  meeting at the hotel?
3     A.  Yes.
4     Q.  It was a meeting in a restaurant. Right? It
5  wasn't in a hotel room. Right?
6     A.  No. It was not in a hotel room.
7     Q.  So you don't know whether they were talking
8  business or not. Right?
9     A.  Mr. Durham implied it was a personal
10 conversation, not a business conversation.
11    Q.  What did he say that implied that?
12    A.  That he had asked Steve is Kim single. And
13 that's how he got the ability to contact Kim.
14    Q.  So the only evidence that you have that a
15 conversation at this bar between Kim and Mr. Durham was
16 the fact that Mr. Durham asked Steve Duncan if she was
17 single?
18    A.  That I can recall, yes.
19    Q.  Did you ever ask Kim whether she thought she
20 was on a date that night?
21    A.  No, I did not.
22    Q.  Why not?
23    A.  Because I had the e-mail from Kim bantering
24 back and forth with Steve about this guy from Atlantic

Deborah Watson

Page 134

1  City who offered her to go down to Atlantic City and
2  spend the night and all this other stuff. And Kim
3  bantered back to Steve I should really have this guy talk
4  to Scott and give Scott some lessons. It was that type
5  of banter.
6      Q.  Now, was that e-mail before or after this
7  alleged date?
8      A.  I would have to see it. I don't know.
9      Q.  Any other reason?
10     A.  Not that I can recall at this moment.
11     Q.  Take a look at 14, please.
12         This looks like notes of a conversation
13  with Mr. Scaffidi.
14     A.  Yes.
15     Q.  This is the event of December 2002, which is
16  Randolph, is it not?
17     A.  Correct.
18     Q.  Tell me what's being said here.
19     A.  La Strada, Randolph location. That was the
20  name of the Italian restaurant. Paul, Kim, Steve,
21  Nick D., who is Nick DiMantis, Mike Smith went to the
22  bar. Kim didn't leave with him, meaning Steve, although
23  she drove to Randolph and the hotel with him. Steve
24  suggested that Kim stay. Paul doesn't know why. Kim

Page 135

1  didn't ask to stay. Kim and Paul stayed, had a few
2  drinks.
3         Kim expressed discomfort to Paul in
4  staying there. Put in a situation where she felt she had
5  to stay. Put on the spot to stay by Steve. Paul doesn't
6  remember exactly what she said. Paul drove her back to
7  the hotel. Conversation at the bar. Commerce
8  procedures, work stuff.
9         Kim and Paul Scaffidi talked
10  approximately a week later. She and Paul talked. Felt
11  she was put in an uncomfortable position by Steve.
12  Approximately one week later she brought it up to Paul
13  again. First time Paul had met Kim and Steve.
14     Q.  Did that conversation give you any help in
15  determining whose side of this sexual harassment
16  allegation was drew?
17     A.  This was helpful in getting through the
18  Randolph incident in specifics.
19     Q.  Well, how did it help you decide?
20     A.  Paul verified that Kim said that she was
21  uncomfortable with the situation she was put in at
22  Randolph.
23     Q.  Kim's story was that she had been sort of left
24  there with the expectation that she would have sex? Is

Page 136

1  that your understanding?
2      A.  Not the sex piece. That she felt like a
3  "piece of meat" and was uncomfortable.
4      Q.  In what way, though? How is she a "piece of
5  meat"? What are you talking about?
6      A.  She felt that she had to build the
7  relationship and be friendly and make them like her.
8  Again, I didn't take it to the sex level because she's
9  now sitting in the bar with Paul. He needs to like her.
10  But that doesn't necessarily mean sex.
11     Q.  But did you ask Steve Duncan, "Why did you
12  leave her there"? He told you that she was left there.
13  Right?
14     A.  Paul told me.
15     Q.  Right.
16     A.  Yes.
17     Q.  Now, when you got that information, did you
18  contact Steve and say, "Hey, Steve. Scaffidi confirms
19  Kim's story that you left her there. Why did you leave
20  her there? What was she expected to do?" Did you ask
21  him that?
22     A.  No. Because Steve's perspective I already
23  knew, which was he did not leave her there -- that he
24  said, "I'm leaving. Do you have a ride?"

Page 137

1         She said yeah. Paul will take me home
2  or Paul said I'll take you home. It was a very different
3  version.
4      Q.  So, ma'am, you're doing an investigation, and
5  you don't think it's worthwhile to confront a person with
6  evidence that is contradictory to their position?
7         MS. LEMING: Objection to the form. You
8  can answer.
9      A.  I already know what their position is. And
10  what I'm now doing is saying I have Kim's position and
11  Steve's position, which is very different. So I go to
12  Paul, who is my witness, to try to help me decide whose
13  side has more fact behind it. And that's why I went to
14  Paul. I already know that -- what Steve says and I
15  already know what Kim says.
16     Q.  But to you it would not have made any sense to
17  go to Steve and say, "Steve, Paul told me something
18  contrary to what you're saying. Is he lying or are you
19  lying?"
20     A.  So I can have two people come back to me and
21  say we're both -- you know, I'm telling the truth and
22  he's lying. I already knew where everyone's position
23  was, which, again, is why I didn't go back. Steve is
24  going to say Paul is lying. Paul has already told me his

Deborah Watson

36 (Pages 138 to 141)

Page 138

1  side and that Steve is lying.
2       Q.  But he gave you Paul's name:
3       A.  No.  Kim gave me Paul's name.
4       Q.  Oh, Kim gave you Paul's name.
5       A.  Kim gave me Paul's name.
6       Q.  Take a look at what we have as Watson 11.
7       A.  Mm-hmm.
8       Q.  That looks like notes of a telephone
9  conversation you had with Scott Durham on May 6th of '03.
10      A.  No.  This is notes of a conversation that I
11  had with Steve.
12      Q.  Oh, Steve Duncan.
13      A.  Yes.
14      Q.  Okay.  As of May 6th, you had already had a
15  meeting with Steve Duncan to discuss his position with
16  respect to the allegations that Kim had made?
17      A.  Correct.
18      Q.  Okay.  This is a follow-up telephone
19  conversation?
20      A.  Yes.
21      Q.  What was the catalyst to this conversation?
22      A.  I was calling for Scott Durham's phone number.
23      Q.  Okay.  You called Steve for Scott's phone
24  number?

Page 139

1       A.  Correct.
2       Q.  Okay.  Then the first entry you have is:  Kim
3  Bailey; two kids; son, 14; daughter, 21.
4       A.  Correct.
5       Q.  Where did you get that from?
6       A.  From Steve.
7       Q.  How did that come up if you're calling for a
8  phone number?
9       A.  I got Steve on the phone.  And he's upset.
10  And he's now had time to think about the conversation
11  that we had earlier in the day.  So he starts coming back
12  with a couple other facts that he wants to tell me -- or
13  allegations is a better word.
14      Q.  Okay.  So what's the entry about Kim and her
15  kids that I just read?  What's that?
16      A.  That's me just writing down what he's telling
17  me on the phone.
18      Q.  How did it come up that he started talking
19  about her kids?
20      A.  Because his next story or comment is he
21  alleges that Kim gave her daughter her license, meaning
22  Kim gave her daughter, the 21-year-old, her license to go
23  to New York to get a fake license and then Kim's daughter
24  lost the license.  And Kim -- Steve was telling me this

Page 140

1  as a comment on Kim's character.
2       Q.  And you made note of that?
3       A.  I was in a conversation, and I tried to make
4  notes whenever I was in a conversation with someone about
5  this.
6       Q.  And he said that Kim told him that?
7       A.  Yes.  She was upset because her daughter lost
8  the license.
9       Q.  That was new information.  Right?
10      A.  Yes.
11      Q.  Did you bother to check with Kim and ask her
12  if that was true?
13      A.  No, I did not.
14      Q.  Why not?
15      A.  Because it didn't have a bearing on the
16  write-up that Kim had given me about the sexual
17  harassment and Steve's counter-allegations to what
18  happened with the sexual harassment.  It's an outside
19  incident that involves Kim and her family.
20      Q.  Did you believe that that was the case -- that
21  what Steve told you was true about Kim?
22      A.  Honestly, I didn't think much about it.  It
23  didn't have any pertinence to what was going on in the
24  workplace.

Page 141

1       Q.  So you didn't believe or disbelieve what he
2  said?
3       A.  Correct.
4       Q.  How about this next entry?
5       A.  Steve said that through the summer of '02 he
6  had to talk with Kim about her outfit.  She wore short
7  skirts, quote, provocative dress.  And when he talked to
8  her, Kim wanted to know why Becky could do this -- could
9  wear these outfits.
10      Q.  Now, was that in response to any kind of a
11  question you asked him?
12      A.  No.
13      Q.  So he just volunteered all this stuff for you?
14      A.  Yes.
15      Q.  Did you think that that had any bearing on
16  anything you were being called upon to look into?
17      A.  No.  We didn't have any issues with dress code
18  going on through the sexual harassment allegations.
19      Q.  Did you believe what Steve said concerning the
20  dress?
21      A.  I did believe this.  I had had -- Steve
22  mentioned to me in another conversation long before this
23  that he had to talk to Kim about dress code.  So this
24  wasn't the first time I heard something like this.

Deborah Watson

Page 142

1    Q.   But you never observed Kim dressing
2  provocatively.  Right?
3    A.   No.  But I didn't work in Delaware.
4    Q.   And there was no record in her personnel file
5  where she was talked to about that.  Right?
6    A.   Mary Corcoran talked to her at one point about
7  it.  She sent her home.
8    Q.   No.  I'm talking about as of May 6th of 2003.
9    A.   I would have to re-review the file.  To my
10 recollection right now, no.
11   Q.   Did you believe that what Steve was telling
12 you was true?
13   A.   I did think it was possible she was having
14 issues with dress code.
15   Q.   Based on what?
16   A.   As I said, he had talked to me at another
17 point casually about the fact he talked to Kim about the
18 dress code.
19   Q.   Is this before all the sexual harassment --
20   A.   Yes.
21   Q.   -- stuff came out?
22   A.   Yes.
23   Q.   What did you tell him to do about it?
24   A.   I don't remember.  I'd have to give you the --

Page 143

1  I'd have to figure out the specific date.
2    Q.   Then moving on down, there's something that
3  says "phone contractor."  Something about a phone
4  contractor.
5    A.   Yes.  It was Dave Cook.
6    Q.   Who's that?
7    A.   He's the guy who works on the phones.  He's a
8  vendor, I believe.
9    Q.   In Delaware?
10   A.   I'm not sure where.  Steve had to talk to Kim
11 about -- SD had to talk to KB about stopping
12 conversation, quote, ass, eyes, physique.  Kim was the
13 instigator.
14   Q.   Now, what does that mean?
15   A.   This was -- what Steve meant was that the
16 phone person would come into the office and that Kim
17 would make comments about his physical appearance in a
18 joking manner and that Steve had talked to her about it
19 and said -- and he said it was in a casual fashion.  But
20 he had said to her, hey, you know what?  That's not
21 really appropriate.  You shouldn't do that.
22   Q.   Did you believe that that actually occurred --
23 that she said things like that to this Mr. Cook?
24   A.   I did believe that she said that.

Page 144

1    Q.   You did?
2    A.   Yeah.
3    Q.   On what basis?
4    A.   Marge Phipps, when we talked to her, said
5  there was a lot of banter in the office and that Kim was
6  trying to keep things light.  But there was a lot of
7  conversation about the physical appearance of the copy
8  machine person and the phone contractor.
9    Q.   Now, did she tell you that before May the 6th
10 or after?
11   A.   We talked to Marge on May the 6th.
12   Q.   Oh, you did.
13   A.   Yeah.
14   Q.   After you talked to Mr. Duncan this time or
15 before?
16   A.   It would have been before, because we
17 interviewed Steve.  Then we interviewed Marge.  Then we
18 left, which is why I'm now on the phone.
19   Q.   So you talked to Marge before these notes were
20 taken?
21   A.   That's my recollection, yes.
22   Q.   Now, did Marge raise the issue also of this
23 Dave Cook or these comments about people's physique?
24   A.   She said there was banter in the office about

Page 145

1  physique.  That was -- we went through this.
2    Q.   You said that you believe that that in fact
3  happened?
4    A.   I do.
5    Q.   Did that fact have any bearing on your
6  investigation into her sexual harassment charges?
7    A.   It was a behavior that I wanted to make sure
8  didn't continue.
9    Q.   Did you do anything about it at that time?
10   A.   At that time, no.
11   Q.   Why not?
12   A.   I was still gathering information.  This was
13 very early in the investigation.
14   Q.   Did Marge Phipps also say that Kim was the
15 instigator of that banter against that man?
16   A.   I don't remember.
17   Q.   But you believe that Kim was the instigator?
18   A.   I believe the banter was going on in the
19 office.  And as the supervisor, Kim certainly wasn't
20 preventing it.  And even if she wasn't instigating it, it
21 was participating in it.
22   Q.   And the evidence that you have that she was
23 participating in it was what?
24   A.   This comment from Steve and Marge of her own

Deborah Watson

38 (Pages 146 to 149)

Page 146

1  accord bringing this up.
2      Q.  Did you ask anybody else other than Marge or
3  Steve whether or not they could corroborate that?
4      A.  No, I could not.
5      Q.  Why not?
6      A.  Steve obviously had his side of the story.
7  Marge — when we spoke to her, it was not about a sexual
8  harassment complaint. It was to get some information
9  about the general feel of the office.
10     Q.  Did you ever ask Kim her side of this story on
11 what was going on in the office with this phone vendor?
12     A.  We did talk about it on June 3rd when Joe
13 Morrissey and I had the counseling session with her and
14 the meeting about what the next steps were.
15     Q.  Did you at that time ask her whether or not
16 those allegations were true?
17     A.  I asked her if there was — I asked — there
18 was — how did I phrase it? We discussed the fact that
19 there was casual banter in the office and some of it was
20 about the physique of some of the vendors. And she
21 didn't deny that. And we said, you know, that's not
22 really appropriate. It opens the door for more casual
23 and sometimes inappropriate conversation. And as a
24 supervisor, you should not be engaging in those

Page 147

1  discussions. And she said she understood. And then we
2  got into the whole discussion about trying to get her
3  some training.
4      Q.  But did she deny that she was involved in it?
5      A.  No, she didn't deny it.
6      Q.  Did she admit it?
7      A.  She didn't deny it.
8      Q.  Did she —
9      A.  I don't remember that she said, yes, I did it.
10     Q.  What about the end? SD -- we can talk to
11 anyone. What does that mean?
12     A.  You can talk to anyone in Delaware to validate
13 the story, quote, how does Kim carry on with men in the
14 office.
15     Q.  So Mr. Duncan is saying that anybody in the
16 Delaware office can corroborate what?
17     A.  Kim's treatment of the male phone contractor
18 or the male vendors that come in.
19     Q.  Where does he talk about other male vendors?
20     A.  What he's saying is "how does Kim carry on
21 with men in the office." So men who come in. I know
22 from Marge that there is a male copy machine person, I
23 believe is what Marge is telling me. And I have a male
24 phone contractor. So those are the two facts that are in

Page 148

1  my mind as far as the men in the office.
2      Q.  Did you talk to anybody else besides Marge and
3  Steve about that?
4      A.  No, I did not.
5      Q.  He said anybody in Delaware can corroborate
6  it. Right?
7      A.  Can talk to anyone in Delaware to validate the
8  story.
9      Q.  Right.
10          That Kim instigates improper comments
11 about the physique of males in the office. Right?
12     A.  Well, what he's saying is how — about how she
13 carries on with men in the office.
14     Q.  Right.
15     A.  He was more vague than that.
16     Q.  Okay.
17     A.  He has one specific instance, and then he just
18 makes a comment "how does Kim carry on with men in the
19 office," because, again, he's now pushing back trying to
20 put her in a bad light.
21     Q.  Right.
22          My question is: What did you do to
23 corroborate that what he said when he was pushing back
24 was true?

Page 149

1      A.  I had already had the conversation with Marge,
2  so I knew what the other management person in the office
3  had heard. And then on June 3rd when we sat down with
4  Kim and talked about some of the behaviors we would have
5  liked to change, we talked about how that type of
6  discussion can -- that you should keep the office more
7  professional and not go down those roads. And again, she
8  didn't deny it.
9      Q.  Skip page 0514 and go to 0515. Tell me what
10 that is.
11     A.  This is our conversation with Marge Phipps.
12     Q.  So the first topic you wanted to talk about
13 was Kim's demeanor and professionalism. Right?
14     A.  Yes.
15     Q.  What did Marge said?
16     A.  She tries to keep it upbeat. Never came down
17 on staff inappropriately. Very friendly but not
18 offensive. She said the phone and the Xerox employee --
19 she hasn't embarrassed anyone. You get to know the
20 people like coworkers. She doesn't always try to make
21 comments sexual.
22     Q.  Hold up.
23          Who wrote phone and Xerox?
24     A.  I did.

Deborah Watson

| Page 150 |
|---|

1    Q.   So that says phone and Xerox what?
2    A.   EE. That's my abbreviation for employee --
3    employees.
4    Q.   Hasn't embarrassed anyone. Right?
5    A.   Yes.
6    Q.   So she told you that Kim didn't embarrass
7    anyone?
8    A.   From Marge's perspective.
9    Q.   Correct.
10   A.   Mm-hmm.
11   Q.   You get to know the people like coworkers.
12   A.   Yes.
13   Q.   Where does she say that Kim participated in
14   banter talking about the physical attributes of this
15   phone and Xerox vendor?
16   A.   It's part of the next comment which is doesn't
17   always try to make comments sexual.
18   Q.   But that's your word. Right?
19   A.   No. That's what Marge is telling me.
20   Q.   But where --
21   A.   This whole conversation is about the banter in
22   the office about the physique and sexual innuendo with
23   these vendors, and what Marge is saying — that it hasn't
24   embarrassed anyone, because these people are in there a

| Page 151 |
|---|

1    lot. They're like coworkers. And in sort of a defense
2    of Kim, she's saying it isn't always a sexual
3    connotation. And she also said that Kim is doing this to
4    try to keep the office upbeat.
5    Q.   She doesn't say -- or at least you didn't
6    write down — that Kim does that?
7    A.   No. That is what I'm saying here. We're
8    talking about Kim. We're talking about Kim's demeanor,
9    which is how we started with this
10   Q.   Right.
11        I'm asking you to point to me language
12   in this note that says that Joan —
13   A.   Marge.
14   Q.   — sorry -- Marge Phipps says that Kim was the
15   instigator of banter concerning the physical attributes
16   of men in the office.
17   A.   No. Instigator was Steve Duncan's word. What
18   Marge said was this was banter that went on in the office
19   and that Kim would try to keep it upbeat and that she
20   would participate in it and that it wasn't always —
21   doesn't always try to make the comments sexual.
22   Q.   Show me one place where it says anywhere in
23   that note that Kim participated in it.
24        MS. LEMING: Objection to the form. You

| Page 152 |
|---|

1    can answer.
2    A.   It doesn't physically say it on the note.
3    Q.   Right. Thank you.
4        "No relationships, personal" -- what
5    does that say there?
6    A.   "No relationships, personal, with men,"
7    meaning did any of these conversations cross into a more
8    personal relationship. And Marge said, no, nothing that
9    she was aware of.
10   Q.   All right. What's the other stuff?
11   A.   Lynn Einstein is Tom's ex-wife. They're
12   divorced now. We asked who's -- you know, who's -- hey,
13   who's Tom Einstein's ex-wife? What's her name? Lynn
14   Einstein. That there was a business-like relationship
15   with Steve and there was no impropriety with Steve or
16   Kim. From Marge's perspective, she didn't have any
17   issues with either one of them.
18   Q.   You mean she didn't?
19   A.   Right.
20   Q.   But she's not saying that nothing wrong
21   happened between Kim and Steve?
22   A.   She actually was not aware of anything.
23   Q.   So you asked her: Did you ever see Steve do
24   anything improper to Kim? And she said I've never seen

| Page 153 |
|---|

1    anything like that?
2    A.   No. What I said was: Have you ever had any
3    impropriety with Steve? No. He's a perfect gentleman.
4    Have you had any impropriety with Kim? No, not at all.
5    Marge actually said something to me later about not
6    knowing that anything was going on.
7    Q.   You called Marge on this or she called you?
8    A.   We talked to her personally.
9    Q.   Well, who summoned her to you? Did you summon
10   her?
11   A.   Bruce McKelvy and I brought her in the room.
12   Q.   All right. Was there any questions asked of
13   Ms. Phipps about how Steve Duncan acted?
14   A.   Yes. That was part of the impropriety. And
15   she said Steve is a perfect gentleman.
16   Q.   So you asked one question about Steve, and all
17   the other questions in that interview were just about
18   Kim?
19   A.   No. I asked a question about Kim — about
20   Kim's demeanor -- and that's where the rest of this came
21   from — and then asked about Lynn Einstein. And I said,
22   you know, what is your relationship with Steve? She said
23   business-like. And then I asked the impropriety
24   questions with Steve and Kim.

Corbett & Wilcox

## Deborah Watson

40 (Pages 154 to 157)

---

Page 154

1    Q.  Did you ask her specifically whether she was
2  ever out with Steve or Kim?
3    A.  No.  I did not ask that question.
4    Q.  Why not?
5    A.  Because I had both Steve and Kim telling me
6  that Marge wasn't at any of these specific events.  The
7  issue was around who -- that Steve said don't bring
8  Marge.  And Steve claimed he never said that.
9    Q.  Will you look at No. 12, please?
10         This looks like a memo from Steve Duncan
11  to you.
12    A.  Yes.
13    Q.  May 7th of '03?
14    A.  Yes.
15    Q.  Was he responding to an e-mail you sent to
16  him?
17    A.  No.  He was, I think, responding from my
18  request for additional information.  I called him and
19  asked for Scott Durham's phone number, and then he
20  verified the golf outing date.  He had brought up the
21  phone call from Kim's cell phone.  He was attaching
22  the roster so I could get Kim's cell phone number and
23  then giving me the name of the phone installer and then
24  Jen Plumeri for her phone number.

---

Page 155

1    Q.  Did you ever contact Mr. Alpugh?
2    A.  No, I did not contact him.
3    Q.  Why not?
4    A.  The information I had was that it was banter
5  in the office, and Marge had said that no one was
6  offended by it.  And he had not filed any sort of
7  complaint or raised an issue about it.  And again, I was
8  trying to keep confidentiality and not expand this
9  farther out.
10    Q.  So, then, you felt that what happened to
11  Mr. Alpugh was basically not a big deal?
12         MS. LEMING:  Objection to the form.  You
13  can answer.
14    A.  No.  I felt it was something I could talk to
15  Kim about later, which I did on June 3rd in a -- just a
16  general discussion about what was occurring in the
17  office.  It's Steve Duncan's contention that this is
18  harassment.  But when Steve originally talked about this,
19  he told me that he had just had to have a conversation
20  with her about office banter.  He throws the word
21  "harassment" out later in my opinion now that he's been
22  sat down and interviewed and is defensive and irritated.
23    Q.  And he's saying that Plumeri heard Kim said
24  that?

---

Page 156

1    A.  He said she was there that day.  He didn't
2  actually tell me that she heard it.
3    Q.  Did you contact Ms. Plumeri, whatever her name
4  is?
5    A.  No.  I had -- we had talked about that, and I
6  had decided not to do that.
7    Q.  Who's "we"?
8    A.  Bruce and I.
9    Q.  Why did you decide not to?
10         MS. LEMING:  That's already been asked
11  and answered, but you can answer again.  Go ahead.
12    A.  Because that she and Steve were involved in a
13  relationship and I'm going to hear from her what I've
14  already heard from Steve.
15    Q.  Well, it sounds like you believe that if you
16  asked Kim questions concerning Mr. Duncan's position that
17  you didn't believe that you would get a truthful answer
18  and that if you asked Mr. Duncan about Kim's position
19  that you wouldn't get a truthful answer.
20    A.  No.  That's not correct.
21    Q.  Then, why didn't you bother to confront these
22  people with the other person's responses?
23    A.  Because I'm going to get -- continue to get
24  two varying sides of the story.

---

Page 157

1    Q.  How do you know?
2    A.  But what I'm trying to do --
3         MS. LEMING:  Can you let her answer,
4  please?
5         THE WITNESS:  What I'm trying to do is
6  find someone else to help me find the facts in these
7  investigations.
8  BY MR. MARCONI:
9    Q.  Well, for example, you found Ms. Plumeri, who
10  is an independent person, and you didn't even bother to
11  call her.  You just assumed that she wouldn't tell you
12  the truth.  Right?
13    A.  No.
14         MS. LEMING:  Objection to the form.
15         THE WITNESS:  No.  That is not correct.
16         For this particular instance, I had no
17  verification that she's even -- can hear this.  He simply
18  says she's there on that date.  Steve wants me to call
19  her to talk about these flowers that show up at the
20  hotel.  I have no way of tracking those flowers.  I have
21  no information on that.  Again, I'm going to hear from
22  her flowers showed up at the hotel -- Steve and I think
23  it was sent by Kim.
24

---

Deborah Watson

41 (Pages 158 to 161)

Page 158

BY MR. MARCONI:
1
2   Q.   I hope this isn't too confusing. I'm going to
3   hand you four exhibits that have been marked 1 through 4.
4   Can we just make sure that we're together on this,
5   Ms. Watson?
6   A.   Mm-hmm.
7   Q.   No. 1 is 0547 through 0549.
8   A.   Yes.
9   Q.   No. 2 is 0550 through 0555?
10  A.   0552? You said No. 2?
11  Q.   Yes.
12  A.   0550, 0551, 0552.
13  Q.   Oh, I'm sorry. I have two together. Correct.
14  Through 0552.
15  A.   Okay.
16  Q.   Then 0553 through 0555.
17  A.   Okay.
18  Q.   Then 4 is 0556 and 0557.
19  A.   Yes.
20  Q.   Now, I want you to review them.
21      My first question, as you're reviewing
22  them, is: Were any of these exhibits ever -- copies of
23  them ever given to Ms. Bailey?
24  A.   No.

Page 159

1   Q.   Okay. Why not?
2   A.   Because these are formal discipline warnings
3   and we decided that we were not going to discipline
4   Ms. Bailey formally.
5   Q.   All right. So your testimony is that all four
6   of these exhibits were formal notification of discipline
7   upon Ms. Bailey?
8   A.   These are -- this is a written warning, which
9   is the second step in our discipline process. And when
10  you move to a written warning, there is a copy that is
11  written up and given to the employee, which is why the
12  last page says Employee Signature Only Indicates that
13  Conference Occurred. And it is a formal discipline step.
14  And that's why it's on this particular template and
15  labeled Written Warning.
16  Q.   How come there's four of them?
17  A.   Bruce and I were working on how to word it.
18  Q.   So you went through four different versions?
19  A.   Yes. Tweakings, I would assume.
20      MS. LEMING: I just want to add that
21  Exhibit 2 and Exhibit 3 are the exact statement document.
22  So I think there's either two versions or three versions.
23      MR. MARCONI: But they do have different
24  Bates numbers on them.

Page 160

1       MS. LEMING: I understand that. For
2   production purposes, we produce what, you know, was
3   responsive to your request. What's in 2 and what's in 3
4   are the same document.
5   BY MR. MARCONI:
6   Q.   Now, this document, is it fair to say that
7   this was sort of a culmination of the results of your
8   investigation into Kim's claim of sexual harassment?
9       MS. LEMING: Which document are you
10  referring to?
11      MR. MARCONI: Let's talk about No. 1
12  first.
13  A.   I'm going to read it, if you don't mind.
14  Q.   No. Please do.
15  A.   It's been a long time.
16  Q.   So you've only looked at one?
17  A.   I know they're all similar versions. If we
18  need to go through each one individually, I can read them
19  individually, if that's okay.
20  Q.   It looks like you're saying here that you've
21  conducted your investigation --
22  A.   Yes.
23  Q.   -- of the claims and that you can't tell Kim
24  anything about how you're dealing with Mr. Duncan, but

Page 161

1   you're also telling her that as part of the investigation
2   you learned of behaviors and errors in judgment on her
3   part that you all felt contributed to what happened to
4   her.
5   A.   May have, yes.
6   Q.   Okay. So in other words, the errors in
7   judgment that she made contributed to Mr. Duncan's
8   conduct?
9       MR. MARCONI: Objection to the form.
10  You can answer.
11  A.   May have put her in a situation where he felt
12  it was okay to take that step. It's not okay for him to
13  take that step.
14  Q.   What step?
15  A.   Where, for example, he admitted to kissing
16  her, although his version was that it was consensual.
17  Q.   Then you say that you're preparing a warning
18  for her that you don't want her to feel is in retaliation
19  for coming forward.
20  A.   Mm-hmm.
21  Q.   Okay. Is that what the rest of this document
22  is -- the warnings that you're giving her?
23  A.   This is all the warning. But the next
24  document -- Problem 1: Plan for Improvement; Problem 2;

Deborah Watson

42 (Pages 162 to 165)

Page 162

1  Plan for Improvement — is to talk about specific things
2  that we would like to see changed.
3      Q.  Do you know when in May this document was
4  prepared?
5      A.  It was late May.
6      Q.  Late May?
7      A.  (The witness indicated.)
8      Q.  You eventually had a meeting with Kim and
9  Mr. Morrissey where she was told what was going on.
10  Right?
11     A.  That was June 3rd.
12     Q.  June 3rd.
13          This Document, No. 1, and these other
14  documents, 2 through 4, were they sort of summaries of
15  what she was told?
16     A.  No.
17     Q.  No?
18     A.  No.
19     Q.  Were you trying to write down and collect your
20  thoughts on what you were going to tell her?
21     A.  No.
22     Q.  All right. It looks like from this Exhibit
23  No. 1 that you had concluded, based on your
24  investigation, that she was guilty of unprofessional

Page 163

1  conduct in the workplace. Right?
2      A.  We found through the course of the
3  investigation that there was some unprofessional conduct
4  that was inappropriate as a member of management that we
5  wanted to see her correct.
6      Q.  Okay. Did you specifically tell her what they
7  were — what that unprofessional and improper conduct —
8  inappropriate conduct was?
9      A.  We talked about that on June 3rd.
10     Q.  You say in this specifically that she made
11  comments about the physique of a phone vendor and a copy
12  machine repairman.
13     A.  Mm-hmm.
14         MS. LEMING:  Yes?
15         THE WITNESS:  Yes. Sorry.
16         MS. LEMING:  That's okay.
17  BY MR. MARCONI:
18     Q.  I think we already established that you never
19  asked Kim for her position on whether she did that or
20  not.
21     A.  No. We talked about that June 3rd.
22     Q.  Oh, you did.
23     A.  Yes. As part of the discussion she and I and
24  Joe Morrissey had about things that we came across in the

Page 164

1  investigation and wanted her to correct. That was the
2  June 3rd conversation.
3      Q.  Did she admit during the June 3rd conversation
4  that she had done that?
5          MS. LEMING:  Objection. Asked and
6  answered. You can answer again.
7      A.  She didn't deny it. I didn't ask her
8  directly, "Did you say this?" We had had a counseling
9  session about appropriate comments and commentary in an
10  office, and we all agreed that that is something that
11  needed to stop.
12     Q.  Well, let's talk about the June meeting for a
13  minute. When was the June meeting scheduled?
14     A.  I believe we wanted to do it in late May, but
15  she was going on the vacation. So we then picked the
16  June 3rd date when she was back.
17     Q.  Was it something that would have been on her
18  calendar that she knew that at such and such a time on
19  June 3rd she was going to have to meet with you two, or
20  did you pick up the phone and say "Kim, come into the
21  conversation room. We want to talk to you"?
22     A.  It was prescheduled. I don't know if she put
23  it on her calendar, but it was prescheduled.
24     Q.  Did she have any idea what it is that you were

Page 165

1  going to be discussing with her at that meeting?
2      A.  That we were going to get together and talk
3  about the results of the investigation and where we go
4  from here, yes.
5      Q.  Results of the investigation concerning her
6  allegations of sexual harassment?
7      A.  Correct.
8      Q.  Did you ever tell her that part of the meeting
9  would be that she would be accused of wrongdoing too?
10         MS. LEMING:  Objection to the form. You
11  may answer.
12     A.  I didn't accuse her of anything.
13     Q.  You said that she committed unprofessional and
14  inappropriate conduct in the workplace.
15     A.  And we discussed at that meeting things in
16  here about —
17     Q.  Can I stop you?
18         MS. LEMING:  Well, no. Can't she finish
19  her answer?
20         MR. MARCONI:  The answer is not
21  responsive to the question.
22  BY MR. MARCONI:
23     Q.  The question is: Did Kim Bailey know? Did
24  you tell her before the meeting that you were going to be

Corbett & Wilcox

A210

Deborah Watson

43 (Pages 166 to 169)

Page 166

1  discussing the fact that you had concluded that she had
2  been unprofessional and inappropriate in the workplace?
3  Did you tell her that beforehand?
4      A.  I told her we were going to be discussing the
5  results of the investigation. I don't recall if I used
6  those specific words.
7      Q.  Did you tell her that her conduct would also
8  be discussed at the meeting as opposed to just
9  Mr. Duncan's?
10     A.  I did not get that specific. I said we're
11 going to discuss the results of the investigation and
12 where we go from here.
13     Q.  But when you started talking to her about the
14 phone vendor, you said she didn't admit it.
15     A.  She didn't deny it either. It was a
16 conversation.
17     Q.  So she listened while you accused her of that.
18 Right?
19     A.  I didn't accuse her.
20         MS. LEMING:  Objection to form. You may
21 answer.
22         THE WITNESS:  I didn't accuse her. It
23 was a discussion. It was a counseling discussion
24 about -- and this is not the document that was reviewed.

Page 167

1  This is not the document that we went through.
2          MS. LEMING:  Just let the record reflect
3  that the witness was gesturing to Exhibit 1.
4  BY MR. MARCONI:
5      Q.  So there was a document that was prepared that
6  you used to go to conduct the June 3 meeting with
7  Ms. Bailey?
8      A.  There were two documents that were prepared.
9  One was the letter that we gave her mandating training.
10 Then the other one is a note to file that I had written
11 of the different topics we were going to talk about,
12 because Commerce made a decision that we were not going
13 to put a formal written warning in front of Kim -- that
14 what we were going to do was have a discussion about the
15 things that we found out in the investigation that we
16 felt were unprofessional or inappropriate and needed to
17 change and talk to her about making those changes and
18 what we expected and then sending her to some training.
19     Q.  But as of June 3rd, you had already concluded
20 that all of those things that you had been told she was
21 guilty of she was in fact guilty of. Right?
22         MS. LEMING:  Objection to the form. You
23 can answer.
24     A.  No. Which is part of why we went in with a

Page 168

1  discussion instead of a formal written warning. It's a
2  softer approach done for the purpose of having a
3  discussion hoping that Kim will understand that some of
4  these things need to change. But it's not a -- for
5  example, in here it doesn't go into the summary. It's
6  conversational and counseling versus the impact of
7  handing a written warning to someone and saying this is a
8  permanent part of your file.
9      Q.  But your analysis of what occurred is laid out
10 in these exhibits. Right?
11     A.  This is what -- the pieces of the
12 investigation that we were not pleased with Kim's
13 behavior are in here. But it's written in a tone, again,
14 of a warning versus the counseling discussion that Joe
15 and I had with her
16     Q.  Right. But this accurately lays out your
17 conclusions concerning the investigation as it relates to
18 the matters that are described in this document. Right?
19 Problem Area No. 1: Unprofessional conduct. Plan for
20 Improvement. Then Problem Area 2 -- separation of work
21 and personal life. You concluded that these were
22 problems for her.
23     A.  These were areas where she needed to improve.
24 Correct.

Page 169

1      Q.  Based on your investigation?
2      A.  Correct.
3      Q.  Okay. My question is again: At any time was
4  Kim ever given an opportunity to refute what is written
5  in this Problem Area No. 1?
6      A.  During the discussion of June 3rd.
7      Q.  How was that opportunity afforded to her?
8      A.  Because it was conversational.
9          Kim, it came up in the investigation
10 that you may have tried through an attempt to build
11 morale in MainStreet to arrange a trip to New York and
12 take separate rides up and stay in a hotel. That is
13 outside the company parameters on a company event, and as
14 a supervisor, we want you to stay within the parameters
15 of the company event. If you feel you want to try to do
16 something different, you should reach out to someone and
17 question it. That was the conversational nature of what
18 occurred on June 3rd.
19     Q.  I don't see anything about that in this
20 Exhibit No. 1. All I see is unprofessional conduct in
21 the workplace, and you're talking about this phone
22 vendor.
23     A.  No. Problem Area 2 is where we go into the
24 e-mail -- 05/4/8.

Deborah Watson

44 (Pages 170 to 173)

Page 170

1    Q.   All right. Let's go to Problem Area No. 1
2  first, though.
3    A.   Mm-hmm.
4    Q.   All right. Is it your testimony that Kim was
5  given an opportunity at the June 3 meeting to refute the
6  claim that she had done that?
7    A.   Yes. She could have looked at me and said
8  that is absolutely not true, Deb.
9    Q.   And she didn't?
10   A.   She didn't.
11   Q.   Okay. You say that she accused Mr. Duncan of
12  making her feel like a "sold object" and that you don't
13  condone such comments if they in fact occurred. Did you
14  deny that they occurred?
15   A.   That was -- the piece of Randolph we couldn't
16  verify was the exact comments that Steve made to her.
17  She said -- I felt my recollection of it -- again, her
18  write-up would be the specifics -- that she felt like a
19  "piece of meat." That's what she said to us as her
20  description. She told Paul she felt uncomfortable. She
21  told us that Steve made some comments walking in that she
22  was uncomfortable with. Steve denied them. No one
23  overhears them.
24   Q.   Then you say: Our point, however, is that

Page 171

1  over time your behavior and demeanor in and out of the
2  office helped contribute to an environment where
3  Mr. Duncan and others may have felt free to make comments
4  that crossed the line and were perceived as
5  inappropriate.
6    A.   Yes.
7    Q.   So aren't you essentially saying, ma'am, that
8  Kim was somehow responsible for the sexual harassment
9  that she received from Mr. Duncan?
10   A.   No.
11       MS. LEMING: Objection to the form. You
12  can answer.
13       THE WITNESS: What I'm saying is that
14  she may have put herself in a situation where someone may
15  have felt she would be receptive to it. Not necessarily
16  harassment but going back to Mr. Duncan's feeling that
17  this is consensual. And the point was: If you don't
18  cross that line and you stay professional and you don't
19  go out with work people after work and involve alcohol,
20  then you're not sending any kind of message about, hey,
21  let's all socialize together and cross that professional-
22  personal line. Draw and keep that line. Don't mix those
23  lines. That's what our point is.
24

Page 172

1  BY MR. MARCONI:
2    Q.   Your point is that if you go out with people
3  at work and alcohol is involved after work that that
4  somehow contributes to an environment where they think
5  that they might be in a position to harass and get away
6  with it?
7        MS. LEMING: Objection to the form. You
8  can answer.
9    A.   No. Harassment is not okay. It puts you in
10  an environment where someone may -- with alcohol
11  sometimes inhibitions come down -- and may cross that
12  line between professional and personal and say things
13  that are inappropriate and that you are offended by.
14       Again, if you keep your professional and
15  personal life separate and you don't go somewhere where
16  alcohol is involved or you don't make, you know,
17  bantering comments with a physique innuendo, people will
18  not generally come up to you and start those
19  conversations. And so, again, I'm not saying under any
20  circumstances that sexual harassment is okay. It's not
21  okay. The point is that if you don't cross that
22  personal-professional line than it is less likely that
23  someone may cross it towards you.
24   Q.   So if you don't do what Kim did, it's less

Page 173

1  likely that she would have been harassed?
2        MS. LEMING: Objection to the form. You
3  can answer.
4    A.   By putting herself in those situations -- and,
5  again, especially where you have alcohol involved, people
6  don't always think straight. And that is where
7  conversations occur that, again, cross that line. And I
8  think it did put her in a difficult situation. And if
9  she doesn't do that and she is just a manager and she
10  stays professional and stays within the company
11  guidelines -- she's in a much better position separating
12  professional from personal life.
13   Q.   Are there company guidelines or rules that say
14  that, for example, she shouldn't have gone down to the
15  golf tournament with Mr. Duncan?
16   A.   There's no formal policy, no.
17   Q.   Is there an informal policy?
18   A.   She could have said no. But there's no
19  informal policy that I'm aware of.
20   Q.   But isn't she in fact expected to go down
21  there because she's trying to sell?
22   A.   No. With Travelers that was an invite where
23  the carrier has invited you to show up and come to their
24  event. And they want to woo Commerce's business. So you

Corbett & Wilcox

A212

Deborah Watson

45 (Pages 174 to 177)

---

Page 174

1  have a right to say no. In the same way that if
2  Commerce's law firm offers Commerce HR people tickets to
3  come hang out with them at a hockey game, you have a
4  right to say no.
5      Q.  Has that ever happened to you?
6      A.  That I've been invited to a hockey game?  Yes.
7      Q.  That you've been invited to anything.
8      A.  Yes.
9      Q.  Have you gone?
10     A.  Sometimes.
11     Q.  Was there ever any alcohol involved?
12     A.  Occasionally.
13     Q.  Then why is it okay for you to do it but it's
14  not okay for her to do it?
15         MS. LEMING:  Objection to the form.  You
16  can answer.
17     A.  Because this is a company event.  There's two
18  separate things going on here.  This is a company event.
19     Q.  Let me stop you.
20         MS. LEMING:  Let the witness finish
21  answering the question.
22         MR. MARCONI:  No.  It's getting late and
23  she's not being responsive.
24         MS. LEMING:  Well, you're also asking

---

Page 175

1  the same question a couple of different ways --
2         MR. MARCONI:  No, I'm not.
3         MS. LEMING:  -- to get the answer you
4  want.  She's entitled to give a response to your
5  question.
6         MS. MARCONI:  All right.
7         MS. LEMING:  If she's not responsive,
8  then you can ask it again and get her to focus.
9         MR. MARCONI:  I'm just trying to get us
10  out of here.  I don't think she's listening to the
11  questions because she is not answering them.
12         MS. LEMING:  She is listening.
13  BY MR. MARCONI:
14     Q.  You said that Travelers invited Kim and
15  Mr. Duncan.
16     A.  Mm-hmm.
17     Q.  You said that it's the same as if a law firm
18  invites the HR people.  Right?
19     A.  Correct.
20     Q.  My question to you was:  Has that ever
21  happened to you where you were invited by a vendor or
22  somebody who was interested in doing business with
23  Commerce to a social event?  And your answer was yes.
24     A.  Mm-hmm.

---

Page 176

1      Q.  Then, my question was:  Was there alcohol
2  involved in that event?  Your answer, I believe, was
3  sometimes yes.
4      A.  Mm-hmm.
5      Q.  Then I said, well, what's the difference
6  between you going to that event and Kim going to the
7  Travelers thing.
8      A.  And that's what I was trying to answer.  It's
9  two separate things.  Because your initial event was
10  about the policy -- does Kim have to go?
11     Q.  No.
12     A.  And the answer is, no, you don't have to go.
13     Q.  My question wasn't does she have to go.  That
14  was your answer, but that wasn't my question.
15         My question was:  Was it improper for
16  Kim to go?
17         MS. LEMING:  No, it wasn't.  But go
18  ahead.  Is that the question now?
19         MR. MARCONI:  Yes.
20     A.  It's not improper for her to go to the
21  Travelers event.  No, that's not improper.  It is
22  improper for her to regularly socialize out in a
23  non-company format where there is alcohol involved at
24  bars, for example.  That, I believe, is her choice.  But

---

Page 177

1  that, I believe, as we wrote in here, may send a message
2  that people can be more casual with her.  And that's my
3  point about the professional versus the personal life.
4      Q.  So Kim's socializing with people outside of
5  work is something that was not permitted by Commerce?
6      A.  That's not what I'm saying.
7      Q.  Tell me what you're saying again.
8      A.  What I'm saying is she chose to socialize
9  after work with some Commerce people mixed with friends,
10  not at a company event.  And that is her choice.  It's
11  not against policy.  But that is the type of situation
12  where, if a couple people get some drinks in them --
13  where inappropriate comments can be made.  And that's
14  where our advice and counsel to her is don't cross that
15  line.  Don't suggest that MainStreet go to New York and
16  go outside of the company-provided bus,
17     Q.  Well, surely --
18     A.  That's the point.
19     Q.  Surely, you would have never said to her that
20  she's not allowed to socialize with people after work
21  that include her friends and some Commerce people.
22     A.  No.  I would not say that.
23     Q.  Have you ever done that?
24     A.  Certainly.

---

Corbett & Wilcox

Deborah Watson

46 (Pages 178 to 181)

Page 178

1    Q.   So it's something that you are criticizing Kim
2  for, but it's okay for you to do it?
3           MS. LEMING: Objection to the form. You
4  can answer again.
5    A.   Well, what I was saying is that she seemed to
6  do this regularly. It seemed to come up regularly. And
7  she's having issues in these interactions. So what we're
8  saying is, Kim, you're telling us that you want this to
9  stop. You don't want it to happen again. We're taking
10  our actions against Steve Duncan. What we're saying is
11  think about putting yourself in those positions. Maybe
12  that isn't a good idea.
13    Q.   Aren't you actually saying that by doing what
14  she did she put herself in a position to be harassed?
15           MR. MARCONI: Objection to the form.
16  You can answer.
17    A.   What we say in here is that -- our point is
18  that over time your behavior and demeanor in and out of
19  the office helped contribute to an environment where
20  Mr. Duncan and others may have felt free to make comments
21  that crossed the line and were perceived as appropriate.
22  I'm not saying it's her fault. I'm saying it may have
23  contributed to this.
24           And, again, you're reading off a piece

Page 179

1  of paper that was written as a formal warning that Joe
2  Morrissey and I took as a consultative counseling session
3  in a less formal dialogue with Kim as opposed to a formal
4  here is your written warning.
5    Q.   So what? You still said that to her. Right?
6    A.   We did discuss this and how that can cause
7  complications.
8    Q.   And, in fact, you accused her of doing things
9  like that which contributed to Steve Duncan's idea that
10  he could get away with whatever he wanted to get away
11  with. Right?
12           MS. LEMING: Objection to the form. You
13  can answer.
14    A.   I would use the word "suggested." I don't
15  feel I accused Kim in this discussion. I feel that we
16  counseled her and found out that she could use some
17  training and talk to her. And I thought we actually had
18  a very good discussion about things that she could do
19  that may have made the situation more complicated and
20  that in the future she shouldn't do so that we don't have
21  any other issues.
22    Q.   Then you say Plan For Improvement: You are to
23  refrain from making comments in the workplace -- do you
24  see that? --

Page 180

1    A.   Yes.
2    Q.   -- that cross the line as being other than
3  totally professional.
4           What does that mean?
5    A.   Meaning that we want dialogue in the office to
6  be professional. No sexual innuendo. Don't banter about
7  physical. Keep it professional. Don't get into a lot of
8  personal life. Keep it professional and business-
9  oriented.
10    Q.   And it's your testimony that you said this to
11  her at the June 3 meeting?
12    A.   I don't know that I used those exact words,
13  but we definitely discussed a professional work
14  environment and keeping it as a supervisor that you're at
15  a higher standard and you are the one that people look to
16  in the office and need to set that example.
17    Q.   Did you tell her that your investigation
18  revealed that she was not doing that in the workplace?
19    A.   To my recollection, yes, we did talk about,
20  you know, the comments about the vendors, the things that
21  came out about she and Steve talking about their personal
22  lives and really crossing that line and that those are
23  conversations that shouldn't occur in the office and that
24  often it's best not to even go there.

Page 181

1    Q.   Then we go down to Problem Area 2 when you say
2  that Mr. Duncan had clearly crossed the line that should
3  exist between work and personal lives.
4    A.   Mm-hmm.
5    Q.   He was at fault for allowing that to happen,
6  but we feel you contributed to the problem as well.
7  There were too many instances where after hours social
8  events involving friends and alcohol contributed to a bad
9  situation. See that?
10    A.   Mm-hmm.
11           MS. LEMING: Yes?
12           THE WITNESS: Yes. I'm sorry.
13           MS. LEMING: That's okay.
14           THE WITNESS: I have to speak.
15  BY MR. MARCONI:
16    Q.   Which incidents were you talking about?
17  Backstage and Kid Shelleen's? Or not Kid Shelleen's. Do
18  you remember which ones you were talking about?
19    A.   Backstage was the initial one where he touched
20  her and they kissed in the car and we had the issue
21  around consensual, not consensual
22    Q.   All right. I'm not asking you what they were.
23  I'm asking you what are you referring to here --
24    A.   Right.

Corbett & Wilcox

Deborah Watson

Page 182

1  Q.  -- when you're talking about --
2  A.  Right.
3  Q.  -- those instances.
4  A.  And I'm sorry. I'm thinking out loud. I
5  apologize for that. Yes. Backstage was definitely one
6  of them. We had the he said/she said with the Travelers
7  event, although that was the weekend where Travelers
8  invited them. Actually, all four of the incidents
9  involved alcohol, if I remember correctly.
10  Q.  Travelers -- was that an after hours social
11  event?
12  A.  It was a Saturday.
13  Q.  Okay. But wasn't that a business event?
14  A.  It -- that one was more within company
15  parameters. But again, Travelers had invited us. And
16  she does have a right to say no. That's not, for
17  example, a business meeting from 1:00 to 3:00 in the
18  afternoon.
19  Q.  So far what she did wrong was she allowed
20  herself to be put in the position at the Backstage. She
21  allowed herself to be put into a bad situation at the
22  Travelers. And it looks like this e-mail concerning the
23  WOW! awards. What was it that you didn't like about
24  that?

Page 183

1  A.  That is outside the company's parameters.
2  The -- that's a company event. And the company provides
3  buses -- company-paid transportation for all the
4  employees to go up to the WOW! awards. And what she
5  did -- and I believe in an effort to increase morale and
6  bonding she offered to arrange outside transportation and
7  arrange for people to stay overnight in hotels in
8  New York as opposed to staying within the company
9  parameters which were the bus picks you up in Delaware,
10  company-provided, drives you to New York. When the WOW!
11  awards are over, you get back on the bus and the bus
12  takes you back.
13  Q.  Same night?
14  A.  Same night.
15  Q.  So what Kim did was, in an effort to raise
16  morale, she was trying to make arrangements for the
17  people that she worked with to stay a night in New York.
18  A.  Yes.
19  Q.  Okay.
20  A.  Night in New York, separate transportation up.
21  Q.  Now, is there any specific policy that you can
22  cite to in the policies and procedures manual that says
23  that that's not proper?
24  A.  I would have to review the handbook, but it

Page 184

1  goes to the manager having to set the example. And if
2  the company is advocating a certain way to do things like
3  the trip to New York, then management should stay within
4  those parameters. And if they're not going to, they
5  should ask about doing something separate.
6  Q.  Now, is that your opinion or is that actually
7  in the book?
8  A.  I would have to look at the book. I don't
9  recall where it is in the book.
10  Q.  So that's another thing that she did wrong.
11  Now, did that contribute to her sexual
12  harassment?
13  MS. LEMING: Objection to the form. You
14  can answer.
15  A.  This contributed to what we felt were
16  behaviors in the workplace we wanted to see her change,
17  and it was an example of her setting up an outing, again,
18  outside the company parameters. You have the company
19  parameter and going outside that that would allow for
20  more freedom for the employees to maybe end up in a
21  situation where there could be alcohol or inappropriate
22  comments or things like that.
23  Q.  I'm trying to figure out how this
24  investigation into her sexual allegation claims turns

Page 185

1  into criticism over the fact that she tried to arrange
2  other transportation to New York to see the WOW! awards.
3  A.  Through the course of the investigation and in
4  pulling e-mails and things like that -- the e-mail that
5  she sends out she had actually sent to me about New York.
6  And this is a behavior that we don't want our management
7  to do. If we set up a company-sponsored event with a
8  certain parameter, we want them within that parameter.
9  So this came up as part of the thorough investigation
10  that we did.
11  Q.  But she sent you an e-mail that she was going
12  to do that? She was going to propose another way up?
13  A.  She sent the e-mail to all of MainStreet.
14  Then she called me because Steve Duncan made a comment to
15  her about it that she didn't like. So then she said she
16  got a little paranoid about it. So she then retracted it
17  to try to make it sound more structured and that she
18  wasn't implying anything. And I asked her to send me
19  everything that she had sent. I believe Steve sent it to
20  me also.
21  Q.  Was she given an opportunity at the June 3
22  meeting to explain to you what she was trying to do
23  there?
24  A.  Yes.

Deborah Watson

48 (Pages 186 to 189)

Page 186

1 Q. What did she say?
2 A. She said that she was trying to get enthusiasm
3 for the company event and to try to get MainStreet to
4 bond and build morale. And we talked about how that
5 intent is good but that that needs to be done within the
6 constraints that the company sets on the event. Don't go
7 outside those. Stay within the expectations of the
8 company events.
9 Q. Has anybody else to your knowledge ever been
10 given these kinds of instructions?
11 A. Warnings, yeah. We give warnings.
12 Q. Like these? Like, for example, has anyone
13 else ever been told that while there may be business
14 social events they should be limited to those
15 organizations by the company or senior management or
16 those that you receive specific approval for?
17 A. I'm sorry. Where are we?
18     MS. LEMING: He's reading down in here
19 This sentence.
20 Q. Like, for example, has any supervisor of yours
21 ever told that to you?
22 A. While there may be business social events,
23 they should be limited to those organized by the company
24 or senior management or those you have received specific

Page 187

1 approval for?
2 Q. Right.
3 A. I don't recall that sentence exactly being
4 used.
5 Q. Just the context in general.
6 A. I actually came out of a very strict culture
7 where business and personal was kept very separate.
8 Q. That's not my question.
9 A. I'm sorry.
10 Q. My question is: Has that concept or that
11 requirement, whether it's those exact words or not, ever
12 been communicated to you by anyone?
13     MS. LEMING: At Commerce?
14     MR. MARCONI: At Commerce.
15 A. At Commerce. Not that I can recall by my
16 supervisor.
17 Q. I asked you this similar question.
18     But is there anything in the company
19 manual that says that that is a company policy?
20 A. I would have to review the manual in detail.
21 I don't have anything specific coming to mind.
22 Q. How about this? Has it ever been communicated
23 to you by anyone at Commerce that your involvement should
24 never cross the line of appropriate business conduct and

Page 188

1 you should be sensitive to keeping your distance from
2 becoming too involved with any individual business
3 associate on a personal level?
4 A. Yes.
5 Q. Who communicated that to you?
6 A. That is actually part of what we discuss in
7 performance management training and management within the
8 law, which are two management classes that we offer at
9 Commerce University.
10 Q. Now, is that something that Kim was taking?
11 Did she take that course?
12 A. We were asking her to take those.
13 Q. Is that someplace in the policy and procedure
14 manual as well?
15 A. Again, I'd have to read through the manual. I
16 know it's in the classes, because I teach the classes.
17 Q. Have you ever invited a personal friend to a
18 business event?
19 A. Me personally?
20 Q. Yes.
21     Like, say, for example, maybe a
22 boyfriend.
23 A. No.
24 Q. Never have?

Page 189

1 A. No.
2 Q. All right. Any personal friend?
3 A. No.
4 Q. Never have?
5 A. No.
6 Q. But if you had, that wouldn't be something
7 that's improper, is it?
8 A. I think it is improper. You shouldn't mix
9 those two.
10 Q. Well, let's say there's a Christmas party at
11 Commerce and someone brings a boyfriend or a girlfriend.
12 You think that would be improper?
13 A. The Christmas party at Commerce is actually
14 set up in a way that you are encouraged to bring a
15 boyfriend or a family member.
16 Q. Oh?
17 A. And it's designed specifically that way. It's
18 also open to customers.
19 Q. So other than that Christmas party, is it your
20 testimony that doing that -- bringing a friend to a
21 company event -- is not allowed?
22 A. I think it's inappropriate. There's no
23 policy, if that's your question.
24 Q. And it's done all the time, isn't it?

Deborah Watson

49 (Pages 190 to 193)

Page 190

1    A. Not to my knowledge.
2    Q. Oh, no?
3        Is there any policy in place that says
4  that you can't party after hours with those you work
5  with?
6    A. It's not a policy. Again, it's talked about
7  in the classes in management that this is not a good
8  idea. You have to keep yourself separate as a management
9  person because you are expected to maintain professional
10  behavior and walk the walk and talk the talk of the
11  company. And often at those after hours gatherings,
12  particularly with subordinates, people start talking
13  about, you know, what stinks at work and, gee, I hate my
14  boss and isn't that a silly way to do this and that type
15  of thing. And it's better if the management person is
16  not in that environment, especially with alcohol
17  involved, mixing it on those conversations.
18    Q. Of all the different events that we discussed
19  that Kim alleges things occurred, were there any
20  subordinates at any of those gatherings?
21    A. I don't know everyone who was at Travelers.
22    Q. All right. Let me ask you --
23    A. I'm trying to think who was at Randolph.
24    Q. Did you have any reason to believe that Kim

Page 191

1  was partying after hours with subordinates at Randolph?
2    A. Actually, Paul is technically not a management
3  person.
4    Q. Oh, he's not.
5    A. Paul Scaffidi was not a management person.
6    Q. Oh.
7    A. Kim was management. Steve was management. I
8  think Nick was management at that point. That's my
9  recollection.
10    Q. So the answer to my question is that you
11  cannot identify any of these events that involved Kim,
12  quote, partying after hours with subordinates?
13    A. No. Paul Scaffidi, as a non-management
14  person, technically, in the hierarchy, is not a
15  subordinate. It's a lesser position. Patty Kalmbacher,
16  as a CSR, versus Kim being in management is a lesser
17  position.
18    Q. Where is it that she partied with Patty
19  Kalmbacher?
20    A. Patty organizes the Christmas party. That was
21  something we were talking about a long time ago -- or I
22  should say much earlier today.
23    Q. So Kim partying with Patty at the Christmas
24  party is improper?

Page 192

1    A. No. I'm trying to answer your question, which
2  is when has Kim mixed with people other than -- or after
3  hours. And so I'm sitting here trying to think of who
4  are the people who would be considered at a lesser level
5  than Kim who she has been out with that I'm aware of.
6  And the two names that are coming to mind are Paul
7  Scaffidi and Patty Kalmbacher.
8    Q. The time you're talking about with Patty
9  Kalmbacher was the Christmas party?
10    A. Yes.
11    (The reporter requested a break.)
12        - - - - -
13    DEBORAH E. WATSON, resumes
14  BY MR. MARCONI:
15    Q. Getting back to those Exhibits 1 through 4,
16  they're called Employee Conference Notes?
17    A. Mm-hmm.
18    MS. LEMING: Yes?
19    THE WITNESS: Yes. I'm sorry.
20  BY MR. MARCONI:
21    Q. I'll hand them back to you.
22        You said that you didn't show copies of
23  those to Kim because she wasn't being officially
24  disciplined or warned. Right?

Page 193

1    A. We were not moving to the formal discipline
2  process.
3    Q. But did you want her to take note of the
4  information that was in those documents?
5    A. I wanted her to take note of the information
6  that we shared with her in the June 3rd conversation.
7    Q. That included some or all of what's in those
8  documents?
9    A. You actually have another document. But, yes,
10  some or all of it. Yes.
11    Q. All of it or some of it?
12    A. I don't have the other document in front of
13  me, but I would say all of it.
14    Q. Okay. Is there any reason why you couldn't
15  have just put some other heading on those exhibits and
16  given her something in writing that reflected that
17  information?
18    A. We chose to give her the training which was
19  the -- what we issued in writing. And we were hoping
20  that the conversation that Joe and I would have had with
21  her that was a softer, again, counseling versus a formal
22  discipline process approach would have conveyed that,
23  yes, this -- these are things you need to change. And
24  Kim said that she realized there were some changes that

Corbett & Wilcox

A217

Deborah Watson

50 (Pages 194 to 197)

Page 194

1  she needed to make and that she would, you know, sign up
2  for the classes. That was in the June 3rd conversation.
3      Q.  So to try to boil down your answer, it sounds
4  like that you didn't feel as though it was necessary to
5  put your concerns in writing and actually give Kim a copy
6  of the document.
7          MS. LEMING: Objection to the form. You
8  can answer.
9      A.  We did not feel it was — we chose not to
10  issue a formal warning in going through the discipline
11  process.
12      Q.  That's not my question. I want you to listen
13  to my question. Okay?
14          You chose not to give Kim a written
15  summary of what you felt was wrong with her. Right?
16  Those documents are written summaries of what her
17  problems are and what she needs to do about her problems.
18  Right?
19      A.  Correct. I did not do that.
20      Q.  Why not?
21      A.  Because I wanted to have a conversational
22  approach versus — when you are in the formal discipline
23  process, it's not as conversational. And you're in the
24  formal discipline process.

Page 195

1          What Joe and I did was counsel Kim from
2  the perspective of Joe, with many years of management,
3  and me, with management and HR, to talk through some of
4  the things we found out, have a dialogue with her about
5  her perspective of it and then talk about changing those
6  behaviors, which she did and was very open to in that
7  discussion saying, "I understand this. I want to put
8  this behind me. That make senses. I will sign up for
9  the classes."
10      Q.  Okay. But you could have given her those
11  documents or a similar document that set forth your
12  concerns in writing, could you not, without formally
13  disciplining her?
14      A.  Yes, I could have.
15      Q.  And you didn't?
16      A.  We did not.
17      Q.  The reason is the reason that you just gave
18  me?
19      A.  Yes.
20      Q.  You didn't think it was a good idea?
21      A.  I felt the conversation and Joe felt the
22  conversation would be enough. And to set — we wanted to
23  put her in a position where she didn't have something in
24  writing in her formal file. This is in the investigation

Page 196

1  file. It never went into her formal file. If I put
2  something in writing, it goes into her employee file. We
3  wanted to have a consultative discussion with her, which
4  is why the only thing we put in writing was the training.
5  I'm trying not to put anything disciplinary in her file.
6  I want her to just talk about it and change it. And I
7  felt that the June 3rd meeting was a very good meeting
8  and that she understood.
9      Q.  So your testimony is that you didn't give her
10  anything in writing because you thought that it would
11  have to be put into her personnel file?
12      A.  We wanted to give her a fresh start, and I
13  didn't want that in her personnel file.
14      Q.  Take a look at what I marked as No. 17.
15      A.  Okay. This is the memo we gave to Kim
16  mandating the training we wanted her to take.
17      Q.  At the June 3 meeting?
18      A.  Yes.
19      Q.  So it's your testimony at the June 3 meeting
20  that you laid out all of the problems that you had with
21  her verbally?
22      A.  Mm-hmm.
23      Q.  And that the only thing you put in writing and
24  showed to her was this training schedule that we've

Page 197

1  marked as 17?
2      A.  Correct.
3      Q.  What did Kim say about the idea of having
4  these training courses?
5      A.  I don't remember specifically, but I remember
6  her being open to it. And I know she wanted to grow her
7  career. And she said she'd sign up for them right away.
8      Q.  At the June 3 meeting, did she sound like she
9  was very cooperative and was going to try to do all she
10  could to keep you all happy?
11      A.  Yes.
12      Q.  Mr. Duncan wasn't terminated for sexual
13  harassment. Right?
14      A.  Correct.
15      Q.  That's because you didn't believe he was
16  guilty of sexual harassment?
17          MS. LEMING: Objection to the form. You
18  can answer.
19      A.  We felt we couldn't prove it either way, but
20  we did feel that he absolutely acted inappropriately and
21  exercised poor judgment.
22      Q.  That was basically becoming involved in a
23  romantic relationship, I guess, as he put it, with
24  Ms. Bailey as a subordinate?

Corbett & Wilcox

Deborah Watson

51 (Pages 198 to 201)

Page 198

1      A.  Correct.  A managerial relationship with a
2   subordinate.
3      Q.  A managerial --
4      A.  He's a manager, meaning -- I'm sorry.  Yes.
5   He was in a higher position, and he engaged in
6   inappropriate behavior with a subordinate.
7      Q.  Now, is there a policy against that?
8      A.  There is now.  I'm not sure if it was there in
9   2003.
10      Q.  Does it say that you're not allowed to have a
11   consensual romantic relationship with somebody who's a
12   subordinate of yours?
13      A.  Yes.
14      Q.  Before all this came about, was Mr. Duncan
15   well-liked at Commerce?
16          MS. LEMING:  Objection to the form.
17          Before all what came about?
18          MR. MARCONI:  The allegation that he
19   sexually harassed Ms. Bailey.
20          MS. LEMING:  Still object to the form.
21   But you can answer.
22      A.  As far as I know.  I didn't have any
23   complaints about him.
24      Q.  As far as you know what?

Page 199

1      A.  People liked him.  I didn't have any
2   complaints about him.
3      Q.  Was there ever any discussions that Mr. Duncan
4   would not be terminated?  That some lesser discipline
5   would happen?
6      A.  We did consider that but dismissed it quickly.
7   We did not feel that his actions were appropriate.
8      Q.  Take a look at what I've marked as No. 6.
9          This is the termination letter that was
10   at least signed by you on August the 27th of 2003
11   terminating Ms. Bailey's employment.  Right?
12      A.  Correct.
13      Q.  Now, have you had a chance to review that,
14   ma'am?
15      A.  Yes.
16      Q.  Okay.  You say:  "It has come to management's
17   attention that an incident occurred in the Delaware
18   office on August 12th, 2003.  The incident involved
19   inappropriate behavior you exhibited toward a
20   subordinate."  Right?
21      A.  Correct.
22      Q.  Is this the incident where she used the word
23   "fuck" in speaking to Valerie Oakes?
24      A.  Correct.

Page 200

1      Q.  And the two other employees who witnessed the
2   incident and verified the inappropriate behavior, is that
3   Dee Whalen and Darlene Wilkins?
4      A.  Yes.
5      Q.  Had you seen copies of the e-mails that they
6   sent to Ms. Corcoran about the incident?
7      A.  Yes.
8      Q.  You discussed it with Ms. Corcoran?
9      A.  Yes.
10      Q.  Was there ever any thought, ma'am, that
11   Ms. Bailey would not be terminated as a result of this
12   incident?
13      A.  Yes.  There was a discussion about moving to a
14   final written warning, which is a step in the formal
15   discipline process.
16      Q.  In fact, that was something that was suggested
17   by Ms. Corcoran, wasn't it?
18      A.  I believe she put that in an e-mail at one
19   point.  Yes, she did.  She sent that to me.
20      Q.  Then you say:  "We previously discussed with
21   you the issue of behavior in the workplace and even
22   arranged for you to attend training on that area, as well
23   as other topics related to your employment at Commerce."
24   What previous discussions are you referring to?

Page 201

1      A.  The June 3rd discussion.
2      Q.  What specifically are you referring to in this
3   letter about the June 3rd discussion?
4      A.  As a management person displaying appropriate
5   behaviors, setting the example in the workplace, keeping
6   the workplace professional, attending the training that
7   we had mandated.
8      Q.  Is it your position that Kim didn't attend all
9   the training?
10      A.  She actually missed one of the classes and
11   didn't notify me.  I was notified by Commerce University
12   and then had to call her to find out what happened.  She
13   didn't tell me that she had missed, actually, the very
14   first mandatory class.  And unfortunately, it was a class
15   that was not going to run again for another six months.
16      Q.  But you gave her a year to take the class.
17   Didn't you?
18      A.  No.  I don't believe we gave her a year.
19      Q.  This is Exhibit 17.
20      A.  Mm-hmm.
21      Q.  It says, "As per our discussion, we are
22   requiring that you attend the following management
23   training classes by the end of the year 2003."
24          That was June?

Deborah Watson

52 (Pages 202 to 205)

Page 202

1    A. Right.
2    Q. So she couldn't have gotten it in December?
3    A. I don't believe so. I don't think it ran
4  again until January, because it was a July class. And
5  they used to run six months apart. So July, January.
6    Q. Was that part of the reason that she was
7  terminated as opposed to being put on final written
8  warning as Ms. Corcoran suggested in the e-mail?
9    A. Actually, Ms. Corcoran wanted to put her on a
10  final written warning when she put that -- sent that
11  e-mail to me.
12    Q. Let me just stop you.
13    A. Oh, I'm sorry.
14    Q. That's not responsive to my question. I need
15  you to listen to my question and answer it.
16    A. Mm-hmm.
17    Q. Okay. Was the fact that she missed the
18  training class part of the reason that she was
19  terminated?
20    A. Yes.
21    Q. This July training class that you're talking
22  about?
23    A. Yes.
24    Q. The other reasons that she was terminated as

Page 203

1  opposed to some lesser form of discipline was because you
2  felt that she violated warnings that you had given her
3  June the 3rd?
4    A. My recollection of why she was terminated
5  instead of giving the final written warning was because
6  this act, combined with missing the training class and
7  some issues with dress code -- but primarily, this act
8  was, in Commerce's opinion, extreme and inappropriate and
9  therefore moved to termination.
10    Q. Well, then, why did you say "We previously
11  discussed with you the issue of behavior in the
12  workplace..."? Are you referring to what was discussed
13  on June 3rd?
14    A. Yes.
15    Q. When you say "we, "you're talking about
16  yourself and Mr. Morrissey?
17    A. Correct.
18    Q. And the only time that you and Mr. Morrissey
19  had a discussion with Kim along the lines of what was
20  going to be expected of her in the future was June 3rd.
21  Right?
22    A. Mr. Morrissey and I, yes.
23    Q. In fact, you say "...and even arranged for you
24  to attend training on that area..." Right?

Page 204

1    A. Correct.
2    Q. And you arranged the training and informed her
3  about the training on June 3rd?
4    A. We -- yes. We told her what classes she
5  needed to take.
6    Q. Right.
7    A. Mm-hmm.
8    Q. "...as well as other topics related to your
9  employment at Commerce.
10       So in that second paragraph of this
11  Exhibit 6, which is 0114, you're referring to June 3rd,
12  2006. Correct?
13    A. Correct.
14    Q. Then you say: "The type of wrongful conduct
15  exhibited by you as a supervisor on August 12, 2003 is
16  unacceptable and violates Commerce's policies."
17    A. Mm-hmm.
18    Q. The inappropriate behavior was the use of the
19  expletive in talking to a subordinate?
20    A. It was the use of the expletive in front of
21  the entire office in direct response to help from a -- a
22  question requiring help from a subordinate.
23    Q. So it's the fact that she used an expletive in
24  response to a request for help. Is that what it was?

Page 205

1    A. It was a direct -- it was used as a direct
2  response to a request from a subordinate for assistance.
3  A supervisor is supposed to assist subordinates. She was
4  asked by a subordinate for -- as they would ask their
5  supervisor for help. And her response was a very
6  aggressive, including the word "fuck," response to this
7  subordinate.
8    Q. So how about if she had aggressively said "I
9  don't have doggone time for this now"? Would she have
10  been disciplined in any way?
11       MS. LEMING: Objection to the form. You
12  can answer.
13    A. Possibly.
14    Q. On what basis?
15    A. It's an inappropriate response -- and again,
16  she's out in the middle of the workplace -- to a request
17  from a subordinate. It's belittling to the subordinate,
18  embarrassed the subordinate, and, in the e-mails, was
19  intimidating to everyone else.
20    Q. Is everyone held to that standard?
21    A. Supervisors are.
22    Q. So everyone above the supervisor level?
23    A. That's my -- yeah. That's how it works.
24    Q. Has anyone ever belittled you at Commerce?

Deborah Watson

Page 206

1    A.  No.
2    Q.  Have you ever belittled anyone?
3    A.  No.
4    Q.  Would it be Commerce's policy that any
5    supervisor that belittles a subordinate in any way -- are
6    they all terminated?
7          MS. LEMING:  Objection to the form.  You
8    can answer.
9    A.  This is the first instance of that extreme,
10   and we moved to termination.
11   Q.  What extreme?
12   A.  Meaning belittling.  Using the word "fuck" out
13   in the middle of the office in front of a lot of other
14   employees.
15   Q.  So if you use the word "fuck" out in the
16   middle of the office but you don't belittle an employee,
17   is that okay?
18   A.  No, that's not okay.
19   Q.  Is that something that someone should be
20   terminated for?
21   A.  It would depend on the circumstance, but it
22   would at least be discipline.
23   Q.  How about if people use "fuck" a lot in the
24   workplace?  Is that something that if they did it -- say

Page 207

1    they said "fuck" like three times -- they would be
2    disciplined but if they used it two times they wouldn't?
3    Is there some threshold you have to cross?
4    A.  If it is a personal -- first of all, profanity
5    in the workplace shouldn't go on.  But based on this
6    discussion, I guess we're talking through this.  I'll
7    give you an example.  An employee in another office
8    called a fellow employee an "asshole."  They were peers.
9    It was not appropriate.  The employee was given a final
10   warning and told not okay.  It's not appropriate.  We
11   want professional behavior in the office.  It was not a
12   management person.
13   Q.  So if you're not a management person, you can
14   say "fuck," but if you are, you can't?
15   A.  A management person can't use that in a
16   response to a subordinate, and I wouldn't want a
17   management person using it anywhere.  They -- managers --
18   to go back to something we said earlier, managers have to
19   set the example for the company.  And that's what makes
20   it different than if a peer says it to a peer.
21   Q.  But does that example only include talking to
22   subordinates?  Doesn't the example that management is
23   supposed to set for the subordinates include their
24   demeanor in the workplace in general?

Page 208

1    A.  Yes.  It should.
2    Q.  So if a manager just screams "fuck" because
3    they're angry at the customer that they just talked to on
4    the phone and slammed down the phone, that's just as
5    inappropriate, is it not, as using the phrase "I don't
6    have fucking time for this now"?
7          MS. LEMING:  Objection to the form.  You
8    can answer.
9    A.  The employee felt embarrassed, and the
10   employees felt -- were afraid to speak up about that
11   because it intimidated them.  And a manager who says
12   "fuck" and slams the phone down -- it's absolutely
13   inappropriate.  If an employee steps forward and says
14   that is intimidating, we've got a situation to deal with.
15   If we hear the manager slam the phone down and yell
16   "fuck," that's something that should be addressed.
17   Q.  Well, the employees didn't come forward, did
18   they?  They were approached by Joan Frenz who instructed
19   Mary Corcoran what had happened, and Mary Corcoran told
20   them to tell her what happened.  Right?
21   A.  Mary Corcoran did what I believe is the
22   management's responsibility, which was to find out, based
23   on what another manager saw, why someone was crying in
24   the hallway.

Page 209

1    Q.  But those people didn't come to management and
2    complain about this incident, did they?
3    A.  No.  We interviewed them.
4    Q.  Have you ever been aware of a situation where
5    somebody slams the phone down and yells "fuck" because
6    they had a frustrating conversation with a customer?  For
7    example, has any management person ever come to any of
8    the people that would have heard that and said, "Were you
9    offended by that?  Make a report"?
10   A.  I'm not aware of a manager who slammed a phone
11   down and yelled "fuck."
12   Q.  If you had been aware of that or if that's
13   something that would have happened --
14   A.  Mm-hmm.
15   Q.  -- and nothing whatsoever happened to those
16   people, is that something that should have been taken
17   into consideration when you were deciding what to do with
18   Kim?
19   A.  Who's -- I'm sorry.  Who's "those people"?
20   I'm sorry.  I'm getting confused.
21   Q.  If it is a fact that in the department
22   employees heard cussing and slamming of phones all the
23   time by management people --
24   A.  Mm-hmm.

Deborah Watson

54 (Pages 210 to 213)

Page 210

1    Q. — let's assume that's true —
2    A. Okay.
3    Q. — and nothing ever happened to the persons
4 who were cussing and slamming the phones all the time —
5    A. Mm-hmm.
6    Q. — is that something that should have been
7 taken into consideration when you were deciding what to
8 do with Kim when she cussed?
9        MS. LEMING: Objection to the form. You
10 can answer.
11    A. It was taken into consideration because
12 Valerie was so upset by what happened she was crying in
13 the hallway. If in fact on the situation that you just
14 laid out phones were slammed and people yelled "fuck" but
15 we didn't have anybody crying or coming to management or
16 visibly upset, I think it should have been addressed.
17 But this particular situation with Valerie resulted in an
18 employee who was crying. So it was taken into
19 consideration, and this situation resulted in a
20 subordinate being very upset and two other people being
21 very upset by it.
22    Q. You heard Valerie Oakes' testimony the other
23 day. Didn't you?
24    A. Yes.

Page 211

1    Q. Didn't she say that she didn't want anything
2 to happen to Kim — that she didn't think that what
3 happened to Kim was right? Did you hear her testify
4 about that?
5    A. I don't recall the specifics.
6    Q. Okay. I'm just trying to make sure I fully
7 understand.
8    A. Mm-hmm.
9    Q. If you upset a subordinate employee by telling
10 them that you don't have time to deal with their issue,
11 is that something that deserves discipline or is it the
12 fact that that was coupled with the word "fuck" in the
13 sentence?
14    A. It's actually that, "fuck," and on display to
15 the rest of the office. It was in the office was the
16 word "fuck" in a direct response to a subordinate asking
17 for help who then is upset enough that they are crying.
18 And then based on interviews, two other people who heard
19 it also felt that it was upsetting and inappropriate.
20    Q. So if somebody screams "fuck" in the office
21 and nobody is offended, that's not something that's going
22 to result in discipline?
23    A. I think it should be addressed.
24    Q. How should it be addressed?

Page 212

1    A. I think the person should be told that that is
2 not appropriate.
3    Q. How about if they do it again?
4    A. If they're a management person who should be
5 setting the example and they've been spoken to and if the
6 behavior continues just as with any other unacceptable
7 behavior, then, yes, you should move to discipline.
8    Q. How many times do they have to say it and what
9 would the discipline be before you would start
10 disciplining?
11    A. I don't have a number. You'd have to look at
12 the circumstance. But the discipline policy is
13 structured with three different levels for a reason so
14 that you can, depending on the circumstance or uniqueness
15 of what you're dealing with, go with a verbal, a written
16 or final written warning.
17    Q. So you don't have any idea when discipline
18 should start under those circumstances; namely, how many
19 times they have to say "fuck" before discipline would
20 start after they have been warned?
21    A. I think I would start — I would give them one
22 warning — one discussion. And then I would go right
23 into discipline. As a management person, you have to set
24 an example.

Page 213

1    Q. What would the discipline be?
2    A. It's documentation in their file and
3 notification that if the behavior continues they'll be
4 subject to further discipline that may include
5 termination.
6    Q. Let's say they did it again. Then what would
7 you do?
8    A. I think you have to look at what else is going
9 on with the person. If you are having other issues with
10 the person, then you may go to termination. If they've
11 been someone who hasn't had issues, then you might go to
12 a stronger step in the discipline process. That's where
13 you have to start looking at the unique situation.
14    Q. Let's say just Kim yelled "fuck" and slammed
15 down the phone on August the 12th, 2003.
16    A. Mm-hmm.
17    Q. She wasn't referring to anyone
18        What would you have done?
19        MS. LEMING: Objection to the form. You
20 can answer.
21    A. I would have counseled with Mary to see what
22 she wanted to do, but I would think it would have been
23 discipline.
24    Q. What level?

Deborah Watson

55 (Pages 214 to 217)

Page 214

1    A. I don't know.
2    Q. Would it have been termination?
3    A. No. I just said it would have been
4   discipline.
5    Q. Well, I consider discipline to be
6   termination -- the ultimate discipline, I guess. So you
7   don't think of termination as discipline?
8    A. No. I'm sorry. I misunderstood you. Meaning
9   that we would have moved to a formal discipline process.
10    Q. Does the formal discipline process include
11   termination?
12    A. There's three steps before termination --
13   verbal, written and final written. And my recommendation
14   in conversation with Mary would have been to move to some
15   of the written discipline -- a verbal, a written or a
16   final written.
17    Q. So the reason that you didn't consider
18   anything other than -- or actually end up deciding
19   anything other than going straight to termination was the
20   fact that Kim used the word "fuck" in response to a
21   request from an employee for assistance and that it was
22   embarrassing to her?
23    A. I personally in a discussion with Mary did not
24   want to go right to termination.

Page 215

1    Q. Why not?
2    A. As an HR person, I prefer the written warning,
3   and I knew that through the Kim investigation we had
4   written a warning, chosen not to issue it and went with
5   the softer discussion hoping to see improvement.
6    Q. I think you're talking about June. Aren't
7   you?
8    A. I'm referring back to June to try to answer
9   the question.
10    Q. I'm talking about in August --
11    A. Yes.
12    Q. -- when everyone was deciding.
13       You said Mary wanted to terminate her,
14   talking about Kim, and you in fact initially didn't think
15   she should be terminated.
16    A. That's correct.
17    Q. Okay.
18    A. When Mary first called me. Mary sends the
19   e-mail that says I want to put her on like a final
20   written warning or written warning. Then I get Mary on
21   the phone, and Mary wants to move to termination. I'm
22   suggesting that, no, we go to a documented discipline
23   process, not termination -- that we go to the final
24   warning, which is what Mary had originally put in her

Page 216

1   write-up -- or in her e-mail from the week before.
2    Q. And that's because you didn't do that back in
3   June when -- you originally set out to do a written
4   warning, but then you decided not to. But now you
5   thought it would be a good idea to take that next step
6   and actually put her on a written warning. Right?
7    A. I officially thought that would be
8   appropriate -- or the best approach with this.
9    Q. Why?
10    A. We had made a decision in June to try to give
11   Kim as clean a start as possible into this department.
12   And as an HR person, I prefer more documentation versus
13   less for -- in case we end up in a situation like this.
14   And especially with Mary's e-mail then coming in with her
15   initial reaction being written warning, I didn't fully
16   understand where we had changed or where Mary's thought
17   process had changed. And in thinking that through, my
18   suggestion was to do the warning, not the termination.
19    Q. Did Mr. Morrissey talk you out of the warning?
20    A. To my recollection, he -- if Mary wanted to
21   move to termination, he backed Mary.
22    Q. So at some point Mary changed her mind?
23    A. Yes.
24    Q. Mary was the one ultimately who made the

Page 217

1   decision, and you guys just said, "If that's what you
2   want to do, Mary -- it's your department -- do it. We'll
3   do it"?
4    A. Mary felt that what Kim had done had
5   intimidated the workforce, and she said she had talked to
6   employees who felt that way and that Mary was not going
7   to be able to turn around MainStreet to the business
8   level we wanted it to go to. It was my understanding
9   successful, but it needed to get to the next level. And
10   she did not see how she was going to be able to
11   rehabilitate Kim based on this latest action. And that's
12   why she really wanted the termination.
13    Q. But my question wasn't why did Mary want
14   termination.
15    A. Oh, okay.
16    Q. My question was: Did Mary ultimately make the
17   final decision on what was going to happen to Kim?
18    A. It was Mary, Joe and I.
19    Q. Basically, you and Joe deferred to Mary,
20   because you said that originally you didn't think that
21   that was what ought to happen. She should be given a
22   written warning.
23    A. We decided that Mary was convincing and that,
24   yes, we would all agree to go to termination.

Corbett & Wilcox

Deborah Watson

56 (Pages 218 to 221)

Page 218

1    Q.   And the ultimate reason given to Kim for the
2  termination was the fact that she had been warned about
3  certain conduct in the workplace and given the
4  opportunity to take classes to improve herself and that
5  she did not, I guess, take heed of those warnings and she
6  didn't take the classes.
7    A.   The word we used was counseled versus warning.
8  But we counseled her, yes.  We counseled her.  She didn't
9  take the class.  Mary was having dress code issues.  She
10  was communication issues with her.  And then this
11  happened.
12    Q.   So the implication is that:  Had you never had
13  a meeting on June 3rd and laid down the law to Kim that
14  she would not have been fired then.  Is that true?
15    A.   I think it all contributed.  I think that a
16  supervisor using profanity towards a subordinate, which,
17  again, this is the first time that has happened that I'm
18  aware of at Commerce Insurance — we still would have
19  talked about termination.  I don't think where we would
20  have ended up with it.  But it all built towards it.
21    Q.   Why did Commerce help Steve Duncan find other
22  employment?
23      MS. LEMING:  Objection to the form.  You
24  can answer.

Page 219

1    A.   In what -- I'm sorry.  In what way?
2    Q.   Weren't there e-mails where you were referring
3  him to other possible employers after he was terminated?
4    A.   Steve Duncan asked me if I knew of any
5  headhunters who placed insurance people, and so I sent
6  three that I had used at Commerce Insurance.
7    Q.   Was a similar service offered to Kim Bailey?
8    A.   We didn't offer it to Kim.  He asked for it.
9  Kim never asked us.  I would have responded the same way
10  to her.
11      MR. MARCONI:  Give me like five minutes.
12      (A brief recess was taken.)
13      - - - - -
14      DEBORAH E. WATSON, resumes
15  BY MR. MARCONI:
16    Q.   How long did the meeting on June 3rd between
17  you and Mr. Morrissey and Ms. Bailey last from the time
18  that she entered the room until the time she left?  Can
19  you approximate that?
20    A.   To my recollection 20, 30 minutes.
21      MR. MARCONI:  Okay.  That's all I have.
22      MS. LEMING:  No questions.
23      (The deposoition concluded at 7:30 p.m.
24  this same day.)

Page 220

1  (I HAVE READ THE FOREGOING DEPOSITION, AND IT IS TRUE AND
2  CORRECT TO THE BEST OF MY KNOWLEDGE.)
3
4
5
6
7      WITNESS NAME
8
9      - - - - -
10
11      INDEX TO TESTIMONY
12
DEBORAH E. WATSON              PAGE
13
   Examination by Mr. Marconi         2
14
15
      - - - - -
16
17
      INDEX TO EXHIBITS
18
19  WATSON DEPOSITION EXHIBIT NO.          PAGE
20  1   Document Bates stamped CIS 547-549    2
21  2   Document Bates stamped CIS 550-552    2
22  3   Document Bates stamped CIS 553-555    2
23  4   Document Bates stamped CIS 556-557    2
24  5   Not introduced

Page 221

1  6   Document Bates stamped CIS 0114      2
2  7   Not introduced
3  8   Document Bates stamped CIS 0488 to 0499   2
4  9   Not introduced
5  10  Document Bates stamped CIS 0505 to 0512   2
6  11  Document Bates stamped CIS 0513-0516   2
7  12  Document Bates stamped CIS 0517      2
8  13  Document Bates stamped CIS 0525      2
9  14  Handwritten notes from conversation with   2
      Paul Scaffidi
10
   15  Not introduced
11
   16  Not introduced
12
   17  Document Bates stamped CIS 0535      2
13
   18  Not introduced
14
15
      - - - - -
16
17
18
19
20
21
22
23
24

Corbett & Wilcox

Deborah Watson

```
                                              Page 222
 1            C E R T I F I C A T E
 2   STATE OF DELAWARE:
                          :
 3   NEW CASTLE COUNTY:
 4        I, Robert Wayne Wilcox, Jr., a Registered
 5   Professional Reporter and Notary Public, within and for
 6   the County and State aforesaid, do hereby certify that
 7   the foregoing deposition of DEBORAH E. WATSON, was taken
 8   before me, pursuant to notice, at the time and place
 9   indicated; that said deponent was by me duly sworn to
10   tell the truth, the whole truth, and nothing but the
11   truth; that the testimony of said deponent was correctly
12   recorded in machine shorthand by me and thereafter
13   transcribed under my supervision with computer-aided
14   transcription; that the deposition is a true record of
15   the testimony given by the witness; and that I am neither
16   of counsel nor kin to any party in said action, nor
17   interested in the outcome thereof.
18        WITNESS my hand and official seal this 24th day
19   of May A.D. 2006.
20
21   _____
          ROBERT WAYNE WILCOX, JR.
22        REGISTERED PROFESSIONAL REPORTER
          CERTIFICATION NO. 101-RPR
23        (Expires January 31, 2008)
24
```

Corbett & Wilcox

## CERTIFICATE OF SERVICE

I, Sarah E. Diluzio, hereby certify that on June 16, 2006, I served two copies of the foregoing DEFENDANT COMMERCE INSURANCE SERVICES, INC.'S APPENDIX TO ITS RENEWED BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, VOLUME III upon the following counsel of record in the manner indicated:

BY HAND DELIVERY

Thomas C. Marconi, Esquire
Losco & Marconi, P.A.
1813 N. Franklin Street
P.O. Box 1677
Wilmington, DE 19899

Sarah E. DiLuzio (DSB ID No. 4085)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Post Office Box 951
Wilmington, Delaware 19899-0951
Tel: (302) 984-6000
E-mail: sdiluzio@potteranderson.com

737313