# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KIMBERLEY A. BAILEY | ) |
| | ) |
|       Plaintiff, | ) C.A. No.: 05-183 SLR |
| | ) |
| v. | ) Trial by Jury Demanded |
| | ) |
| COMMERCE NATIONAL INSURANCE | ) |
| SERVICES, INC., a New Jersey corporation. | ) |
| | ) |
|       Defendant. | ) |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**LOSCO & MARCONI, P.A.**

/s/Thoms C. Marconi, Esquire
Thomas C. Marconi, Esquire (#2761)
1813 N Franklin Street
P.O. Box 1677
Wilmington, DE 19899
(302) 656-2284
(302) 656-3081
tmarconi@delaw.org
Attorneys for Plaintiff, Kimberley A. Bailey

Date of Filing: June 30, 2006

# TABLE OF CONTENTS

Page

A. Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

B. Table of Citations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

C. Statement of the Nature and Stage of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . 1

D. Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

E. Concise Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

F. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      I.      Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      II.     Plaintiff has Established a *Prima Facie* Case of Retaliation. . . . . . . . . . 25

      III.    There is No Other Reasonable Explanation For Defendant's Treatment of Plaintiff Except Retaliation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      IV.    Defendant's Treatment of Plaintiff following her Sexual Harassment charge was Malicious, thereby entitling Plaintiff to Punitive Damages . .32

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

i

## <u>TABLE OF CITATIONS</u>

**CASES**                                                                 **Page**

*Adamson v. William Patterson College of New Jersey*,
260 F.3d 265, 289 (3d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Celotex Corp. v. Catrett,*
477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) . . . . . . . . . . . . . . . . . .24

*Fuentes v. Perskie,*
32F.3d 759 (3d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

*Hargrave v. County of Atlantic*,
262 F.Supp.2d 393 (D.N.J 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hullett v. Towers, Perrin, Forster & Crosby, Inc.*
38 F.3d 107, 111(3d. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Kachmar v. Sungard Data Sys., Inc.*
109 F.3d 173, 177 (3d. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

*Schatzman v. Martin Newark Dealership, Inc.*,
158 F.Supp.2d 392, 404 (D. Del. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

### C. STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

This is an action under Title VII in which Plaintiff alleges that Defendant, her former employer, retaliated against her in violation of §2000e-3(a) after she made a charge of sexual harassment against her supervisor in April 2003.

Defendant's retaliation against Plaintiff culminated on August 27, 2003, when Defendant terminated Plaintiff's employment. On November 6, 2003, Plaintiff filed a timely charge of retaliation against Defendant with the State of Delaware, Department of Labor, Division of Industrial Affairs ("Department"). Plaintiff's charge was subsequently referred by the Department to the U.S. Equal Employment Opportunity Commission ("EEOC").

On January 10, 2005, Plaintiff received a Notice of Right to Sue letter from the EEOC. The instant action was filed on March 24, 2005. Fact discovery ended on May 15, 2006[1]. Defendant filed its Motion for Summary Judgment and its original Brief, and Appendix in support thereof on May 1, 2006. Defendant subsequently filed its Renewed Brief and Appendix in support of its Motion for Summary Judgment on June 16, 2006.

This is Plaintiff's Answering Brief in Opposition to Defendant's Motion for Summary Judgment.

---

[1]Defendant incorrectly states in its Renewed Brief in Support of its Motion for Summary Judgment that Discovery ended in this case on March 31, 2006. The Court entered an Order on May 4, 2006 re-setting the fact discovery deadline for May 15, 2006 [D.I. 35].

## D. SUMMARY OF ARGUMENT

I.        Plaintiff has clearly established a *prima facie* case of retaliation under Title VII, under the burden-shifting framework for pretext suits.

II.       A jury could reasonably conclude that Defendant has failed to establish a legitimate reason for its treatment of Plaintiff, or, that its proffered legitimate reason for Defendant's treatment of Plaintiff following her charge of sexual harassment was pretextual, and, that retaliation was the more likely motivating cause.

III.      A jury could reasonably conclude that Defendant's treatment of Plaintiff following her charge of sexual harassment was intentional, and was done with malice or reckless indifference to Plaintiff's rights, thereby entitling Plaintiff to a punitive damage award against Defendant.

## E. CONCISE STATEMENT OF FACTS

By way of this action, Plaintiff, Kimberley A. Bailey, seeks redress under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, and the Civil Rights Act of 1991 ("Act"), on the grounds that the Defendant retaliated against her for complaining about Title VII violations in the workplace.

### a. Background

Plaintiff, currently  resides at 7 Giliberti Lane, Newark, Delaware **[B 2]**. Defendant is a New Jersey corporation engaged in the insurance business in the State of  Delaware, and elsewhere.  Plaintiff was employed at Defendant's facility located in the Delle Donne Corporate Center on Centre Road, Wilmington, Delaware.  From this location, Defendant sells and services various kinds of personal and business insurance products, mostly through a network of independent insurance brokers, and agents, located throughout the country **[B 2]**. Plaintiff began her employment with Defendant on August 27, 2001 as a Senior Customer Service Representative.   That position entailed handling telephone, internet, and mail inquiries from insurance brokers and others trying to place personal and business insurance policies with Defendant. Plaintiff worked in this position full time until May 2002, when she was promoted to the Supervisor position in a newly created department known as "Main Street" ("Department").   Plaintiff's Supervisor position entailed direct supervision over approximately ten Customer Service Representatives, and five sales people, working in the Department. Plaintiff's immediate supervisor at that time was the Director of the Department, Mr. Steven Duncan **[B 2]**.

Plaintiff enjoyed very much working for Defendant, and she was totally dedicated to Defendant, and the employees under her supervision **[B 2-3]**. The people on Plaintiff's team while she worked for Defendant were like family **[B 16-18]**. Within a few months of taking on the Supervisor position in the Department, Plaintiff hired and trained all ten Customer Service representatives, and all five Sales representatives working in the Department. She represented the Department and Defendant at various internal and external business meetings and functions. Plaintiff authored the Department's procedure manual working on it both during normal working hours, and on her own time **[B 2-3]**.

Plaintiff received a written evaluation of her performance in the Supervisor position in November 2002. In that evaluation, Plaintiff received either "superior" or "outstanding" grades in the following areas: job knowledge, customer service, work quality, initiative, compliance/business ethics, organization and planning, strategic focus, communications, leadership and motivation. In this performance evaluation, the Department Director praised Plaintiff as follows in giving Plaintiff a rating of "outstanding" in the area of leadership and motivation:

> "Kim leads by example. She stays late, does the same work as her staff and supports their efforts. Her daily input into their individual tasks, client relationship and ongoing support of their extra work effort helps the team stay focused. She inspires her staff to do more, better and faster and have fun." **[B 19-27]**.

**b. The Department**

The Department was highly successful throughout Plaintiff's tenure as the Department Supervisor. The atmosphere in the Department during Plaintiff's employment

was fast paced, and highly stressful. At her deposition, Valerie Oakes, a long time member of the Department staff, who is still employed in the Department, described the atmosphere in the Department in August 2003, and before, as follows:

> "It was - back then it was fast paced. We were drowning. We were drowning in paperwork, and it just kept piling up. And we were drowning in phone calls. And it was just a very stressful place to work at the time" **[B 28]**.

One side effect of the stressful, fast paced atmosphere in the Department, was that, on occasion, Department employees, at all levels, would lose their temper, use vulgar language, slam telephones, and scream at each other, and others, in the workplace. While this conduct was not encouraged by Defendant, prior to August 2003, such conduct had never been used as the basis for any level of disciplinary action against anyone in the Department **[B 29-33]**.

In fact, Plaintiff used vulgarity nearly every day she worked in the Department, and so did most other Department personnel. **[B 34-35]**. Plaintiff testified, in fact, that she personally heard Mary Corcoran, Mr. Duncan's successor as the Director of the Department, use vulgar language in the workplace. **[B 31]**. The Assistant Director of the Department, Marge Phipps would routinely slam down her telephone, after speaking with either customers or colleagues that angered her, and scream:

> "mother f_ _ _er". "I'm f_ _ _ing sick and tired of this sh_ _."

According to Plaintiff, incidents like this occurred on a daily basis.

Plaintiff also testified at her deposition that on occasion, she observed Ms. Phipps yell at

-5-

Valerie Oakes, and Darlene Wilkins, both Customer Service Representatives in the Department; telling Ms. Oakes to:

> "shut up and get to work" **[B 31]**

Plaintiff's testimony concerning the atmosphere in the Department in August 2003, and before, was confirmed by Valerie Oakes, and Darlene Wilkins. When asked at her deposition whether she could identify anyone in the Department who cursed in the workplace, Ms. Oakes, responded:

> "Just - - everybody mainly. Mostly."

They would say "Bite me"after ending a telephone call with a customer. They would also say "I'm tired of this shit". Ms. Oakes also testified as follows:

> "Q: Was the word f_ _ k used?
>
> A: Yes
>
> Q: A lot?
>
> A: Yes          **[B 36]**

Ms. Oakes also testified that Mary Corcoran has screamed at her in the workplace. At her deposition when asked if she cried after being screamed at by Ms. Corcoran, Ms. Oakes responded: "probably" **[B 37]**.

This testimony was confirmed by Darlene Wilkins, who has worked in the Department since it was established, and currently works in the Department. At her deposition, Ms. Wilkins testified as follows:

Q: Have you ever heard Marge Phipps use curse words at work?

A: Yes

Q: Have you ever heard Marge Phipps slam down the phone and scream?

A: We all do that

Q: You all do that?

A: Mm-hmm

Q: Have you always done it?

A: When you get a client that drives you crazy, you react. You know what I mean?

**[B 38]**.

Stated simply, this kind of conduct was an accepted part of the way things were in the Department. Employees at all levels would sometimes react to the stressful working conditions with vulgarity, and outbursts of frustration, and when this occurred, it was generally understood that no offense was intended or taken.

It was also routine for Defendant to hold company outings to celebrate achieving goals. These outings sometimes involved the consumption of alcohol **[B 39]**. It was also routine for members of the Department to go to restaurants and bars for dinner and cocktails with colleagues, customers, and insurance company representatives, during and after normal working hours. The purpose of these events was to foster goodwill. Sometimes, Defendant hosted these events, and other times outside insurance agents, brokers, and carriers hosted the events, and invited members of the Department. As the Department supervisor, Plaintiff

was frequently invited to these events, and expected to attend, along with other members of the Department **[B 40-45]**. It was at these kinds of events that the former Department Director, Steven Duncan, took the opportunity to sexually harass Plaintiff.

**c. Sexual Harassment of Plaintiff**

The first incident of sexual harassment in the workplace by Mr. Duncan occurred when Plaintiff was invited to attend a meeting with Scott Durham, an insurance company marketing representative from Andover, Maryland. The meeting was to include drinks after hours at a bar called the Backstage Café. Shortly after Mr. Durham arrived for the meeting, Plaintiff was summoned to a conference room to be introduced to Mr. Durham by Mr. Duncan **[B 46, B 12]**.

After Plaintiff shook Mr. Durham's hand, and turned to take her seat, Mr. Duncan commented: "see, what did I tell ya". Plaintiff perceived this comment as meaning that Mr. Duncan and Mr. Durham had been discussing her anatomy prior to her arrival in the room. This offended Plaintiff **[B 12]**.

Shortly after arriving at the Backstage Café, the group decided to go to another bar. Plaintiff rode to the other bar with Mr. Duncan. Mr. Durham drove to the other bar with Plaintiff's friend. On the ride to the other bar, Mr. Duncan touched Plaintiff inappropriately. He held her hand and rubbed her leg and inner thigh saying that he was "really attracted" to her. Plaintiff was offended by this and removed Mr. Duncan's hand from her person. The rest of that evening was uneventful. Plaintiff was too embarrassed and afraid to report Mr.

Duncan's conduct to Defendant **[B 11]**.

Soon thereafter, an invitation was received by Mr. Duncan from a Travelers Insurance Company marketing representative to attend a Senior PGA Golf Tournament in Maryland. After making arrangements for the tickets, Mr. Duncan informed Plaintiff that it would be a good thing for her to attend this event because of recent changes at Travelers. Plaintiff was informed that it would be a good idea for the Department to "make an appearance and let ourselves be known to these people". On this basis, Plaintiff felt this was a work function **[B 47-49]**. The drive to the event was in excess of two hours long. Therefore, Plaintiff agreed to drive to the event with Mr. Duncan. On the way to the event, Mr. Duncan began to talk to Plaintiff about sex. He put her hand between her legs and asked her to masturbate. This was extremely offensive to Plaintiff. Mr. Duncan also spoke of his extramarital affairs. **[B 11-14]**.

Later in the day, Mr. Duncan continued his harassment of Plaintiff. Scott Durham, the marketing representative from Andover, Maryland that Plaintiff had meet earlier, was also in attendance at the golf event. Against Plaintiff's wishes, Mr. Duncan persisted in trying to take Plaintiff to Mr. Durham's hotel room. Plaintiff tried to make it clear to Mr. Duncan, that she was not interested in going to Mr. Durham's hotel room, and that she wanted to go home. Eventually Mr. Duncan relented, and took Plaintiff home. On the way home, Mr. Duncan persisted in discussing his sex life, and his extramarital affairs **[B 50-51, B 11-14]**. Here again, despite the fact that Plaintiff was offended by this conduct she was

afraid to notify Defendant.

The next event occurred at a meeting in Randolf, New Jersey, at which Mr. Duncan, and Plaintiff, were called upon to do a training session for persons referred to as "core producers". On the way to that meeting, Mr. Duncan proceeded to describe to Plaintiff each of the core producers and their different "mannerisms". Mr. Duncan specifically informed Plaintiff that she had to "win them over" and that the best way for her to do that was for these core producers to "love" her. Plaintiff wasn't sure exactly what Mr. Duncan meant by these remarks, but she knew that the majority of the Department's small business was written by these producers, and that they were important.

After the training session, the attendees were scheduled for dinner and cocktails at a local restaurant. After dinner and cocktails, eventually Mr. Duncan, Plaintiff, and one of the core producers were the only persons remaining at the restaurant. Plaintiff requested that Mr. Duncan take her back to her hotel room. Rather than comply with this request, Mr. Duncan left Plaintiff at the restaurant insisting that she stay with the other person and develop a "relationship". The implication was that she should have sex with this individual for the sake of the Department **[B 11-14]**. This made Plaintiff very uncomfortable. She confided with the other person that she felt like a "sold piece of meat" and that she was embarrassed by what Mr. Duncan had done. The other person drove Plaintiff back to her hotel room.

Plaintiff ultimately realized that the situation with Mr. Duncan was out of control. As

a result, on April 3, 2003, with the assistance of counsel, Plaintiff prepared a written statement setting forth the harassment she had suffered at the hands of Mr. Duncan. The statement was submitted to Deborah Watson, Defendant's Vice President of Human Resources **[B 11-14]**.

At the conclusion of her written statement, Plaintiff expressed her gratitude for the promotion to Supervisor of the Department, and stated that she enjoyed her work in the Department. She stated that she was concerned for her future with Defendant as long as Mr. Duncan was "in control" of her career. She told Defendant in the statement that she was a single mother, with two children, and that she needed her job, and that she was too "embarrassed and afraid" to come forward sooner **[B 11]**. Plaintiff submitted her written statement at a meeting with Deborah Watson in Randolf, New Jersey.

### d. Defendant's Response to Plaintiff's Charge of Sexual Harassment

For a period of approximately eight weeks thereafter, Defendant conducted an alleged investigation into Plaintiff's charges. Plaintiff was required to continue to work directly under Mr. Duncan during this period **[B 4]** despite Plaintiff's complaints to Ms. Watson that Plaintiff and others overheard Mr. Duncan discussing Plaintiff's charge of sexual harassment on the telephone in his office **[B 52-53]**. Plaintiff was also criticized during this period by Ms. Watson for trying to arrange for members of the Department staff to stay overnight in New York following the WOW! Awards[2] **[B 54-55]**. Plaintiff was criticized despite the fact

---

[2]WOW! Awards is a company wide awards ceremony.

that there was no company policy against making such arrangements, and, despite the fact that Deborah Watson acknowledged that Plaintiff was doing so to "increase morale and bonding" **[B 56]**.

Defendant's alleged investigation into Plaintiff's charges was minimal at best. Ms. Watson was the primary investigator. She talked to Plaintiff twice about her charge. The first time was at the meeting in Randolph at which Plaintiff submitted her written statement. That meeting lasted between 30 minutes and an hour **[B 57]**. The second discussion was at a meeting involving Plaintiff, Ms. Watson and Bruce McKelvey[3] at which Ms. Watson and Mr. McKelvey asked Plaintiff for more detailed facts concerning the information contained in her written statement.

Defendant interviewed four witnesses in addition to Mr. Duncan. These were Cindy Smith, Scott Durham, Paul Scaffidi and Marge Phipps **[B 58]**. Despite the fact that these individuals' version of what happened between Plaintiff and Mr. Duncan revealed that Plaintiff's version was more credible, Defendant concluded, among other things, that Plaintiff was responsible for Mr. Duncan's harassment **[B 60-74]**.

In late May 2003, a meeting was scheduled with Plaintiff by Ms. Watson. Plaintiff was informed that the purpose of the meeting was to discuss the results of Defendant's investigation into Plaintiff's allegations of sexual harassment by Steven Duncan **[B 89-90]**. The meeting was held on June 3, 2003. In attendance was Plaintiff, Ms. Watson, and Joseph

---

[3] Bruce McKelvey was an employee of Defendant with 25 years of experience in the human resources field **[B 59]**.

Morrissey **[B 75]**. Prior to the June 3, 2003 meeting, Ms. Watson had prepared various versions of a "Written Warning" directed to Plaintiff which listed transgressions allegedly committed by Plaintiff, which Defendant concluded had caused the sexual harassment committed by Mr. Duncan **[B 76]**. A written warning is the second step in Defendant's disciplinary process.

In the Written Warning, Ms. Watson was careful to point out:

> "The warning that we have prepared here is clearly not in retaliation for your coming forward and speaking to us..." **[B 77-87]**.

No part of the June 3, 2003 meeting had anything to do with the sexual harassment committed by Mr. Duncan. In fact, following its alleged eight week investigation, Defendant specifically refused to inform Plaintiff about any of "the details of how we are dealing with Mr. Duncan" **[B 77]**. Rather, the sole focus of the June 3, 2003 meeting was to falsely accuse Plaintiff of wrongdoing which, as earlier indicated, Defendant claimed caused Mr. Duncan to sexually harass Plaintiff. The accusations against Plaintiff were broken down into two specific "problem areas" **[B 88-90]**.

The first problem area was "unprofessional conduct in the workplace". The only specific example of "unprofessional conduct in the workplace" allegedly committed by Plaintiff, which Defendant concluded caused Mr. Duncan to sexually harass her was:

> "It was reported that it was not uncommon for you to make office banter about men that come into the workplace. Specifically, it was reported that you made comments about the 'physique' of a phone vendor and a copy machine repairman" **[B 77-87]**.

-13-

This allegation is based upon information received from Steven Duncan while he was in the midst of defending himself against Plaintiff's sexual harassment charge. Plaintiff denied that she was involved in this "banter" or otherwise said anything inappropriate about anyone **[B 91]**. Ms. Watson testified at her deposition that after hearing this allegation from Mr. Duncan, she contacted Marge Phipps, who had a daily opportunity to observe Plaintiff in the workplace, in an effort to corroborate Mr. Duncan's allegation against Plaintiff. At her deposition, Ms. Watson testified:

> "Q: Did Marge Phipps also say that Kim was the instigator of the bantor against that man?
>
> A: I don't remember." **[B 92-94]**

In fact, there was no evidence other than Mr. Duncan's self serving allegation that Plaintiff instigated or participated in this conduct, whether from Marge Phipps, or anyone else. In fact, Marge Phipps informed Ms. Watson that she had never seen Plaintiff do anything inappropriate or unprofessional **[B 95]**. Defendant did not attempt to corroborate Mr. Duncan's allegation further despite Mr. Duncan's claim that: "you can talk to anyone in Delaware to validate the story" **[B 93]**. Rather, Defendant adopted these allegations as fact in the face of a specific denial by Mr. Phipps, and used the allegation as a basis to discipline Plaintiff following her claim of sexual harassment, without giving Plaintiff any realistic opportunity to respond to this claim **[B96-98]**.

The second "problem area" allegedly uncovered by Defendant during its investigation of Mr. Duncan was: "separation of work and personal life." According to Defendant, it

-14-

became clear during the "investigation" of Mr. Duncan that "the relationship between you and Mr. Duncan had clearly crossed that line that should exist between work and personal lives... There were too many instances where after hours social events involving friends and alcohol contributed to a bad situation" **[B 77-87]**. Defendant, however, failed to identify any details of any kind concerning any "instance" which formed the basis of this accusation against Plaintiff at the June 3, 2003 meeting.

At her deposition, Ms. Watson attempted to articulate Plaintiff's transgressions. In essence, Plaintiff's sin was that she attended functions outside of the workplace at which alcohol was served. Ms. Watson apparently concluded, without any corroborating evidence, that Plaintiff had become intoxicated at after work hours events, and that her intoxication became an invitation to Mr. Duncan to sexually harass her **[B 98]**.

For example, according to Defendant, Plaintiff should not have gone to the Travelers golf event, despite the fact that it was clearly business related, and despite the fact that Ms. Watson herself, occasionally goes to company functions where alcohol is served **[B 98-101]**. In fact, all the events at which Mr. Duncan sexually harassed Plaintiff were work related which Plaintiff was encouraged, if not expected, to attend **[B 102-103]**.

According to Ms. Watson, had Plaintiff just said no to the Travelers invitation she would not have been sexually harassed, and, by choosing to attend, Plaintiff was considered partially responsible for the harassment.

According to Ms. Watson another example of Plaintiff's failure to separate her work

and personal life included sending the e-mail concerning travel and lodging arrangements to New York for the WOW! Awards. Plaintiff was chastised for her efforts despite the fact that Ms. Watson acknowledged at her deposition that Plaintiff's efforts were: "I believe in an effort to increase morale and bonding"**[B 104-105]**.

On this issue, Ms. Watson further testified as follows:

"Q: So what Kim did, in an effort to raise morale, she was trying to make arrangements for the people that she worked with to stay a night in New York?

A: Yes.

Q: Ok.

A: Night in New York, separate transportation up.

Q: Is there any specific policy that you can cite to in the policy and procedures manual that says that's not proper?

A: I would have to review the hand book, but it goes to the manager having to set the example."

Ms. Watson was unable to identify anyone who had ever been criticized or disciplined for doing something similar to that done by Plaintiff concerning transportation and lodging to the WOW! Awards.

Generally speaking, Mr. Watson was unable to articulate any other specific examples of Plaintiff's inability to separate her work and personal life **[B 105-107]**.

As a punishment for contributing to her own sexual harassment by Mr. Duncan, and, to insure that "situations like this never happen again in any context "Plaintiff's sentence was as follows: "To assist you in learning how to manage in the most professional way possible

-16-

*you will* attend the following courses by year-end 2003:

HRM1 - Leadership the Commerce Way

HRM 3 - Managing within the Law

At least four parts of the DDI Series, including Core skills for Building Commitment and Retaining Talent: The Leader's Role" **[B 108, B77-81]**.

Plaintiff was receptive to the idea, wishing only to put the entire matter behind her.

Plaintiff was given two weeks to register for all of the courses, and was required to complete all course work before the end of calendar year 2003. Plaintiff registered for these courses **[B 108-111]**. They were held hours away, however, Plaintiff was still required to attend these courses and continue managing ten customer service representatives, and five sales representatives in a Department that was "drowning" in paperwork, and telephone calls. One of the courses Plaintiff attended had nothing whatsoever to do with her position **[B112-113]**. Plaintiff missed one of the classes due to a scheduling error **[B 33]**.

Mr. Duncan's employment was terminated on June 3, 2003, for exercising poor judgment. His "poor judgment" was ""becoming involved in a romantic relationship with Ms. Bailey - a subordinate" **[B 114-115]**, and Mary Corcoran was brought in to replace Mr. Duncan almost immediately **[B 116]**. Defendant assisted Mr. Duncan in finding other employment following his termination **[B 117]**. From virtually the moment that Ms. Corcoran took over as Director of the Department, Plaintiff was subjected to treatment that was unnecessary and improper and which had never been imposed upon others.

Specifically, Plaintiff was instructed to go home and change her clothing on the grounds that her dress on a particular day did not meet Defendant's dress code. She was subjected to this treatment despite the fact that another management level employee typically wore clothing that did not meet Defendant's "policy" and nothing was done to that person **[B 118-121, B 5]**. This was known by Ms. Watson prior to Plaintiff's termination **[B 122]**.

Plaintiff was also criticized by Ms. Corcoran concerning e-mail communications Plaintiff made to the Department staff, including, informal e-mails, despite the fact that Plaintiff's communication skills were rated as "consistently meets or exceeds job requirements. Skills and ability are highly developed and applied with consistent good effort", **[B 19-27]** Ms. Watson was aware that Ms. Corcoran was criticizing Plaintiff's e-mails prior to Plaintiff's termination **[B 123-124]**.

Following her report of sexual harassment, Defendant relieved Plaintiff of duties she previously performed, and excluded her from matters in which she had been previously involved, including, the SEMSI Project, goal setting for the Department staff, as well supervision over five sales people in the Department. Plaintiff was embarrassed when the removal of the five sale people was announced to the entire Department for the first time at a staff meeting in Plaintiff's presence **[B 5-6]**.

Fearing that her sexual harassment complaint against Mr. Duncan was the source of this treatment by Ms. Corcoran, Plaintiff sought the assistance of Deborah Watson. Specifically, Plaintiff testified at her deposition that she spoke to Ms. Watson once by

-18-

telephone, and also asked to speak to her in person. Plaintiff testified that she told Ms.

Watson: "I thought I pissed in my pond". The testimony continued:

> Q: When you say you pissed in your pond, what did you mean by that?
>
> A: By filing the complaint that was public knowledge and people were after

me, they were out to make my life miserable.

> Q: And you thought that Mary Corcoran was one of those people?
>
> A: Yes, I did.
>
> Q: And did you ask Ms. Watson to intervene?
>
> A: Yes, I did.
>
> Q: And did she intervene?
>
> A: No, she did not.
>
> Q: Did she tell you why not?
>
> A: She told me to talk to Mary which I didn't trust Mary.
>
> Q: Did you talked to Mary?
>
> A: No, I did not.        **[B 125-126]**

**e. Plaintiff's Employment is Terminated by Defendant**

At the beginning of the work day on August 12, 2003, Plaintiff was sitting in for one

of her Customer Service Representatives that was out for the day, and also performing her

supervisory duties within the Department[4]. Valerie Oakes, a Customer Service

---

[4]

Plaintiff testified that a total of three (out of ten) Customer Service Representatives were out that day **[B 127]**.

Representatives was late for work. When Ms. Oakes arrived, rather than report to her station, and begin her duties, she was searching for information concerning a training class that she wanted to take. Unable to find what she was looking for, Ms. Oakes yelled to Plaintiff from across the room, instructing Plaintiff to "come here".

Frustrated with Ms. Oakes choice of priorities, and, drowning in more than a typical day's work load, Plaintiff responded to Ms. Oakes substantially as follows "I don't have f_ _ _ing time for this now".

Plaintiff testified at her deposition that she did not perceive Ms. Oakes as being troubled in any way by Plaintiff's statement. In fact, Plaintiff testified that after her statement, Ms. Oakes gestured to her by giving her "the finger". Plaintiff further testified that Dee Whalen, another Customer Service Representative in the Department was giggling along with Ms. Oakes, when Ms. Oakes gestured to Plaintiff. According to Plaintiff this was no different than any other day in the Department **[B 128-129]**. Ms. Oakes did not report this incident to anyone.

Two weeks later, Valerie Oakes, Dee Whalen and Darlene Wilkins were instructed by Ms. Corcoran to describe what occurred between Ms. Oakes, and Plaintiff, on August 12, 2003. On August 26, 2003, Ms. Oakes and Ms. Wilkins prepared an e-mail at Ms. Corcoran's direction explaining what occurred **[B 130-131]**.

In addition to being instructed to identify what happened, Mary Corcoran instructed Ms. Oakes and Ms. Wilkins to state why the matter was not reported. In her August 26, 2003

-20-

e-mail, which was copied to Ms. Watson, Ms. Oakes stated:

"1. Fear of retaliation from Kim. I have been on Kim's bad side before and her reactions make the working conditions around the office very tense.
2. Kim does my performance review and I don't want this used against me.
3. I felt that it was futile, as last December there was a problem with Kim that I reported to my manager (Mr. Duncan at the time) asking for a meeting with the three of us to resolve it. The meeting never took place, the problem was never addresses, and my personal file and performance review reflected it."

There is no evidence that Ms. Corcoran or Ms. Watson did anything to determine exactly what, Ms. Oakes was referring to in her stated reasons for not reporting the incident on August 12, 2003. While Ms. Oakes denied at her deposition that she was instructed what to write in the e-mail, it is difficult to square her deposition testimony with the information contained in the e-mail[5].

Indeed, as to the concern expressed in the e-mail regarding retaliation, Ms. Oakes testified at her deposition that she did not consider Plaintiff as threatening to her **[B 132]**. She simply follows a general philosophy not to "report your supervisor"**[B 132-134]**.

With respect to the reference concerning the fact that Plaintiff was responsible for Ms. Oakes performance review, here again, Ms. Oakes did not testify at her deposition that she feared that Plaintiff would give her a bad review because she reported the incident. Rather, it was just a general feeling similar to the philosophy not to report a supervisor. Ms. Oakes testified that she just did not want to: "start trouble" **[B 135-136]**. The third reason,

---

[5] Ms. Oakes reaction to the incident is important because Defendant appears to claim that Plaintiff's transgression was not so much the use of the expletive, as it was discouraging and demoralizing a subordinate seeking assistance.

referring to a feeling that reporting it was "futile", Ms. Oakes description of which she was referring to there was convoluted to say at least, and, essentially showed that she was referring to a legitimate, good faith difference of opinion between herself, and Plaintiff, concerning her performance in the job **[B136 -144]**.

On August 27, 2003, Plaintiff's employment was terminated by Defendant despite the fact that, Mary Corcoran initially recommended a " written warning" **[B 169]**. In its response to Plaintiff's interrogatories, when asked to identify the persons who took part in the decision to terminate Plaintiff's employment, the Defendant responded:

"It is impossible to identify a single person who made the final decision to terminate Ms. Bailey's employment. This is because the decision was made collectively after much deliberation on the part of Commerce management" **[B 137-156]**.

It is clear however that Ms. Watson, Mr. McKelvey, Mr. Morrissey, and Ms. Corcoran were all involved. It is also clear that Plaintiff's termination had little to do with the August 12, 2003 incident. According to Defendant, the incident was a part of "broader failure of Ms. Bailey to maintain standards of professionalism as a supervisor".

In reality Plaintiff was terminated in retaliation for making her charge of sexual harassment against Mr. Duncan four months earlier. There is no other rational reason for her termination.

The expletive used by Plaintiff was not directed at Ms. Oakes, and was no different than what had gone on in the Department every day. The other "transgressions" which

formed the basis for Plaintiff's termination were untrue, unsubstantiated claims, to which Plaintiff was not allowed to respond, and which Defendant's own investigation revealed were probably not true. Plaintiff's other sin was attending job related activities that she was encouraged, and, indeed, expected to attend **[B 145-168]**.

**<u>ARGUMENT</u>**

**I.      Standard of Review**.

Summary Judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact, and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In making this determination, the Court must draw all reasonable inferences - including issues of credibility - in favor of the non-movant. *Hullett v. Towers, Perrin, Forster & Crosby, Inc.* 38 F.3d 107, 111(3d. Cir. 1994).

Applying this standard to the facts of record in this case, it is clear that Defendant's Motion for Summary Judgment must be denied.

## II.    Plaintiff has Established a *Prima Facie* Case of Retaliation.

In order to establish a *prima facie* case of retaliation, Plaintiff must establish, by a preponderance of the evidence, that: (1) she engaged in a protected activity; (2) that Defendant took adverse employment action against her; and (3) that a causal link exists between the protected activity, and the adverse action. *Kachmar v. Sungard Data Sys., Inc.* 109 F.3d 173, 177 (3d. Cir. 1999).

Defendant apparently concedes that Plaintiff has shown the first two requirements for establishing a *prima facie* case of retaliation. Defendant does not deny that Plaintiff's charge of sexual harassment against Steven Duncan was a protected activity; nor does Defendant deny that adverse action was taken against Plaintiff following her report of sexual harassment. Defendant's argument is that because Mary Corcoran was allegedly unaware of Plaintiff's charge of sexual harassment, nothing done to Plaintiff could have been retaliatory under Title VII. Defendant's argument is overly simplistic, and completely ignores the fact that Ms. Corcoran's mistreatment of Plaintiff was just the tip of the iceberg.

Defendant correctly points out in its opening Brief that Courts have held that one way to show causation is to show an ongoing pattern of antagonism between the time of the protected activity and the time of the adverse employment action. *Kachmar*, 109 F2d at 177-178. Ultimately the Court must conduct a case-by-case, fact-sensitive analysis to determine whether the evidence looked at as whole, is sufficient to raise the inference of causation. *Hargrave v. County of Atlantic*, 262 F.Supp.2d 393 (D.N.J 2003).

A broad array of circumstantial evidence may be used to illustrated the causal link. *Adamson v. William Paterson College of New Jersey*, 260 F.3d 265, 289 (3d Cir. 2001).

Clearly other management personnel working for Defendant were both aware of Plaintiff's charge, and, also involved in adverse action against her, including her termination. Ms. Watson, Mr. McKelvey, and Mr. Morrissey were aware of or directly involved in the "investigation" of Plaintiff's charge, as well as nearly all of the adverse action taken against Plaintiff after she made the charge. These three were also directly involved in the decision to terminate Plaintiff.

As to the other adverse action that befell Plaintiff after her charge, Ms. Watson and Mr. McKelvey made Plaintiff continue to directly work with Mr. Duncan for eight weeks after the charge was made. This continued even after Plaintiff made it known to Ms. Watson that it was difficult to do so, especially given that Plaintiff heard Mr. Duncan discuss the matter with another person in a manner that others could hear his words.

Ms. Watson unjustly criticized Plaintiff after her charge of harassment for attempting to make travel arrangements for the WOW! Awards. Ms. Watson herself later admitted that Plaintiff's efforts were designed to "increase morale and bonding" among members of the Department staff. This "transgression" was one of the bases used to terminate Plaintiff; however Ms. Watson could not identify a policy against it, and, to her knowledge, no one had ever been disciplined under similar circumstances before.

Mr. Morrisey, and Ms. Watson accused Plaintiff of the two "problem areas"

identified at the June 3, 2003, meeting. Mr. McKelvey was aware of this as well. These alleged problem areas were identified as key factors in the decision to terminate Plaintiff. They were also allegedly the reason that Plaintiff was ordered to complete an aggressive list of courses, held hours away, within a very short period of time, covering matters that either did not relate to her position, or, in which she had already shown considerable proficiency.

The June 3, 2003 meeting with Ms. Watson and Mr. Morrissey was itself adverse action against Plaintiff. Indeed, Plaintiff was instructed to attend the meeting under the pretense that it was to discuss the results of the eight week "investigation" into her sexual harassment charge against Mr. Duncan. Instead, Defendant refused to discuss that issue as well as what the plan was for Mr. Duncan.

Rather, the discussion at the meeting turned into an indictment of Plaintiff, based primarily on lies told by Mr. Duncan when he was trying to save his own skin, in the face of Plaintiff's charges. In fact, in the two instances where Defendant bothered to try to verify Mr. Duncan's lies, the evidence showed that Plaintiff's version of events was more credible. Yet, Mr. Duncan's words were taken as gospel, and Plaintiff was criticized, punished, and, ultimately, terminated, based on his words.

The causal link is perhaps best shown by Defendant's decision to punish Plaintiff on June 3, 2003, and ultimately terminate her, for failing to "separate her personal life from her business life"; and, by Ms. Watson's refusal to assist Plaintiff.

Reduced to its essence, Defendant's claim that Plaintiff failed to separate her business

-27-

life from her personal life, is that she should not have attended the various business functions at which Mr. Duncan took the opportunity to sexually harass her. That is, as earlier indicated, Defendant concluded that Plaintiff was responsible for her own harassment; and, significantly, it did so without any credible evidence, and, in the face of independent evidence to the contrary.

Moreover, soon after Mary Corcoran took over as Director of the Department, Plaintiff approached Deborah Watson, Defendant's Vice President of Human Resources to inform Ms. Watson that Plaintiff believed she was being retaliated against by Ms. Corcoran as a result of her sexual harassment claim. Inexplicably, Ms. Watson declined to intervene or assist Plaintiff in any way, other than to tell Plaintiff to take the matter up with Mary Corcoran, the very person that Plaintiff believed was retaliating against her.

The causal link between Plaintiff's charge of sexual harassment, and Defendant's adverse treatment of her, is clearly made on the record of this case.

### III.    There is No Other Reasonable Explanation for Defendant's Treatment of Plaintiff Except Retaliation.

To defeat summary judgment when the Defendant answers the Plaintiff's *prima facie* case with legitimate, non-discriminatory reasons for its action, the Plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes v. Perskie,* 32 F.3d 759 (3d Cir. 1994).

Try as it might, Defendant has been unable to articulate a good faith, non-discriminatory basis for its treatment of Plaintiff. Even assuming *arguendo* that it has, Plaintiff contends that it is more likely than not that a reasonable finder of fact will disbelieve Defendant's stated reasons for its mistreatment of Plaintiff, and conclude that retaliation was the true cause.

Indeed, it is difficult to conceive how Defendant could legitimately require Plaintiff to continue to work directly under Mr. Duncan for eight weeks, knowing that Mr. Duncan was loudly discussing Plaintiff's charge in the office. It is similarly difficult to understand how Defendant can legitimize criticizing Plaintiff for attempting to bolster the morale of her staff by arranging an overnight stay in New York following the WOW! Awards.

It also appears likely that a jury would be highly suspicious of the manner in which Defendant approached its investigation of Plaintiff's sexual harassment charge, and Defendant's conclusion that Plaintiff was responsible for her own harassment. It is also

-29-

unlikely that a jury would conclude that there was a non-retaliatory reason for punishing Plaintiff by making her take inconvenient, unnecessary classes, or, for Ms. Watson's refusal to attest Plaintiff with her problems with Ms. Corcoran.

Plaintiff further contends that the jury will disagree with Defendant that Plaintiff should not have attended the various events at which she was harassed by Mr. Duncan, nor will it believe that the August 12, 2003 incident had anything to do with Defendant's decision to terminate Plaintiff, given the atmosphere in the Department at the time.

**IV.    Defendant's Treatment of Plaintiff following her Sexual Harassment Charge Was Malicious, Thereby Entitling Plaintiff to Punitive Damages.**

In order to recover punitive damages for  retaliation under Title VII, a Plaintiff must prove that Defendant acted with "malicious  or with reckless indifference to Plaintiff's federally protected rights. *Schatzman v. Martin Newark Dealership, Inc.*, 158 F.Supp.2d 392, 404 (D. Del. 2001)

Plaintiff contends that the various examples of mistreatment by Defendant detailed above clearly show malice, and indifference toward Plaintiff's federally protected rights. Thus the jury should be left to decide whether to award punitive damages.

## **CONCLUSION**

Taking the facts, as it must, in a light most favorable to Plaintiff, it is clear that Defendant's Motion for Summary Judgment should be denied.

Plaintiff has made out a *prima facia* case of retaliation. Defendant does not dispute that Plaintiff engaged in a protected activity, and that Defendant took adverse action against her. Contrary to Defendant's claim in its motion, the facts of record clearly show a causal connection between the adverse action, and Plaintiffs protected activity.

Defendant has also failed to come forward with a legitimate, non-discriminatory, good faith, basis for its treatment of Plaintiff. Assuming *arguendo* that has come forward with such a basis, a jury could reasonably conclude, under all of the circumstances, that Defendant's proffered reasons for its mistreatment of Plaintiff, were pretextual, and, that retaliation was the true motivating factor.

Finally, because a reasonable jury could conclude based on Defendant's mistreatment of Plaintiff, that Defendant maliciously or knowingly disregarded Plaintiff's federally protected rights, Plaintiff is entitled to an award of punitive damages.

For the reasons set forth above Defendant's Motion for Summary Judgment should be denied.

**LOSCO & MARCONI,  P.A.**

/s/Thoms C. Marconi, Esquire
Thomas C. Marconi, Esquire (#2761)
1813 N Franklin Street
P.O. Box 1677
Wilmington, DE 19899
(302) 656-2284
(302) 656-3081
tmarconi@delaw.org
Attorneys for Plaintiff, Kimberley A. Bailey

Date: June 30, 2006

G:\Carla\Bailey, Kim 0309-3714\Pleadings US Dist Ct of DE\Answering Brief in Opposition to Def. Motion for Summary Judgment 6.30.06.wpd