# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KIMBERLEY A. BAILEY | ) |
| | ) |
| Plaintiff, | ) C.A. No.: 05-183 SLR |
| | ) |
| v. | ) Trial by Jury Demanded |
| | ) |
| COMMERCE NATIONAL INSURANCE | ) |
| SERVICES, INC., a New Jersey corporation. | ) |
| | ) |
| Defendant. | ) |

## APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**LOSCO & MARCONI, P.A.**

/s/Thoms C. Marconi, Esquire
Thomas C. Marconi, Esquire (#2761)
1813 N Franklin Street
P.O. Box 1677
Wilmington, DE 19899
(302) 656-2284
(302) 656-3081
tmarconi@delaw.org
Attorneys for Plaintiff, Kimberley A. Bailey

Date of Filing: June 30, 2006

## APPENDIX TABLE OF CONTENTS

Pages

B1 - B 15                          Plaintiff's Complaint

B 16 - B 17                        Oakes deposition transcript p. 78-85

B 18                              Bates CIS 0524

B 19 - B 27                        Bates CIS 044-052

B 28                              Oakes deposition transcript p. 42-45

B 29                              Oakes deposition transcript p. 18-21

B 30                              Wilkins deposition transcript p. 30-33

B 31                              Bailey deposition transcript p. 301-304

B 32 - B 33                        Bailey deposition transcript p. 333-340

B 34 - B 35                        Bailey deposition transcript p. 329-336

B 36                              Oakes deposition transcript p. 18-21

B 37                              Oakes deposition transcript p. 42-45

B 38                              Wilkins deposition transcript p. 14

B 39                              Bailey deposition transcript p. 46-49

B 40 - B 45                        Bailey deposition transcript p. 70-93

B 46                              Bailey deposition transcript p. 130-133

B 47 - B 48                        Bailey deposition transcript p. 122-129

B 49                              Bailey deposition transcript p. 313-316

B 50 - B 51                        Bailey deposition transcript p. 130-137

B 52                              Bailey deposition transcript p. 257-260

| | |
|---|---|
| B 53 | Watson deposition transcript p. 38-41 |
| B 54 - B 55 | Bates CIS 0530-0531 |
| B 56 | Watson deposition transcript p. 182-185 |
| B 57 | Watson deposition transcript p. 30-33 |
| B 58 | Watson deposition transcript p. 26-29 |
| B 59 | Watson deposition transcript p. 6-9 |
| B 60 - B 62 | Watson deposition transcript p. 46-57 |
| B 63 -B 64 | Watson deposition transcript p. 70-77 |
| B 65 - B 74 | Watson deposition transcript p. 82-121 |
| B 75 | Watson deposition transcript p. 162-165 |
| B 76 | Watson deposition transcript p. 158-161 |
| B 77 - B 87 | Watson deposition exhibits 1-4 |
| B 88 - B 90 | Watson deposition transcript p. 158-169 |
| B 91 | Bailey deposition transcript p. 241-244 |
| B 92 - B 94 | Watson deposition transcript p. 142-153 |
| B 95 | Watson deposition transcript p. 26-29 |
| B 96 - B 98 | Watson deposition transcript p. 162-173 |
| B 99 - B 101 | Watson deposition transcript p. 170-181 |
| B 102 | Bailey deposition transcript p. 313-316 |
| B 103 | Bailey deposition transcript p. 309-312 |
| B 104 - B 108 | Watson deposition transcript p. 178-197 |
| B 109 - B 111 | Bates CIS 0541-0543 |

| | |
|---|---|
| B 112 | Bailey deposition transcript p. 245-248 |
| B 113 | Bates CIS 0570 |
| B 114 - B 115 | Watson deposition transcript p. 194-201 |
| B 116 | Corcoran deposition transcript p. 34-37 |
| B 117 | Watson deposition transcript p. 218-221 |
| B 118 - B 119 | Bailey deposition transcript p. 297-304 |
| B 120 - B 121 | Bailey deposition transcript p. 313-320 |
| B 122 - B 124 | Bates CIS 0593-0595 |
| B 125 - B 127 | Bailey deposition transcript p. 321-332 |
| B 128 - B 129 | Bailey deposition transcript p. 329-336 |
| B 130 | Bates CIS 0614 |
| B 131 | Bates CIS 0575 |
| B 132 - B 134 | Oakes deposition transcript p. 50-52 |
| B 135- B 144 | Oakes deposition transcript p. 62-71 |
| B 145 - B 164 | Defendant's Responses to Plaintiff's First Set of Interrogatories |
| B 165 - B 168 | Letter to Department of Labor from William M. Tambussi |
| B 169 | Watson deposition transcript p. 214-217 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

KIMBERLEY A. BAILEY )
                                                    )
                    Plaintiff,                      )    C.A. No.:  05 - 1 8 3
                                                    )
v.                                                  )    Trial by Jury Demanded
                                                    )
COMMERCE NATIONAL INSURANCE                         )
SERVICES, INC., a New Jersey corporation.           )
                                                    )
                    Defendant.                      )

## COMPLAINT

### I. Introduction

1. By way of this action, Plaintiff, Kimberley A. Bailey, seeks redress under Title VII of the

Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, and the

Civil Rights Act of 1991 ("Act"), on the grounds that the Defendant retaliated against her for

complaining about Title VII violations in the workplace.

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331

in that Plaintiff seeks to vindicate rights possessed by her under the laws of the United States of

America. Venue in this District is proper pursuant to 28 U.S.C. § 1391.

3. On November, 6, 2003, Plaintiff filed a charge of discrimination against the Defendant

with the State of Delaware, Department of Labor, Division of Industrial Affairs ("Department").

Following an effort at mediation by the Department, the matter was referred to the U.S. Equal

Employment Opportunity Commission ("EEOC"). On January10, 2005, Plaintiff received a Notice

of Right to Sue letter from the EEOC. A copy of the Notice of Right to Sue letter issued by the

EEOC to Plaintiff is attached hereto as Exhibit "A".

**B 1**

## II. Background Facts

4.  Plaintiff, currently resides at 7 Giliberti Lane, Newark, Delaware.

5.  Defendant, is a New Jersey corporation engaged in the insurance business in the State of

Delaware, and elsewhere. Ms. Bailey was employed at Defendant's facility located in the Delle Donne

Corporate Center on Centre Road, Wilmington, Delaware. From this location, Defendant sells and

services various kinds of personal and business insurance products, mostly through a network of

independent insurance brokers and agents located throughout the country.

6.  Ms. Bailey began employment with Defendant on August 27, 2001 as a Senior Customer

Service Representative. That position entailed handling telephone, internet, and mail inquiries from

insurance brokers and others trying to place personal and business insurance policies with Defendant.

Ms. Bailey worked in this position full time until May 2002 when she was promoted to a supervisor

position in a newly created department known as "Main Street" ("department"). Ms. Bailey's new

position entailed direct supervision over ten Customer Service Representatives and five sales people

working in the department. Ms. Bailey's immediate supervisor was Mr. Steven Duncan.

7.  Ms. Bailey enjoyed very much working for Defendant. She liked her earlier position as

a Senior Customer Service Representative, and was excited to be in the new supervisory position

in the department. Ms. Bailey had never held a supervisory position before with Defendant, and was

determined to show that she could be a talented manager. Ms Bailey was dedicated to Defendant, and

the employees under her supervision. For example, within a few months of taking on the supervisor

position in the department, Ms. Bailey hired and trained all ten customer service representatives, and

all five sales representatives working in the department. She represented the department and

Defendant at various business meetings and functions. Ms. Bailey created the department's procedure

-2-

B 2

manual, during work hours and on her own time.

8. In the only performance evaluation done of Ms. Bailey in her supervisor position, she received either superior or outstanding evaluations in the following areas; job knowledge, customer service, work quality, initiative, compliance/business ethics, organization and planning, strategic focus, communications, leadership, and motivation. In addition, her supervisor commented as follows when giving Ms. Bailey a rating of outstanding in the area of leadership and motivation:

> "Kim leads by example. She stays late, does the same work as her staff and supports their efforts. Her daily input into their individual tasks, client relationship and ongoing support of their extra work effort helps the team stay focused. She inspires her staff to do more, better and faster and have fun."

### III. Ms. Bailey is the Victim of Sexual Harassment

9. Beginning in December 2001, Ms. Bailey's supervisor, Steven Duncan, began to sexually harass her in and outside the workplace. The harassment included: fondling her back, breasts, and buttocks; forcibly kissing her; suggesting that he and Ms. Bailey have sex on upcoming business trips; stating that he wanted to have sex with her; making comments to male business associates about portions of Ms. Bailey's anatomy; rubbing her legs and inner thighs; pushing her hand between her legs and asking her to masturbate in his car; inviting her to join him and his girlfriend in a hotel room to have sex; and attempting to convince her to have sex with a business associate to improve the relationship between Defendant and the business associate.

10. The harassment continued over a fourteen month period. Because Ms. Bailey was completely embarrassed by the harassment, and fearful of either losing her job, or becoming an outcast, she did not report the harassment to Defendant until March 2003, when she sent a letter summarizing what occurred to Defendant's Human Resources Department. A copy of Ms. Bailey's

B 3

letter is attached hereto as Exhibit "B"

## IV. Retaliation against Ms. Bailey

11. For eight weeks following Ms. Bailey's report of sexual harassment, she was required to continue to work side by side with Mr. Duncan. In addition, Ms. Bailey was completely excluded from the investigation, and was not given any information about the status of the investigation until June 2003, when she learned that Mr. Duncan was no longer employed by Defendant.

12. In addition, after Ms. Bailey made the sexual harassment charge, she began to be excluded from meetings, projects and other matters concerning the operation of the department, despite the fact that she was a supervisor in the department, and, indeed, an integral part of the success that the department had achieved since its creation.

13. After Ms. Bailey made the sexual harassment charge, Defendant improperly decided just after concluding its " investigation" of Ms. Bailey's sexual harassment charge against Mr. Duncan, that "both parties had engaged in inappropriate behavior in violation of Commerce guidelines on professionalism and its policies and procedures". Defendant made this determination based at least in part on lies told by Mr. Duncan while he was defending himself against the sexual harassment charge. Defendant's conclusion that Ms. Bailey behaved improperly was made without notifying Ms. Bailey of the inappropriate behavior she allegedly committed, and without giving her any opportunity to respond to this conclusion.

14. After Ms. Bailey made the sexual harassment charge, Defendant decided that it needed to "assist Ms. Bailey in understanding her role as a supervisor". Defendant made this decision despite the fact that six months earlier, Ms. Bailey's performance evaluation rated both her job knowledge and her work quality as "consistently meets or exceeds job requirements, skills and abilities are highly

-4-

**B 4**

developed and applied with consistent good efforts".   In the same performance evaluation, Ms. Bailey's leadership and motivation skills were rated at the highest level available on the evaluation scale, namely;

> "Performance is characterized by outstanding accomplishments far exceeding job requirements, skills and abilities are highly developed and applied with consistent effort. Sets example for others".

15.   In order to assist Ms. Bailey in "understanding her role as a supervisor" she was instructed to attend six (6) classes, all of which were held hours away. However, the only class she was able to attend was not, according to the instructor of the class, designed for the insurance business. Specifically, Ms. Bailey drove two hours to attend a class in New Jersey called "Conducting a Team Meeting" which was designed for interns on the banking side of Defendant's business, not the insurance side. Ms. Bailey attended the class but because it did not address issues related to her work, it was largely a waste of time. Upon information and belief, no other similarly situated persons were required to take similar classes under similar circumstances.

16.   After Ms. Bailey made the sexual harassment charge, the new Director of the Department, Mary Corcoran, admonished and sent Ms. Bailey home to change her clothes, in the presence of another employee for wearing a pair of "capri" slacks to work that Ms. Bailey had worn to work before. Ms. Corcoran claimed she wanted only business suits worn by management personnel. However, other management personnel, including the Assistant Director of the department, routinely wore denim jeans to the office.

17.   After Ms. Bailey made the sexual harassment charge, Defendant relieved her of duties she previously performed, and excluded her from matters in which she was previously involved, including: the SEMSI project, goal setting for the employees directly supervised by Ms. Bailey, and

**B 5**

the supervision of five sales personnel. Ms. Bailey was embarrassed in front of others in the department when Defendant announced for the first time in a department meeting that Ms. Bailey would no longer be supervising the five sales people.

18.  After Ms. Bailey made the sexual harassment charge, virtually every part of her job performance was scrutinized with a thoroughness not applied to others, including the grammar, sentence structure, and spelling, in informal e-mails sent internally.  Ms. Bailey was also openly criticized for organizing a company event at a bowling alley which was approved in advance by Ms. Corcoran on the grounds that the bowling was not a sophisticated activity, and that Ms. Bailey should have organized a golf outing.

19.  On August 12, 2003, Ms. Bailey was sitting in for a customer service representative who was out sick, and also performing her normal duties of supervising the rest of the representatives in the department, when she responded to an inquiry made by a subordinate by using profanity.

20.  It was not uncommon in the department for the customer service representatives, Ms. Bailey, and others, including the former Director, Mr. Duncan, the then current Director, Ms. Corcoran, and the then current Assistant Director, Ms. Phipps, to frequently use similar words under similar and different circumstances throughout the entire time that Ms. Bailey worked for Defendant. While such conduct was not encouraged, at no time was anyone ever disciplined by Defendant for using profanity in the workplace in the way that Ms. Bailey used it on August 12, 2003.

21.  The employee to whom the profanity was directed did not complain to management, and was not adversely affected by it.  In fact, she responded back later with laughter and profane gestures shortly thereafter.  The incident was apparently reported to Ms. Corcoran by Ms. Joan Frenz a Vice-President, in a completely different Department, and a close  personal friend of Ms Corcoran.

**B 6**

22.  On August 27, 2003, Ms. Bailey's employment was terminated by Defendant on the grounds that on August 12, 2003 Ms. Bailey was involved in "inappropriate behavior exhibited toward a subordinate". The termination was effective "immediately". Ms. Bailey was not given any opportunity to address the matter or otherwise be heard in any way. There was no progressive discipline. The "inappropriate behavior" was the use of profanity in response to the inquiry made by the subordinate. A copy of Defendant's termination letter is attached hereto as Exhibit "C"

## V. Cause of Action

23.  Ms. Bailey's charge of sexual harassment against Mr. Duncan in March 2003 was protected activity under the Act.

24.  Defendant took adverse action against Ms. Bailey that was causally related to her sexual harassment charges, in that between March 2003, when she first notified Defendant that she had been sexually harassed in the workplace, and August 27, 2003, when Ms. Bailey's employment with Defendant was terminated, Defendant:

(a) forced Ms. Bailey to continue to work directly with Mr. Duncan for eight weeks after she made the charge;

(b) failed to keep the charge against Mr. Duncan confidential which resulted in others in the department learning of the charges, causing Ms. Bailey further fear and embarrassment;

(c) failed to keep Ms. Bailey apprised of the status of the investigation while forcing Ms. Bailey to continue working directly with Mr. Duncan;

(d) took an inordinate amount of time to investigate the charge while forcing Ms. Bailey to continue working directly with Mr. Duncan;

(e) failed to permit Ms. Bailey to respond in any way to untrue and unsubstantiated

-7-

B 7

accusations of misconduct made against her by Mr. Duncan in an effort to defend himself against Ms. Bailey's sexual harassment charge;

(f) accused Ms. Bailey of being unable to perform her duties as a supervisor based solely on untrue and unsubstantiated accusations of misconduct made by Mr. Duncan in an effort to defend himself against Ms. Bailey's sexual harassment charge, despite the fact that Ms. Bailey's formal performance evaluations indicated that she was highly proficient at her duties;

(g) excluded Ms. Bailey from meetings and other briefings on matters related to the department;

(h) relieved Ms. Bailey of duties she previously performed and excluded her from matters in which she was previously involved;

(i) forced Ms. Bailey to attend classes that others were not required to attend that were held hours away, and had little or nothing to do with her position with Defendant, while still requiring her to perform her normal job duties;

(j) overly scrutinized virtually all aspects of Ms. Bailey's work ranging from spelling to grammar to organizing social activities, using criteria not applied to other similarly situated employees;

(k) falsely accused Ms. Bailey of "engaging in social activities involving consumption of alcohol which were not sponsored by Commerce", when others who actually engaged in such conduct were not penalized, and when no mention was ever made that such activities were not permitted until after Ms. Bailey made the sexual harassment charge;

(l) embarrassed her in the presence of other employees, and sent her home to change clothing that Defendant considered inappropriate, which she had been permitted to wear before, and which

was similar to and probably more professional than clothing routinely worn by several other

managers;

(m) embarrassed her by announcing in a staff meeting for the first time that she would no

longer be supervising the five sales people in the department;

(n) terminated her employment for using profanity when others in the department, including

the Director, and the Assistant Director, routinely used profanity in the same way;

(o) terminated her employment allegedly for using profanity without any form of progressive

discipline or opportunity to respond to the charge;

(p) otherwise retaliated against Ms. Bailey.

25.  Defendant's retaliatory actions toward Ms. Bailey violated her rights under the Act,

entitling her to redress under the law.

WHEREFORE, Plaintiff, Kimberley A. Bailey, prays that the Court enter judgment in her

favor and against Defendant, Commerce National Insurance Services, Inc, and award her damages

including: front pay, back pay, compensatory damages, punitive damages, attorney's fees, costs, pre-

and post judgment interest, and all such other and further damages and other relief permitted by law

and otherwise that the Court deems just and proper.

LOSCO & MARCONI,  P.A.


Thomas C. Marconi, Esquire (#2761)
1813 N Franklin Street
P.O. Box 1677
Wilmington, DE 19899
(302) 656-7776
F(302)656-7774
tmarconi@delaw.org
Attorney for Plaintiff, Kimberley A. Bailey

Date: March 24, 2005

**B 9**

EEOC Form 161-B (10/96)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: Kimberly A. Bailey
7 Giliberti Lane
Newark, DE 19711

From: U. S. Equal Employment Opportunity Commission
Philadelphia District Office
21 South 5th Street - Suite 400
Philadelphia, PA 19106-2515

*On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17C-2004-00078 (formerly 17CA400078) | Legal Unit | 215-440-2828 |

*(See also the additional information attached to this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or ADA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ X ]   More than 180 days have passed since the filing of this charge.

[   ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[ X ]   The EEOC is terminating its processing of this charge.

[   ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[   ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[   ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Marie M. Tomasso, District Director

*(Date Mailed)*

Enclosure(s)

cc:   Commerce Insurance Services
      Thomas C. Marconi, Esquire (for Charging Party)

EXHIBIT   A

**B 10**

*Kim Bail*

I need to report events that have occurred in recent months that have brought me here today. Mr. Steven Duncan has made several offensive inappropriate sexual advances towards me since approximately December, 2001. Until now, I was too embarrassed and afraid to report his advances.

December 2001, Marjorie Phipps, Patty Kalmbacher, Steve Duncan and I went to the Back Stage Café. That evening Mr. Duncan advised me that the MainStreet Sales & Service Supervisor position was available. He asked me directly if I were interested. I was elated and advised him YES!! He asked me to come talk to him the next day at work. As the evening progressed, Patty and Margie left, leaving Mr. Duncan and me. Mr. Duncan suggested he walk me to my car, which because of the location of this bar, seemed appropriate. As we approached my car I began to feel extremely awkward about the situation, however, nothing offensive occurred.

Shortly thereafter I was approved for an interview for the MainStreet position. I interviewed with Mr. Duncan and Ms. Phipps for the supervisory position and soon thereafter the position was offered to me and plans for me to transfer over to MainStreet were underway.

Over the next several weeks Mr. Duncan, Margie, and I met several times after hours to discuss where we were going with MainStreet. At these meetings the conversation sometimes turned to personal matters. I spoke of my current separation from my husband, my kids and also my very close girlfriends. One evening I invited Mr. Duncan to join me and my girlfriends at the Back Stage Café. He agreed to meet us there but didn't want me to tell Margie.

Almost immediately after he arrived he began rubbing my back and touching my backside. I was offended by this and asked him "what are you doing?" He completely ignored my question and asked me if I wanted to dance. I told him no. Mr. Duncan also asked me questions about traveling and if I would have any problems getting away for business. He insinuated that we could travel together and that he was interested in having sex with me on these trips. He insinuated that having sex with him could be beneficial to my career.

As the evening progressed, I decided that it was getting late and I and my girlfriends wanted to go to a tavern near our homes. I was thinking we (my girlfriends & I) would leave but would have to extend the offer to Mr. Duncan, hoping he would decline to follow. Mr. Duncan accepted the offer to follow us. We went to Bank Shots in Pike Creek. After being there for a short while, Mr. Duncan advised he needed to go home. He had a much farther drive to make. He asked me to walk him to his car, and I complied. When we got to his car, he asked me to get in the car so that we could talk just a little more. I complied. As soon as I entered his car he lunged at me forcing his tongue in my mouth. He started kissing me, feeling my breast and telling me how excited I made him and that he would "love to make love to me". He reiterated that he would have to find a way for us to travel together.

I was in shock. My girlfriends came out into the parking lot to check on me. One girlfriend knocked on his window, telling me to get out. I reached for the door and he reached for me. He kissed me one more time and then let me go. I got out of the car and was so embarrassed; I

**B 11**

didn't know what to tell my friends.

The next day at work was very awkward. Approximately one week later I asked Mr. Duncan to lunch to talk about what happened. As soon as we sat down at the table and I informed Mr. Duncan that I was not interested in a relationship with him and did not want a repeat of what occurred earlier, he thanked me for taking that weight off his shoulders. I asked him if I got the job because of my physical appearance or if he was thinking along the lines of establishing a relationship with me? He reassured me that the reason I was offered the position was not because of my physical attributes and that I was more than qualified for the position. He indicated he was looking forward to watching me advance. I also conveyed to him that I didn't want anyone to think I got this job because I slept with him. He again thanked me for being so open, honest and up front with him. He said he thought our business relationship would prosper if we did not make our relationship sexual. By the conclusion of our meeting I made it clear that I believed I had did not want any more sexual advances or sexual innuendo.

About two months later, Mr. Duncan advised me that Mr. Durham, a marketing representative, would be coming in from Andover and that I should invite a girlfriend to join us for drinks. Mr. Duncan again asked me not to advise Margie of our plans. I complied and invited one of my girlfriends. Mr. Durham made it to our office late in the afternoon. Mr. Duncan met with him in the boardroom and called me in soon after their meeting started. I went to the boardroom to meet Mr. Durham with paper and pen to take notes. I approached Mr. Durham to shake his hand, both Mr. Duncan and Mr. Durham stood for the introduction. After I shook Mr. Durham's hand, I turned to go around the table to sit. As I turned, Mr. Duncan said... "see, what did I tell ya." I got to my seat, and questioned Mr. Durham about his comment. Both Mr. Durham & Mr. Duncan just smiled and ignored the question. I sat ready to take notes with reference to Andover's marketing appetite but the conversation never went there. Mr. Duncan asked if I was ready to go and who would be meeting us? I told him yes, I was ready and my friend was joining us. He told me to go close up my computer and to meet him and Mr. Durham at Back Stage Café.

Soon after we arrived we decided to visit another bar. Mr. Duncan suggested I ride with him and have Mr. Durham ride over with my friend because Mr. Duncan wanted to " talk to me". We got into the cars and we started down the road. Mr. Duncan started holding my hand, rubbing my palms and fingers. He told me that Mr. Durham was "really attracted to me" and in saying this; he started rubbing my leg and my inner thigh. He advised me Mr. Durham would love to be rubbing my leg right at this moment. I gave a nervous laugh to Mr. Duncan and put his hand in mine, to keep his hands off me. We arrived at the bar and the evening was uneventful after that.

Soon thereafter, Mr. Duncan received an invitation from Travelers to attend a Senior Golf Tournament in Graves, MD. Mr. Duncan advised me that Mr. Durham would be there and we (Mr. Durham & I) could "hook up". The golf tournament was on a Saturday and Mr. Duncan advised me to clear my calendar so the two of us could attend. He told me Mr. Durham might able to set us up in the hotel for the night. Here again, he asked me not to tell Margie.

I met Mr. Duncan on the Saturday morning we were to go to the tournament. Shortly after I got into his car Mr. Duncan started talking about sex again. He took my hand and pushed it in

between my legs. He asked me to masturbate, to show him "how I would pleasure myself". I did not comply. He continued trying to force me by keeping my hand in between my legs. This was very offensive to me. I immediately changed the subject and eventually he took his hands off of me. During the rest of the ride down he was talking about his extra-marital affairs. He stated that he has never been faithful to his wife and probably would never be.

We finally made it to the golf tournament and toward the end of the day Mr. Duncan tried to make arrangements to drop me off at Mr. Durham's hotel despite the fact that I was not interested in being dropped off there. I asked Mr. Duncan to please stop worrying about my sex life. I would be fine and did not need him to try to "hook me up." Finally Mr. Duncan agreed to go home but we would stop for some dinner first. We stopped somewhere in Maryland where Mr. Duncan began again telling me about his sex life and his extra-marital affairs.

The next event that happened that really made me see how Mr. Duncan thought of me was on our over night trip to Randolph, NJ. I was concerned because he advised me of his recent break up of an extra-marital affair and I didn't want him to think that he could refocus his sexual desire on me. When we were scheduling the trip I indicated we would be staying in two separate rooms. He agreed.

We scheduled a meeting for Mr. Duncan and me to meet with the core producers from Randolph to educate them on some of our procedures and to basically reassure them their clients past and present will be taken care of. On our ride up Mr. Duncan tried to describe each producer and their different mannerisms. Mr. Duncan advised me the best way for us to win them over is for these men to "love me". I need to make them "love me". I thought love was a strong word but I was trying to go with the importance of the situation. A majority of our small business is written from this area and has direct connections with these producers. The implication, however, was that I should consider sleeping with these producers as a way for us to garner their favor and keep their business.

We arrived and had our meeting. We were scheduled for a dinner and drinks afterward at a restaurant. Our meeting went well and the dinner was extremely nice. A few of us stayed afterwards for cocktails. Soon all that was left was Mr. Duncan, myself and one other of the Randolph core producers. Mr. Duncan decided he wanted to go back to the hotel and would leave me with this producer.

I told Mr. Duncan, I would leave with him; I needed to go back to my room and catch up on some e-mails and what not. He insisted I stay and establish the "relationship". I again said I think I should go; I barely know this individual and would feel uncomfortable having him drive me back to the hotel. Mr. Duncan told me everything would be ok. Feeling like a sold piece of meat and dumbfounded at my situation, I sat there and had a few more drinks with this producer and explained how awkward I felt and how cheap this made me feel. Again, the implication was that I should sleep with this person. This person eventually drove me back to my hotel without doing anything improper to me. However, I blame Mr. Duncan for putting me in this embarrassing position.

**B 13**

I am very grateful to our company for the promotion and I my work immensely.  However, I am concerned for my future at Commerce with Mr. Duncan in control of my career.  I am sick to my stomach and find it extremely hard to do my work.  I've recently learned of some other issues that I would prefer talking about rather than putting them in writing.  I'm a single mom with two children; I'm a hard worker and I need my job.

I did nothing to deserve this treatment of me by Mr. Duncan and I respectfully request that Commerce see to it that it will not happen again and that no adverse action be taken against me as a result of this complaint now and in the future.

Patti/Baily

**B 14**



*Commerce Insurance Services*

August 27, 2003

Kimberley Bailey
3214 Champions Drive
Wilmington, DE 19808

Dear Kimberley,

It has come to management's attention that an incident occurred in the Delaware office on August 12, 2003. The incident involved inappropriate behavior you exhibited toward a subordinate. Two other employees witnessed this incident and both verified the inappropriate behavior.

We previously discussed with you the issue of behavior in the workplace, and even arranged for you to attend training on that area, as well as other topics related to your employment at Commerce.

The type of wrongful conduct exhibited by you as a supervisor, on August 12, 2003, is unacceptable and violates Commerce's policies. It is, therefore, necessary for Commerce to terminate your employment effective immediately.

If you have further questions, please contact me at (856) 470-3309.

Sincerely,

Deborah Watson
Human Resources Manager

cc: Joe Morrissey
    Ed Kiessling

EXHIBIT    C

**B 15**

Page 78

1  Commerce?
2      A.  I could have.
3      Q.  I mean like Ms. Watson or Ms. Corcoran.
4      A.  I don't know.
5      Q.  Who are you talking about when you say "no one
6  here"?
7      A.  I'm talking about our team.
8      Q.  Who was that?
9      A.  The CSRs.  The other CSRs and myself.
10     Q.  How do you know what the other people on the
11 team were thinking about it?
12     A.  Because we discuss things at work.
13     Q.  Do you recall discussing this with Darlene?
14     A.  Yes.
15     Q.  Did Darlene tell you that she didn't think
16 that what happened to Kim was justified?
17     A.  Darlene had a difference of -- she had a
18 different opinion.
19     Q.  How about --
20         MR. COOK:  Can she finish the question?
21         MR. MARCONI:  Oh, I'm sorry.  I didn't
22 know she wasn't finished.
23     A.  She -- Darlene was very angry over the
24 incident, and it offended her.  But I know Darlene holds

Page 79

1  no ill will towards Kim.  And nobody wanted Kim to be
2  fired and nobody wished Kim to be let go.
3      Q.  Including Darlene?
4      A.  Including Darlene.
5      Q.  How about Dee Whalen?
6      A.  She was upset also that Kim was let go.
7      Q.  Did you specifically talk to her about that?
8      A.  Yes.
9      Q.  Then you go on to say that you were all
10 shocked.  When you say that, do you mean that you were
11 shocked that she was terminated?
12     A.  Yes.
13     Q.  Again, did you talk to the other members on
14 the team and they seemed to share that view?
15     A.  Yes.
16     Q.  Now, when did you have these conversations
17 with other members on the team?  Was it long after the
18 termination or around the time?  Or when?
19     A.  It was the same day or the days following the
20 termination.
21     Q.  Did anyone protest the termination to anybody
22 as far as you know?
23     A.  I don't understand what you mean by that.
24     Q.  In other words, did anybody go to the

Page 80

1  management at Commerce and say we don't think that Kim
2  deserved to be terminated --
3      A.  Oh.
4      Q.  -- for what she did?
5      A.  Not that I know of.  I have no knowledge of
6  that.
7      Q.  "Everyone missed -- and still does -- you and
8  there was never a unkind word spoken about you."  Are you
9  talking about since the termination?
10     A.  Since the termination, correct.
11     Q.  Again, you talked to the members of the team
12 about Kim and --
13     A.  Correct.
14     Q.  Is it fair to say that they wished she was
15 back?
16     A.  We've had comments to that effect.
17     Q.  By whom?
18     A.  Members of the team.
19     Q.  Like who?
20     A.  All of us that were there.
21     Q.  And so --
22     A.  Most of us that were there.
23     Q.  When you say "us," I take it you're including
24 yourself in that group that wishes she was back.

Page 81

1      A.  (The witness indicated.)
2      Q.  Did you just shake your head yes?
3      A.  Yes.
4         MR. COOK:  I'm going to object to that
5  characterization.  If she's shaking her head, she's
6  shaking her head.  Whether or not she means yes or no is
7  unclear unless she says something unclear.
8         MR. MARCONI:  That was a question.
9         MR. COOK:  Pardon me?
10        MR. MARCONI:  That was a question, and
11 she answered the question "yes."
12        MR. COOK:  No.  She shook her head, and
13 then you inserted into the record that she said "yes."
14 You didn't ask her for her verbal answer.
15        MR. MARCONI:  I did.  I said, "You're
16 shaking your head yes?"  And she said, "Yes."
17        MR. COOK:  That's not my recollection.
18        MR. MARCONI:  I'm not even going to
19 waste his time reading it back.
20 BY MR. MARCONI:
21     Q.  You described in this e-mail, Valerie, at the
22 end of your part that it was like a family at Commerce.
23 What did you mean by that?
24     A.  That's how we refer to ourselves to our

Valerie Oakes

22 (Pages 82 to 85)

Page 82

1  department.
2      Q.  When Kim was there?
3      A.  Yes.
4      Q.  What did you mean, though, when you said
5  "family"?  You mean the people on the team treated each
6  other like family?
7      A.  Correct.
8      Q.  Who would have been, I'll say, the mother of
9  the family?  Would that have been Kim?
10     A.  That would have been Kim.
11         MR. MARCONI:  I don't have any other
12  questions.
13  BY MR. COOK:
14     Q.  Mrs. Oakes, you answered some questions today
15  about some phone calls that were made by counsel for the
16  plaintiff to you.  Can you describe what was said in
17  those phone calls?
18     A.  Plaintiff's counsel left his name and told me
19  that he was the attorney for Kim Bailey and that Kim said
20  she thought that he wouldn't mind if I -- if he gave me a
21  call and asked me a few questions and asked me to return
22  his call.
23     Q.  How many times did he make these phone calls?
24     A.  Twice, I think.

Page 83

1      Q.  Can you recall when those phone calls began?
2      A.  The first one was right after Kim and Diane
3  and I had had drinks.
4      Q.  Now, did he inform you that he had received
5  the consent of Commerce's counsel to speak with you?
6      A.  No.
7          MR. COOK:  Okay.  I have no further
8  questions.
9          MR. MARCONI:  Okay.
10         MR. COOK:  We'll read.
11         (The deposition concluded at 1:20 p.m.
12  this same day.)
13
14         - - - - -
15
16         (I HAVE READ THE FOREGOING DEPOSITION,
17  AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.)
18
19
20
21  _____
22         WITNESS NAME
23
24

Page 84

1              INDEX TO TESTIMONY
2
   VALERIE OAKES                    PAGE
3
      Examination by Mr. Marconi        2
      Examination by Mr. Cook          82
5
6
7
8              INDEX TO EXHIBITS
9
   OAKES DEPOSITION EXHIBIT NO.        PAGE
10
11  1   Document Bates stamped CIS 0848    25
12  2   Document Bates stamped CIS 0843    27
13  3   One-page e-mail from Valerie Oakes to   28
        Kimberly Bailey dated July 19, 2005
14  4   Two-page e-mail with YAHOO! Mail heading  34
        dated December 14, 2005 from Kimberly
15      Bailey to Valerie Oakes
16  5   One-page handwritten sketch        56
17  6   Document Bates stamped CIS 0614    56
18  7   Two-page e-mail dated September 26, 2005  71
        From Valerie Oakes to Kimberly Bailey
19
20
21         - - - - -
22
23
24

Page 85

1              C E R T I F I C A T E
2  STATE OF DELAWARE:
                        :
3  NEW CASTLE COUNTY:
4      I, Robert Wayne Wilcox, Jr., a Registered
5  Professional Reporter and Notary Public, within and for
6  the County and State aforesaid, do hereby certify that
7  the foregoing deposition of VALERIE OAKES, was taken
8  before me, pursuant to notice, at the time and place
9  indicated; that said deponent was by me duly sworn to
10  tell the truth, the whole truth, and nothing but the
11  truth; that the testimony of said deponent was correctly
12  recorded in machine shorthand by me and thereafter
13  transcribed under my supervision with computer-aided
14  transcription; that the deposition is a true record of
15  the testimony given by the witness; and that I am neither
16  of counsel nor kin to any party in said action, nor
17  interested in the outcome thereof.
18     WITNESS my hand and official seal this 20th day
19  of May A.D. 2006.
20
21  _____
22  ROBERT WAYNE WILCOX, JR.
    REGISTERED PROFESSIONAL REPORTER
    CERTIFICATION NO. 101-RPR
23  (Expires January 31, 2008)
24

B 17

**Kimberly A Bailey**
05/15/03 09:43 AM

To: Darlene Wilkins/Commerce Bank@yesbank, Heather L Pokoiski/Commerce Bank@yesbank, Valerie J Oakes/Commerce Bank@yesbank, Dorothy L Whalen/Commerce Bank@yesbank, Julius A Bland/Commerce Bank@yesbank, Dorothy E Deegan/Commerce Bank@yesbank, Cheryl L Luckanish/Commerce Bank@yesbank, Heather B Smith/Commerce Bank@yesbank, Diane M Schauber/Commerce Bank@yesbank

cc: Marjorie Phipps/Commerce Bank@yesbank, Steven E Duncan/Commerce Bank@yesbank, (bcc: Deborah E Watson/Commerce Bank)

Subject: flowers

All,

Your timing is impeccable...    Yes the roses brought many tears to my eyes.

I would like you all to know you are very welcome and I do appreciate each & everyone of you.  I could not imagine being any where but MainStreet.

YOU ALL ARE THE BEST and I would like to say to you...  Thank you.

Kim

I have to be honest...  Margie helped too.

CONFIDENTIAL

**B 18**



**RECEIVED** NOV 0 6 2002

## PERFORMANCE PLANNING AND APPRAISAL
### Management / Sales

| EMPLOYEE INFORMATION | |
|---|---|
| NAME: | Kimberley Bailey |
| DEPARTMENT / COST CENTER: | MainStreet |
| JOB TITLE: | Sales / Service - Supervisor |
| DATE OF HIRE: | 08/2001 |
| REVIEW PERIOD: | FROM:  05 / 2002          TO: 11 / 2002 |
| SUPERVISOR: | Steve Duncan |

## EVALUATION SCALE:

The purpose of giving feedback is to focus on PERFORMANCE to communicate personal accomplishment as well as business success and to allow for INDIVIDUAL DEVELOPMENT to maximize employee potential and ensure that CNIS has leaders prepared to face future needs.

Employees should be assigned a rating on each performance factor as applicable:

| | |
|---|---|
| 5 | Performance is characterized by outstanding accomplishments far exceeding job requirements. Skills and abilities are very highly developed and applied with consistent high effort. Sets example for others. |
| 4 | Performance consistently meets or exceeds job requirements. Skills and abilities are highly developed and applied with consistent good effort. |
| 3 | Performance consistently meets required standards for the job. Relevant skills, abilities and efforts are appropriate for the job. |
| 2 | Performance is consistently below expectations for the job, but may be improved with guidance, training or further experience. |
| 1 | Performance is well below the standard required for the job.  A serious performance problem is evident and requires attention. Skills, abilities or effort are clearly lacking or not being applied. |

CIS 044    B 19

## SECTION A: KEY PERFORMANCE FACTORS (to be completed for all employees)

| JOB KNOWLEDGE: | | How well is the job understood? The employee's knowledge of the fundamentals, skills, methods and procedures required to complete the normal and typical tasks of the job. |
|---|---|---|

**RATING ON THIS FACTOR (Check one box only)**

| 5 | X 4 | 3 | 2 | 1 |
|---|---|---|---|---|

SUPPORTING COMMENTS OR EXAMPLES:

| CUSTOMER SERVICE: | | How well are the needs of internal and external customers met? Emphasis placed on enhancing the Customer experience and exceeding their expectations on deliverables and services. Works to "WOW" the Customer. |
|---|---|---|

**RATING ON THIS FACTOR (Check one box only)**

| 5 | X 4 | 3 | 2 | 1 |
|---|---|---|---|---|

SUPPORTING COMMENTS OR EXAMPLES:

| WORK QUALITY: | | How good is the work produced? Effort that consistently achieves desired outcomes with a minimum of avoidable errors and problems and with effective use of resources. |
|---|---|---|

**RATING ON THIS FACTOR (Check one box only)**

| 5 | X 4 | 3 | 2 | 1 |
|---|---|---|---|---|

SUPPORTING COMMENTS OR EXAMPLES:

| INITIATIVE: | | How well does the employee work independently? The employee's ability to work with minimal guidance or supervision and to identify and solve issues without being directed to do so. |
|---|---|---|

**RATING ON THIS FACTOR (Check one box only)**

| X 5 | 4 | 3 | 2 | 1 |
|---|---|---|---|---|

SUPPORTING COMMENTS OR EXAMPLES: Kim understands the big picture. She understands what must be done to be successful. From the many extra hours, to the acceptance of bringing the paperwork to the Wilmington offices as a training tool, supporting the idea of having Core CSR's support our efforts in return for over-time, Kim gets the job done with minimal supervision.  Kim single handedly took our work count down over 500 pieces in one day (one Saturday). She is also an avid supporter of the WOW and helps her staff promote and use WOW in everyday activities.

| COMPLIANCE / BUSINESS ETHICS: | | Does the employee abide by sound, ethical business practices? Demonstration of broad knowledge of the policies and practices of the organization and industry. Conducts business transactions in accordance with accepted ethical standards and codes of conduct. |
|---|---|---|

**RATING ON THIS FACTOR (Check one box only)**

CIS 045

**B 20**

| 5 | | 3 | 2 | 1 |
|---|---|---|---|---|

SUPPORTING COMMENTS OR EXAMPLES:

| JUDGMENT / DECISION MAKING: | | How appropriate are actions taken? <br><br> The quality of decisions made and ability to take actions appropriate to the situation and that lead to effective outcomes. |
|---|---|---|

| RATING ON THIS FACTOR (Check one box only) | | | | |
|---|---|---|---|---|
| 5 | 4 | X  3 | 2 | 1 |

SUPPORTING COMMENTS OR EXAMPLES:

| INTERPERSONAL RELATIONS: | | How well does the employee interact with others? <br><br> Ability to establish and maintain positive and productive working relationships. Willingness to help customers and co — workers. |
|---|---|---|

| RATING ON THIS FACTOR (Check one box only) | | | | |
|---|---|---|---|---|
| 5 | 4 | X  3 | 2 | 1 |

SUPPORTING COMMENTS OR EXAMPLES:

| ORGANIZATION AND PLANNING: | | How well does the employee anticipate needs? <br><br> The ability to anticipate and forecast business needs; plan and schedule time and resources effectively. |
|---|---|---|

| RATING ON THIS FACTOR (Check one box only) | | | | |
|---|---|---|---|---|
| 5 | X  3 | 3 | 2 | 1 |

SUPPORTING COMMENTS OR EXAMPLES:

| STRATEGIC FOCUS: | | Do the employee's actions focus on future, in addition to immediate, benefit to the organization? <br><br> The ability to maintain and communicate future perspective in the development of plans and strategies. |
|---|---|---|

| RATING ON THIS FACTOR (Check one box only) | | | | |
|---|---|---|---|---|
| 5 | X  4 | 3 | 2 | 1 |

SUPPORTING COMMENTS OR EXAMPLES:

| PROFESSIONALISM: | | How well does the employee represent CNIS? <br><br> Displays constructive behaviors that embody the culture of CNIS. Presents a positive image in appearance and language. Is a positive influence on others. |
|---|---|---|

| RATING ON THIS FACTOR (Check one box only) | | | | |
|---|---|---|---|---|
| 5 | 4 | X  3 | 2 | 1 |

SUPPORTING COMMENTS OR EXAMPLES:

CIS 046

**B 21**

## SECTION B: MANAGEMENT / SUPERVISORY FACTORS (to be completed for individuals with responsibility for managing other people)

| COMMUNICATIONS: | | *How effective is the manager / supervisor at sharing information?* |
|---|---|---|
| | | The ability to share information clearly and effectively in writing and / or orally. Initiate or respond to communications in an appropriate, comprehensive and timely manner. |

**RATING ON THIS FACTOR (Check one box only)**

| 5 | X 4 | 3 | 2 | 1 |
|---|---|---|---|---|

SUPPORTING COMMENTS OR EXAMPLES:

| DELEGATION: | | *How effectively is work assigned among subordinates?* |
|---|---|---|
| | | Assigning and encouraging subordinates to undertake responsibilities and tasks. Provides material support and coaching. Displays trust and avoids micromanagement. Recognizes and acknowledges others. |

**RATING ON THIS FACTOR (Check one box only)**

| 5 | 4 | X 3 | 2 | 1 |
|---|---|---|---|---|

SUPPORTING COMMENTS OR EXAMPLES

| LEADERSHIP AND MOTIVATION: | | *How is the individual recognized as a leader?* |
|---|---|---|
| | | The ability to articulate a vision that others will understand and readily embrace. Able to secure cooperation of subordinates and drive all towards common objectives. |

**RATING ON THIS FACTOR (Check one box only)**

| X 5 | 4 | 3 | 2 | 1 |
|---|---|---|---|---|

SUPPORTING COMMENTS OR EXAMPLES: Kim leads by example. She stays late, does the same work as her staff and supports their efforts. Her daily input into their individual tasks, client relationships and ongoing support of their extra work efforts helps the team stay focused. She inspires her staff to do more, better and faster and have fun.

| EMPLOYEE DEVELOPMENT: | | *How effective is this manager in developing staff capabilities?* |
|---|---|---|
| | | Concern for the professional and personal growth of staff. Skill at identifying learning opportunities and providing active support and encouragement to subordinates. |

**RATING ON THIS FACTOR (Check one box only)**

| 5 | 4 | X 3 | 2 | 1 |
|---|---|---|---|---|

SUPPORTING COMMENTS OR EXAMPLES:

CIS 047    B 22

**SECTION C: SALES PERFORMANCE FACTORS** (to be completed for all individuals with Sales responsibilities)

| UNDERSTANDING OF CLIENT / MARKET: | | *How well does the individual know CNIS products and client base?* The extent to which the individual knows the Company's product offerings and is able to link them effectively to prospective and existing customers. |
|---|---|---|

| RATING ON THIS FACTOR (Check one box only) | | | | |
|---|---|---|---|---|
| 5 | X 4 | 3 | 2 | 1 |

SUPPORTING COMMENTS OR EXAMPLES:

| CLOSING SKILLS: | | *How effective is the individual at "making the deal"?* The effectiveness of the individual in closing business in a way that allows both the organization and the customer to feel that they participated in a win-win situation. |
|---|---|---|

| RATING ON THIS FACTOR (Check one box only) | | | | |
|---|---|---|---|---|
| 5 | 4 | X 3 | 2 | 1 |

SUPPORTING COMMENTS OR EXAMPLES:

| ANALYTIC ABILITY: | | *How effectively does the individual make conclusions based on available information?* The ability to select appropriate information, recognize assumptions, develop a hypothesis and reach a valid conclusion. |
|---|---|---|

| RATING ON THIS FACTOR (Check one box only) | | | | |
|---|---|---|---|---|
| 5 | X 4 | 3 | 2 | 1 |

SUPPORTING COMMENTS OR EXAMPLES: These skills are used to support the producers with their daily questions.

| PROFIT MENTALITY: | | *How effective is this individual at focusing on bottom-line results?* The ability to focus on issues that impact profitability. Able to effectively manage distractions that would lead to ineffective use of time and resources. |
|---|---|---|

| RATING ON THIS FACTOR (Check one box only) | | | | |
|---|---|---|---|---|
| X 5 | 4 | 3 | 2 | 1 |

SUPPORTING COMMENTS OR EXAMPLES: I am always asking the producers… why do we want to write this? Asking the producers questions like why mono-line and who writes there other business… Is this prospect a Commerce Bank customer???

CIS 048

**B 23**

## SECTION D: JOB SPECIFIC PERFORMANCE FACTORS (additional performance factors relating to the employee's specific job should be addressed in this section, if appropriate)

| : | | |
|---|---|---|

| RATING ON THIS FACTOR (Check one box only) | | | | |
|---|---|---|---|---|
| 5 | 4 | 3 | 2 | 1 |

SUPPORTING COMMENTS OR EXAMPLES:

| : | | |
|---|---|---|

| RATING ON THIS FACTOR (Check one box only) | | | | |
|---|---|---|---|---|
| 5 | 4 | 3 | 2 | 1 |

SUPPORTING COMMENTS OR EXAMPLES:

| : | | |
|---|---|---|

| RATING ON THIS FACTOR (Check one box only) | | | | |
|---|---|---|---|---|
| 5 | 4 | 3 | 2 | 1 |

SUPPORTING COMMENTS OR EXAMPLES:

CIS 049

**B 24**

## SECTION E: PERFORMANCE AGAINST GOALS (this section should be used to comment on performance on specific goals or objectives identified prior to the review)

| GOAL / OBJECTIVE | COMMENTS ON ACHIEVEMENTS |
|---|---|
|  |  |
|  |  |
|  |  |

## SECTION F: DEVELOPMENT PLANNING AND GOAL SETTING

*This section to be completed jointly by manager and employee during review session*

Based on current job as well as career aspirations, identify goals, capabilities, knowledge and experience to be developed during the next review period:

**SPECIFIC GOALS / DEVELOPMENT ACTIVITIES TO BE ACCOMPLISHED DURING NEXT REVIEW PERIOD:**

| GOAL / OBJECTIVE | EXPECTED OUTCOMES / DELIVERABLES / TIMEFRAME |
|---|---|
| CIC Designation | Begin classes for designation. Complete two classes in 2003. |
| Attend external classes on communication skills / letter writing skills | Satisfactory completion of seminar(s) in 2003 |
|  |  |

CIS 050

**B 25**

## SECTION G: OVERALL PERFORMANCE RATING / SIGNATURES

| OVERALL PERFORMANCE (Refer to definitions on page one) | | | | |
|:---:|:---:|:---:|:---:|:---:|
| 5 | | 3 | 2 | 1 |

**MANAGER'S COMMENTS:**

**Kim needs to continue to work on her communication skills (internal) and should focus on becoming a "smart" manager. She has learned many other skills in her first foray into management and will be a successful manager with additional time and training. I look forward to her continued successes and will work with her to make sure does what is necessary to secure her future as a leader within CNIS.**

**SIGNATURES:**

| MANAGER: |  | Date: 11/1/02 |
|---|---|---|
| NEXT LEVEL / OFFICER: | | Date: |

## SECTION H: EMPLOYEE COMMENTS TO REVIEW / EMPLOYEE SIGNATURE

I believe that the ratings and comments in this appraisal are a fair and reasonable assessment of my job performance during the defined review period:

Agree                    Not Sure                    Disagree

**EMPLOYEE COMMENTS:**

| EMPLOYEE SIGNATURE: | _Kim Baley_ | Date: 11/1/02 |

CIS 052    B 27

Valerie Oakes

12 (Pages 42 to 45)

### Page 42

1    Q.  Okay.  As soon as Kim said that, what did you
2  do?
3    A.  I got up and walked out of the cubicle, walked
4  out to the hallway.
5    Q.  Where's the hallway?
6    A.  I walked down this aisle, out here and down
7  the hallway, which is right out here.
8    Q.  Did you make any kind of gestures or say
9  anything under your breath or anything like that?
10    A.  I just got up and walked out.  I was
11  embarrassed.  I was angry.  And I just got up from my
12  desk and walked away.  That was it.
13    Q.  Did you cry?
14    A.  Probably.
15    Q.  In the hallway here?
16    A.  Probably.
17    Q.  Had you ever cried at work before?
18    A.  Mm-hmm.
19    Q.  Why?
20    A.  I have a tendency to cry if somebody screams
21  at me.
22    Q.  So people screamed at you at work before?
23    A.  I've gotten screamed at before, yeah.
24    Q.  By whom?

### Page 43

1    A.  Kim, Steve.
2    Q.  Steve Duncan?
3    A.  Mm-hmm.
4    Q.  Anybody else?
5    A.  Not screamed directly towards me, no.
6    Q.  Well, how do they scream, then?
7    A.  Well, when your supervisor screams at you.  It
8  was either Kim or Steve.
9    Q.  Has Mary Corcoran ever screamed at you?
10    A.  Mary Corcoran wasn't there at the time.
11    Q.  No.
12        I mean, has she ever screamed?
13    A.  Has she ever screamed at me?
14    Q.  Yes.
15    A.  (The witness indicated.)
16    Q.  She has?
17    A.  Yes.
18    Q.  How many times?
19    A.  A couple.
20    Q.  Did you cry?
21    A.  Probably.
22    Q.  What did you do that she screamed at you
23  about?
24    A.  I'm trying to think.  I said something to one

### Page 44

1  of the supervisors that I thought she was rude.
2    Q.  You said that?
3    A.  Yes.  I did.
4    Q.  Has anybody ever reported her screaming at
5  you?  When I say "her," I'm talking about Mary Corcoran.
6    A.  No.
7    Q.  Why not?
8        MR. COOK:  Objection to the form.
9    A.  Probably she screams in private.  She has
10  never screamed at me in front of people.
11    Q.  Oh, she screams at you in private.
12    A.  She'll bring you in her office or in the
13  conference room if she's going to say something to you.
14  So it was -- we're in private then.  Never out in the
15  middle of the floor.
16    Q.  If you counted up the times you got screamed
17  at, who screamed at you more, Kim or Mary?
18    A.  Probably Kim.
19    Q.  Close?
20    A.  No.  It was definitely more Kim.  It was a
21  different time back then.
22    Q.  How so?
23    A.  It was just a different atmosphere and a
24  different stress level.

### Page 45

1    Q.  More stress back then?
2    A.  Different kind of stress.
3    Q.  How so?
4    A.  It was a -- back then it was fast-paced.  We
5  were drowning.  We were drowning in paperwork, and it
6  just kept piling up.  And we were drowning in phone
7  calls.  And it was just a very stressful place to work at
8  the time.
9    Q.  At the time that Kim said that to you on
10  August the 12th?
11    A.  Correct.
12    Q.  But since then did they hire more people?  Now
13  there's more people to spread the work around with?
14    A.  They've hired a few more people.  And the
15  work -- we -- when we took over MainStreet and started
16  with MainStreet, they were just bringing all the
17  paperwork down from another office in Randolph, and all
18  the phone calls that were going to those other offices in
19  Jersey were starting to come to us.  So it was a new
20  department.  We were taking over work from a whole bunch
21  of different locations.
22        Now everything is centralized.  So we
23  all have our own book of business the way we did then.
24  But back then it was get the work done.  It didn't matter

Valerie Oakes

6 (Pages 18 to 21)

Page 18

1  might put the phone down and say "Bite me."
2      Q.  "Bite me"?
3      A.  You know what I mean.
4      Q.  Anything else?
5      A.  "I'm tired of this shit" or, you know, just
6  general --
7      Q.  Did you ever hear any --
8      A.  It was not unheard of.
9      Q.  Was the word "fuck" used?
10     A.  Yes.
11     Q.  A lot?
12     A.  Yes.
13     Q.  Did you use it?
14     A.  Yes.
15     Q.  Were you offended by the word "fuck"?
16     A.  No.
17     Q.  Are there any curse words that offend you?
18     A.  Well --
19     Q.  I'm not asking you to say them.
20     A.  -- I was going to say -- no.  I mean...
21     Q.  But "fuck" doesn't --
22     A.  It depends on what situation you're in.  I
23  mean, if somebody is saying them to me, yeah, it might
24  offend me.  But in general conversation in the world

Page 19

1  today, I've gotten used to people just using language
2  like that.
3      Q.  And you're used to it?
4      A.  I heard it.
5      Q.  You, in fact, use it yourself.  Right?
6      A.  Occasionally, yes.
7      Q.  And didn't pretty much everybody do it --
8  curse?
9      A.  At that time, yes.
10     Q.  What time are you referring to?
11     A.  At the time we all worked in the MainStreet
12  department together.
13     Q.  August of 2003?
14     A.  Right.
15     Q.  To your knowledge has anyone ever been
16  disciplined for cussing?
17         MR. COOK:  Objection to form.
18  BY MR. MARCONI:
19     Q.  You can answer it.
20     A.  Oh.  Not that I know of.  Except for Kim.  But
21  I wouldn't know if somebody was disciplined.  I mean,
22  they wouldn't do that in front of me.  They would take
23  someone in the office.  I wouldn't have known if somebody
24  was disciplined.

Page 20

1      Q.  Well, you would have known if they were
2  terminated.  Right?
3      A.  Yes, I would have known if they were
4  terminated.  Correct.
5      Q.  Or suspended or something like that?
6      A.  No.  I've never seen anybody suspended, so...
7      Q.  Did people use cuss words like "fuck" when
8  they were frustrated?
9      A.  Yes.
10     Q.  Did they direct that frustration at times to
11  other people in the office?
12     A.  It was not really to other people.  It was
13  more of a -- about the situation.
14     Q.  I'm not sure I understand that.
15     A.  In other words, if you were cussing in
16  frustration, it was more about the situation, about the
17  workload, about the -- it wasn't about people.  I mean,
18  we had a good team.  We had a good team.  People were
19  good to each other.  I mean, when you did say a cuss
20  word, it was -- it really just was kind of --
21     Q.  So --
22     A.  You didn't even listen.
23     Q.  It sounds like you're saying no one would
24  say -- pardon the expression -- no one would say to

Page 21

1  another employee "Fuck you."
2      A.  No.
3      Q.  That didn't happen.  Right?
4      A.  No, that didn't happen.
5      Q.  But they would say stuff like "I hate that
6  fucking customer" or something like that?
7      A.  Yeah.
8      Q.  Okay.  That was something that, as far as you
9  knew, was fairly common?
10     A.  It was used.
11     Q.  And generally wasn't something that offended
12  you?
13     A.  No.  I mean, don't get me wrong.  I'm not in
14  the habit of, you know, using it or listening to it.  I
15  do use it occasionally.  What someone else does with
16  their -- in their talking does not offend me.
17     Q.  I understand.
18         Because this was a pretty hard-driving
19  successful department, wasn't it?
20     A.  Yes, it was.
21     Q.  Was there a lot of pressure?
22     A.  Yes.
23     Q.  Was everybody pretty much under the same sort
24  of pressure?

Darlene Wilkins

9 (Pages 30 to 33)

## Page 30

1  with something. It's not like they would just walk up,
2  you know, and just be crude and say, you know -- pardon
3  the expression -- "How you doin', son of a bitch?" It's
4  not like that. Right?
5  A. No, it isn't.
6  Q. People would need to be tense and frustrated.
7  Right?
8  MR. COOK: Objection.
9  BY MR. MARCONI:
10  Q. Generally, they would do it?
11  A. On occasion, yes.
12  Q. Right. I'm not trying to trap you into saying
13  that it happens every day.
14  A. Mm-hmm.
15  Q. But when it happens, it's a situation where a
16  person is under stress and frustrated. Right?
17  A. Yeah.
18  Q. In your experience that's generally accepted
19  as long as it's a situation that's isolated and there's
20  frustration involved?
21  A. I will say, no, it's not accepted.
22  Q. Is anybody disciplined for it?
23  A. Not to my knowledge.
24  Q. That's always been the case?

## Page 31

1  A. As far as I know.
2  Q. Has anyone ever said anything to you when you
3  cursed in a disciplinary sort of manner?
4  A. "Anyone" meaning who?
5  Q. Anyone.
6  Q. Anyone in management?
7  Q. Anyone anywhere anytime.
8  Q. To me?
9  Q. Correct.
10  A. No.
11  Q. To anybody?
12  MR. COOK: Objection to the form.
13  A. Not that I'm aware of.
14  Q. Okay. But you did do it? You would get
15  frustrated and slam the phone and cuss?
16  A. On occasion.
17  Q. Okay. Ma'am, are you aware that Ms. Bailey
18  filed a claim of sexual harassment against someone at
19  Commerce?
20  A. Yes.
21  Q. When did you learn that?
22  A. I heard of that after Kim left.
23  Q. Who told you?
24  A. I don't know.

## Page 32

1  Q. Was that like something that was sort of
2  scuttlebutt around the office or was there an official
3  announcement or something?
4  A. No, there was no official announcement. It
5  was -- I just heard from a coworker.
6  Q. Kim didn't tell you. Right?
7  A. No.
8  Q. But it was sometime after Kim left?
9  A. Yes.
10  Q. Do you happen to know how long after Kim left?
11  A. No, I don't.
12  Q. You can't even estimate it?
13  A. I --
14  Q. A month? A week?
15  A. I don't know when I heard it.
16  Q. Okay. Is it possible that you heard it before
17  Kim left?
18  MR. COOK: Objection to the form.
19  BY MR. MARCONI:
20  Q. I can tell you, if it helps, that Kim left on
21  August 27th of 2003.
22  A. I don't know.
23  Q. You're not sure?
24  A. I don't know. I know I learned of it after

## Page 33

1  she left. I didn't know of it prior to that.
2  Q. Okay. And you don't remember how you found
3  out?
4  A. No. Somebody told me.
5  Q. Was it sort of like they kind of pulled you
6  aside and said, "Did you hear about this"? Is that how
7  it was?
8  A. Yeah. It would have been in general
9  conversation.
10  Q. Did that person tell you how they heard it?
11  A. I don't recall.
12  Q. You don't know who it was?
13  A. No.
14  Q. Was it somebody in MainStreet?
15  MR. COOK: Objection to form.
16  A. Yes. It would have been.
17  Q. Was it Mary Corcoran?
18  A. No, it wasn't.
19  Q. Was it Ms. Watson?
20  I know she's not in MainStreet.
21  A. No.
22  Q. No?
23  A. No.
24  Q. Val?

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006                                                    Bailey, Kimberly A. - Vol. 2

Page 301

1  inappropriate.
2      Q.  What were you wearing that day?
3      A.  I was wearing a pair of capri slacks, a red
4  undershirt which was sleeveless, with a jacket over top.
5      Q.  Did you take your jacket off while you were at
6  work?
7      A.  At 7:30 when I got there, yes, it was very hot.
8  I had taken my blazer off.  My intent was to wear it the
9  entire day.  Normally people don't arrive until closer to
10  8:00, 8:15.  I had turned the air down.  I was running
11  around doing a few reports that I do first thing in the
12  morning.  I had just walked in and it was still a little
13  bit warm.  I had taken my jacket off.
14      Q.  Isn't it a fact that Commerce policy does not
15  encourage or permit the use of profanities in the
16  workplace?  Yes or no?
17      A.  That may be their policy.
18          MR. TAMBUSSI:  Thank you.  Okay.  That's all
19  I have.
20              EXAMINATION
21  BY MR. MARCONI:
22      Q.  Ms. Bailey, you just testified that not using
23  profanity in the workplace may be their policy.  But was
24  it, in fact, their practice?

Page 302

1      A.  Every day.  Yes.
2      Q.  What do you mean by "every day, yes"?
3      A.  Every day someone used profanity in that
4  workplace.  If it was one of my subordinates, myself, a
5  producer who could be of a VP standing, everyone used
6  profanity.
7      Q.  I think you testified earlier that you heard Ms.
8  Corcoran use profanity in the workplace, correct?
9      A.  Yes.
10      Q.  And did she use the word "fuck"?
11      A.  Yes.
12      Q.  And to your knowledge, was anything whatsoever
13  done to her in the form of disciplinary action as a
14  result of the use of that word?
15      A.  No.
16      Q.  And was there an assistant director of the
17  MainStreet Division?
18      A.  Yes, Marge Phipps.
19      Q.  And did you ever hear Ms. Phipps use profanity in
20  the workplace?
21      A.  Every day.
22      Q.  Could you describe the kind of words and actions
23  that Ms. Phipps would engage in?
24      A.  Marge Phipps would have blow-ups or arguments

Page 303

1  with one of the individuals, particularly in the Randolph
2  office, Nick, I can't remember his last name.  She would
3  slam the phone down, scream, "Mother fucker," she said,
4  "I'm fucking sick and tired of this shit," and have to
5  get up and go get a smoke or something like that.
6          And that was on an almost a daily occasion
7  when the MainStreet and core business were interacting.
8      Q.  And would she ever speak disrespectfully or treat
9  other Commerce employees disrespectfully, either in
10  person or over the telephone?
11      A.  Yes.  Actually, she sat right next to Val Oakes
12  who would, on occasion, start bitching about something,
13  and Marge would lean over and yell at her and tell her to
14  shut up and get back to work, something along those
15  lines.  Profanity could have been used.  There was no
16  issues there.
17          But she would on occasion yell at Darlene
18  also, which Darlene and Marge had many years of tenure
19  together, so I think they were comfortable doing that
20  also.
21      Q.  Was that something that you personally overheard?
22      A.  Yes.
23      Q.  And did other people personally overhear that,
24  those kinds of exchanges you are referring to?

Page 304

1          MR. TAMBUSSI:  Objection to the form of the
2  question.
3      Q.  You can answer.
4      A.  Within the MainStreet Department, yes.
5      Q.  And do you know whether or not anyone was ever
6  asked to make a report to Ms. Corcoran or anybody else
7  concerning those events?
8      A.  Never, never.
9      Q.  Was any disciplinary action ever taken against
10  that individual?
11      A.  Marge Phipps, no.
12      Q.  Marge Phipps.
13      A.  Not that I'm aware of.
14      Q.  You still have your exhibits in front of you, I
15  notice.  Take a look at numbers 4 and 5, please.
16      A.  Okay.
17      Q.  Now, those are e-mails between the two of us
18  concerning your complaint about Mr. Duncan to Commerce,
19  correct?
20      A.  Yes.
21      Q.  Was it your understanding that making a complaint
22  to Commerce about sexual harassment by your supervisor,
23  who was also employed by Commerce, was something that
24  related to Commerce Insurance Services?  In other words,

33 (Pages 301 to 304)

Bailey v. Commerce National Insurance Services, Inc.
February 7, 2006                 C.A. # 05-CV-183 SLR                 Bailey, Kimberly A. - Vol. 2

Page 333

1  A.  And just kind of, you know, gave me the
2  I'm-not-doing-anything look.
3  Q.  Was Val giggling?
4  A.  Yes.
5  Q.  And who else was giggling?
6  A.  Dee Whalen.
7  Q.  Anybody else?
8  A.  Not that I -- I'm sure other people saw it, but I
9  was only paying attention to the two of them. I'm sure
10  everybody saw what happened or overheard what happened
11  because other people reported it.
12         But I went back to Julius' desk and I
13  continued to work. I spent another hour or so there.
14  Then I went over and did some other stuff, and the day
15  went on as a normal day.
16  Q.  Was that sort of event anything really different
17  than other things you had observed at Commerce that
18  involved other people?
19         MR. TAMBUSSI:  Objection to the form.
20  A.  That was a normal day within MainStreet.
21  Q.  And had you used profanity before?
22  A.  Yes.
23  Q.  And had you ever been disciplined for that
24  before?

Page 334

1  A.  I have not.
2  Q.  And I think you testified earlier that you had
3  heard other people use profanity in that same manner
4  before?
5  A.  Almost everyone in that building used profanity
6  almost every day.
7  Q.  And no one was disciplined for it?
8  A.  No one was disciplined.
9  Q.  Had you received any kind of warning of any kind
10  that that kind of language and that kind of conduct was
11  not permitted any longer or that they were trying to
12  change things around the office?
13  A.  I received no warning, no.
14  Q.  No discussions in that regard at all?
15  A.  No discussion of any changes in our conduct or
16  the way that we were doing things. As far as I knew,
17  everything was going along great in MainStreet.
18  Q.  And when you got your interview, I believe that
19  it was November of 2002, but it was your first and only
20  -- I'm sorry -- performance appraisal that you got.
21  A.  Okay.
22  Q.  In November of 2002, which was your first one as
23  a supervisor?
24  A.  It was my first one as a supervisor.

Page 335

1  Q.  Had you ever gotten another one?
2  A.  I believe that there was one other, because when
3  I first worked at Commerce, Glen Burchum was my
4  supervisor, and I started there in August, they gave the
5  reviews in November, and they gave me a bonus, and I am
6  sure I had a review or something like that. I don't
7  actually recall.
8  Q.  How about as a supervisor, had you only received
9  one review as a supervisor?
10  A.  Yes.
11  Q.  Do you know why you only got one as a supervisor?
12         MR. TAMBUSSI:  Objection. Objection to the
13  form.
14  A.  They schedule them in November. I was terminated
15  before my next scheduled review.
16  Q.  Okay. Had anybody ever told you that there was
17  anything wrong with the review that you received, that it
18  was inaccurate?
19  A.  No.
20  Q.  When you received that review, were you
21  conducting yourself in the same way that you were
22  conducting yourself on August the 12th of 2003?
23  A.  Yes.
24  Q.  Do you believe Mr. Duncan was aware curse words

Page 336

1  were being used in the department?
2  A.  Yes.
3         MR. TAMBUSSI:  Objection to the form.
4  Q.  And there was nothing in your review that said
5  that that wasn't appropriate?
6  A.  There was nothing in my review that indicated
7  profanity was inappropriate.
8  Q.  Again, Ms. Corcoran never said anything to you
9  about the use of profanity at all?
10  A.  No.
11  Q.  Was it you and Valerie Oakes that had a nickname
12  for each other?
13  A.  No. That was somebody else.
14  Q.  Who was the other person?
15  A.  Diane Schauber and Heather Pokoiski. It is
16  Chickadel now.
17  Q.  And did Ms. Whalen ever cuss or be involved in
18  using profanity?
19  A.  I'm sure she did. She wasn't one of our normal
20  sailors, but she will -- she would get angry with some of
21  the situations or producers we were dealing with.
22  Q.  How about Ms. Wilkins?
23  A.  Darlene, I don't think that she used that much
24  profanity. She would on occasion, shit or something

41 (Pages 333 to 336)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006                                    Bailey, Kimberly A. - Vol. 2

Page 337

1  along those lines. She, she is pretty funny.
2     Q.  In what way?
3     A.  Darlene was -- she was like the mom of the
4  department. And she would always talk to us about her
5  and her husband Skip and swinging from the chandeliers,
6  or she is sorry she is running late, her and Skip were
7  having -- going at it, having mad sex and stuff like
8  that.
9     Q.  So she would say that publicly in the department?
10    A.  Yes, and we would all laugh about it, giggle.
11    Q.  Was anybody ever disciplined for anything like
12 that?
13    A.  No.
14    Q.  How about Ms. Whalen, did she have any things
15 that you found funny or interesting about her?
16    A.  No. Dee is a good girl. She would on occasion
17 cuss. She wasn't a big yeller or screamer, but she is a
18 good girl. She would egg Darlene on. We all would egg
19 Darlene on, which would just make her story -- the fish
20 story would get bigger and larger and louder. But we
21 just all enjoyed each other.
22    Q.  Other than the meeting you had with Ms. Watson
23 and Mr. Morrissey after the termination --
24    A.  Of Mr. Duncan.

Page 338

1     Q.  -- that was in June of 2003, correct?
2     A.  I don't remember.
3     Q.  But it was the meeting at which you were told
4  that he was terminated?
5     A.  Yes.
6     Q.  Were you given any sort of memoranda or anything
7  in writing, e-mails, letters, anything in writing that
8  laid out their plan for you to help you get this fresh
9  start that you were talking about?
10    A.  No.
11    Q.  Did they ever specifically tell you what it was
12 that you had done wrong or what it was that displeased
13 them about your performance that led them to the
14 conclusion that you needed a fresh start or help in being
15 a better supervisor?
16    A.  They conveyed nothing to that matter.
17    Q.  Other than take some courses, were you
18 specifically instructed to do or not to do anything at
19 all in connection with your job in order to please
20 Commerce or make it understand that you were getting your
21 fresh start?
22        MR. TAMBUSSI:  Objection to the form.
23    A.  They didn't, they didn't tell me -- give me any
24 specific instructions, no, other than the classes.

Page 339

1     Q.  On the classes, you did go to the one, right?
2     A.  Yes.
3     Q.  Second one sounds like you mixed up the
4  scheduling?
5     A.  Yes.
6     Q.  Was that just an honest mistake?
7     A.  That was an honest mistake. That was my fault.
8     Q.  And then, well, the one that you did go to, that
9  sounded like, based on your testimony, that it was more
10 for the banking side?
11    A.  It was conducting a team meeting. That's the
12 name of the class, if I remember correctly. And there
13 were banking people there where they would talk about
14 banking situations, and how you would discuss certain
15 things in a team meeting scenario.
16        So when it came for my turn to talk about
17 conducting a team meeting, and I would want to talk about
18 insurance situations, the guy basically, the instructor
19 of the class apologized later, and at that time, in
20 stating that they don't know anything about insurance or
21 what we would talk about, so he didn't feel that the
22 class or the staying there or role playing would benefit
23 me, because there is no way that they could understand
24 what facing an X date would be.

Page 340

1         You know, for a bank teller to tell me,
2  well, you know that X date is really staring at me, you
3  know, so they had no idea in how to role play with me.
4     Q.  Did he offer to let you leave?
5     A.  No. I told him I drove over two hours to get
6  there. I wasn't just going to turn around and leave, or
7  leave. I was going to stay. I was told to go to the
8  class.
9     Q.  Now, were you given any choice in terms of what
10 classes you were to attend or were you just told that you
11 were going to attend certain classes?
12    A.  First Deb Watson had indicated there were some
13 classes she wanted me to go. Then she came back and
14 said, "Oh, those weren't available, but they were looking
15 for some other ones and they were trying to get you,
16 know, something put together."
17    Q.  My question is, though, regardless of what
18 classes they were, did you have any say in what classes
19 were selected for you or was that sort of imposed on you?
20    A.  They told me what classes to attend.
21        MR. MARCONI:  That's all I have for now.
22        RE-EXAMINATION
23 BY MR. TAMBUSSI:
24    Q.  Just a couple, Miss Bailey. Did you ever request

42 (Pages 337 to 340)

(302)655-0477

B 33

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2005                                    Bailey, Kimberly A. - Vol. 2

Page 329

1   that he lunged at you and kissed you --
2      A.  Yes.
3      Q.  -- did you intend that either one of you would
4   kiss when you got into his car?
5      A.  No.
6      Q.  Did you want him to kiss you when he kissed you?
7      A.  No, I did not.
8      Q.  How soon after he kissed you did you leave the
9   car?
10     A.  It wasn't very long.  It had -- I don't exactly
11  -- it wasn't, it wasn't that long.  It was thirty seconds
12  to a minute.  It wasn't very long at all.
13     Q.  Is it fair to say you were shocked when he did
14  it?
15     A.  I was floored, yes.  I was totally shocked.
16     Q.  Is it fair to say that you didn't want him to do
17  it again?
18     A.  Yes, that's very fair to say.  I didn't, I didn't
19  want his advancements.
20     Q.  In your response to certain written discovery
21  that was sent to you by Commerce, the various questions
22  you were asked to answer, the documents you were prepared
23  to supply, do you remember those?
24     A.  Vaguely, yes.

Page 330

1      Q.  The questions we call the interrogatories.
2      A.  Okay.
3      Q.  And the papers, of course, or the documents were
4   called document production requests.  Do you remember
5   those?
6      A.  Yes.
7      Q.  Sort of towards the end of your questioning by
8   Mr. Tambussi you were talking about basically your work
9   history from the time that you left Commerce.
10     A.  Yes.
11     Q.  And you sounded a little bit unsure and confused
12  and didn't recall certain things, as I recall.
13     A.  Okay.
14     Q.  Are you relying, though, on the information that
15  was set forth in that other discovery as being accurate,
16  rather than what you can sit here today and remember?
17     A.  Yes.  The other discovery is much more accurate,
18  yes.
19     Q.  When you made the infamous reaction on August the
20  12th of 2003 to Ms. Oakes inquiry -- well, actually,
21  let's back up.  Describe, if you will, the events of that
22  morning leading up to what happened, that reaction.
23     A.  My day started at Commerce about 7:30.  My
24  subordinates started at 8:30.  I would come in, run my

Page 331

1   reports.
2         I actually had two people out, if I remember
3   correctly, that day, and one called out sick, so I had
4   three customer service reps out.
5      Q.  Of how many?
6      A.  There is ten customer service reps.  I jumped
7   into Julius, because he was actually on his honeymoon, I
8   was in his desk working some of his backlog, just so when
9   he comes back he is not that far behind and if there is
10  any expiring issues that we don't put ours in an E&O
11  issue.
12        Valerie came walking in probably about 20
13  minutes, 15, 20 minutes late.  And I'm like, "Good
14  morning, Val."  You know, we gave that little rapport
15  back and forth, where she knows I'm aggravated with her.
16  She is like, "I'm here," you know, and she goes to her
17  desk.  And I'm actually on the phone with somebody, and
18  answering some questions, and somebody that's looking for
19  something that was due two days ago.  And it was always
20  very stressful, working Julius' work.
21        And Val yells across the two cubicles, "Kim,
22  Kim, come here."  I'm like, you know, "In a second."
23        So I get done what I was doing.  I go back
24  there.  And I look at her monitor and she is on the

Page 332

1   Internet.  She hasn't even signed into her e-mail, hasn't
2   signed on to her phone, which you have to sign on to so
3   you can get the calls to come through, because if you are
4   not signed on, they go -- they are either dumped onto
5   somebody else or they go into your voice mail.  And she
6   hasn't signed into Sagitta, which is our 800 number.
7         But she has a CIC website up on the
8   Internet.  And I look at her.  She goes, "I want to go to
9   this."  I said, "I ain't got fucking time for this shit.
10  You know what the procedures are, for requesting,"
11  whatever, and I walked away from her.  And in my walking
12  away, Dee Whalen was between the two of us, I hear Dee
13  laughing, and I turn around and Val is like this
14  (indicating).  It was Val's normal rapport to do this
15  (indicating).
16     Q.  For the record, you are --
17     A.  For the record, I'm giving the finger with both
18  hands and jerking them back and forth.
19     Q.  So, in other words, you believe that she was
20  giving you the finger when your back was turned?
21     A.  Yes.  Because they both were giggling and Val
22  took the smirk, you know, and gave me the straight face,
23  and --
24     Q.  I'm sorry.

Wilcox & Fetzer, Ltd.          Registered Professional Reporters          (302)655-0477

B 34

February 7, 2006                                                        Bailey, Kimberly A. - Vol. 2

Page 333

1   A.  And just kind of, you know, gave me the
2   I'm-not-doing-anything look.
3       Q.  Was Val giggling?
4       A.  Yes.
5       Q.  And who else was giggling?
6       A.  Dee Whalen.
7       Q.  Anybody else?
8       A.  Not that I -- I'm sure other people saw it, but I
9   was only paying attention to the two of them.  I'm sure
10  everybody saw what happened or overheard what happened
11  because other people reported it.
12          But I went back to Julius' desk and I
13  continued to work.  I spent another hour or so there.
14  Then I went over and did some other stuff, and the day
15  went on as a normal day.
16      Q.  Was that sort of event anything really different
17  than other things you had observed at Commerce that
18  involved other people?
19          MR. TAMBUSSI:  Objection to the form.
20      A.  That was a normal day within MainStreet.
21      Q.  And had you used profanity before?
22      A.  Yes.
23      Q.  And had you ever been disciplined for that
24  before?

Page 334

1       A.  I have not.
2       Q.  And I think you testified earlier that you had
3   heard other people use profanity in that same manner
4   before?
5       A.  Almost everyone in that building used profanity
6   almost every day.
7       Q.  And no one was disciplined for it?
8       A.  No one was disciplined.
9       Q.  Had you received any kind of warning of any kind
10  that that kind of language and that kind of conduct was
11  not permitted any longer or that they were trying to
12  change things around the office?
13      A.  I received no warning, no.
14      Q.  No discussions in that regard at all?
15      A.  No discussion of any changes in our conduct or
16  the way that we were doing things.  As far as I knew,
17  everything was going along great in MainStreet.
18      Q.  And when you got your interview, I believe that
19  it was November of 2002, but it was your first and only
20  -- I'm sorry -- performance appraisal that you got.
21      A.  Okay.
22      Q.  In November of 2002, which was your first one as
23  a supervisor?
24      A.  It was my first one as a supervisor.

Page 335

1       Q.  Had you ever gotten another one?
2       A.  I believe that there was one other, because when
3   I first worked at Commerce, Glen Burchum was my
4   supervisor, and I started there in August, they gave the
5   reviews in November, and they gave me a bonus, and I am
6   sure I had a review or something like that.  I don't
7   actually recall.
8       Q.  How about as a supervisor, had you only received
9   one review as a supervisor?
10      A.  Yes.
11      Q.  Do you know why you only got one as a supervisor?
12          MR. TAMBUSSI:  Objection.  Objection to the
13  form.
14      A.  They schedule them in November.  I was terminated
15  before my next scheduled review.
16      Q.  Okay.  Had anybody ever told you that there was
17  anything wrong with the review that you received, that it
18  was inaccurate?
19      A.  No.
20      Q.  When you received that review, were you
21  conducting yourself in the same way that you were
22  conducting yourself on August the 12th of 2003?
23      A.  Yes.
24      Q.  Do you believe Mr. Duncan was aware curse words

Page 336

1   were being used in the department?
2       A.  Yes.
3           MR. TAMBUSSI:  Objection to the form.
4       Q.  And there was nothing in your review that said
5   that that wasn't appropriate?
6       A.  There was nothing in my review that indicated
7   profanity was inappropriate.
8       Q.  Again, Ms. Corcoran never said anything to you
9   about the use of profanity at all?
10      A.  No.
11      Q.  Was it you and Valerie Oakes that had a nickname
12  for each other?
13      A.  No.  That was somebody else.
14      Q.  Who was the other person?
15      A.  Diane Schauber and Heather Pokoiski.  It is
16  Chickadel now.
17      Q.  And did Ms. Whalen ever cuss or be involved in
18  using profanity?
19      A.  I'm sure she did.  She wasn't one of our normal
20  sailors, but she will -- she would get angry with some of
21  the situations or producers we were dealing with.
22      Q.  How about Ms. Wilkins?
23      A.  Darlene, I don't think that she used that much
24  profanity.  She would on occasion, shit or something

41 (Pages 333 to 336)

**B 35**

Valerie Oakes

6 (Pages 18 to 21)

Page 18

1  might put the phone down and say "Bite me."
2      Q.  "Bite me"?
3      A.  You know what I mean.
4      Q.  Anything else?
5      A.  "I'm tired of this shit" or, you know, just
6  general --
7      Q.  Did you ever hear any --
8      A.  It was not unheard of.
9      Q.  Was the word "fuck" used?
10     A.  Yes.
11     Q.  A lot?
12     A.  Yes.
13     Q.  Did you use it?
14     A.  Yes.
15     Q.  Were you offended by the word "fuck"?
16     A.  No.
17     Q.  Are there any curse words that offend you?
18     A.  Well --
19     Q.  I'm not asking you to say them.
20     A.  -- I was going to say -- no.  I mean...
21     Q.  But "fuck" doesn't --
22     A.  It depends on what situation you're in.  I
23  mean, if somebody is saying them to me, yeah, it might
24  offend me.  But in general conversation in the world

Page 19

1  today, I've gotten used to people just using language
2  like that.
3      Q.  And you're used to it?
4      A.  I heard it.
5      Q.  You, in fact, use it yourself.  Right?
6      A.  Occasionally, yes.
7      Q.  And didn't pretty much everybody do it --
8  curse?
9      A.  At that time, yes.
10     Q.  What time are you referring to?
11     A.  At the time we all worked in the MainStreet
12  department together.
13     Q.  August of 2003?
14     A.  Right.
15     Q.  To your knowledge has anyone ever been
16  disciplined for cussing?
17         MR. COOK:  Objection to form.
18  BY MR. MARCONI:
19     Q.  You can answer it.
20     A.  Oh.  Not that I know of.  Except for Kim.  But
21  I wouldn't know if somebody was disciplined.  I mean,
22  they wouldn't do that in front of me.  They would take
23  someone in the office.  I wouldn't have known if somebody
24  was disciplined.

Page 20

1      Q.  Well, you would have known if they were
2  terminated.  Right?
3      A.  Yes, I would have known if they were
4  terminated.  Correct.
5      Q.  Or suspended or something like that?
6      A.  No.  I've never seen anybody suspended, so...
7      Q.  Did people use cuss words like "fuck" when
8  they were frustrated?
9      A.  Yes.
10     Q.  Did they direct that frustration at times to
11  other people in the office?
12     A.  It was not really to other people.  It was
13  more of a -- about the situation.
14     Q.  I'm not sure I understand that.
15     A.  In other words, if you were cussing in
16  frustration, it was more about the situation, about the
17  workload, about the -- it wasn't about people.  I mean,
18  we had a good team.  We had a good team.  People were
19  good to each other.  I mean, when you did say a cuss
20  word, it was -- it really just was kind of --
21     Q.  So --
22     A.  You didn't even listen.
23     Q.  It sounds like you're saying no one would
24  say -- pardon the expression -- no one would say to

Page 21

1  another employee "Fuck you."
2      A.  No.
3      Q.  That didn't happen.  Right?
4      A.  No, that didn't happen.
5      Q.  But they would say stuff like "I hate that
6  fucking customer" or something like that?
7      A.  Yeah.
8      Q.  Okay.  That was something that, as far as you
9  knew, was fairly common?
10     A.  It was used.
11     Q.  And generally wasn't something that offended
12  you?
13     A.  No.  I mean, don't get me wrong.  I'm not in
14  the habit of, you know, using it or listening to it.  I
15  do use it occasionally.  What someone else does with
16  their -- in their talking does not offend me.
17     Q.  I understand.
18         Because this was a pretty hard-driving
19  successful department, wasn't it?
20     A.  Yes, it was.
21     Q.  Was there a lot of pressure?
22     A.  Yes.
23     Q.  Was everybody pretty much under the same sort
24  of pressure?

B 36

Valerie Oakes

12 (Pages 42 to 45)

Page 42

1    Q.  Okay.  As soon as Kim said that, what did you
2   do?
3    A.  I got up and walked out of the cubicle, walked
4   out to the hallway.
5    Q.  Where's the hallway?
6    A.  I walked down this aisle, out here and down
7   the hallway, which is right out here.
8    Q.  Did you make any kind of gestures or say
9   anything under your breath or anything like that?
10    A.  I just got up and walked out.  I was
11   embarrassed.  I was angry.  And I just got up from my
12   desk and walked away.  That was it.
13    Q.  Did you cry?
14    A.  Probably.
15    Q.  In the hallway here?
16    A.  Probably.
17    Q.  Had you ever cried at work before?
18    A.  Mm-hmm.
19    Q.  Why?
20    A.  I have a tendency to cry if somebody screams
21   at me.
22    Q.  So people screamed at you at work before?
23    A.  I've gotten screamed at before, yeah.
24    Q.  By whom?

Page 43

1    A.  Kim, Steve.
2    Q.  Steve Duncan?
3    A.  Mm-hmm.
4    Q.  Anybody else?
5    A.  Not screamed directly towards me, no.
6    Q.  Well, how do they scream, then?
7    A.  Well, when your supervisor screams at you.  It
8   was either Kim or Steve.
9    Q.  Has Mary Corcoran ever screamed at you?
10    A.  Mary Corcoran wasn't there at the time.
11    Q.  No.
12       I mean, has she ever screamed?
13    A.  Has she ever screamed at me?
14    Q.  Yes.
15    A.  (The witness indicated.)
16    Q.  She has?
17    A.  Yes.
18    Q.  How many times?
19    A.  A couple.
20    Q.  Did you cry?
21    A.  Probably.
22    Q.  What did you do that she screamed at you
23   about?
24    A.  I'm trying to think.  I said something to one

Page 44

1   of the supervisors that I thought she was rude.
2    Q.  You said that?
3    A.  Yes.  I did.
4    Q.  Has anybody ever reported her screaming at
5   you?  When I say "her," I'm talking about Mary Corcoran.
6    A.  No.
7    Q.  Why not?
8       MR. COOK:  Objection to the form.
9    A.  Probably she screams in private.  She has
10   never screamed at me in front of people.
11    Q.  Oh, she screams at you in private.
12    A.  She'll bring you in her office or in the
13   conference room if she's going to say something to you.
14   So it was -- we're in private then.  Never out in the
15   middle of the floor.
16    Q.  If you counted up the times you got screamed
17   at, who screamed at you more, Kim or Mary?
18    A.  Probably Kim.
19    Q.  Close?
20    A.  No.  It was definitely more Kim.  It was a
21   different time back then.
22    Q.  How so?
23    A.  It was just a different atmosphere and a
24   different stress level.

Page 45

1    Q.  More stress back then?
2    A.  Different kind of stress.
3    Q.  How so?
4    A.  It was a -- back then it was fast-paced.  We
5   were drowning.  We were drowning in paperwork, and it
6   just kept piling up.  And we were drowning in phone
7   calls.  And it was just a very stressful place to work at
8   the time.
9    Q.  At the time that Kim said that to you on
10   August the 12th?
11    A.  Correct.
12    Q.  But since then did they hire more people?  Now
13   there's more people to spread the work around with?
14    A.  They've hired a few more people.  And the
15   work -- we -- when we took over MainStreet and started
16   with MainStreet, they were just bringing all the
17   paperwork down from another office in Randolph, and all
18   the phone calls that were going to those other offices in
19   Jersey were starting to come to us.  So it was a new
20   department.  We were taking over work from a whole bunch
21   of different locations.
22       Now everything is centralized.  So we
23   all have our own book of business the way we did then.
24   But back then it was get the work done.  It didn't matter

CORBETT & WILCOX

Darlene Wilkins

Page 14

1       A.    Marge Phipps.

2       Q.    Is Marge Phipps still there?

3       A.    Yes.

4       Q.    Is she?

5             Do you know what her job is now?

6       A.    She is an AVP.  She's in sales.

7       Q.    Have you ever heard Marge Phipps use curse

8    words at work?

9       A.    Yes.

10      Q.    Have you ever heard Marge Phipps slam down the

11   phone and scream?

12      A.    We all do that.

13      Q.    You all do it?

14      A.    Mm-hmm.

15      Q.    Have you always done it?

16      A.    When you get a client that drives you crazy,

17   you react.  You know what I mean?  So...

18      Q.    What?

19      A.    Not scream.  You don't scream.  I mean, you

20   get an irate client or somebody gets you angry, and you

21   just slam down the phone.

22      Q.    All right.  But let's just go back and talk

23   about Marge Phipps.

24      A.    Mm-hmm.

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

January 27, 2006                                    Bailey, Kimberly A. - Vol. 1

Page 46

1    maybe 8 months.
2       Q.  What happened after that 6- to 8-month period?
3       A.  A position became known to me that would be in
4    the Wilmington office that would be a promotion. I was
5    extremely interested in being able to -- buying into the
6    WOW and the Commerce. I loved my job there. I loved the
7    company.
8            To better myself, I became aware of a
9    position that because of my tenure I didn't know if I was
10   able to apply for that position. I believe that I spoke
11   with Deb Watson first and by the suggestion of Steve
12   Duncan to the fact that would I be allowed to apply for
13   the position, because my -- I think you had to be there a
14   year before you can post out or get promoted to a
15   different position or something along those lines.
16      Q.  Okay. Did someone tell you that there was a
17   position open?
18      A.  Steve Duncan did, yes.
19      Q.  This is during the period of time that you were
20   working with Mr. Burcham, correct?
21      A.  Yes, it was.
22      Q.  Was Mr. Duncan a co-worker of yours at that
23   time?
24      A.  Mr. Duncan had recently I guess came to

Page 47

1    Commerce. We were at a company outing for the Wilmington
2    office. They had reached their goals and they were
3    taking us to Smyrna to some restaurant. We had crabs and
4    beer and had an afternoon of I guess rewards for a good
5    year. At that time Mr. Duncan was first became aware of
6    in the Wilmington office and was sitting with Marge
7    Phipps. And somebody had asked who he was and then I
8    guess that's where it all started. And, actually, I
9    became aware through Steve, in talking with him and
10   introducing through whomever, that he was coming down to
11   start up a small business department.
12      Q.  So did you first meet Mr. Duncan at this lunch
13   in Smyrna?
14      A.  I don't believe I was actually introduced to him
15   at that time or maybe I was introduced, but it was just
16   an introduction. I didn't actually have time to go over
17   and say, hey, what's, you know, what's your deal, or to
18   find out anything more than what his name was and he was
19   heading up the small business.
20      Q.  How long had you been working for Commerce when
21   you first met Mr. Duncan?
22      A.  A little over 6 months.
23      Q.  Okay.
24      A.  It was under a year.

Page 48

1       Q.  Was Mr. Duncan already there or did he come
2    after you to Commerce?
3       A.  I believe he was employed after me.
4       Q.  Okay. So you started at Commerce in 2001?
5       A.  Yes.
6       Q.  Approximately six months later you meet
7    Mr. Duncan?
8       A.  I would assume -- yeah. That is correct.
9       Q.  You first met Mr. Duncan at this lunch?
10      A.  That's the first time that I had ever seen him,
11   yes.
12      Q.  All right. Then how long is it after this lunch
13   that Mr. Duncan told you about this other position?
14      A.  I will guess and say probably two, three weeks.
15      Q.  All right. Is that a guess or best estimate?
16      A.  That's my best estimate.
17      Q.  Okay. All right. You have known Duncan for two
18   to three weeks and he tells you that there's a position
19   available in Wilmington.
20      A.  He was talking about Commerce bringing the small
21   business department to the Wilmington office, that they
22   were looking to grow it. They needed someone to
23   supervise or to run that department -- supervise the
24   department for them.

Page 49

1       Q.  Let me see if I can break this down a little bit
2    more. You become aware that Mr. Duncan is working for
3    Commerce when you go to this luncheon where they are
4    eating crabs and beer, celebrating meeting their goal,
5    correct?
6       A.  Correct.
7       Q.  Approximately two to three weeks pass after that
8    and then he tells you that there's a potential job
9    opening for an aspect of the work in Wilmington, correct?
10      A.  Yes.
11      Q.  Okay. During this two- to three-week period
12   from the time you first met Mr. Duncan, what was his
13   position with Commerce with regard to you?
14      A.  He had -- his position to me was nothing. He
15   was a completely different department.
16      Q.  Okay. He didn't work with you at all?
17      A.  No.
18      Q.  Okay. Did he work in the same location as you?
19      A.  I believe, I guess when he first started he came
20   to the same location. I think the big thing was when he
21   went to the crab lunch everybody was like who in the heck
22   is that? Why is he here, coming on to our rewards? They
23   thought he was some bigwig at Commerce coming down and
24   checking up on everybody.

13 (Pages 46 to 49)

**B 39**

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

January 27, 2006                                    Bailey, Kimberly A. - Vol. 1

Page 70

1    Q.  Okay.  Now, when you start this new position,
2    does Mr. Duncan give you any more specificity as to what
3    your job duties are?
4    A.  I don't remember exact -- no.  I believe that --
5    no, he did not.
6    Q.  Okay.  And just so I understand how this part of
7    the business was structured, you have Mr. Duncan as a
8    manager of sorts?
9    A.  He was a director.
10   Q.  And then Ms. Phipps, what was her title?
11   A.  She was the assistant director.
12   Q.  Then there was you?
13   A.  Yes.
14   Q.  And you were manager?
15   A.  I was supervisor.
16   Q.  Supervisor.  Okay.  Who was beneath you?
17   A.  I had 10 -- well, immediately or at what time?
18   Q.  When you started.
19   A.  I believe when I finally made the move over to
20   the Main Street, releasing my responsibilities of the
21   core position, we had hired at that time two customer
22   service reps.
23   Q.  So initially there were two customer service
24   reps?

Page 71

1    A.  One was sales; one was customer service.
2    Q.  Two people --
3    A.  I'm sorry.  They both were sales.  Areceli and
4    Sharon both came over as sales.
5    Q.  What was the first name?
6    A.  A-r-e-c-e-l-i.
7    Q.  Those two people reported to you?
8    A.  Yes.
9    Q.  So initially there were two people reporting to
10   you?
11   A.  Yes.
12   Q.  Ultimately that grew to a greater number of
13   people?
14   A.  Fifteen.
15   Q.  Ultimately when you left you were supervising 15
16   people?
17   A.  I was supervising 10.
18   Q.  Okay.  15 reported to you?
19   A.  No.  I wasn't overseeing the sales department
20   anymore.  I was just overseeing customer service.
21   Q.  Initially when you become supervisor, you are
22   overseeing sales, there's two people.  Then more customer
23   service reps come in, correct?
24   A.  Yes.

Page 72

1    Q.  Then the sales group grows also, but you are no
2    longer supervising them?
3    A.  It wasn't until Mr. Duncan was terminated that
4    the sales was taken from me, the salespeople, the
5    supervisory position of the salespeople.
6    Q.  Now, when you became a supervisor, you
7    understood, did you not, that your responsibilities would
8    change somewhat from your previous position in Commerce?
9    A.  My -- yes.  I understood my responsibilities
10   would change.
11   Q.  You understood that you would be expected to
12   lead by example, correct?
13   A.  And that's exactly what I told Mr. Duncan in the
14   interview, is that -- he asked me what type of supervisor
15   I was.  I said I was the one that basically led by
16   example.
17   Q.  Okay.  You understood that Commerce itself, at
18   least from your orientation, had certain expectations on
19   how its employees should act in the workplace, correct?
20   A.  Yes.
21   Q.  And how its employee should dress in the
22   workplace?
23   A.  Yes.
24   Q.  You understood that?

Page 73

1    A.  Yes.
2    Q.  Okay.  When you start this job with Main Street,
3    did there come a time thereafter where you socialized in
4    any way, shape or form with Mr. Duncan?
5    A.  Socialize, what do you mean?
6    Q.  Anything where you met with Mr. Duncan, either
7    by yourself or others outside of the workplace.
8    A.  Any outside -- anything outside of the office
9    was something that was work related or work gathering.
10   It wasn't -- there wasn't a meeting outside of work,
11   outside of the office that was social between Mr. Duncan
12   and myself.
13   Q.  Did you ever attend any activities outside of
14   the office with Mr. Duncan where work was not discussed?
15   A.  No.
16   Q.  All right.  Tell me about the events that
17   occurred after you started in Main Street outside of the
18   office where Mr. Duncan was in your company, even if
19   others were present?
20   A.  I don't follow your question.
21   Q.  Fair enough.
22   A.  Do we have a specific?
23   Q.  All right.  Sometime in 2002 you are working
24   directly for Mr. Duncan, correct?

19 (Pages 70 to 73)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

January 27, 2006                                    Bailey, Kimberly A. - Vol. 1

Page 74

1    A.  Yes.
2    Q.  At some time thereafter you were at events,
3  activities, get-togethers, where Mr. Duncan was also
4  present outside of the workplace, correct?
5    A.  Yes.
6    Q.  Tell me what they were, when they occurred and
7  who else was there.
8    A.  The majority of the events were carrier related
9  where marketing reps would want to take the department as
10  a whole out on a social event.
11    Q.  Tell me what they were, where they occurred,
12  when, who was there.
13    A.  I don't remember exactly all of them.
14    Q.  How many?
15    A.  I couldn't give you a number.
16    Q.  More than 20?
17    A.  I don't believe so, but I couldn't give you a
18  number.
19    Q.  How about more than 10?
20    A.  I don't remember.
21        MR. MARCONI:  Can I lodge an objection?
22  Sort of ask for a clarification.  Do you mean other than
23  what's already been identified in the sexual harassment
24  complaint or in our complaint in the District Court?

Page 75

1    A.  Approximately 8 weeks or -- you know, I don't
2  know.  I don't recall.
3    Q.  For how long of a period of time did you work
4  for Ms. Corcoran?
5    A.  I don't recall when Mr. Duncan was terminated.
6    Q.  My question is -- I'm sorry.  Did you finish?
7    A.  Up until when Mary took the gap between
8  Mr. Duncan leaving and Mary coming and my termination, I
9  don't recall the exact number.
10    Q.  I'm not asking for exact.  Can you give me your
11  best approximation of the period of time that you worked
12  under the supervision of Ms. Corcoran?
13    A.  Under Ms. Corcoran?  I honestly -- it wasn't
14  long.
15    Q.  Eight weeks?
16    A.  I don't remember.
17        MR. MARCONI:  I'm going to object and
18  instruct her not to answer.  This is all information that
19  is within Commerce's records.
20        MR. TAMBUSSI:  Don't give a speaking
21  objection.  You objected.
22        MR. MARCONI:  Well, I'm going to object and
23  instruct her not to answer the question.
24        MR. TAMBUSSI:  Are you asserting some sort

Page 76

1        MR. TAMBUSSI:  I mean what she recalls.
2        MR. MARCONI:  Sitting here this minute?
3        MR. TAMBUSSI:  Sitting here today what she
4  recalls.
5  BY MR. TAMBUSSI:
6    Q.  Were there more than 5 events outside the
7  office?
8    A.  I couldn't give you an exact number.
9    Q.  Do you have an estimation?
10    A.  No.
11    Q.  Okay.  For how many months did you work under
12  Mr. Duncan's supervision?
13    A.  From the beginning up until his termination.
14    Q.  How many months was that?
15    A.  I don't know.
16    Q.  More than 15, 18 months?
17    A.  I don't remember the exact date of his
18  termination.
19    Q.  Do you remember the exact date of your
20  termination?
21    A.  August 27, 2003.
22    Q.  Was Mr. Duncan terminated before you?
23    A.  Yes.
24    Q.  How far before you was Mr. Duncan terminated?

Page 77

1  of privilege?
2        MR. MARCONI:  No.  They are asked and
3  answered and I think you are trying to harass her.  You
4  are asking her the same question.  It's all just in a
5  different way.
6        MR. TAMBUSSI:  I'm asking her questions in
7  a way to try to refresh her recollection.
8        MR. MARCONI:  She's --
9        MR. TAMBUSSI:  I am entitled to test her
10  recollection and that's part of the deposition process.
11  She makes very serious allegations.  These are what she
12  claims to be very serious events and she has no idea of
13  the time frames involved.  I think that's very relevant
14  and it also goes to her credibility.
15        Now, you have instructed her not to answer.
16  You can assert that.  There's no privilege being
17  asserted.  You made an additional statement.  I'll move
18  on, but the fact of the matter is I'm entitled to probe
19  her recollection.
20        MR. MARCONI:  I agree.  But if she says to
21  you sitting here today she can't tell you the period of
22  time that she worked for a particular individual three
23  years ago, I think you should just take the answer as I
24  don't know, I don't remember.

20 (Pages 74 to 77)

Bailey v. Commerce National Insurance Services, Inc.
January 27, 2006                C.A. # 05-CV-183 SLR                Bailey, Kimberly A. - Vol. 1

Page 78

1       MR. TAMBUSSI: Counsel, you can take your
2   depositions the way you like, but I think I'm entitled to
3   probe her testimony and her recollection by using
4   whatever means possible to try to refresh her. That's
5   what I've done. If you don't like that, that's fine.
6   You stated your objection for the record.
7       MR. MARCONI: All right. For the record, I
8   think that your tactics are abusive and I don't think
9   it's necessary.
10      MR. TAMBUSSI: That can be your opinion,
11  Counsel.
12  BY MR. TAMBUSSI:
13      Q. Ms. Bailey, do you recall any of the carriers
14  that you say organized an event outside of the workplace
15  that involved your --
16      A. CNA.
17      Q. When did that occur?
18      A. I don't have an exact date.
19      Q. Okay. Did it occur shortly after you came to
20  work for Mr. Duncan or towards the period of time when
21  you were working for Ms. Corcoran?
22      A. It was during the time that I worked for
23  Mr. Duncan.
24      Q. Okay. Where was this event at?

Page 79

1       A. The marketing rep from CNA would try to do
2   something with us monthly.
3       Q. Do you recall having monthly events with the
4   folks from CNA?
5       A. I said she would try to do something with us
6   monthly. I don't believe we were able to do something
7   with every visit.
8       Q. Do you recall the number of times that CNA
9   organized an event?
10      A. No. Do not.
11      Q. Do you recall going to more than one event
12  organized by CNA?
13      A. Yes, I do.
14      Q. To your best recollection, approximation, how
15  many events organized by CNA did you go to?
16      A. I don't remember exactly.
17      Q. Where did these events occur?
18      A. The events would occur at local taverns or bars.
19      Q. Tell me which locations.
20      A. In particular, I can remember one at Backstage
21  Cafe and another one at BBC, which was the Brandywine
22  Brew Club.
23      Q. Just have recollection of two, correct?
24      A. That's my -- I can recall two.

Page 80

1       Q. Can you tell me when the Backstage event
2   occurred in relationship to the time that you first
3   started working with Mr. Duncan?
4       A. It was warm outside, so it had to be summertime.
5   I don't know an exact date.
6       Q. If you started with Mr. Duncan sometime July,
7   August 2002, would it be during that time frame?
8       A. I can't -- I don't have an exact date. I don't
9   have --
10      Q. You have no approximation as we sit here today?
11      A. I know it was summer. And we had already
12  established a work force of 15. Starting from two, we
13  had several months of interviewing and hiring and
14  training all these people. So...
15      Q. The answer is no, you have no approximation of
16  when it occurred?
17      A. It was in the summer of 2002.
18      Q. Who was there?
19      A. I don't remember exactly who was all there.
20      Q. Do you remember Mr. Duncan being there?
21      A. Mr. Duncan was there.
22      Q. Do you recall yourself being there?
23      A. I was there.
24      Q. Was Ms. Phipps there?

Page 81

1       A. I believe, but I can't imagine what why she
2   wouldn't be there. So, yeah, I'm sure she was there.
3       Q. Is that a guess on your part?
4       A. It's a guess.
5       Q. Who was there from CNA?
6       A. Jennifer Palmieri.
7       Q. What is it about this event that enables you to
8   recall that an event occurred at Backstage?
9       A. CNA was the only carrier that would actually,
10  that would try and produce events that were after work.
11  The majority of the other carriers would produce lunch or
12  do something and bring something in for the team. This
13  was just one summer after work that I remember going with
14  the group of girls down to Backstage Cafe.
15      Q. Group of girls and Mr. Duncan?
16      A. And Mr. Duncan.
17      Q. Was he the only male there?
18      A. I believe Julius Bland was also a customer
19  service representative, that he went down with us.
20      Q. Did he report to you?
21      A. Yes, he did.
22      Q. Okay. For how long were you there?
23      A. I don't remember exactly.
24      Q. Approximately?

21 (Pages 78 to 81)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

January 27, 2006                                        Bailey, Kimberly A. - Vol. 1

Page 82

1    A.   I don't remember.
2    Q.   Can we say that it occurred after 5:00?
3    A.   It occurred after 5:00.
4    Q.   Do you recall about what time you got home that
5    night?
6    A.   No, I don't.
7    Q.   Do you recall whether or not you were one of the
8    first people to leave or one of the last people to leave?
9    A.   I was probably in the middle.
10   Q.   Okay.  And did you leave at the same time that
11   anyone else left?
12   A.   Not that I -- I don't recall.
13   Q.   You don't recall leaving alone or leaving with
14   anyone?
15   A.   No, I don't.  I don't recall if anyone left at
16   the same time as I did.
17   Q.   Do you recall walking out of the establishment
18   with anyone?
19   A.   Do I recall walking out of the establishment?
20   Q.   That's the question.
21   A.   I don't think that I visually see myself.  I
22   know I left.  So, no, I guess I don't actually recall it.
23   Q.   Okay.  Did you have anything to drink that night
24   of an alcoholic beverage nature?

Page 83

1    A.   I'm sure I had a beer.
2    Q.   One beer or more than one?
3    A.   I'm sure I had more than one beer.
4    Q.   Okay.  And did you have any interaction with
5    Mr. Duncan whatsoever that night?
6    A.   What type of -- speaking with him after work
7    or --
8    Q.   Anything.  Do you understand what the word
9    "interaction" means?
10   A.   I think it could be defined different ways.
11   Q.   Did you have any interaction whatsoever of any
12   nature, regardless of the definition, with Mr. Duncan
13   that night?
14   A.   I'm sure I told him good night or something
15   along those lines or I'm leaving.  I don't think that I
16   had any other conversation with him.
17   Q.   Well, what conversation did you have with him?
18   A.   We could have talked about what our -- what the
19   CNA market, what their appetite was, what they're writing
20   more than they are not writing and trying to incent the
21   sales people and getting them ideas on which way to look
22   at a risk.
23   Q.   Is that a guess on your part?
24   A.   It's a guess probably on what the conversation

Page 84

1    would have been, but normally that's what they would be
2    like, having the CNA --
3    Q.   I want to focus on this event and what words you
4    recall speaking with Mr. Duncan.
5    A.   I don't recall exact words.
6    Q.   Do you recall having any conversations non-
7    business related that night with Mr. Duncan?
8    A.   No.  I do not.
9    Q.   Did you have any conversation with Ms. Palmieri
10   that night?
11   A.   Yes, I did.
12   Q.   What was the nature of that conversation?
13   A.   More than likely work.  It was business related.
14   We would have been talking about either work related or
15   just other -- how are the kids doing.  She was a very
16   friendly marketing rep.
17   Q.   You said we would have been talking.  Do you
18   have any recollection?
19   A.   I have no recollection, no.
20   Q.   Anything else you recall about this specific
21   event at Backstage?
22   A.   No.
23   Q.   All right.  Tell me about the Brandywine Brew
24   Club event?  Did that occur before or after the CNA

Page 85

1    Backstage event?
2    A.   I believe it was after.
3    Q.   Okay.  Was Mr. Duncan present there?
4    A.   Yes, he was.
5    Q.   Were your other co-workers present?
6    A.   Other co-workers were present.
7    Q.   People that you supervised were there?
8    A.   Yes.
9    Q.   Was Mr. Duncan the only male there?
10   A.   I don't remember exactly.
11   Q.   Was Ms. Palmieri there?
12   A.   Yes, she was.
13   Q.   Do you have any recollection whatsoever of
14   anything that transpired that night?
15   A.   No.  An exact recollection, no, I do not.
16   Q.   Did you drink any alcoholic beverages that
17   night?
18   A.   Yes.
19   Q.   What did you drink?
20   A.   Beer.
21   Q.   A beer or more than one?
22   A.   Probably more than one beer.
23   Q.   How long did that event last?
24   A.   I don't remember.

22 (Pages 82 to 85)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

January 27, 2006                                        Bailey, Kimberly A. - Vol. 1

Page 86

1    Q.   More than one hour?
2    A.   I don't remember.
3    Q.   More than two hours?
4    A.   I don't remember.
5    Q.   Did you have any interaction, by whatever
6    definition you want to put to that word, with Mr. Duncan
7    that night?
8    A.   Other than conversation. That was the
9    interaction was conversation.
10   Q.   What was the subject of the conversation?
11   A.   Work related.
12   Q.   Solely work related?
13   A.   I don't remember exactly.
14   Q.   Could it have been something other than work
15   related?
16   A.   I don't remember.
17   Q.   Could have been?
18   A.   I don't remember.
19   Q.   You don't contend, do you, that Mr. Duncan did
20   anything inappropriate as to you on the night of the
21   Backstage event that you referred to here, that CNA
22   hosted?
23   A.   Did he do anything inappropriate to me?
24   Q.   Yes.

Page 87

1    A.   No.
2    Q.   You don't make any contention that on the
3    occasion that you were in Mr. Duncan's company at the
4    Brandywine Brew Club that anything inappropriate occurred
5    to you from Mr. Duncan?
6    A.   No.
7    Q.   All right. Tell me some more events that
8    occurred outside of the workplace where Mr. Duncan was
9    present and you were present during the period of time
10   that you worked for Mr. Duncan other than these two.
11   A.   There was an occasion where we had a marketing
12   rep come down from -- Hanover I believe was the carrier
13   and Mr. Duncan wanted me to go out with him and this
14   marketing rep --
15   Q.   Okay.
16   A.   -- after work.
17   Q.   When did that occur?
18   A.   I don't remember the exact date.
19   Q.   Do you have an approximation?
20   A.   I have no approximation.
21   Q.   Was this a significant event work-wise?
22   A.   No. Significant by what standards?
23   Q.   I mean, you have a Hanover rep coming down and
24   you are going to meet and talk about business presumably,

Page 88

1    correct?
2    A.   Exactly.
3    Q.   Did the Hanover people come down and take you
4    out or take people from Commerce out frequently?
5    A.   It was my understanding they did, but I had no
6    immediate or -- I had no knowledge of what their
7    activities were.
8    Q.   This is the first time that you were meeting
9    with a Hanover rep after work to talk about business,
10   correct?
11   A.   We initially met at the office and Mr. Duncan
12   had made arrangements with Mr. Durham to go out
13   afterwards and asked me to join.
14   Q.   Was this the first time that you were asked to
15   join Mr. Duncan in meeting with a rep of an insurance
16   company?
17   A.   No.
18   Q.   Okay. Is this the first time that you went out
19   with Mr. Duncan and a rep of an insurance company after
20   work?
21   A.   No.
22   Q.   How many times had you gone out with reps of
23   insurance companies prior to this with Mr. Duncan after
24   work?

Page 89

1    A.   I don't have an exact number, but an example
2    would be the CNA outing.
3    Q.   With what frequency did you meet with members,
4    representatives from insurance companies and go out with
5    them after work in Mr. Duncan's company?
6    A.   I don't have an exact number. To my
7    recollection, it wasn't that frequent.
8    Q.   Was it more than once a week?
9    A.   No -- I don't know how often. It wasn't that
10   often.
11   Q.   Was it more than twice a month?
12   A.   I don't remember.
13        (Ms. Watson has left the deposition.)
14   BY MR. TAMBUSSI:
15   Q.   As we sit here today, your testimony under oath,
16   you can't recall the number of times that you went out
17   with Mr. Duncan and insurance company reps during the
18   period of time that you worked with Mr. Duncan?
19   A.   An exact number, no. I could not recall.
20   Q.   Can you give us an approximation?
21   A.   No. I could not.
22   Q.   You can't identify any frequency with
23   relationship to weeks or months?
24   A.   No. It wasn't scheduled or it wasn't -- there

23 (Pages 86 to 89)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

January 27, 2006                                              Bailey, Kimberly A. - Vol. 1

Page 90

1    wasn't a certain frequency it would go by.
2        Q.    When you went out with this Hanover rep, where
3    did you go?
4        A.    We initially went to Backstage Cafe.
5        Q.    And it was just the three of you, Mr. Duncan,
6    Mr. Durham, and yourself, correct?
7        A.    No.  My girlfriend Cindy met us.
8        Q.    What is her last name?
9        A.    Smith.
10       Q.    Where does Ms. Smith reside?
11       A.    She resides in Apollo, Pennsylvania.
12       Q.    Okay.  Where did she reside at the time of this?
13       A.    Claymont.
14       Q.    Do you have Ms. Smith's phone number?
15       A.    Yes, I do.
16       Q.    What is it?
17       A.    I don't know it offhand.
18       Q.    Okay.  If I made a request, you could find it?
19       A.    Yes, I could.
20       Q.    How did Ms. Smith come to meet you there?  Did
21   you call her?
22       A.    Yeah.  I asked her to meet us there.  It was
23   Mr. Duncan's request, actually.
24       Q.    Mr. Duncan asked you to have Ms. Smith come?

Page 91

1        A.    Yeah.
2        Q.    How did Mr. Duncan know Ms. Smith?
3        A.    I guess in me talking about her.  I don't know
4    if -- I believe that they had met one other time.
5        Q.    What other time did they meet?
6        A.    I guess on another outing when we were at the
7    Backstage Cafe.
8        Q.    Ms. Smith didn't work for Commerce, did she?
9        A.    No.  She did not.
10       Q.    How was it that Ms. Smith would be invited to
11   these carrier-sponsored events at Backstage?
12       A.    I would tell her to either meet me there and we
13   would go somewhere else, because she was a girlfriend and
14   we palled around.  So whenever I was done with my work
15   function, I would go out with my girlfriends.
16       Q.    You told me that these functions that the
17   carriers had for after work were work related, correct?
18       A.    Yes.
19       Q.    Was Ms. Smith invited into these work-related
20   functions, even though she wasn't an employee of
21   Commerce?
22       A.    No.  She wasn't invited in.  She would either
23   meet us there and I would talk to her.  It wasn't -- it
24   wasn't, you know -- it was a social outing.

Page 92

1        Q.    How many times had Ms. Smith met Mr. Duncan
2    prior to this Hanover event?
3        A.    I don't recall.  I believe it was once.
4        Q.    You as we sit here today have specific
5    recollection of Mr. Duncan telling you to call Cindy
6    Smith and telling her to meet you at the Backstage?
7        A.    Yes.
8        Q.    Did you tell Ms. Smith why they wanted,
9    Mr. Duncan wanted her to meet you there?
10       A.    I think Mr. Duncan's thought was that there were
11   two gentlemen, there should be two women.
12       Q.    Did he say that to you?
13       A.    No.  He did not.  It was --
14       Q.    So that's an assumption?
15       A.    It was the assumption that I took, that I might
16   be uncomfortable going out with two gentlemen.  To have a
17   friend there for me.
18       Q.    It was your assumption that Mr. Duncan was
19   looking out for your well-being?
20       A.    I guess you could say that.
21       Q.    No, you said that.
22       A.    Yeah.
23       Q.    So did Ms. Smith meet you there?
24       A.    Yes.

Page 93

1        Q.    How long did you stay?
2        A.    We stayed at Backstage maybe an hour and then we
3    went to a different bar.
4        Q.    Did you have anything to drink at Backstage?
5        A.    Yes.
6        Q.    What did you have to drink?
7        A.    I would assume it was a beer.
8        Q.    A beer or more than one?
9        A.    Probably one.
10       Q.    Just one.  Where did you go after that?
11       A.    Kid Shelleen's.
12       Q.    I'm sorry?
13       A.    Kid Shelleen's.
14       Q.    What's that?
15       A.    It's a local restaurant, tavern, bar.
16       Q.    Did you sit down and have a meal?
17       A.    I don't recall.  I don't know if we ordered
18   appetizers or not.  I don't recall.
19       Q.    Did you sit at the table or at a bar?
20       A.    At the bar.
21       Q.    Okay.  Did you have anything to drink there?
22       A.    Yes.
23       Q.    What did you have?
24       A.    Probably a beer.

24 (Pages 90 to 93)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

January 27, 2006                                                      Bailey, Kimberly A. - Vol. 1

Page 130

1 that one incident where he kissed me and had asked him
2 that he's my boss and I didn't want any advances that
3 way.
4     Q.   Okay.  When you say I finally did get in touch
5 with him --
6     A.   The day he had kissed me and I tried to approach
7 him asking him, you know, if we could talk, he wasn't at
8 work or he wasn't in the office, our office that day.
9 There was plenty of times he spent time up in New Jersey.
10 When I was able to get ahold of him and have a moment and
11 said, can we go to lunch or can we get out of the office
12 so that I can talk to you, he evaded me for a little bit,
13 because I'm sure he knew I wanted to talk about that.
14 But then finally within the next week we did make it to
15 lunch.
16     Q.   So you initiated a lunch with Mr. Duncan?
17     A.   Yes, I did.
18     Q.   Okay.  How long was it between this Bank Shots
19 occurrence and that lunch?  Weeks?
20     A.   I believe it was within, it was within the next
21 week.  So that week ended up where he was either out of
22 the office one day and then the next day he didn't have
23 time to -- I didn't have the correct time in private to
24 say, you know, I'd like to have a lunch with you to

Page 131

1 discuss some things.  So that week had ended and it was
2 with the next week that we had lunch.
3     Q.   Where did you go for lunch?
4     A.   Bull's Eye.
5     Q.   What's that?
6     A.   It's a little roast beef joint on Kirkwood
7 Highway.
8     Q.   Do they serve alcohol there?
9     A.   Yes.
10     Q.   Did you have any at lunch?
11     A.   No.
12     Q.   Did Mr. Duncan?
13     A.   I don't believe that he did, no.
14     Q.   Tell me what you said and he said at that lunch.
15     A.   It was, the drive over was fairly quiet.  We got
16 into the restaurant.  Mr. Duncan drove.  And I had
17 insinuated to -- I said to him -- I didn't insinuate.  I
18 said to him, "You are my boss.  I don't eat where I
19 shit."  And I don't, you know, I don't want any
20 advancement -- I asked him that, did he offer me this
21 opportunity, this career opportunity because he was
22 attracted to me or was there anything along those lines?
23 He had indicated, no, that there was not.  He apologized.
24 He understood what my parameters were.  And he indicated

Page 132

1 that it wouldn't happen again.
2     Q.   Okay.  You left the lunch --
3     A.   We finished lunch up.  From what I understood,
4 it was understood.
5     Q.   So then when you went out with Ms. Smith and
6 Mr. Duncan and Mr. Durham after that --
7     A.   After that.
8     Q.   -- did you attempt to have a similar
9 conversation?
10     A.   That's why I took his hand out of and I held on
11 to it, so he would not touch me.
12     Q.   Did you have any further discussion with him
13 after that event?
14     A.   After?
15     Q.   Like the lunch you had at Bull's Eye?
16     A.   No.  The Bull's Eye was the only actual time
17 that I said, you are my boss, I'm your subordinate.  Do
18 not do that.  That's not where I want -- that's not what
19 I wanted out of this opportunity.
20     Q.   So then you go to this Travelers event.  You
21 drive for a couple hours down.  Anything significant
22 happen on the hour -- the drive?
23     A.   Mr. Duncan asked me to masturbate in front of
24 him or something like that.  He stuck his hand between my

Page 133

1 legs and asked if I were to masturbate, how would I
2 masturbate.  I told him I would not masturbate in front
3 of him.
4     Q.   How far in the ride were you when he made this
5 comment?
6     A.   I don't know exactly how far into the ride it
7 was.
8     Q.   You ultimately got to the event?
9     A.   We ultimately got to the event.
10     Q.   Anything happen there?
11     A.   As far as him touching me at the event?
12     Q.   Anything.
13     A.   Nothing that I can recall happened at the event.
14     Q.   Okay.  There were other Commerce people there,
15 though?
16     A.   There were other Commerce people there.
17     Q.   Did you at any time indicate to any of the other
18 Commerce people there that you believed Mr. Duncan was
19 acting inappropriately?
20     A.   No, I did not.
21     Q.   Okay.  This was on a Saturday?
22     A.   This was on a Saturday.
23     Q.   Okay.  At some point in time the event ended and
24 you needed to come back to Christiana Mall, correct?

34 (Pages 130 to 133)

B 46

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006                    C.A. # 05-CV-183 SLR                    Bailey, Kimberly A. - Vol. 1

Page 122

1  A. I don't have a specific recollection of what our
2  discussion was, but I knew that it was in disgust or
3  disbelief of what had happened.
4  Q. All right. Did you say anything to Mr. Duncan
5  in that car?
6  A. No. I started to -- I began to speak and that's
7  when he lunged over.
8  Q. Okay. How about after that, after Ms. Smith
9  knocked on the window?
10  A. She knocked on the window. I was in such shock,
11  I just opened -- I believe that her words were, "what are
12  you doing, get out of there," you know, or something
13  along those lines. And I just opened the door and got
14  out.
15  Q. Mr. Duncan drove away?
16  A. Yes.
17  Q. Do you recall what day of the week this
18  occurred?
19  A. I do not.
20  Q. The next day you went to work, did you contact
21  anybody, anyone in Commerce to tell them that this event
22  occurred?
23  A. I tried to speak with Mr. Duncan. He was not
24  there that day. I did not contact anyone else.

Page 123

1  Q. Did you contact anybody in law enforcement?
2  A. No.
3  Q. Did you tell anyone, other than Ms. Smith who
4  observed what you say happened, that this event occurred?
5  A. Besides Lynn and Tim, no.
6  Q. Did you tell anybody in the workplace?
7  A. No.
8  Q. Okay.
9  A. I was embarrassed.
10  Q. Did you tell Ms. Phipps?
11  A. No. I did not. I was embarrassed.
12  Q. How about any of the people that worked for you?
13  A. No. I did not.
14  Q. But you were aware that Commerce has a phone
15  number that you can call if you feel that there's -- you
16  have some problems in the workplace?
17  A. I don't know that there's an exact phone number.
18  I'm sure there's someone you can contact.
19  Q. But you didn't do that?
20  A. No. I did not.
21  Q. Okay. How much time went by between this event
22  occurring and the time you were out with Mr. Durham and
23  Ms. Smith?
24  A. I don't have -- I know it is written down there

Page 124

1  somewhere. I don't know what the exact time is.
2  Q. Was it weeks or months?
3  A. I don't know.
4  Q. This is the same Ms. Smith who you called to go
5  out with Mr. Duncan and Mr. Durham who witnessed this
6  event at Bank Shots?
7  A. Yes.
8      MR. TAMBUSSI: Okay. I need to take a
9  short break.
10      (Discussion off the record.)
11      (Luncheon recess from 12:07 to 12:50 p.m.)
12  BY MR. TAMBUSSI:
13  Q. Ms. Bailey, we are back on the record after a
14  brief lunch break. Thus far you told me that you have
15  been out with Mr. Duncan on four different occasions
16  after work hours that you can recall, this Backstage
17  event with your friends, the Hanover Durham meeting --
18  A. Yes.
19  Q. -- and then two events that you recall, one at
20  Backstage, one at Brandywine Brew Club that CNA was
21  somehow involved with?
22  A. Yes.
23  Q. Can you recall any other times that you were
24  with or in the company of Mr. Duncan outside of the

Page 125

1  workplace?
2  A. There was the Travelers event where we went to
3  the Seniors golf outing.
4  Q. When did that occur?
5  A. I don't recall the date.
6  Q. Do you recall the month?
7  A. No.
8  Q. Do you recall the year?
9  A. No, I don't.
10  Q. Do you recall where it occurred?
11  A. In Maryland.
12  Q. All right. Was Travelers sponsoring or hosting
13  that event?
14  A. I don't believe that they were sponsoring it.
15  They were a vendor or a venue at the outing. They had a
16  tent.
17  Q. Okay. Did this occur after work hours? During
18  work hours?
19  A. This was on a Saturday.
20  Q. Okay. Were there any other folks from Commerce
21  there?
22  A. Yes, there were. I don't recall their names.
23  Q. Were you the only person from your group with
24  Mr. Duncan?

32 (Pages 122 to 125)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006

C.A. # 05-CV-183 SLR

Bailey, Kimberly A. - Vol. 1

Page 126

1    A.  Yes.
2    Q.  How did you come to go to that event?
3    A.  Chris Link, who was the Travelers marketing
4    representative, had offered to Steve tickets to attend
5    the Seniors Open Tour I believe is what it is called.
6    Q.  "Steve" meaning Mr. Duncan?
7    A.  Yes.
8    Q.  Okay.  How many tickets did he offer?
9    A.  I don't know that for exact.
10   Q.  Okay.  How did you come to learn of the event?
11   A.  Mr. Duncan asked me if I would like to attend.
12   Q.  Now, this Travelers event, was it before or
13   after the time that you were first at Backstage and then
14   at Bank Shots?
15   A.  It was after.
16   Q.  Was it before or after the Hanover occurrence?
17   A.  It was after.
18   Q.  Okay.  Was it months after the Hanover?
19   A.  I don't know exactly.
20   Q.  Okay.  How did you come to be invited to this?
21   A.  Mr. Duncan invited me.
22   Q.  How did that occur?  Did he call you into his
23   office?  What happened?
24   A.  If I remember correctly, Chris Link was visiting

Page 127

1    on a marketing visit to the department and had indicated
2    that the Seniors Tour was coming up and asked if we liked
3    golf or something like that, said that he could get us
4    tickets or something along those lines.
5    Q.  Were you present when he said this?
6    A.  When Mr. Link was talking about it the first
7    time, I remember hearing conversations about it, just in
8    being in the office with Mr. Link, Mr. Duncan and myself.
9    They were finishing up talking about upcoming events or
10   something and Chris had told Steve if he needed some
11   tickets for his department, if anyone would like to
12   attend, he could get some tickets.
13   Q.  Did you express any interest in going to this?
14   A.  I can't stand golf, no.
15   Q.  Me, neither.  I don't golf, nor do I like it.
16       All right.  So how was the subject broached
17   that you would attend?
18   A.  It was later on that Mr. Duncan had insinuated
19   that it would probably be a good thing for me to go, that
20   there was -- Travelers was recently taken over by some
21   CEO or something, somebody changed from one carrier to
22   the other and he was going to be there and he thought it
23   would be a good idea if we attended and made an
24   appearance as Commerce Main Street.

Page 128

1    Q.  Did he make this -- you said "insinuation."
2    What do you mean by that?
3    A.  I guess insinuation is not the right -- he
4    indicated to me that with the change of the CEOs and the
5    important people that were going to be there for
6    Travelers, that it would be a good idea that as Commerce
7    -- and we are supposed to be an upcoming thing -- that we
8    should make an appearance and let ourselves be known to
9    these people.
10   Q.  You used the word insinuation before and I'm --
11   A.  I think I may have used it wrong.
12   Q.  Did you mean statement?  Did he say actual
13   words?
14   A.  Yes.  He said actual words.
15   Q.  So it wasn't that he implied something.  He
16   actually said something?
17   A.  He said that, yes.
18   Q.  Okay.  Who else, if anyone, was present when he
19   said these words to you?
20   A.  I don't recall.  I believe it would have just
21   been the two of us.
22   Q.  Okay.  Did you agree to go?
23   A.  Yes, I did.
24   Q.  He explained a business purpose for it and you

Page 129

1    agreed to go?
2    A.  Yes, and I agreed to go.
3    Q.  All right.  Now, how far away was this event in
4    terms of driving distance?
5    A.  I don't actually recall.  I know it was south.
6    Q.  Well, Maryland, part of Maryland is south of
7    Delaware --
8    A.  Yes.
9    Q.  Some of it might be west, but --
10   A.  It's definitely south.
11   Q.  Now, did you drive with Mr. Duncan to this
12   event?
13   A.  We made arrangements to meet at Pier 1 at the
14   Christiana Mall.  I parked my car there and Mr. Duncan
15   drove.
16   Q.  How long of a drive was it?
17   A.  I don't actually remember.  I know it was over a
18   couple hours.
19   Q.  Couple hour drive?
20   A.  I believe so, but I don't actually remember.
21   Q.  Prior to making this drive, did you say anything
22   to Mr. Duncan with regard to these other events that had
23   occurred in the past and that you were not interested?
24   A.  We finally, I finally did get ahold of him after

33 (Pages 126 to 129)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006

Bailey, Kimberly A. - Vol. 2

Page 313

1  your testimony when Mr. Tambussi was questioning you,
2  that was sort of at a point where he had gone to the Back
3  Stage with you, but then were you trying to get rid of
4  him sort of?
5  A. No. That was on a separate occasion. This was
6  with Mr. Durham.
7  Q. Tell me about that then.
8  A. We had left Back Stage Cage, were headed over to
9  Kid Shelleen's, and that's when Mr. Duncan was trying to
10  express to me how I guess excited Mr. Durham was or how
11  interested Mr. Durham was by rubbing my leg and my inner
12  thigh. And I took his hand and put it between both of my
13  hands and talked to him so he would keep his hands out of
14  between my legs.
15  Q. Would you consider that something related to your
16  work with Commerce or did that sort of cross over the
17  line into a non-work-related event?
18      MR. TAMBUSSI: Objection to the form of the
19  question.
20  A. We were still with the marketing rep, Mr. Durham.
21  I don't think I understand your question.
22  Q. Well, no, I think you answered it.
23  A. We were still with Mr. Durham, so it was still
24  work-related.

Page 314

1  Q. Okay.
2  A. But I don't know if you meant his putting his
3  hand, if that's work-related. That's not work-related.
4  Q. I'm talking about the situation in which you
5  found yourself when that occurred.
6  A. We were still with the marketing rep, Mr. Durham.
7  Q. And, therefore, you felt it was still
8  work-related; is that what you are saying?
9  A. Yes, it was.
10  Q. How about the second time?
11  A. When Mr. Duncan put his hands on me?
12  Q. Correct.
13  A. That was when we were headed to the golf outing,
14  when he asked me to masturbate, but he put his hands
15  between my legs with my hands.
16  Q. You were in his car?
17  A. Yes.
18  Q. And he was driving, you were in the passenger
19  seat?
20  A. Yes.
21  Q. And you were going down to the senior golf
22  tournament?
23  A. Yes.
24  Q. In Maryland?

Page 315

1  A. Yes.
2  Q. Was that a business function?
3  A. That was a business function.
4  Q. Did you consider yourself to be at work when you
5  were in the car with Mr. Duncan?
6  A. I was representing Commerce, yes.
7  Q. When you were in the car with him on the way
8  down, you considered that to be work?
9  A. Yes.
10  Q. Go to paragraph 12 of this same Exhibit 10. Read
11  it to yourself.
12  A. Okay.
13  Q. Now, you discussed with Mr. Tambussi when he was
14  questioning you things that you had previously been
15  involved in and that you had been excluded from after you
16  made your charge of sexual harassment. One of those was
17  that SEMCI project?
18  A. Yes.
19  Q. S-E-M --
20  A. -- C-I, I believe.
21  Q. S-E-M-C-I. And Mr. Tambussi asked you whether or
22  not you believed that it was in Ms. Corcoran's purview to
23  remove you from certain projects, certain meetings,
24  things like that, and you testified I believe of course

Page 316

1  it was in her purview to do that, correct?
2  A. It was her privilege. She is the director.
3  Q. Now, when you were removed from the various
4  meetings and projects and other matters, were you ever
5  given any explanation as to why you were removed?
6  A. No. In fact, I would question, "Do you need me
7  to go to the next meeting?" She is like, "Oh, no, no,
8  no, no." She completely took me out of the loop, no
9  explanation provided.
10  Q. So were you ever informed, for example, with
11  respect to SEMCI that you were not doing a good job?
12  A. No.
13  Q. Was the work that you did on that project, for
14  example, something that, as far as you know, contributed
15  to the betterment, if you will, of the --
16  A. I was an integral part at the beginning, yes.
17      MR. TAMBUSSI: Objection to the form of the
18  question.
19  Q. How about when the sales personnel were removed
20  from your supervision, do you remember that happening?
21  A. Yes, I do.
22  Q. That happened after the report of the sexual
23  harassment?
24  A. Yes, it did.

36 (Pages 313 to 316)

Bailey v. Commerce National Insurance Services, Inc.

January 27, 2006

C.A. # 05-CV-183 SLR

Bailey, Kimberly A. - Vol. 1

Page 130

1  that one incident where he kissed me and had asked him
2  that he's my boss and I didn't want any advances that
3  way.
4      Q.  Okay. When you say I finally did get in touch
5  with him --
6      A.  The day he had kissed me and I tried to approach
7  him asking him, you know, if we could talk, he wasn't at
8  work or he wasn't in the office, our office that day.
9  There was plenty of times he spent time up in New Jersey.
10  When I was able to get ahold of him and have a moment and
11  said, can we go to lunch or can we get out of the office
12  so that I can talk to you, he evaded me for a little bit,
13  because I'm sure he knew I wanted to talk about that.
14  But then finally within the next week we did make it to
15  lunch.
16      Q.  So you initiated a lunch with Mr. Duncan?
17      A.  Yes, I did.
18      Q.  Okay. How long was it between this Bank Shots
19  occurrence and that lunch? Weeks?
20      A.  I believe it was within, it was within the next
21  week. So that week ended up where he was either out of
22  the office one day and then the next day he didn't have
23  time to -- I didn't have the correct time in private to
24  say, you know, I'd like to have a lunch with you to

Page 131

1  discuss some things. So that week had ended and it was
2  with the next week that we had lunch.
3      Q.  Where did you go for lunch?
4      A.  Bull's Eye.
5      Q.  What's that?
6      A.  It's a little roast beef joint on Kirkwood
7  Highway.
8      Q.  Do they serve alcohol there?
9      A.  Yes.
10      Q.  Did you have any at lunch?
11      A.  No.
12      Q.  Did Mr. Duncan?
13      A.  I don't believe that he did, no.
14      Q.  Tell me what you said and he said at that lunch.
15      A.  It was, the drive over was fairly quiet. We got
16  into the restaurant. Mr. Duncan drove. And I had
17  insinuated to -- I said to him -- I didn't insinuate. I
18  said to him, "You are my boss. I don't eat where I
19  shit." And I don't, you know, I don't want any
20  advancement -- I asked him that, did he offer me this
21  opportunity, this career opportunity because he was
22  attracted to me or was there anything along those lines?
23  He had indicated, no, that there was not. He apologized.
24  He understood what my parameters were. And he indicated

Page 132

1  that it wouldn't happen again.
2      Q.  Okay. You left the lunch --
3      A.  We finished lunch up. From what I understood,
4  it was understood.
5      Q.  So then when you went out with Ms. Smith and
6  Mr. Duncan and Mr. Durham after that --
7      A.  After that.
8      Q.  -- did you attempt to have a similar
9  conversation?
10      A.  That's why I took his hand out of and I held on
11  to it, so he would not touch me.
12      Q.  Did you have any further discussion with him
13  after that event?
14      A.  After?
15      Q.  Like the lunch you had at Bull's Eye?
16      A.  No. The Bull's Eye was the only actual time
17  that I said, you are my boss, I'm your subordinate. Do
18  not do that. That's not where I want -- that's not what
19  I wanted out of this opportunity.
20      Q.  So then you go to this Travelers event. You
21  drive for a couple hours down. Anything significant
22  happen on the hour -- the drive?
23      A.  Mr. Duncan asked me to masturbate in front of
24  him or something like that. He stuck his hand between my

Page 133

1  legs and asked if I were to masturbate, how would I
2  masturbate. I told him I would not masturbate in front
3  of him.
4      Q.  How far in the ride were you when he made this
5  comment?
6      A.  I don't know exactly how far into the ride it
7  was.
8      Q.  You ultimately got to the event?
9      A.  We ultimately got to the event.
10      Q.  Anything happen there?
11      A.  As far as him touching me at the event?
12      Q.  Anything.
13      A.  Nothing that I can recall happened at the event.
14      Q.  Okay. There were other Commerce people there,
15  though?
16      A.  There were other Commerce people there.
17      Q.  Did you at any time indicate to any of the other
18  Commerce people there that you believed Mr. Duncan was
19  acting inappropriately?
20      A.  No, I did not.
21      Q.  Okay. This was on a Saturday?
22      A.  This was on a Saturday.
23      Q.  Okay. At some point in time the event ended and
24  you needed to come back to Christiana Mall, correct?

34 (Pages 130 to 133)