Corcoran, Joseph Morrissey, and Bruce McKelvy. It was based on information received from Ms. Valerie Oakes, Ms. Darlene Wilkins and Ms. Dee Whalen.

Ms. Watson and Ms. Corcoran participated in the meeting in which Ms. Bailey was informed of her termination. Mr. Morrissey was kept informed of developments with respect to Ms. Bailey. Mr. McKelvy was also kept informed of developments. Ms. Oakes, Ms. Wilkins and Ms. Whalen were witnesses to the conversation in which Ms. Bailey used the inappropriate language.

It is impossible to identify a single person who made the final decision to terminate Ms. Bailey's employment. This is because the decision was made collectively after much deliberation on the part of Commerce management.

INTERROGATORY NO. 3. Please identify whether or not Steven Duncan had ever been accused of sexual harassment or other misconduct of a sexual nature at any time prior to the charge made by Plaintiff against Mr. Duncan. If so, please identify the facts surrounding the charge, the including the person making the charge, the charge made, the date of all alleged misconduct and the disposition of the charge by Defendant.

ANSWER:

The Defendant incorporates it General Objections set forth above. Subject to and without waiving the foregoing objections, Commerce is not aware of any other incidents of misconduct by Mr. Duncan at Commerce during his employment. Commerce reserves the right to supplement this answer as discovery proceeds.

INTERROGATORY NO. 4. Please identify all policies, rules or regulations, hereinafter ("policy or policies") allegedly violated by Plaintiff at any time during her employment with Defendant. With respect to each such violation, please identify the policy, the date the alleged violation occurred, all disciplinary or related action taken against Plaintiff as a result of the violation, and the identity of all persons having knowledge of the facts related to the alleged violation, and the facts known to each such person.

B 151

ANSWER:

The Defendant incorporates its General Objections set forth above.  The Defendant specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objections,  see Answer to Interrogatory No. 1.

INTERROGATORY NO. 5. If you contend that one of the reasons for Plaintiff's termination was inappropriate dress, please identify specifically and in detail the alleged inappropriate dress worn by Plaintiff and all dates when Plaintiff was allegedly inappropriately dressed.

ANSWER:

See Answer to Interrogatory No. 1.

The Defendant incorporates its General Objections set forth above.  Subject to and without waiving the foregoing objection, Ms. Corcoran enforced the Commerce dress code by sending Ms. Bailey home for inappropriate dress.  As noted, this occurred in July 2003.

INTERROGATORY NO. 6. With respect to all counseling given to Plaintiff by Defendant at any time, please identify the specific reason why she was counseled, the dates and nature of all counseling, all persons involved in the counseling, including the decision to counsel Plaintiff, and the role played by each such person.

ANSWER:

See Answers to previous Interrogatories and Plaintiff's personnel file, which is attached to Defendant's Responses to Plaintiff's Request for Production of Documents. The Defendant incorporates its General Objections set forth above.  Subject to and without waiving the foregoing objections, Commerce counseled Ms. Bailey on the

8

**B 152**

opportunities available for her to grow as a supervisor under the guidance of Ms. Corcoran. Ms. Corcoran's role was to improve production at Main Street and to help her team of which Ms. Bailey was integral.

INTERROGATORY NO. 7. Please identify all disciplinary action taken by Defendant against Plaintiff at any time while she was employed by Defendant. With respect to each such disciplinary action, please identify the date and nature of the offense giving rise to the disciplinary action, the date and nature of the disciplinary action taken, all persons involved in the decision to take disciplinary action and the role played by each such person in the decision as well as all persons making a complaint or other charge against Plaintiff which resulted in such disciplinary action.

ANSWER:

See Answer to Interrogatory No. 1.

INTERROGATORY NO. 8. If you contend that Plaintiff committed "inappropriate behavior toward co-workers and subordinates directly under her supervision," please identify all facts which support your contention, including, but not limited to, the date and nature of all such inappropriate behavior, the person or persons to whom such behavior was directed, all other persons having knowledge of such inappropriate behavior and the knowledge possessed by each such person, and all action taken by Defendant in response to Plaintiff's alleged inappropriate behavior.

ANSWER:

See previous interrogatory answers on reasons for termination. See previous interrogatory answers regarding Commerce's impressions conveyed to Ms. Bailey at the June 2003 meeting in which Commerce advised Ms. Bailey that she needed to use better judgment in her outside encounters with co-employees. See previous interrogatories regarding Ms. Bailey's failure to abide by the dress code. See previous interrogatories regarding Ms. Bailey's usage of inappropriate language toward a subordinate.

INTERROGATORY NO. 9. If you contend that Plaintiff committed "unprofessional conduct which set a poor example for the customer service representatives," please identify all facts which support your contention, including but not limited to, the date and

9

**B 153**

nature of all such unprofessional conduct, all persons having knowledge of such unprofessional conduct and the knowledge possessed by each such person, and all action taken by Defendant in response to Plaintiff's alleged unprofessional conduct.

ANSWER:

See previous interrogatory answers discussing reasons for termination.   See previous interrogatory answers discussing persons involved in the various instances of unprofessional conduct. See previous interrogatory answers regarding the actions taken by Commerce to help Ms. Bailey in her role as supervisor.

INTERROGATORY NO. 10. If you contend that Plaintiff made inappropriate comments about the physique of a male phone vendor representative and/or a copy machine vendor representative in the presence of her staff, please identify precisely what comments were made, the person(s) to whom they were directed, each and every date on which this conduct allegedly occurred, and all witnesses to this conduct. Also please identify all action taken by Defendant in response thereto.

ANSWER:

The Defendant incorporates its General Objections set forth above.   The Defendant specifically objects to this Interrogatory on the grounds that it is overbroad and unduly burdensome.   Subject to and without waiving the foregoing objections, Ms. Bailey's inappropriate comments about male phone vendor or copy machine vendor representatives occurred in early 2003.   The name of the phone vendor was Greg Alpugh. Please refer to documents produced in response to Plaintiff's Request for Production of Documents for a more detailed account of the inappropriate comments.   All employees within Main Street in early 2003 were familiar with Ms. Bailey's behavior toward outside vendors.   Those familiar with Ms. Bailey's behavior in this regard would include, but are not limited to, Darlene Wilkins, Heather Pokoisky, Valerie Oakes, Dee Whalen, Julius Bland, Dorothy Deegan, Cheryl Luckanish, Heather Smith, Diane Schauber, Marjorie

**B 154**

Phipps and Stephen Duncan.  Ms. Bailey was informed at the meeting in June 2003 that she needed to avoid making such comments about others.

INTERROGATORY NO. 11.  If you contend that Plaintiff coordinated and engaged in social activities involving consumption of alcohol which were not sponsored by the Defendant, please identify each and every date which this conduct allegedly occurred, precisely what occurred, all witnesses to this conduct, and all action taken by Defendant in response thereto.

ANSWER:

The Defendant incorporates its General Objections set forth above.  The Defendant specifically objects to this Interrogatory on the ground that it is overbroad, ambiguous and seeks information outside the permissible scope of discovery established by the Federal Rules of Civil Procedure.  Plaintiff is better able to respond to this interrogatory than Defendant as she possesses greater knowledge of her social activities.  Subject to and without waiving the foregoing objections, and by way of further response, see previous interrogatory answers regarding the reasons for Ms. Bailey's termination.  See previous interrogatory answers discussing June 2003 meeting at which Commerce informed Ms. Bailey of the results of their investigation into her allegations of Mr. Duncan's sexual harassment.  See previous interrogatory answers regarding the counseling Ms. Bailey received as to the need to understand the important of the distinction between professional and social activities.  See previous interrogatory answers discussing Ms. Bailey's email in May 2003 regarding a Commerce event in New York City.

In addition, Commerce's investigation into Ms. Bailey's allegations of sexual harassment revealed that Ms. Bailey had used poor judgment in social activities during the period in which she claims she was harassed by Mr. Duncan.  These events include an

11

**B 155**

event in May 2002 during which Ms. Bailey invited Steve Duncan to join Ms. Bailey and her girlfriends at the Backstage Café. After meeting at the Backstage on the same evening, Bailey, her girlfriends and Duncan went to a place called Bank Shots. After a while at Banks Shots, Mr. Duncan told Ms. Bailey that he was going home and he asked her to escort him to his car. Ms. Bailey voluntarily went with Mr. Duncan to his car. Moreover, when Mr. Duncan asked Ms. Bailey to get into his car with him, she voluntarily entered the car with him. Later, in June 2002, Ms. Bailey voluntarily agreed to go to a golf event in Maryland with Mr. Duncan in the same car.

INTERROGATORY NO. 12. If you contend that Plaintiff did not understand her role as a supervisor, particularly a supervisor for her own department, please identify all facts which support your response as well as the identify of persons having knowledge of such facts and the facts known to each such person.

ANSWER:

See previous interrogatory answers discussing circumstances leading to Ms. Bailey's termination. See previous interrogatory answers discussing the efforts of Commerce to help plaintiff understand her role as a supervisor. See previous interrogatory answers discussing the necessity for a supervisor to act as a role model for others. See previous interrogatory answers discussing the need for supervisors to take Commerce to a higher level at all times.

INTERROGATORY NO. 13. If you deny that Steven Duncan sexually harassed Plaintiff, please identify all facts which you believe support your denial as well as the identity of all persons having knowledge of such facts and the facts known to each such person.

ANSWER:

The Defendant incorporates its General Objections set forth above. Subject to

12

**B 156**

and without waiving the foregoing objections, Commerce took Ms. Bailey's internal complaints regarding Mr. Duncan's sexual harassment very seriously. As already noted, Commerce performed a prompt and comprehensive investigation. Commerce concluded that both Mr. Duncan and Ms. Bailey engaged in inappropriate behavior. At the conclusion of the investigation, Mr. Duncan was terminated.

INTERROGATORY NO. 14. If you contend that Plaintiff was in any way responsible for, or contributed in any way to the sexual harassment by Steven Duncan, please identify all facts which you believe support that contention as well as the identity of all persons having knowledge of such facts, and the facts known to each such person.

ANSWER:

See previous interrogatory answers discussing Ms. Bailey's failure to use proper judgment in outside social activities.

INTERROGATORY NO. 15. Please identify each and every reason why Plaintiff was required to continue to work directly with Steven Duncan while Defendant was investigating Plaintiff's sexual harassment charges against Steven Duncan. Please further identify all persons having knowledge of such reasons and the knowledge possessed by each such person.

ANSWER:

The Defendant incorporates its General Objections set forth above. Subject to and without waiving the foregoing objections, Commerce took Ms. Bailey's allegations of sexual harassment very seriously. Commerce engaged in an extensive 8-week investigation of Ms. Bailey's allegations to allow it time to thoroughly interview all witnesses. Accordingly, Commerce did not take action against Mr. Duncan until the investigation had concluded. Furthermore, given the nature and location of Main Street, as well as Mr. Duncan's job assignment, reassignment of Mr. Duncan to another position or location was not an available alternative. During the investigation of Ms. Bailey's

13

**B 157**

complaints of Mr. Duncan's sexual harassment, Commerce put Mr. Duncan on notice that he was to behave appropriately or he would be fired.

INTERROGATORY NO. 16.  Please state why Plaintiff was not in any way involved in the investigation of the sexual harassment charges made by Plaintiff against Steven Duncan after she made the initial charge. Please identify each person having knowledge of the facts contained in your response and the facts known to each such person.

ANSWER:

The Defendant incorporates its General Objections set forth above.  Subject to and without waiving the foregoing objection, Commerce expressly disputes the underlying proposition that Ms. Bailey had no involvement in the investigation after she made the charges against Mr. Duncan.  Ms. Bailey was the first person Commerce interviewed after she submitted her claims to Commerce administration.  See also the April 17, 2003 email from Ms. Bailey to Ms. Watson and Bruce McKelvy.  Ms. Bailey thanked Ms. Watson and Mr. McKelvy for taking the time to meet with her.  See Mr. McKelvy's response to Ms. Bailey's email of April 17, 2003.  In this email, Mr. McKelvy specifically told Ms. Bailey that Commerce strives to have a diverse workforce and provide equal opportunity to all employees.  Mr. McKelvy further explained to Ms. Bailey in no uncertain terms "we have taken your complaint seriously and will do our very best to get to the bottom of it."  Mr. McKelvy advised Ms. Bailey that Commerce would be in touch with Ms. Bailey as the investigation progresses and he further advised Ms. Bailey that she should "be sure to let either of us know immediately if there are any further inappropriate contacts.

In addition, at no point during the 8-week investigation did Commerce thwart Ms. Bailey's ability to contact Ms. Watson or Mr. McKelvy either through email or by phone.

14

**B 158**

This is evidenced by at least two instances where Ms. Bailey emailed Ms. Watson during the investigation. See the May 15, 2003 email from Ms. Bailey to Ms. Watson regarding the event in New York City. See also the May 15, 2003 email in which Ms. Bailey blind carbon copies Ms. Watson on an email that Ms. Bailey sent to her Main Street staff in which Ms. Bailey informed the staff "YOU ALL ARE THE BEST."

Further, Commerce observes that in late May 2003, when Commerce intended to meet with Ms. Bailey again about the investigation, Ms. Bailey advised Ms. Watson that she could not meet because she had a vacation scheduled for Thursday and Friday of that week and she had to leave early on Wednesday prior to her vacation. Commerce was flexible in its efforts to accommodate Ms. Bailey's vacation schedule.

INTERROGATORY NO. 17.Please identify specifically and in detail each and every defense given by Steven Duncan to Defendant to the sexual harassment charge made by Plaintiff.

ANSWER:

See May 6, 2003 interview notes of Ms. Watson with Mr. Duncan.

The Defendant incorporates its General Objections set forth above. Subject to and without waiving the foregoing objections, Commerce states that, in part, Mr. Duncan believed that Ms. Bailey was motivated in her allegations by the frustrations she had insofar as the relationship between Mr. Duncan and her had not continued.

INTERROGATORY NO. 18. Please identify all "inappropriate behavior" committed by Plaintiff that Defendant learned of during the investigation into the sexual harassment charges made by Plaintiff against Steven Duncan. Please identify each and every inappropriate act as well as the date the act was committed. Please further identify how Defendant first learned of this alleged inappropriate behavior by Plaintiff, and all witnesses to each alleged inappropriate act.

15

**B 159**

ANSWER:

See previous interrogatory answers discussing reasons for Ms. Bailey's termination.    See previous interrogatory answers discussing Ms. Bailey's failure to understanding the importance of keeping personal and work lives separate.

INTERROGATORY NO. 19.  If you contend that Plaintiff "considered Ms. Corchoran's attention to detail and enforcement of Commerce policies as a personal affront," please identify each and every fact which you believe supports that contention, including specific example of situations in which this occurred.  Please further identify all persons having knowledge of the facts and the facts known to each such person.

ANSWER:

The Defendant incorporates its General Objections set forth above.  Subject to and without waiving the foregoing objections, Ms. Bailey failed to cooperate with Ms. Corcoran's reasonable efforts to assist Ms. Bailey in her professional development.  This included Ms. Bailey's failure to abide by Ms. Corcoran's advice on how to compose office emails.  This also included Ms Bailey's violation of the standards for dress at Commerce.

INTERROGATORY NO. 20.  If you contend that Plaintiff "balked at the opportunity to expand her professional experience under Ms. Corchoran," please identify all facts which you believe support that contention, including specific examples of situations in which this occurred.  Further please also identify all persons having knowledge of such facts and the facts known to each such person.

ANSWER:

See previous interrogatory answers regarding Ms. Bailey's failure to effectively follow up on the recommendations of Commerce administration, as discussed at the meeting in June 2003 when Commerce informed Ms. Bailey of the reasons for her termination.

INTERROGATORY NO. 21.  Please identify the facts known to the following persons

16

**B 160**

which Defendant stated in its Rule 26(a) initial disclosures that it may use to support its claims or defenses:

> Valerie Oakes
> Darlene Wilkins
> Dorothy Whalen
>
> Robert Hackett
> Marjorie Phipps
> Ms. McKee

ANSWER:

The Defendant incorporates its General Objections set forth above.  Subject to and without waiving the foregoing objections, all individuals listed above have knowledge regarding plaintiff's employment at CIS and allegations raised by plaintiff in this litigation.  Specifically, Ms. Oakes, Ms. Wilkins and Ms. Whalen were witnesses to the inappropriate language that Ms. Bailey used toward a supervisor in August 2003.  These individuals are also familiar with the general environment that Ms. Bailey allowed to exist at Main Street.  Mr. Hacket and Ms. McKee are familiar with the inappropriate dress of Ms. Bailey.

INTERROGATORY NO. 22. Please identify whether any other supervisory or management level employee of Defendant dressed inappropriately at any time. If so, please identify all such persons and all dates when such person dressed inappropriately. Please further identify what action, if any, was taken against such person and the person or persons taking such action.

ANSWER:

The Defendant incorporates its General Objections set forth above.  The Defendant specifically objects to this Interrogatory on the grounds that it is overbroad, unduly burdensome and outside the scope of permissible discovery established by Federal Rules of Civil Procedure.  Subject to and without waiving the foregoing

17

B 161

objections, Defendant submits that the dress code is enforced among supervisors to maintain the professionalism that is necessary in the office. Enforcement of the dress code among supervisors is critical given that supervisors must be ready to meet with other business professionals on short notice during the day.

INTERROGATORY NO. 23. Please identify all current or former employees of Defendant whom Defendant believes were fearful or apprehensive of Plaintiff allegedly as a result of her use of profanity in the workplace. Please further identify all facts which form the basis for this belief.

ANSWER:

The Defendant incorporates its General Objections set forth above. Subject to and without waiving the foregoing objections, Commerce states:

Valerie Oakes (see email of August 26, 2003 to Mary Corcoran – fear of retaliation for reporting profanity incident)

Dee Whalen (see email of August 26, 2003 to Mary Corcoran – fear of retaliation for reporting profanity incident)

This is not an exclusive list, as not every employee at Main Street documented such concerns in writing. Defendant reserves the right to call as witnesses any of the employees who worked under the supervision of or with Ms. Bailey at Main Street.

INTERROGATORY NO. 24. Please state whether at any time prior to Plaintiff's termination any other employees of Defendant ever used profanity in the workplace. Please further identify each and every person whom Defendant knew or believe used profanity in the workplace at any time prior to Plaintiff's termination. With respect to each such person, please identify the profanity used, all persons who witnessed such conduct, as well as the date of such conduct and all disciplinary or other action taken against each such person or each occasion as a result of their use of profanity in the workplace.

18

ANSWER:

The Defendant incorporates its General Objections set forth above. The Defendant specifically objects to this Interrogatory on the grounds that it is overbroad and outside the scope of permissible discovery established by Federal Rules of Civil Procedure. Subject to and without waiving the foregoing objections, Commerce is not aware of the use of profanity by a supervisor, in a derogatory and condescending manner, against a subordinate employee. It is the responsibility of a supervisor to maintain professionalism in the workplace.

INTERROGATORY NO. 25. If you contend that there is a difference or distinction between the profanity used by Plaintiff which caused or contributed to Defendant's decision to terminate Plaintiff's employment, and the profanity used by other employees of Defendant, please explain the distinction.

ANSWER:

See answer to Interrogatory No. 24.

19

**B 163**

POTTER ANDERSON & CORROON LLP

By _Elizabeth King_

Wendy K. Voss (I.D.# 3142)
Sarah E. DiLuzio (I.D. # 4085)
Elizabeth King (I.D. #4475)
Hercules Plaza, Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19801
(302) 984-6000 – Telephone
(302) 658-1192 – Facsimile

*Attorneys for Defendant*

OF COUNSEL:

William M. Tambussi, Esquire
Susan M. Leming, Esquire
BROWN & CONNERY, LLP
360 Haddon Avenue
Westmont, NJ 08108

Dated: October 21, 2005
PA&C-704352v1

20

**B 164**

# BROWN & CONNERY
## LLP

WARREN W. FAULK◦
STEVEN G. WOLSCHINA
PAUL MAINARDI
MICHAEL J. VASSALOTTI◦
DENNIS P. BLAKE◦
WILLIAM M. TAMBUSSI◦
MARK P. ASSELTA*
STEPHEN J. DeFEO*
JOSEPH M. NARDI, III*
CHRISTINE P. O'HEARN*
JOSEPH T. CARNEY*

NATHAN A. FRIEDMAN◦
OF COUNSEL
KATHIE L. RENNER*
OF COUNSEL

THOMAS F. CONNERY, JR. (1915-2004)
HORACE G. BROWN (1902-1990)
HOWARD G. KULP, JR. (1906-1987)

ATTORNEYS AT LAW AND PROCTORS IN ADMIRALTY
360 HADDON AVENUE
P.O. BOX 539
WESTMONT, NEW JERSEY  08108

TELEPHONE (856) 854-8900
FACSIMILE (856) 858-4967
**www.brownconnery.com**

WOODBURY, NJ 08096          CAMDEN, NJ 08102          PHILADELPHIA, PA 19102
(856) 812-8900                  (856) 365-5100                  (215) 592-4352

JACQUELINE R. BARRETT*
ILA BHATNAGAR*
MARK CAIRA
MICHELLE A. CARTER*
JOSEPH M. GAREMORE*
PATRICK J. HOLSTON*
SHAWN C. HUBER*
JEFFREY R. JOHNSON*
DIANE S. KANE*
SUSAN M. LEMING*
LOUIS R. LESSIG*
BETH L. MARLIN*
KAREN A. MCGUINNESS*
STEPHANIE NOLAN DEVINEY*
BLAIR C. TALTY*

◦ CERTIFIED BY THE SUPREME COURT OF
   NEW JERSEY AS A CIVIL TRIAL ATTORNEY

* ALSO ADMITTED IN PENNSYLVANIA

July 21, 2004

Our File No.: 03-0704

<u>VIA FEDERAL EXPRESS</u>

Julie Cutler, Supervisor
State of Delaware, Department of Labor
Division of Industrial Affairs
4425 North Market Street
Wilmington, Delaware  19802

DEPT OF LABOR

JUL 2 2 2004

INDUSTRIAL AFFAIRS
OFFICE OF LABOR
LAW ENFORCEMENT

Re:     <u>Bailey v. Commerce  Insurance Services, Inc.</u>
        Charge of Discrimination - Case No.: 0311080/17CA400078

## *POSITION STATEMENT*

Dear Ms. Cutler:

In response to your letter dated June 16, 2004, please accept this letter on behalf of Commerce  Insurance Services, Inc. ("Commerce") in response to the above-referenced Charge of Discrimination.  The complainant, Kimberly Bailey, alleges that she has been retaliated against due to complaints about sexual harassment.  Specifically, Ms. Bailey complains that Commerce retaliated against her for complaining about her supervisor, Steven Duncan, former Director of the Main Street Division where complainant was employed as a supervisor, by terminating her for various violations of Commerce policy including inappropriate dress and use of profanity.  As such, Ms. Bailey alleges that Commerce unfairly held her to a higher standard.

However, Ms. Bailey only tells part of the story and she leaves out information critical to the Charge.  What Ms. Bailey does not reveal is that Commerce counseled her prior to her termination about her inappropriate behavior among co-workers and subordinates directly under her supervision, and offered to provide her with management training to no avail.  In fact, Commerce issued a letter to Ms. Bailey <u>mandating</u> training and held a counseling session with her.  Rather than behave appropriately as a supervisor in the role to which she was promoted, Ms. Bailey engaged in unprofessional conduct which set a poor example for the Customer Service Representatives who

**B 165**

BROWN & CONNERY
LLP

Ms. Bailey includes commenting about the physique of a male phone vendor representative and copy machine vendor representative in the presence of her staff, and coordinating and engaging in social activities involving consumption of alcohol which were not sponsored by Commerce.

In an effort to assist Ms. Bailey in understanding her role as a supervisor, particularly a supervisor for the very department from which she was promoted, Commerce attempted to train her by sending her to the following courses to be completed prior to the end of year 2003: (1) Human Resource Management-1 Leadership in the Commerce Way; (2) Human Resource Management-3 Managing within the Law; (3) Core Skills for Building Commitment; and (4) Retaining Talent - The Leader's Role. Though Ms. Bailey was counseled on the importance of attending these courses, she failed to attend the most relevant training course - Leadership in the Commerce Way - which was aimed at training Commerce employees, such as Ms. Bailey, who rise through the ranks to supervise individuals who at one time were their peers. Ms. Bailey was scheduled to attend Leadership in the Commerce Way in July of 2003. The course was not to be offered again for at least six (6) months. Significantly, Ms. Bailey did not even bring to Commerce's attention that she missed the class. Rather, Commerce was informed that Ms. Bailey did not attend the class via email from the course administrator, and Commerce then had to raise the issue with Ms. Bailey and instruct her to re-register for the next course in January, 2004, falling outside her deadline to complete the courses.

Lastly, Ms. Bailey was forewarned that further reports of unprofessional or inappropriate comments and/or behavior may result in termination. As described more fully below, rather than improve, Ms. Bailey's work performance deteriorated to a point where it became intolerable as a supervisor.

## I.    STATEMENT OF FACTS

Ms. Bailey was employed at Commerce from August 27, 2001 through August, 27, 2003. Ms. Bailey was employed as a Senior Customer Service Representative of the Commerce Core Division - Delaware location. When a decision was made to expand the Core Division and create the Main Street Department, Ms. Bailey was promoted to the position of Supervisor. At that time, Mr. Duncan was Director of the Main Street Department and it was Mr. Duncan himself who recommended Ms. Bailey for the promotion to Supervisor of Main Street. Commerce promoted Ms. Bailey based in large part upon the recommendation of Mr. Duncan.

Commerce took Ms. Bailey's internal complaints regarding Mr. Duncan very seriously. Commerce performed a prompt investigation, interviewing relevant witnesses with knowledge, many of whom were identified either by Ms. Bailey and/or by the accused, over the eight (8) weeks following her initial complaints of sexual harassment. As a result of its findings that both parties had engaged in inappropriate behavior in violation of Commerce guidelines on professionalism and

2

**B 166**

BROWN & CONNERY
LLP

its policies and procedures, Commerce terminated Mr. Duncan. Clearly then, the actions taken by Commerce were squarely aimed at effectively putting a stop to any alleged sexual harassment.

As for Ms. Bailey, despite that the investigation revealed that Ms. Bailey herself had knowingly and willingly engaged in inappropriate behavior, Commerce decided against taking action against her, instead providing her with a fresh start. The goal of Commerce at that time was to provide Ms. Bailey with a fair opportunity to prove herself as a supervisor, unencumbered by past issues surrounding Mr. Duncan. In that vein, a brand new Director was brought in to manage Ms. Bailey, at the Main Street location, by the name of Mary Corcoran. In order to protect Ms. Bailey's privacy and to effectuate her fresh start as Supervisor, Commerce did not discuss its investigation of Mr. Duncan and/or Ms. Bailey's claims of sexual harassment with Ms. Corcoran, nor did Commerce reveal any of its findings to her.

After the alleged harasser was terminated, Commerce counseled Ms. Bailey on the opportunities available for her to grow as a supervisor under the guidance of Ms. Corcoran. Ms. Corcoran's role was specifically to improve production at Main Street and help her team, of which Ms. Bailey was integral, to mature. Instead, Ms. Bailey balked at the opportunity to expand her professional experience under Ms. Corcoran. Rather, Ms. Bailey considered Ms. Corcoran's attention to detail and enforcement of Commerce policies as a personal affront, which was nothing more than Ms. Bailey's own baseless conjecture.

Specifically, Ms. Corcoran enforced the Commerce dress code by sending Ms. Bailey home for inappropriate dress. Given the highly customer-service driven nature of the business in which Ms. Bailey was employed in the capacity of a supervisor, it was essential for Ms. Bailey to represent Commerce in the most professional light possible. This was particularly so given that Commerce does not maintain a casual dress code or a dress-down policy in the normal course of its business. Moreover, as a supervisor of a team of Customer Service Representatives who looked to Ms. Bailey as a role model, it was all-the-more important for Ms. Corcoran to apply the rules to all, including Ms. Bailey. Thus, Ms. Bailey's reference in the Charge of Discrimination to being targeted for inappropriate dress as constituting some sort of employment discrimination is wholly unsupported.

As for Ms. Bailey's use of profanity in the workplace which finally formed the basis for her termination, Ms. Bailey used highly inappropriate language against one of her own subordinates, in response to that subordinate's request for Ms. Bailey's assistance. Specifically, Ms. Bailey aimed the following profanity directly at the subordinate employee: "I DON'T F——G HAVE TIME FOR THIS NOW."

This highly inappropriate language was witnessed by other Main Street employees. The employee against whom Ms. Bailey directed this profanity informed Commerce representatives that Ms. Bailey's behavior had engendered fear in the workplace. Thus, Ms. Bailey disrupted the

3

BROWN & CONNERY
LLP

workforce and hindered Commerce operations, which Ms. Corcoran was attempting to place back on track after the firing of Mr. Duncan, by instilling fear and apprehension among the very workforce which had to report to her. Accordingly, Ms. Bailey's conduct made her unfit to be a supervisor or even an employee of Commerce.

## II.    COMPLAINANT'S CHARGE IS NOT SUPPORTED BY THE FACTS

The foregoing facts demonstrate that Ms. Bailey's allegations of discrimination/retaliation because of her prior reports of sexual harassment are wholly unfounded and without merit. Ms. Bailey's allegation that others used inappropriate language but were not terminated is again half the story. Even assuming *arguendo* that other employees used profanity occasionally at the workplace, there is no evidence whatsoever that they used it against a subordinate employee, targeting that employee and instilling fear in the team. While the occasional slip of the tongue may not be pleasant, it is entirely another thing to curse **at** one whom complainant was hired to assist and supervise, and to belittle that employee. Also, the record clearly indicates that Ms. Bailey's complaints about Mr. Duncan were not only listened to but also given credence, and in fact, they formed the basis for the termination of employment of the alleged harasser. Complainant's subsequent inability to conform to Commerce policies and rules, and her insubordination towards her new boss, Ms. Corcoran, does not form the basis for a Charge of Discrimination.

## III.    CONCLUSION

For all of the foregoing reasons, Commerce respectfully requests that the complainant's charges of alleged discrimination and retaliation be dismissed with prejudice. Clearly, Commerce did not discriminate or retaliate against Ms. Bailey in any way. All dealings with the complainant were fair, equitable and in accordance with Commerce policies.

Commerce will continue to cooperate fully with the Division of Industrial Affairs to resolve this Charge. Please advise if you require additional information. We look forward to working with you in resolving this matter.

Very truly yours,

BROWN & CONNERY, LLP

William M. Tambussi

WMT/ib

4

**B 168**

Deborah Watson

55  (Pages 214 to 217)

Page 214

1    A. I don't know.
2    Q. Would it have been termination?
3    A. No. I just said it would have been
4  discipline.
5    Q. Well, I consider discipline to be
6  termination -- the ultimate discipline, I guess. So you
7  don't think of termination as discipline?
8    A. No. I'm sorry. I misunderstood you. Meaning
9  that we would have moved to a formal discipline process.
10    Q. Does the formal discipline process include
11  termination?
12    A. There's three steps before termination --
13  verbal, written and final written. And my recommendation
14  in conversation with Mary would have been to move to some
15  of the written discipline -- a verbal, a written or a
16  final written.
17    Q. So the reason that you didn't consider
18  anything other than -- or actually end up deciding
19  anything other than going straight to termination was the
20  fact that Kim used the word "fuck" in response to a
21  request from an employee for assistance and that it was
22  embarrassing to her?
23    A. I personally in a discussion with Mary did not
24  want to go right to termination.

Page 215

1    Q. Why not?
2    A. As an HR person, I prefer the written warning,
3  and I knew that through the Kim investigation we had
4  written a warning, chosen not to issue it and went with
5  the softer discussion hoping to see improvement.
6    Q. I think you're talking about June. Aren't
7  you?
8    A. I'm referring back to June to try to answer
9  the question.
10    Q. I'm talking about in August --
11    A. Yes.
12    Q. -- when everyone was deciding.
13      You said Mary wanted to terminate her,
14  talking about Kim, and you in fact initially didn't think
15  she should be terminated.
16    A. That's correct.
17    Q. Okay.
18    A. When Mary first called me. Mary sends the
19  e-mail that says I want to put her on like a final
20  written warning or written warning. Then I get Mary on
21  the phone, and Mary wants to move to termination. I'm
22  suggesting that, no, we go to a documented discipline
23  process, not termination -- that we go to the final
24  warning, which is what Mary had originally put in her

Page 216

1  write-up -- or in her e-mail from the week before.
2    Q. And that's because you didn't do that back in
3  June when -- you originally set out to do a written
4  warning, but then you decided not to. But now you
5  thought it would be a good idea to take that next step
6  and actually put her on a written warning. Right?
7    A. I officially thought that would be
8  appropriate -- or the best approach with this.
9    Q. Why?
10    A. We had made a decision in June to try to give
11  Kim as clean a start as possible into this department.
12  And as an HR person, I prefer more documentation versus
13  less for -- in case we end up in a situation like this.
14  And especially with Mary's e-mail then coming in with her
15  initial reaction being written warning, I didn't fully
16  understand where we had changed or where Mary's thought
17  process had changed. And in thinking that through, my
18  suggestion was to do the warning, not the termination.
19    Q. Did Mr. Morrissey talk you out of the warning?
20    A. To my recollection, he -- if Mary wanted to
21  move to termination, he backed Mary.
22    Q. So at some point Mary changed her mind?
23    A. Yes.
24    Q. Mary was the one ultimately who made the

Page 217

1  decision, and you guys just said, "If that's what you
2  want to do, Mary -- it's your department -- do it. We'll
3  do it"?
4    A. Mary felt that what Kim had done had
5  intimidated the workforce, and she said she had talked to
6  employees who felt that way and that Mary was not going
7  to be able to turn around MainStreet to the business
8  level we wanted it to go to. It was my understanding
9  successful, but it needed to get to the next level. And
10  she did not see how she was going to be able to
11  rehabilitate Kim based on this latest action. And that's
12  why she really wanted the termination.
13    Q. But my question wasn't why did Mary want
14  termination.
15    A. Oh, okay.
16    Q. My question was: Did Mary ultimately make the
17  final decision on what was going to happen to Kim?
18    A. It was Mary, Joe and I.
19    Q. Basically, you and Joe deferred to Mary,
20  because you said that originally you didn't think that
21  that was what ought to happen. She should be given a
22  written warning.
23    A. We decided that Mary was convincing and that,
24  yes, we would all agree to go to termination.

Corbett & Wilcox