Page 134

1  A. Yes.
2  Q. Did you ask any of the other Commerce people
3  there to give you a ride back?
4  A. No, I didn't. Mr. Duncan was trying to drop me
5  off at the hotel of Mr. Durham.
6  Q. He was trying to drop you off at the hotel of
7  Mr. Durham. Was Mr. Durham at this event?
8  A. Yes, he was.
9  Q. Tell me what you mean by that.
10 A. Mr. Duncan was trying to set up or have
11 Mr. Durham and I date and I guess he was trying to play
12 matchmaker.
13 Q. Okay. What makes you believe that?
14 A. He had asked me if I wanted to go to
15 Mr. Durham's hotel room. And he had already also at
16 other times with this other outing with Mr. Durham, he
17 had tried to set us up or get us to be able to get
18 interested in each other or date.
19 Q. I thought he had Ms. Smith go with Mr. Durham?
20 A. He had Mr. Durham drive with Ms. Smith to the
21 second bar, but on our drive over there when Mr. Duncan
22 was putting his hand between his legs, he was expressing
23 Mr. Durham's -- he liked me or he wanted to touch me
24 here, he wanted to do this and that --

Page 135

1  Q. Well, what are the exact words that he said?
2  A. I don't remember exactly, but they were sexual
3  in content.
4  Q. So you get to this Travelers event. Did you
5  know Mr. Durham was going to be there?
6  A. I knew Mr. Durham was going to be there.
7  Q. Had you had any occasion to interact in any way
8  with Mr. Durham between the time that he was at the
9  Backstage with you and Mr. Duncan and Cindy?
10 A. Mr. Durham and I e-mailed on occasion. I
11 believe that he may have called me. I can't recall if we
12 actually -- I had his cell phone number only because that
13 was his business number. I don't know if I actually gave
14 him my cell phone number, but I know that we had called
15 each other.
16 Q. What did you talk about?
17 A. He wanted to meet. He wanted to be able to have
18 dinner, something along those lines.
19 Q. Did you return his calls?
20 A. I talked to him on occasion, yes.
21 Q. Did you ever tell Mr. Durham that you weren't
22 interested in having dinner with him or anything of --
23 A. That I was not interested?
24 Q. That you were not interested.

Page 136

1  A. No.
2  Q. These e-mails that you sent and received from
3  Mr. Durham, about how many are there?
4  A. I can't recall exactly.
5  Q. Did you send them from your Commerce computer?
6  A. I possibly did, yes.
7  Q. How about your home computer?
8  A. I can't recall that if I -- I'm sure I may have,
9  but I cannot recall.
10 Q. These e-mails, e-mail traffic that you had with
11 Dr. Durham, did any of that occur after hours, so to
12 speak, in the evening, for example, or weekends?
13 A. Well, there was several times in my job that I
14 worked very late and/or worked over the weekend that I
15 may have received an e-mail that he sent, when they could
16 have been after those particular hours.
17 Q. How about the e-mail traffic that had nothing to
18 do with work, but, rather, having dinner and things like
19 that?
20 A. I don't believe there was too much
21 correspondence via e-mail that way. He would either call
22 and we would try to set up something that way.
23 Q. Did you ever go out to dinner with him?
24 A. We had appetizers and a drink one time.

Page 137

1  Q. That's it?
2  A. Yes.
3  Q. Where was that?
4  A. That was at the -- we decided to meet in the
5  middle, which was Philadelphia at the Airport Marriott in
6  the bar there.
7  Q. So you drove up to Philadelphia?
8  A. Yes, I did.
9  Q. Was that after hours?
10 A. Yes, it was. I'm trying to remember if it was
11 over the weekend. I don't recall.
12 Q. Okay. Was this before or after the golf outing
13 in Maryland?
14 A. I don't truly recall. I believe it was after.
15 Q. How long did this appetizers and drinks meeting
16 last?
17 A. Our date? My date with Mr. Durham?
18 Q. Yeah.
19 A. It was a date. Probably two hours. It wasn't
20 that long.
21 Q. Did you ever tell Mr. Durham that you thought
22 Mr. Duncan had acted inappropriately toward you?
23 A. I don't believe that I used those exact words.
24 Q. What words did you use?

35 (Pages 134 to 137)

Bailey v. Commerce National Insurance Services, Inc.

February 7, 2006                    C.A. # 05-CV-183 SLR              Bailey, Kimberly A. - Vol. 2

Page 257

1  office, correct?
2      A.  Yes.
3      Q.  During that eight-week period could you estimate
4  how much time he was out of the office?
5      A.  No, I could not.
6      Q.  During that eight-week period, do you have any
7  specific recollection of any words that he said to you
8  other than "Good e-mail"?
9      A.  No, I don't have any recollection of him saying
10 anything other than that, other than business related.
11     Q.  Okay.  And in those words that he spoke to you
12 that were business related, were they conveyed to you in
13 a professional manner?
14     A.  It was just a normal conversation.
15     Q.  Where are we on the Jones file sort of comments?
16     A.  That, yes.
17     Q.  And during that eight-week period were you ever
18 put in a situation where you and Mr. Duncan were to
19 travel together?
20     A.  No.
21     Q.  During that eight-week period were you ever in a
22 situation where you and Mr. Duncan were at a social
23 occasion together?
24     A.  No.  I would never agree to travel or to

Page 258

1  socialize or anything.  It was an uncomfortable time.
2      Q.  That's not my question.
3      A.  But, no, we were not to travel or to social
4  events, no.
5      Q.  Okay.  So you were at no travel events with Mr.
6  Duncan during the eight-week period, correct?
7      A.  No.  Correct.
8      Q.  You did not go to any social events with Mr.
9  Duncan, correct?
10     A.  No.
11     Q.  Did you ever have lunch with Mr. Duncan during
12 that eight-week period?
13     A.  No.
14     Q.  Were you ever during that eight-week period in
15 the workplace with Mr. Duncan alone, behind closed doors?
16     A.  No.  I was advised not to do that, which I
17 wouldn't have done it anyway.
18     Q.  Well, the answer is no then, you were not behind
19 closed doors with Mr. Duncan at any time during that
20 eight-week period, correct?
21     A.  I was behind closed doors.  There was someone
22 with me.  Marge Phipps was with us in his office.  The
23 door was closed.
24     Q.  All right.  During that eight-week period Mr.

Page 259

1  Duncan did not make any disparaging remarks to you,
2  correct?
3      A.  I avoided Mr. Duncan, so I don't recall any
4  comments.
5      Q.  During that eight-week period Mr. Duncan did not
6  make any disparaging remarks to you, correct?
7      A.  Not that I recall.
8      Q.  On page 7, paragraph 24, subparagraph (b), you
9  state that Commerce "failed to keep the charge against
10 Mr. Duncan confidential which resulted in others in the
11 department learning of the charges," do you see that?
12     A.  Yes.
13     Q.  Who are the others, specifically by name?
14     A.  Mr. Duncan would speak in his office loudly to
15 others about the situation.  Outside of his office is a
16 lady, Chickadel is her last name, Nancy, Nancy Chickadel.
17 In walking up and down the hallway you could hear Mr.
18 Duncan talking on the phone.  Nancy sits right there.
19 Nancy had to have heard everything that he had said on
20 the phone.
21     Q.  Was that a mere assumption on your part?
22     A.  No.  It has to be fact because she sits there.
23 She is not deaf.  And you can walk down the hallway, feet
24 from his office, and hear him speaking, and she is

Page 260

1  sitting right there.
2      Q.  Did you ever ask her if she heard anything about
3  your charge?
4      A.  I never spoke about my charge to anyone.
5      Q.  So you assume that she heard it, correct?
6      A.  She had to have heard it.
7      Q.  Okay.  Who are the others?
8      A.  I believe Mr. Duncan was talking on the phone
9  with those people, whomever he was speaking with.
10     Q.  So you have no idea who the others are that you
11 put in this complaint other than the woman who sat
12 outside of his office?
13     A.  There was -- I know that he spoke to Paul
14 Scaffidi because Paul Scaffidi told me.  I know that he
15 talked to the director up in Randolph.
16     Q.  Who is that?
17     A.  I don't recall his name.
18     Q.  What did Mr. Scaffidi tell you?
19     A.  He just asked, or he said, "Steve called and
20 wanted to talk about the charges," and just basically
21 wanted to know what Paul's side of the story was going to
22 be.
23     Q.  And Mr. Scaffidi told you this before or after
24 you had slept with him?

22 (Pages 257 to 260)

Deborah Watson

Page 38

1  questions was correct?
2      A.  No.  These were my notes from the
3  conversations we had.
4      Q.  But the conversation you had was her answers
5  to your questions.  Right?
6      A.  Right.  About the document she had already put
7  in writing for us.
8      Q.  Right.
9          But was she ever given an opportunity to
10  review this and say whether she agreed with your summary
11  of her answers?
12      A.  No.
13      Q.  Why not?
14      A.  Because these are confidential documents that
15  stay in the investigation file.  So, again, Bruce and I
16  were the only ones who saw these as a part of when we
17  worked through the investigation.
18      Q.  But they couldn't have been confidential as to
19  Kim.  Right?  She's the one that's the source of all of
20  the answers.
21      A.  It's confidential from everyone.  It's Bruce
22  and I through an information-gathering process.  I
23  wouldn't share that.
24      Q.  How can you share information with the source

Page 39

1  of the information?
2      A.  Excuse me?
3      Q.  What you're saying is that you would not share
4  the information that you have with the source of the
5  information.
6      A.  What I'm saying is, as I gather facts through
7  the investigation, those are things that Bruce and I
8  would gather and keep together.  If there was something
9  in here that we needed to go back and clarify, we would.
10  But I'm not going to put a formal document in front of
11  her.  These are my notes.
12      Q.  You didn't think it was important that Kim
13  agree with the way you've characterized her answers or at
14  least have an opportunity to see how you've characterized
15  her answers?
16          MS. LEMING:  Objection to the form.  You
17  can answer.
18      A.  I wrote down, to the best of my ability, what
19  she said.
20      Q.  Well, that's not my question.
21          My question is:  Didn't you think it was
22  important to at least let Kim Bailey see your
23  characterization of her answers?
24          MS. LEMING:  Objection to the form.  You

Page 40

1  can answer.
2      A.  I didn't think it was necessary, because,
3  again, I wrote down to the best of my ability what she
4  said, and I was going off of something she had already
5  put in writing for me.
6      Q.  Why did you have her sign this statement,
7  then?
8      A.  Because when I got the statement there was no
9  name on it and there was no date on it.
10      Q.  Well, why did you have her sign it?
11          You knew who it came from.
12      A.  If I got hit by a bus, I wanted to make sure
13  that everybody knew who it came from.
14      Q.  You told me earlier you had two meetings with
15  Kim.  One was the Sage Diner.
16      A.  Mm-hmm.
17      Q.  The second one was this meeting where you went
18  over this questionnaire.  Any other meetings with Kim
19  concerning the investigation of Steve Duncan's sexual
20  harassment of her?
21      A.  After we terminated Steve, Joe Morrissey --
22      Q.  Before that.
23      A.  Before that?
24      Q.  Yes.

Page 41

1      A.  No.  It was phone conversation or e-mail.
2      Q.  How many phone conversations?
3      A.  I don't remember how many.
4      Q.  Can you tell me whether it was more or less
5  than ten?
6      A.  It was less than ten.
7      Q.  Less than five?
8      A.  I don't know.  I'm comfortable saying less
9  than ten.  I don't want to drill it any further.  I'd be
10  purely guessing.
11      Q.  Can you recall the substance of any of those
12  conversations?
13      A.  One of them concerned Steve Duncan talking to
14  Mike Smith, Sr., and Kim wanted to let me know what she
15  had overheard -- or actually what she heard by listening
16  in on the phone.
17      Q.  What did she tell you?
18      A.  She told me that she heard Steve talk to Mike
19  Smith, Sr., and tell him that HR was going to talk to
20  Paul Scaffidi about the night that Kim and Steve were in
21  Randolph in MainStreet for a meeting.
22      Q.  So Kim overheard this conversation with Steve
23  talking to Mike Smith, Sr.?
24      A.  No.  Kim actually told me she had the ability

**Kimberly A Bailey**          To: Deborah E Watson/Commerce Bank@yesbank
05/15/03 08:38 AM              cc:
                               Subject: Re: WOW Awards

The original e-mail sent at 9:25am is what I would normally say to the entire department, excluding no one. After Mr. Duncan dropped his comment to me... I let it bother me, thinking I had done or said something wrong. I send a clarification to the e-mail at 4:25pm.

----- Forwarded by Kimberly A Bailey/Commerce Bank on 05/15/03 08:37 AM -----

**Kimberly A Bailey**          To: Kimberly A Bailey/Commerce Bank@yesbank
05/13/03 04:25 PM              cc: Andrew H Bumstead/Commerce Bank@yesbank, Cheryl L
                               Luckanish/Commerce Bank@yesbank, Coralea M Layton/Commerce
                               Bank@yesbank, Darlene Wilkins/Commerce Bank@yesbank, Diane M
                               Schauber/Commerce Bank@yesbank, Dorothy E Deegan/Commerce
                               Bank@yesbank, Dorothy L Whalen/Commerce Bank@yesbank,
                               Heather B Smith/Commerce Bank@yesbank, Heather L
                               Pokoiski/Commerce Bank@yesbank, Julius A Bland/Commerce
                               Bank@yesbank, Maria A Campos/Commerce Bank@yesbank, Marjorie
                               Phipps/Commerce Bank@yesbank, Patricia L Scott/Commerce
                               Bank@yesbank, Sharon B Scotton/Commerce Bank@yesbank, Steven
                               E Duncan/Commerce Bank@yesbank, Valerie J Oakes/Commerce
                               Bank@yesbank
                               Subject: Re: WOW Awards🗒

All I would like to clarify... you are not in anyway pressured to stay with me or the department... I just wanted to make the offer. It doesn't appear that we've (MainStreet) has made any plans together yet. If you want to go up **"just"** for the WOW Awards - this is perfectly ok. We can follow up with the plans the DE office is making.

As for the over night plans... if these were to happen. In no way would I put anyone in uncomfortable position. The ladies would be assigned only on an agreed assignment. Gentlemen... I didn't want to exclude you but you may be on your own.

Kimberly A Bailey

**Kimberly A Bailey**          To: Darlene Wilkins/Commerce Bank@yesbank, Heather L
05/13/03 09:25 AM              Pokoiski/Commerce Bank@yesbank, Valerie J Oakes/Commerce
                               Bank@yesbank, Dorothy L Whalen/Commerce Bank@yesbank, Julius
                               A Bland/Commerce Bank@yesbank, Dorothy E Deegan/Commerce
                               Bank@yesbank, Cheryl L Luckanish/Commerce Bank@yesbank,
                               Heather B Smith/Commerce Bank@yesbank, Sharon B
                               Scotton/Commerce Bank@yesbank, Andrew H Bumstead/Commerce
                               Bank@yesbank, Coralea M Layton/Commerce Bank@yesbank,
                               Patricia L Scott/Commerce Bank@yesbank, Maria A
                               Campos/Commerce Bank@yesbank, Diane M Schauber/Commerce
                               Bank@yesbank
                               cc: Steven E Duncan/Commerce Bank@yesbank, Marjorie
                               Phipps/Commerce Bank@yesbank, Kimberly A Bailey/Commerce
                               Bank@yesbank
                               Subject: WOW Awards

## Where is our MainStreet Representation????????

Things have changed for me and I am NOW available to attend the WOW Awards. I

CONFIDENTIAL          CIS 0530          **B 54**

will be making Hotel arrangements for anyone interested in staying over night. I will also drive so we don't have to deal with waiting on someone else make this decision.

So this is what I need from you... **ARE YOU GOING?????????  yes or no**

Please respond back to me by Thursday May 15th if you are planning on going. I will shop hotels this weekend and come back Monday with some options. I will try to keep it very reasonable, not to cost us too much... Gals, we may have to sleep four to a room. Hope no one snores. Boys (all two of you) I need to know if you are going... I will need to make special arrangements for mixed company... I'll see if there are suites available with separate rooms.

I will promise all of you a fun time in NY and I will try to keep us out of trouble...  I'm excited and I'm looking forward to enjoying the evening of celebrating the WOW with all.

Steve, I will no longer need PTO on 6/27 & 6/30 - my vacation plans for Pittsburgh have changed.

CONFIDENTIAL

Deborah Watson

47 (Pages 182 to 185)

Page 182

1    Q. -- when you're talking about --
2    A. Right.
3    Q. -- those instances.
4    A. And I'm sorry. I'm thinking out loud. I
5    apologize for that. Yes. Backstage was definitely one
6    of them. We had the he said/she said with the Travelers
7    event, although that was the weekend where Travelers
8    invited them. Actually, all four of the incidents
9    involved alcohol, if I remember correctly.
10   Q. Travelers -- was that an after hours social
11   event?
12   A. It was a Saturday.
13   Q. Okay. But wasn't that a business event?
14   A. It -- that one was more within company
15   parameters. But again, Travelers had invited us. And
16   she does have a right to say no. That's not, for
17   example, a business meeting from 1:00 to 3:00 in the
18   afternoon.
19   Q. So far what she did wrong was she allowed
20   herself to be put in the position at the Backstage. She
21   allowed herself to be put into a bad situation at the
22   Travelers. And it looks like this e-mail concerning the
23   WOW! awards. What was it that you didn't like about
24   that?

Page 183

1    A. That is outside the company's parameters.
2    The -- that's a company event. And the company provides
3    buses -- company-paid transportation for all the
4    employees to go up to the WOW! awards. And what she
5    did -- and I believe in an effort to increase morale and
6    bonding she offered to arrange outside transportation and
7    arrange for people to stay overnight in hotels in
8    New York as opposed to staying within the company
9    parameters which were the bus picks you up in Delaware,
10   company-provided, drives you to New York. When the WOW!
11   awards are over, you get back on the bus and the bus
12   takes you back.
13   Q. Same night?
14   A. Same night.
15   Q. So what Kim did was, in an effort to raise
16   morale, she was trying to make arrangements for the
17   people that she worked with to stay a night in New York.
18   A. Yes.
19   Q. Okay.
20   A. Night in New York, separate transportation up.
21   Q. Now, is there any specific policy that you can
22   cite to in the policies and procedures manual that says
23   that that's not proper?
24   A. I would have to review the handbook, but it

Page 184

1    goes to the manager having to set the example. And if
2    the company is advocating a certain way to do things like
3    the trip to New York, then management should stay within
4    those parameters. And if they're not going to, they
5    should ask about doing something separate.
6    Q. Now, is that your opinion or is that actually
7    in the book?
8    A. I would have to look at the book. I don't
9    recall where it is in the book.
10   Q. So that's another thing that she did wrong.
11       Now, did that contribute to her sexual
12   harassment?
13       MS. LEMING: Objection to the form. You
14   can answer.
15   A. This contributed to what we felt were
16   behaviors in the workplace we wanted to see her change,
17   and it was an example of her setting up an outing, again,
18   outside the company parameters. You have the company
19   parameter and going outside that that would allow for
20   more freedom for the employees to maybe end up in a
21   situation where there could be alcohol or inappropriate
22   comments or things like that.
23   Q. I'm trying to figure out how this
24   investigation into her sexual allegation claims turns

Page 185

1    into criticism over the fact that she tried to arrange
2    other transportation to New York to see the WOW! awards.
3    A. Through the course of the investigation and in
4    pulling e-mails and things like that -- the e-mail that
5    she sends out she had actually sent to me about New York.
6    And this is a behavior that we don't want our management
7    to do. If we set up a company-sponsored event with a
8    certain parameter, we want them within that parameter.
9    So this came up as part of the thorough investigation
10   that we did.
11   Q. But she sent you an e-mail that she was going
12   to do that? She was going to propose another way up?
13   A. She sent the e-mail to all of MainStreet.
14   Then she called me because Steve Duncan made a comment to
15   her about it that she didn't like. So then she said she
16   got a little paranoid about it. So she then retracted it
17   to try to make it sound more structured and that she
18   wasn't implying anything. And I asked her to send me
19   everything that she had sent. I believe Steve sent it to
20   me also.
21   Q. Was she given an opportunity at the June 3
22   meeting to explain to you what she was trying to do
23   there?
24   A. Yes.

Deborah Watson

9 (Pages 30 to 33)

Page 30

1    A.  To try to get a feel for the office.
2    Q.  Why did you think that was important?
3    A.  Because we had the complaint -- or the charge
4  from Kim and we had interviewed Steve Duncan and he had
5  some very different versions. And so we were trying to
6  get a feel for: Was anything out in the workplace?  Was
7  the office functioning or was this dysfunctional?  Was
8  there anything visible?  So we interviewed the third
9  member of the management team figuring she would have the
10  most interaction with Kim and Steve.
11    Q.  Did you interview Kim other than to take her
12  initial complaint?
13    A.  I talked to Kim twice.
14    Q.  You mean after she filed the complaint?
15    A.  The first time I talked to Kim I met her at
16  the Sage Diner, and we had an initial discussion.
17    Q.  What's the Sage Diner?
18    A.  It's a diner in Cherry Hill.
19    Q.  After hours?
20    A.  I think it was breakfast.  It was early in the
21  morning.
22    Q.  What was she doing in Cherry Hill?
23    A.  She sent me an e-mail and asked to meet with
24  me.

Page 31

1    Q.  This is before she filed the written letter or
2  after the written letter?
3    A.  She handed me the written letter at the
4  meeting.
5    Q.  Okay.  At the meeting with Kim where she
6  handed you the letter?
7    A.  Yes.
8    Q.  All right.  Let me ask you this:  I suppose
9  that the substance of the meeting was what was contained
10  in that letter.  Right?
11    A.  We discussed the summary of it.  She let me
12  read it.  I asked her to think about how she would --
13  what did she want out of this, how did she want to see
14  this resolved and to communicate that to me in writing.
15  And then I asked that I have some time to read through it
16  and then contact her if I needed to speak with her again.
17    Q.  Of course, she said that's fine.  Right?
18    A.  Yes.
19    Q.  How long did that meeting last?
20    A.  I don't recall.  But I'd say 30 minutes to an
21  hour.
22    Q.  You said it was a breakfast meeting?
23    A.  Yes.
24    Q.  Did both of you eat breakfast?

Page 32

1    A.  I don't remember.
2    Q.  You said you had another communication with
3  Kim after she gave you that letter at the Sage Diner?
4    A.  Yes.
5    Q.  What was that?
6    A.  We asked her to come up and meet with Bruce
7  McKelvy and I.  I had shared the letter with Bruce.  And
8  we wanted to ask her questions to make sure we thoroughly
9  understood her charge and her perspective on this.
10    Q.  Was this meeting in Cherry Hill?
11    A.  Yes.
12    Q.  It was you, Bruce McKelvy and Kim?
13    A.  Yes.
14    Q.  How soon after you got the letter at the Sage
15  Diner did this meeting occur?
16    A.  A couple days, maybe.  I don't remember
17  exactly.
18    Q.  Do you have any notes of that meeting?
19    A.  Yes.  You have them.
20    Q.  Do you have any notes of the meeting at the
21  Sage Diner?
22    A.  No.
23       MS. LEMING:  Can we just take a short
24  break real quick?

Page 33

1       MR. MARCONI:  Sure.
2       (A recess was taken.)
3       - - - - -
4       DEBORAH E. WATSON, resumes
5  BY MR. MARCONI:
6    Q.  Can you take a look at what I've marked as
7  Watson 8?  Obviously, we're going out of order.
8    A.  (The witness complied with counsel's request.)
9    Q.  First, let me ask you:  Do you recognize that
10  as your handwriting?
11    A.  Yes.
12    Q.  Are these notes that you took from this second
13  meeting in Cherry Hill?
14    A.  Yes.
15    Q.  Now, who prepared this form?
16    A.  I did.
17    Q.  Okay.  So you were asking Kim these questions,
18  and then you're writing down her answers?
19    A.  Yes.
20    Q.  Had she been given the questions before, or
21  did you just ask her for the first time when she came?
22    A.  These were -- this was my way of working
23  through her charge document to make sure I understood
24  everything.  So she had not seen them ahead of time.  It

Deborah Watson

8 (Pages 26 to 29)

Page 26

1 their bosses went.
2     Q.  Did you ever consult Kim specifically and
3 discuss with her why she wasn't being moved or he wasn't
4 being moved?
5     A.  I don't recall. But we, I would hope, had
6 asked her in the initial meeting if she could work
7 professionally with him while we worked through this.
8     Q.  Is –
9     A.  And I believe we asked Mr. Duncan the same
10 thing.
11     Q.  So you say you hoped you would have asked her
12 that?
13     A.  I'm going to change that to I believe we asked
14 her.
15     Q.  Are you sure?
16     A.  To the best of my recollection.
17     Q.  You did ask her?
18     A.  Yes.
19     Q.  Did you ask her input into your decision that
20 there was no place to send her other than Randolph?  In
21 other words, did you ask her, look, we're willing to send
22 you to Randolph if you want, you know, but we're not
23 going to require you to go there?
24     A.  No, we did not ask her that.

Page 27

1     Q.  Why not?
2     A.  Because it would seem punishing.  She lives in
3 Delaware.  Randolph is up north.  Again, we would have a
4 better business reason, but we still have to explain why
5 she's up there.  And the investigation, it was not
6 something we would do in a day or two, which meant it
7 would have been an extended period of time.  It would
8 have felt burdensome.
9     Q.  So you decided that it would be more
10 burdensome for her to go up to Randolph every day than it
11 would to work with a guy that was sexually harassing her?
12         MS. LEMING:  Objection to the form.  You
13 can answer.
14     A.  I didn't have facts yet that he was sexually
15 harassing her.  I had her charge, which was why we asked
16 if she could work professionally with him.  And, again,
17 we had to ask the same thing of Duncan.
18     Q.  Your testimony is that you believe you asked
19 Kim that question, and she said, sure, I'm willing to
20 work with him?
21     A.  No.  I said I believe I asked that question,
22 and she did not come back to me.  I don't know what
23 specifically she said that I recall, but she did not come
24 back to me and say, no, no way.  I can't do it.

Page 28

1     Q.  Did you she specifically tell you that she was
2 willing to work with Steve Duncan while you were
3 investigating?
4         MS. LEMING:  Objection to the form.  You
5 can answer.
6     A.  That I don't recall.
7     Q.  So you and Mr. McKelvy were the only people
8 that were involved in the investigation into the charges
9 of sexual harassment.  Correct?
10     A.  Yes.  He and I interviewed the witnesses,
11 talked to Steve, talked to Kim.
12     Q.  Who were the witnesses that you interviewed?
13     A.  Cindy Smith, Scott Durham, Paul Scaffidi.  We
14 spoke to Steve Duncan.  And we spoke to Marge Phipps with
15 just some general questions about the office environment.
16     Q.  What did you ask Marge?
17     A.  We asked Marge about professional behavior in
18 the MainStreet office.
19     Q.  Can you be more specific?
20     A.  We asked her if she had any inappropriate
21 dealings with Steve, and she said no; any inappropriate
22 dealings with Kim, which she said no.
23     Q.  What did you mean by "inappropriate dealings"?
24     A.  Meaning like uncomfortable or unprofessional.

Page 29

1     Q.  Towards her?
2     A.  In her personal interactions, yes.
3     Q.  In other words, did you ask her:  Did you ever
4 see Steve Duncan and Kim doing anything of a sexual-type
5 nature?
6     A.  No.
7     Q.  No?
8     A.  What I asked her was:  Marge, in your
9 interactions with Steve, has he ever been unprofessional?
10 Inappropriate?  And her response was, no, he's always a
11 perfect gentleman.
12         Marge, in your interactions with Kim,
13 has there ever been anything unprofessional or
14 inappropriate?  And she said there was a lot of office
15 banter – some of it directed at the copy machine
16 person – and that she felt it was Kim trying to keep it
17 light, but it was sometimes unprofessional.
18     Q.  Did she specifically accuse Kim of doing
19 anything unprofessional?
20     A.  She felt that Kim was trying to keep it light.
21 She didn't say it was unprofessional.  She just said it
22 was not, I guess, as professional as Mr. Duncan was.
23     Q.  What is it that made you ask Marge Phipps
24 anything?

B 58

Deborah Watson

3 (Pages 6 to 9)

Page 6

1  administrative proceedings that were held before the
2  Department of Labor in this matter?
3     A.  It's addressed to Julie Cutler at the
4  Department of Labor. So at that point I would have to
5  say yes. I don't remember personally mailing it or
6  anything like that.
7     Q.  Did you review it before it was sent to
8  Ms. Cutler?
9     A.  That I don't recall.
10    Q.  Do you know whether anyone reviewed it before
11 it was sent to Ms. Cutler?
12    A.  I don't know. I could only speak for myself.
13    Q.  You don't know whether you did or not?
14    A.  I don't remember. I'm sorry.
15    Q.  Is there anything in that document that you
16 consider to be inaccurate?
17    A.  I'm comfortable with the document.
18    Q.  I looked at my watch when you began to read it
19 a second time --
20    A.  Mm-hmm.
21    Q.  -- and you took about two minutes.
22       Did you have enough time to review it to
23 make sure that you were comfortable with it?
24    A.  Yes.

Page 7

1     Q.  What was your role, ma'am, if any, in the
2  decision to terminate Ms. Bailey's employment with
3  Commerce?
4     A.  I was part of the group that discussed that.
5     Q.  When you say "that," you mean the decision to
6  terminate Ms. Bailey?
7     A.  Yes.
8     Q.  Who else was part of the group?
9     A.  Mary Corcoran, Joe Morrissey. I called Sue
10 Leming. Possibly Ed Kiessling. Possibly Bruce McKelvy.
11    Q.  At the time this group was formed -- actually,
12 when was this group formed, if you will?
13       MS. LEMING: Objection to the form. You
14 can answer.
15 BY MR. MARCONI:
16    Q.  Assembled, maybe.
17       MS. LEMING: Same objection. You can
18 answer.
19    A.  It wasn't really a group that was formed.
20 Mary, as the department manager, as I stated earlier, is
21 someone I would talk to if we were going to talk about a
22 termination or discipline. Joe is Mary's boss and was
23 ultimately responsible for MainStreet. Ed Kiessling was
24 the president of Commerce Insurance at the time. And,

Page 8

1  then, Bruce McKelvy had assisted me in the initial
2  investigation.
3     Q.  Of Steve Duncan?
4     A.  Yes.
5     Q.  Why did you feel it was necessary to bring
6  Bruce McKelvy in to a committee or a group that was going
7  to be assembled to discuss firing Kim?
8     A.  That's why I said "possibly." I'll be honest
9  with you. I don't recall a specific conversation I had
10 with him.
11    Q.  Well, let's assume that he was brought in.
12       Why would you have brought him in?
13    A.  I use Bruce as a sounding board for myself.
14 He has over 25 years of human resources experience, and
15 he's a respected colleague.
16    Q.  Do you recall asking Bruce for his advice in
17 connection with this -- firing Kim?
18    A.  I don't recall.
19    Q.  Why did you consult with Ms. Leming?
20    A.  I knew from doing the sexual harassment
21 investigation that she had -- Kim had e-mailed her
22 original letter to you for editing, at which point if I
23 know an employee is in contact with an attorney I will
24 often contact our attorneys as a sounding board.

Page 9

1     Q.  Now, did you contact Ms. Leming during the
2  investigation of the charges against Steve Duncan?
3     A.  No. I believe Bruce was talking to Sam first
4  at Brown & -- or at Blank Rome, which is the other
5  employment attorneys that the bank uses.
6     Q.  About what?
7        MS. LEMING: I'm going to --
8     A.  I wasn't part of the conversation. I don't
9  know.
10    Q.  Well, you have no idea what he was talking to
11 Blank Rome about?
12       MS. LEMING: I'm just going to instruct
13 you not to disclose any attorney-client communication, if
14 you know any.
15    A.  I don't.
16    Q.  But were they discussing Duncan or Kim?
17    A.  I don't know.
18    Q.  Okay.
19    A.  I don't know.
20    Q.  All right. So the group was -- and I'll use
21 the word "assembled." I know that wasn't your word. But
22 there was a group of people that you consulted with prior
23 to making the determination to terminate Kim's
24 employment. Right?

Deborah Watson

13 (Pages 46 to 49)

Page 46

1  e-mail that, you know, she was kidding and no one would
2  have to stay in a room with someone that they didn't want
3  to.
4      Q.  Anything else you can remember?
5          Now we've got at least two
6  communications with Kim.
7      A.  I contacted her in May, late May, to try to
8  set up a meeting because we needed to meet with her and
9  Steve to resolve this, and she said she was going out on
10 vacation.  She was going to be out for three days.
11     Q.  You proposed a meeting.
12         Who was going to be at the meeting?
13     A.  At least myself.
14     Q.  So --
15     A.  I don't remember if Bruce was coming down or
16 not.
17     Q.  And Kim and Steve Duncan?
18     A.  No.  We were going to have to go down there to
19 meet with Kim to talk to her about what was going -- you
20 know, what was going to happen and the conclusion of the
21 investigation and to talk to Steve, as the other party,
22 about the conclusion of the investigation.
23     Q.  But not in the same meeting.  Right?
24     A.  No, no.

Page 47

1      Q.  So you proposed to meet with Kim to tell her,
2  okay, Kim, this is what we have decided to do --
3      A.  Right.
4      Q.  -- with your charge?
5      A.  Right.
6      Q.  And this is late May?
7      A.  Late May.
8      Q.  And she couldn't make it?
9      A.  She had a vacation.
10     Q.  So did you eventually have this meeting with
11 her?
12     A.  It ended up it was June 3rd.
13     Q.  June 3rd.
14         Did you have the meeting with Steve
15 Duncan in late May when she wasn't around --
16     A.  No.
17     Q.  -- and terminate him?
18     A.  No.
19     Q.  When was he terminated?
20     A.  June 3rd.
21     Q.  Okay.  So he was terminated first, and then
22 Kim was sat down and talked to?
23     A.  Yes.
24     Q.  Anything else?  Oh, that's it.  You said

Page 48

1  that's June 3rd.  Right?
2      A.  Yeah.  I thought of something else, though.
3      Q.  Go ahead.
4      A.  I had to contact Kim at one point because we
5  wanted -- Bruce and I wanted to talk to Cindy Smith.  And
6  I had to reach out to Kim to find out how to get in touch
7  with Cindy so we could set up a meeting with Cindy.
8      Q.  Did you do that?
9      A.  Yes.
10     Q.  When was that, do you remember?
11     A.  May sometime.
12     Q.  May of 2003?
13     A.  Yes.
14     Q.  What did Cindy Smith have to say?
15     A.  We asked her about the initial meeting -- the
16 initial outing where Kim left the bar with Steve to walk
17 him to his car, I believe.
18     Q.  What did she say?
19     A.  Cindy said they had all been out, and they
20 were having drinks.  And Steve said that he had to go.
21 And he asked Kim if she would walk him to his car, which
22 she agreed to do.  And then about ten minutes or so later
23 Cindy and the rest of the group came out, because I think
24 a couple of Cindy's friends were there too.  And they

Page 49

1  kind of waited and could see that Kim was in the car with
2  Steve, at which point Cindy had to go home.  She wasn't
3  really sure what to do.  So she finally decided to go up
4  and knock on the window and said, "Kim, get out of there.
5  I've got to go home."
6      Q.  She said to Kim to get out of the car?
7      A.  Yeah.  She had to go home.
8      Q.  What else did she say?
9      A.  She told us that she had known Kim for a
10 while.  She told us that Kim had asked her to go out the
11 night that Scott Durham, Steve, and Kim were all going to
12 go out -- that Cindy was the fourth person to come along.
13 That was a carrier meeting.  And they had been out for
14 drinks that night also.  She said that she and Kim had
15 talked about -- that Kim had been uncomfortable at the
16 bar the first meeting.  And they had talked about Kim
17 talking to Steve about it and that they had agreed that
18 Kim was going to say something to Steve.
19     Q.  Cindy and Kim agreed?
20     A.  Yes.
21     Q.  So she said that Kim expressed to her
22 discomfort with what was going on with Duncan and that
23 she wanted it to stop?
24     A.  The one evening that she felt uncomfortable.

## Deborah Watson

14 (Pages 50 to 53)

### Page 50

1  Q. Do you remember what evening that was?
2  A. I think it was the first night.
3  Q. Did you ask Cindy if she saw Mr. Duncan put
4  his hands on Kim inappropriately?
5  A. She said she could see them in the car, but I
6  don't recall that she could see what they were doing.
7  She said she just knocked on the window.
8  Q. My question was: Did you ask her whether she
9  saw Steve Duncan do anything inappropriate to Kim Bailey?
10  A. I think yes. Yes, we did.
11  Q. What —
12  A. Yes, we did. We asked about being in the bar,
13  because Kim had said that Steve was touching her in the
14  bar.
15  Q. What did Cindy say in response to that
16  question?
17  A. Cindy said that they were standing separate —
18  they weren't really with the group — and that Kim had
19  said something to her later.
20  Q. Said something to her about what?
21  A. As I said earlier, that she had been
22  uncomfortable and that she was going to talk to Steve
23  about it.
24  Q. But did you ask her, ma'am, whether she saw —

### Page 51

1  I'm not asking you whether it happened.
2  A. Yeah.
3  Q. I'm asking you: Did you ask her whether or
4  not she saw Steve Duncan do anything inappropriate to
5  Kim?
6  A. I believe we asked if she saw her — him touch
7  her in the bar. And that's when she said they were
8  standing separate. And then she told us that Kim felt
9  uncomfortable later and had talked it over with her.
10  Q. Did you do a similar template like you did
11  with Exhibit No. 8 where you typed up general areas of
12  questioning and wrote down Cindy's responses?
13  A. I did that with Steve, not with Cindy.
14  Q. You didn't do it with Cindy?
15  A. No.
16  Q. Why not?
17  A. Steve and Kim were the two main parties. When
18  we met with Cindy, it was at a restaurant in Delaware,
19  and it was more conversational. So it was over lunch.
20  Q. You have no notes of any kind concerning your
21  conversation with Cindy?
22  A. Yeah. I do have a few. They're in the stack.
23  Q. Did you give those to us?
24  A. Yes.

### Page 52

1  Q. Those were taken down the same way?
2  A. Yeah. They — it was handwritten.
3  Q. At this restaurant meeting —
4  A. Yes.
5  Q. — with Cindy?
6  A. Yes.
7  Q. So basically what did Cindy tell you happened
8  between Steve Duncan and Kim?
9  A. That Steve had come out that first night and
10  that they were standing separately and that when Steve
11  went to leave he asked Kim to walk to the car, which she
12  did, and that they were gone about ten minutes, and that
13  when Cindy came out they were both in the car. And Cindy
14  was kind of standing a couple cars down with whoever
15  these other people were and she needed to leave. So she
16  walked up to the window, knocked on the window and could
17  see them both in the car and said, "Get out of the car.
18  I need to leave."
19  Q. Did you draw any conclusions based on your
20  discussions with Cindy whether or not Steve had in fact
21  sexually harassed Kim Bailey?
22  A. It verified for me that Kim felt uncomfortable
23  after the first meeting because she said something to
24  Cindy. I did wonder about the ten-minute delay on the

### Page 53

1  walk out to the car.
2  Q. What did you wonder about that?
3  A. It just seemed like a long amount of time to
4  walk to a car, be in a car.
5  Q. Well, what did you perceive as happened in
6  that ten minutes?
7  A. I didn't know. I assumed they just walked to
8  the car and got in the car, which Kim said she got in the
9  car and Steve lunged at her. Steve said it was
10  consensual.
11  Q. But had you already talked to Steve by the
12  time you talked to Cindy?
13  A. Yes.
14  Q. Did Cindy's name come from Steve or from Kim?
15  A. From Kim.
16  Q. Did Cindy's information in your view
17  corroborate anything that Steve Duncan had said?
18  A. It was more Kim's side of the story because of
19  the uncomfortable piece and the fact that Cindy said that
20  Kim had talked to her about wanting to talk to Steve to
21  make sure it didn't happen again. I did have the
22  question about the ten-minute walk to the car.
23  Q. I'm not trying to —
24  A. It was a question in my head, though.

Deborah Watson

15 (Pages 54 to 57)

Page 54

1   Q.   What were you questioning?
2   A.   That length of time — being gone for ten
3   minutes.
4   Q.   Well, what was the significance of that?
5   A.   What I was wondering was — Kim said that she
6   felt that she had to get in the car, and then Steve
7   lunged at her. And if in fact they were in the car for
8   the full ten minutes -- Steve said consensual. Kim said
9   no. I was wondering in my mind where does ten minutes
10  land in that.
11  Q.   Maybe I misunderstood your testimony.
12       There is ten minutes that's missing
13  between the time that they left the bar together --
14  A.   Mm-hmm.
15  Q.   -- and they were seen in the car together.
16       Is that what you're saying?
17  A.   Yes.
18  Q.   That's what Cindy told you?
19  A.   Yes.
20  Q.   Your question is:  What happened during that
21  ten minutes?
22  A.   Right. Because I had two separate stories.
23  Q.   What were the stories?
24  A.   Kim's story was that they had walked to the

Page 55

1   car and Steve asked her to get in the car to talk. And
2   they did. And then he lunged at her. And she didn't get
3   out or couldn't get out until her friend knocked on the
4   window. Steve's story was he asked her to walk to the
5   car, they got in the car, and that he kissed her and that
6   it was consensual.
7   Q.   So your question is:  If he lunged at you —
8   you're assuming that he lunged at her right away. Your
9   question is:  If he lunged at you right away and you
10  didn't like it, why didn't you just high-tail it out of
11  that car? Right?
12  A.   That's what I was thinking. And I didn't have
13  any way to prove it because Cindy didn't see specifically
14  in the car.
15  Q.   Was that something you were trying to prove?
16  A.   No. It was just a thought that I had. And I
17  wrote that off as a he said/she said.
18  Q.   Take a look at -- again, I'm out of order
19  here -- what I've marked as No. 10.
20       Can I interrupt you real quickly and ask
21  you one thing? Did you ever show Steve Duncan a copy of
22  the written complaint that Kim made?
23  A.   No.
24  Q.   No?

Page 56

1   A.   No.
2   Q.   Why not?
3   A.   Again because that's in the confidential
4   investigation file. I wanted to confront him with the
5   allegations and find out what his side of the story was.
6   Q.   So your interpretation of the allegations?
7       MS. LEMING:  Objection to the form. You
8   can answer.
9   A.   Well, no. Based on the writing and based on
10  the interview I had with Kim, she had some very specific
11  instances in there, and I wanted to find out what his
12  side of the story was.
13  Q.   You've had a chance to review Watson No. 10?
14  A.   Yes.
15  Q.   Can you tell me what that is, ma'am?
16  A.   These are the questions and notes from Bruce
17  McKelvy and my interview with Steve Duncan.
18  Q.   Was the typewritten stuff prepared in advance?
19  A.   Yes.
20  Q.   Then you sat down with Steve and you asked him
21  these questions?
22  A.   Yes.
23  Q.   And you wrote down the answers?
24  A.   Yes.

Page 57

1   Q.   Before this was Steve asked to give any kind
2   of a written statement about what his position was on the
3   charge?
4   A.   No.
5   Q.   I take it you interviewed him on May 6th.
6   A.   Yes.
7   Q.   You and Mr. Morrissey together prepared this
8   template?
9   A.   No.
10  Q.   Who did?
11  A.   I prepared the template and I showed it to
12  Bruce. It was Bruce McKelvy, not Morrissey.
13  Q.   I'm sorry.
14       Did Bruce make any changes?
15  A.   I don't recall.
16  Q.   If he did, they would have been incorporated
17  into the typewritten part, though?
18  A.   Correct.
19  Q.   How soon before May the 6th, 2003 did you show
20  this to Bruce?
21  A.   I don't recall.
22  Q.   So you met with Steve Duncan, and you went
23  through these questions line by line?
24  A.   Correct.

Deborah Watson

19 (Pages 70 to 73)

Page 70

1  disturbed about her allegations about the conversation in
2  the bar and the touching in the bar. And he's admitted
3  to the kissing, but he's reiterating that there was no
4  touching in the bar and none of these conversations in
5  the bar. So Steve is keeping it focused to in the car.
6      Q. So he admitted to kissing her in the car.
7  It's just that she said he lunged at her and did it, and
8  he says that it was consensual.
9      A. Yes.
10     Q. Who's Einstein's ex-wife?
11     A. Tom Einstein was an employee of Commerce
12  Insurance Services, and his ex-wife apparently was part
13  of this group.
14     Q. He's saying she's the one that knocked on the
15  window when they were kissing?
16     A. Yes. Steve thought that was her.
17     Q. Then it says: When you were in the car, what
18  happened? Who initiated it? Was anyone else there?
19     A. His answer was they were in there for
20  approximately ten minutes and that both of them agreed to
21  get in the car.
22     Q. Now, is that the ten minutes that you had
23  concerns about that you talked to me about earlier?
24     A. That was Steve's version of how long it was.

Page 71

1  And then when we talked to Cindy Smith, we asked her
2  approximately how long it was, and she also said about
3  ten minutes.
4      Q. How long what was?
5      A. Between — Cindy had said between when they
6  left the bar — when Kim and Steve left the bar to go to
7  the car and then when Cindy walked out with the rest of
8  the friends.
9      Q. And saw them in the car?
10     A. Yes.
11     Q. There are notes that Cindy said that?
12     A. Yes. The ten minutes, I believe, is written
13  off to the side.
14     Q. No. 10 says — what is that saying?
15     A. When did the evening end? This is where Steve
16  said that her friends saw the end of the evening. It
17  ended because he had to go. And Kim left with her
18  friend. And I wrote Tom Einstein's ex-wife made the
19  comment because Steve felt that it was Tom Einstein's
20  ex-wife who knocked on the window and said, "I've got to
21  go."
22     Q. So what you're saying here is that Mr. Duncan
23  thought that the lady that knocked on the door and said,
24  "Kim, I have to go" was Tom Einstein's wife?

Page 72

1      A. Ex-wife, yes.
2      Q. Ex-wife.
3         Did you try to contact her?
4      A. No.
5      Q. Why not?
6      A. Because Kim was sure that it was Cindy Smith
7  who knocked on the door and Steve had verified that these
8  were Kim's friends.
9      Q. Look at the back. It's CIS 0506.
10     A. Mm-hmm.
11     Q. What's that? I'm not sure what that says.
12  What does "C1" mean?
13     A. "C1" — if you look at the list, the major
14  events, I have letters. And then you have the questions
15  numbered. "C1" is a comment that Steve made relative to
16  a question I asked that I didn't fit underneath that. So
17  that's how I cross-reference it —
18     Q. Okay.
19     A. — to keep it organized.
20     Q. What does that mean — that C1 on CIS 0506?
21     A. We were talking about Steve — who Scott
22  Durham was. And Steve wanted to set them up.
23     Q. But I'm asking you to tell me what that says.
24     A. Kim confided in Steve about her personal life.

Page 73

1  Tom Cetola — in the spring Tom came to SD, Steve Duncan,
2  and said, quote, Kim likes you and was telling people at
3  the WOW! awards. Kim never confronted — or didn't
4  confront him.
5      Q. All right. So who told you that Kim confided
6  in Steve about her personal life?
7      A. Steve.
8      Q. Steve?
9      A. Yeah.
10     Q. Did you do anything to corroborate that?
11        MS. LEMING: Objection to the form. You
12  can answer.
13     A. We had pulled the e-mails to see what the
14  conversation was back and forth between Steve and Kim.
15  And, for example, we had an e-mail discussion between the
16  two of them about some guy who was going to invite Kim to
17  Atlantic City.
18     Q. Okay. Then Tom Cetola in the spring. What
19  does that mean?
20     A. In the spring of that year — so earlier that
21  year — Tom Cetola, who was a producer in Core, according
22  to Steve Duncan, had come to Steve and said that Kim
23  likes you and that Kim was wandering around the WOW!
24  awards, which was March of that year, I guess, telling

Corbett & Wilcox

**B 63**

Deborah Watson

20 (Pages 74 to 77)

Page 74

1 people that she liked him.
2    Q.  All right.  Cetola was telling people at the
3 WOW! awards — let me finish — that he was saying that
4 Kim Bailey liked Steve Duncan?
5    A.  Tom Cetola came to Steve and said to Steve,
6 "Kim likes you.  Kim was telling people this at the WOW!
7 awards."
8    Q.  And Steve Duncan told you this?
9    A.  Yes.
10   Q.  Did you talk to Tom Cetola about that?
11   A.  No, I did not.
12   Q.  Why not?
13   A.  Because this occurred before Kim's first
14 interaction with Steve in May that she had — that she
15 was upset about.
16   Q.  Yeah.  But you had a suspicious, didn't you,
17 at least based on information that you got from Steve
18 Duncan that all of this was consensual?  Right?
19   A.  I had two sides of the story.  I didn't have
20 any facts yet.
21   Q.  Well, but you did have an allegation that it
22 was consensual and an allegation that it wasn't.
23   A.  Correct.
24   Q.  Now we have a third party here who apparently

Page 75

1 says that he, of his own personal knowledge, heard Kim
2 say she likes Duncan.  Right?
3    A.  Correct.
4    Q.  Now, wouldn't that in your mind lend credence
5 to Duncan's argument that all this was consensual?
6         MS. LEMING:  Objection to the form.  You
7 can answer.
8    A.  That's not a yes or a no.  Can I give you more
9 information?
10   Q.  Well, first give me a yes or no, and then you
11 can give me more information.
12   A.  No.  Not necessarily.
13   Q.  Okay.  Well, how might it?
14   A.  Just because Kim says to someone that she
15 likes them doesn't mean that she's willing or interested
16 in doing something about it.
17   Q.  But—
18   A.  In doing the investigation, what I was looking
19 for was the events that occurred in trying to corroborate
20 with facts whose side of the story was more accurate.
21   Q.  All right.  That sounds good.
22         But you mean the fact that this was
23 allegedly said didn't even warrant an inquiry at all?
24         MS. LEMING:  Objection to the form.  You

Page 76

1 can answer.
2 BY MR. MARCONI:
3    Q.  Maybe it's not going to prove it one way or
4 the other, but you said you didn't do anything to
5 corroborate that.
6         MS. LEMING:  Objection to the form.  You
7 can answer.
8    A.  I also did not want to open the investigation
9 up to another party beyond the people that I had already
10 been given by Kim.  And Steve had also given me some
11 people.  And this was going to give me one statement that
12 Kim might have made to Tom and his allegations that she
13 was saying that as opposed to trying to verify, for
14 example, by talking to a Cindy Smith what she physically
15 saw in the bar relative to an event that Steve denied and
16 Kim was very much upset about.
17   Q.  Wait a minute.  You're investigating a claim
18 of sexual harassment.  What difference does it make how
19 many people are involved as long as you get to the proper
20 conclusion?
21   A.  Because I am trying to get to the proper
22 conclusion but at the same time honor Kim's request and,
23 to an extent, Steve's request to keep this confidential.
24   Q.  Yeah.  But did Kim say I want this kept

Page 77

1 confidential at the expense of the integrity of your
2 investigation?
3         MS. LEMING:  Objection to the form.  You
4 can answer.
5    A.  Kim was very concerned about confidentiality
6 right from the start.  And therefore, in trying to
7 determine who we would interview, we were very careful
8 again to try to get to people who had facts as opposed to
9 going to a Tom Cetola that is a name I'm only hearing
10 from one side, which is only Steve, to try to get to the
11 facts.
12         If you look at the three people we spoke
13 to, I have Steve and Kim both saying that Cindy Smith was
14 involved in some of these.  So I have both of them saying
15 that.  I have Paul Scaffidi — again, both of them saying
16 that Paul Scaffidi was talked to.  And then I have Scott
17 Durham.  Again, both of them saying that.  In this
18 instance, I just have Tom Cetola coming in from Steve's
19 side.
20   Q.  So you decided it wasn't worth pursuing this
21 with Tom Cetola.  Right?
22         MS. LEMING:  Objection to the form.  You
23 can answer.
24   A.  We made a decision not to talk to Tom in an

B 64

Deborah Watson

22 (Pages 82 to 85)

Page 82

1  at Bull's Eye?
2     A. No.
3     Q. Go down to the heading C, the June 2002 entry.
4        Did you ask Kim to discuss how Kim and
5  Mr. Durham met?
6     A. My first question is: Who is Scott Durham?
7  When did Kim meet him? Steve said -- Steve wanted to set
8  them up. Steve had, quote, prepped Scott about Kim.
9     Q. Did he say what he said about her?
10    A. No. Not that I recall.
11    Q. Did you ask him?
12    A. I don't remember.
13    Q. If you had, would you have made a note of it?
14    A. I did ask him about "See, what did I tell
15  you," which was Kim's allegation that when they walked in
16  the room for the carrier meeting that Steve looked at
17  Scott and made this comment -- "See, what did I tell
18  you" -- that Kim didn't know how to interpret. And Steve
19  denied making the comment.
20    Q. Did you ever verify that with Mr. Durham?
21    A. It would be in my notes somewhere. There are
22  notes from my conversation with Mr. Durham.
23    Q. So if you had, you would have noted that in
24  your notes from that conversation?

Page 83

1     A. Yes. I believe so.
2     Q. Then the next question asks: Did Kim say she
3  was uncomfortable during the meeting? He didn't answer
4  that?
5     A. I don't have anything written down.
6     Q. Any idea why?
7     A. I don't recall.
8     Q. Do you know whether you asked him that
9  question or not?
10    A. Don't recall.
11    Q. Then it says that Mr. Durham told you that you
12  went to Kid Shelleen's after this meeting in the board
13  room with Mr. Durham and Kim.
14    A. This is Mr. Duncan.
15    Q. I'm sorry. Steve Duncan.
16        But wasn't it Mr. Duncan, Mr. Durham and
17  Kim?
18    A. The three of them in the meeting was -- yes.
19  That was my understanding.
20    Q. But who went to Kid Shelleen's?
21    A. It was Kim, Steve, Scott Durham, and then, per
22  the next question, short woman sells life insurance, not
23  Tom Einstein's wife. And we verified that this was Cindy
24  Smith.

Page 84

1     Q. Then you said: Whose idea was it for Kim to
2  bring a friend? Why did she come?
3     A. Steve's answer was it was support for Kim.
4  The "no" is that he said it was not his idea.
5     Q. Did he say why he thought Kim needed support?
6     A. I believe he said that it was because there
7  were three of them. It's an awkward number.
8     Q. Did MainStreet have any business dealings with
9  Scott Durham?
10    A. My understanding is that he was a carrier rep
11  for Andover Insurance, which was either one of our
12  carriers or a carrier that we were trying to build a
13  relationship with.
14    Q. Would that have been part of Kim's job -- to
15  help build a relationship with him?
16    A. It would have been part of Kim's job to meet
17  with the carrier representative and participate in any
18  business discussions to get a business relationship
19  going.
20    Q. Would that include going to Kid Shelleen's?
21    A. I don't know if the carrier paid for that
22  evening.
23    Q. What difference does that make?
24    A. I don't know that it was a social gathering or

Page 85

1  did the carrier pay for it, meaning that the carrier
2  invited them out.
3     Q. Well, how about if they invited the carrier?
4     A. The carriers usually pay is my understanding
5  because they want to hook up with brokers because we're
6  the ones who bring in business.
7     Q. But by going to Kid Shelleen's, Kim was trying
8  to impress Mr. Durham so that he would perhaps send
9  business Commerce's way. There would have been nothing
10  wrong with that at all. Right?
11        MS. LEMING: Objection to the form. You
12  can answer.
13    A. It depends on whether or not this was a
14  business meeting -- a continuation of the meeting in the
15  conference room or if this was a more social, hey, let's
16  just go out and have a drink.
17    Q. Well, do you have any reason to suspect that
18  it wasn't a continuation of the meeting that was started
19  in the conference room?
20    A. Well, yes. Because Cindy Smith was invited.
21  And if it's a business meeting, why would you invite an
22  outside person?
23    Q. Any other reason to believe that business
24  wasn't discussed at that meeting?

Deborah Watson

23 (Pages 86 to 89)

Page 86

1      A.  Why would you have the preliminary meeting and
2  not just finish everything up there?
3      Q.  I don't know that that's responsive to my
4  question.
5      A.  Well, maybe I didn't understand your question.
6  I apologize.
7      Q.  The question is:  Do you have any other reason
8  to believe, other than Cindy Smith was there, that
9  business wasn't on the agenda at Kid Shelleen's?
10     A.  Steve Duncan's version was that he was trying
11  to hook up Scott and Kim.
12     Q.  Where's that?
13     A.  CI:  Who is Scott Durham?  When did Kim meet
14  him?  Steve wanted to set them up.  Steve had prepped
15  Scott about Kim.
16     Q.  Well, that's what Steve and Scott intended.
17         Is there any reason to believe that
18  that's what Kim was looking for too?
19     A.  Kim's version of this was that there was a
20  business meeting in the conference room and that she was
21  instructed to go in there to meet the carrier rep and
22  that Steve had asked Kim that they were going to go out
23  later and to bring a friend, which Kim felt was unusual
24  but that she had complied.  So, again, I have two

Page 87

1  different versions.
2      Q.  But you don't have any reason to suspect that
3  Kim did not believe that that was a business meeting --
4  that that's what they were going out for?
5      A.  I believe she said in her write-up that she
6  thought it was a little unusual.  But her boss asked it,
7  so she complied.
8      Q.  Okay.  Did you think that it was proper for
9  Scott Durham and Steve Duncan to try to set Mr. Durham up
10  with Kim?
11         MS. LEMING:  Objection to the form.  You
12  can answer.
13     A.  Personally or professionally?
14     Q.  Both.
15     A.  Personally and professionally, I don't believe
16  that, as a manager, you should be that involved in a
17  subordinate's life.  And as a subordinate, I think you
18  should try to keep the business life separate from the
19  personal life.
20     Q.  Okay.  Let me ask you this.
21         I want you to assume for me that Kim
22  Bailey had no idea that Mr. Duncan and Mr. Durham had
23  discussed trying to fix her up with Mr. Durham.  I want
24  you to assume that.  Okay?

Page 88

1      A.  Mm-hmm.
2      Q.  I also want you to assume that when she left
3  her office with those people and Ms. Smith to go to
4  Kid Shelleen's that the only reason she intended to go
5  there was to discuss business with Mr. Durham and
6  hopefully get some business from his company.  Okay?  I
7  want you to assume that too.
8      A.  Mm-hmm.
9      Q.  Do you believe that it's sexual harassment for
10  Mr. Duncan to make an arrangement to try to fix her up
11  with Mr. Durham without telling her?
12         MS. LEMING:  Objection to the form.  You
13  can answer, if you can.
14     A.  Honestly, I'm not comfortable with trying to
15  answer that because you've asked me to make two
16  assumptions --
17     Q.  Well, you have to answer it.
18     A.  -- that I don't necessarily agree with.
19     Q.  Well, I'm not asking you whether you agree
20  with them.  I'm just asking you to make those assumptions
21  and answer the question.  And you can't not answer it.
22     A.  Could you repeat it for me one more time?
23         MR. MARCONI:  Could you read it back?
24         Actually, wait a second.  Let me --

Page 89

1  BY MR. MARCONI:
2      Q.  If Steve Duncan is making arrangements to set
3  up Kim and Mr. Durham and Kim doesn't know about it --
4      A.  Mm-hmm.
5      Q.  -- and Kim's not interested in it, do you
6  contend or do you believe that that's sexual harassment?
7         MS. LEMING:  Objection.  You can answer.
8      A.  If it makes Kim uncomfortable, then she has a
9  right to tell him to stop or to contact human resources
10  or another management person and let us know that it's
11  making her uncomfortable, at which point it could
12  potentially be a sexual harassment allegation.
13     Q.  What would be required beyond that to make it
14  a sexual harassment allegation?
15     A.  She has to be uncomfortable with the actions
16  in order for it to be sexual harassment.  If she's -- if
17  it's not quid pro quo and she is not expressing it is
18  making her feel uncomfortable or inhibiting her ability
19  to do her job in a reasonable manner or environment, then
20  it may not be sexual harassment.  It depends on how she's
21  feeling about this.  And your question was concerning
22  whether or not she knew it was going on.
23     Q.  Well, let's say she didn't know when it was
24  happening but she found out about it in the middle of the

Corbett & Wilcox

Deborah Watson

24  (Pages 90 to 93)

Page 90

1  night, you know, when they're at the bar and she got
2  angry and she came in the very next day and said, "Guess
3  what Steve Duncan did to me."
4     A.  Mm-hmm.
5     Q.  Would you consider that to be sexual
6  harassment?
7        MS. LEMING:  Objection.
8     A.  I would consider that to be a charge of sexual
9  harassment.  I then have to go investigate and find out
10 what he did.
11    Q.  All right.  Let's assume you investigated it
12 and everything that she said happened happened.  Is that
13 sexual harassment?
14       MS. LEMING:  Objection to the form.  You
15 can answer.
16    A.  So I'm assuming, to make sure I'm clear, that
17 she finds out in the middle of the night.  She comes to
18 human resources the next day.  We investigate it.  And
19 are you saying that Steve Duncan admits to the whole
20 thing?
21    Q.  Yeah.
22       Steve Duncan says I tried to fix up
23 Mr. Durham with Kim Bailey.  I didn't tell her.  I
24 thought she would like it.  I thought it would be cool

Page 91

1  for him.  And that's what I did.  And she comes in and
2  says I hate it.  There's no way I ever wanted anything
3  like that.  How dare he?
4     A.  Mm-hmm.
5     Q.  You have all those facts in front of you. . .
6     A.  Mm-hmm.
7     Q.  What's the answer?  Sexual harassment or not?
8     A.  If it has not negatively impacted her and we
9  stop that behavior, it's not going to fall in the sexual
10 harassment realm.  It is absolutely going to fall in the
11 inappropriate realm.  And I would be happy that she
12 brought that to my attention so I can deal with the
13 management person.
14    Q.  Well, where's the line?  When do you decide
15 when it's sexual harassment and when it's not?  Do you
16 decide that?
17    A.  It's part of the investigation, which is
18 what --
19    Q.  But there's no more --
20       MS. LEMING:  Can she finish her answer,
21 please?
22       MR. MARCONI:  I don't want to interrupt
23 her, but there's no more investigation.
24

Page 92

1  BY MR. MARCONI:
2     Q.  The investigation has concluded, and the
3  results of the investigation are as I have described them
4  already.  He did it.  He didn't tell her he was doing it.
5  He did it like he felt like it.  She absolutely detested
6  the fact that he did it.  And the moment she found out
7  about it she came to you.
8     A.  Mm-hmm.
9     Q.  You said that that's not sexual harassment.
10 It's inappropriate.  Right?
11    A.  Because --
12       MS. LEMING:  There's no question
13 pending.
14       MR. MARCONI:  Well, the question is:
15 Right?
16 BY MR. MARCONI:
17    Q.  Is that what you said?
18       MS. LEMING:  Is that what you said?
19 BY MR. MARCONI:
20    Q.  You said that is not sexual harassment, but it
21 is certainly inappropriate.
22    A.  I said that may not be sexual harassment, but
23 it is certainly inappropriate, because the piece that we
24 have to find out through the investigation is:  Is there

Page 93

1  any negative impact in her job?
2     Q.  How about the fact that she feels as though
3  she's been betrayed and abused personally?
4        MS. LEMING:  Objection.
5     A.  But now you're modifying the initial question
6  that you asked me to answer.
7     Q.  All right.  Well, what is it that has to
8  affect her job that would bring it over the threshold
9  into sexual harassment from just inappropriate?
10    A.  Did he threaten her in any way?  If she does
11 not go out for dinner that night or to drinks --
12    Q.  No.
13    A.  -- that X will happen to her.
14    Q.  No.
15    A.  Has he taken any negative steps towards her
16 because of either refusing or expressing the anger?  Has
17 there been any retaliation of any sort for her bringing
18 it to human resources?  In other words, has something in
19 her work been impacted beyond her ability to work within
20 that environment?
21    Q.  So all that stuff has to be shown before you
22 think that that's sexual harassment?
23    A.  That it would qualify under a hostile work
24 environment.

Corbett & Wilcox

A192

B 67

Deborah Watson

25 (Pages 94 to 97)

Page 94

1    Q.  Did you tell Ms. Bailey that Mr. Duncan was
2   trying to fix her up with Mr. Durham or did she tell you?
3    A.  I didn't tell her.
4    Q.  But you talked about that with Mr. Duncan.
5       Did he deny it?
6    A.  I asked him these questions: Who is Scott
7   Durham? When did Kim meet him? And Steve volunteered
8   that he wanted to set them up.
9    Q.  That Steve wanted to?
10    A.  Yes. It's in my notes Steve wanted to set
11   them up.
12    Q.  Did you ask Steve if he ever asked Kim if it
13   was okay to set the two of them up?
14    A.  I don't recall.
15    Q.  If you have, that would be in the notes?
16    A.  Possibly.
17    Q.  Did you ever ask Kim whether it was okay for
18   Duncan to try to set her and Durham up?
19    A.  I asked Scott Durham about that, not Kim.
20    Q.  You never asked Kim?
21    A.  I don't recall asking Kim.
22    Q.  Why not? Why didn't you ask her?
23    A.  Because Kim said she was uncomfortable with
24   the meeting with Steve and Scott. Steve says I wanted to

Page 95

1   set them up. I know through the e-mail that there has
2   been conversation between Kim and Steve about who Kim
3   dates. So I went to Scott Durham to try to find out what
4   happened with these three people -- Scott, Steve and Kim.
5    Q.  Wasn't it important for you to know whether or
6   not Kim objected to trying to be fixed up with Scott
7   Durham?
8       MS. LEMING: Objection to the form.
9   You can answer.
10    A.  It was important to try to find a fact. And
11   the fact was Scott Durham said that he and Kim met at a
12   Marriott. So Kim was not upset enough about this that
13   she refused to meet Mr. Durham to have a drink.
14    Q.  They met at a Marriott? At a hotel?
15    A.  Just a conversation to meet each other, yes.
16   Like a date.
17    Q.  Before this Kid Shelleen's or after?
18    A.  After.
19    Q.  I'm talking about before. I'm trying to
20   figure out why you wouldn't ask Kim when you're trying to
21   figure out whether Steve Duncan was sexually harassing
22   her. I'm trying to figure out why you wouldn't ask her
23   did she have an objection to Steve Duncan trying to fix
24   her up with this Durham guy. I don't understand why you

Page 96

1   wouldn't do that.
2    A.  Because --
3       MS. LEMING: Is there a question there?
4       MR. MARCONI: Yeah.
5   BY MR. MARCONI:
6    Q.  Explain to me why you didn't do that.
7    A.  Because I'm trying to collaborate either Steve
8   or Kim's version of the events that Steve was -- Steve
9   and Kim were bothered by. So, again, I go to Scott
10   Durham to say, "Did you meet Kim? What happened there?"
11   because I already know that Kim's lining up in these
12   meetings that none of this was consensual and made her
13   uncomfortable. And Steve is lining up saying that this
14   was consensual. So I went to this third person that they
15   have both talked about and asked him.
16    Q.  Well, what did he say?
17    A.  He said that, yes, they met at a Marriott and
18   they had a conversation. And then I found an e-mail
19   where Kim actually references Scott in a very casual
20   fashion. So I know that they did at some point meet and
21   say I should have this -- again, the guy from Atlantic
22   City's name is escaping me. But have him give Scott
23   lessons.
24       THE WITNESS: Can I have a break,

Page 97

1   please?
2       MR. MARCONI: Sure.
3       THE WITNESS: We've been at this for a
4   while.
5       MR. MARCONI: Sure.
6       THE WITNESS: Thank you.
7       (A recess was taken.)
8       - - - - -
9       DEBORAH E. WATSON, resumes
10   BY MR. MARCONI:
11    Q.  Move on please to page 0509 beginning with D.
12    A.  (The witness complied with counsel's request.)
13    Q.  Would you go through those and explain what
14   you're saying and what's being said under the Heading D?
15    A.  D -- Caves Valley Golf Tournament in Caves
16   Valley, Maryland. What was the purpose of the event?
17   Who went? Anyone else from CIS? Travelers invited Kim
18   and Steve to tournament. All-day event. Bill Taylor was
19   there. Scott was at Andover tent.
20    Q.  What does that mean?
21    A.  That means it was a -- we were invited to the
22   event, meaning Kim and Steve were invited to the event by
23   Travelers, which is one of our carriers. It was an all-
24   day event. Bill Taylor, who's another management person,

Deborah Watson

26 (Pages 98 to 101)

Page 98

1  was there. Scott was at the Andover tent. And that's
2  Scott Durham, which is with Andover, which is the other
3  carrier.
4      Q.  So Scott Durham — that's right. He worked
5  for Andover. Didn't he?
6      A.  Correct.
7      Q.  Okay. Go ahead.
8      A.  Did anything happen in the car? SD said
9  touching in the car on the way home.
10     Q.  That's Steve Duncan?
11     A.  Steve Duncan.
12         SD:  Nothing on the way down. Event
13 didn't happen. And what we're talking about is that Kim
14 said that there was touching and conversation she didn't
15 like on the way down.
16     Q.  But is she saying that there was touching in
17 the car on the way home?
18     A.  Yes.
19     Q.  Did he say whether or not that touching was
20 something that Kim found offensive?
21     A.  It's actually farther down, if we keep going.
22     Q.  Okay. Show me.
23     A.  When you get to No. 4 -- did Kim tell you she
24 was uncomfortable or to stop? Did she tell you she was

Page 99

1  uncomfortable with the topic of the conversation -- his
2  sex life and extramarital affairs? Kim had said that
3  Steve was talking about his extramarital affairs on the
4  way down and that, although she hadn't said anything, she
5  didn't want to hear about it.
6         Steve talked about his personal life.
7  Steve touched her leg and said — and this he said to
8  himself -- quote, I'm not going to do this. And that's
9  what the arrow is to himself. She didn't say no. And
10 according to Steve, when Steve stopped touching her, Kim
11 yelled at Steve, quote, you can't do this. Makes me mad
12 that you won't continue this.
13     Q.  So basically Steve said that she wanted him to
14 touch her in the car?
15     A.  To continue what was going on. That's what
16 Steve said.
17     Q.  What was going on? He was touching her leg?
18     A.  Yes.
19     Q.  Now, did you ever confront Kim and tell Kim
20 that Steve had said that it was consensual and asked for
21 her response to this claim?
22     A.  I already had her response which was that the
23 touching in the car was not consensual and that she had
24 not said anything to him, because I had asked that

Page 100

1  question.
2      Q.  Was there anybody that corroborated either
3  side?
4      A.  No.
5      Q.  Did you do anything to try to corroborate
6  either side on this issue?
7      A.  Yes.
8      Q.  What?
9      A.  Steve claimed that when they got home Kim
10 called him and continued to yell at him. So we got Kim's
11 cell phone number and tried to verify the phone call and
12 were unable to do so.
13     Q.  So he wasn't telling the truth?
14     A.  Unable to verify whether the phone call
15 occurred. I was looking for a fact from either side that
16 I could verify since I had two people sitting alone in a
17 car.
18     Q.  And he gave you a fact. Right? He said that
19 she called from her cell phone to his cell phone. Right?
20     A.  He gave me an allegation that I then tried to
21 prove or disprove and was unable to prove or disprove
22 with the cell phone bills.
23     Q.  What was the allegation? That she called him
24 from her cell phone to his cell phone?

Page 101

1      A.  Yes. Later at night.
2      Q.  Okay. You reviewed the cell phone records for
3  both Kim and Mr. Durham?
4      A.  No. It was not Mr. Durham. It was between
5  Kim and Mr. Duncan.
6      Q.  I'm sorry. Mr. Duncan.
7      A.  He was not able to prove -- it might not have
8  gone to his cell phone, because the cell phone records I
9  could try to get a hold of was Kim's.
10     Q.  Those records would have shown if she had
11 placed a call from her cell phone to him that day.
12 Right?
13     A.  That's what I was hoping that it would show.
14     Q.  Why were you hoping that's what it would show?
15     A.  Because I'm looking for a fact. I'm looking
16 for something to show that it -- one thing did or didn't
17 occur. And what happened when I got the cell phone bills
18 is that it didn't list the phone numbers. I was unable
19 to prove or disprove either side.
20     Q.  So it didn't list the phone numbers that she
21 was calling to?
22     A.  Correct.
23     Q.  Did you do anything else to try to find his
24 cell phone number?

Deborah Watson

27 (Pages 102 to 105)

Page 102

1    A.  I don't believe it went to his cell phone. I
2  would have to double-check that. There was one cell
3  phone we could check, and I don't remember why we
4  couldn't check the other side of it.
5      Q.  How did you get Kim's cell phone?
6      A.  If it's a company cell phone, then Commerce
7  Insurance pays for the majority of the bill and gets the
8  bills. We have access to those.
9      Q.  None of the phone bills or the phone records
10  that you get from Kim's phone ever show numbers that were
11  called?
12      A.  I didn't peruse all of Kim's phone bills
13  because I didn't want to look into all of those calls. I
14  was trying to figure out this fact, again, with two
15  people in a car alone.
16      Q.  All right. But you knew the day that this
17  call was allegedly made. Right?
18      A.  Mm-hmm.
19      Q.  Did you review the phone records for the day
20  that the call was made?
21      A.  There's an e-mail where I believe we requested
22  it for approximately a four-day period.
23      Q.  Ma'am, my question is: Did you review the
24  phone records for the day that this alleged phone call

Page 103

1  was made?
2      A.  Yes.
3      Q.  Okay. Any of those phone records that you
4  reviewed, did they show telephone numbers to which calls
5  were placed by that cell phone?
6      A.  No. That was the problem. It wasn't a bill
7  that gave me both sides of a phone call, meaning both
8  phone numbers. It would show incoming or it would show
9  outgoing to her phone number, but it wouldn't show the
10  other phone number.
11      Q.  So if she was called by Mr. Duncan, for
12  example, it would have shown his number on the bill?
13      A.  No. It would have shown incoming — the word
14  "incoming" or "outgoing," if I remember correctly.
15      Q.  But no number —
16      A.  Right.
17      Q.  — to which the outgoing call went?
18      A.  Correct.
19      Q.  That was with respect to all of the days that
20  you looked at or just this day?
21      A.  All of those days.
22      Q.  Are all the bills like that all the time?
23      A.  I haven't looked at all of the bills.
24      Q.  So you weren't able to corroborate his story

Page 104

1  that basically the events in the car were consensual?
2      A.  I couldn't corroborate either side. Correct.
3      Q.  Did you tell Kim that he had said that she
4  called him and complained that the relationship was over
5  or whatever he said?
6      A.  No. Because, again, I was looking to try to
7  find a fact to see who's side of the story I could get a
8  fact to back up.
9      Q.  Well, what if Kim was able to show you that
10  she was with a certain person from the time that an hour
11  before he claimed it happened to an hour after he claimed
12  it happened? What if she could have had somebody
13  corroborate that she never been made such a phone call?
14  Wouldn't that have been important?
15          MS. LEMING:  Objection to the form. You
16  can answer.
17      A.  There was a phone call made between 11:00 and
18  12:00 at night.
19      Q.  Right.
20      A.  It was a late night phone call.
21      Q.  Okay. Let's say you called Kim and —
22      A.  Mm-hmm.
23      Q.  — talked to her husband and he said, "I can
24  tell you she came home at 10:45, dropped down on the bed

Page 105

1  and was sound asleep the moment she came in the door and
2  slept like a baby all the way through."
3          Would that have been something that
4  would have been interesting to you in terms of your
5  investigation?
6      A.  It would have been an opinion of a witness
7  from her side. What I was looking for was the cell phone
8  bill was ironclad. If I can get a phone bill that can
9  prove one phone number to another phone number at that
10  specific time, then I don't have to really worry about is
11  Steve or Kim telling the truth. I can prove it. And
12  therefore, that's why I went after the bill.
13      Q.  What's wrong with a witness from her side?
14      A.  Meaning that — Kim obviously has her people
15  who she wants me to talk to who will collaborate her
16  side. Steve Duncan has people he wants me to talk to
17  that will collaborate his side. And those people have
18  emotional attachments to either Steve or Kim. So what
19  I'm looking for is this — if I can verify this phone
20  call. It doesn't verify for me exactly what happened in
21  the car. It just is a fact that if I can figure it out
22  helps me take an independent fact and apply it to one
23  side or the other.
24      Q.  Right.

Deborah Watson

28  (Pages 106 to 109)

Page 106

1        And if Kim's husband says, "I was with
2    her the whole time, and she didn't make any such phone
3    call," wouldn't that have an effect on Mr. Duncan's
4    credibility?
5            MS. LEMING: Objection. You can answer.
6        A.   It would have had some effect, but I really
7    wanted to get an actual fact coming out of a phone bill.
8        Q.   But you couldn't.
9        A.   But to my earlier statement, the other key
10    with this fact is that it wasn't going to help me with
11    what happened in the car. In the car I have a he said/
12    she said.
13        Q.   But you also have a guy who's telling you that
14    certain things happen. And if you can investigate what
15    he says and it turns out that what he says is not true,
16    then perhaps some of the other stuff that he said wasn't
17    true. Right?
18        A.   I'm sorry. Could you repeat that?
19        Q.   If you investigate a statement that he
20    makes --
21        A.   Mm-hmm.
22        Q.   -- and it turns out that it's not true, then
23    wouldn't that lead you to the conclusion that perhaps the
24    other stuff he said happened that night didn't happen?

Page 107

1        A.   It would give me an impression. But, again,
2    I'm looking for a fact.
3        Q.   But the point is you didn't even try to
4    contact Kim to at least ask her to deny or admit that
5    that phone call happened. Right?
6            MS. LEMING: Objection. You can answer.
7        A.   That is correct. I did not call Kim.
8        Q.   Did you communicate with her in that regard in
9    any way?
10        A.   In this particular instance, no.
11        Q.   Okay. Did you believe Steve's side of the
12    story or her side of the story?
13            MS. LEMING: Objection. You can answer.
14        A.   About what?
15        Q.   About what happened in the car to and from
16    Andover.
17        A.   I questioned why Kim would get in the car with
18    him and drive to Maryland.
19        Q.   Anything else?
20        A.   Beyond that I had no way to decide either
21    side. And, again, I'm trying to look for a fact, not an
22    opinion.
23        Q.   So you didn't believe one side or the other is
24    what you're telling me?

Page 108

1        A.   I found it unusual that Kim got in the car
2    after having had two instances where her boss made her
3    very uncomfortable and that she was in a position where
4    she was alone with him in a car for two and a half hours
5    each way again.
6        Q.   Based on that, it sounds like you were leaning
7    towards believing Steve Duncan and not Kim Bailey.
8            MS. LEMING: Objection to the form. You
9    can answer.
10        A.   For this particular instance, that would be
11    correct.
12        Q.   Well, how about the other instances?
13            Let me make sure I understand. You
14    basically believe Steve Duncan's version of what happened
15    over Kim Bailey's version of what happened in the ride to
16    and from Andover and whatever else happened in Andover.
17            MS. LEMING: Objection to the form. You
18    can answer.
19        A.   I am -- I do believe -- I do lean a little
20    more toward Steve's side on what happened with Andover
21    than I do -- or the Caves Valley, Maryland trip than I do
22    with Kim's. Although, to be clear, I don't have a fact
23    backing up either side.
24        Q.   Not a single fact?

Page 109

1        A.   Other than they both agreed that they got in
2    the car. They road together.
3        Q.   No. We're talking about --
4        A.   They spent the day.
5        Q.   I'm not talking about that stuff. We're
6    talking about the stuff that she said happened that was
7    offensive that she alleged in her letter to you in her
8    initial complaint.
9            And, then, based on the conversation you
10    had with Mr. Duncan, you believe him and not her. Right?
11            MS. LEMING: Objection. You can answer.
12        A.   For this particular instance, I'm leaning more
13    towards Steve's side.
14        Q.   Now? Or did you lean more toward Steve's side
15    when this was all going on back in May and June of 2003?
16        A.   For this particular instance, it was a
17    question mark in my mind as to who's side I was leaning
18    towards. And for this particular instance in 2003, I was
19    leaning a little more towards Steve's side.
20        Q.   How about Mr. McKelvy?
21        A.   I believe Bruce agreed with me.
22        Q.   How about Mr. Morrissey?
23        A.   Mr. Morrissey was not involved in that level
24    of detail. He would not have heard this.

Corbett & Wilcox

B 71

Deborah Watson

29 (Pages 110 to 113)

### Page 110

1     Q. Did Mr. McKelvy do any independent
2 investigation of his own into the facts concerning the
3 Caves Valley golf tournament matter?
4     A. Not that I'm aware of. He may have.
5     Q. So you met with him, told him the results of
6 your investigation and that you had concluded that you
7 were more likely to believe Mr. Duncan than Ms. Bailey?
8     A. No. Mr. McKelvy was with me through these
9 interviews.
10     Q. Oh, he was.
11     A. Yes. The only person I spoke to alone was
12 Paul Scaffidi as far as interviews went.
13     Q. Okay. Did Mr. McKelvy take any notes like you
14 did?
15     A. Not to this extent. I was the one who was
16 writing. If he has any notes, you would have them.
17     MR. MARCONI: Off the record.
18        (A brief discussion was held off the
19 record.)
20 BY MR. MARCONI:
21     Q. You said that Mr. McKelvy was with you
22 whenever you interviewed these people except
23 Mr. Scaffidi.
24     A. Correct.

### Page 111

1     Q. All right. You also said that he took notes
2 of the meetings but not as extensive the notes as you
3 took?
4     A. I specifically remember him writing during the
5 Bruce, Kim and I meeting, which I thought you guys had
6 copies of. I'm almost positive I've seen a copy of it.
7 I was primary writer. Absolutely.
8     Q. All right. But my question is: Did you see
9 Mr. McKelvy writing notes of any of the interviews of any
10 of the people involved that you and he conducted?
11     A. I remember specifically that he took some
12 notes when we talked to Kim. I can't specifically speak
13 to Steve, Cindy Smith or Scott Durham. I know I was
14 writing and that I was the one who talked to Scaffidi.
15     Q. All right. Move on to E in this Exhibit
16 No. 10 on page 0509.
17     A. Mm-hmm.
18     Q. That's concerning the Randolph trip?
19     A. Yes.
20     Q. Let's go through that.
21     I want you to tell me what you're saying
22 here and what's being told to you.
23     A. The first sentence: Steve told Kim affair was
24 over. He and Jen had decided not to tell her. Kim was

### Page 112

1 dating Jen Plumeri. And according to Steve --
2     Q. Did you just misspeak? I think you said Kim
3 was dating --
4     A. I'm sorry. Yes. Thank you. Steve was dating
5 Jen Plumeri. And according to Steve, he and Jen had
6 decided not to tell Kim that they were continuing to
7 date, that instead they told her that it was over -- they
8 had split up.
9     Q. How did that come up?
10     A. Steve -- we get to it farther in the back.
11 Steve felt that Kim's motivation -- it's on 0511. Steve
12 felt she wants to carry on the relationship with him and
13 is getting back at him. Steve felt that this was
14 retaliatory in some way by Kim to file this complaint.
15     Q. So the concept is that Kim wanted a
16 relationship, Steve did not, and Kim was retaliating
17 against him for cutting her off by filing a sexual
18 harassment claim?
19     A. That was his perspective, yes.
20     Q. Okay. Now, explain to me how this
21 relationship with Ms. Plumeri comes into play.
22     A. Steve denied or had a different -- totally
23 different version of the trip to Randolph. And part of
24 Steve saying that this had not occurred was him telling

### Page 113

1 Bruce and I that he was in a relationship with Jen
2 Plumeri and he was not going to go outside this
3 relationship.
4     Q. Well, what was his version about what happened
5 in Randolph?
6     A. Well, that's what this piece is here.
7     Q. Well, tell me what it says.
8     A. Purpose for the trip? How did you get there?
9 What was discussed in the car? Kim was in the car. They
10 took Core AEs and MainStreet out to dinner. They drove
11 Steve's car up to Randolph.
12     Q. Let me just stop you a sec.
13     Is he saying that this was a business
14 trip to Randolph that Kim was on as well as he and some
15 other people?
16     A. It was he and Kim going to Randolph to meet
17 with other Commerce business people.
18     Q. He's not saying that it was some kind of a
19 personal get-together. This was a business trip?
20     A. Correct.
21     Q. Okay. Go ahead.
22     A. Correct.
23     Alleged comment -- if you don't get
24 laid, it's your fault -- walking into the Randolph lobby.

Deborah Watson

30  (Pages 114 to 117)

Page 114

1   Kim had said he said that. Love me was not the
2   implication she interpreted it to be. Kim felt that
3   Steve implied that she needed to build a relationship.
4   Make these people, you know, love you, had sexual
5   overtures when Steve said it. Steve's version was that
6   he may have said, you know, make them love you or love
7   me, but it was not a sexual thing. It was more of a —
8   they — we need these people to like us to help bring in
9   business, because they were meeting with salespeople.
10      Q.  So he's saying she misinterpreted what I told
11  her?
12      A.  Yes.
13      Q.  Let me just ask you this.
14          Did you ever talk to Kim and say, Kim,
15  is it possible that you misinterpreted what Mr. Duncan
16  said to you up there in the Randolph trip about make them
17  love you?
18      A.  No. Because I knew her perspective was that
19  it had an overtone. The next sentence is: They went at
20  the end of the evening. Did Kim return to the hotel with
21  you? Why or why not? They went on Route 10 to an
22  Italian restaurant. Steve claimed he didn't want to be
23  around her. Then, who's idea was it for her to stay
24  behind? Steve said you were leaving. Can you get a

Page 115

1   ride? Yeah. Paul said he'd take her home. And nothing
2   unusual on the ride up or the ride back.
3          So Steve denied any improper
4   conversations and he denied he told Kim to stay at
5   the bar and build the relationship.
6      Q.  He denied that?
7      A.  Mm-hmm.
8      Q.  So Kim's idea of staying at the bar with
9   Mr. Scaffidi was Kim's idea?
10      A.  That's what Mr. Duncan felt.
11      Q.  Okay. Did you talk to Mr. Scaffidi about
12  that?
13      A.  Yes, I did.
14      Q.  What did he say?
15      A.  He said that he didn't hear the conversation
16  between Steve and Kim but that Kim said something to him
17  afterwards that she was kind of uncomfortable. And Paul
18  took her home.
19      Q.  Uncomfortable about the fact that she had been
20  left there?
21      A.  Yes. That she was still there.
22      Q.  Now, did you form a belief as to who was
23  telling the truth concerning what happened at the
24  Randolph trip, whether it was Mr. Duncan or Kim Bailey?

Page 116

1      A.  I felt for this event I was leaning more
2   towards Kim's side of the story.
3      Q.  In what way?
4      A.  Mr. Scaffidi verified that she had a
5   conversation with him afterwards that she was
6   uncomfortable.
7      Q.  Did you feel that it was generally improper
8   for Kim to go with Mr. Duncan to this Randolph trip?
9      A.  No. She was, my understanding, the
10  supervisor, you know, they were meeting with the producers and
11  management in Randolph who had a MainStreet unit. And
12  they were moving the MainStreet unit down to Delaware.
13      Q.  What accusations did Kim make, if you can
14  recall, about what Mr. Durham had done on the Randolph
15  trip — what had he done improperly?
16      A.  Mr. Duncan?
17      Q.  I'm sorry. Mr. Duncan.
18      A.  It concerned the comments — the love me
19  comments with the innuendo. It was, in her opinion,
20  making her feel like she had to stay at the bar and build
21  the relationship while he left. And I believe she wrote
22  in her write-up that she felt like a piece of meat that
23  was being sold.
24      Q.  Did you understand that her position was that

Page 117

1   Mr. Duncan was encouraging her to have sex with
2   Mr. Scaffidi?
3      A.  My understanding is that she felt — it wasn't
4   that it was about sex, but it was implied that she build
5   that relationship and be social and friendly so they
6   really liked her.
7      Q.  My question is: What was your understanding
8   of Kim's take on all this? In her write-up, didn't she
9   say that she felt as though she was dropped off there
10  with the understanding that she would have sex with this
11  Mr. Scaffidi?
12      A.  I don't believe that was in her write-up. I
13  believe she said it was feeling kind of cheap and like a
14  piece of meat. I don't believe it was that specific.
15      Q.  Well, what did you understand that to mean,
16  then?
17          MS. LEMING: Objection to the form. You
18  can answer, if you know.
19      A.  My understanding is that she was to form a
20  relationship — a friendlier relationship than just
21  business. I didn't take it as an assumption that that
22  meant sex. I took it from the perspective that Kim was
23  put in a very uncomfortable position, which, from my
24  perspective, as an investigator, I have to try to verify.

Deborah Watson

31 (Pages 118 to 121)

### Page 118

1 And I did verify that with Mr. Scaffidi.
2    Q. So do you think that what Mr. Duncan did was
3 wrong?
4       MS. LEMING: Objection to the form. You
5 can answer.
6    A. I am leaning towards Kim's side of the story.
7 If I try to assume that Kim's side is correct, then
8 Steve's comments were not right. But, again, I told you
9 earlier I'm assuming on this toward's Kim's side -- or I
10 am leaning towards Kim's side of the story because of
11 what Paul told me about her feeling uncomfortable. I was
12 not able to collaborate the actual dialogue that
13 occurred.
14    Q. Did you believe that what Kim said happened
15 happened? Yes or no?
16       MS. LEMING: On this instance?
17       MR. MARCONI: Yes. On Randolph.
18    A. I do believe that Mr. Duncan didn't want to
19 take her home from the bar and that she felt
20 uncomfortable sitting there with Paul and wasn't sure why
21 she was stuck there and from her perspective that with
22 these comments that Steve made she felt that she was sort
23 of left there in an uncomfortable position.
24    Q. Do you believe Mr. Duncan's claim that Kim

### Page 119

1 really wanted a relationship with him and that he decided
2 not to tell Kim about his decision concerning
3 Ms. Plumeri?
4       MS. LEMING: Can you repeat the
5 question?
6       (The reporter read the requested
7 portion.)
8       MS. LEMING: Thank you.
9    A. I believe that he didn't want to discuss
10 Ms. Plumeri with Kim. I don't necessarily believe his
11 theory that she did all this for anger over a
12 relationship.
13    Q. On June 3rd, 2003, when there was a meeting
14 involving you and Mr. Morrissey and Kim, did you believe
15 then that Kim was essentially thwarted in her desire for
16 a relationship with Steve Duncan and that's in part why
17 she filed her sexual harassment claim against him?
18       MS. LEMING: Objection to the form. You
19 can answer, if you know.
20    A. I believe that Kim felt mistreated by
21 Mr. Duncan. I don't think she did it solely as a
22 retaliation against this relationship. I believe she
23 wanted any behavior like this to stop.
24    Q. Well, do you think that her desire for a

### Page 120

1 relationship with Mr. Duncan and the alleged thwarting of
2 that played any part in her decision to file a sexual
3 harassment claim against Mr. Duncan?
4    A. Kim told me that the reason she filed this
5 complaint was because she overheard Steve in his office
6 talking about her and her family. That was the
7 motivation she gave me. Steve denied that conversation.
8    Q. All right. Ma'am, I don't think -- I know
9 this is going long, but --
10    A. That's okay.
11    Q. -- I don't think you're listening to my
12 questions.
13    A. Okay. I apologize.
14    Q. My question is, Ms. Watson: Based on your
15 investigation, her desire for a relationship with Steve
16 Duncan that he claims he rebuffed, did that have any
17 impact on her decision to file a sexual harassment claim
18 against Mr. Duncan? In other words, the fact that she
19 was this alleged jilted lover, did that have any bearing
20 on her decision in your view based on your investigation?
21       MS. LEMING: Objection to the form. You
22 can answer.
23    A. In my view, no. I believe she overheard a
24 conversation from Steve that made her uncomfortable and

### Page 121

1 she decided to come forward. Part of what you said,
2 though, was about the investigation. In the
3 investigation I could not collaborate his theory or her
4 theory because Steve denied the conversation that Kim
5 allegedly overheard.
6    Q. So your testimony is that the reason that she
7 filed this sexual harassment claim -- as a result of your
8 investigation, you concluded that the reason she did it
9 had nothing to do with what was written in the letter
10 that she had initially gave to you making the claim.
11 Rather, it was some telephone conversation that she
12 overheard Steve make?
13    A. No.
14       MS. LEMING: Objection to the form. You
15 can answer.
16       THE WITNESS: That's right. No. I
17 disagree.
18 BY MR. MARCONI:
19    Q. Then, I don't understand your answer.
20    A. Kim made the sexual harassment complaint
21 because she was very uncomfortable with what had happened
22 and she wanted it to stop, and she wanted to make sure
23 that it didn't impact her career.
24    Q. Now, wait a minute. Hold on a second.

Deborah Watson

42 (Pages 162 to 165)

Page 162

1  Plan for Improvement -- is to talk about specific things
2  that we would like to see changed.
3      Q.  Do you know when in May this document was
4  prepared?
5      A.  It was late May.
6      Q.  Late May?
7      A.  (The witness indicated.)
8      Q.  You eventually had a meeting with Kim and
9  Mr. Morrissey where she was told what was going on.
10 Right?
11     A.  That was June 3rd.
12     Q.  June 3rd.
13         This Document, No. 1, and these other
14 documents, 2 through 4, were they sort of summaries of
15 what she was told?
16     A.  No.
17     Q.  No?
18     A.  No.
19     Q.  Were you trying to write down and collect your
20 thoughts on what you were going to tell her?
21     A.  No.
22     Q.  All right.  It looks like from this Exhibit
23 No. 1 that you had concluded, based on your
24 investigation, that she was guilty of unprofessional

Page 163

1  conduct in the workplace.  Right?
2      A.  We found through the course of the
3  investigation that there was some unprofessional conduct
4  that was inappropriate as a member of management that we
5  wanted to see her correct.
6      Q.  Okay.  Did you specifically tell her what they
7  were -- what that unprofessional and improper conduct --
8  inappropriate conduct was?
9      A.  We talked about that on June 3rd.
10     Q.  You say in this specifically that she made
11 comments about the physique of a phone vendor and a copy
12 machine repairman.
13     A.  Mm-hmm.
14         MS. LEMING:  Yes?
15         THE WITNESS:  Yes.  Sorry.
16         MS. LEMING:  That's okay.
17 BY MR. MARCONI:
18     Q.  I think we already established that you never
19 asked Kim for her position on whether she did that or
20 not.
21     A.  No.  We talked about that June 3rd.
22     Q.  Oh, you did.
23     A.  Yes.  As part of the discussion she and I and
24 Joe Morrissey had about things that we came across in the

Page 164

1  investigation and wanted her to correct.  That was the
2  June 3rd conversation.
3      Q.  Did she admit during the June 3rd conversation
4  that she had done that?
5         MS. LEMING:  Objection.  Asked and
6  answered.  You can answer again.
7      A.  She didn't deny it.  I didn't ask her
8  directly, "Did you say this?"  We had had a counseling
9  session about appropriate comments and commentary in an
10 office, and we all agreed that that is something that
11 needed to stop.
12     Q.  Well, let's talk about the June meeting for a
13 minute.  When was the June meeting scheduled?
14     A.  I believe we wanted to do it in late May, but
15 she was going on the vacation.  So we then picked the
16 June 3rd date when she was back.
17     Q.  Was it something that would have been on her
18 calendar that she knew that at such and such a time on
19 June 3rd she was going to have to meet with you two, or
20 did you pick up the phone and say "Kim, come into the
21 conversation room.  We want to talk to you"?
22     A.  It was prescheduled.  I don't know if she put
23 it on her calendar, but it was prescheduled.
24     Q.  Did she have any idea what it is that you were

Page 165

1  going to be discussing with her at that meeting?
2      A.  That we were going to get together and talk
3  about the results of the investigation and where we go
4  from here, yes.
5      Q.  Results of the investigation concerning her
6  allegations of sexual harassment?
7      A.  Correct.
8      Q.  Did you ever tell her that part of the meeting
9  would be that she would be accused of wrongdoing too?
10         MS. LEMING:  Objection to the form.  You
11 may answer.
12     A.  I didn't accuse her of anything.
13     Q.  You said that she committed unprofessional and
14 inappropriate conduct in the workplace.
15     A.  And we discussed at that meeting things in
16 here about --
17     Q.  Can I stop you?
18         MS. LEMING:  Well, no.  Can't she finish
19 her answer?
20         MR. MARCONI:  The answer is not
21 responsive to the question.
22 BY MR. MARCONI:
23     Q.  The question is:  Did Kim Bailey know?  Did
24 you tell her before the meeting that you were going to be