Deborah Watson

41 (Pages 158 to 161)

Page 158

1  BY MR. MARCONI:
2    Q.  I hope this isn't too confusing. I'm going to
3  hand you four exhibits that have been marked 1 through 4.
4  Can we just make sure that we're together on this,
5  Ms. Watson?
6    A.  Mm-hmm.
7    Q.  No. 1 is 0547 through 0549.
8    A.  Yes.
9    Q.  No. 2 is 0550 through 0555?
10   Q.  0552? You said No. 2?
11   A.  Yes.
12   A.  0550, 0551, 0552.
13   Q.  Oh, I'm sorry. I have two together. Correct.
14  Through 0552.
15   A.  Okay.
16   Q.  Then 0553 through 0555.
17   A.  Okay.
18   Q.  Then 4 is 0556 and 0557.
19   A.  Yes.
20   Q.  Now, I want you to review them.
21        My first question, as you're reviewing
22  them, is: Were any of these exhibits ever — copies of
23  them ever given to Ms. Bailey?
24   A.  No.

Page 159

1    Q.  Okay. Why not?
2    A.  Because these are formal discipline warnings
3  and we decided that we were not going to discipline
4  Ms. Bailey formally.
5    Q.  All right. So your testimony is that all four
6  of these exhibits were formal notification of discipline
7  upon Ms. Bailey?
8    A.  These are — this is a written warning, which
9  is the second step in our discipline process. And when
10  you move to a written warning, there is a copy that is
11  written up and given to the employee, which is why the
12  last page says Employee Signature Only Indicates that
13  Conference Occurred. And it is a formal discipline step.
14  And that's why it's on this particular template and
15  labeled Written Warning.
16   Q.  How come there's four of them?
17   A.  Bruce and I were working on how to word it.
18   Q.  So you went through four different versions?
19   A.  Yes. Tweakings, I would assume.
20        MS. LEMING: I just want to add that
21  Exhibit 2 and Exhibit 3 are the exact statement document.
22  So I think there's either two versions or three versions.
23        MR. MARCONI: But they do have different
24  Bates numbers on them.

Page 160

1        MS. LEMING: I understand that. For
2  production purposes, we produce what, you know, was
3  responsive to your request. What's in 2 and what's in 3
4  are the same document.
5  BY MR. MARCONI:
6    Q.  Now, this document, is it fair to say that
7  this was sort of a culmination of the results of your
8  investigation into Kim's claim of sexual harassment?
9        MS. LEMING: Which document are you
10  referring to?
11        MR. MARCONI: Let's talk about No. 1
12  first.
13   A.  I'm going to read it, if you don't mind.
14   Q.  No. Please do.
15   A.  It's been a long time.
16   Q.  So you've only looked at one?
17   A.  I know they're all similar versions. If we
18  need to go through each one individually, I can read them
19  individually, if that's okay.
20   Q.  It looks like you're saying here that you've
21  conducted your investigation —
22   A.  Yes.
23   Q.  — of the claims and that you can't tell Kim
24  anything about how you're dealing with Mr. Duncan, but

Page 161

1  you're also telling her that as part of the investigation
2  you learned of behaviors and errors in judgment on her
3  part that you all felt contributed to what happened to
4  her.
5    A.  May have, yes.
6    Q.  Okay. So in other words, the errors in
7  judgment that she made contributed to Mr. Duncan's
8  conduct?
9        MR. MARCONI: Objection to the form.
10  You can answer.
11   A.  May have put her in a situation where he felt
12  it was okay to take that step. It's not okay for him to
13  take that step.
14   Q.  What step?
15   A.  Where, for example, he admitted to kissing
16  her, although his version was that it was consensual.
17   Q.  Then you say that you're preparing a warning
18  for her that you don't want her to feel is in retaliation
19  for coming forward.
20   A.  Mm-hmm.
21   Q.  Okay. Is that what the rest of this document
22  is — the warnings that you're giving her?
23   A.  This is all the warning. But the next
24  document — Problem 1: Plan for Improvement; Problem 2;

## Employee Conference Notes

**Employee Name:** Kimberly Bailey

**Department:** Mainstreet Division

**Supervisor:** Joseph Morrissey

**Type of Warning:** Written Warning

**Date:** May ___, 2003

**Designated Time Frame For Improvement:** Immediate and sustained

On April 15, 2003 Bruce McKelvy and I met with you to listen to your concerns and discuss the document you had prepared and given to me on April 3, 2003. As we mentioned to you in that discussion, Commerce takes such matters seriously, and investigates them thoroughly. We understand our responsibility to provide a workplace where people are treated with respect and are free from behavior that is offensive or hostile. We explained to you that our investigation would definitely involve speaking with others that might have first hand knowledge of some of the events you described. We also spoke with Mr. Duncan as we said we would, to get his account of the events you described. As you know, we spoke with individuals both inside and outside the company, that were present at some of the encounters you mentioned. We extracted information from our corporate e-mail and other systems, to see what might be out there to assist us in filtering through the information that was shared with us. We have now completed our investigation. We have given a great deal of thought to the details and perceptions that have been shared with us and are poised to take the actions that we feel are appropriate. Kim while we are not able to share with you the details of how we are dealing with Mr. Duncan, you need to understand that as part of the investigation, we learned of behaviors and errors in judgement on your part that we feel have contributed to this situation. The warning that we have prepared here is clearly not in retaliation for you coming forward and speaking with us. To the contrary, we wish you had come forward sooner and reported the behaviors you found offensive. This document is designed to bring to your attention those changes in behavior and judgement we need to see from you going forward, so situations like this never happen again in any context:

**Problem Area #1:** Unprofessional conduct in the workplace: In the course of our investigation we learned that at times your comments and conduct in the workplace have been unprofessional and inappropriate, particularly for a member of management. Subordinates look to their boss to set the standard for what is appropriate in the workplace. For example: It was reported that it was not uncommon for you to make office banter about men that came into the workplace. Specifically it was reported that you made comments about the 'physique' of a phone vendor and a copy machine repairman. Although we do not believe you intended to make them uncomfortable, nor was a complaint registered, it sets a tone in the workplace that such banter is acceptable and co-workers read into that that such discussions and behavior are acceptable. You reported that Mr. Duncan made comments in front of visitors and with co-workers that made you feel uncomfortable and "like a sold object". We do not condone such comments, if in fact they occurred. Our point however, is that over time your behavior and demeanor in and out of the office, helped contribute to an environment where Mr.



DEPOSITION EXHIBIT
WATSON
1

CONFIDENTIAL          CIS 0547          **B 77**

Duncan and others may have felt free to make comments that crossed the line and were perceived as inappropriate.

**Plan for Improvement # 1:** Going forward, you are to refrain from making comments in the workplace that cross the line as being other than totally professional. While you are relatively new to management, you need to understand that your role is to be the beacon of professionalism and not "one of the gang", when it comes to humor in the office. This is not an easy task, and particularly not easy for a person that is now in a leadership role in a unit they were promoted from. It is a key component however, in building a workplace where familiarity and office banter do not set the stage for other more offensive behaviors. To assist you in learning how to manage in the most professional way possible you will attend the following courses by year-end 2003:
HRM 1-Leadership the Commerce Way
HRM 3-Managing with in the Law
At least four parts of the DDI series, including Core skills for Building Commitment and Retaining Talent: the Leader's Role

**Problem Area #2:** Separation of work and personal life: Kim, it became clear during our investigation that the relationship between you and Mr. Duncan had clearly crossed the line that should exist between work and personal lives. Clearly, he was at fault for allowing that to happen, but we feel you contributed to the problem as well. There were too many instances where after hour's social events involving friends and alcohol contributed to a bad situation. Both of the instances where you claim he highly offended you were of this format. Simply stated, neither you nor he should have ever allowed that to happen or put yourselves in that situation. In reviewing your e-mails as part of this investigation, we see examples of this still continuing. For example: Your email to the Mainstreet staff concerning the WOW! awards and making plans separate from Commerce's for transportation to NY and an overnight stay. Although your intent may have been help the department get to know each other and improve morale, this is not an appropriate way to develop this bond. You set yourself up to be "party central" rather than exhibit the management oversight to work within the process or parameters that the company establishes for events they sponsor. For example, having all DE employees travel to NY on the same bus not only allows the Mainstreet staff get to know each other better, but encourages them to get to know their fellow DE employees in Core, Healthcare, etc.

**Plan for Improvement # 2:** You must remember that as a member of management you need to keep your business and personal life separate. While there may be business social events, they should be limited to those organized by the company or senior management or those that you have received specific approval for. Your involvement should never cross the line of appropriate business conduct and you should be sensitive to keeping your distance from becoming too involved with any individual business associate on a personal level. Personal friends should never be invited to business events nor is it a good practice to party after-hours with those you work with.

CONFIDENTIAL    CIS 0548    **B 78**

**In Summary:** Kimberly, please accept this document in the vein it is intended. We do not condone some of the things that were alleged to have taken place. To an extent that we will never know for sure, we feel that both Mr. Duncan and you both have contributed to the events that bring us to this point. We feel we are taking the appropriate actions and will keep those actions to the extent possible confined to the parties involved and those in management that need to know. Understand that you did the right thing coming forward, but that you have some things of your own in the way of behavior as a manager to work on. We appreciate your talents and are confident that you can make the necessary changes to your behavior in order to have a long and successful career at Commerce. In order to further that end, we are requiring the above training in order to support you in that endeavor. Please apply your full energies to making the needed changes. Likewise, do not underestimate the severity of the above matters or take this warning lightly. We need to see the above-mentioned changes, or further disciplinary action will be necessary.


Employee Comments:

### *(Employee Signature Only Indicates that Conference Occurred)*


Date:_____Employee Signature:_____

Date:_____Supervisor Signature:_____

Date:_____Department Head:_____


Reviewed Date:_____

_____
     (HR Representative)


CONFIDENTIAL          CIS 0549          **B 79**

## Employee Conference Notes

**Employee Name:** Kimberly Bailey

**Department:** Mainstreet Division

**Supervisor:** Joseph Morrissey

**Type of Warning:** Written Warning

**Date:** May ___, 2003

**Designated Time Frame
For Improvement:** Immediate and
sustained

On April 15, 2003 Bruce McKelvy and Deborah Watson met with you to listen to your concerns and discuss the document you had prepared and given to Deborah on April 3, 2003. As they mentioned to you in that discussion, Commerce takes such matters seriously, and investigates them thoroughly. We understand our responsibility to provide a workplace where people are treated with respect and are free from behavior that is offensive or hostile. They explained to you that their investigation would definitely involve speaking with others that might have first hand knowledge of some of the events you described. They also spoke with Mr. Duncan as they said they would, to get his account of the events you described. As you know, they also spoke with individuals both inside and outside the company, that were present at some of the encounters you mentioned. Furthermore, information was extracted from our corporate e-mail and other systems, to see what might be out there to assist them in filtering through the information that was shared during the interviews. They have now completed their investigation. As an organization we have given a great deal of thought to the details and perceptions that have been shared with us and are poised to take the actions that we feel are appropriate. Kim while we are not able to share with you the details of how we are dealing with Mr. Duncan, you need to understand that as part of the investigation, we learned of behaviors and errors in judgement on your part that we feel have contributed to this situation. The warning that we have prepared here is clearly not in retaliation for you coming forward and speaking with us. To the contrary, we wish you had come forward sooner and reported the behaviors you found offensive sooner, so that this matter could have been addressed in its early stages. This document is designed to bring to your attention those changes in behavior and judgement we need to see from you going forward, so situations like this never happen again, in any context:

**Problem Area #1:** Unprofessional conduct in the workplace: In the course of our investigation we learned that at times your comments and conduct in the workplace have been unprofessional and inappropriate, particularly for a member of management. Subordinates look to their boss to set the standard for what is appropriate in the workplace. For example: It was reported that it was not uncommon for you to make office banter about men that came into the workplace. Specifically it was reported that you made comments about the 'physique' of a phone vendor and a copy machine repairman. Although we do not believe you intended to make them uncomfortable, nor was a complaint registered, it sets a tone in the workplace that such banter is acceptable and co-workers read into it that such discussions and behavior are acceptable. You reported that Mr. Duncan made comments in front of visitors and with co-workers that made you feel uncomfortable and "like a sold object". We do not condone such

DEPOSITION
EXHIBIT
Watson
2
PENGAD 800-631-6989

CONFIDENTIAL          CIS 0550          B 80

comments, if in fact they occurred. Our point however, is that over time your behavior and demeanor in and out of the office, may have contributed to an environment where Mr. Duncan and others may have felt free to make comments that crossed the line and were perceived as inappropriate.

**Plan for Improvement # 1:** Going forward, you are to refrain from making comments in the workplace that cross the line as being other than totally professional. While you are relatively new to management, you need to understand that your role is to be the beacon of professionalism and not "one of the gang", when it comes to humor in the office. This is not an easy task, and particularly not easy for a person that is now in a leadership role in a unit they were promoted from. It is a key component however, in building a workplace where familiarity and office banter do not set the stage for other more offensive behaviors. To assist you in learning how to manage in the most professional way possible, you are required to attend the following courses by year-end 2003:
HRM 1-Leadership the Commerce Way
HRM 3-Managing with in the Law
At least four parts of the DDI series, including Core skills for Building Commitment and Retaining Talent: the Leader's Role

**Problem Area #2:** Separation of work and personal life: Kim, it became clear during this investigation that the relationship between you and Mr. Duncan had crossed the line that should exist between work and personal lives. Clearly as your boss he was at fault for allowing that to happen, but we feel you contributed to the problem as well. There were too many instances where after hour's social events involving friends and alcohol contributed to a bad situation. Both of the instances where you claim he highly offended you were of this format. Simply stated, neither you nor he should have ever allowed your relationship to progress to that point or put yourselves in that situation. In reviewing your e-mails as part of this investigation, we saw examples of this still continuing. For example: Your email to the Mainstreet staff concerning the WOW! awards and making plans separate from Commerce's for transportation to NY and an overnight stay. Although your intent may have been help the department get to know each other and improve morale, this is not an appropriate way to develop this bond. You set yourself up to be "party central" rather than exhibit the management oversight to work within the process or parameters that the company establishes for events they sponsor. For example, having <u>all</u> DE employees travel to NY on the same bus not only allows the Mainstreet staff get to know each other better, but encourages them to get to know their fellow DE employees in Core, Healthcare, etc.

**Plan for Improvement # 2:** You must remember that as a member of management you need to keep your business and personal life separate. While there may be business social events, they should be limited to only those organized by the company or senior management, or those that you have received specific approval for. Your involvement should never cross the line of appropriate business conduct and you should be sensitive to keeping your distance from becoming too involved with any individual business associate on a personal level. Personal friends should never be invited to business events, nor is it a good practice to party after-hours with those you work with.

CONFIDENTIAL          CIS 0551          **B 81**

**In Summary:** Kimberly, please accept this document in the vein it is intended. We do not condone some of the things that were alleged to have taken place. To an extent that we will never know for sure, we feel that both Mr. Duncan and you both have contributed to the events that bring us to this point. We feel we are taking the appropriate actions and will keep those actions to the extent possible confined to the parties involved and those in management that need to know. Understand that you did the right thing coming forward, but that you have some things of your own in the way of behavior as a manager to work on. We appreciate your talents and are confident that you can make the necessary changes to your behavior in order to be successful at Commerce. In order to further that end, we are requiring the above training to support you in that endeavor. Please apply your full energies to making the needed changes. Likewise, do not underestimate the severity of the above matters or take this warning lightly. We need to see the above-mentioned changes, or further disciplinary action will be necessary. It should go without mention that you should keep this matter confidential and not talk about it within the office.

Employee Comments:

### *(Employee Signature Only Indicates that Conference Occurred)*

Date:_____Employee Signature:_____

Date:_____Supervisor Signature:_____

Date:_____Department Head:_____

Reviewed Date:_____

_____
    (HR Representative)

CONFIDENTIAL        CIS 0552

**B 82**

## Employee Conference Notes

**Employee Name:** Kimberly Bailey

**Department:** Mainstreet Division

**Supervisor:** Joseph Morrissey

**Type of Warning:** Written Warning

**Date:** May ___, 2003

**Designated Time Frame
For Improvement:** Immediate and
sustained

On April 15, 2003 Bruce McKelvy and Deborah Watson met with you to listen to your concerns and discuss the document you had prepared and given to Deborah on April 3, 2003. As they mentioned to you in that discussion, Commerce takes such matters seriously, and investigates them thoroughly. We understand our responsibility to provide a workplace where people are treated with respect and are free from behavior that is offensive or hostile.   They explained to you that their investigation would definitely involve speaking with others that might have first hand knowledge of some of the events you described. They also spoke with Mr. Duncan as they said they would, to get his account of the events you described. As you know, they also spoke with individuals both inside and outside the company, that were present at some of the encounters you mentioned.  Furthermore, information was extracted from our corporate e-mail and other systems, to see what might be out there to assist them in filtering through the information that was shared during the interviews.   They have now completed their investigation.  As an organization we have given a great deal of thought to the details and perceptions that have been shared with us and are poised to take the actions that we feel are appropriate.   Kim while we are not able to share with you the details of how we are dealing with Mr. Duncan, you need to understand that as part of the investigation, we learned of behaviors and errors in judgement on your part that we feel have contributed to this situation.   The warning that we have prepared here is clearly not in retaliation for you coming forward and speaking with us.  To the contrary, we wish you had come forward sooner and reported the behaviors you found offensive sooner, so that this matter could have been addressed in its early stages.  This document is designed to bring to your attention those changes in behavior and judgement we need to see from you going forward, so situations like this never happen again, in any context.

**Problem Area #1:** Unprofessional conduct in the workplace:  In the course of our investigation we learned that at times your comments and conduct in the workplace have been unprofessional and inappropriate, particularly for a member of management. Subordinates look to their boss to set the standard for what is appropriate in the workplace.  For example: It was reported that it was not uncommon for you to make office banter about men that came into the workplace.  Specifically it was reported that you made comments about the 'physique' of a phone vendor and a copy machine repairman.   Although we do not believe you intended to make them uncomfortable, nor was a complaint registered, it sets a tone in the workplace that such banter is acceptable and co-workers read into it that such discussions and behavior are acceptable. You reported that Mr. Duncan made comments in front of visitors and with co-workers that made you feel uncomfortable and "like a sold object".  We do not condone such



DEPOSITION
EXHIBIT
Watson
3

CONFIDENTIAL          CIS 0553          **B 83**

comments, if in fact they occurred. Our point however, is that over time your behavior and demeanor in and out of the office, may have contributed to an environment where Mr. Duncan and others may have felt free to make comments that crossed the line and were perceived as inappropriate.

**Plan for Improvement # 1:** Going forward, you are to refrain from making comments in the workplace that cross the line as being other than totally professional. While you are relatively new to management, you need to understand that your role is to be the beacon of professionalism and not "one of the gang", when it comes to humor in the office. This is not an easy task, and particularly not easy for a person that is now in a leadership role in a unit they were promoted from. It is a key component however, in building a workplace where familiarity and office banter do not set the stage for other more offensive behaviors. To assist you in learning how to manage in the most professional way possible, you are required to attend the following courses by year-end 2003:
HRM 1-Leadership the Commerce Way
HRM 3-Managing with in the Law
At least four parts of the DDI series, including Core skills for Building Commitment and Retaining Talent: the Leader's Role

**Problem Area #2:** Separation of work and personal life:   Kim, it became clear during this investigation that the relationship between you and Mr. Duncan had crossed the line that should exist between work and personal lives.   Clearly as your boss he was at fault for allowing that to happen, but we feel you contributed to the problem as well.  There were too many instances where after hour's social events involving friends and alcohol contributed to a bad situation. Both of the instances where you claim he highly offended you were of this format.   Simply stated, neither you nor he should have ever allowed your relationship to progress to that point or put yourselves in that situation.   In reviewing your e-mails as part of this investigation, we saw examples of this still continuing.  For example: Your email to the Mainstreet staff concerning the WOW! awards and making plans separate from Commerce's for transportation to NY and an overnight stay. Although your intent may have been help the department get to know each other and improve morale, this is not an appropriate way to develop this bond. You set yourself up to be "party central" rather than exhibit the management oversight to work within the process or parameters that the company establishes for events they sponsor. For example, having all DE employees travel to NY on the same bus not only allows the Mainstreet staff get to know each other better, but encourages them to get to know their fellow DE employees in Core, Healthcare, etc.

**Plan for Improvement # 2:** You must remember that as a member of management you need to keep your business and personal life separate. While there may be business social events, they should be limited to only those organized by the company or senior management, or those that you have received specific approval for.   Your involvement should never cross the line of appropriate business conduct and you should be sensitive to keeping your distance from becoming too involved with any individual business associate on a personal level.  Personal friends should never be invited to business events, nor is it a good practice to party after-hours with those you work with.

CONFIDENTIAL    CIS 0554

**B 84**

**In Summary:** Kimberly, please accept this document in the vein it is intended. We do not condone some of the things that were alleged to have taken place. To an extent that we will never know for sure, we feel that both Mr. Duncan and you both have contributed to the events that bring us to this point. We feel we are taking the appropriate actions and will keep those actions to the extent possible confined to the parties involved and those in management that need to know. Understand that you did the right thing coming forward, but that you have some things of your own in the way of behavior as a manager to work on. We appreciate your talents and are confident that you can make the necessary changes to your behavior in order to be successful at Commerce. In order to further that end, we are requiring the above training to support you in that endeavor. Please apply your full energies to making the needed changes. Likewise, do not underestimate the severity of the above matters or take this warning lightly. We need to see the above-mentioned changes, or further disciplinary action will be necessary. It should go without mention that you should keep this matter confidential and not talk about it within the office.

Employee Comments:

### *(Employee Signature Only Indicates that Conference Occurred)*

Date:_____ Employee Signature:_____

Date:_____ Supervisor Signature:_____

Date:_____ Department Head:_____

Reviewed Date:_____

_____
    (HR Representative)

CONFIDENTIAL        CIS 0555        **B 85**

## Employee Conference Notes

**Employee Name:** Kimberly Bailey

**Type of Warning:** Written Warning

**Department:** Mainstreet Division

**Date:** May ___, 2003

**Supervisor:** Deborah Watson
Joe Morrissey

**Designated Time Frame
For Improvement:** Immediate and
sustained

**Reason for Conference: Unprofessional and inappropriate comments/conduct in the workplace**

**Problem Area #1:** Kimberly, it has been brought to our attention that some of your comments and conduct in the workplace have been unprofessional and inappropriate, particularly for a management person. For example: Banter between yourself and some of your staff concerning the 'physique' of the phone vendor representative and copy machine vendor representative. Although we do not believe you intended to make anyone uncomfortable, as a management person you are expected to set the example for appropriate conduct in the workplace.

**Problem Area #2:** Coordination of events outside of company parameters. For example: Your email to the Mainstreet staff concerning the WOW! awards and making plans separate from Commerce's for transportation to NY and an overnight stay. Kimberly, although your intent may have been help the department get to know each other and improve morale, this is not an appropriate way to develop this bond. As a management person you should work within the process or parameters that the company establishes for events they sponsor. For example, having all DE employees travel to NY on the same bus not only allows the Mainstreet staff get to know each other better, but encourages them to get to know their fellow DE employees in Core, Healthcare, etc. Also, you should limit the amount of time you spend socializing with coworkers outside of the workplace. As a management person, you are expected to set the example of professionalism and to be a leader. Engaging in 'social' activities with coworkers that are not company sponsored, may make it more difficult for you to perform your duties as a member of management and may be damaging to your reputation.

**Plan for Improvement # 1:** Immediately, you are to refrain from making any type of unprofessional comments particularly those concerning a person's appearance. Coordination of 'social events' with the staff will be company sponsored only and will adhere to any parameters or procedures established for that particular event. Contact with coworkers outside the workplace will be limited and professional, not social in nature.
You will attend the following courses by year end 2003:
HRM 1-Leadership the Commerce Way
HRM 3-Managing with in the Law
At least four parts of the DDI series, including Core skills for Building Commitment, and Retaining Talent: the Leader's Role
Any further reports of unprofessional or inappropriate comments or behavior will result in further discipline up to and including possible termination of employment.


DEPOSITION
EXHIBIT
WATSON
4

CONFIDENTIAL    CIS 0556

**B 86**

**In Summary:** Kimberly, we appreciate your talents and are confident that you can make the necessary changes to your behavior in order to have a long and successful career at Commerce. In order to further that end, we are requiring the above training in order to support you in that endeavor. Please apply your full energies to making the needed changes.

Do not underestimate the severity of the above matters or take this warning lightly. Our expectation is immediate, significant and sustained improvement in all of the above areas. Should you be successful in meeting the terms of this plan and revert back to unacceptable behavior, the disciplinary process will not begin again.

Employee Comments:

*(Employee Signature Only Indicates that Conference Occurred)*

Date:_____Employee Signature:_____

Date:_____Supervisor Signature:_____

Date:_____Department Head:_____

Reviewed Date:_____

_____
     (HR Representative)

CONFIDENTIAL     CIS 0557     B 87

Deborah Watson

41 (Pages 158 to 161)

## Page 158

BY MR. MARCONI:

1   BY MR. MARCONI:
2       Q.  I hope this isn't too confusing. I'm going to
3   hand you four exhibits that have been marked 1 through 4.
4   Can we just make sure that we're together on this,
5   Ms. Watson?
6       A.  Mm-hmm.
7       Q.  No. 1 is 0547 through 0549.
8       A.  Yes.
9       Q.  No. 2 is 0550 through 0555?
10      A.  0552? You said No. 2?
11      Q.  Yes.
12      A.  0550, 0551, 0552.
13      Q.  Oh, I'm sorry. I have two together. Correct.
14  Through 0552.
15      A.  Okay.
16      Q.  Then 0553 through 0555.
17      A.  Okay.
18      Q.  Then 4 is 0556 and 0557.
19      A.  Yes.
20      Q.  Now, I want you to review them.
21          My first question, as you're reviewing
22  them, is: Were any of these exhibits ever -- copies of
23  them ever given to Ms. Bailey?
24      A.  No.

## Page 159

1       Q.  Okay. Why not?
2       A.  Because these are formal discipline warnings
3   and we decided that we were not going to discipline
4   Ms. Bailey formally.
5       Q.  All right. So your testimony is that all four
6   of these exhibits were formal notification of discipline
7   upon Ms. Bailey?
8       A.  These are -- this is a written warning, which
9   is the second step in our discipline process. And when
10  you move to a written warning, there is a copy that is
11  written up and given to the employee, which is why the
12  last page says Employee Signature Only Indicates that
13  Conference Occurred. And it is a formal discipline step.
14  And that's why it's on this particular template and
15  labeled Written Warning.
16      Q.  How come there's four of them?
17      A.  Bruce and I were working on how to word it.
18      Q.  So you went through four different versions?
19      A.  Yes. Tweakings, I would assume.
20          MS. LEMING: I just want to add that
21  Exhibit 2 and Exhibit 3 are the exact statement document.
22  So I think there's either two versions or three versions.
23          MR. MARCONI: But they do have different
24  Bates numbers on them.

## Page 160

1           MS. LEMING: I understand that. For
2   production purposes, we produce what, you know, was
3   responsive to your request. What's in 2 and what's in 3
4   are the same document.
5   BY MR. MARCONI:
6       Q.  Now, this document, is it fair to say that
7   this was sort of a culmination of the results of your
8   investigation into Kim's claim of sexual harassment?
9           MS. LEMING: Which document are you
10  referring to?
11          MR. MARCONI: Let's talk about No. 1
12  first.
13      A.  I'm going to read it, if you don't mind.
14      Q.  No. Please do.
15      A.  It's been a long time.
16      Q.  So you've only looked at one?
17      A.  I know they're all similar versions. If we
18  need to go through each one individually, I can read them
19  individually, if that's okay.
20      Q.  It looks like you're saying here that you've
21  conducted your investigation --
22      A.  Yes.
23      Q.  -- of the claims and that you can't tell Kim
24  anything about how you're dealing with Mr. Duncan, but

## Page 161

1   you're also telling her that as part of the investigation
2   you learned of behaviors and errors in judgment on her
3   part that you all felt contributed to what happened to
4   her.
5       A.  May have, yes.
6       Q.  Okay. So in other words, the errors in
7   judgment that she made contributed to Mr. Duncan's
8   conduct?
9           MR. MARCONI: Objection to the form.
10  You can answer.
11      A.  May have put her in a situation where he felt
12  it was okay to take that step. It's not okay for him to
13  take that step.
14      Q.  What step?
15      A.  Where, for example, he admitted to kissing
16  her, although his version was that it was consensual.
17      Q.  Then you say that you're preparing a warning
18  for her that you don't want her to feel is in retaliation
19  for coming forward.
20      A.  Mm-hmm.
21      Q.  Okay. Is that what the rest of this document
22  is -- the warnings that you're giving her?
23      A.  This is all the warning. But the next
24  document -- Problem 1: Plan for Improvement; Problem 2;

Deborah Watson

42 (Pages 162 to 165)

Page 162

1 Plan for Improvement — is to talk about specific things
2 that we would like to see changed.
3     Q.  Do you know when in May this document was
4 prepared?
5     A.  It was late May.
6     Q.  Late May?
7     A.  (The witness indicated.)
8     Q.  You eventually had a meeting with Kim and
9 Mr. Morrissey where she was told what was going on.
10 Right?
11    A.  That was June 3rd.
12    Q.  June 3rd.
13        This Document, No. 1, and these other
14 documents, 2 through 4, were they sort of summaries of
15 what she was told?
16    A.  No.
17    Q.  No?
18    A.  No.
19    Q.  Were you trying to write down and collect your
20 thoughts on what you were going to tell her?
21    A.  No.
22    Q.  All right.  It looks like from this Exhibit
23 No. 1 that you had concluded, based on your
24 investigation, that she was guilty of unprofessional

Page 163

1 conduct in the workplace.  Right?
2     A.  We found through the course of the
3 investigation that there was some unprofessional conduct
4 that was inappropriate as a member of management that we
5 wanted to see her correct.
6     Q.  Okay.  Did you specifically tell her what they
7 were — what that unprofessional and improper conduct —
8 inappropriate conduct was?
9     A.  We talked about that on June 3rd.
10    Q.  You say in this specifically that she made
11 comments about the physique of a phone vendor and a copy
12 machine repairman.
13    A.  Mm-hmm.
14        MS. LEMING:  Yes?
15        THE WITNESS:  Yes.  Sorry.
16        MS. LEMING:  That's okay.
17 BY MR. MARCONI:
18    Q.  I think we already established that you never
19 asked Kim for her position on whether she did that or
20 not.
21    A.  No.  We talked about that June 3rd.
22    Q.  Oh, you did.
23    A.  Yes.  As part of the discussion she and I and
24 Joe Morrissey had about things that we came across in the

Page 164

1 investigation and wanted her to correct.  That was the
2 June 3rd conversation.
3     Q.  Did she admit during the June 3rd conversation
4 that she had done that?
5         MS. LEMING:  Objection.  Asked and
6 answered.  You can answer again.
7     A.  She didn't deny it.  I didn't ask her
8 directly, "Did you say this?"  We had had a counseling
9 session about appropriate comments and commentary in an
10 office, and we all agreed that that is something that
11 needed to stop.
12    Q.  Well, let's talk about the June meeting for a
13 minute.  When was the June meeting scheduled?
14    A.  I believe we wanted to do it in late May, but
15 she was going on the vacation.  So we then picked the
16 June 3rd date when she was back.
17    Q.  Was it something that would have been on her
18 calendar that she knew that at such and such a time on
19 June 3rd she was going to have to meet with you two, or
20 did you pick up the phone and say "Kim, come into the
21 conversation room.  We want to talk to you"?
22    A.  It was prescheduled.  I don't know if she put
23 it on her calendar, but it was prescheduled.
24    Q.  Did she have any idea what it is that you were

Page 165

1 going to be discussing with her at that meeting?
2     A.  That we were going to get together and talk
3 about the results of the investigation and where we go
4 from here, yes.
5     Q.  Results of the investigation concerning her
6 allegations of sexual harassment?
7     A.  Correct.
8     Q.  Did you ever tell her that part of the meeting
9 would be that she would be accused of wrongdoing too?
10        MS. LEMING:  Objection to the form.  You
11 may answer.
12    A.  I didn't accuse her of anything.
13    Q.  You said that she committed unprofessional and
14 inappropriate conduct in the workplace.
15    A.  And we discussed at that meeting things in
16 here about —
17    Q.  Can I stop you?
18        MS. LEMING:  Well, no.  Can't she finish
19 her answer?
20        MR. MARCONI:  The answer is not
21 responsive to the question.
22 BY MR. MARCONI:
23    Q.  The question is:  Did Kim Bailey know?  Did
24 you tell her before the meeting that you were going to be

Corbett & Wilcox

A210

B 89

Deborah Watson

43 (Pages 166 to 169)

Page 166

1  discussing the fact that you had concluded that she had
2  been unprofessional and inappropriate in the workplace?
3  Did you tell her that beforehand?
4      A.  I told her we were going to be discussing the
5  results of the investigation.  I don't recall if I used
6  those specific words.
7      Q.  Did you tell her that her conduct would also
8  be discussed at the meeting as opposed to just
9  Mr. Duncan's?
10     A.  I did not get that specific.  I said we're
11 going to discuss the results of the investigation and
12 where we go from here.
13     Q.  But when you started talking to her about the
14 phone vendor, you said she didn't admit it.
15     A.  She didn't deny it either.  It was a
16 conversation.
17     Q.  So she listened while you accused her of that.
18 Right?
19     A.  I didn't accuse her.
20         MS. LEMING:  Objection to form.  You may
21 answer.
22         THE WITNESS:  I didn't accuse her.  It
23 was a discussion.  It was a counseling discussion
24 about -- and this is not the document that was reviewed.

Page 167

1  This is not the document that we went through.
2          MS. LEMING:  Just let the record reflect
3  that the witness was gesturing to Exhibit 1.
4  BY MR. MARCONI:
5      Q.  So there was a document that was prepared that
6  you used to go to conduct the June 3 meeting with
7  Ms. Bailey?
8      A.  There were two documents that were prepared.
9  One was the letter that we gave her mandating training.
10 Then the other one is a note to file that I had written
11 of the different topics we were going to talk about,
12 because Commerce made a decision that we were not going
13 to put a formal written warning in front of Kim -- that
14 what we were going to do was have a discussion about the
15 things that we found out in the investigation that we
16 felt were unprofessional or inappropriate and needed to
17 change and talk to her about making those changes and
18 what we expected and then sending her to some training.
19     Q.  But as of June 3rd, you had already concluded
20 that all of those things that you had been told she was
21 guilty of she was in fact guilty of.  Right?
22         MS. LEMING:  Objection to the form.  You
23 can answer.
24     A.  No.  Which is part of why we went in with a

Page 168

1  discussion instead of a formal written warning.  It's a
2  softer approach done for the purpose of having a
3  discussion hoping that Kim will understand that some of
4  these things need to change.  But it's not a -- for
5  example, in here it doesn't go into the summary.  It's
6  conversational and counseling versus the impact of
7  handing a written warning to someone and saying this is a
8  permanent part of your file.
9      Q.  But your analysis of what occurred is laid out
10 in these exhibits.  Right?
11     A.  This is what -- the pieces of the
12 investigation that we were not pleased with Kim's
13 behavior are in here.  But it's written in a tone, again,
14 of a warning versus the counseling discussion that Joe
15 and I had with her.
16     Q.  Right.  But this accurately lays out your
17 conclusions concerning the investigation as it relates to
18 the matters that are described in this document.  Right?
19 Problem Area No. 1:  Unprofessional conduct.  Plan for
20 Improvement.  Then Problem Area 2 -- separation of work
21 and personal life.  You concluded that these were
22 problems for her.
23     A.  These were areas where she needed to improve.
24 Correct.

Page 169

1      Q.  Based on your investigation?
2      A.  Correct.
3      Q.  Okay.  My question is again:  At any time was
4  Kim ever given an opportunity to refute what is written
5  in this Problem Area No. 1?
6      A.  During the discussion of June 3rd.
7      Q.  How was that opportunity afforded to her?
8      A.  Because it was conversational.
9          Kim, it came up in the investigation
10 that you may have tried through an attempt to build
11 morale in MainStreet to arrange a trip to New York and
12 take separate rides up and stay in a hotel.  That is
13 outside the company parameters on a company event, and as
14 a supervisor, we want you to stay within the parameters
15 of the company event.  If you feel you want to try to do
16 something different, you should reach out to someone and
17 question it.  That was the conversational nature of what
18 occurred on June 3rd.
19     Q.  I don't see anything about that in this
20 Exhibit No. 1.  All I see is unprofessional conduct in
21 the workplace, and you're talking about this phone
22 vendor.
23     A.  No.  Problem Area 2 is where we go into the
24 e-mail -- 05/4/8.

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006

Bailey, Kimberly A. - Vol. 2

Page 241

1    Q. What meetings?
2    A. At the time when Mr. Duncan was fired, we were in
3    the midst of putting together or working with a vendor to
4    put together a software program called SEMCI. It is a
5    single entry management something or other that our
6    salespeople would be able to work with that would be
7    easier for them to quote new business.
8         I was very much involved with this prior to
9    Deb Watson coming along.
10    Q. Deb Watson or Mary Corcoran?
11    A. I'm sorry, Mary Corcoran. And soon after Mary's
12    arrival I was excluded from these meetings.
13    Q. Okay. What facts do you have as we sit here
14    today that would support any contention that Mary
15    Corcoran's decision to exclude you from these meetings
16    were related to the filing of the Duncan complaint?
17    A. The facts that I have is the meetings, I attended
18    all of them. Mary came and then I didn't attend any.
19    Now, what their -- how they relate as a fact to what you
20    are indicating, I don't have that fact.
21    Q. Okay. It is an assumption on your part?
22    A. Yes.
23    Q. All right. What projects were you excluded from?
24    A. The project was the SEMCI project and putting

Page 242

1    together the software, working with the vendor. That was
2    a project that was the SEMCI project.
3    Q. Is that it? Because you used the word
4    "projects," plural.
5    A. I can't remember offhand, other than any other
6    sales-related projects, because they were taken from me
7    also.
8    Q. Which ones?
9    A. Working with the marketing people, learning the
10    new markets, the risks.
11    Q. What facts as we sit here today do you have to
12    support any contention that those projects were taken
13    away from you by Mary Corcoran because you filed a
14    complaint against Steve Duncan?
15    A. I don't have that facts or those facts.
16    Q. All right. You refer to other matters concerning
17    the operation of the department from which you were
18    excluded. What other matters are you referring to?
19    A. I would handle the marketing reps that would come
20    in, and scheduling them. I wasn't doing that anymore.
21    Q. That's a decision that Miss Corcoran made?
22    A. Yes.
23    Q. Okay.
24    A. Just, you know, my daily operations in working

Page 243

1    with my team were interfered by her, so, and a lot of I
2    guess my direct dealings were not -- they weren't just as
3    easy, so --
4    Q. What facts do you have as we sit here today that
5    would support any contention that Mary Corcoran's
6    decision in that regard was a result of your filing of
7    the complaint against Mr. Duncan?
8    A. I don't have any facts to support that.
9    Q. Thank you. Paragraph 13, you refer to a
10    conclusion of the Commerce investigation and quote, "both
11    parties had engaged in inappropriate behavior in
12    violation of Commerce guidelines on professionalism and
13    its policies and procedures," do you see that?
14    A. Yes.
15    Q. Then it continues that "Defendant made this
16    determination based at least in part on lies told by Mr.
17    Duncan," do you see that?
18    A. Yes.
19    Q. What specific lies did Mr. Duncan tell?
20    A. I don't know them to be exact. What we know is
21    things that have been brought up in other I guess
22    mediations or things along those lines where they have
23    accused me of doing certain things which are untrue.
24    Q. Well, what lies are they? Tell me if it is not

Page 244

1    true.
2    A. Something to do with a phone vendor, a copy
3    vendor, and I believe there was something else. I don't
4    remember off the top of my head.
5    Q. Can you be more specific?
6    A. Mr. Duncan had indicated that I was sexually
7    forward with both these vendors.
8    Q. And is it your contention that you were not?
9    A. It is my contention I was not.
10    Q. What else did Mr. Duncan say that you say are
11    lies?
12    A. I don't, I don't remember.
13    Q. Well, it is your complaint so you have to tell me
14    what the lies are.
15    A. I can't -- I know that there was one about the
16    copy vendor and the phone guy. But they are just things
17    that we had heard, I guess, from Commerce. But I can't
18    remember what the other ones were.
19    Q. How do you know that Commerce made its
20    determination based at least in part on lies told by Mr.
21    Duncan?
22    A. Because they had accused my of inappropriate
23    behavior.
24    Q. Well, we know that you had a dating relationship

18 (Pages 241 to 244)

Deborah Watson

Page 142

1      Q.  But you never observed Kim dressing
2  provocatively.  Right?
3      A.  No.  But I didn't work in Delaware.
4      Q.  And there was no record in her personnel file
5  where she was talked to about that.  Right?
6      A.  Mary Corcoran talked to her at one point about
7  it.  She sent her home.
8      Q.  No.  I'm talking about as of May 6th of 2003.
9      A.  I would have to re-review the file.  To my
10  recollection right now, no.
11     Q.  Did you believe that what Steve was telling
12  you was true?
13     A.  I did think it was possible she was having
14  issues with dress code.
15     Q.  Based on what?
16     A.  As I said, he had talked to me at another
17  point casually about the fact he talked to Kim about the
18  dress code.
19     Q.  Is this before all the sexual harassment —
20     A.  Yes.
21     Q.  — stuff came out?
22     A.  Yes.
23     Q.  What did you tell him to do about it?
24     A.  I don't remember.  I'd have to give you the —

Page 143

1  I'd have to figure out the specific date.
2      Q.  Then moving on down, there's something that
3  says "phone contractor."  Something about a phone
4  contractor.
5      A.  Yes.  It was Dave Cook.
6      Q.  Who's that?
7      A.  He's the guy who works on the phones.  He's a
8  vendor, I believe.
9      Q.  In Delaware?
10     A.  I'm not sure where.  Steve had to talk to Kim
11  about — SD had to talk to KB about stopping
12  conversation, quote, ass, eyes, physique.  Kim was the
13  instigator.
14     Q.  Now, what does that mean?
15     A.  This was — what Steve meant was that the
16  phone person would come into the office and that she
17  would make comments about his physical appearance in a
18  joking manner and that Steve had talked to her about it
19  and said — he said it was in a casual fashion.  But
20  he had said to her, hey, you know what?  That's not
21  really appropriate.  You shouldn't do that.
22     Q.  Did you believe that that actually occurred —
23  that she said things like that to this Mr. Cook?
24     A.  I did believe that she said that.

Page 144

1      Q.  You did?
2      A.  Yeah.
3      Q.  On what basis?
4      A.  Marge Phipps, when we talked to her, said
5  there was a lot of banter in the office and that Kim was
6  trying to keep things light.  But there was a lot of
7  conversation about the physical appearance of the copy
8  machine person and the phone contractor.
9      Q.  Now, did she tell you that before May the 6th
10  or after?
11     A.  We talked to Marge on May the 6th.
12     Q.  Oh, you did.
13     A.  Yeah.
14     Q.  After you talked to Mr. Duncan this time or
15  before?
16     A.  It would have been before, because we
17  interviewed Steve.  Then we interviewed Marge.  Then we
18  left, which is why I'm now on the phone.
19     Q.  So you talked to Marge before these notes were
20  taken?
21     A.  That's my recollection, yes.
22     Q.  Now, did Marge raise the issue also of this
23  Dave Cook or these comments about people's physique?
24     A.  She said there was banter in the office about

Page 145

1  physique.  That was — we went through this.
2      Q.  You said that you believe that that in fact
3  happened?
4      A.  I do.
5      Q.  Did that fact have any bearing on your
6  investigation into her sexual harassment charges?
7      A.  It was a behavior that I wanted to make sure
8  didn't continue.
9      Q.  Did you do anything about it at that time?
10     A.  At that time, no.
11     Q.  Why not?
12     A.  I was still gathering information.  This was
13  very early in the investigation.
14     Q.  Did Marge Phipps also say that Kim was the
15  instigator of that banter against that man?
16     A.  I don't remember.
17     Q.  But you believe that Kim was the instigator?
18     A.  I believe the banter was going on in the
19  office.  And as the supervisor, Kim certainly wasn't
20  preventing it.  And even if she wasn't instigating it, it
21  was participating in it.
22     Q.  And the evidence that you have that she was
23  participating in it was what?
24     A.  This comment from Steve and Marge of her own

Deborah Watson

38 (Pages 146 to 149)

Page 146

1  accord bringing this up.
2      Q.  Did you ask anybody else other than Marge or
3  Steve whether or not they could corroborate that?
4      A.  No, I could not.
5      Q.  Why not?
6      A.  Steve obviously had his side of the story.
7  Marge -- when we spoke to her, it was not about a sexual
8  harassment complaint.  It was to get some information
9  about the general feel of the office.
10     Q.  Did you ever ask Kim her side of this story on
11 what was going on in the office with this phone vendor?
12     A.  We did talk about it on June 3rd when Joe
13 Morrissey and I had the counseling session with her and
14 the meeting about what the next steps were.
15     Q.  Did you at that time ask her whether or not
16 those allegations were true?
17     A.  I asked her if there was -- I asked -- there
18 was -- how did I phrase it?  We discussed the fact that
19 there was casual banter in the office and some of it was
20 about the physique of some of the vendors.  And she
21 didn't deny that.  And we said, you know, that's not
22 really appropriate.  It opens the door for more casual
23 and sometimes inappropriate conversation.  And as a
24 supervisor, you should not be engaging in those

Page 147

1  discussions.  And she said she understood.  And then we
2  got into the whole discussion about trying to get her
3  some training.
4      Q.  But did she deny that she was involved in it?
5      A.  No, she didn't deny it.
6      Q.  Did she admit it?
7      A.  She didn't deny it.
8      Q.  Did she --
9      A.  I don't remember that she said, yes, I did it.
10     Q.  What about the end?  SD -- we can talk to
11 anyone.  What does that mean?
12     A.  You can talk to anyone in Delaware to validate
13 the story, quote, how does Kim carry on with men in the
14 office.
15     Q.  So Mr. Duncan is saying that anybody in the
16 Delaware office can corroborate what?
17     A.  Kim's treatment of the male phone contractor
18 or the male vendors that come in.
19     Q.  Where does he talk about other male vendors?
20     A.  What he's saying is "how does Kim carry on
21 with men in the office."  So men who come in.  I know
22 from Marge that there is a male copy machine person, I
23 believe is what Marge is telling me.  And I have a male
24 phone contractor.  So those are the two facts that are in

Page 148

1  my mind as far as the men in the office.
2      Q.  Did you talk to anybody else besides Marge and
3  Steve about that?
4      A.  No, I did not.
5      Q.  He said anybody in Delaware can corroborate
6  it.  Right?
7      A.  Can talk to anyone in Delaware to validate the
8  story.
9      Q.  Right.
10         That Kim instigates improper comments
11 about the physique of males in the office.  Right?
12     A.  Well, what he's saying is how -- about how she
13 carries on with men in the office.
14     Q.  Right.
15     A.  He was more vague than that.
16     Q.  Okay.
17     A.  He has one specific instance, and then he just
18 makes a comment "how does Kim carry on with men in the
19 office," because, again, he's now pushing back trying to
20 put her in a bad light.
21     Q.  Right.
22         My question is:  What did you do to
23 corroborate that what he said when he was pushing back
24 was true?

Page 149

1      A.  I had already had the conversation with Marge,
2  so I knew what the other management person in the office
3  had heard.  And then on June 3rd when we sat down with
4  Kim and talked about some of the behaviors we would have
5  liked to change, we talked about how that type of
6  discussion can -- that you should keep the office more
7  professional and not go down those roads.  And again, she
8  didn't deny it.
9      Q.  Skip page 0514 and go to 0515.  Tell me what
10 that is.
11     A.  This is our conversation with Marge Phipps.
12     Q.  So the first topic you wanted to talk about
13 was Kim's demeanor and professionalism.  Right?
14     A.  Yes.
15     Q.  What did Marge said?
16     A.  She tries to keep it upbeat.  Never came down
17 on staff inappropriately.  Very friendly but not
18 offensive.  She said the phone and the Xerox employee --
19 she hasn't embarrassed anyone.  You get to know the
20 people like coworkers.  She doesn't always try to make
21 comments sexual.
22     Q.  Hold up.
23         Who wrote phone and Xerox?
24     A.  I did.

Deborah Watson

39 (Pages 150 to 153)

## Page 150

1    Q.  So that says phone and Xerox what?
2    A.  EE.  That's my abbreviation for employee --
3  employees.
4    Q.  Hasn't embarrassed anyone.  Right?
5    A.  Yes.
6    Q.  So she told you that Kim didn't embarrass
7  anyone?
8    A.  From Marge's perspective.
9    Q.  Correct.
10   A.  Mm-hmm.
11   Q.  You get to know the people like coworkers.
12   A.  Yes.
13   Q.  Where does she say that Kim participated in
14 banter talking about the physical attributes of this
15 phone and Xerox vendor?
16   A.  It's part of the next comment which is doesn't
17 always try to make comments sexual.
18   Q.  But that's your word.  Right?
19   A.  No.  That's what Marge is telling me.
20   Q.  But where --
21   A.  This whole conversation is about the banter in
22 the office about the physique and sexual innuendo with
23 these vendors, and what Marge is saying -- that it hasn't
24 embarrassed anyone, because these people are in there a

## Page 151

1  lot.  They're like coworkers.  And in sort of a defense
2  of Kim, she's saying it isn't always a sexual
3  connotation.  And she also said that Kim is doing this to
4  try to keep the office upbeat.
5    Q.  She doesn't say -- or at least you didn't
6  write down -- that Kim does that?
7    A.  No.  That is what I'm saying here.  We're
8  talking about Kim.  We're talking about Kim's demeanor,
9  which is how we started with this.
10   Q.  Right.
11       I'm asking you to point to me language
12 in this note that says that Joan --
13   A.  Marge.
14   Q.  -- sorry -- Marge Phipps says that Kim was the
15 instigator of banter concerning the physical attributes
16 of men in the office.
17   A.  No.  Instigator was Steve Duncan's word.  What
18 Marge said was this was banter that went on in the office
19 and that Kim would try to keep it upbeat and that she
20 would participate in it and that it wasn't always --
21 doesn't always try to make the comments sexual.
22   Q.  Show me one place where it says anywhere in
23 that note that Kim participated in it.
24       MS. LEMING:  Objection to the form.  You

## Page 152

1  can answer.
2    A.  It doesn't physically say it on the note.
3    Q.  Right.  Thank you.
4        "No relationships, personal" -- what
5  does that say there?
6    A.  "No relationships, personal, with men,"
7  meaning did any of these conversations cross into a more
8  personal relationship.  And Marge said, no, nothing that
9  she was aware of.
10   Q.  All right.  What's the other stuff?
11   A.  Lynn Einstein is Tom's ex-wife.  They're
12 divorced now.  We asked who's -- you know, who's -- hey,
13 who's Tom Einstein's ex-wife?  What's her name?  Lynn
14 Einstein.  That there was a business-like relationship
15 with Steve and there was no impropriety with Steve or
16 Kim.  From Marge's perspective, she didn't have any
17 issues with either one of them.
18   Q.  You mean she didn't?
19   A.  Right.
20   Q.  But she's not saying that nothing wrong
21 happened between Kim and Steve?
22   A.  She actually was not aware of anything.
23   Q.  So you asked her:  Did you ever see Steve do
24 anything improper to Kim?  And she said I've never seen

## Page 153

1  anything like that?
2    A.  No.  What I said was:  Have you ever had any
3  impropriety with Steve?  No.  He's a perfect gentleman.
4  Have you had any impropriety with Kim?  No, not at all.
5  Marge actually said something to me later about not
6  knowing that anything was going on.
7    Q.  You called Marge on this or she called you?
8    A.  We talked to her personally.
9    Q.  Well, who summoned her to you?  Did you summon
10 her?
11   A.  Bruce McKelvy and I brought her in the room.
12   Q.  All right.  Was there any questions asked of
13 Ms. Phipps about how Steve Duncan acted?
14   A.  Yes.  That was part of the impropriety.  And
15 she said Steve is a perfect gentleman.
16   Q.  So you asked one question about Steve, and all
17 the other questions in that interview were just about
18 Kim?
19   A.  No.  I asked a question about Kim -- about
20 Kim's demeanor -- and that's where the rest of this came
21 from -- and then asked about Lynn Einstein.  And I said,
22 you know, what is your relationship with Steve?  She said
23 business-like.  And then I asked the impropriety
24 questions with Steve and Kim.

Corbett & Wilcox

Deborah Watson

8 (Pages 26 to 29)

Page 26

1 their bosses went.
2    Q. Did you ever consult Kim specifically and
3 discuss with her why she wasn't being moved or he wasn't
4 being moved?
5    A. I don't recall. But we, I would hope, had
6 asked her in the initial meeting if she could work
7 professionally with him while we worked through this.
8    Q. Is –
9    A. And I believe we asked Mr. Duncan the same
10 thing.
11    Q. So you say you hoped you would have asked her
12 that?
13    A. I'm going to change that to I believe we asked
14 her.
15    Q. Are you sure?
16    A. To the best of my recollection.
17    Q. You did ask her?
18    A. Yes.
19    Q. Did you ask her input into your decision that
20 there was no place to send her other than Randolph? In
21 other words, did you ask her, look, we're willing to send
22 you to Randolph if you want, you know, but we're not
23 going to require you to go there?
24    A. No, we did not ask her that.

Page 27

1    Q. Why not?
2    A. Because it would seem punishing. She lives in
3 Delaware. Randolph is up north. Again, we would have a
4 better business reason, but we still have to explain why
5 she's up there. And the investigation, it was not
6 something we would do in a day or two, which meant it
7 would have been an extended period of time. It would
8 have felt burdensome.
9    Q. So you decided that it would be more
10 burdensome for her to go up to Randolph every day than it
11 would to work with a guy that was sexually harassing her?
12        MS. LEMING: Objection to the form. You
13 can answer.
14    A. I didn't have facts yet that he was sexually
15 harassing her. I had her charge, which was why we asked
16 if she could work professionally with him. And, again,
17 we had to ask the same thing of Duncan.
18    Q. Your testimony is that you believe you asked
19 Kim that question, and she said, sure, I'm willing to
20 work with him?
21    A. No. I said I believe I asked that question,
22 and she did not come back to me. I don't know what
23 specifically she said that I recall, but she did not come
24 back to me and say, no, no way. I can't do it.

Page 28

1    Q. Did you she specifically tell you that she was
2 willing to work with Steve Duncan while you were
3 investigating?
4        MS. LEMING: Objection to the form. You
5 can answer.
6    A. That I don't recall.
7    Q. So you and Mr. McKelvy were the only people
8 that were involved in the investigation into the charges
9 of sexual harassment. Correct?
10    A. Yes. He and I interviewed the witnesses,
11 talked to Steve, talked to Kim.
12    Q. Who were the witnesses that you interviewed?
13    A. Cindy Smith, Scott Durham, Paul Scaffidi. We
14 spoke to Steve Duncan. And we spoke to Marge Phipps with
15 just some general questions about the office environment.
16    Q. What did you ask Marge?
17    A. We asked Marge about professional behavior in
18 the MainStreet office.
19    Q. Can you be more specific?
20    A. We asked her if she had any inappropriate
21 dealings with Steve, and she said no; any inappropriate
22 dealings with Kim, which she said no.
23    Q. What did you mean by "inappropriate dealings"?
24    A. Meaning like uncomfortable or unprofessional.

Page 29

1    Q. Towards her?
2    A. In her personal interactions, yes.
3    Q. In other words, did you ask her: Did you ever
4 see Steve Duncan and Kim doing anything of a sexual-type
5 nature?
6    A. No.
7    Q. No?
8    A. What I asked her was: Marge, in your
9 interactions with Steve, has he ever been unprofessional?
10 Inappropriate? And her response was, no, he's always a
11 perfect gentleman.
12       Marge, in your interactions with Kim,
13 has there ever been anything unprofessional or
14 inappropriate? And she said there was a lot of office
15 banter – some of it directed at the copy machine
16 person – and that she felt it was Kim trying to keep it
17 light, but it was sometimes unprofessional.
18    Q. Did she specifically accuse Kim of doing
19 anything unprofessional?
20    A. She felt that Kim was trying to keep it light.
21 She didn't say it was unprofessional. She just said it
22 was not, I guess, as professional as Mr. Duncan was.
23    Q. What is it that made you ask Marge Phipps
24 anything?

Deborah Watson

42 (Pages 162 to 165)

Page 162

1  Plan for Improvement -- is to talk about specific things
2  that we would like to see changed.
3       Q. Do you know when in May this document was
4  prepared?
5       A. It was late May.
6       Q. Late May?
7       A. (The witness indicated.)
8       Q. You eventually had a meeting with Kim and
9  Mr. Morrissey where she was told what was going on.
10 Right?
11      A. That was June 3rd.
12      Q. June 3rd.
13          This Document, No. 1, and these other
14 documents, 2 through 4, were they sort of summaries of
15 what she was told?
16      A. No.
17      Q. No?
18      A. No.
19      Q. Were you trying to write down and collect your
20 thoughts on what you were going to tell her?
21      A. No.
22      Q. All right. It looks like from this Exhibit
23 No. 1 that you had concluded, based on your
24 investigation, that she was guilty of unprofessional

Page 163

1  conduct in the workplace. Right?
2       A. We found through the course of the
3  investigation that there was some unprofessional conduct
4  that was inappropriate as a member of management that we
5  wanted to see her correct.
6       Q. Okay. Did you specifically tell her what they
7  were -- what that unprofessional and improper conduct --
8  inappropriate conduct was?
9       A. We talked about that on June 3rd.
10      Q. You say in this specifically that she made
11 comments about the physique of a phone vendor and a copy
12 machine repairman.
13      A. Mm-hmm.
14          MS. LEMING: Yes?
15          THE WITNESS: Yes. Sorry.
16          MS. LEMING: That's okay.
17 BY MR. MARCONI:
18      Q. I think we already established that you never
19 asked Kim for her position on whether she did that or
20 not.
21      A. No. We talked about that June 3rd.
22      Q. Oh, you did.
23      A. Yes. As part of the discussion she and I and
24 Joe Morrissey had about things that we came across in the

Page 164

1  investigation and wanted her to correct. That was the
2  June 3rd conversation.
3       Q. Did she admit during the June 3rd conversation
4  that she had done that?
5          MS. LEMING: Objection. Asked and
6  answered. You can answer again.
7       A. She didn't deny it. I didn't ask her
8  directly, "Did you say this?" We had had a counseling
9  session about appropriate comments and commentary in an
10 office, and we all agreed that that is something that
11 needed to stop.
12      Q. Well, let's talk about the June meeting for a
13 minute. When was the June meeting scheduled?
14      A. I believe we wanted to do it in late May, but
15 she was going on the vacation. So we then picked the
16 June 3rd date when she was back.
17      Q. Was it something that would have been on her
18 calendar that she knew that at such and such a time on
19 June 3rd she was going to have to meet with you two, or
20 did you pick up the phone and say "Kim, come into the
21 conversation room. We want to talk to you"?
22      A. It was prescheduled. I don't know if she put
23 it on her calendar, but it was prescheduled.
24      Q. Did she have any idea what it is that you were

Page 165

1  going to be discussing with her at that meeting?
2       A. That we were going to get together and talk
3  about the results of the investigation and where we go
4  from here, yes.
5       Q. Results of the investigation concerning her
6  allegations of sexual harassment?
7       A. Correct.
8       Q. Did you ever tell her that part of the meeting
9  would be that she would be accused of wrongdoing too?
10          MS. LEMING: Objection to the form. You
11 may answer.
12      A. I didn't accuse her of anything.
13      Q. You said that she committed unprofessional and
14 inappropriate conduct in the workplace.
15      A. And we discussed at that meeting things in
16 here about --
17      Q. Can I stop you?
18          MS. LEMING: Well, no. Can't she finish
19 her answer?
20          MR. MARCONI: The answer is not
21 responsive to the question.
22 BY MR. MARCONI:
23      Q. The question is: Did Kim Bailey know? Did
24 you tell her before the meeting that you were going to be

## Page 166

1  discussing the fact that you had concluded that she had
2  been unprofessional and inappropriate in the workplace?
3  Did you tell her that beforehand?
4      A.  I told her we were going to be discussing the
5  results of the investigation. I don't recall if I used
6  those specific words.
7      Q.  Did you tell her that her conduct would also
8  be discussed at the meeting as opposed to just
9  Mr. Duncan's?
10     A.  I did not get that specific. I said we're
11  going to discuss the results of the investigation and
12  where we go from here.
13     Q.  But when you started talking to her about the
14  phone vendor, you said she didn't admit it.
15     A.  She didn't deny it either. It was a
16  conversation.
17     Q.  So she listened while you accused her of that.
18  Right?
19     A.  I didn't accuse her.
20          MS. LEMING: Objection to form. You may
21  answer.
22          THE WITNESS: I didn't accuse her. It
23  was a discussion. It was a counseling discussion
24  about -- and this is not the document that was reviewed.

## Page 167

1  This is not the document that we went through.
2          MS. LEMING: Just let the record reflect
3  that the witness is gesturing to Exhibit 1.
4  BY MR. MARCONI:
5      Q.  So there was a document that was prepared that
6  you used to go to conduct the June 3 meeting with
7  Ms. Bailey?
8      A.  There were two documents that were prepared.
9  One was the letter that we gave her mandating training.
10  Then the other one is a note to file that I had written
11  of the different topics we were going to talk about,
12  because Commerce made a decision that we were not going
13  to put a formal written warning in front of Kim -- that
14  what we were going to do was have a discussion about the
15  things that we found out in the investigation that we
16  felt were unprofessional or inappropriate and needed to
17  change and talk to her about making those changes and
18  what we expected and then sending her to some training.
19     Q.  But as of June 3rd, you had already concluded
20  that all of those things that you had been told she was
21  guilty of she was in fact guilty of. Right?
22          MS. LEMING: Objection to the form. You
23  can answer.
24     A.  No. Which is part of why we went in with a

## Page 168

1  discussion instead of a formal written warning. It's a
2  softer approach done for the purpose of having a
3  discussion hoping that Kim will understand that some of
4  these things need to change. But it's not a -- for
5  example, in here it doesn't go into the summary. It's
6  conversational and counseling versus the impact of
7  handing a written warning to someone and saying this is a
8  permanent part of your file.
9      Q.  But your analysis of what occurred is laid out
10  in these exhibits. Right?
11     A.  This is what -- the pieces of the
12  investigation that we were not pleased with Kim's
13  behavior are in here. But it's written in a tone, again,
14  of a warning versus the counseling discussion that Joe
15  and I had with her.
16     Q.  Right. But this accurately lays out your
17  conclusions concerning the investigation as it relates to
18  the matters that are described in this document. Right?
19  Problem Area No. 1: Unprofessional conduct. Plan for
20  Improvement. Then Problem Area 2 -- separation of work
21  and personal life. You concluded that these were
22  problems for her.
23     A.  These were areas where she needed to improve.
24  Correct.

## Page 169

1      Q.  Based on your investigation?
2      A.  Correct.
3      Q.  Okay. My question is again: At any time was
4  Kim ever given an opportunity to refute what is written
5  in this Problem Area No. 1?
6      A.  During the discussion of June 3rd.
7      Q.  How was that opportunity afforded to her?
8      A.  Because it was conversational.
9          Kim, it came up in the investigation
10  that you may have tried through an attempt to build
11  morale in MainStreet to arrange a trip to New York and
12  take separate rides up and stay in a hotel. That is
13  outside the company parameters on a company event, and as
14  a supervisor, we want you to stay within the parameters
15  of the company event. If you feel you want to try to do
16  something different, you should reach out to someone and
17  question it. That was the conversational nature of what
18  occurred on June 3rd.
19     Q.  I don't see anything about that in this
20  Exhibit No. 1. All I see is unprofessional conduct in
21  the workplace, and you're talking about this phone
22  vendor.
23     A.  No. Problem Area 2 is where we go into the
24  e-mail -- 05/4/8.

Deborah Watson

44 (Pages 170 to 173)

Page 170

1    Q. All right. Let's go to Problem Area No. 1
2  first, though.
3    A. Mm-hmm.
4    Q. All right. Is it your testimony that Kim was
5  given an opportunity at the June 3 meeting to refute the
6  claim that she had done that?
7    A. Yes. She could have looked at me and said
8  that is absolutely not true, Deb.
9    Q. And she didn't?
10    A. She didn't.
11    Q. Okay. You say that she accused Mr. Duncan of
12  making her feel like a "sold object" and that you don't
13  condone such comments if they in fact occurred. Did you
14  deny that they occurred?
15    A. That was -- the piece of Randolph we couldn't
16  verify was the exact comments that Steve made to her.
17  She said -- I felt my recollection of it -- again, her
18  write-up would be the specifics -- that she felt like a
19  "piece of meat." That's what she said to us as her
20  description. She told Paul she felt uncomfortable. She
21  told us that Steve made some comments walking in that she
22  was uncomfortable with. Steve denied them. No one
23  overhears them.
24    Q. Then you say: Our point, however, is that

Page 171

1  over time your behavior and demeanor in and out of the
2  office helped contribute to an environment where
3  Mr. Duncan and others may have felt free to make comments
4  that crossed the line and were perceived as
5  inappropriate.
6    A. Yes.
7    Q. So aren't you essentially saying, ma'am, that
8  Kim was somehow responsible for the sexual harassment
9  that she received from Mr. Duncan?
10    A. No.
11    MS. LEMING: Objection to the form. You
12  can answer.
13    THE WITNESS: What I'm saying is that
14  she may have put herself in a situation where someone may
15  have felt she would be receptive to it. Not necessarily
16  harassment but going back to Mr. Duncan's feeling that
17  this is consensual. And the point was: If you don't
18  cross that line and you stay professional and you don't
19  go out with work people after work and involve alcohol,
20  then you're not sending any kind of message about, hey,
21  let's all socialize together and cross that professional-
22  personal line. Draw and keep that line. Don't mix those
23  lines. That's what our point is.
24

Page 172

1  BY MR. MARCONI:
2    Q. Your point is that if you go out with people
3  at work and alcohol is involved after work that that
4  somehow contributes to an environment where they think
5  that they might be in a position to harass and get away
6  with it?
7    MS. LEMING: Objection to the form. You
8  can answer.
9    A. No. Harassment is not okay. It puts you in
10  an environment where someone may -- with alcohol
11  sometimes inhibitions come down -- and may cross that
12  line between professional and personal and say things
13  that are inappropriate and that you are offended by.
14    Again, if you keep your professional and
15  personal life separate and you don't go somewhere where
16  alcohol is involved or you don't make, you know,
17  bantering comments with a physique innuendo, people will
18  not generally come up to you and start those
19  conversations. And so, again, I'm not saying under any
20  circumstances that sexual harassment is okay. It's not
21  okay. The point is that if you don't cross that
22  personal-professional line than it is less likely that
23  someone may cross it towards you.
24    Q. So if you don't do what Kim did, it's less

Page 173

1  likely that she would have been harassed?
2    MS. LEMING: Objection to the form. You
3  can answer.
4    A. By putting herself in those situations -- and,
5  again, especially where you have alcohol involved, people
6  don't always think straight. And that is where
7  conversations occur that, again, cross that line. And I
8  think it did put her in a difficult situation. And if
9  she doesn't do that and she is just a manager and she
10  stays professional and stays within the company
11  guidelines -- she's in a much better position separating
12  professional from personal life.
13    Q. Are there company guidelines or rules that say
14  that, for example, she shouldn't have gone down to the
15  golf tournament with Mr. Duncan?
16    A. There's no formal policy, no.
17    Q. Is there an informal policy?
18    A. She could have said no. But there's no
19  informal policy that I'm aware of.
20    Q. But isn't she in fact expected to go down
21  there because she's trying to sell?
22    A. No. With Travelers that was an invite where
23  the carrier has invited you to show up and come to their
24  event. And they want to woo Commerce's business. So you

Deborah Watson

44 (Pages 170 to 173)

Page 170

1     Q.  All right. Let's go to Problem Area No. 1
2   first, though.
3     A.  Mm-hmm.
4     Q.  All right. Is it your testimony that Kim was
5   given an opportunity at the June 3 meeting to refute the
6   claim that she had done that?
7     A.  Yes. She could have looked at me and said
8   that is absolutely not true, Deb.
9     Q.  And she didn't?
10    A.  She didn't.
11    Q.  Okay. You say that she accused Mr. Duncan of
12  making her feel like a "sold object" and that you don't
13  condone such comments if they in fact occurred. Did you
14  deny that they occurred?
15    A.  That was -- the piece of Randolph we couldn't
16  verify was the exact comments that Steve made to her.
17  She said -- I felt my recollection of it -- again, her
18  write-up would be the specifics -- that she felt like a
19  "piece of meat." That's what she said to us as her
20  description. She told Paul she felt uncomfortable. She
21  told us that Steve made some comments walking in that she
22  was uncomfortable with. Steve denied them. No one
23  overhears them.
24    Q.  Then you say: Our point, however, is that

Page 171

1   over time your behavior and demeanor in and out of the
2   office helped contribute to an environment where
3   Mr. Duncan and others may have felt free to make comments
4   that crossed the line and were perceived as
5   inappropriate.
6     A.  Yes.
7     Q.  So aren't you essentially saying, ma'am, that
8   Kim was somehow responsible for the sexual harassment
9   that she received from Mr. Duncan?
10    A.  No.
11        MS. LEMING: Objection to the form. You
12  can answer.
13        THE WITNESS: What I'm saying is that
14  she may have put herself in a situation where someone may
15  have felt she would be receptive to it. Not necessarily
16  harassment but going back to Mr. Duncan's feeling that
17  this is consensual. And the point was: If you don't
18  cross that line and you stay professional and you don't
19  go out with work people after work and involve alcohol,
20  then you're not sending any kind of message about, hey,
21  let's all socialize together and cross that professional-
22  personal line. Draw and keep that line. Don't mix those
23  lines. That's what our point is.
24

Page 172

1   BY MR. MARCONI:
2     Q.  Your point is that if you go out with people
3   at work and alcohol is involved after work that that
4   somehow contributes to an environment where they think
5   that they might be in a position to harass and get away
6   with it?
7        MS. LEMING: Objection to the form. You
8   can answer.
9     A.  No. Harassment is not okay. It puts you in
10  an environment where someone may -- with alcohol
11  sometimes inhibitions come down -- and may cross that
12  line between professional and personal and say things
13  that are inappropriate and that you are offended by.
14        Again, if you keep your professional and
15  personal life separate and you don't go somewhere where
16  alcohol is involved or you don't make, you know,
17  bantering comments with a physique innuendo, people will
18  not generally come up to you and start those
19  conversations. And so, again, I'm not saying under any
20  circumstances that sexual harassment is okay. It's not
21  okay. The point is that if you don't cross that
22  personal-professional line than it is less likely that
23  someone may cross it towards you.
24    Q.  So if you don't do what Kim did, it's less

Page 173

1   likely that she would have been harassed?
2        MS. LEMING: Objection to the form. You
3   can answer.
4     A.  By putting herself in those situations -- and,
5   again, especially where you have alcohol involved, people
6   don't always think straight. And that is where
7   conversations occur that, again, cross that line. And I
8   think it did put her in a difficult situation. And if
9   she doesn't do that and she is just a manager and she
10  stays professional and stays within the company
11  guidelines -- she's in a much better position separating
12  professional from personal life.
13    Q.  Are there company guidelines or rules that say
14  that, for example, she shouldn't have gone down to the
15  golf tournament with Mr. Duncan? .
16    A.  There's no formal policy, no.
17    Q.  Is there an informal policy?
18    A.  She could have said no. But there's no
19  informal policy that I'm aware of.
20    Q.  But isn't she in fact expected to go down
21  there because she's trying to sell?
22    A.  No. With Travelers that was an invite where
23  the carrier has invited you to show up and come to their
24  event. And they want to woo Commerce's business. So you

Corbett & Wilcox

Page 174

1  have a right to say no. In the same way that if
2  Commerce's law firm offers Commerce HR people tickets to
3  come hang out with them at a hockey game, you have a
4  right to say no.
5      Q.  Has that ever happened to you?
6      A.  That I've been invited to a hockey game?  Yes.
7      Q.  That you've been invited to anything.
8      A.  Yes.
9      Q.  Have you gone?
10     A.  Sometimes.
11     Q.  Was there ever any alcohol involved?
12     A.  Occasionally.
13     Q.  Then why is it okay for you to do it but it's
14 not okay for her to do it?
15         MS. LEMING:  Objection to the form.  You
16 can answer.
17     A.  Because this is a company event.  There's two
18 separate things going on here.  This is a company event.
19     Q.  Let me stop you.
20         MS. LEMING:  Let the witness finish
21 answering the question.
22         MR. MARCONI:  No.  It's getting late and
23 she's not being responsive.
24         MS. LEMING:  Well, you're also asking

Page 175

1  the same question a couple of different ways --
2          MR. MARCONI:  No, I'm not.
3          MS. LEMING:  -- to get the answer you
4  want.  She's entitled to give a response to your
5  question.
6          MS. MARCONI:  All right.
7          MS. LEMING:  If she's not responsive,
8  then you can ask it again and get her to focus.
9          MR. MARCONI:  I'm just trying to get us
10 out of here.  I don't think she's listening to the
11 questions because she is not answering them.
12         MS. LEMING:  She is listening.
13 BY MR. MARCONI:
14     Q.  You said that Travelers invited Kim and
15 Mr. Duncan.
16     A.  Mm-hmm.
17     Q.  You said that it's the same as if a law firm
18 invites the HR people.  Right?
19     A.  Correct.
20     Q.  My question to you was:  Has that ever
21 happened to you where you were invited by a vendor or
22 somebody who was interested in doing business with
23 Commerce to a social event?  And your answer was yes.
24     A.  Mm-hmm.

Page 176

1      Q.  Then, my question was:  Was there alcohol
2  involved in that event?  Your answer, I believe, was
3  sometimes yes.
4      A.  Mm-hmm.
5      Q.  Then I said, well, what's the difference
6  between you going to that event and Kim going to the
7  Travelers thing.
8      A.  And that's what I was trying to answer.  It's
9  two separate things.  Because your initial event was
10 about the policy -- does Kim have to go?
11     Q.  No.
12     A.  And the answer is, no, you don't have to go.
13     Q.  My question wasn't does she have to go.  That
14 was your answer, but that wasn't my question.
15         My question was:  Was it improper for
16 Kim to go?
17         MS. LEMING:  No, it wasn't.  But go
18 ahead.  Is that the question now?
19         MR. MARCONI:  Yes.
20     A.  It's not improper for her to go to the
21 Travelers event.  No, that's not improper.  It is
22 improper for her to regularly socialize out in a
23 non-company format where there is alcohol involved at
24 bars, for example.  That, I believe, is her choice.  But

Page 177

1  that, I believe, as we wrote in here, may send a message
2  that people can be more casual with her.  And that's my
3  point about the professional versus the personal life.
4      Q.  So Kim's socializing with people outside of
5  work is something that was not permitted by Commerce?
6      A.  That's not what I'm saying.
7      Q.  Tell me what you're saying again.
8      A.  What I'm saying is she chose to socialize
9  after work with some Commerce people mixed with friends,
10 not at a company event.  And that is her choice.  It's
11 not against policy.  But that is the type of situation
12 where, if a couple people get some drinks in them --
13 where inappropriate comments can be made.  And that's
14 where our advice and counsel to her is don't cross that
15 line.  Don't suggest that MainStreet go to New York and
16 go outside of the company-provided bus.
17     Q.  Well, surely --
18     A.  That's the point.
19     Q.  Surely, you would have never said to her that
20 she's not allowed to socialize with people after work
21 that include her friends and some Commerce people.
22     A.  No.  I would not say that.
23     Q.  Have you ever done that?
24     A.  Certainly.