Deborah Watson

46 (Pages 178 to 181)

Page 178

1    Q. So it's something that you are criticizing Kim
2  for, but it's okay for you to do it?
3        MS. LEMING: Objection to the form. You
4  can answer again.
5    A. Well, what I was saying is that she seemed to
6  do this regularly. It seemed to come up regularly. And
7  she's having issues in these interactions. So what we're
8  saying is, Kim, you're telling us that you want this to
9  stop. You don't want it to happen again. We're taking
10  our actions against Steve Duncan. What we're saying is
11  think about putting yourself in those positions. Maybe
12  that isn't a good idea.
13   Q. Aren't you actually saying that by doing what
14  she did she put herself in a position to be harassed?
15        MR. MARCONI: Objection to the form.
16  You can answer.
17   A. What we say in here is that — our point is
18  that over time your behavior and demeanor in and out of
19  the office helped contribute to an environment where
20  Mr. Duncan and others may have felt free to make comments
21  that crossed the line and were perceived as appropriate.
22  I'm not saying it's her fault. I'm saying it may have
23  contributed to this.
24        And, again, you're reading off a piece

Page 179

1  of paper that was written as a formal warning that Joe
2  Morrissey and I took as a consultative counseling session
3  in a less formal dialogue with Kim as opposed to a formal
4  here is your written warning.
5    Q. So what? You still said that to her. Right?
6    A. We did discuss this and how that can cause
7  complications.
8    Q. And, in fact, you accused her of doing things
9  like that which contributed to Steve Duncan's idea that
10  he could get away with whatever he wanted to get away
11  with. Right?
12        MS. LEMING: Objection to the form. You
13  can answer.
14   A. I would use the word "suggested." I don't
15  feel I accused Kim in this discussion. I feel that we
16  counseled her and found out that she could use some
17  training and talk to her. And I thought we actually had
18  a very good discussion about things that she could do
19  that may have made the situation more complicated and
20  that in the future she shouldn't do so that we don't have
21  any other issues.
22   Q. Then you say Plan For Improvement: You are to
23  refrain from making comments in the workplace — do you
24  see that? —

Page 180

1    A. Yes.
2    Q. — that cross the line as being other than
3  totally professional.
4        What does that mean?
5    A. Meaning that we want dialogue in the office to
6  be professional. No sexual innuendo. Don't banter about
7  physical. Keep it professional. Don't get into a lot of
8  personal life. Keep it professional and business-
9  oriented.
10   Q. And it's your testimony that you said this to
11  her at the June 3 meeting?
12   A. I don't know that I used those exact words,
13  but we definitely discussed a professional work
14  environment and keeping it as a supervisor that you're at
15  a higher standard and you are the one that people look to
16  in the office and need to set that example.
17   Q. Did you tell her that your investigation
18  revealed that she was not doing that in the workplace?
19   A. To my recollection, yes, we did talk about,
20  you know, the comments about the vendors, the things that
21  came out about she and Steve talking about their personal
22  lives and really crossing that line and that those are
23  conversations that shouldn't occur in the office and that
24  often it's best not to even go there.

Page 181

1    Q. Then we go down to Problem Area 2 when you say
2  that Mr. Duncan had clearly crossed the line that should
3  exist between work and personal lives.
4    A. Mm-hmm.
5    Q. He was at fault for allowing that to happen,
6  but we feel you contributed to the problem as well.
7  There were too many instances where after hours social
8  events involving friends and alcohol contributed to a bad
9  situation. See that?
10   A. Mm-hmm.
11        MS. LEMING: Yes?
12        THE WITNESS: Yes. I'm sorry.
13        MS. LEMING: That's okay.
14        THE WITNESS: I have to speak.
15  BY MR. MARCONI:
16   Q. Which incidents were you talking about?
17  Backstage and Kid Shelleen's? Or not Kid Shelleen's. Do
18  you remember which ones you were talking about?
19   A. Backstage was the initial one where he touched
20  her and they kissed in the car and we had the issue
21  around consensual, not consensual.
22   Q. All right. I'm not asking you what they were.
23  I'm asking you what are you referring to here —
24   A. Right.

Bailey v. Commerce National Insurance Services, Inc.
February 7, 2006                C.A. # 05-CV-183 SLR                Bailey, Kimberly A. - Vol. 2

Page 313

1   your testimony when Mr. Tambussi was questioning you,
2   that was sort of at a point where he had gone to the Back
3   Stage with you, but then were you trying to get rid of
4   him sort of?
5       A.   No.  That was on a separate occasion.  This was
6   with Mr. Durham.
7       Q.   Tell me about that then.
8       A.   We had left Back Stage Cage, were headed over to
9   Kid Shelleen's, and that's when Mr. Duncan was trying to
10  express to me how I guess excited Mr. Durham was or how
11  interested Mr. Durham was by rubbing my leg and my inner
12  thigh.  And I took his hand and put it between both of my
13  hands and talked to him so he would keep his hands out of
14  between my legs.
15      Q.   Would you consider that something related to your
16  work with Commerce or did that sort of cross over the
17  line into a non-work-related event?
18          MR. TAMBUSSI:  Objection to the form of the
19  question.
20      A.   We were still with the marketing rep, Mr. Durham.
21  I don't think I understand your question.
22      Q.   Well, no, I think you answered it.
23      A.   We were still with Mr. Durham, so it was still
24  work-related.

Page 314

1       Q.   Okay.
2       A.   But I don't know if you meant his putting his
3   hand, if that's work-related.  That's not work-related.
4       Q.   I'm talking about the situation in which you
5   found yourself when that occurred.
6       A.   We were still with the marketing rep, Mr. Durham.
7       Q.   And, therefore, you felt it was still
8   work-related; is that what you are saying?
9       A.   Yes, it was.
10      Q.   How about the second time?
11      A.   When Mr. Duncan put his hands on me?
12      Q.   Correct.
13      A.   That was when we were headed to the golf outing,
14  when he asked me to masturbate, but he put his hands
15  between my legs with my hands.
16      Q.   You were in his car?
17      A.   Yes.
18      Q.   And he was driving, you were in the passenger
19  seat?
20      A.   Yes.
21      Q.   And you were going down to the senior golf
22  tournament?
23      A.   Yes.
24      Q.   In Maryland?

Page 315

1       A.   Yes.
2       Q.   Was that a business function?
3       A.   That was a business function.
4       Q.   Did you consider yourself to be at work when you
5   were in the car with Mr. Duncan?
6       A.   I was representing Commerce, yes.
7       Q.   When you were in the car with him on the way
8   down, you considered that to be work?
9       A.   Yes.
10      Q.   Go to paragraph 12 of this same Exhibit 10.  Read
11  it to yourself.
12      A.   Okay.
13      Q.   Now, you discussed with Mr. Tambussi when he was
14  questioning you things that you had previously been
15  involved in and that you had been excluded from after you
16  made your charge of sexual harassment.  One of those was
17  that SEMCI project?
18      A.   Yes.
19      Q.   S-E-M --
20      A.   -- C-I, I believe.
21      Q.   S-E-M-C-I.  And Mr. Tambussi asked you whether or
22  not you believed that it was in Ms. Corcoran's purview to
23  remove you from certain projects, certain meetings,
24  things like that, and you testified I believe of course

Page 316

1   it was in her purview to do that, correct?
2       A.   It was her privilege.  She is the director.
3       Q.   Now, when you were removed from the various
4   meetings and projects and other matters, were you ever
5   given any explanation as to why you were removed?
6       A.   No.  In fact, I would question, "Do you need me
7   to go to the next meeting?"  She is like, "Oh, no, no,
8   no, no."  She completely took me out of the loop, no
9   explanation provided.
10      Q.   So were you ever informed, for example, with
11  respect to SEMCI that you were not doing a good job?
12      A.   No.
13      Q.   Was the work that you did on that project, for
14  example, something that, as far as you know, contributed
15  to the betterment, if you will, of the --
16      A.   I was an integral part at the beginning, yes.
17          MR. TAMBUSSI:  Objection to the form of the
18  question.
19      Q.   How about when the sales personnel were removed
20  from your supervision, do you remember that happening?
21      A.   Yes, I do.
22      Q.   That happened after the report of the sexual
23  harassment?
24      A.   Yes, it did.

36 (Pages 313 to 316)

B  102

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006

Bailey, Kimberly A. - Vol. 2

Page 309

1    A. Yes, I am.

2    Q. And is it because of these same things or is it

3 because I'm asking you about it?

4    A. It is just a combination of all. It is, it is

5 just a little bit overwhelming.

6    Q. All right. We will move off of that. During the

7 eight-week period that Commerce was supposedly

8 investigating this, your sexual harassment charge, were

9 you ever given the opportunity to move to another

10 position?

11        MR. TAMBUSSI: Objection to the form of the

12 question.

13    A. No, I was not.

14    Q. Did you make it known to Commerce that you felt

15 uncomfortable continuing to work with Mr. Duncan during

16 this eight-week period?

17    A. I specifically told Deb Watson that it was very

18 stressful to work with Mr. Duncan.

19    Q. What was her response when you made that known to

20 her?

21    A. They were doing the best that they could.

22    Q. Do you know, in fact, whether or not there was

23 another place you could have worked while this was going

24 on?

Page 310

1    A. I don't know. I mean, I could have worked from

2 home. I'm sure that there is something they could have

3 worked out where Mr. Duncan could have worked -- they

4 have many different locations. There could have been

5 something they worked out.

6    Q. As far as you know, it was possible, perhaps Mr.

7 Duncan could have been moved some place else?

8        MR. TAMBUSSI: Objection to the form.

9    A. His office could have been moved to a different

10 Commerce location, yes.

11    Q. Had you been given the opportunity to move your

12 office or work at home or do something other than

13 continue to work directly with and for Mr. Duncan during

14 the eight weeks, would you have taken advantage of that?

15    A. Yes, I would.

16    Q. Take a look, please, Kim, at Exhibit 10, which is

17 the complaint that was filed in the case.

18    A. Do you want me to read it again?

19    Q. No, no, not the whole thing. Take a look at

20 numbered paragraph 9. Just read it to yourself.

21    A. Okay.

22    Q. The first thing we talk about in the second line

23 of paragraph 9 is the harassment included, and it says,

24 "fondling her back, breasts, and buttocks." What

Page 311

1 incident are you referring to in that?

2    A. When he was -- when he fondled by back, my

3 breasts and my buttocks was at the Back Stage Cage.

4    Q. Was that outside the workplace that that

5 occurred?

6    A. It was in the Back Stage Cage. It was outside.

7    Q. Okay. Now, was Mr. Duncan there sort of in his

8 capacity as your supervisor or did he just happen to show

9 up?

10    A. He was there as -- I believe that we went

11 together, and, again, then separated or whatever. But he

12 was there initially as my supervisor or as my -- as a

13 director, yes.

14    Q. So, in other words, you left directly from work

15 and he left directly from work, and the plan was, in both

16 of your minds at the time, was to leave work and go

17 there, correct?

18    A. Yes.

19    Q. To discuss business?

20    A. Yes.

21    Q. How about when the suggestion was made that you

22 and he have sex on business trips, was that something

23 that was spoken while you were at your office or some

24 place else?

Page 312

1    A. That was out of the office.

2    Q. Where?

3    A. At Back Stage Cage or any of the other taverns

4 that we may have visited.

5    Q. Now, do you know whether or not that was a

6 similar situation, where you were there with Mr. Duncan

7 to discuss business?

8    A. Yes.

9    Q. How about the making comments to male business

10 associates and so on about your anatomy?

11    A. That was, one particular time, with Mr. Durham.

12    Q. Was that when he came to Commerce's office?

13    A. Yes. It was in the board room.

14    Q. So this was in the Commerce office?

15    A. It was in the Commerce office.

16    Q. Okay. Now, how about the rubbing her legs and

17 inner thighs and so on?

18    A. He did that on two separate occasions, one was

19 leaving Back Stage, where Mr. Duncan asked me to ride

20 with him, and Mr. Durham rode with my girlfriend Cindy,

21 and he also put his hand on my leg or inner thigh.

22    Q. Well, let's take it one at a time.

23    A. Okay.

24    Q. When you were leaving the Back Stage, if I recall

35 (Pages 309 to 312)

(302)655-0477

B 103

Deborah Watson

46 (Pages 178 to 181)

Page 178

1  Q.  So it's something that you are criticizing Kim
2  for, but it's okay for you to do it?
3        MS. LEMING:  Objection to the form.  You
4  can answer again.
5  A.  Well, what I was saying is that she seemed to
6  do this regularly.  It seemed to come up regularly.  And
7  she's having issues in these interactions.  So what we're
8  saying is, Kim, you're telling us that you want this to
9  stop.  You don't want it to happen again.  We're taking
10  our actions against Steve Duncan.  What we're saying is
11  think about putting yourself in those positions.  Maybe
12  that isn't a good idea.
13  Q.  Aren't you actually saying that by doing what
14  she did she put herself in a position to be harassed?
15        MR. MARCONI:  Objection to the form.
16  You can answer.
17  A.  What we say in here is that -- our point is
18  that over time your behavior and demeanor in and out of
19  the office helped contribute to an environment where
20  Mr. Duncan and others may have felt free to make comments
21  that crossed the line and were perceived as appropriate.
22  I'm not saying it's her fault.  I'm saying it may have
23  contributed to this.
24        And, again, you're reading off a piece

Page 179

1  of paper that was written as a formal warning that Joe
2  Morrissey and I took as a consultative counseling session
3  in a less formal dialogue with Kim as opposed to a formal
4  here is your written warning.
5  Q.  So what?  You still said that to her.  Right?
6  A.  We did discuss this and how that can cause
7  complications.
8  Q.  And, in fact, you accused her of doing things
9  like that which contributed to Steve Duncan's idea that
10  he could get away with whatever he wanted to get away
11  with.  Right?
12        MS. LEMING:  Objection to the form.  You
13  can answer.
14  A.  I would use the word "suggested."  I don't
15  feel I accused Kim in this discussion.  I feel that we
16  counseled her and found out that she could use some
17  training and talk to her.  And I thought we actually had
18  a very good discussion about things that she could do
19  that may have made the situation more complicated and
20  that in the future she shouldn't do so that we don't have
21  any other issues.
22  Q.  Then you say Plan For Improvement:  You are to
23  refrain from making comments in the workplace -- do you
24  see that? --

Page 180

1  A.  Yes.
2  Q.  -- that cross the line as being other than
3  totally professional.
4        What does that mean?
5  A.  Meaning that we want dialogue in the office to
6  be professional.  No sexual innuendo.  Don't banter about
7  physical.  Keep it professional.  Don't get into a lot of
8  personal life.  Keep it professional and business-
9  oriented.
10  Q.  And it's your testimony that you said this to
11  her at the June 3 meeting?
12  A.  I don't know that I used those exact words,
13  but we definitely discussed a professional work
14  environment and keeping it as a supervisor that you're at
15  a higher standard and you are the one that people look to
16  in the office and need to set that example.
17  Q.  Did you tell her that your investigation
18  revealed that she was not doing that in the workplace?
19  A.  To my recollection, yes, we did talk about,
20  you know, the comments about the vendors, the things that
21  came out about she and Steve talking about their personal
22  lives and really crossing that line and that those are
23  conversations that shouldn't occur in the office and that
24  often it's best not to even go there.

Page 181

1  Q.  Then we go down to Problem Area 2 when you say
2  that Mr. Duncan had clearly crossed the line that should
3  exist between work and personal lives.
4  A.  Mm-hmm.
5  Q.  He was at fault for allowing that to happen,
6  but we feel you contributed to the problem as well.
7  There were too many instances where after hours social
8  events involving friends and alcohol contributed to a bad
9  situation.  See that?
10  A.  Mm-hmm.
11        MS. LEMING:  Yes?
12        THE WITNESS:  Yes.  I'm sorry.
13        MS. LEMING:  That's okay.
14        THE WITNESS:  I have to speak.
15  BY MR. MARCONI:
16  Q.  Which incidents were you talking about?
17  Backstage and Kid Shelleen's?  Or not Kid Shelleen's.  Do
18  you remember which ones you were talking about?
19  A.  Backstage was the initial one where he touched
20  her and they kissed in the car and we had the issue
21  around consensual, not consensual.
22  Q.  All right.  I'm not asking you what they were.
23  I'm asking you what you are referring to here --
24  A.  Right.

Corbett & Wilcox

**B 104**

Page 182

1    Q.  -- when you're talking about --
2    A.  Right.
3    Q.  -- those instances.
4    A.  And I'm sorry. I'm thinking out loud. I
5    apologize for that. Yes. Backstage was definitely one
6    of them. We had the he said/she said with the Travelers
7    event, although that was the weekend where Travelers
8    invited them. Actually, all four of the incidents
9    involved alcohol, if I remember correctly.
10   Q.  Travelers -- was that an after hours social
11   event?
12   A.  It was a Saturday.
13   Q.  Okay. But wasn't that a business event?
14   A.  It -- that one was more within company
15   parameters. But again, Travelers had invited us. And
16   she does have a right to say no. That's not, for
17   example, a business meeting from 1:00 to 3:00 in the
18   afternoon.
19   Q.  So far what she did wrong was she allowed
20   herself to be put in the position at the Backstage. She
21   allowed herself to be put into a bad situation at the
22   Travelers. And it looks like this e-mail concerning the
23   WOW! awards. What was it that you didn't like about
24   that?

Page 183

1    A.  That is outside the company's parameters.
2    The -- that's a company event. And the company provides
3    buses -- company-paid transportation for all the
4    employees to go up to the WOW! awards. And what she
5    did -- and I believe in an effort to increase morale and
6    bonding she offered to arrange outside transportation and
7    arrange for people to stay overnight in hotels in
8    New York as opposed to staying within the company
9    parameters which were the bus picks you up in Delaware,
10   company-provided, drives you to New York. When the WOW!
11   awards are over, you get back on the bus and the bus
12   takes you back.
13   Q.  Same night?
14   A.  Same night.
15   Q.  So what Kim did was, in an effort to raise
16   morale, she was trying to make arrangements for the
17   people that she worked with to stay a night in New York.
18   A.  Yes.
19   Q.  Okay.
20   A.  Night in New York, separate transportation up.
21   Q.  Now, is there any specific policy that you can
22   cite to in the policies and procedures manual that says
23   that that's not proper?
24   A.  I would have to review the handbook, but it

Page 184

1    goes to the manager having to set the example. And if
2    the company is advocating a certain way to do things like
3    the trip to New York, then management should stay within
4    those parameters. And if they're not going to, they
5    should ask about doing something separate.
6    Q.  Now, is that your opinion or is that actually
7    in the book?
8    A.  I would have to look at the book. I don't
9    recall where it is in the book.
10   Q.  So that's another thing that she did wrong.
11       Now, did that contribute to her sexual
12   harassment?
13       MS. LEMING: Objection to the form. You
14   can answer.
15   A.  This contributed to what we felt were
16   behaviors in the workplace we wanted to see her change,
17   and it was an example of her setting up an outing, again,
18   outside the company parameters. You have the company
19   parameter and going outside that that would allow for
20   more freedom for the employees to maybe end up in a
21   situation where there could be alcohol or inappropriate
22   comments or things like that.
23   Q.  I'm trying to figure out how this
24   investigation into her sexual allegation claims turns

Page 185

1    into criticism over the fact that she tried to arrange
2    other transportation to New York to see the WOW! awards.
3    A.  Through the course of the investigation and in
4    pulling e-mails and things like that -- the e-mail that
5    she sends out she had actually sent to me about New York.
6    And this is a behavior that we don't want our management
7    to do. If we set up a company-sponsored event with a
8    certain parameter, we want them within that parameter.
9    So this came up as part of the thorough investigation
10   that we did.
11   Q.  But she sent you an e-mail that she was going
12   to do that? She was going to propose another way up?
13   A.  She sent the e-mail to all of MainStreet.
14   Then she called me because Steve Duncan made a comment to
15   her about it that she didn't like. So then she said she
16   got a little paranoid about it. So she then retracted it
17   to try to make it sound more structured and that she
18   wasn't implying anything. And I asked her to send me
19   everything that she had sent. I believe Steve sent it to
20   me also.
21   Q.  Was she given an opportunity at the June 3
22   meeting to explain to you what she was trying to do
23   there?
24   A.  Yes.

Deborah Watson

48 (Pages 186 to 189)

Page 186

1  Q.  What did she say?
2  A.  She said that she was trying to get enthusiasm
3  for the company event and to try to get MainStreet to
4  bond and build morale.  And we talked about how that
5  intent is good but that that needs to be done within the
6  constraints that the company sets on the event.  Don't go
7  outside those.  Stay within the expectations of the
8  company events.
9  Q.  Has anybody else to your knowledge ever been
10 given these kinds of instructions?
11 A.  Warnings, yeah.  We give warnings.
12 Q.  Like these?  Like, for example, has anyone
13 else ever been told that while there may be business
14 social events they should be limited to
15 organizations by the company or senior management or
16 those that you receive specific approval for?
17 A.  I'm sorry.  Where are we?
18     MS. LEMING:  He's reading down in here.
19 This sentence.
20 Q.  Like, for example, has any supervisor of yours
21 ever told that to you?
22 A.  While there may be business social events,
23 they should be limited to those organized by the company
24 or senior management or those you have received specific

Page 187

1  approval for?
2  Q.  Right.
3  A.  I don't recall that sentence exactly being
4  used.
5  Q.  Just the context in general.
6  A.  I actually came out of a very strict culture
7  where business and personal was kept very separate.
8  Q.  That's not my question.
9  A.  I'm sorry.
10 Q.  My question is:  Has that concept or that
11 requirement, whether it's those exact words or not, ever
12 been communicated to you by anyone?
13     MS. LEMING:  At Commerce?
14     MR. MARCONI:  At Commerce.
15 A.  At Commerce.  Not that I can recall by my
16 supervisor.
17 Q.  I asked you this similar question.
18     But is there anything in the company
19 manual that says that that is a company policy?
20 A.  I would have to review the manual in detail.
21 I don't have anything specific coming to mind.
22 Q.  How about this?  Has it ever been communicated
23 to you by anyone at Commerce that your involvement should
24 never cross the line of appropriate business conduct and

Page 188

1  you should be sensitive to keeping your distance from
2  becoming too involved with any individual business
3  associate on a personal level?
4  A.  Yes.
5  Q.  Who communicated that to you?
6  A.  That is actually part of what we discuss in
7  performance management training and management within the
8  law, which are two management classes that we offer at
9  Commerce University.
10 Q.  Now, is that something that Kim was taking?
11 Did she take that course?
12 A.  We were asking her to take those.
13 Q.  Is that someplace in the policy and procedure
14 manual as well?
15 A.  Again, I'd have to read through the manual.  I
16 know it's in the classes, because I teach the classes.
17 Q.  Have you ever invited a personal friend to a
18 business event?
19 A.  Me personally?
20 Q.  Yes.
21     Like, say, for example, maybe a
22 boyfriend.
23 A.  No.
24 Q.  Never have?

Page 189

1  A.  No.
2  Q.  All right.  Any personal friend?
3  A.  No.
4  Q.  Never have?
5  A.  No.
6  Q.  But if you had, that wouldn't be something
7  that's improper, is it?
8  A.  I think it is improper.  You shouldn't mix
9  those two.
10 Q.  Well, let's say there's a Christmas party at
11 Commerce and someone brings a boyfriend or a girlfriend.
12 You think that would be improper?
13 A.  The Christmas party at Commerce is actually
14 set up in a way that you are encouraged to bring a
15 boyfriend or a family member.
16 Q.  Oh?
17 A.  And it's designed specifically that way.  It's
18 also open to customers.
19 Q.  So other than that Christmas party, is it your
20 testimony that doing that -- bringing a friend to a
21 company event -- is not allowed?
22 A.  I think it's inappropriate.  There's no
23 policy, if that's your question.
24 Q.  And it's done all the time, isn't it?

Corbett & Wilcox

B 106

Deborah Watson

Page 190

1   A.  Not to my knowledge.
2   Q.  Oh, no?
3       Is there any policy in place that says
4   that you can't party after hours with those you work
5   with?
6   A.  It's not a policy.  Again, it's talked about
7   in the classes in management that this is not a good
8   idea.  You have to keep yourself separate as a management
9   person because you are expected to maintain professional
10  behavior and walk the walk and talk the talk of the
11  company.  And often at those after hours gatherings,
12  particularly with subordinates, people start talking
13  about, you know, what stinks at work and, gee, I hate my
14  boss and isn't that a silly way to do this and that type
15  of thing.  And it's better if the management person is
16  not in that environment, especially with alcohol
17  involved, mixing it on those conversations.
18  Q.  Of all the different events that we discussed
19  that Kim alleges things occurred, were there any
20  subordinates at any of those gatherings?
21  A.  I don't know everyone who was at Travelers.
22  Q.  All right.  Let me ask you --
23  A.  I'm trying to think who was at Randolph.
24  Q.  Did you have any reason to believe that Kim

Page 191

1   was partying after hours with subordinates at Randolph?
2   A.  Actually, Paul is technically not a management
3   person.
4   Q.  Oh, he's not.
5   A.  Paul Scaffidi was not a management person.
6   Q.  Oh.
7   A.  Kim was management.  Steve was management.  I
8   think Nick was management at that point.  That's my
9   recollection.
10  Q.  So the answer to my question is that you
11  cannot identify any of these events that involved Kim,
12  quote, partying after hours with subordinates?
13  A.  No.  Paul Scaffidi, as a non-management
14  person, technically, in the hierarchy, is not a
15  subordinate.  It's a lesser position.  Patty Kalmbacher,
16  as a CSR, versus Kim being in management is a lesser
17  position.
18  Q.  Where is it that she partied with Patty
19  Kalmbacher?
20  A.  Patty organizes the Christmas party.  That was
21  something we were talking about a long time ago -- or I
22  should say much earlier today.
23  Q.  So Kim partying with Patty at the Christmas
24  party is improper?

Page 192

1   A.  No.  I'm trying to answer your question, which
2   is when has Kim mixed with people other than -- after
3   hours.  And so I'm sitting here trying to think of who
4   are the people who would be considered at a lesser level
5   than Kim who she has been out with that I'm aware of.
6   And the two names that are coming to mind are Paul
7   Scaffidi and Patty Kalmbacher.
8   Q.  The time you're talking about with Patty
9   Kalmbacher was the Christmas party?
10  A.  Yes.
11      (The reporter requested a break.)
12      - - - - -
13      DEBORAH E. WATSON, resumes
14  BY MR. MARCONI:
15  Q.  Getting back to those Exhibits 1 through 4,
16  they're called Employee Conference Notes?
17  A.  Mm-hmm.
18      MS. LEMING:  Yes?
19      THE WITNESS:  Yes.  I'm sorry.
20  BY MR. MARCONI:
21  Q.  I'll hand them back to you.
22      You said that you didn't show copies of
23  those to Kim because she wasn't being officially
24  disciplined or warned.  Right?

Page 193

1   A.  We were not moving to the formal discipline
2   process.
3   Q.  But did you want her to take note of the
4   information that was in those documents?
5   A.  I wanted her to take note of the information
6   that we shared with her in the June 3rd conversation.
7   Q.  That included some or all of what's in those
8   documents?
9   A.  You actually have another document.  But, yes,
10  some or all of it.  Yes.
11  Q.  All of it or some of it?
12  A.  I don't have the other document in front of
13  me, but I would say all of it.
14  Q.  Okay.  Is there any reason why you couldn't
15  have just put some other heading on those exhibits and
16  given her something in writing that reflected that
17  information?
18  A.  We chose to give her the training which was
19  the -- what we issued in writing.  And we were hoping
20  that the conversation that Joe and I would have had with
21  her that was a softer, again, counseling versus a formal
22  discipline process approach would have conveyed that,
23  yes, this -- these are things you need to change.  And
24  Kim said that she realized there were some changes that

Deborah Watson

50 (Pages 194 to 197)

Page 194

1  she needed to make and that she would, you know, sign up
2  for the classes. That was in the June 3rd conversation.
3    Q. So to try to boil down your answer, it sounds
4  like that you didn't feel as though it was necessary to
5  put your concerns in writing and actually give Kim a copy
6  of the document.
7      MS. LEMING: Objection to the form. You
8  can answer.
9    A. We did not feel it was -- we chose not to
10  issue a formal warning in going through the discipline
11  process.
12    Q. That's not my question. I want you to listen
13  to my question. Okay?
14      You chose not to give Kim a written
15  summary of what you felt was wrong with her. Right?
16  Those documents are written summaries of what her
17  problems are and what she needs to do about her problems.
18  Right?
19    A. Correct. I did not do that.
20    Q. Why not?
21    A. Because I wanted to have a conversational
22  approach versus -- when you are in the formal discipline
23  process, it's not as conversational. And you're in the
24  formal discipline process.

Page 195

1      What Joe and I did was counsel Kim from
2  the perspective of Joe, with many years of management,
3  and me, with management and HR, to talk through some of
4  the things we found out, have a dialogue with her about
5  her perspective of it and then talk about changing those
6  behaviors, which she did and was very open to in that
7  discussion saying, "I understand this. I want to put
8  this behind me. That make senses. I will sign up for
9  the classes."
10    Q. Okay. But you could have given her those
11  documents or a similar document that set forth your
12  concerns in writing, could you not, without formally
13  disciplining her?
14    A. Yes, I could have.
15    Q. And you didn't?
16    A. We did not.
17    Q. The reason is the reason that you just gave
18  me?
19    A. Yes.
20    Q. You didn't think it was a good idea?
21    A. I felt the conversation and Joe felt the
22  conversation would be enough. And to set -- we wanted to
23  put her in a position where she didn't have something in
24  writing in her formal file. This is in the investigation

Page 196

1  file. It never went into her formal file. If I put
2  something in writing, it goes into her employee file. We
3  wanted to have a consultative discussion with her, which
4  is why the only thing we put in writing was the training.
5  I'm trying not to put anything disciplinary in her file.
6  I want her to just talk about it and change it. And I
7  felt that the June 3rd meeting was a very good meeting
8  and that she understood.
9    Q. So your testimony is that you didn't give her
10  anything in writing because you thought that it would
11  have to be put into her personnel file?
12    A. We wanted to give her a fresh start, and I
13  didn't want that in her personnel file.
14    Q. Take a look at what I marked as No. 17.
15    A. Okay. This is the memo we gave to Kim
16  mandating the training we wanted her to take.
17    Q. At the June 3 meeting?
18    A. Yes.
19    Q. So it's your testimony at the June 3 meeting
20  that you laid out all of the problems that you had with
21  her verbally?
22    A. Mm-hmm.
23    Q. And that the only thing you put in writing and
24  showed to her was this training schedule that we've

Page 197

1  marked as 17?
2    A. Correct.
3    Q. What did Kim say about the idea of having
4  these training courses?
5    A. I don't remember specifically, but I remember
6  her being open to it. And I know she wanted to grow her
7  career. And she said she'd sign up for them right away.
8    Q. At the June 3 meeting, did she sound like she
9  was very cooperative and was going to try to do all she
10  could to keep you all happy?
11    A. Yes.
12    Q. Mr. Duncan wasn't terminated for sexual
13  harassment. Right?
14    A. Correct.
15    Q. That's because you didn't believe he was
16  guilty of sexual harassment?
17      MS. LEMING: Objection to the form. You
18  can answer.
19    A. We felt we couldn't prove it either way, but
20  we did feel that he absolutely acted inappropriately and
21  exercised poor judgment.
22    Q. That was basically becoming involved in a
23  romantic relationship, I guess, as he put it, with
24  Ms. Bailey as a subordinate?

**Kimberly A Bailey**　　　　To: Deborah E Watson/Commerce Bank@yesbank
08/07/03 03:51 PM　　　　cc:
　　　　　　　　　　　　　Subject: Re: Revision to training schedule

Debbie,

Per your request, here is a schedule of classes I've registered for:

1) 08/18/03 - Delegating Responsibility  - on a wait list
2) 08/19/03 - Conducting a Team Meeting
3) 08/25/03 - Effective Communication Skills
4) 08/27/03 - Reducing Resistance to Change

Deborah E Watson

**Deborah E Watson**　　　　To: Kimberly A Bailey/Commerce Bank@yesbank
08/06/03 01:56 PM　　　　cc:
　　　　　　　　　　　　　Subject: Revision to training schedule

Hi Kim
Thank you for explaining why you missed the below class. Please reschedule to take it when it is available again. It will most likely be in January or February of 2004. Please make sure that you attend Managing within the Law that you are scheduled for in August.

Also, please attend the following three classes by year end 2003:

Effective Communication Skills
Conducting a Team Meeting
Reducing Resistance to Change

If that will not be possible due to scheduling constraints, please let me know as soon as possible.
Thanks,
Debbie
----- Forwarded by Deborah E Watson/Commerce Bank on 08/06/03 01:50 PM -----

**Cathy Ensign**　　　　To: Deborah E Watson/Commerce Bank@yesbank
07/30/03 12:41 PM　　　　cc:
　　　　　　　　　　　　　Subject: Kimberly A Bailey did not attend Commerce University HRM Series Part
　　　　　　　　　　　　　6: Leading People From All Walks of Life

. Kimberly A Bailey was absent from the scheduled course HRM Series Part 6:  Leading People From All Walks of Life:

Location: Commerce U-Mt. Laurel;  Date: 07/30/2003;  Time: 08:00:00 AM - 12:30:00 PM;  Instructor: Karen A Watson

CONFIDENTIAL

CIS 0541

**B 109**

**Deborah E Watson**

06/11/03 06:30 PM

To: Kimberly A Bailey/Commerce Bank
cc:
cc: Deborah E Watson/Commerce Bank@yesbank, Joseph Morrissey/Commerce Bank@yesbank
Subject: Re: CU Classes

Hi Kim,
I'll look into the DDI classes. They are listed separately by number. I don't think they are listed under DDI as a whole.
I'll follow up and get back to you.
Thanks,
Deb
Kimberly A Bailey

**Kimberly A Bailey**

06/05/03 01:32 PM

To: Deborah E Watson/Commerce Bank@yesbank
cc: Joseph Morrissey/Commerce Bank@yesbank
Subject: CU Classes

Debbie,

I've signed up for two of the HRM series – part 1 Leadership the Commerce Way 07/30 & part 6 Leading People from all walks of life 08/11

In reviewing the other HRM class you suggested (part 3 Managing with in the law) - it was only scheduled for April 2003. I need to wait for the updated schedule to be offered.

The DDI (supervisory training series) - I can't find in the course registration. Is the course description a series or separate classes listed?

Thanks for your time.

CONFIDENTIAL

CIS 0542

**B 110**

**Kimberly A Bailey**
06/05/03 01:32 PM

To: Deborah E Watson/Commerce Bank@yesbank
cc: Joseph Morrissey/Commerce Bank@yesbank
Subject: CU Classes

Debbie,

I've signed up for two of the HRM series - part 1 Leadership the Commerce Way 07/30 & part 6 Leading People from all walks of life 08/11

In reviewing the other HRM class you suggested (part 3 Managing with in the law) - it was only scheduled for April 2003. I need to wait for the updated schedule to be offered.

The DDI (supervisory training series) - I can't find in the course registration. Is the course description a series or separate classes listed?

Thanks for your time.

CONFIDENTIAL

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006                                         Bailey, Kimberly A. - Vol. 2

Page 245

1  with an insurance person?
2      A.  That was outside of work.
3      Q.  Okay.  We know that you also had a sexual
4  relationship with a core producer, correct?
5      A.  That was not in my statement.
6      Q.  We know that you told lies to Commerce in the
7  internal investigation, correct?
8      A.  They were mis-truths.  I don't believe that they
9  were lies.
10     Q.  Mis-truths?
11     A.  Mis-truths.
12     Q.  You prefer that word to lie?
13     A.  Yes.
14     Q.  Is there a difference in the definition in your
15  mind between lie and mis-truth?
16     A.  I believe in my statements that you are
17  construing to be lies were mis-truths that I told because
18  I was trying to be politically correct, professional.
19     Q.  Didn't you tell me in your deposition under oath
20  that they were lies?
21     A.  Well, I'm saying that what you are trying to
22  indicate is lies are mis-truths in my eyes.
23     Q.  Didn't you answer the questions in this
24  deposition, this morning, just a few minutes ago --

Page 246

1      A.  Yes, yes, I did.
2      Q.  -- that they were lies?
3      A.  Yes, I did.
4      Q.  Okay.  Now, in paragraph 15 you refer to the
5  assistance that Commerce wanted to provide you in
6  understanding your role as a supervisor.  Do you see
7  that?
8      A.  Yes.
9      Q.  And Commerce wanted you to attend certain
10  classes, correct?
11     A.  Yes.
12     Q.  Okay.  What facts as we sit here today do you
13  have that would support any contention that having you
14  attend classes to further your education in the business
15  was retaliation for filing a complaint against Mr.
16  Duncan?
17     A.  I don't have facts to indicate that.  I just know
18  that no one else was asked to attend these classes and
19  these classes had nothing to do with insurance.
20     Q.  Well, they did have to do with acting as a
21  supervisor; did they not?
22     A.  They had to do with taking a bank teller to an
23  assistant manager position.
24     Q.  Well, they had to do with understanding your role

Page 247

1  as a supervisor, correct?
2      A.  Not -- I don't believe necessarily.  It was all
3  -- I'm sure that their interpretation is to make an
4  indication to teach these entry-level people to go up to
5  an assistant manager position type, and what to do with
6  your daily, common problems.
7         (Discussion off the record.)
8         (Lunch recess taken.)
9  BY MR. TAMBUSSI:
10     Q.  I guess we left off, Miss Bailey, before the
11  lunch break we were talking about, I think we left off at
12  paragraph 15, did we?
13     A.  I don't remember.  I'm sorry.
14     Q.  Let me try to refresh my own memory here.
15     A.  Okay.
16     Q.  Can you refer to paragraph 15 on page 5 of your
17  complaint?
18     A.  Okay.
19     Q.  You refer to certain classes that Commerce wanted
20  you to go to, correct?
21     A.  Yes.
22     Q.  Did you attend all those classes?
23     A.  No, I did not.
24     Q.  Did you notify Commerce that you had, in fact,

Page 248

1  missed at least one of those classes?
2      A.  I actually e-mailed Deb Watson that I had missed
3  one, yes.
4      Q.  Was that in response to her e-mail to you?
5      A.  I don't remember exactly.  It may have been.
6      Q.  Why did you miss the class?
7      A.  I believe the one class that I missed, I had
8  written it down for the afternoon and it was actually a
9  morning class, so...
10     Q.  Any others?
11     A.  I attended a class that was up in northern New
12  Jersey.  I missed two classes at my termination week that
13  Mary Corcoran advised me not to attend.
14     Q.  Did Miss Corcoran do that in writing?
15     A.  I don't remember.
16     Q.  You say in your complaint that the class that you
17  did attend was largely a waste of time?
18     A.  Yes.
19     Q.  That was your opinion?
20     A.  Yes.
21     Q.  Paragraph number 17 begins on page 5 and
22  continues over to page 6.  Could you just read that
23  paragraph, please, to yourself.
24     A.  Okay.

19 (Pages 245 to 248)

**Deborah E Watson**          To: John Kulikowski/Commerce Bank,
08/26/03 08:53 AM            cc:
                             cc:
                             Subject: Classes

Hi John,
Below is one of the classes that you recommended for Kim Bailey. When she attended the class it was very retail specific and the trainer told her that she should have taken 'prerequisites' and that she shouldn't have been in the class since she didn't work in retail.

Could you please follow up with the vendor and keep me posted? I'll follow up with Kim when you get me an answer.
Thanks,
Deb
----- Forwarded by Deborah E Watson/Commerce Bank on 08/26/03 08:53 AM -----

**Kimberly A Bailey**          To: Deborah E Watson/Commerce Bank@yesbank
08/26/03 08:10 AM            cc:
                             Subject: Classes

Debbie, here is the e-mail from Luke, the instructor from the "conducting a team meeting" class I recently took. I asked him to provide me an agenda or list of classes offered in the order sequence and below is the response I got.

----- Forwarded by Kimberly A Bailey/Commerce Bank on 08/26/03 08:11 AM -----

**Louis Jacobs**          To: Kimberly A Bailey/Commerce Bank@yesbank
08/20/03 01:41 PM            cc: ,
                             Subject: Classes

Hi Kim,

Commerce U changed the rule on the RMS classes. They are developing classes for non-branch departments. At the moment they will not allow "back office" departments take the classes. I am sorry about that. I will keep you posted to when those classes will be released. Talk to you soon.

Luke

CONFIDENTIAL

CIS 0570

**B 113**

Deborah Watson

50 (Pages 194 to 197)

Page 194

1  she needed to make and that she would, you know, sign up
2  for the classes. That was in the June 3rd conversation.
3      Q.  So to try to boil down your answer, it sounds
4  like that you didn't feel as though it was necessary to
5  put your concerns in writing and actually give Kim a copy
6  of the document.
7          MS. LEMING:  Objection to the form.  You
8  can answer.
9      A.  We did not feel it was -- we chose not to
10  issue a formal warning in going through the discipline
11  process.
12     Q.  That's not my question.  I want you to listen
13  to my question.  Okay?
14         You chose not to give Kim a written
15  summary of what you felt was wrong with her.  Right?
16  Those documents are written summaries of what her
17  problems are and what she needs to do about her problems.
18  Right?
19     A.  Correct.  I did not do that.
20     Q.  Why not?
21     A.  Because I wanted to have a conversational
22  approach versus -- when you are in the formal discipline
23  process, it's not as conversational.  And you're in the
24  formal discipline process.

Page 195

1          What Joe and I did was counsel Kim from
2  the perspective of Joe, with many years of management,
3  and me, with management and HR, to talk through some of
4  the things we found out, have a dialogue with her about
5  her perspective of it and then talk about changing those
6  behaviors, which she did and was very open to in that
7  discussion saying, "I understand this.  I want to put
8  this behind me.  That make senses.  I will sign up for
9  the classes."
10     Q.  Okay.  But you could have given her those
11  documents or a similar document that set forth your
12  concerns in writing, could you not, without formally
13  disciplining her?
14     A.  Yes, I could have.
15     Q.  And you didn't?
16     A.  We did not.
17     Q.  The reason is the reason that you just gave
18  me?
19     A.  Yes.
20     Q.  You didn't think it was a good idea?
21     A.  I felt the conversation and Joe felt the
22  conversation would be enough.  And to set -- we wanted to
23  put her in a position where she didn't have something in
24  writing in her formal file.  This is in the investigation

Page 196

1  file.  It never went into her formal file.  If I put
2  something in writing, it goes into her employee file.  We
3  wanted to have a consultative discussion with her, which
4  is why the only thing we put in writing was the training.
5  I'm trying not to put anything disciplinary in her file.
6  I want her to just talk about it and change it.  And I
7  felt that the June 3rd meeting was a very good meeting
8  and that she understood.
9      Q.  So your testimony is that you didn't give her
10  anything in writing because you thought that it would
11  have to be put into her personnel file?
12     A.  We wanted to give her a fresh start, and I
13  didn't want that in her personnel file.
14     Q.  Take a look at what I marked as No. 17.
15     A.  Okay.  This is the memo we gave to Kim
16  mandating the training we wanted her to take.
17     Q.  At the June 3 meeting?
18     A.  Yes.
19     Q.  So it's your testimony at the June 3 meeting
20  that you laid out all of the problems that you had with
21  her verbally?
22     A.  Mm-hmm.
23     Q.  And that the only thing you put in writing and
24  showed to her was this training schedule that we've

Page 197

1  marked as 17?
2      A.  Correct.
3      Q.  What did Kim say about the idea of having
4  these training courses?
5      A.  I don't remember specifically, but I remember
6  her being open to it.  And I know she wanted to grow her
7  career.  And she said she'd sign up for them right away.
8      Q.  At the June 3 meeting, did she sound like she
9  was very cooperative and was going to try to do all she
10  could to keep you all happy?
11     A.  Yes.
12     Q.  Mr. Duncan wasn't terminated for sexual
13  harassment.  Right?
14     A.  Correct.
15     Q.  That's because you didn't believe he was
16  guilty of sexual harassment?
17         MS. LEMING:  Objection to the form.  You
18  can answer.
19     A.  We felt we couldn't prove it either way, but
20  we did feel that he absolutely acted inappropriately and
21  exercised poor judgment.
22     Q.  That was basically becoming involved in a
23  romantic relationship, I guess, as he put it, with
24  Ms. Bailey as a subordinate?

Deborah Watson

Page 198

1      A.  Correct.  A managerial relationship with a
2  subordinate.
3      Q.  A managerial --
4      A.  He's a manager, meaning -- I'm sorry.  Yes.
5  He was in a higher position, and he engaged in
6  inappropriate behavior with a subordinate.
7      Q.  Now, is there a policy against that?
8      A.  There is now.  I'm not sure if it was there in
9  2003.
10     Q.  Does it say that you're not allowed to have a
11 consensual romantic relationship with somebody who's a
12 subordinate of yours?
13     A.  Yes.
14     Q.  Before all this came about, was Mr. Duncan
15 well-liked at Commerce?
16         MS. LEMING:  Objection to the form.
17     Before all what came about?
18         MR. MARCONI:  The allegation that he
19 sexually harassed Ms. Bailey.
20         MS. LEMING:  Still object to the form.
21 But you can answer.
22     A.  As far as I know.  I didn't have any
23 complaints about him.
24     Q.  As far as you know what?

Page 199

1      A.  People liked him.  I didn't have any
2  complaints about him.
3      Q.  Was there ever any discussions that Mr. Duncan
4  would not be terminated?  That some lesser discipline
5  would happen?
6      A.  We did consider that but dismissed it quickly.
7  We did not feel that his actions were appropriate.
8      Q.  Take a look at what I've marked as No. 6.
9          This is the termination letter that was
10 at least signed by you on August the 27th of 2003
11 terminating Ms. Bailey's employment.  Right?
12     A.  Correct.
13     Q.  Now, have you had a chance to review that,
14 ma'am?
15     A.  Yes.
16     Q.  Okay.  You say:  "It has come to management's
17 attention that an incident occurred in the Delaware
18 office on August 12th, 2003.  The incident involved
19 inappropriate behavior you exhibited toward a
20 subordinate."  Right?
21     A.  Correct.
22     Q.  Is this the incident where she used the word
23 "fuck" in speaking to Valerie Oakes?
24     A.  Correct.

Page 200

1      Q.  And the two other employees who witnessed the
2  incident and verified the inappropriate behavior, is that
3  Dee Whalen and Darlene Wilkins?
4      A.  Yes.
5      Q.  Had you seen copies of the e-mails that they
6  sent to Ms. Corcoran about the incident?
7      A.  Yes.
8      Q.  You discussed it with Ms. Corcoran?
9      A.  Yes.
10     Q.  Was there ever any thought, ma'am, that
11 Ms. Bailey would not be terminated as a result of this
12 incident?
13     A.  Yes.  There was a discussion about moving to a
14 final written warning, which is a step in the formal
15 discipline process.
16     Q.  In fact, that was something that was suggested
17 by Ms. Corcoran, wasn't it?
18     A.  I believe she put that in an e-mail at one
19 point.  Yes, she did.  She sent that to me.
20     Q.  Then you say:  "We previously discussed with
21 you the issue of behavior in the workplace and even
22 arranged for you to attend training on that area, as well
23 as other topics related to your employment at Commerce."
24 What previous discussions are you referring to?

Page 201

1      A.  The June 3rd discussion.
2      Q.  What specifically are you referring to in this
3  letter about the June 3rd discussion?
4      A.  As a management person displaying appropriate
5  behaviors, setting the example in the workplace, keeping
6  the workplace professional, attending the training that
7  we had mandated.
8      Q.  Is it your position that Kim didn't attend all
9  the training?
10     A.  She actually missed one of the classes and
11 didn't notify me.  I was notified by Commerce University
12 and then had to call her to find out what happened.  She
13 didn't tell me that she had missed, actually, the very
14 first mandatory class.  And unfortunately, it was a class
15 that was not going to run again for another six months.
16     Q.  But you gave her a year to take the class.
17 Didn't you?
18     A.  No.  I don't believe we gave her a year.
19     Q.  This is Exhibit 17.
20     A.  Mm-hmm.
21     Q.  It says, "As per our discussion, we are
22 requiring that you attend the following management
23 training classes by the end of the year 2003."
24         That was June?

Mary Corcoran

10 (Pages 34 to 37)

Page 34

1    Q.  Not at all?
2    A.  No one's name -- no one's specific name came
3  up.
4    Q.  Did you get any information from them at this
5  meeting -- Mr. Morrissey and Mr. Kiessling -- that they
6  felt that the supervisor of the unit was not doing a good
7  job?
8    A.  No.  We didn't talk about specific employees.
9    Q.  And you didn't talk about specific positions?
10    A.  No.
11    Q.  What else did they say at the meeting was
12  wrong with MainStreet?
13    A.  Nothing.  They didn't -- to be honest, they
14  really didn't know much about MainStreet.
15    Q.  Were you offered the position that night?
16    A.  Yes.
17    Q.  Did you accept it?
18    A.  Not that night.
19    Q.  What did you do between the time of that
20  meeting and the time that you accepted the position to
21  figure out whether you wanted it?  Did you talk to
22  anybody?
23    A.  I talked to my husband.  That was pretty much
24  it.  I looked -- I can't remember if I spoke to HR or not

Page 35

1  about it.  But I don't think that I did.  And I looked --
2  I went back over the -- what we call Monday morning
3  reports that show all the results and, you know, just
4  kind of looked at a little bit of the history of
5  MainStreet.  But, no, I really didn't really talk to many
6  people about it.  I had to make the decision the next
7  morning.
8    Q.  So you made the decision the next morning?
9    A.  Yes.  I did.
10    Q.  That would have been sometime in June of 2003?
11    A.  Correct.
12    Q.  How much time elapsed between the time that
13  you accepted the job and the time that you actually
14  started performing the job?
15    A.  Two days.
16    Q.  Two days?
17    A.  Mm-hmm.
18    Q.  Now --
19    A.  As a matter of fact, it might have even -- I
20  don't recall the timing, but it might have been that next
21  day that Joe introduced me.  I can't recall the exact
22  time frame, but it was very short.  It may have been that
23  next afternoon.  I know it was an afternoon when Joe took
24  me down there to introduce me.  So it may have been that

Page 36

1  afternoon.
2    Q.  What was the timing between Steve Duncan's
3  termination and the time that you started?
4    A.  That I didn't know.  I didn't know that.
5    Q.  You did know that Steve had been terminated by
6  then.  Right?
7    A.  Yes.
8    Q.  What did you do, other than what you said
9  already, to prepare yourself for the job?  By that I
10  mean, you said you reviewed numbers.
11    A.  Mm-hmm.
12    Q.  Did you look at personnel files or --
13    A.  No.
14    Q.  -- interview people?
15    A.  No.  I didn't have access to any of that
16  information.
17    Q.  You never looked at any of that stuff?
18    A.  I didn't have access to that prior to coming
19  down to MainStreet.
20    Q.  No.  But I mean afterwards.
21    A.  Oh, after?
22    Q.  Yeah.  Once you're in the chair.
23    A.  Oh.  I thought the question was in preparation
24  for.

Page 37

1    Q.  No.  I'm sorry.  Maybe I misspoke.
2        What I'm trying to get you to tell me
3  is:  What did you do once you were there to sort of
4  orient yourself to what you were dealing with?
5    A.  I did look at Steve's files, but they -- to be
6  honest with you, they were -- there was a lot missing.  I
7  went -- I contacted all the carriers to let them know,
8  the insurance carriers.
9    Q.  Let me just stop you a second.
10        When you say you looked at Steve's
11  files, what files would you have looked at?
12    A.  Everything that was in his office.
13    Q.  Okay.
14    A.  So carrier information, special projects, if
15  he had information on individual employees, which he
16  didn't have a whole lot of in his office.
17    Q.  Did he have any information on Kim Bailey?
18    A.  No.
19    Q.  What else?
20    A.  I contacted the carriers.  I let them know
21  that I was in this position now.  And then I proceeded --
22  I met with the employees, like I said, a day or two
23  after taking over MainStreet.  Well, Joe came down,
24  introduced me.  I let them -- I encouraged them at the

Corbett & Wilcox

B 116

Deborah Watson

56 (Pages 218 to 221)

**Page 218**

1    Q. And the ultimate reason given to Kim for the
2 termination was the fact that she had been warned about
3 certain conduct in the workplace and given the
4 opportunity to take classes to improve herself and that
5 she did not, I guess, take heed of those warnings and she
6 didn't take the classes.
7    A. The word we used was counseled versus warning.
8 But we counseled her, yes. We counseled her. She didn't
9 take the class. Mary was having dress code issues. She
10 was communication issues with her. And then this
11 happened.
12    Q. So the implication is that: Had you never had
13 a meeting on June 3rd and laid down the law to Kim that
14 she would not have been fired then. Is that true?
15    A. I think it all contributed. I think that a
16 supervisor using profanity towards a subordinate, which,
17 again, this is the first time that has happened that I'm
18 aware of at Commerce Insurance -- we still would have
19 talked about termination. I don't think where we would
20 have ended up with it. But it all built towards it.
21    Q. Why did Commerce help Steve Duncan find other
22 employment?
     MS. LEMING: Objection to the form. You
can answer.

**Page 219**

1    A. In what -- I'm sorry. In what way?
2    Q. Weren't there e-mails where you were referring
3 him to other possible employers after he was terminated?
4    A. Steve Duncan asked me if I knew of any
5 headhunters who placed insurance people, and so I sent
6 three that I had used at Commerce Insurance.
7    Q. Was a similar service offered to Kim Bailey?
8    A. We didn't offer it to Kim. He asked for it.
9 Kim never asked us. I would have responded the same way
10 to her.
11    MR. MARCONI: Give me like five minutes.
12    (A brief recess was taken.)
13    -----
14    DEBORAH E. WATSON, resumes
15 BY MR. MARCONI:
16    Q. How long did the meeting on June 3rd between
17 you and Mr. Morrissey and Ms. Bailey last from the time
18 that she entered the room until the time she left? Can
19 you approximate that?
20    A. To my recollection 20, 30 minutes.
21    MR. MARCONI: Okay. That's all I have.
   MS. LEMING: No questions.
   (The depososition concluded at 7:30 p.m.
24 this same day.)

**Page 220**

1 (I HAVE READ THE FOREGOING DEPOSITION, AND IT IS TRUE AND
2 CORRECT TO THE BEST OF MY KNOWLEDGE.)

7    WITNESS NAME
9    -----
11    INDEX TO TESTIMONY
13 DEBORAH E. WATSON    PAGE
   Examination by Mr. Marconi    2
15    -----
17    INDEX TO EXHIBITS
19 WATSON DEPOSITION EXHIBIT NO.    PAGE
20 1 Document Bates stamped CIS 547-549    2
21 2 Document Bates stamped CIS 550-552    2
22 3 Document Bates stamped CIS 553-555    2
23 4 Document Bates stamped CIS 556-557    2
24 5 Not introduced

**Page 221**

1 6 Document Bates stamped CIS 0114    2
2 7 Not introduced
3 8 Document Bates stamped CIS 0488 to 0499  2
4 9 Not introduced
5 10 Document Bates stamped CIS 0505 to 0512  2
6 11 Document Bates stamped CIS 0513-0516  2
7 12 Document Bates stamped CIS 0517    2
8 13 Document Bates stamped CIS 0525    2
9 14 Handwritten notes from conversation with  2
   Paul Scaffidi
15 Not introduced
16 Not introduced
17 Document Bates stamped CIS 0535    2
18 Not introduced
   -----

Corbett & Wilcox

**B 117**

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006

Bailey, Kimberly A. - Vol. 2

Page 297

1  indicating that it is that meeting.
2    Q.  Well, did Miss Oakes report a problem that she
3  had with you to Mr. Duncan in December that you recall?
4    A.  Oh, no, no. No.  The problem was with her
5  performance review, a comment that Mr. Duncan made on her
6  review, that she was -- wanted to rebuttal.
7        (Bailey Deposition Exhibit 12 was marked for
8  identification.)
9    Q.  Miss Bailey, before you is Bailey 12 for
10  identification.
11    A.  Yes.
12    Q.  Do you recognize that document?
13    A.  The Code of Ethics, yes.
14    Q.  And is that your name printed at the bottom of
15  that page?
16    A.  That is my name printed.
17    Q.  And is that also your signature?
18    A.  Yes, that's my signature.
19    Q.  Did you read this before today?
20    A.  I think I have glanced over it, yes.
21    Q.  Do you see paragraph number 5, "I agree to fully
22  review the Code of Conduct/Conflict of Interest Policy"?
23    A.  Yes.
24    Q.  Did you read the, review the Code of Conduct?

Page 298

1    A.  I don't remember. I don't recall.
2    Q.  Up at the top, second full paragraph, do you see
3  where it says, "As a condition of my employment by the
4  Bank, I accept the principle that the welfare of the Bank
5  depends upon the conduct and honesty of the employee," do
6  you see that?
7    A.  Yes.
8    Q.  And you have admitted here in this deposition
9  that you were not entirely honest with Commerce, correct?
10    A.  I believe what I had done was in the best
11  interests of Commerce and my employment and my
12  well-being.
13    Q.  You indicated here in this deposition that you
14  were not entirely honest with Commerce, correct?
15    A.  It is a mis-true. Again, I believe it was in my
16  best interests.
17    Q.  Thank you.
18        (Bailey Deposition Exhibit 13 was marked for
19  identification.)
20    Q.  Miss Bailey, before you is Bailey 13 for
21  identification.
22    A.  Yes.
23    Q.  The Commerce e-mail policy.  Is that your printed
24  name and signature at the bottom of that page?

Page 299

1    A.  Yes, it is.
2    Q.  Did you read that policy before you signed it?
3    A.  I reviewed it, yes.
4    Q.  Did you understand it?
5    A.  Yes.
6    Q.  Based on some of the e-mails that we have
7  discussed and talked about and you were shown in this
8  deposition, isn't it a fact that you violated certain
9  portions of that e-mail policy at times?
10    A.  I may have. But along with everyone else, I
11  think that I was following suit.
12    Q.  Thank you.
13        (Bailey Deposition Exhibit 14 was marked for
14  identification.)
15    Q.  Miss Bailey, before you is Bailey 14 for
16  identification.
17    A.  Yes.
18    Q.  Which is the Commerce Internet policy.  Is that
19  your signature and printed name at the bottom of the
20  page?
21    A.  Yes, it is.
22    Q.  Did you review this policy before you signed it?
23    A.  I reviewed it.
24    Q.  Did you understand it?

Page 300

1    A.  I believe, yes, I did.
2    Q.  You understand that violation of this policy,
3  like the other policies, is subject to disciplinary
4  action up to termination?
5    A.  Yes, I understand that.
6        (Bailey Deposition Exhibit 15 was marked for
7  identification.)
8    Q.  Miss Bailey, before you is Bailey 15, which is an
9  employee acknowledgment form indicating that you had
10  acknowledged that you have reviewed the Commerce
11  handbook, understood that it is your responsibility to
12  read and comply with the policies contained in the
13  handbook.  Does that document bear your signature and
14  printed name?
15    A.  Yes, it does.
16    Q.  Did you read the handbook?
17    A.  I reviewed it.
18    Q.  Isn't it a fact that based on some of the
19  testimony in this deposition, you have conceded that you
20  violated certain portions of that handbook?
21    A.  I don't believe that I have.
22    Q.  You don't believe that you violated the dress
23  code?
24    A.  No, I don't believe what I wore was

32 (Pages 297 to 300)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006

Bailey, Kimberly A. - Vol. 2

Page 301

1 inappropriate.
2 Q. What were you wearing that day?
3 A. I was wearing a pair of capri slacks, a red
4 undershirt which was sleeveless, with a jacket over top.
5 Q. Did you take your jacket off while you were at
6 work?
7 A. At 7:30 when I got there, yes, it was very hot.
8 I had taken my blazer off. My intent was to wear it the
9 entire day. Normally people don't arrive until closer to
10 8:00, 8:15. I had turned the air down. I was running
11 around doing a few reports that I do first thing in the
12 morning. I had just walked in and it was still a little
13 bit warm. I had taken my jacket off.
14 Q. Isn't it a fact that Commerce policy does not
15 encourage or permit the use of profanities in the
16 workplace? Yes or no?
17 A. That may be their policy.
18 MR. TAMBUSSI: Thank you. Okay. That's all
19 I have.
20 EXAMINATION
21 BY MR. MARCONI:
22 Q. Ms. Bailey, you just testified that not using
23 profanity in the workplace may be their policy. But was
24 it, in fact, their practice?

Page 302

1 A. Every day. Yes.
2 Q. What do you mean by "every day, yes"?
3 A. Every day someone used profanity in that
4 workplace. If it was one of my subordinates, myself, a
5 producer who could be of a VP standing, everyone used
6 profanity.
7 Q. I think you testified earlier that you heard Ms.
8 Corcoran use profanity in the workplace, correct?
9 A. Yes.
10 Q. And did she use the word "fuck"?
11 A. Yes.
12 Q. And to your knowledge, was anything whatsoever
13 done to her in the form of disciplinary action as a
14 result of the use of that word?
15 A. No.
16 Q. And was there an assistant director of the
17 MainStreet Division?
18 A. Yes, Marge Phipps.
19 Q. And did you ever hear Ms. Phipps use profanity in
20 the workplace?
21 A. Every day.
22 Q. Could you describe the kind of words and actions
23 that Ms. Phipps would engage in?
24 A. Marge Phipps would have blow-ups or arguments

Page 303

1 with one of the individuals, particularly in the Randolph
2 office, Nick, I can't remember his last name. She would
3 slam the phone down, scream, "Mother fucker," she said,
4 "I'm fucking sick and tired of this shit," and have to
5 get up and go get a smoke or something like that.
6 And that was on an almost a daily occasion
7 when the MainStreet and core business were interacting.
8 Q. And would she ever speak disrespectfully or treat
9 other Commerce employees disrespectfully, either in
10 person or over the telephone?
11 A. Yes. Actually, she sat right next to Val Oakes
12 who would, on occasion, start bitching about something,
13 and Marge would lean over and yell at her and tell her to
14 shut up and get back to work, something along those
15 lines. Profanity could have been used. There was no
16 issues there.
17 But she would on occasion yell at Darlene
18 also, which Darlene and Marge had many years of tenure
19 together, so I think they were comfortable doing that
20 also.
21 Q. Was that something that you personally overheard?
22 A. Yes.
23 Q. And did other people personally overhear that,
24 those kinds of exchanges you are referring to?

Page 304

1 MR. TAMBUSSI: Objection to the form of the
2 question.
3 Q. You can answer.
4 A. Within the MainStreet Department, yes.
5 Q. And do you know whether or not anyone was ever
6 asked to make a report to Ms. Corcoran or anybody else
7 concerning those events?
8 A. Never, never.
9 Q. Was any disciplinary action ever taken against
10 that individual?
11 A. Marge Phipps, no.
12 Q. Marge Phipps.
13 A. Not that I'm aware of.
14 Q. You still have your exhibits in front of you, I
15 notice. Take a look at numbers 4 and 5, please.
16 A. Okay.
17 Q. Now, those are e-mails between the two of us
18 concerning your complaint about Mr. Duncan to Commerce,
19 correct?
20 A. Yes.
21 Q. Was it your understanding that making a complaint
22 to Commerce about sexual harassment by your supervisor,
23 who was also employed by Commerce, was something that
24 related to Commerce Insurance Services? In other words,

33 (Pages 301 to 304)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006                                                    Bailey, Kimberly A. - Vol. 2

Page 313

1  your testimony when Mr. Tambussi was questioning you,
2  that was sort of at a point where he had gone to the Back
3  Stage with you, but then were you trying to get rid of
4  him sort of?
5      A. No. That was on a separate occasion. This was
6  with Mr. Durham.
7      Q. Tell me about that then.
8      A. We had left Back Stage Cage, were headed over to
9  Kid Shelleen's, and that's when Mr. Duncan was trying to
10 express to me how I guess excited Mr. Durham was or how
11 interested Mr. Durham was by rubbing my leg and my inner
12 thigh. And I took his hand and put it between both of my
13 hands and talked to him so he would keep his hands out of
14 between my legs.
15     Q. Would you consider that something related to your
16 work with Commerce or did that sort of cross over the
17 line into a non-work-related event?
18         MR. TAMBUSSI: Objection to the form of the
19 question.
20     A. We were still with the marketing rep, Mr. Durham.
21 I don't think I understand your question.
22     Q. Well, no, I think you answered it.
23     A. We were still with Mr. Durham, so it was still
24 work-related.

Page 314

1      Q. Okay.
2      A. But I don't know if you meant his putting his
3  hand, if that's work-related. That's not work-related.
4      Q. I'm talking about the situation in which you
5  found yourself when that occurred.
6      A. We were still with the marketing rep, Mr. Durham.
7      Q. And, therefore, you felt it was still
8  work-related; is that what you are saying?
9      A. Yes, it was.
10     Q. How about the second time?
11     A. When Mr. Duncan put his hands on me?
12     Q. Correct.
13     A. That was when we were headed to the golf outing,
14 when he asked me to masturbate, but he put his hands
15 between my legs with my hands.
16     Q. You were in his car?
17     A. Yes.
18     Q. And he was driving, you were in the passenger
19 seat?
20     A. Yes.
21     Q. And you were going down to the senior golf
22 tournament?
23     A. Yes.
24     Q. In Maryland?

Page 315

1      A. Yes.
2      Q. Was that a business function?
3      A. That was a business function.
4      Q. Did you consider yourself to be at work when you
5  were in the car with Mr. Duncan?
6      A. I was representing Commerce, yes.
7      Q. When you were in the car with him on the way
8  down, you considered that to be work?
9      A. Yes.
10     Q. Go to paragraph 12 of this same Exhibit 10. Read
11 it to yourself.
12     A. Okay.
13     Q. Now, you discussed with Mr. Tambussi when he was
14 questioning you things that you had previously been
15 involved in and that you had been excluded from after you
16 made your charge of sexual harassment. One of those was
17 that SEMCI project?
18     A. Yes.
19     Q. S-E-M --
20     A. -- C-I, I believe.
21     Q. S-E-M-C-I. And Mr. Tambussi asked you whether or
22 not you believed that it was in Ms. Corcoran's purview to
23 remove you from certain projects, certain meetings,
24 things like that, and you testified I believe of course

Page 316

1  it was in her purview to do that, correct?
2      A. It was her privilege. She is the director.
3      Q. Now, when you were removed from the various
4  meetings and projects and other matters, were you ever
5  given any explanation as to why you were removed?
6      A. No. In fact, I would question, "Do you need me
7  to go to the next meeting?" She is like, "Oh, no, no,
8  no, no." She completely took me out of the loop, no
9  explanation provided.
10     Q. So were you ever informed, for example, with
11 respect to SEMCI that you were not doing a good job?
12     A. No.
13     Q. Was the work that you did on that project, for
14 example, something that, as far as you know, contributed
15 to the betterment, if you will, of the --
16     A. I was an integral part at the beginning, yes.
17         MR. TAMBUSSI: Objection to the form of the
18 question.
19     Q. How about when the sales personnel were removed
20 from your supervision, do you remember that happening?
21     A. Yes, I do.
22     Q. That happened after the report of the sexual
23 harassment?
24     A. Yes, it did.

36 (Pages 313 to 316)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006                                                                  Bailey, Kimberly A. - Vol. 2

Page 317

1    Q.  Were you ever informed at any time that those
2    sales personnel were not performing properly or that
3    there was anything wrong with the way you were handling
4    them?
5    A.  I was not informed that there was any issues with
6    the sales department.  I was actually informed that the
7    salespeople would be going under the guidance of Miss
8    Phipps at the same time everyone else was in a team
9    meeting.  So she didn't give me any heads-up on that at
10   all.
11   Q.  So were you ever given any explanation whatsoever
12   as to why those people were removed?
13   A.  No, no, I wasn't given an explanation.  It was
14   just part of the MainStreet area.
15   Q.  Sorry, didn't mean to interrupt.  Had you ever
16   been counseled in any way by Ms. Corcoran or anybody with
17   regard to problems that they perceived in your
18   performance, other than I know there was an issue with an
19   e-mail?
20   A.  An e-mail.  No.  Other than the attire where she
21   sent me home, and from that point forward, I understood
22   she likes to see people in business attire or suits,
23   particularly.  But, no, she -- never was I ever counseled
24   or taken within her office to discuss any performance

Page 318

1    issues.
2    Q.  Speaking of the dress issue, Ms. Phipps was the
3    assistant director of the MainStreet area, correct?
4    A.  Yes, she was.
5    Q.  Did Ms. Phipps comply with the dress code that
6    was in place at Commerce?
7        MR. TAMBUSSI:  Objection to the form of the
8    question.  You can answer.
9    A.  It depends on whose dress code you are going by.
10   I'm sure Mary Corcoran would have much rather seen her
11   wear matching business -- or suits.  It was Marge's --
12   Q.  Let me stop you and pose the question this way:
13   Did Marge wear clothing that was less nice, if you will,
14   than the capri pants you were sent home for wearing?
15   A.  Yes, she did.
16       MR. TAMBUSSI:  Objection to the form of the
17   question.
18   Q.  Could you explain your answer then?  What do you
19   mean?
20   A.  Marge wore corduroys or colored denim with a
21   blazer, and a lot of the times her shoes were tattered or
22   worn.  So Marge, in a physical appearance or attire, was
23   not always nice.
24   Q.  And was she ever disciplined or counseled or

Page 319

1    spoken to in any way?
2    A.  No.
3        MR. TAMBUSSI:  Objection to the form of the
4    question.
5    Q.  Was she ever sent home?
6    A.  No, she was never sent home to change.  Neither
7    were any of the girls who wore short skirts.
8    Q.  Were you aware that wearing short skirts was not
9    permitted at Commerce?
10   A.  In comparing my skirts to the other skirts, I
11   mean, it is only -- I think it is understood that you
12   don't wear something that is going to reveal or show
13   anything.  None of my skirts were that way.  But -- I'm
14   sorry, I forgot what your question was.  Was I aware
15   that--
16   Q.  Just slow down.
17   A.  Okay.
18   Q.  Take a breath.  All I'm trying to figure out is,
19   was it common knowledge at Commerce that short skirts
20   were not permitted?
21       MR. TAMBUSSI:  Objection to the form of the
22   question.
23   A.  No, it was not.
24   Q.  Do you believe that Ms. Corcoran observed Ms.

Page 320

1    Phipps wearing clothing, the clothing that you just
2    described, denim and jackets?
3        MR. TAMBUSSI:  Objection to the form of the
4    question.
5    Q.  You have to give --
6    A.  Did she observe it?
7    Q.  That's the question, correct.
8    A.  Yes.
9    Q.  To your knowledge, was Ms. Phipps ever talked to,
10   sent home, counseled or anything?
11   A.  No.
12       MR. TAMBUSSI:  Objection to the form of the
13   question.
14       (Discussion off the record.)
15   Q.  When the announcement was made that the
16   salespeople would be taken away from you, was that made
17   in a public meeting?
18   A.  Yes.
19   Q.  And had you any knowledge or inkling at all that
20   either the announcement would be made at that public
21   meeting or that the decision had been made to take those
22   people away from you?
23   A.  No, no.  I had no forewarning.
24   Q.  And was that something that was embarrassing to

37 (Pages 317 to 320)



**Mary T Corcoran**    To: Deborah E Watson/Commerce Bank@yesbank
08/22/03 11:01 AM    cc:
    Subject: Kim Bailey

Deb,

This is the email I sent to Kim thanking her for going home and changing into more professional attire after she came to work with a sleeveless sweater, pedal pusher (3/4 length) pants and open-toed, backless, slip-on shoes.

Both Bob Hackett and Liz McKee also had noticed and mentioned to me that he apparel was inappropriate.

Mary
----- Forwarded by Mary T Corcoran/Commerce Bank on 08/22/03 10:58 AM -----

**Kimberly A Bailey**    To: Mary T Corcoran/Commerce Bank@yesbank
07/18/03 08:52 AM    cc:
    Subject: Re: Thank you

I'm back and I'm sorry...
duly noted.

Mary T Corcoran



**Mary T Corcoran**    To: Kimberly A Bailey/Commerce Bank@yesbank
07/18/03 08:39 AM    cc:
    Subject: Thank you

Thank you for your cooperation in taking Main Street to the next level.

Mary

CONFIDENTIAL



**Mary T Corcoran**          To: Deborah E Watson/Commerce Bank@yesbank
08/22/03 11:05 AM            cc:
                             Subject: Procedure for Noncompliance...

Deb,

This is an example of a document I edited/and reviewed for Kim in an effort to assist her with her written communication skills.

Mary
----- Forwarded by Mary T Corcoran/Commerce Bank on 08/22/03 11:04 AM -----



**Mary T Corcoran**          To: Kimberly A Bailey/Commerce Bank@yesbank
07/31/03 01:46 PM            cc:
                             Subject: Procedure for Noncompliance...

Let me know if you are having difficulting following my changes.

Mary
----- Forwarded by Mary T Corcoran/Commerce Bank on 07/31/03 01:46 PM -----

**Kimberly A Bailey**        To: Mary T Corcoran/Commerce Bank@yesbank
07/22/03 11:22 AM            cc:
                             bcc:
                             Subject: Procedure for Noncompliance...

thanks...

All,

Upon reviewing the Main Street Policy & Procedures manual I realized the above topic is not fully addressed.   Therefore, the below policy will go into effect immediately.

When a notice of cancellation for noncompliance is received the following steps are to be followed:

1) Contact the client and educate them as to the nature of the cancellation (ie: audit, loss control recommendations, etc..). Explain that their failure to comply will compromise their coverage.   <u>Document in Sagitta on the policy line.  In addition, send a letter along with supporting information/documentation confirming your conversation and attached it to Sagitta</u>

2) If you get an answering machine leave a message and send follow the documentation procedure outlined (and underlined) in Item #1.

3) If the cancellation notice is the result of a self audit,   obtain a copy of the self audit form from the carrier so as to confirm with the client the nature of the audit adjustment and follow the documentation procedure outlined (and underlined) in Item #1.

4) If the cancellation notice is the result of loss control recommendations, obtain a copy of the recommendations from the carrier and follow the documentation procedure outlined (and underlined) in Item #1.

The above procedure will be added to the Main Street Procedural Manual. *To reiterate, contact  must be made with each insured who is in jeopardy of cancellation due to noncompliance.*   This will enhance our customer service and assist in educating our clients.

CONFIDENTIAL          CIS 0594

**B  123**

If you have any questions please see me.

CONFIDENTIAL    CIS 0595