Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006                                             Bailey, Kimberly A. - Vol. 2

Page 321

1    you?
2        A.  Yes, it was.  I had several people from the
3    sales, two in particular, that asked me what was going
4    on, why wasn't I overseeing them anymore.
5        Q.  And did you ultimately get any kind of a reason
6    from anybody as to why those people were taken away?
7        A.  No, I did not.
8        Q.  In your experience, have you ever been involved
9    in a situation where a person was similarly embarrassed?
10           MR. TAMBUSSI:  Objection to the form of the
11   question.
12       A.  No.
13       Q.  Or something like that was done to somebody else
14   besides you?
15       A.  No.
16           MR. TAMBUSSI:  Objection to the form of the
17   question.
18       Q.  Do you have any idea why they would have done
19   that to you?
20           MR. TAMBUSSI:  Objection to the form of the
21   question.
22       A.  It appeared to me because of my complaint.
23       Q.  You testified earlier, again in response to
24   questions from Mr. Tambussi, that you didn't have any

Page 322

1    facts to support any claim that Ms. Corcoran knew about
2    the charge of sexual harassment that you made against Mr.
3    Duncan.  Do you have any belief as to whether or not she
4    knew about it?
5            MR. TAMBUSSI:  Objection to the form of the
6    question.
7        A.  Oh, I have belief that she knew, yes.
8        Q.  What was your belief?
9        A.  I believe that she knew through her good friend
10   Joan Frenz, or through Commerce, through HR.  There were
11   several situations where Joan Frenz spoke of other people
12   being terminated or private information that I became
13   privy to, just being in a meeting with Joan Frenz and Mr.
14   Duncan, where Joan Frenz would gossip about things that
15   were going on.
16           I'm well aware that Joan Frenz knew about
17   the situation with Mr. Duncan, and I believe that she
18   conveyed that to Mary Corcoran.
19       Q.  How do you know that she knew about the situation
20   with Mr. Duncan?
21       A.  Joan Frenz was brought in as Steve's support when
22   they terminated him and to clear out his office.
23       Q.  When Ms. Corcoran was, we will say counseling you
24   concerning the e-mail that she didn't like —

Page 323

1        A.  Yes.
2        Q.  — how did that entire situation come up?  Did
3    you send an e-mail that she saw and she called you in?
4        A.  Yes.  More than likely, I had shared something
5    with the department, and I would always cc my director
6    and assistant director on those e-mails, and that had to
7    be where it came from.
8        Q.  Now, when you did your e-mails, do you have like
9    a list where you can just identify a list and an entire
10   list of people would be sent the e-mail, plus cc, or did
11   you have to type individual names every time?
12       A.  I think that I had to type individual name every
13   time.  I never put an address book or something like that
14   together.
15       Q.  That's what I meant.  Was it your impression that
16   Ms. Corcoran, in criticizing you over this e-mail, was
17   trying to improve your performance or was some other
18   motive sort of apparent to you?
19           MR. TAMBUSSI:  Objection to the form of the
20   question.
21       A.  It wasn't apparent that she was trying to improve
22   my English or my e-mail format.  It kind of caught me off
23   guard.  I had no idea what she was actually trying to do
24   or get out of that meeting.

Page 324

1        Q.  Did you get any constructive criticism from her
2    in that review?
3        A.  Other than my e-mail?
4        Q.  No.  I mean, did you consider the criticism that
5    you got from her concerning your e-mail constructive or
6    something else?
7        A.  It wasn't constructive.  I thought it to be
8    evasive.  It didn't help me improve.  So what I took from
9    the meeting was more confusion than anything, because
10   there was no plan for improvement.  She just said my
11   e-mails were bad.  It was just criticism.
12       Q.  Criticism for the sake of criticism?
13           MR. TAMBUSSI:  Objection to the form of the
14   question.
15       A.  Yes.
16       Q.  I think you testified when Mr. Tambussi was
17   questioning you that you got the feeling that Ms.
18   Corcoran was after you.
19       A.  Yes.
20       Q.  I think you gave him a couple of examples of why
21   you got that feeling.  Did you testify also that you
22   asked someone for assistance in that regard?
23       A.  I spoke to Deb Watson on the phone once, and
24   after a meeting one time I asked to speak to her in

38 (Pages 321 to 324)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006                                                   Bailey, Kimberly A. - Vol. 2

Page 325

1   person. I told her that I thought I pissed in my pond
2   because I honestly thought Mary was after me. She
3   indicated for me to discuss this with Mary.
4       Q.   When you say you pissed in your pond, what did
5   you mean by that?
6       A.   By filing the complaint, that it was public
7   knowledge and people were after me, they were out to make
8   my life miserable.
9       Q.   And you thought that Mary Corcoran was one of
10  those people?
11      A.   Yes, I did.
12      Q.   And did you ask Ms. Watson to intervene?
13      A.   Yes, I did.
14      Q.   And did she intervene?
15      A.   No, she did not.
16      Q.   Did she tell you why not?
17      A.   She told me to talk to Mary, which I didn't trust
18  Mary.
19      Q.   Did you talk to Mary?
20      A.   No, I did not.
21      Q.   Why not?
22      A.   I didn't trust Mary. I didn't -- I didn't -- I
23  didn't talk to anybody about the complaint, and I didn't
24  want to go there with her. I was told at my termination

Page 326

1   they were giving me a new beginning, and I didn't want to
2   have to go back.
3       Q.   You mean at Mr. Duncan's termination?
4       A.   No, my -- oh, yes, at Mr. Duncan's termination.
5   I was beginning a fresh start.
6       Q.   Did you feel like you needed a fresh start?
7       A.   No, I didn't feel I needed a fresh start. I just
8   wanted the harassment to go away. I thought the team,
9   overall, we were doing great.
10      Q.   When Ms. Corcoran was, I think you used the
11  phrase criticizing you about planning and holding a
12  bowling outing, she directed the criticism to you; am I
13  correct?
14      A.   Yes, she did.
15      Q.   Saying something along the lines that, I'll
16  paraphrase poorly, that bowling is not a sophisticated
17  activity in her eyes, and essentially you should not have
18  scheduled a bowling outing? Is that basically what she
19  said?
20      A.   Yes.
21      Q.   Did she say that to you in a way that sounded as
22  though she was trying to be helpful to you?
23      A.   No, she was --
24           MR. TAMBUSSI: Objection to the form.

Page 327

1       A.   She was criticizing me. She was making fun of me
2   at that time in front of my subordinates.
3       Q.   And was that something that was embarrassing to
4   you?
5       A.   Yes, it was.
6       Q.   In your experience, is that something that people
7   at Commerce did routinely?
8       A.   No, that does not uphold to their WOW standards.
9       Q.   Do you have any idea why Ms. Corcoran might be
10  here again publicly embarrassing you in front of --
11      A.   I thought it was because of my complaint.
12      Q.   Did you get approval from anyone for holding a
13  bowling outing that Ms. Corcoran apparently didn't think
14  was sophisticated enough?
15      A.   Mary Corcoran approved the outing.
16      Q.   Before you held it?
17      A.   Yes.
18      Q.   You testified earlier that you did not discuss
19  the relationship that you had with Mr. Scaffidi, you
20  didn't discuss that relationship with Mr. McKelvy or Ms.
21  Watson in the context of their investigation into the
22  sexual harassment charge. Do you remember that
23  testimony?
24      A.   Yes, I do.

Page 328

1       Q.   Were you asked about a relationship with Mr.
2   Scaffidi?
3       A.   No, I was not.
4       Q.   By either Mr. McKelvy or Ms. Watson?
5       A.   No, I was not.
6       Q.   Did your relationship with Mr. Scaffidi, in your
7   view, have anything whatsoever to do with the sexual
8   harassment charges that you were making against Mr.
9   Duncan?
10      A.   No.
11      Q.   Is that why you didn't mention it to them at that
12  meeting?
13      A.   Yes, that's why.
14      Q.   To your knowledge, was it common practice at
15  Commerce for employees occasionally to use their company
16  e-mail for personal matters?
17      A.   Yes.
18      Q.   As far as you know, has anybody ever been
19  disciplined for that?
20           MR. TAMBUSSI: Objection to the form of the
21  question.
22      A.   No.
23      Q.   When you went to Bank Shots and you found
24  yourself in Mr. Duncan's car, and I think you testified

39 (Pages 325 to 328)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006                                                     Bailey, Kimberly A. - Vol. 1

Page 329

1  that he lunged at you and kissed you --
2      A.  Yes.
3      Q.  -- did you intend that either one of you would
4  kiss when you got into his car?
5      A.  No.
6      Q.  Did you want him to kiss you when he kissed you?
7      A.  No, I did not.
8      Q.  How soon after he kissed you did you leave the
9  car?
10     A.  It wasn't very long.  It had -- I don't exactly
11  -- it wasn't, it wasn't that long.  It was thirty seconds
12  to a minute.  It wasn't very long at all.
13     Q.  Is it fair to say you were shocked when he did
14  it?
15     A.  I was floored, yes.  I was totally shocked.
16     Q.  Is it fair to say that you didn't want him to do
17  it again?
18     A.  Yes, that's very fair to say.  I didn't, I didn't
19  want his advancements.
20     Q.  In your response to certain written discovery
21  that was sent to you by Commerce, the various questions
22  you were asked to answer, the documents you were prepared
23  to supply, do you remember those?
24     A.  Vaguely, yes.

Page 330

1      Q.  The questions we call the interrogatories.
2      A.  Okay.
3      Q.  And the papers, of course, or the documents were
4  called document production requests.  Do you remember
5  those?
6      A.  Yes.
7      Q.  Sort of towards the end of your questioning by
8  Mr. Tambussi you were talking about basically your work
9  history from the time that you left Commerce.
10     A.  Yes.
11     Q.  And you sounded a little bit unsure and confused
12  and didn't recall certain things, as I recall.
13     A.  Okay.
14     Q.  Are you relying, though, on the information that
15  was set forth in that other discovery as being accurate,
16  rather than what you can sit here today and remember?
17     A.  Yes.  The other discovery is much more accurate,
18  yes.
19     Q.  When you made the infamous reaction on August the
20  12th of 2003 to Ms. Oakes inquiry -- well, actually,
21  let's back up.  Describe, if you will, the events of that
22  morning leading up to what happened, that reaction.
23     A.  My day started at Commerce about 7:30.  My
24  subordinates started at 8:30.  I would come in, run my

Page 331

1  reports.
2      I actually had two people out, if I remember
3  correctly, that day, and one called out sick, so I had
4  three customer service reps out.
5      Q.  Of how many?
6      A.  There is ten customer service reps.  I jumped
7  into Julius, because he was actually on his honeymoon, I
8  was in his desk working some of his backlog, just so when
9  he comes back he is not that far behind and if there is
10  any expiring issues that we don't put ours in an E&O
11  issue.
12     Valerie came walking in probably about 20
13  minutes, 15, 20 minutes late.  And I'm like, "Good
14  morning, Val."  You know, we gave that little rapport
15  back and forth, where she knows I'm aggravated with her.
16  She is like, "I'm here," you know, and she goes to her
17  desk.  And I'm actually on the phone with somebody, and
18  answering some questions, and somebody that's looking for
19  something that was due two days ago.  And it was always
20  very stressful, working Julius' work.
21     And Val yells across the two cubicles, "Kim,
22  Kim, come here."  I'm like, you know, "In a second."
23     So I get done what I was doing.  I go back
24  there.  And I look at her monitor and she is on the

Page 332

1  Internet.  She hasn't even signed into her e-mail, hasn't
2  signed on to her phone, which you have to sign on to so
3  you can get the calls to come through, because if you are
4  not signed on, they go -- they are either dumped into
5  somebody else or they go into your voice mail.  And she
6  hasn't signed into Sagitta, which is our 800 number.
7      But she has a CIC website up on the
8  Internet.  And I look at her.  She goes, "I want to go to
9  this."  I said, "I ain't got fucking time for this shit.
10  You know what the procedures are, for requesting,"
11  whatever, and I walked away from her.  And in my walking
12  away, Dee Whalen was between the two of us, I hear Dee
13  laughing, and I turn around and Val is like this
14  (indicating).  It was Val's normal rapport to do this
15  (indicating).
16     Q.  For the record, you are --
17     A.  For the record, I'm giving the finger with both
18  hands and jerking them back and forth.
19     Q.  So, in other words, you believe that she was
20  giving you the finger when your back was turned?
21     A.  Yes.  Because they both were giggling and Val
22  took the smirk, you know, and gave me the straight face,
23  and --
24     Q.  I'm sorry.

40 (Pages 329 to 332)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2005                                    Bailey, Kimberly A. - Vol. 2

Page 329

1  that he lunged at you and kissed you --
2      A.  Yes.
3      Q.  -- did you intend that either one of you would
4  kiss when you got into his car?
5      A.  No.
6      Q.  Did you want him to kiss you when he kissed you?
7      A.  No, I did not.
8      Q.  How soon after he kissed you did you leave the
9  car?
10     A.  It wasn't very long.  It had -- I don't exactly
11  -- it wasn't, it wasn't that long.  It was thirty seconds
12  to a minute.  It wasn't very long at all.
13     Q.  Is it fair to say you were shocked when he did
14  it?
15     A.  I was floored, yes.  I was totally shocked.
16     Q.  Is it fair to say that you didn't want him to do
17  it again?
18     A.  Yes, that's very fair to say.  I didn't, I didn't
19  want his advancements.
20     Q.  In your response to certain written discovery
21  that was sent to you by Commerce, the various questions
22  you were asked to answer, the documents you were prepared
23  to supply, do you remember those?
24     A.  Vaguely, yes.

Page 330

1      Q.  The questions we call the interrogatories.
2      A.  Okay.
3      Q.  And the papers, of course, or the documents were
4  called document production requests.  Do you remember
5  those?
6      A.  Yes.
7      Q.  Sort of towards the end of your questioning by
8  Mr. Tambussi you were talking about basically your work
9  history from the time that you left Commerce.
10     A.  Yes.
11     Q.  And you sounded a little bit unsure and confused
12  and didn't recall certain things, as I recall.
13     A.  Okay.
14     Q.  Are you relying, though, on the information that
15  was set forth in that other discovery as being accurate,
16  rather than what you can sit here today and remember?
17     A.  Yes.  The other discovery is much more accurate,
18  yes.
19     Q.  When you made the infamous reaction on August the
20  12th of 2003 to Ms. Oakes inquiry -- well, actually,
21  let's back up.  Describe, if you will, the events of that
22  morning leading up to what happened, that reaction.
23     A.  My day started at Commerce about 7:30.  My
24  subordinates started at 8:30.  I would come in, run my

Page 331

1  reports.
2      I actually had two people out, if I remember
3  correctly, that day, and one called out sick, so I had
4  three customer service reps out.
5      Q.  Of how many?
6      A.  There is ten customer service reps.  I jumped
7  into Julius, because he was actually on his honeymoon, I
8  was in his desk working some of his backlog, just so when
9  he comes back he is not that far behind and if there is
10  any expiring issues that we don't put ours in an E&O
11  issue.
12     Valerie came walking in probably about 20
13  minutes, 15, 20 minutes late.  And I'm like, "Good
14  morning, Val."  You know, we gave that little rapport
15  back and forth, where she knows I'm aggravated with her.
16  She is like, "I'm here," you know, and she goes to her
17  desk.  And I'm actually on the phone with somebody, and
18  answering some questions, and somebody that's looking for
19  something that was due two days ago.  And it was always
20  very stressful, working Julius' work.
21     And Val yells across the two cubicles, "Kim,
22  Kim, come here."  I'm like, you know, "In a second."
23     So I get done what I was doing.  I go back
24  there.  And I look at her monitor and she is on the

Page 332

1  Internet.  She hasn't even signed into her e-mail, hasn't
2  signed on to her phone, which you have to sign on to so
3  you can get the calls to come through, because if you are
4  not signed on, they go -- they are either dumped into
5  somebody else or they go into your voice mail.  And she
6  hasn't signed into Sagitta, which is our 800 number.
7      But she has a CIC website up on the
8  Internet.  And I look at her.  She goes, "I want to go to
9  this."  I said, "I ain't got fucking time for this shit,"
10  You know what the procedures are, for requesting,"
11  whatever, and I walked away from her.  And in my walking
12  away, Dee Whalen was between the two of us, I hear Dee
13  laughing, and I turn around and Val is like this
14  (indicating).  It was Val's normal rapport to do this
15  (indicating).
16     Q.  For the record, you are --
17     A.  For the record, I'm giving the finger with both
18  hands and jerking them back and forth.
19     Q.  So, in other words, you believe that she was
20  giving you the finger when your back was turned?
21     A.  Yes.  Because they both were giggling and Val
22  took the smirk, you know, and gave me the straight face,
23  and --
24     Q.  I'm sorry.

40 (Pages 329 to 332)

Bailey v. Commerce National Insurance Services, Inc.
C.A. # 05-CV-183 SLR

February 7, 2006                                                    Bailey, Kimberly A. - Vol. 2

Page 333

1  A. And just kind of, you know, gave me the
2  I'm-not-doing-anything look.
3  Q. Was Val giggling?
4  A. Yes.
5  Q. And who else was giggling?
6  A. Dee Whalen.
7  Q. Anybody else?
8  A. Not that I -- I'm sure other people saw it, but I
9  was only paying attention to the two of them. I'm sure
10  everybody saw what happened or overheard what happened
11  because other people reported it.
12       But I went back to Julius' desk and I
13  continued to work. I spent another hour or so there.
14  Then I went over and did some other stuff, and the day
15  went on as a normal day.
16  Q. Was that sort of event anything really different
17  than other things you had observed at Commerce that
18  involved other people?
19       MR. TAMBUSSI: Objection to the form.
20  A. That was a normal day within MainStreet.
21  Q. And had you used profanity before?
22  A. Yes.
23  Q. And had you ever been disciplined for that
24  before?

Page 334

1  A. I have not.
2  Q. And I think you testified earlier that you had
3  heard other people use profanity in that same manner
4  before?
5  A. Almost everyone in that building used profanity
6  almost every day.
7  Q. And no one was disciplined for it?
8  A. No one was disciplined.
9  Q. Had you received any kind of warning of any kind
10  that that kind of language and that kind of conduct was
11  not permitted any longer or that they were trying to
12  change things around the office?
13  A. I received no warning, no.
14  Q. No discussions in that regard at all?
15  A. No discussion of any changes in our conduct or
16  the way that we were doing things. As far as I knew,
17  everything was going along great in MainStreet.
18  Q. And when you got your interview, I believe that
19  it was November of 2002, but it was your first and only
20  -- I'm sorry -- performance appraisal that you got.
21  A. Okay.
22  Q. In November of 2002, which was your first one as
23  a supervisor?
24  A. It was my first one as a supervisor.

Page 335

1  Q. Had you ever gotten another one?
2  A. I believe that there was one other, because when
3  I first worked at Commerce, Glen Burchum was my
4  supervisor, and I started there in August, they gave the
5  reviews in November, and they gave me a bonus, and I am
6  sure I had a review or something like that. I don't
7  actually recall.
8  Q. How about as a supervisor, had you only received
9  one review as a supervisor?
10  A. Yes.
11  Q. Do you know why you only got one as a supervisor?
12       MR. TAMBUSSI: Objection. Objection to the
13  form.
14  A. They schedule them in November. I was terminated
15  before my next scheduled review.
16  Q. Okay. Had anybody ever told you that there was
17  anything wrong with the review that you received, that it
18  was inaccurate?
19  A. No.
20  Q. When you received that review, were you
21  conducting yourself in the same way that you were
22  conducting yourself on August the 12th of 2003?
23  A. Yes.
24  Q. Do you believe Mr. Duncan was aware curse words

Page 336

1  were being used in the department?
2  A. Yes.
3       MR. TAMBUSSI: Objection to the form.
4  Q. And there was nothing in your review that said
5  that that wasn't appropriate?
6  A. There was nothing in my review that indicated
7  profanity was inappropriate.
8  Q. Again, Ms. Corcoran never said anything to you
9  about the use of profanity at all?
10  A. No.
11  Q. Was it you and Valerie Oakes that had a nickname
12  for each other?
13  A. No. That was somebody else.
14  Q. Who was the other person?
15  A. Diane Schauber and Heather Pokoiski. It is
16  Chickadel now.
17  Q. And did Ms. Whalen ever cuss or be involved in
18  using profanity?
19  A. I'm sure she did. She wasn't one of our normal
20  sailors, but she will -- she would get angry with some of
21  the situations or producers we were dealing with.
22  Q. How about Ms. Wilkins?
23  A. Darlene, I don't think that she used that much
24  profanity. She would on occasion, shit or something

41 (Pages 333 to 336)

Valerie J Oakes

*Commerce Insurance Services*    08/26/03 11:11 AM

To: Mary T Corcoran/Commerce Bank@yesbank
cc: Deborah E Watson/Commerce Bank@yesbank
Subject:

As you requested, the following are the events of Tuesday, August 12, 2003.

Around 8:45 a.m., I asked Kim what information she needed from me in order to approve my enrollment in a CIC class. While at my desk, Kim said, "I don't fucking have time for this now, I have too much work on my desk." With that she walked away.

I did not want to report this for the following reasons:

    1.  Fear of retaliation from Kim.  I have been on Kim's bad side before and her reactions make the working conditions around the office very tense.

    2.  Kim writes my performance review and I don't want this used against me.

    3.  I felt it was futile, as last December there was a problem with Kim that I reported to my manager, (Mr. Duncan at the time) asking for a meeting with the three of us to resolve it,  The meeting never took place, the problem was never addressed, and my personnel file and performance review reflected it.



DEPOSITION
EXHIBIT
Oakes · 6
Reuter 5.12.06

CONFIDENTIAL    CIS 0614    B 130

**Darlene Wilkins**

To: Mary T Corcoran/Commerce Bank@yesbank·
cc: Deborah E Watson/Commerce Bank@yesbank

08/26/03 10:27 AM

Subject:

The incident between Valerie Oaks and Kim Bailey occurred on August 12, early in the morning. Valerie asked Kim for help  and Kim went back to her desk.   All of a sudden Kim screamed at Valerie, I don 't have time for this fucking shit, I have my own work or I have my own work, I don't have time for this fucking shit.  In which order I don't recall.  The wording is accurate, I just don't recall the order.

I didn't say anything simply because I have a close personal  friendship with Valerie.  I got very angry and to have spoken to Kim at that moment  could have taken the situation to a different level.   So I elected not to say anything.

Mary, I hope this is what you asked for.



DEPOSITION
EXHIBIT
WilKins-7
RWWSR 5.12.06
PENGAD 800-631-6989

CONFIDENTIAL

CIS 0575

**B 131**

Page 50

1          A.    If that was -- yeah.

2          Q.    If this happened on the 12th?

3          A.    Yes.

4          Q.    Okay.  On the 13th were you called in by

5    anybody to talk about this incident?

6          A.    I was called in by Mary.

7          Q.    So the very next day?

8          A.    I'm pretty sure it was.

9          Q.    Okay.  What happened?

10         A.    She asked me what happened and asked me why I

11   didn't report it.  It was either the next day or the day

12   after.  I'm not sure.  But I know I hadn't said anything

13   to Mary.  And she asked me why I didn't want to report it

14   and what had happened and --

15         Q.    What did you say?

16         A.    I just said I didn't want any trouble.  I

17   didn't want to report it.

18         Q.    Why didn't you want to report it?

19         A.    Because you never want to report anything

20   against your supervisor.  I still had to work for Kim.

21   You know, not that Kim is threatening to me, but she's my

22   supervisor.  I was always brought up under the law that

23   you don't, you know...

24         Q.    Report your supervisor?

Valerie Oakes

Page 51

1    A.   Report your supervisor.  Exactly.

2    Q.   Now, is that a philosophy that you've always

3 followed or is that a philosophy that you just followed

4 with Kim?

5    A.   That's a philosophy that I've always filed.

6    Q.   Do you still follow it today?

7    A.   I try to, yes.  But, I mean, there's times

8 that I haven't.  There's been other supervisors that I've

9 reported stuff on.

10   Q.   Like what?

11   A.   I had a supervisor once that was stealing from

12 the company that I reported.

13   Q.   Did you ever report a supervisor that did

14 something to you personally that you didn't like?

15   A.   No.

16   Q.   Or another member of the staff on which you

17 worked?

18   A.   Not that I recall.

19   Q.   Okay.  So Joan heard you in the hall.  She

20 called you in.  She apparently informed Mary Corcoran.

21 Mary called you in to a meeting a couple of days probably

22 after this incident.  Right?

23        MR. COOK:  Objection to the form.

24 That's not her testimony.

**B 133**

Valerie Oakes

Page 52

1    BY MR. MARCONI:

2         Q.    You can answer the question.

3         A.    Joan talked to me about it.  And then when

4    Mary came back, Mary talked to me about it.

5         Q.    Okay.

6         A.    I'm not sure the amount of days that went

7    before Mary came back.

8         Q.    Okay.

9         A.    I mean, it could have been a weekend.  It

10   could have been the next day.  I'm not sure.

11        Q.    You're not sure the span of time between when

12   it occurred and when Mary first talked to you about it?

13        A.    Correct.

14        Q.    Okay.  Can you narrow it down?  Was it less

15   than a week?

16        A.    I'm pretty sure it was less than a week.

17        Q.    Okay.  So whatever day Mary got back from

18   vacation, that's the day she talked to you about it?

19        A.    Correct.

20        Q.    Okay.  I guess we can ask Mary what day that

21   was.

22                    So far you've told me that she asked you

23   why you didn't report it, and you answered that question.

24        A.    Mm-hmm.

Valerie Oakes

Page 62

inquiry about why you did not want to report it.

A.    Correct.

Q.    The first thing you said is for fear of retaliation from Kim.

A.    Correct.

Q.    Is that sort of your following your general philosophy that you've always followed that you're not going to report a supervisor?

A.    This is -- if I report a supervisor, yeah, it does make the working conditions harder.

Q.    That's what you are basically saying here?

A.    That's exactly what I'm saying.

Q.    Then down in No. 2 it says Kim writes my performance review and I don't want this used against me.

A.    Correct.

Q.    Again, is that the same as saying I don't report my supervisor because I don't want bad blood with my supervisor?

A.    Well, she writes my performance review, and I didn't -- did not want it used against me.  Exactly what I said.

Q.    How could she use it against you?  Or what were you thinking of that she could do?

A.    I could get a less than satisfactory review.

Valerie Oakes

Page 63

Q.    You mean, in other words, she would --

A.    I just didn't want to start trouble.

Q.    What's the third item that you're talking about?

A.    That was an incident that happened between Mr. Duncan and I.  And to make a long story short, he said -- he told me something that Kim had said that apparently she had trained me and trained me and trained me on this particular subject or whatever and that I didn't catch on or wasn't learning or whatever.  And I remember saying to him that's not true and I want a meeting between you, me and Kim.  Kim was on vacation at the time.  And I said I want a meeting between the three of us so that we can figure this out.

This all had to do with me taking vacation at the time.  I had asked to take a vacation. Kim had told me no, and then Steve had told me yes.  And then it was left up to me whether to take it or not.  And I basically wanted to know if it was going to be held against me or not if I went on vacation.  And that's how I got into this argument over what Kim had said.  And I didn't -- wasn't sure.  I wanted to meet with the three of them -- or the two of them to decide what was honestly said and what wasn't, because I didn't agree with it.

B 136

Valerie Oakes

Page 64

    Q.  All right.

    A.  And that's why I asked Mr. Duncan for the meeting.

    Q.  I'm not sure I followed all that, but just bear with me a sec. So in December of 2002, Kim made some statements to Mr. Duncan about some area of your performance of your job that were apparently negative.

    A.  That's what Mr. Duncan told me, yes.

    Q.  Okay. You didn't agree with those comments. Correct?

    A.  Correct.

    Q.  And at a time when Kim was on vacation, you talked to Mr. Duncan about it?

    A.  Yeah. I don't know if she was on vacation or she was just out that day.

    Q.  Okay.

    A.  But she was not at work that day.

    Q.  So you talked --

    A.  I would have asked for her to be brought in immediately.

    Q.  But you talked to Mr. Duncan saying that you objected to these comments that she had made?

    A.  Correct.

    Q.  Okay. You requested a meeting to discuss

Valerie Oakes

Page 65

these comments --

A.    Correct.

Q.    -- that were made about your performance among the three of you, meaning Mr. Duncan, yourself, and Kim Bailey?

A.    Correct.

Q.    Did you ever get that meeting?

A.    No.

Q.    Did you ever ask for it again?

A.    I don't recall.

Q.    I'm not sure I follow what the vacation had to do with it. You mentioned that you were asked to choose whether you wanted to go on vacation.

A.    I had asked for -- I had somebody get me tickets for a flight to Florida, so I asked for vacation. It was the end of the year. We were busy. And Kim said that, no, it was -- we were too busy for me to take a vacation. And I asked Mr. -- I went over her head and asked Mr. Duncan. And Mr. Duncan said that it was fine, go ahead and take it.

So I had gone in to Mr. Duncan's office to make sure, and I came out and said to him, "Is this in any way going to affect my job if I go on vacation?" I mean, I don't want to go come back and not have a job.

Valerie Oakes

Page 66

And I was told that I was to use my own discretion and it
was up to me whether I wanted to take the vacation or
not.

And that's when I had made a comment,
well, I don't want to come back and have things worse
than they are or have things -- you know, have trouble
just because I didn't -- I went on this vacation. And I
said I'm having enough trouble keeping up with the
workload and so on and so forth.

And that's when the comment was made,
well, Kim said that she has trained you and trained you
and trained you on this subject. I don't know what the
subject was that we were -- I don't know what we were
discussing at the time. But some type of work. And
that's when I said, no, she hasn't, and I want a meeting
between the three of us.

Q.    This vacation stuff happened before. The
discussions about the vacation happened before the
discussions about when Kim made comments about your
performance that you didn't like.

A.    The discussion about the vacation -- this all
happened the day after -- within two days. I e-mailed
Kim and asked her if I could take a vacation, and she
told me no.

Valerie Oakes

Page 67

Q.    Because it was too busy?

A.    Because it was too busy.

Q.    Right.

A.    So I e-mailed Steve Duncan and asked him if I could take the vacation, and he said yes.

Q.    Okay.

A.    So then I got to thinking about it.  And I went in to Steve's office to make sure I was comfortable with taking the vacation.

Q.    And he said use your own discretion?

A.    Correct.  He said, "It's up to you.  Whatever you feel you should be doing is what you should do."

Q.    Well, the criticism about training and training, when did that happen?

A.    Well, that's when I said to him I don't want it held against me.  If I go on this vacation, I don't want to come back and find out I don't have a job.  And I don't want to come back and have things harder on me than they already are.  And Kim already said, no, I can't take the vacation.  So I don't want her upset with me because I went over her head.

Q.    When you say "harder" on you, you mean just the sheer volume of work that you had to do?

A.    That, the stress level, everything.  Yes.

Valerie Oakes

Page 68

Obviously, if you go away, you're going to have double the work when you come back.

Q.  So what did you eventually do?  Did you go on vacation?

A.  No.  I don't think I did.

Q.  You didn't?

A.  No.

Q.  So that wasn't the cruise you were talking about in that e-mail?

A.  No.

Q.  Different vacation?

A.  Right.  That was a year later.

Q.  Okay.  What did that incident that you just described have to do with you not reporting the August the 12th incident?

A.  I just figured I had already reported something and asked for something and it just didn't come about.  So, I mean, I know it was two different people.  One was Mary and one was Steve.  But they were still in the same position.

Q.  I thought you said he said you could do whatever you want.

A.  Oh, he did.

Q.  Oh.

Valerie Oakes

Page 69

A.    But that doesn't have anything to do with me reporting or not reporting.  I don't understand the question.  Sorry.

Q.    I'll read it to you.  This is the third thing in your e-mail under the heading:  Why Didn't You Report It?  I felt it was futile.  As last December there was a problem with Kim that I reported to my manager.  What was the problem that you reported?  That she wouldn't let you have a vacation day because it was too busy?

A.    No.  The problem I reported was that I was drowning in work and that I needed help with something and she was -- had told Mr. Duncan that she had already trained me on how to do whatever it was that we were doing at the time.

Q.    So that's the problem?

A.    That was the problem.

Q.    You were just too busy and you were drowning in work?

A.    Mm-hmm.

Q.    Wasn't everybody drowning in work, though?

A.    Yes.

Q.    Then you asked Steve for a meeting to try to resolve it.  Right?

A.    Correct.

Valerie Oakes

Page 70

Q.   You didn't ask Kim, did you?

A.   No.

Q.   Steve is the guy that either forgot about it or didn't give you a meeting.  Right?

A.   He didn't give me a meeting.

Q.   Okay.

A.   And my performance review was not exactly what I thought it should have been.

Q.   What was wrong with it?

A.   I didn't think it was good enough.

Q.   In what way?

A.   I just didn't think it was good enough.  I thought my performance was better than what the review said.

Q.   Can you give me a particular area that sticks in your mind?

A.   No.  If I had known, I'd have pulled the report and taken a look at it.  But...

Q.   Did you ever sign that personal performance review indicating that you agreed with it?

A.   I signed it, but I think I put my comments on it saying that I didn't agree with it.

Q.   Did any of those comments say anything about you thought that Kim was being unfair or retaliating

Valerie Oakes

Page 71

against you?

    A.   I don't recall.

    Q.   Did you feel that way?

    A.   I felt Kim was being unfair.

    Q.   Based on this incident that you're describing in the e-mail that we have as --

    A.   No.  Not on that one incident.  I just thought she was being unfair based on a lot of different things.

    Q.   In other words, you just had a different opinion of how well you were doing than she did.  Right?

           MR. COOK:  Objection to the form.

    A.   Correct.

           MR. MARCONI:  I don't have any other questions.

           MR. COOK:  Can we take a five-minute break?

           MR. MARCONI:  Yes.

           MR. COOK:  Thanks.

           (A recess was taken. )

           - - - - -

           VALERIE OAKES, resumes

           (Oakes Deposition Exhibit No. 7 was marked for identification.)

*19*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| KIMBERLEY A. BAILEY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-CV-183-SLR |
| | ) | |
| COMMERCE NATIONAL | ) | TRIAL BY JURY DEMANDED |
| INSURANCE SERVICES, INC., a | ) | |
| New Jersey corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S RESPONSES TO PLAINTIFF'S
## FIRST SET OF INTERROGATORIES

Defendant Commerce Insurance Services, Inc. ("Defendant" or "Commerce"),

improperly pled as Commerce National Insurance Services, Inc., hereby responds and

objects to Plaintiff's First Set of Interrogatories to Defendant as follows:

## GENERAL OBJECTIONS

1       Defendant objects to each interrogatory to the extent it purports to impose

upon Defendant obligations beyond the scope of that set forth in the Federal Rules of

Civil Procedure.  Defendant will object to each interrogatory to the extent required by the

Federal Rules of Civil Procedure.

2       Defendant objects to each interrogatory to the extent it seeks information

which is subject to the attorney-client privilege or the work product doctrine or to any

other privilege or doctrine which precludes a response to the request.

3       Defendant objects to each interrogatory to the extent that it is overbroad,

ambiguous or uses terms or phrases without definition thereof.

**B  145**

## PRESERVATION OF RIGHTS

All responses to the following interrogatories are made without in any way waiving or intending to waive, but on the contrary, intending to preserve and preserving:

1.      The right to object on any grounds to use any of these responses or any subsequently produced documents or the subject matter thereof, in any subsequent proceeding or the trial of this or any other action;

2.      The right to object on any grounds at any time to a demand for further responses to these discovery requests or other discovery requests involving or relating to the subject matter of the discovery requests herein answered; and

3.      The right at any time to revise, correct, supplement, clarify and/or amend the responses and objections set forth herein.

## INTERROGATORIES

INTERROGATORY NO. 1. Please identify specifically and in detail each and every reason why Defendant terminated Plaintiff's employment, including but not limited to, each and every action, or inaction committed, or foregone by Plaintiff, which caused or contributed to Defendant's decision.

ANSWER:

The Defendant incorporates its General Objections set forth above.  Subject to and without waiving the foregoing objections, Plaintiff's employment with Commerce was terminated on August 27, 2003 as the result of a pattern of conduct and misconduct demonstrating that she lacked the supervisory and leadership skills required for her position.  On that date, Ms. Bailey was informed of her termination at a private meeting between Deborah Watson, Mary Corcoran and Ms. Bailey.  The purpose of the meeting was to inform Ms. Bailey of her termination and also inform her of the reasons for her termination.

2

**B  146**

Ms. Watson explained to Ms. Bailey that an incident had been brought to her attention which involved Ms. Bailey's use of language unbecoming of a supervisor toward a subordinate. Ms. Bailey was told that this language could not be tolerated. Ms. Bailey was also told that such behavior is the type that seriously undermines employee morale in the workplace. Ms. Bailey was reminded of the counseling she had received from Mr. Joseph Morrissey, and Ms. Watson. Ms. Bailey's use of inappropriate language was part of a broader failure of Ms. Bailey to maintain standards of professionalism as a supervisor.

Ms. Watson made clear to Ms. Bailey that Commerce was not "out to get" Ms. Bailey after Ms. Bailey's allegation of sexual harassment by Stephen Duncan. Ms. Watson told Ms. Bailey that this was not where Commerce wanted this to end. Ms. Watson informed Ms. Bailey that supervisors must be held to a higher standard. In June 2003, after Commerce had completed its extensive investigation into Ms. Bailey's allegation of sexual misconduct by Mr. Duncan, Ms. Bailey was asked not to initiate or encourage this banter about the physique of the phone or copy vendor representatives. As another example, Commerce cited an incident involving an email between Ms. Bailey and her staff at Main Street at an upcoming Commerce function in New York City which involved an overnight stay. In the email, Ms. Bailey suggested that the employees at Main Street take transportation to New York separate from the transportation that Commerce would have provided for the employees. Ms. Bailey was advised that she should work within the parameters that the company establishes for the events they sponsor. In June 2003, Ms. Bailey was told about engaging in social activities with coworkers that are not company sponsored. Ms. Bailey was also reminded that such

3

**B 147**

outside activities may make it more difficult for her to perform the duties in her role as supervisor.  It was recommended that she refrain from making any unprofessional comments, especially those concerning a person's appearance.  It was also suggested to Ms. Bailey that she coordinate social events which were company sponsored only. Commerce asked Ms. Bailey to avoid contact with coworkers outside the workplace except for contacts that were limited and professional.  Commerce required Ms. Bailey to take various leadership courses that were offered by Commerce for its supervisors.  At the time, Commerce also made clear that it appreciated her talents and that it was confident that she could make the changes necessary to improve her supervisory skills. Commerce told Ms. Bailey that they wanted her to have a long and successful career at Commerce.  All agreed that the process was a learning experience and it was time to move on.  Commerce did not formally reprimand Ms. Bailey at this time.  Commerce's clear objective was to give Ms. Bailey a second chance.

After the meeting in 2003 in which Commerce informed Ms. Bailey of the results of their investigation, Commerce took extensive measures to help Ms. Bailey improve her professional abilities.  Commerce required that Ms. Bailey take as many as seven courses to assist her in her improvement.  Commerce gave Ms. Bailey several months to complete these classes.  These classes included the following:

1.   Leadership the Commerce Way!;

2.   Management within the Law;

3.   Performance Management;

4.   Effective Communication Skills;

5.   Handling a Performance Problem;

4

**B  148**

6.    Conducting a Team Meeting; and

7.    Reducing Resistance to Change

When Ms. Bailey was unable to make a class on July 30, 2003, Commerce did not punish Ms. Bailey for missing the class. Rather, Commerce told Ms. Bailey that she simply needed to reschedule the class, so as to not make the attendance of these classes an onerous burden upon Ms. Bailey's time.

A separate incident involving Ms. Bailey occurred July 18, 2003. That day, Ms. Bailey came to work in clothes that her co-employees felt were inappropriate. Her clothing included a sleeveless sweater, pedal pusher pants and open-toed backless slip-on shoes. Ms. Bailey's supervisor, Ms. Corcoran, asked Ms. Bailey to go home and change into more appropriate clothing.

In another example, Ms. Corcoran had worked with Ms. Bailey on an ongoing basis throughout the summer of 2003 to help Ms. Bailey improve her communication skills, especially the tone of her emails. Ms. Corcoran made such efforts because she wanted to preclude disciplinary action with Ms. Bailey. Ms. Bailey balked at the chance to expand her professional experienced under Ms. Corcoran. Rather, Ms. Bailey considered Ms. Corcoran's attention to detail and Ms. Corcoran's enforcement of Commerce policies as a personal affront.

All of these events preceded the event in August 2003 when Ms. Bailey used inappropriate language toward a subordinate. In making its decision to terminate Ms. Bailey on August 27, 2003, Commerce also had evidence that Ms. Bailey had created an atmosphere in which her employees at Main Street were intimidated from bringing their employment concerns to Ms. Bailey. This was aptly demonstrated by the emails written

by witnesses to Commerce administration explaining what occurred with the inappropriate comment that Ms. Bailey made toward one of her subordinates. Commerce explained to Ms. Bailey at the meeting on August 27, 2003 in which Commerce told Ms. Bailey that she would be terminated, these were the types of behaviors behind Commerce's decision.

The goal of Commerce at that time was to give Ms. Bailey a fair opportunity to prove herself as a supervisor. To facilitate that process, Commerce hired a new director to manage Ms. Bailey at the Main Street location. This was Mary Corcoran. Commerce specifically did not discuss its investigation of Mr. Duncan or Ms. Bailey's claims of sexual harassment with Ms. Corcoran. Commerce did not do this because it wanted to protect Ms. Bailey's privacy and because Commerce felt this would give Ms. Bailey the best opportunity for a fresh start.

Commerce also observes that Ms. Bailey made no complaints about retaliation in the weeks following her report about Duncan in April 2003. She made no complaints about retaliation as the investigation was ongoing.

INTERROGATORY NO. 2. Identify all persons who took part in any investigation or review in connection with the decision to terminate Plaintiff's employment. With respect to each such person, identify specifically the role such person played in Defendant's decision to terminate Plaintiff's employment. Please also identify the person who made the final decision to terminate Plaintiff's employment and the date that decision was finally made.

ANSWER:

The Defendant incorporates its General Objections set forth above. Subject to and without waiving the foregoing objections, the decision by Commerce to terminate Ms. Bailey from employment with Main Street was a decision that was made collectively by various employees within Commerce. These persons included Ms. Watson, Ms.

6

**B 150**