UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KIMBERLEY A. BAILEY<br><br>        Plaintiff,<br>vs.<br><br>COMMERCE INSURANCE SERVICES, INC.,<br>a New Jersey corporation<br><br>        Defendant. | Civil No. 05-CV-183 (SLR)<br><br>Civil Action |

---

**DEFENDANT COMMERCE INSURANCE SERVICES, INC.'S APPENDIX VOLUME IV TO THE REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

POTTER ANDERSON & CORROON LLP
Wendy K. Voss (I.D.# 3142)
Sarah E. DiLuzio (I.D. # 4085)
1313 N. Market Street
Wilmington, DE 19801
Telephone (302) 984-6000
wvoss@potteranderson.com
sdiluzio@potteranderson.com

BROWN & CONNERY, LLP
William M. Tambussi, Esq.
Susan M. Leming, Esq.
William F. Cook, Esq.
360 Haddon Avenue
P.O. Box 539
Westmont, NJ 08108
(856) 854-8900

Attorneys for Defendant
Commerce Insurance Services

Dated: July 10, 2006

# TABLE OF CONTENTS – APPENDIX VOLUME IV

| **Description** | **Page** |
|---|---|
| Email of May 13, 2003 from Plaintiff to Main Street | A226 |
| Email of May 15, 2003 from Plaintiff to Main Street | A227 |
| Email of November 25, 2002 from Plaintiff to Steven Duncan | A228 |
| Email of October 10, 2002 from Plaintiff to Steven Duncan | A229 |
| Memorandum of April 14, 2003 from Plaintiff to Deborah Watson | A231 |
| Transcript of Deposition of Darlene Wilkins, pgs. 42-58 | A232 |

| | |
|---|---|
| **Steven E Duncan**<br>05/13/03 09:43 AM | To: Deborah E Watson/Commerce Bank@yesbank<br>cc: Steven E Duncan/Commerce Bank@yesbank<br>Subject: Re: WOW Awards |

FYI

Kimberly A Bailey

| | |
|---|---|
| **Kimberly A Bailey**<br>05/13/03 09:25 AM | To: Darlene Wilkins/Commerce Bank@yesbank, Heather L Pokoiski/Commerce Bank@yesbank, Valerie J Oakes/Commerce Bank@yesbank, Dorothy L Whalen/Commerce Bank@yesbank, Julius A Bland/Commerce Bank@yesbank, Dorothy E Deegan/Commerce Bank@yesbank, Cheryl L Luckanish/Commerce Bank@yesbank, Heather B Smith/Commerce Bank@yesbank, Sharon B Scotton/Commerce Bank@yesbank, Andrew H Bumstead/Commerce Bank@yesbank, Coralea M Layton/Commerce Bank@yesbank, Patricia L Scott/Commerce Bank@yesbank, Maria A Campos/Commerce Bank@yesbank, Diane M Schauber/Commerce Bank@yesbank<br>cc: Steven E Duncan/Commerce Bank@yesbank, Marjorie Phipps/Commerce Bank@yesbank, Kimberly A Bailey/Commerce Bank@yesbank<br>Subject: WOW Awards |

## Where is our MainStreet Representation????????

Things have changed for me and I am NOW available to attend the WOW Awards. I will be making Hotel arrangements for anyone interested in staying over night. I will also drive so we don't have to deal with waiting on someone else make this decision.

So this is what I need from you...   **ARE YOU GOING????????   yes or no**

Please respond back to me by Thursday May 15th if you are planning on going. I will shop hotels this weekend and come back Monday with some options. I will try to keep it very reasonable, not to cost us too much... Gals, we may have to sleep four to a room. Hope no one snores. Boys (all two of you) I need to know if you are going... I will need to make special arrangements for mixed company... I'll see if there are suites available with separate rooms.

I will promise all of you a fun time in NY and I will try to keep us out of trouble...   I'm excited and I'm looking forward to enjoying the evening of celebrating the WOW with all.

Steve, I will no longer need PTO on 6/27 & 6/30 - my vacation plans for Pittsburgh have changed.



CONFIDENTIAL

A226

CIS 0528

**Kimberly A Bailey**
05/15/03 09:43 AM

To: Darlene Wilkins/Commerce Bank@yesbank, Heather L Pokoiski/Commerce Bank@yesbank, Valerie J Oakes/Commerce Bank@yesbank, Dorothy L Whalen/Commerce Bank@yesbank, Julius A Bland/Commerce Bank@yesbank, Dorothy E Deegan/Commerce Bank@yesbank, Cheryl L Luckanish/Commerce Bank@yesbank, Heather B Smith/Commerce Bank@yesbank, Diane M Schauber/Commerce Bank@yesbank
cc: Marjorie Phipps/Commerce Bank@yesbank, Steven E Duncan/Commerce Bank@yesbank, (bcc: Deborah E Watson/Commerce Bank)
Subject: flowers

All,

Your timing is impeccable... Yes the roses brought many tears to my eyes.

I would like you all to know you are very welcome and I do appreciate each & everyone of you. I could not imagine being any where but MainStreet.

YOU ALL ARE THE BEST and I would like to say to you... Thank you.

Kim

I have to be honest... Margie helped too.

EXHIBIT

CONFIDENTIAL

A227

CIS 0524

 **Kimberly A Bailey**
11/25/02 11:06 AM

To: Steven E Duncan/Commerce Bank@yesbank
cc:
Subject: Re: BIO's

I guess this will do...
you didn't mention anything about long walks on the beach or bubble baths
or that I am soon to be single and looking for Daddy Warbucks.
Or that I am the WOW of MainStreet

good job stevie... let the print job begin.

Steven E Duncan

 **Steven E Duncan**
11/25/2002 10:55 AM

To:     Kimberly A Bailey/Commerce Bank@yesbank
cc:
Subject: BIO's

What do you think?


BIO's.doc

**CONFIDENTIAL**

A228
CIS 0267

 **Kimberly A Bailey**
10/10/02 03:21 PM

To: Steven E Duncan/Commerce Bank@yesbank
cc:
Subject: time off

Can a girl get some time off....

It's a damn shame..... I'm not at all interested in him.
I need to get this guy to give Scott some lessons.

-------------------- Forwarded by Kimberly A Bailey/Commerce Bank on 10/10/2002 03:18 PM --------------------

"James E. Scull Sr." <jscull@salemco.org> on 10/10/2002 02:22:33 PM

Please respond to "James E. Scull Sr." <jscull@salemco.org>

To: "Kim (work)" <kbailey@yesinsure.com>
cc:
Subject: Here goes......

Kim
As you may or may not know........I am a member of my City School Board. Every year in October, I go to Atlantic City for the NJ School Boards Convention.
   I would like to extend an invitation to you........and ask that you consider :
Room at the Tropicana from Tuesday  evening, Oct. 22 to Friday afternoon, Oct. 25.
You will be afforded the luxury of total relaxation......... sleep until you feel like getting up. Breakfast in bed........every morning......(or afternoon if you prefer). There will be luncheons at some of the most renowned restaurants in the City. Exquisite dining and nightly invitations to the most elegant "after dinner" receptions thrown by some of the largest business firms in NJ. Endless galas and parties at every casino...... Drinking and Dancing. Gambling until whenever (dawn if you prefer)
You will be pampered, cuddled, coddled, waited on and waited for..........chauffeured......... treated with the utmost respect and dignity.
Options include moon lit walks, hand in hand, on the beach and boardwalk........midnight dinner and relaxing conversation in the room...........napping together thru the late afternoon........ we will do as much or as little as you wish to experience.
I have very few obligations........during the day........so........ all attention would focus on you. All requests will be honored. Oh......and Kim......... <u>all expenses are paid</u>. You need only money to gamble.....if you so choose.
Casual and business attire accepted. (I can't imagine you not looking great in anything anyway.) I would consider it a privilege entering any gala with you. Join me........consider taking the time........or part of the time.........whichever works for you..........

EXHIBIT

CONFIDENTIAL

A229
CIS 0268

Jim

CONFIDENTIAL

CIS 0269    A230

Date:      April 14, 2003

To:        Debbie Watson

From:      Kim Bailey
_____

Putting in writing what my expectations are has been extremely difficult. I've considered all of the possible outcomes. That exercise has been stressful. MainStreet has overcome so many recent obstacles that I am concerned what negative impact these serious issues may have on the department. First and foremost the moral and team spirit of MainStreet must not be interrupted. I take serious pride in the many hours that I have put into and continue to do for my job in spite of what has happen.

It was not my intention to report these issues and have Mr. Duncan terminated. I would like the issues addressed in a respectful and professional manor. I am embarrassed, sickened and sad to be in this current situation. I can not imagine anything but a very unpleasant outcome but I will fully welcome a professional apology, along with confirmation that these issues will not happen again to me or any other Commerce employee. I will also respectfully expect that these issues will not have a negative impact on, what I was told to be my promising career.

I used to love my job. I used to look forward to coming to work. I would have to admit that I haven't experienced this excitement in a while. My career was on a fast track and it was conveyed to me that stock options, AVP and my own personal parking space would be in my very near future. I would like this issued resolved quickly so that I can get back on track and achieve my personal and professional goals.

Thank you for your time.

EXHIBIT

CONFIDENTIAL

CIS 0667

A231

Darlene Wilkins

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KIMBERLEY A. BAILEY,          )
                              )
        Plaintiff,            )
                              )
v.                            )   Civil Action No.
                              )   05-183 SLR
COMMERCE NATIONAL INSURANCE   )
SERVICES, INC., a New Jersey  )
corporation,                  )
                              )
        Defendant.            )

     Deposition of DARLENE WILKINS taken pursuant to notice at the law offices of Losco & Marconi, P.A., 1813 North Franklin Street, Wilmington, Delaware, beginning at 10:00 a.m. on Friday, May 12, 2006, before Robert Wayne Wilcox, Jr., Registered Professional Reporter and Notary Public.

APPEARANCES:

    THOMAS C. MARCONI, ESQ.
    LOSCO & MARCONI, P.A.
      1813 North Franklin Street
      Wilmington, Delaware  19801
      for the Plaintiff,

    WILLIAM F. COOK, ESQ.
    BROWN & CONNERY
      360 Haddon Avenue
      Westmont, New Jersey  08108
      for the Defendant.

ALSO PRESENT:  KIMBERLY BAILEY
              DEBORAH E. WATSON, SPHR,
              Commerce Insurance Services

CORBETT & WILCOX
Registered Professional Reporters
230 North Market Street    Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com

CORBETT & WILCOX

Darlene Wilkins

12 (Pages 42 to 45)

Page 42

1   A. Yes.
2   Q. Okay. If you were invited out with a group
3 for dinner or a movie or something and Kim was going,
4 would you have gone?
5   A. Do I have to say yes or no?
6   Q. That would be nice.
7   A. No.
8   Q. You wouldn't?
9   A. I would not have.
10  Q. Why not?
11  A. Because I never go to after-hour events.
12  Q. No, no. I said like a movie.
13  A. No. I would not. Not with a group of
14 Commerce employees. Whether Kim was there or not --
15  Q. Oh.
16  A. -- I don't do that.
17  Q. Okay. I wasn't aware of that.
18     I want to talk to you, Darlene, about
19 August the 12th of 2003.
20  A. Okay.
21  Q. Do you know if there's any significance to
22 that date in terms of Kim?
23     MR. COOK: Objection as to form.
24  A. Not the date, no.

Page 43

1   Q. That's probably not a good question.
2      Do you recall Kim using a curse word in
3 your presence and Valerie Oakes' presence one morning? I
4 believe she used the word "fuck."
5   A. Yes.
6   Q. Now, tell me what you remember about that
7 whole incident.
8   A. Well, I was at my desk and I could hear
9 Valerie talking to Kim, because Kim sat on the other
10 wall -- on the other side of the wall from Valerie --
11 asking Kim for some kind of help. I wasn't really paying
12 attention. I just could hear Valerie.
13     And then Val -- Kim comes from around
14 the other side of the hall -- of the wall and she screams
15 at Valerie, "I don't have time for this fucking shit. I
16 have my own work to do." Yadda-yadda-yadda. And that's
17 what happened.
18  Q. You said she screamed at her?
19  A. Yeah.
20  Q. What did you do then?
21  A. I got pissed off.
22  Q. Why?
23  A. Because she should not have screamed at
24 Valerie like that.

Page 44

1   Q. Was it a situation where Kim seemed
2 frustrated?
3   A. I don't know if she was frustrated or not.
4   Q. That's right. You said you weren't listening
5 to what was going on before.
6   A. I was not. I could hear Valerie because
7 Valerie sat behind me. Kim sat in the back of me on the
8 opposite wall across from Valerie. So I didn't hear Kim
9 saying anything. I could just hear Valerie talk --
10 saying things to Kim.
11  Q. What was she saying?
12  A. She needed help with something. And I was
13 working. But, you know, we're in that area. We're all
14 open space. So I heard. I'm not even sure what Valerie
15 was asking her to help her with.
16  Q. What do you have? Cubicles? Is that what you
17 work from?
18  A. Yes. But it's open. It was open at the time.
19 Short walls.
20  Q. So how far were you from where Valerie was?
21 Just on the other side of the wall?
22  A. Just to -- she was two desks away behind me.
23  Q. Where was Kim?
24  A. She was on the opposite side of Valerie on the

Page 45

1 other side of the wall.
2   Q. Did you say you saw Kim get up and leave her
3 area?
4   A. No, no.
5   Q. I'm sorry.
6   A. I said that I saw Kim come from behind the
7 wall, because Kim had to walk to come from behind the
8 wall to enter the main area because there was a big
9 separation. There's a separation -- a wall separating
10 Kim and Valerie.
11  Q. Do you think you can draw this for me?
12  A. Yeah. It's a wall.
13  Q. If I'm on the ceiling looking down.
14  A. Oh, Lord.
15  Q. Or however you think it would make me
16 understand.
17  A. Well, I mean, I -- where was I? I'm in the
18 front. I'm here.
19  Q. Write your name. Just your initials.
20  A. Darlene. I'm down there.
21  Q. Okay.
22  A. And, then, there's a desk there. And, then,
23 there's a desk there. And right here is Valerie. And
24 there's a wall. This is a wall.

Page 46

1  Q. Now, is that one of those partition walls
2  that --
3  A. Yes. A partition wall. And Kim is here.
4  This is Kim.
5  Q. Can Kim and Valerie see over the wall?
6  A. No.
7  Q. Oh, no.
8  A. No. They can't see.
9  Q. It's like that wall?
10 A. It's a high wall. Yes. A partition. So Kim
11 had to come from there and go here and then go to get
12 Valerie.
13 Q. Okay. So she walked all the way around?
14 A. Yes.
15 Q. And you were here?
16 A. I'm there.
17 Q. Are there desks like?
18 A. Yes. There's a desk here. There's a desk
19 here and there's a desk here.
20 Q. And, then, there's a desk here. Right?
21 A. And there's a desk right here. And there's
22 nothing here.
23 Q. This is like a hallway in between where I'm
24 putting --

Page 47

1  A. No. It's not a hallway. It's a work area.
2  Q. Okay. But it's open and you can walk through?
3  A. It's open. That's correct.
4  Q. All right. So you're here.
5  A. Mm-hmm.
6  Q. You hear Valerie speaking.
7  A. Yes.
8  Q. Okay. Then what do you see? You see Kim come
9  around?
10 A. Mm-hmm.
11 Q. She walked past you?
12 A. Yes.
13 Q. Then you heard Kim say something to Valerie?
14 A. Yeah. I heard Kim scream at Valerie.
15 Q. What did she scream?
16 A. Like I said, she said, "I don't have time for
17 this fucking shit. I have my own work to do." Something
18 to that nature.
19 Q. You said that that pissed you off?
20 A. Yeah. It did.
21 Q. What did you do about it?
22 A. I didn't do anything.
23 Q. Why not?
24 A. Honestly?

Page 48

1  Q. Yeah.
2  A. Because had I said something to Kim, then I
3  probably would have lost my job, because it really made
4  me mad. And then I would have said something like, Kim,
5  you don't talk to Valerie like that. That's not the
6  right way to talk to her.
7  Q. And so --
8  A. And it would have escalated. So I chose not
9  to say anything.
10 Q. So you thought that you would have become
11 excited?
12 A. Yes. I would have.
13 Q. And that your excitement would have escalated
14 such that you're afraid that you would have been
15 insubordinate?
16 A. Yes.
17    MR. MARCONI: I'm going to mark this as
18 6.
19    (Wilkins Deposition Exhibit No. 6 was
20 marked for identification.)
21 BY MR. MARCONI:
22 Q. That was on August 12th?
23 A. I don't know which date it was.
24 Q. Okay.

Page 49

1  A. Whatever date that incident occurred, that's
2  when it was.
3  Q. Okay. Do you recall approximately what time
4  of day that happened?
5  A. It was in the morning.
6  Q. Had anything like that ever happened before
7  similar to that as far as you know?
8  A. Not that I recall, no.
9  Q. Okay. It happened in the morning. Right?
10 A. Yes.
11 Q. What, if anything, did you do the rest of that
12 day with respect to this incident? Did you report it to
13 anybody or anything?
14 A. No, I didn't.
15 Q. Why not?
16 A. It wasn't my place to report it.
17 Q. I guess you eventually cooled down so you
18 weren't pissed off anymore. Right?
19 A. Yeah. Eventually, I did, yeah.
20 Q. How long do you think it took you?
21 A. I would say a few hours.
22 Q. A few hours?
23 A. Mm-hmm.
24 Q. Have you ever discussed the issues that you're

**Page 50**

1  talking about now with Ms. Watson, this incident, I'll
2  call it?
3  　　A.　I don't think. I don't think I did. I'm not
4  sure about that. I don't think I did.
5  　　Q.　How about at the meeting that you told me you
6  had a couple months ago?
7  　　A.　No, no.
8  　　Q.　You didn't talk --
9  　　A.　No. The incident wasn't discussed then.
10 　　Q.　So it took you a couple hours to cool down.
11 Right?
12 　　A.　Mm-hmm.
13 　　Q.　And you really didn't report it to anybody
14 because you didn't feel it was your place.
15 　　A.　That's correct.
16 　　Q.　Do you know whether anybody else heard it?
17 　　　　　Of course, Valerie heard it.
18 　　A.　Mm-hmm.
19 　　Q.　Did anybody besides you and Valerie hear it?
20 　　A.　Yeah. People in the unit heard it.
21 　　Q.　Who else?
22 　　A.　Well, Dee Whalen heard it. Who else? Dottie
23 heard it.
24 　　Q.　Dottie Deegan?

**Page 51**

1  　　A.　Mm-hmm. And I'm not sure who else heard it.
2  I'm not sure about that, because I don't recall exactly
3  who was in the office that morning outside of those
4  people.
5  　　Q.　Did you tell anybody that day what had
6  happened with what you saw Kim do?
7  　　A.　We may have -- I may have discussed it with
8  the -- my coworkers. I may have discussed it with them.
9  I probably did discuss it with them.
10 　　Q.　Do you remember what you said or what they
11 said?
12 　　A.　No. Because I don't know who I discussed it
13 with. I'm just saying I may have discussed it with
14 somebody. Chances -- knowing myself, I probably did
15 discuss it with somebody. You know what I mean? But I
16 don't recall who I discussed it with. Naturally, I
17 talked to Valerie about it. But I don't recall if I
18 spoke to anybody else.
19 　　Q.　What did she say?
20 　　A.　Well, Valerie was upset. She was upset.
21 　　Q.　Did you notice Valerie making any kind of
22 gestures to Kim after she said what she said?
23 　　A.　Gestures?
24 　　Q.　As in the middle finger like this?

**Page 52**

1  　　A.　No.
2  　　Q.　No?
3  　　A.　No.
4  　　Q.　You didn't see her doing anything like that?
5  　　A.　No, I didn't.
6  　　Q.　Any kind of clowning at all?
7  　　A.　Valerie didn't clown with that. Valerie got
8  embarrassed and ran out crying. She was -- Valerie was
9  very upset.
10 　　Q.　So you saw Valerie cry?
11 　　A.　Yes.
12 　　Q.　Immediately?
13 　　A.　Not immediately.
14 　　Q.　When?
15 　　A.　Valerie went outside. Valerie went outside.
16 And then shortly after I went outside. And I just told
17 her -- I said, "Calm down. Just calm down." And I left.
18 She went to the ladies' room, and I went back to the
19 office. Valerie and I are friends.
20 　　Q.　So the only people you talked to were --
21 　　A.　That I know that I spoke with was Valerie.
22 That day.
23 　　Q.　Okay. How about days after that?
24 　　A.　No, no.

**Page 53**

1  　　Q.　Did you just sort of let it drop?
2  　　A.　You know, I don't remember if we just let it
3  drop or if -- you know, if we -- a bunch of women
4  talking. I mean, you know, I didn't report it to
5  management. I didn't -- I don't recall who I spoke with,
6  although I'm sure I did, because that's just my nature.
7  I would have spoken to other coworkers about it.
8  　　Q.　Did you ever eventually say anything to Kim?
9  　　A.　No. I never did address Kim on that.
10 　　Q.　Now, Darlene, eventually, you were called upon
11 to prepare an e-mail concerning this incident. Do you
12 remember that?
13 　　A.　Yeah.
14 　　Q.　Now, who asked you to do that?
15 　　A.　Mary did.
16 　　Q.　Mary Corcoran did?
17 　　A.　Mm-hmm.
18 　　Q.　So you didn't come to her and say, "I got to
19 tell you something"?
20 　　A.　No.
21 　　Q.　No.
22 　　　　　Do you know whether Mary Corcoran was
23 instructed to get a statement from you by somebody else?
24 　　A.　I'm not aware of that.

Page 54

1   Q. One way or the other?
2   A. One way or the other.
3   Q. Tell me how that happened where Mary
4   apparently approached you and said --
5   A. Well, no. She called me in her office, and
6   she asked me if I had witnessed what went on with Kim and
7   Valerie. And I said yes. And she said that she wanted
8   me to type up in an e-mail what had occurred and to send
9   it to her and to cc Deb Watson. And I did.
10  Q. Have you reviewed that e-mail recently?
11  A. Yes.
12  Q. When was the last time you looked at it?
13  A. Yesterday.
14  Q. Who showed it to you?
15  A. Sue e-mailed it to me.
16  Q. You hadn't looked at it before that?
17  A. No.
18         (Wilkins Deposition Exhibit No. 7 was
19  marked for identification.)
20  BY MR. MARCONI:
21  Q. Ma'am, is this a copy of the e-mail that's
22  been marked as, I think, Wilkins 7?
23  A. Yep. That's what I wrote.
24  Q. Did you discuss what you were going to say in

Page 55

1   the e-mail before you wrote it with anyone?
2   A. Did I discuss it with anyone?
3   Q. Yes.
4   A. No. Mary told me to write it and I wrote it.
5   Q. Did you have any discussions with anybody
6   after you sent that e-mail?
7   A. No. It had quieted down. It was -- no. I
8   didn't discuss it with anybody. I just wrote it and sent
9   it to her.
10  Q. It was on August the 26th of 2003. Right?
11  A. Yeah.
12  Q. Do you know how long of a period of time it
13  took you to respond with that e-mail from the time that
14  you were asked to do it?
15  A. I went back to my desk and did it right away.
16  Q. That day?
17  A. Mm-hmm.
18  Q. It looks like it was probably about August
19  the 26th that you were asked to do it.
20  A. Right.
21  Q. Do you know what, if any, investigation was
22  done of this incident, we'll call it, between August
23  the 12th and August the 26th?
24  A. Investigation?

Page 56

1   Q. Yeah.
2       Were you asked any questions about it
3   other than this?
4   A. No.
5   Q. No.
6       Does this remind you that it did happen
7   on August the 12th?
8   A. Yes. Because that's what I wrote.
9   Q. Did Ms. Corcoran remind you of the date or did
10  you remember it?
11  A. I remembered it.
12      MR. MARCONI: I don't have anything
13  further now. Actually, give me one second. I want to
14  talk a quick little break.
15      MR. COOK: That's fine.
16      (A brief recess was taken.)
17      -----
18      MR. MARCONI: I don't have any other
19  questions for Darlene. Thank you for coming in.
20      MR. COOK: No questions.
21      We can read and sign.
22      (The deposition concluded at 11:25 a.m.
23  this same day.)
24      -----

Page 57

1   (I HAVE READ THE FOREGOING DEPOSITION,
2   AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.)
3
4   _____
5   WITNESS NAME
6
    -----
7
8   INDEX TO TESTIMONY
9   DARLENE WILKINS                    PAGE
10  Examination by Mr. Marconi          2
11
    -----
12
13  INDEX TO EXHIBITS
14
    WILKINS DEPOSITION EXHIBIT NO.     PAGE
15
    1  Document Bates stamped CIS 0740    37
16
    2  Two-page e-mail dated December 9, 2003   38
17
    3  Two-page e-mail dated November 15, 2005  39
18
    4  Document Bates stamped CIS 0738    40
19
    5  Two-page document Bates stamped    40
20     CIS 0680-0681
21  6  One-page handwritten drawing       48
22  7  Document Bates stamped CIS 0575    54
23
    -----
24

Page 58

1      CERTIFICATE
2  STATE OF DELAWARE:
          :
3  NEW CASTLE COUNTY:
4          I, Robert Wayne Wilcox, Jr., a Registered
5  Professional Reporter and Notary Public, within and for
6  the County and State aforesaid, do hereby certify that
7  the foregoing deposition of DARLENE WILKINS, was taken
8  before me, pursuant to notice, at the time and place
9  indicated; that said deponent was by me duly sworn to
10 tell the truth, the whole truth, and nothing but the
11 truth; that the testimony of said deponent was correctly
12 recorded in machine shorthand by me and thereafter
13 transcribed under my supervision with computer-aided
14 transcription; that the deposition is a true record of
15 the testimony given by the witness; and that I am neither
16 of counsel nor kin to any party in said action, nor
17 interested in the outcome thereof.
18         WITNESS my hand and official seal this 17th day
19 of May A.D. 2006.
20
21     _____
       ROBERT WAYNE WILCOX, JR.
22     REGISTERED PROFESSIONAL REPORTER
       CERTIFICATION NO. 101-RPR
23     (Expires January 31, 2008)
24

## CERTIFICATE OF SERVICE

I, Sarah E. Diluzio, hereby certify that on July 10, 2006, I served two copies of the foregoing DEFENDANT COMMERCE INSURANCE SERVICES, INC.'S APPENDIX VOLUME IV TO THE REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT upon the following counsel of record in the manner indicated:

BY HAND DELIVERY

Thomas C. Marconi, Esquire
Losco & Marconi, P.A.
1813 N. Franklin Street
P.O. Box 1677
Wilmington, DE 19899

/s/ Sarah E. DiLuzio
Sarah E. DiLuzio (DSB ID No. 4085)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Post Office Box 951
Wilmington, Delaware  19899-0951
Tel:  (302) 984-6000
E-mail:  sdiluzio@potteranderson.com

730260