IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KIMBERLEY A. BAILEY,                    )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )   Civ. No. 05-183-SLR
                                        )
COMMERCE NATIONAL INSURANCE             )
SERVICES, INC.,                         )
                                        )
          Defendant.                    )

---

Thomas C. Marconi, Esquire of Losco & Marconi, P.A., Wilmington, Delaware.  Attorney for Plaintiff.

Elizabeth King, Esquire and Sarah E. DiLuzio, Esquire of Potter Anderson & Corroon, LLP, Wilmington, Delaware.  Attorneys for Defendant.  Of Counsel:  Susan M. Leming, Esquire of Brown & Connery, Westmont, New Jersey.

---

**MEMORANDUM OPINION**

Dated:  February 13, 2007
Wilmington, Delaware

ROBINSON, /Chief Judge

## I.  INTRODUCTION

On March 24, 2005, plaintiff Kimberley Bailey filed suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., alleging that Commerce National Insurance Services, Inc. ("defendant"), her former employer, retaliated against her for making an internal complaint of sexual harassment.  (D.I. 1)  Plaintiff filed the charge of sexual harassment ("the internal complaint") on April 3, 2003, and was fired approximately four months later.  (See id., ex. B)  On January 10, 2005, plaintiff received a notice of right to sue letter from the Equal Employment Opportunity Commission.  (Id. at ¶ 3)  She then filed the action at bar, seeking damages "including:  front pay, back pay, compensatory damages, punitive damages, attorney's fees, costs, pre- and post judgment interest."  (Id. at 9)  Presently before the court is defendant's motion for summary judgment.  (D.I. 31)  The court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II.  BACKGROUND

Defendant, a financial services company, hired plaintiff as a Core Customer Service Representative on August 27, 2001.  (D.I. 33 at A10-A11)  Several months after she was hired, plaintiff met Steve Duncan ("Duncan"), the director of defendant's Main Street Department ("the Department"), at a company luncheon.  (Id. at A12-A13)  Two to three weeks later, Duncan informed plaintiff of

an available supervisory position in his Department.  (Id. at A13)  Plaintiff interviewed for, was offered, and accepted the position.  (Id. at A17)

When plaintiff joined the Department as a supervisor, Duncan became her boss.  Plaintiff also worked under the supervision of Marjorie Phipps ("Phipps"), the assistant director of the Department.  (D.I. 33 at A19)  Plaintiff received only one performance evaluation, completed by Duncan in November 2002, during her tenure as a supervisor in the Department.  (See D.I. 38 at B19)  Though the evaluation was positive overall, Duncan noted that plaintiff "need[ed] to continue to work on her communication skills," and stated that plaintiff was expected to take classes on communication and letter writing during the next review period.  (Id. at B25-B26)

## A.  Allegations of Sexual Harassment

Plaintiff reports that she first felt uncomfortable around Duncan the night he told her about the opening in the Department, which occurred at an after hours "get-together" with some coworkers in December 2001.[1]  (D.I. 33 at A14; D.I. 1, ex. B at

---

[1]The exact dates (or even months) during which many of the following events occurred are not clear from the evidence of record.  Some of the time periods given by plaintiff in her deposition testimony conflict with those identified in the internal complaint.  (Compare D.I. 33 at A12-A13 (plaintiff states that she first met Duncan approximately six months after she was hired by defendant in August 2001), with D.I. 1, ex. B at 1 (plaintiff states that Duncan told her of the position in December 2001, less than four months after she joined the

2

1)  According to plaintiff, Duncan walked her to her car that
night and, while Duncan did not do anything inappropriate,
plaintiff was "uncomfortable with his presence," feeling that he
was "standing . . . a little too close or just walking a little
closer than what [she] thought was normal." (D.I. 33 at A15)
Plaintiff then got in her car and left, and did not subsequently
tell Duncan that he had made her uncomfortable.  (Id.)

     The first alleged instance of Duncan's inappropriate sexual
behavior toward plaintiff occurred in May 2002. (D.I. 37 at
A178, A184-A185).  Plaintiff was meeting friends at a bar when
Duncan showed up and joined her group. (D.I. 33 at A27)
Plaintiff maintains that Duncan placed his hand on her backside
several times despite her repeated non-verbal signals that she
wanted him to stop. (Id. at A28-A29)  Later, after the group had
moved to a second bar, Duncan rose to leave and asked plaintiff
to walk him to his car, which she did. (Id. at A30)  Duncan
asked plaintiff to get into his car; again, she complied. (Id.
at A31)  Plaintiff alleges that, after entering the car, Duncan
"lunged over and started kissing [her]." (Id.)  Plaintiff, who
says she was shocked by Duncan's act, got out of the car.
Plaintiff did not immediately report the incident to any of
defendant's employees. (Id. at A31-A32)  According to plaintiff,

_____

company))  Any time period identified in this opinion, therefore,
is approximate unless otherwise noted.

she asked Duncan to lunch about a week later to discuss the
situation and advised him that she did not wish to pursue a
sexual relationship.  (Id. at A33-A34; D.I. 1, ex. B at 2)

     During the course of her employment with defendant,
plaintiff attended numerous marketing events which took place
after hours.[2]  (D.I. 33 at A21)  Duncan also attended these
events.  On one occasion, after finishing a meeting with a
marketing representative named Scott Durham ("Durham"), Duncan
took plaintiff and Durham out for drinks; Duncan asked plaintiff
to invite a friend to accompany her.  (Id. at A23-A24)  On their
way to a second bar, plaintiff accepted a ride with Duncan after
he indicated that he wanted to talk to her.  (Id. at A25)
Plaintiff alleges that, during the car ride, Duncan placed his
hand between her legs.  (Id.; D.I. 1, ex. B at 2)  Plaintiff then
"took [Duncan's] hands up out of [her] crotch area and held onto
his hand to keep it out of [her] crotch area."  Nothing untoward
happened after they arrived at the bar.  Plaintiff did not
immediately report the incident to any of defendant's employees.
(D.I. 33 at A25-A26; D.I. 1, ex. B at 2)

     The next incident allegedly occurred on a Saturday afternoon
plaintiff and Duncan spent at a work-related golf outing in
Maryland.  (D.I. 33 at A32)  Plaintiff alleges that Duncan made

_____

[2]The specific meetings plaintiff could recall took place
sometime during the summer of 2002.  (D.I. 33 at A21)

4

sexually explicit comments to her while they were driving to the event. (Id. at A34; D.I. 1, ex. B at 2-3)  She likewise states that, once at the event, Duncan attempted to set her up on a date with Durham, who was also in attendance.  (D.I. 33 at A34-A35; D.I. 1, ex. B at 3)  At some point after the golf outing, plaintiff went on a date with Durham.  (D.I. 33 at A35)

        In November or December of 2002, plaintiff and Duncan traveled out of town in order to attend another work-related event in Randolph, New Jersey.  (Id. at A39)  According to plaintiff, she told Duncan from the outset that "in no way [were] any advancements from him acceptable," and that she did not want him to touch her.  (Id. at A40)  On the drive to the event, Duncan told plaintiff that a number of the individuals they would be meeting at dinner were of particular importance to defendant's business, including a man named Paul Scaffidi ("Scaffidi").  (Id. at A41)  Duncan told plaintiff that Scaffidi "had to love Main Street, [and] he had to love [her]" (id.), which plaintiff took as an "implication . . . that [she] should consider sleeping with [Scaffidi] as a way . . . to garner [his] favor and keep [his] business."  (D.I. 1, ex. B at 3)  After having dinner and drinks with plaintiff and Scaffidi, Duncan retired for the evening; plaintiff contends that, while she asked for permission to leave at the same time, Duncan insisted that she stay with Scaffidi.  (D.I. 33 at A41)  Plaintiff alleges that, on the drive back to

5

her hotel room, Scaffidi touched her inappropriately and tried to kiss her.  (Id. at A42)  Plaintiff later had a brief consensual sexual relationship with Scaffidi, but claims she did so only to please Duncan, her boss.  (Id. at A42, A44)

For the next several months, plaintiff had no other contact with Duncan outside of work.  (Id. at A43)  Although she did not mention it in her internal complaint, plaintiff reports that Duncan eventually invited her to engage in sexual relations with himself and his girlfriend.  (Id. at A44)  According to plaintiff, this was "the proverbial straw that broke the camel's back."  (Id.)  Assuming, arguendo, that plaintiff filed her internal complaint fairly soon after this incident occurred, the final alleged act of harassment would have taken place sometime around February or March 2003, approximately fourteen months after Duncan first made plaintiff uncomfortable.

## B.  Defendant's Response

One April 3, 2003, plaintiff made an internal written complaint about Duncan's behavior to defendant's Human Resources Department.  (D.I. 33 at A49; D.I. 34 at A109)  Less than two weeks later, plaintiff met with Deborah Watson ("Watson"), Vice President of Human Resources, and Bruce McKelvy ("McKelvy"), Regional Supervisor of Human Resources, to discuss the situation. (D.I. 37 at A177; D.I. 34 at A117)  Plaintiff and Duncan remained at their respective positions in the Department, which was still

6

under Duncan's supervision, pending the outcome of an
investigation into plaintiff's claims.

On June 3, 2003, after an eight-week investigation,
plaintiff met with Human Resources officials to discuss their
findings.  (D.I. 37 at A210)  Defendant fired Duncan
immediately;[3] it likewise concluded, as a result of its inquiry,
that plaintiff had engaged in "some unprofessional conduct that
was inappropriate as a member of management that [defendant]
wanted to see her correct."  (Id.)  At the June 2003 meeting,
plaintiff was verbally counseled about "problem areas" defendant
had uncovered during the investigation, as well as "plans for
improving" her behavior, such as mandatory training courses.
(Id. at A210-A218; D.I. 38 at B77-B87)

After Duncan was fired, plaintiff had the opportunity to
work with a new, female supervisor.  Duncan was replaced by Mary
Corcoran ("Corcoran"), who transferred to the Department from
another office.  (D.I. 37 at A153)  Corcoran states that she had
no knowledge of plaintiff's internal complaint against Duncan
when she took over the Department and did not learn of the sexual

---

[3]Defendant ultimately concluded that, although Duncan had
behaved inappropriately, he had not engaged in sexual harassment.
(D.I. 37 at A200, A218)

7

harassment allegations until after plaintiff was fired.[4]  (Id. at A152-A155)

In July 2003, plaintiff missed one of her mandatory training courses.  (Id. at A219-A220)  Then, on July 18, 2003, Corcoran sent plaintiff home to change because of a dress code violation. (Id. at A159; D.I. 34 at A142)  Plaintiff contends that she had worn the same attire without incident on multiple occasions before Corcoran became her supervisor.  (D.I. 33 at A49) Plaintiff likewise asserts that others, including Assistant Director Phipps, wore clothing that violated the dress code without suffering similar disciplinary action.  (Id. at A49, A82)

At some point after Corcoran took control of the Department, Corcoran removed several sales people from plaintiff's supervision, took her off of a project on which she had been working, and told her she did not need to attend certain meetings, all of which plaintiff found embarrassing.  (Id. at A81-A83)  According to plaintiff, Corcoran did all of these things without providing plaintiff any advanced warning or explanation.[5]  (Id.)

_____

[4]Watson confirms that she never spoke to Corcoran about plaintiff's internal complaint until after the incident in August 2003 which led to plaintiff's termination.  (D.I. 37 at A173)

[5]Plaintiff agrees that, as the director of the Department, the decision to remove her from projects and the like was technically within Corcoran's purview.  (D.I. 33 at A81) Corcoran maintains that she took these steps because, in her opinion, plaintiff had "too many people reporting to her," and

8

## C.  Plaintiff's Termination

Defendant fired plaintiff on August 27, 2003, two years after she was first hired.  (D.I. 34 at A146)  The immediate incident leading to plaintiff's termination arose on August 12, 2003, when Valerie Oakes ("Oakes"), an employee in the Department, asked a question to which plaintiff responded with profanity.  (Id. at A144)  At Corcoran's request, Oakes documented the incident in an email and carbon copied Watson.  (Id.)  It is undisputed that defendant's employees used profanity in the workplace.[6]  (D.I. 37 at A149; D.I. 33 at A78)  Corcoran can only remember disciplining one other employee for using profanity at work (D.I. 34 at A161); however, there is no evidence of record that any other employees had directed profanities at their subordinates, as plaintiff had done to Oakes.[7]

she was trying to make plaintiff's work load "more manageable." (D.I. 37 at A167)

[6]Corcoran was aware that members of the Department cursed at work.  (D.I. 37 at A148-A149)  Oakes confirmed the use of profane language by her coworkers.  (D.I. 38 at B36)  Another of defendant's employees, Ms. Wilkins, testified that Phipps also used profanity at work.  (Id. at B38)  Finally, plaintiff alleges that Corcoran herself used profanity in the workplace (D.I. 33 at A50), something Corcoran denies (D.I. 37 at A162).

[7]According to Watson, plaintiff's use of profanity to "belittle" her subordinate was "the first instance of that extreme," which is why the decisionmakers "moved to termination." (D.I. 37 at A221)

9

The decision to terminate plaintiff was made by a group which included Corcoran, Watson, and McKelvy. (Id. at A129) While Corcoran initially considered placing plaintiff on "final written warning," she ultimately decided to fire plaintiff. (D.I. 37 at A164, A223) The group deferred to Corcoran's opinion because she was director of the Department and "she did not see how she was going to be able to rehabilitate [plaintiff] based on this latest action." (Id. at A223)

Defendant maintains that it fired plaintiff for violating company policy because of dress code violations and use of profanity toward a subordinate. Additionally, defendant states, the termination was based upon plaintiff's continued participation in and organization of inappropriate social events with co-workers; failure to attend a mandatory supervisory training course; and poor communication skills. (Id. at A224; D.I. 34 at A127-A129)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec.

10

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).
"Facts that could alter the outcome are 'material,' and disputes
are 'genuine' if evidence exists from which a rational person
could conclude that the position of the person with the burden of
proof on the disputed issue is correct." Horowitz v. Fed. Kemper
Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal
citations omitted).

     If the moving party has demonstrated an absence of material
fact, the nonmoving party then "must come forward with 'specific
facts showing that there is a genuine issue for trial.'"
Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  The
court will "view the underlying facts and all reasonable
inferences therefrom in the light most favorable to the party
opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231,
236 (3d Cir. 1995).  The mere existence of some evidence in
support of the nonmoving party, however, will not be sufficient
for denial of a motion for summary judgment; there must be enough
evidence to enable a jury reasonably to find for the nonmoving
party on that issue.  See Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 249 (1986).

     If the nonmoving party fails to make a sufficient showing on
an essential element of its case with respect to which it has the
burden of proof, the moving party is entitled to judgment as a
matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322

11

(1986).  With respect to summary judgment in discrimination

cases, the court's role is "to determine whether, upon reviewing

all the facts and inferences to be drawn therefrom in the light

most favorable to the plaintiff, there exists sufficient evidence

to create a genuine issue of material fact as to whether the

employer intentionally discriminated against the plaintiff."

Revis v. Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993)

(quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir.

1987)).

## IV.  DISCUSSION

Claims brought pursuant to Title VII are analyzed under a

burden-shifting framework.  If plaintiff makes a prima facie

showing of discrimination or retaliation, the burden shifts to

defendant to establish a legitimate, nondiscriminatory reason for

its actions.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792,

802 (1973).  If defendant carries this burden, the presumption of

discrimination drops from the case, and plaintiff must "cast

sufficient doubt" upon defendant's proffered reasons to permit a

reasonable factfinder to conclude that the reasons are

fabricated.  See Sheridan v. E.I. DuPont de Nemours & Co., 100

F.3d 1061, 1072 (3d Cir. 1996) (en banc).

As with a discrimination claim, a plaintiff claiming

retaliation must first establish a prima facie case for

retaliation under Title VII.  A plaintiff must demonstrate by a

12

preponderance of the evidence, that: (1) she engaged in protected activity;[8] (2) the defendant took adverse employment action against her; and (3) a causal link exists between the protected activity and the adverse action.[9]  See Kamchar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1999).

Once a plaintiff has established a prima facie case, the burden shifts to the defendant to "clearly set forth through the introduction of admissible evidence" reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the motivating force behind the adverse employment action.  See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981).

---

[8]Title VII defines a "protected activity" as an instance in which an employee has "opposed any practice made an unlawful employment practice by this subchapter, or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

[9]According to the United States Court of Appeals for the Third Circuit, causation can be evidenced by close temporal proximity and through evidence of antagonism in response to the protected activity.  See Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997) (quoting Robinson v. Se. Penn. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993)).  Those methods, however, "are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference."  Kachmer v. SunGuard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997) (citing Waddell v. Small Tube Prods., Inc., 799 F.2d 69, 73 (3d Cir. 1986)).  "[T]emporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive'" of retaliation.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000) (quoting Krause v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997)).

13

If the defendant successfully rebuts the plaintiff's prima facie showing, the presumption of discrimination drops from the case, and plaintiff must present sufficient evidence for a reasonable factfinder to conclude "that the proffered reason was not the true reason for the employment decision." Id. at 256. See also Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997) ("The plaintiff must produce evidence from which a reasonable factfinder could conclude either that the defendant's proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination.").

## A. Plaintiff's Prima Facie Case

In the action at bar, defendant argues that plaintiff cannot make out a prima facie case of discrimination because she is unable to satisfy the causation prong.[10]  (D.I. 32 at 3)  The court agrees and finds that plaintiff has failed to produce evidence of a causal link between her protected activity and her termination sufficient to raise an inference of retaliation.

Four months elapsed between plaintiff's charge of harassment and the date of her termination.  Defendant spent two of those months investigating plaintiff's claim of harassment, meaning that defendant fired plaintiff approximately eight weeks after

---

[10]Defendant does not dispute that plaintiff engaged in a protected activity when she filed a sexual harassment complaint against Duncan, nor that her termination constituted an adverse employment action.

14

concluding its investigation of her internal complaint. A number of relevant incidents occurred during that time period, including plaintiff's dress code violation, her absence from a mandatory training class, and her use of profanity toward a subordinate. Therefore, even when utilizing the shorter eight-week period to measure temporal proximity, the court finds that the length of time between the end of the investigation and defendant's decision to fire plaintiff is not "unusually suggestive of retaliatory motive." Krouse, 126 F.3d at 503 (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)).

Plaintiff also cannot establish a pattern of antagonism following her complaint of sexual harassment. See Woodson, 109 F.3d at 920-21. It is true that, after defendant's investigation, plaintiff's work was examined more thoroughly than it had been before. However, the supervisor about whom plaintiff complained had been replaced by someone new, Corcoran. Plaintiff admits that Corcoran had a reputation within the company for being a "forceful" manager with high standards even before she was named director of the Department. (D.I. 33 at A48) Subsequent to Duncan's termination and plaintiff's post-investigation counseling on June 3, 2003, most (if not all) of the criticism and discipline plaintiff received came from Corcoran. (See, e.g., id. at A49-A50) Defendant states that

15

Corcoran was not involved with nor aware of the sexual harassment investigation; plaintiff has proffered no evidence to the contrary.[11] As a result, plaintiff cannot show a nexus between her participation in a protected activity and her discharge based on a pattern of antagonism by Corcoran.[12]

Temporal proximity and a pattern of antagonism are not the only methods for raising an inference of retaliation; however, "the proffered evidence, looked at as a whole," is also insufficient to do so in the case at bar. Kachmer v. SunGuard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997) (citation omitted). Plaintiff maintains that defendant's argument (that Corcoran's conduct could not have been retaliatory because she

---

[11]In her deposition, plaintiff was asked the following:

Q. Do you have any facts as we sit here today that Miss Corcoran had knowledge of anything that you said Mr. Duncan did to you?
A. Do I have any facts?
Q. Facts.
A. No.
. . . .
Q. Do you have any facts as we sit here today to support any contention that Miss Corcoran knew anything about your written complaint to Commerce Human Resources?
A. Facts?
Q. Facts.
A. No.

(D.I. 33 at A48)

[12]When questioned by defense counsel, plaintiff repeatedly answered that she had no facts showing that Corcoran's actions toward her were retaliatory in nature. (D.I. 33 at A49, A50, A52, A53)

16

did not know of plaintiff's internal complaint) is "overly simplistic, and completely ignores the fact that Ms. Corcoran's mistreatment of [p]laintiff was just the tip of the iceberg." (D.I. 38 at 25)   Plaintiff correctly points out that some of the same officials involved in the investigation of her sexual harassment complaint were members of the group which determined her punishment for the incident of August 12, 2003.   Despite this, both Corcoran and Watson testified that it was Corcoran, the department manager, who made the final decision to terminate plaintiff, and plaintiff has produced no evidence to the contrary.

Plaintiff's letter of termination referenced both her use of profanity toward a subordinate and the unprofessional behavior defendant discovered during the course of its investigation of plaintiff's sexual harassment complaint.   Plaintiff states that defendant's investigation "was minimal at best," and that "the sole focus of the June 3, 2003 meeting was to falsely accuse [p]laintiff of wrongdoing which . . . [d]efendant claimed caused Mr. Duncan to sexually harass [p]laintiff."   (Id. at 12-13) Plaintiff claims that the meeting "was itself an adverse action against [her]," and implies that, by admonishing plaintiff for some of her conduct during the period of harassment, defendant was accusing her of bringing the harassment upon herself.   (Id. at 26-28)   Plaintiff has cited no authority to support the notion

17

that an employer must ignore evidence of an employee's inappropriate or unprofessional conduct which is uncovered during an investigation into his or her charge of harassment. An internal complaint of sexual harassment requires investigators to assess the conduct of **all** of the involved parties. In so doing, defendant determined that plaintiff had, at times, behaved unprofessionally and shown poor judgment, although not to such an extent that defendant felt the need to fire her, as it had Duncan. After warning plaintiff that she needed to change her behavior, Corcoran, who had no knowledge of the internal complaint, made the decision to terminate her for repeated unprofessional conduct. Aside from plaintiff's own conclusory statements and assumptions, she has not proffered sufficient evidence to indicate the existence of a causal link between her decision to file a harassment claim and her termination; therefore, plaintiff is unable to meet her prima facie burden of proof.

## B.    Defendant's Proffered Legitimate Reasons for Termination and Plaintiff's Proof of Pretext

Even if plaintiff were able to establish causation and, thereby, make a prima facie case of retaliation, she remains unable to adequately rebut the legitimate reasons defendant has set forth to explain its decision to fire her. In its brief in support of summary judgment, defendant stated that plaintiff was discharged for violations of company policy, as well as other

18

issues related to her failure to attend a mandatory training course and use of profanity toward a subordinate. (D.I. 32 at 13-14, 6-7) Plaintiff does not deny that the above accusations are factually accurate; instead, she argues that, because other employees were not disciplined for the same or similar conduct, the only "reasonable explanation" for her discharge is retaliation for her internal complaint against Duncan. (D.I. 38 at 29-30) The evidence of record, however, belies this conclusion.

Plaintiff acknowledges that, from the outset, Corcoran's management style differed from Duncan's, and that Corcoran was known within the company as one who "ran a tight ship." (D.I. 33 at A48) Plaintiff asserts that other individuals violated the dress code or cursed in the workplace and were not disciplined by defendant. However, plaintiff has presented no testimony, documentation, or facts indicating that Corcoran expected or required more of her than of others employees.[13] In November 2002, months before her harassment claim was filed, plaintiff's performance evaluation noted that her communication skills needed

---

[13]Plaintiff has expressed the opinion that the trait of demanding respect from others can be employed in a retaliatory manner. At her deposition, plaintiff was asked, "[o]ther than the fact that you were one of her supervisors, how and in what way did Miss Corcoran demand more respect from you [than from others]?" Plaintiff answered, "I believe that her demanding respect of me was just her way of trying to mold me into something. But I'm not sure that I have an answer for that." (D.I. 33 at A51)

19

improvement. Defendant again addressed plaintiff's communication skills in June 2003, when it counseled her on the subject, and the record indicates that Corcoran, unaware of these previous issues, attempted to work with plaintiff on increasing the professionalism of her e-mails. The aftermath of defendant's investigation put plaintiff on notice that defendant expected her to increase the professionalism of her workplace behavior, particularly since she was a supervisor and was supposed to be setting an example for the rest of the Department (see D.I. 33 at A50). Additionally, while plaintiff asserts that profanity was used in the workplace on a regular basis, a fact that is corroborated by other witnesses, those witnesses agree that such profanity was motivated by job frustration, and did not include supervisors directing profanity at their subordinates. Nothing in the record indicates that another supervisor directed profanity at a subordinate without punishment.

Plaintiff has not proffered sufficient evidence to rebut defendant's legitimate, nondiscriminatory explanation for its decision to fire her. Even viewing all of the facts and inferences therefrom in a light most favorable to plaintiff, the evidence of record is insufficient to allow a reasonable jury to find that plaintiff's termination was motivated by retaliation. Consequently, the court will grant defendant's motion for summary judgement. (D.I. 31)

20

## V.  CONCLUSION

For the reasons stated, defendant's motion for summary judgment is granted.  An appropriate order shall issue.